**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW YORK**
**(SOUTHERN DIVISION)**

|  |  |  |
|---|---|---|
| **RUDERSDAL, EOOD,** | ) | |
| By: Erik Bresling | ) | |
| Director | ) | **Case No. 18-cv-11072** |
| Sømarksvej 17 | ) | |
| 2900 Hellerup, Denmark | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **ALL SEAS PROPERTY 2, OOD,** | ) | |
| By: Yordanka Zhekova Georgieva | ) | |
| Manager | ) | |
| 15 Seliolu Street | ) | |
| Floor 1, Apartment 2 | ) | |
| Varna Center | ) | |
| Varna, Bulgaria 9002 | ) | |
| | ) | |
| **ASSET MANAGEMENT, EAD,** | ) | |
| By: Svetlozar Kasabov | ) | |
| Tzar Ivan Assen 1 | ) | |
| Ground/Parter Floor | ) | |
| Turgovishte, Bulgaria 7700 | ) | |
| | ) | |
| **ZAHARI TOMOV,** | ) | |
| Individually  and as | ) | |
| Special Counsel to U.S. Trustee | ) | |
| In U.S. Bankruptcy Court, | ) | |
| Beli Lilii Street, No. 30 | ) | |
| Floor 3, Suite 13 | ) | |
| Varna, Bulgaria 9000 | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHILIP ROBERT HARRIS,** | ) | |
| 459 Chippendale Drive | ) | |
| Rockwall, TX 75032 | ) | |
| | ) | |
| | ) | |
| | ) | |

**AYR LOGISTICS LIMITED, INC.,**      )
By: Philip Robert Harris                         )
President and General Manager            )
459 Chippendale Drive                        )
Rockwall, TX 75032                            )
                                                          )
**ANTHONY DENNIS HARRIOTT,**      )
21 Foxcroft Drive                                )
Princeton, NJ 08540                           )
                                                          )
**GRANT CAPITAL**                           )
**INVESTMENTS, LTD.**                      )
By: Anthony D. Harriott                      )
Director                                              )
21 Foxcroft Drive                                )
Princeton, NJ 08540                           )
                                                          )
**FIRST INVESTMENT BANK, AD,**      )
By: Nedelcho Vasilev Nedelchev         )
Director                                              )
37 Dragan Tzankov Boulevard            )
Municipality Stolichna                        )
Sofia, Bulgaria 1797                           )
                                                          )
**TSEKO TODOROV MINEV,**             )
20 Dospat Str.                                     )
Fl. 4, Ap. 12                                        )
Sofia, Bulgaria 1463                           )
                                                          )
**IVAILO DIMITROV MUTAFCHIEV,**  )
26 Krushova Gradina Str.                    )
Sofia, Bulgaria 1415                           )
                                                          )
**CHAVDAR ANGELOV ANGELOV,**    )
Tourist Lodge in the                            )
Aladzha Manastir locality                    )
Primorski District                                )
Varna, Bulgaria 9007                          )
                                                          )
                                                          )
                                                          )
                                                          )

**ALL SEAS MANAGEMENT, LTD.**          )
By: Registered Agent                          )
Marshall Islands Management Company           )
Trust Company of the Marshall Islands, Inc.   )
Trust Company Complex, Suite 206              )
Aljeltake Road, Ajeltake Island               )
P.O. Box 3055                                 )
Majuro, MH 96960                              )
                                              )
**BLUE FINANCE LIMITED**              )
By: Registered Agent                          )
Marshall Islands Management Company           )
Trust Company of the Marshall Islands, Inc.   )
Trust Company Complex, Suite 206              )
Aljeltake Road, Ajeltake Island               )
P.O. Box 3055                                 )
Majuro, MH 96960                              )
                                              )
**DELYAN SLAVCHEV PEEVSKI,**          )
6 Atanas Dalchev Street                       )
Sofia, Bulgaria  1113                         )
                                              )
**NSN INVESTMENT, EOOD,**             )
By: Alexander Kirilov Georgiev                )
119 Ekzarh Yosif Street                       )
Oborishte District                            )
Sofia, Bulgaria 1527                          )
                                              )
**BULGARTABAC HOLDING, AD,**          )
By: Radoslav Vasilev Rahnev                   )
Director                                      )
62 Graf Ignatiev Street                       )
Sofia, Bulgaria 1000                          )
                                              )
**BULGARIAN NATIONAL BANK,**          )
By: Dimitar Radev                             )
Governor                                      )
1 Knyaz Alexander I Square                    )
Sofia, Bulgaria 1000                          )
                                              )
                                              )
                                              )

**STANISLAV GEORGIEV LYUTOV,** )
Individually and as BNB Conservator )
22 Anton Chehov Street )
1 Floor Apt 16 )
Sofia, Bulgaria 1113 )
Conservator of Corporate Commercial Bank )
)
**ELENA ZDRAVKOVA** )
**KOSTADINCHEV,** )
Individually and as BNB Conservator )
District Lager )
Building 12, Entrance B, Floor 1 Apt. 1 )
Sofia, Bulgaria 1612 )
Conservator of Corporate Commercial Bank )
)
**TABAK MARKET, AD,** )
By: Victor Nikolaev Nalbantov )
Director )
161 Knyaz Boris I Street )
Vazrajdane District )
Sofia, Bulgaria 1202 )
)
**CIBOLE SERVICES INCORPORATED,** )
**BULGARIA, EOOD,** )
By: Gergana Kirilova Angelova )
Manager )
11 Antim I Street )
Vazrajdane District )
Sofia, Bulgaria 1303 )
)
**ASTERIA BG, EOOD** )
**a/k/a DROSLIAN BULGARIA, EOOD,** )
By: Borislav Ivanov Borisov )
Manager )
10 Doyran Street )
Krasno Selo District )
Sofia, Bulgaria 1700 )
)
)
)
)
)

**VILI VIST, EAD,**                         )
By: Nikolai Milev Milev                     )
Director                                    )
47 Industrialna Street                      )
Burgas, Bulgaria 8000                       )
                                            )
**PROMISHLENO STROITELSTVO**                )
**HOLDING, EAD,**                           )
By: Kamen Stoyanov Kanev                    )
Director                                    )
1 Zavodska Street                           )
Village of Yana                             )
Sofia, Bulgaria 1895                        )
                                            )
**THE BANK OF NEW YORK**                    )
**MELLON CORPORATION,**                     )
One Wall Street                             )
New York, New York 10286                    )
By: Registered Agent                        )
New York State Secretary of State           )
New York Dept. of State                     )
One Commerce Plaza                          )
99 Washington Avenue                        )
Albany, NY 12231                            )
                                            )
**EATON VANCE STRUCTURED**                  )
**EMERGING MARKETS**                        )
**EQUITY FUND, LLC,**                       )
By: Eaton Vance Management                  )
New York State Secretary of State           )
New York Dept. of State                     )
One Commerce Plaza                          )
99 Washington Avenue                        )
Albany, NY 12231                            )
                                            )
**THE BANK FOR FOREIGN TRADE OF**)
**THE RUSSIAN FEDERATION,**                 )
**a/k/a VTB BANK**                          )
By: Anton G. Siluanov                       )
Chairman of the Supervisory Council         )
Or                                          )
By: Andre L. Kostin                         )
President and Chairman of VTB Bank          )

| | |
|---|---|
| Registered Address: | **)** |
| 29 Bolshaya Morskaya Street | **)** |
| St. Petersburg, Russia 190000, | **)** |
| | **)** |
| **Defendants.** | **)** |

## COMPLAINT

Plaintiffs RUDERSDAL, EOOD (hereinafter "Rudersdal"), ALL SEAS PROPERTY 2, OOD (hereinafter "ASP2"), ASSET MANAGEMENT, EAD (hereinafter "Asset Management"), and ZAHARI TOMOV (hereinafter "Tomov" or "Tomov-Special Counsel"), by and through their undersigned counsel, based on both their direct claims and their purchase and assignment of claims arising out of defendant AYR LOGISTICS LIMITED, INC.'s (hereinafter "Ayr") (a U.S. entity) U.S. Bankruptcy proceeding in Dallas, Texas (fashioned as "In re: Ayr Logistics Limited Inc.," Case No. 14-34940-bjh-7) assigned to plaintiffs by the U.S. Trustee, as and for their Complaint against the above-named Defendants, allege as follows:

### NATURE OF CLAIM

1. The U.S. bankruptcy asset of approximately $65 million brought together the defendants in varying acts of tortious and illegal conduct for self-dealing, profit and ancillary benefit, defrauding plaintiffs of their claims to the asset as investors and creditors.  It all began when Ayr acquired the Bulgarian Silver Beach Project (hereinafter "SBP"), a development project of 1048 hectares expanding the town of Balchik, Bulgaria, from APD2, in 2009 for €89 million which initially included the assumption of €88 million in FIB loans with performance in and through New York City. The sale of the Ayr SBP real property created the $65 million asset through its wholly own subsidiary Ayr Property Development, AD (hereinafter "APD").  The conspiratorial course of conduct was intentionally designed by defendants, individually and in two identifiable groups,  to obscure their tortious conduct

6

and demonstrate a new species of concerted global scheming by gaining access to and profit in privatization mechanisms.

2. Plaintiffs seek to vindicate these wrongdoings in New York because this venue was integral and pivotal to defendants' acts and harm to plaintiffs; in addition, in various contracts between the parties they agreed to subject themselves to venue, personal, and subject matter jurisdiction in New York. Plaintiffs seek recovery in claims sounding in civil Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), civil conspiracy, breach of contract, tortious interference with contracts, breach of fiduciary duty, aiding and abetting of fiduciary duty, unjust enrichment, fraudulent concealment, fraud, aiding and abetting fraud, negligent misrepresentation, negligence, conversion, and fraudulent transfer of bankruptcy assets.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 18. U.S.C. § 1964(c) and has supplemental jurisdiction over the state common law claims pursuant to 28 U.S.C. § 1367.

4. This Court has personal jurisdiction over Defendants Philip Robert Harris (hereinafter "Harris"), Anthony Dennis Harriott (hereinafter "Harriott"), and Chavdar Angelov Angelov (hereinafter "Angelov"), and Ayr both in its own capacity and against its executive officers and shareholders, pursuant to N.Y. CPLR §§ 301 and 302(a)(1)–(3). Not only do Harris, Harriott, Angelov and Ayr transact substantial business in New York State, the causes of action asserted in this lawsuit arise directly out of Harris, Harriott, and Angelov's tortious acts both within New York and outside of New York partly on behalf of Ayr which caused injury to persons and property within New York. Additionally, the agreements upon which this claim in part arises specifically provide for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

5. This Court has personal jurisdiction over First Investment Bank (hereinafter "FIB"), on its own and against its executive officers and shareholders, pursuant to N.Y. CPLR § 302(a)(3) because FIB was a co-conspirator with, *inter alia,* Harris, Harriott, and Angelov to divest plaintiffs of their investment in the U.S. company, Ayr, through its Bulgarian-registered subsidiary, APD. FIB's acts, on its own and through its shareholders, had a direct effect in the United States, and FIB knew or should have known that its acts would have an effect in the United States.  Specifically, Defendant FIB, by its acts, either expected or should have reasonably expected to have a consequence in New York and FIB derived substantial revenue from interstate and/or international commerce arising from those acts. Additionally, the agreements upon which FIB's acts arise in part specifically provides for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York. FIB may be served pursuant to the requirements of the Hague Convention on Service of Process.

6. The Court has personal jurisdiction over all other defendants pursuant to N.Y. CPLR § 302(a)(3). The causes of action asserted in this lawsuit arise directly out of Harris, Harriott and Angelov's New York acts, and the acts committed by Harris, Harriott and Angelov as co-conspirators with all other defendants, as well as by other participants in the conspiracy and/or enterprise, are imputable to all other defendants in this case.  Defendants, by their acts, either expected or should have reasonably expected to have a consequence in New York and they derived substantial revenue from interstate and/or international commerce. All foreign defendants may be served pursuant to the requirements of the Hague Convention on Service of Process.

7. In the alternative, this Court has personal jurisdiction over the foreign defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

8. Defendant Bulgarian National Bank (hereinafter "BNB") is the central bank of Bulgarian, organized under the laws of Bulgarian and owned by the Republic of Bulgaria. Therefore, this Court has personal jurisdiction over BNB pursuant to 28 U.S.C. § 1602(a)(2) because the Republic of Bulgaria through BNB committed acts outside the territory of the United States in connection with its commercial activity and those acts caused a direct effect in the United States. BNB may be served pursuant to the requirements of the Hague Convention on Service of Process.

9. Defendant The Bank for Foreign Trade of the Russian Federation (hereinafter "VTB") is an investment bank registered in St. Petersburg, Russia. VTB Bank wholly owns and controls VTB Capital, AD, and wholly owns and controls Russian Commercial Bank with a branch in the Republic of Cyprus. The Russian Federation is a majority shareholder of VTB. Therefore, this Court has personal jurisdiction over VTB pursuant to 28 U.S.C. § 1602(a)(2) because the Russian Federation through VTB committed acts outside the territory of the United States in connection with its commercial activity and those acts caused a direct effect in the United States. VTB may be served pursuant to the requirements of the Hague Convention on Service of Process.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3).

11. Venue is also proper under 18 U.S.C. § 1965(b). The ends of justice require that those defendants who reside in other jurisdictions and countries be brought before this Court in this civil action under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. § 1962(a)-(c) to account for their wrongful acts.

## THE PARTIES

**Plaintiffs**

12. Plaintiff Rudersdal, EOOD (hereinafter "Rudersdal") is a company incorporated in Bulgaria with its principal place of business at Sofia, Bulgaria. Rudersdal is a wholly-owned subsidiary of Rudersdal, A/S, a company incorporated in Denmark with its principal place of business in Birkerod, Denmark. Rudersdal consists of shareholder/investors from the United Kingdom and Denmark who invested million of Euros in the SBP. Rudersdal is also an assignee of the claims of the Trustee in the Ayr U.S. bankruptcy proceedings in Dallas, Texas and a creditor of Ayr in the amount of approximately $14,908,580.20 the underlying agreements of which specifically provides for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

13. Plaintiff All Seas Property 2, OOD  (hereinafter "All Sea" or "ASP2") is a company incorporated in Bulgaria with its principal place of business in Varna, Bulgaria, and an assignee of the claims of the Trustee in the Ayr bankruptcy proceedings in Dallas, Texas and a creditor of Ayr in the amount of approximately $37,897,480.61 the underlying agreements of which specifically provides for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

14. Plaintiff Asset Management, EAD (hereinafter "Asset Management") is a company incorporated in Bulgaria with its principal place of business in Targovishte, Bulgaria, and an assignee of the claims of the Trustee in the Ayr bankruptcy proceedings in Dallas, Texas and a creditor of Ayr in the amount of approximately $1,938,115.43 the underlying agreements of which specifically provides for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

15. Plaintiff Zahari Tomov (hereinafter "Tomov") is a citizen of Bulgaria, and an assignee of the claims of the Trustee in the Ayr bankruptcy proceedings in Dallas, Texas and a creditor of Ayr in the amount of approximately $10 million arising from Ayr and Harris' breach of

contract and failure to pay legal fees for completed work, the underlying agreement of which provides for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

16. Plaintiff Zahari Tomov (hereinafter "Tomov-Special Counsel") is a citizen of Bulgaria, a U.S. Bankruptcy Court appointed Special Counsel and an assignee and owner of the claims of the Trustee in the Ayr bankruptcy proceedings in Dallas, Texas, claims of which provide venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York.

**Defendants**

17. Upon information and belief, Defendant Philip Robert Harris (hereinafter "Harris") is a citizen of the United States and operates and is President and General Manager of Ayr, a company incorporated on or about 1995 majority-owned, upon information and belief, by Harris, and having offices in Texas, as well as other Ayr subsidiary companies. Ayr coordinated overseas business projects including as a joint partner in various international manufacturing and infrastructure projects. He also served as the sole Executive Director of Ayr's subsidiary Ayr Property Development, AD (hereinafter "APD").

18. Upon information and belief, Defendant Ayr Logistics Limited, Inc. (hereinafter "Ayr") is a company organized under the laws of the United States, incorporated in Texas with its principal place of business in Texas. Ayr is subject to bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas (Dallas) (fashioned as "In re: Ayr Logistics Limited Inc.," Case No. 14-34940-bjh-7), and, upon information and belief, Ayr is majority-owned by Harris with Harris as its President and General Manager. The corporate veil between Ayr and Harris should be pierced to hold Harris personally liable for Ayr's wrongdoings as Harris treated Ayr as an alter ego at all times relevant herein.

19. Upon information and belief, Defendant Anthony Dennis Harriott (hereinafter "Harriott") is a permanent resident of the United States, is a citizen of Canada and the United Kingdom, a close business associate of Harris, owns Grant Capital Investments Limited incorporated in Malta, and is the Director of Wallace Companies, Inc., incorporated and with offices in Texas.

20. Upon information and belief, Grant Capital Investments Limited (hereinafter "Grant Capital") is a company organized under the laws of the Malta, with its principal place of business in Malta, and, upon information and belief, Grant Capital is owned by Harriott. The corporate veil between Grant Capital and Harriott should be pierced to hold Harriott personally liable for Grant Capital's wrongdoings as Harriott treated Grant Capital Investors as an alter ego at all times relevant herein.

21. Upon information and belief, Defendant First Investment Bank, AD (hereinafter "FIB") is a bank organized under the laws of the Republic of Bulgaria, operating therein and in the United States, the Republic of Cyprus, the Republic of Bulgaria, and the European Union (hereinafter "EU"). FIB is registered and operates in the United States pursuant to its Foreign Account Tax Compliance Act (hereinafter "FATCA") registration. FIB is licensed and transacts business in the United States pursuant to its Diner's Club franchise agreement. FIB conducted business in the United States through a Mortgage Receivable Sale and Purchase Agreement executed in the United States. In addition, at least two United States entities are minority shareholders in FIB: Defendants The Bank of New York Mellon Corporation in New York, N.Y., and Eaton Vance Structured Emerging Markets in Boston, M.A.

22. Upon information and belief, Defendant Tseko Todorov Minev (hereinafter "Minev") is a citizen of the Republic of Bulgaria and a majority shareholder of FIB. The FIB corporate

veil should be pierced to hold Minev personally liable for FIB's wrongdoings because Minev completely controlled FIB and failed to treat it as a separate business identity, and Minev used his complete control of FIB to commit fraud and unjust acts against the plaintiffs, and personally profited thereby.

23. Upon information and belief, Defendant Ivailo Dimitrov Mutafchiev (hereinafter "Mutafchiev") is a citizen of the Republic of Bulgaria and a majority shareholder of FIB. The FIB corporate veil should be pierced to hold Mutafchiev personally liable for FIB's wrongdoings because Mutafchiev completely controlled FIB and failed to treat it as a separate business identity, and Mutafchiev used his complete control of FIB to commit fraud and unjust acts against the plaintiffs, and personally profited thereby.

24. Upon information and belief, Defendant Chavdar Angelov Angelov (hereinafter "Angelov") is a citizen of the Republic of Bulgaria and a permanent resident of the United States, and a close business associate of Harris and Harriott. Upon information and belief, Angelov maintains a residence in the state of New York.

25. Upon information and belief, Defendant All Seas Management, Ltd. (hereinafter "All Seas Management") is a company organized under the laws of the Marshall Islands with its principal place of business in Malta, and, upon information and belief, All Seas Management is owned by Angelov. The corporate veil between All Seas Management and Angelov should be pierced to hold Angelov personally liable for All Seas Management's wrongdoings as Angelov treated All Seas Management as an alter ego at all times relevant herein.

26. Upon information and belief, Defendant Blue Finance Limited (hereinafter "Blue Finance") is a company organized under the laws of the Marshall Islands, with its principal place of business in Malta, and, upon information and belief, Blue Finance is owned by

Angelov. The corporate veil between Blue Finance and Angelov should be pierced to hold Angelov personally liable for Blue Finance's wrongdoings as Angelov treated Blue Finance as an alter ego at all times relevant herein.

27. Upon information and belief, Defendant Delyan Slavchev Peevski (hereinafter "Peevski") is a citizen of the Republic of Bulgaria and politician and a key figure in the Movement for Rights and Freedoms political party (hereinafter "MRF") in the Republic of Bulgaria.

28. Upon information and belief, Defendant NSN Investment, EOOD (hereinafter "NSN"), is a corporation organized under the laws of the Republic of Bulgaria, operating therein and in the Middle East, Republic of Turkey, and European Union, and is wholly owned by Peevski.

29. Upon information and belief, Defendant Bulgartabac Holding, AD (hereinafter "Bulgartabac or BTH") is a corporation organized under the laws of the Republic of Bulgarian. Bulgartabac is the Bulgarian monopoly which holds 22 subsidiaries in a world wide tobacco manufacturing and distribution business. Bulgartabac routinely transacts business in the United States.  Bulgartabac has been subject to U.S. jurisdiction in multiple previous lawsuits in various U.S. jurisdictions and state and federal courts. In addition, Mellon Bank, and Eaton Vance are all United States entity minority shareholders of Bulgartabac. Bulgartabac additionally  maintains operations and conducts business in the United States, the Middle East, the Republic of Turkey, the Arab Republic of Egypt, Republic of Indonesia, EU, Federative Republic of Brazil, the Republic of Guatemala, the Republic of Kenya, the Republic of Zimbabwe, the Republic of Uganda, the Republic of Malawi, the Argentine Republic, India, the Republic of Belarus, and the Russian Federation.

30. Upon information and belief, Defendant Bulgarian National Bank (hereinafter "BNB") is the central bank of the Republic of Bulgaria responsible for, *inter alia*, issuing banknotes and coins, overseeing and regulating the banking sector (requires and holds private bank reserves for banks with credit issues), and keeping the Republic of Bulgaria reserves.  It is the sole owner of the Bulgarian Mint and routinely transacts business in U.S. dollar currency, including, through the Society for Worldwide Interbank Financial Telecommunication (hereinafter "SWIFT").

31. Upon information and belief, Defendant Stanislav Georgiev Lyutov (hereinafter "Lyutov" or "BNB Conservator") is a citizen of Bulgaria, appointed by BNB  as  conservator over the BNB takeover of CCB.

32. Upon information and belief, Defendant Elena Zdravkova Kostadinchev (hereinafter "Kostadinchev" or "BNB Conservator") is a citizen of Bulgaria, appointed by BNB as conservator over the BNB takeover of CCB.

33. Upon information and belief, Defendant Tabak Market, AD (hereinafter "Tabak Market"), is a corporation created in 2006 and organized under the laws of the Republic of Bulgaria, operating therein and in the Middle East, Republic of Turkey, EU, and is a wholly owned subsidiary of Bulgartabac Holding.  It distributes primarily tobacco and tobacco products under the brand name Lafka in conjunction with Bulgartabac cigarette products in Bulgaria. Tabak Market obtained CCB loans to expand its infrastructure.

34. Upon information and belief, Defendant Cibole Services Incorporated Bulgaria, EOOD (hereinafter "Cibole") is a corporation organized under the laws of the Republic of Bulgaria, operating therein and in the Middle East, the Republic of Turkey, EU, and the Republic of Panama, and is a wholly owned subsidiary of Cibole Services Incorporated, a Panama-registered entity. Cibole was created in 2012 to participate in the privatization deal

of the Bulgarian Government owned entity Technoexportstroy, AD, and to participate in Russia Federation Gazprom's southern pipeline project consortium sanctioned by the EU and the United States. Technoexportstroy, AD engaged in construction in 20 countries: Europe, Middle East, Africa, well as for international financial and investment institutions such as the World Bank and the Arab Fund. Technoexportstroy has branches and affiliated firms, and is operating in the Republic of Bulgaria, Federal Republic of Germany, Russian Federation, The State of Libya, Federal Republic of Nigeria, Kingdom of Morocco, Republic of Iraq, Republic of Zimbabwe, Republic of Yemen and Syrian Arab Republic. These deals were funded by a CCB bank loan.

35. Upon information and belief, Defendant Asteria BG, EOOD a/k/a Droslian Bulgaria EOOD (hereinafter "Droslian"), is a corporation created in 2013, organized under the laws of the Republic of Bulgaria, operating therein and in the Middle East, the Republic of Turkey, and the EU, and is a wholly owned subsidiary of Droslian Limited, a Belize-registered entity. Droslian Limited purchased 100 % of Baranco EOOD, which Bulgarian company is owner on 49% of Yurii Gagarin AD. This deal was a funding by a Droslian Bulgaria CCB bank loan.

36. Upon information and belief, Defendant Vili Vist, EAD, (hereinafter "Vili Vist") is a corporation created in 2013 and organized under the laws of the Republic of Bulgaria and controlled by MRF. It was established to buy the already privatized construction company Transstroy Burgas, AD which engages in the construction and renovation of ports, airports, railroads, roads, other transport infrastructure, reinforcing facilities, hydro technical and irrigation infrastructure, industrial and residential buildings, electrical supply, and pipeline networks and to participate in Russia Federation Gazprom's southern pipeline project

consortium sanctioned by the EU and the United States.  These deals were funded by a CCB bank loan.

37. Upon information and belief, Defendant Promishleno Stroitelstvo Holding, EAD (hereinafter "Promishleno Stroitelstvo") is a corporation organized under the laws of the Republic of Bulgaria, created on 1952. Promishleno Stroitelstvo Holding provides industrial construction services. In 2011, based on a privatization deal with the Bulgarian Government, Promishleno Stroitelstvo was privatized by Vodstroi 98, AD, a Bulgarian company operating and controlled by MRF.  In August 2013,  Promishleno Stroitelstvo was the primary Bulgarian partner in the Russian Federation Gazprom's southern pipeline project consortium sanctioned by the EU and the United States. These deals were funded by a CCB bank loan.

38. Upon information and belief, Defendant The Bank of New York Mellon Corporation (hereinafter "Mellon Bank") is a bank organized under the laws of the United States and operating therein, incorporated in Delaware, domesticated in New York with its principal place of business in New York City, N.Y. Mellon Bank is a minority shareholder of FIB, Bulgartabac Holding, AD, and Commercial Corporate Bank, AD (hereinafter "CCB"), a Bulgarian bank.

39. Upon information and belief, Defendant Eaton Vance Structured Emerging Markets, Inc. (hereinafter "Eaton Vance") is a corporation organized under the laws of the United States and operating therein, with its principal place of business in Boston, Massachusetts and with operations in New York City, New York. Upon information and belief, Eaton Vance comes under the management of Eaton Vance Management in New York, New York. Eaton Vance is a minority shareholder of FIB, Bulgartabac Holding, and CCB.

40. Upon information and belief, Defendant The Bank for Foreign Trade of the Russian Federation (hereinafter "VTB") is a Russian Federation investment bank organized under the laws thereunder and registered in St. Petersburg, Russia in 1990, operating therein and in the United States, Commonwealth of Independent States (hereinafter "CIS"), Middle East, Asia, Africa and the EU. VTB is a 10% shareholder in CCB.

## FACTS RELEVANT TO ALL COUNTS

41. The Ayr Silver Beach construction development project (hereinafter "SBP") was to be a $542,976,244 (€404,000,000) expansion of the town of Balchik, Bulgaria on the Black Sea with a new multi-use and multi-purpose 259-acre neighborhood consisting of 2480 mixed housing, retirement community, hospital, shopping mall complex, parking, waterfront fishing village, cultural center, amphitheater, marina, religious facilities, solar power park, water greenery complex, all utilities, including, water purification and sewer treatment. On or about September 2008, zoning had been approved as well as design and construction contracts executed.

42. Upon information and belief, in or about July 2007 Angelov, through his company, purchased the SBP land which was to become the SBP, thereby commencing the orchestrated mechanism which resulted in the fraudulent taking of approximately $65,209,976 (97,500,000 BGN), the proceeds of the eventual sale of the SBP land (hereinafter "the Funds"). Angelov, through his company, procured two FIB construction loans in 2007 $32,261,224(€24,320,000) and 2008 $3,316,326(€2,500,000) collateralizing the SBP land.

43. Thereafter, Harris and Angelov entered into a contract on September 15, 2009, which provided in pertinent part that Angelov's company would provide the licensing, in-country support, operational support, and marketing for the SBP, and that Ayr committed to provide

18

the financing as well as design, engineering, construction, and construction management of the SBP (See Exhibit A September 15, 2009 contract attached hereto and incorporated herein by reference).

44. The September 15, 2009, agreement further bound the parties to English as the operative language (See Article 3.4 of Exhibit A); and "to abide by the United States Law prohibiting the bribing, favor-giving, or any other financial inducement provided to a foreign government official or any other party for the purpose of obtaining business within the foreign nation." (See Article 6 of Exhibit A).

45. On June 4, 2010, Ayr, APD and FIB enter into an agreement whereby Ayr assumed the two Angelov previously procured FIB SBP construction loans (See Exhibit B attached hereto and incorporated by reference herein).

46. Harris, Angelov and FIB, falsely, maliciously, and with intent to damage plaintiffs and disrupt plaintiffs' benefit of the bargain, used the September 15, 2009 and the June 4, 2010 agreements as a basis to divert funds from the two pre-existing FIB loans in the SBP, for which the SBP land was collateral.

47. Harris and Angelov thus breached the terms of the September 15, 2009 and the June 4, 2010 agreements with the participation of FIB when they failed to invest the two pre-existing FIB SBP construction loans funds into the SBP and instead transferred said funds to Bank of Valletta in Malta to purchase Mexican bonds for their own economic gain. The recipient of the Malta transfer was Angelov's company All Seas Management, a company registered in the Marshall Islands. Angelov and All Seas Management in collusion with Harriott then transferred the funds converting them to U.S. dollars to Grant Capital, a company registered in Malta, with offices in the United States and conducting business in the United States, of which Harriott was the director and knowing these funds were illicitly

diverted because he was the orchestrator of the Mexican bond scheme, purchased in U.S. dollars and ultimately are titled in his name. Harriot thereby was the alter ego of Grant Capital by using Grant Capital as a mere instrumentality to further his own personal activities and gain, and used the corporation to perpetrate a fraud on the plaintiffs. Angelov also was the alter ego of All Seas Management in that he used All Seas Management as a mere instrumentality to further his own personal activities and gain, and used the corporation to perpetrate a fraud on the plaintiffs. These activities were not a part of the contract and violated the terms of the September 15, 2009 and the June 4, 2010 agreements as well as  the terms of the two FIB SBP loans.

48. As a direct, proximate, and foreseeable result of their breach, plaintiffs suffered damages in the ultimate loss of the Funds to defendants' scheme.

49. Angelov, Harris and FIB knew their actions breached the contracts, were fraudulent, self-serving, done in bad faith, and purposefully designed to ultimately defraud the plaintiffs and violate the law which recent became known to plaintiffs.

50. In furtherance of these bad acts, Harris, Angelov, and FIB on December 29, 2009 entered into a third FIB SBP construction loan, which funds were used to pay the interest payments on the previous two FIB SBP construction loans of 2007 and 2008 (See Exhibit C attached hereto and incorporated by reference herein). This action was designed to hide from Bulgarian bank regulators the illegality of the purposeful diversion of funds from the 2007 and 2008 loans.

51. The diversion of the Funds from the SBP to Malta by Harris, Angelov, and FIB was made possible only with the necessary participation by FIB as FIB fraudulently authorized the release of the construction loan funds to Malta.  These loan funds could not be transferred to Malta unless the bank specifically approved the transfers.  FIB authorized and enabled

the proceeds by way of FIB-authorized and -issued payment orders sent through the SWIFT banking communications system on the following dates: November 26, 2007; November 29, 2007; November 30, 2007; December 3, 2007; October 8, 2008; December 31, 2009; and January 20, 2010.

52. Ayr failed to fund SBP, which ultimately compelled Harris to file for bankruptcy for Ayr's subsidiary, ADP, in Bulgaria in February, 2011, through which the SBP property was sold on December 15, 2012 for $65,209,976 (97,500,000 BGN) ("the Funds") and the Funds from that sale on January 14, 2013 ($66,506,142) (97,500,000 BGN) were placed in ADP's interest-bearing bank accounts in CCB. The Funds in the CCB accounts were an Ayr asset which the defendants, *inter alia,* wrongfully and deceitfully divested from the plaintiffs through conspiracy.

53. Upon information and belief, two groups participated in a coordinated conspiracy which resulted in the theft of the Funds to which the Ayr Logistics creditors in the U.S Bankruptcy proceeding in Dallas, Texas are entitled to as claimants.

54. Upon information and belief, the First Group consisted of Ayr, Harris, Harriott, Angelov, and FIB, and FIB's shareholders Minev, Mutafchiev, Mellon Bank, and Eaton Vance (hereinafter "First Group").  These defendants conspired to create fraudulent loans against the Ayr Silver Beach property through Ayr's wholly owned Bulgarian subsidiary, APD, which ultimately enabled Harris, Harriott, and Angelov in conjunction with FIB and FIB shareholders to abscond with the money from the SBP construction loans for personal gain in Mexican bonds and opened the door for FIB to gain control and become the title owner over the Funds and steal them for its own benefit and that of other defendants in the Second Group, Peevski, BNB, VTB, NSN, BT, Lyutov, Kostadinchev, Tabak Market, Cibole, Asteria, Vili Vist, and Promishleno Stroitelstvo Holding (hereinafter the "Second Group").

55. From October 2009 through December 2014, Harris, Harriott, Angelov, and FIB devised a scheme, colluded, and acted intentionally and concertedly to disguise the money transfers to All Seas Management Ltd., an entity owned and controlled solely by Chavdar Angelov and Blue Finance Limited, an entity owned and controlled solely by Chavdar Angelov, both Marshall Island registered entities, to look like legitimate investments in a large property development project by Ayr, the Silver Beach project.  When FIB failed through court action to become a creditor in APD's bankruptcy, on October 10, 2014 Harris fraudulently filed a no asset bankruptcy proceedings in the U.S. by virtue of Ayr's position as parent company of APD and did not disclose the Funds held in the CCB accounts, thereby allowing FIB to circumvent the automatic stay on all of Ayr's assets and effectuate the stealing of the Silver Beach land sale funds for FIB and others benefit.

56. Upon information and belief, the second group consisted of Ayr, Harris, FIB (along with its minority shareholders: The Bank of New York Mellon, and Eaton Vance Structured Emerging Markets, and majority shareholders: Minev and Mutafchiev), Peevski, BNB, Lyutov, Kostadinchev, Tabak Market, Cibole, Droslian, Vili Vist, Promishleno Stroitelstvo Holding, and VTB (hereinafter "the Second Group").  The Second Group engaged in fraud, conspiracy and coordinated actions to steal the Funds held in Ayr's subsidiary CCB bank accounts in favor of FIB and Peevski and the call option participants: VTB; EFV International Financial Ventures Ltd (hereinafter "EFV"); Livero Establishment (hereinafter "Livero"); TGI Middle East FZE (hereinafter "TGI"); Salam Qader Faraj (hereinafter "Faraj"); Bulgartabac Holding; and Bulgartabac Holding's subsidiaries.

57. EFV International Financial Ventures Ltd, (hereinafter "EFV") is a company registered in the British Virgin Islands (hereinafter "BVI"). Upon information and belief, EFV is owned by Tsvetan Radoev Vassilev (hereinafter "Vassilev").

58. EFV financed two call options: the Bulgartabac Holding, AD and Vivacom, AD (the largest mobile telecommunication company in Bulgaria).   EFV was established by two shareholders of CCB: VTB and Vassilev (the majority shareholder and Chairman of the Supervisory Board of CCB) for the sole purpose of obtaining CCB's bank loans to finance the two call options. The CCB call option loans were in the amount of €70 M representing 79.83% of Bulgartabac and in the amount of €50M representing 33% of Vivacom.

59. Upon information and belief, TGI Middle East FZE (hereinafter "TGI"), is a company registered in Dubai, United Arab Emirates.   TGI gained its interest in the Bulgartabac Holding call option by purchasing Livero's, a registered foundation in Liechtenstein, Bulgartabac Holding call option rights for €45 million. Peevski's mother, Irena Krusteva, is the owner of Livero.

60. Vassilev's EFV, based on a CCB loan between EFV and Livero, was a party to the Bulgartabac Holding call option with VTB.   TGI bought Livero's EFV debt and as part of that debt extinguishment became the sole owner of Livero.   Based on this transaction, VTB, based on the call options provisions and Peevski's instructions through Livero, transferred BT Invest GmbH, an Austrian registered company (owner of the privatized share of BTH) which held 79.83% of BTH, to Livero.

61. Upon information and belief, VTB conspired with these parties to effectuate the privatization of BTH in order to receive and distribute commissions based on the Funds, in which it had no ownership interest.

62. Upon Information and belief, Faraj, a citizen of the Republic of Iraq, personally and through his company, Tobacco EMEA Trade Limited, registered in Dubai, UAE, participated in the payment structure of VTB's BTH call option exercised in November 2014 in favour of TGI. Upon information and belief, Faraj personally and through his U.S.

company, Caledon Invest Inc, registered in the State Delaware, between 2000-2011, engaged in the sale of and controlled the contraband channels of Bulgartabac cigarettes in Middle East, Iran and Syria in violation of U.N., U.S. and EU sanctions resulting in financing of ISIS. Based on the exercise of VTB's BTH call option, Faraj was enabled to take and did take full control over the distribution channels of Bulgartabac cigarettes in the Middle East markets.

63. Upon information and belief, the end beneficiaries of these coordinated efforts were all the defendants and EFV, Livero, TGI and Faraj. They participated in the conspiracy for, *inter alia*, personal gain, corporate consolidation, access to contraband cigarette channels in the Middle East, and political influence.

64. BTH, albeit a recently publicly traded company, once privatized its value on the stock market is in direct relation to whether it owned the entire cycle of production and manufacturing of cigarettes, namely, whether it owned Tabak Market and Yurii Gagarin, which it did debt-free.

**Theft of The Funds**

65. On June 20, 2014, BNB took over the Corporate Commercial Bank AD (CCB) in Sofia, Bulgaria.

66. On June 25, 2014 BNB appointed to CCB two Conservators, Lyutov and Kosdadinchev.

67. Upon information and belief, in turn, FIB, BNB, BNB's Conservators, and Peevski colluded so that the defendants would benefit from FIB's scheme with Harris, Harriott, and Angelov (the First Group). Peevski, BNB and the BNB Conservators made it possible for FIB to use the Funds in APD's accounts by granting FIB written authorization through a "Payment Order" dated October 24, 2014. FIB was therefore able, between November 13, 2014 and December 1, 2014, to transfer the Funds over to the five companies TM, Cibole,

Droslian, Vili Vist, and Promishleno Stroitelstvo (hereinafter collectively "Five Companies") whose debts to CCB were paid and discharged with the Funds.

68. On November 17, 2014, APD's Bankruptcy Trustee Martin Apostolov declared to the Bulgarian ADP bankruptcy judge that the Funds were in the four APD CCB banks accounts.  This was additionally confirmed by the CCB bank statement for these accounts dated November 10 and 13, 2014, reflecting a non-interest bearing balance of $65,576,106, respectively.

69. Upon information and belief, on November 18, 2014, APD's Bankruptcy Trustee Martin Apostolov, under threat and duress from FIB, the confirmed "Payment Order  on October 24, 2014" that FIB submitted to CBB under his falsified signature.

70. On or about July 11, 2014, the APD bankruptcy judge issued an order to the BNB conservators ordering them "to open a new special bank account on behalf of the bankrupt debtor with Bulgarian Development Bank (BDB) and cause a transfer of the money currently on deposit in the special account with CCB to such new bank account."

71. In anticipation of BNB's public statement that it would resume normal banking relations on July 21, 2014, the Bulgarian court issued this order in advance of the July 21 date so that the Funds, which was the largest deposit in the country, could be further protected at a non-distressed banking institution namely, Bulgarian Development Bank, a government financial institution.

72. As of July 2014 the Funds were held in a Bulgarian bankruptcy bank account in CCB subject to the above court order. To move those funds or change the Funds' status or ownership, BNB and the BNB CCB conservators first needed court authority which they did not obtain, and they knew that all matters arising through the APD CCB accounts had to proceed through the court. BNB and BNB CCB conservators, by October 22, 2014, knew

or should have known that Ayr had filed bankruptcy on October 10, 2014 and that the automatic stay of any potential Ayr assets was in place precluding moving of the Funds, an Ayr asset. And that is further the case because APD and Harris's attorney in the APD bankruptcy proceeding, Nakova, advised the committee of creditors and APD and the trustee that Ayr had filed for bankruptcy in the U.S. in conjunction with cross-communication with the U.S. Ayr bankruptcy trustee.

73. Long after the fact, the creditors learned that FIB used a letter dated October 24, 2014, which erroneously and deceitfully recognized FIB as the sole signatory to APD's accounts with CCB to achieve access to the Funds to pay off the CCB debts of the Five Companies.

74. After the CCB debts of the Five Companies were paid off with the Funds, the balance in APD's account should have been $11,094,780 (BGN 17,307,857).

75. Upon information and belief, on or after December 1, 2014, the defendants absconded with the remaining balance of $11,094,780 (BGN 17,307,857) and, in acquiescence and pursuant to the joint conspiracy, BNB and the BNB CCB Conservators without justification or right closed the ADP bank accounts at CCB, and with the closing of the Ayr owned ADP CCB bank accounts the final balance of $11,094,780 (BGN 17,307,857) disappeared and has not been located to date.  All inquiries as to the location of the Funds to the First and Second Groups have gone unanswered with total silence and unresponsiveness to both the Bulgarian trustee and U.S. Trustee, as well as Plaintiffs as Ayr's creditors.

76. Upon information and belief, BNB and/or the BNB CCB Conservators fraudulently accepted FIB as the new title holder to the Funds in CCB as well as approved the CCB debt extinguishment of the Five Companies.

77. Neither FIB, the BNB Conservators overseeing CCB, nor the Five Companies which owed debts to CCB, had the legal authority or power to dispose of any of the Funds that were

being held in the CCB accounts. All of the defendants wrongly and without authorization stole and distributed the Funds for their sole personal benefit and gains, breaching their fiduciary duties to Ayr and the plaintiffs as ultimate beneficiaries thereof and fraudulently failing to disclose material facts and failing to act to protect the Funds.

78. As of October 10, 2014, based on the automatic stay in the Ayr U.S. Bankruptcy proceedings, the Funds were and are due and payable to the Ayr bankruptcy creditors, the plaintiffs in this matter.

79. As a result of the seizure of the Funds in APD's bank accounts with CCB, Ayr's Estate and its creditors, the plaintiffs: Rudersdal;  All Seas Property 2;  Asset Management; and Zahari Tomov in his individual capacity and in his capacity as Special Counsel in the U.S. Bankruptcy proceedings, suffered loss of funds in the amount no less than approximately $65,576,106 (BGN 102,966,946).

**Ayr was the owner of the Funds, $65,576,106, held in the CCB Accounts.**

80. Harris, through Ayr and Ayr's various subsidiaries, sought to develop SBP, which was the expansion of the town of Balchik, Bulgaria on the Black Sea.

81. To that end, Harris through Ayr created Ayr Property Development, AD, its wholly owned Bulgarian-subsidiary which held the property for the SBP. Bulgaria law at the time required a non-European entity to have a domestic subsidiary to directly own land in Bulgaria. Ayr created APD as a shell subsidiary solely for that purpose; APD had no office, no employees, no business activities of its own, not even its own website or email address. All Harris's activities, liabilities, responsibilities, undertakings, earnings, dealings, negotiations, agreements, and any and all operations in pursuit of SBP are solely imputable to Ayr in the United States, where Ayr is incorporated, situated, and operates in Texas and New York.  Ayr fully own APD and performed all of its managerial and financial decisions

from the United States of America. Moreover, Harris treated both APD and Ayr as mere instrumentalities in furtherance of his own personal activities and gain, and ultimately used them to commit fraud on the plaintiffs. Ayr and Harris were the orchestrators and stood to benefit from any and all activity connected to the creation of APD. Ayr and Harris made all corporate decisions regarding every aspect of the Silver Beach Project in the United States of America, including, specifically as to funding in the State of New York.

82. Therefore, while it existed, APD was merely an empty shell company and a vehicle of convenience for Ayr and Harris, given that Bulgarian law at that time precluded foreigners and non-EU registered companies from owning real property.

83. In or about the end of 2007 through the end of 2008, FIB made two loans in the amount of $46,907,243.69(€32,500,000) allegedly for development of the Silver Beach Project.  Of that amount, $33,417,656 (€26,820,000) was transferred to the Angelov's Marshall Island All Seas Management's bank account in Bank of Valletta in Malta. Angelov and FIB conspired to steal these funds, for this transfer necessarily required FIB's authorization.

84.  In order for FIB to show on its books that the loans were active and properly serviced by the borrower, so as to remain under the radar and avoid the appearance of money laundering in Bulgaria and prevent BNB regulatory oversight, FIB had to show monthly interest payments on the loans.

85. On October 2, 2009, FIB, conspiring with Angelov, sent a letter to Harris stating its knowledge that Harris wanted to take over the development of SBP. FIB thereafter conspired with Harris, Harriott and Angelov to divest the plaintiffs of their investment through, *inter alia*, acts  ultimately committed in New York.

86. FIB told Harris that it had already invested $46,907,243.69 (€32.5 million) into the project by way of two project development loans and therefore had a lien against the property, and if Ayr was going to develop it then it had to buy these FIB's debt positions.

87. On or about December 17, 2009, Ayr, by and through Harris, sent a first letter of commitment to FIB stating that it would provide the financial backbone for SBP through its subsidiary company APD "for the purpose of acquiring and development of the Silver Beach Investment Project," and that pursuant thereto Ayr Logistics would purchase the two pre-existing debts owed at that time to FIB for the project.

88. FIB agreed to Harris' buyout offer, but conditioned it on Harris paying interest on the FIB debts.

89. To that end, FIB, Harris, and Angelov agreed that FIB would provide a loan of $11,646,640 (€8,000,000) which was used to make interest payments on the two pre-existing 2007 and 2008 loans.

90. In December 2009, FIB issued its third loan related to the SBP.  It gave the  $11,646,640 (€8,000,000) loan to Asset Management. Asset Management was the company Harris and Angelov designated to be the front organization for the $11,646,640 (€8,000,000) interest loan.

91. Upon information and belief, FIB, Harris, and Angelov conspired to extract further funds for their enterprise when they further agreed to create fake coal delivery invoices from Angelov's Marshall Island company, Blue Finance, to be the basis on FIB's books for the $11,646,640 (€8,000,000) interest payment loan. Angelov also was the alter ego of Blue Finance in that he used Blue Finance as a mere instrumentality to further his own personal activities and gain, and used the corporation to perpetrate a fraud on the plaintiffs.

92. FIB issues the $11,646,640 (€8,000,000) loan to Blue Finance, with this underlying agreement.

93. Upon information and belief, the coal invoices were fake, any coal contracts inferred were false, and there never were any coal deliveries based on the fake contracts or invoices. This mechanism was also used and true for the FIB 2007 and 2008 loans as well.

94. Harris, Angelov, Harriott and FIB conspired in the creation of the escrow agreement arrangements related to the purchase of ancient Mexican bonds to be sold in the U.S.  so that approximately $39,823,594 (€31,938,000)  of all three loans was diverted from SBP and transferred to Malta for purchase of the Mexican bonds.

95. On or about December 29, 2009 through June 30, 2010, Angelov, using Blue Finance as a corporate instrumentality for his own personal gain and fraudulent activities, transferred approximately $7,916,241 (€5,516,000) to FIB to pay interest on the 2007 and 2008 FIB loans and $2,905,587 (€2,000,000) was transferred from FIB in Varna, Bulgaria to Blue Finance. Angelov, through Blue Finance, wired those funds to FIB's Cypress Adorna Management Ltd. bank account. Upon information and belief, this was done either as a commission to FIB or Harris.

96. The balance of the loan, roughly $2,086,074 (€1.7 million), went towards the June 2010 interest payment to keep up FIB's regulatory productive loan requirements.

97. On the surface, FIB designated this $11,546,398 (€8,000,000) loan and the $46,907,243 (€32.5 million) loan as both having gone into SBP. None of these monies were actually used to develop SBP in any way. No steps were ever taken to begin construction of the SBP.

98. The agreement was for FIB to recover the principal of the three loans through the value in the real property asset of the SBP. To this end, FIB, Angelov, Harris, and Harriott, through Ayr agreed in 2010 for Ayr to purchase the three 2007, 2008, and 2009 loans from FIB.

99. Ayr acquired the SBP property through APD, and the comprehensive project with all its existing approvals, for example, zoning and design from ASP2, in December 2009 for $123,941,834 (€89 million).

100.    On or about June 4, 2010, Harris and FIB agreed that Ayr and APD shall enter into a "Mortgage Receivables Sale and Purchase Agreement" for the Silver Beach funds, which was executed in the United States and notarized by Sara Deanne Feazell, Notary Public of the State of Texas (see Exhibit B attached hereto).

101.    In or about June 2010, Harris offered to buy out FIB's debt in SBP. For that purpose, Harris arranged for the buyout funds to originate in New York City, New York through Oriana Capital Partners' New York HSBC bank account. Further, upon information and belief, Harris communicated on multiple occasion in New York with HSBC Bank via email and/or telephone to create the transaction and deal to effectuate the buyout funds.

102.    On or about October 13, 2010, Harris and FIB exchanged emails confirming Ayr's commitment to pay the liabilities of the three loans, including that of borrower Asset Management, and that Ayr would perform the borrower's obligations and assume the rights of the creditor.

103.    On or about November 1, 2010, in a letter to HSBC Bank and Investbank, AD in Bulgaria, Harris confirmed that the first stage of financing through Ayr for SBP had been completed in New York. The letter further stated that HSBC New York would be

responsible for getting Ayr's board of directors to release from New York the first payment of $27,852,097 (€20,000,000) out of the total $123,941,834 (€89,000,000) for SBP.

104.     However, ultimately Ayr failed to repay the loans secured on SBP, and FIB threatened to foreclose on the property despite FIB knowingly never having transferred the loan proceeds for SBP development.

105.     On or about December 29, 2010, at a meeting of the General Shareholders of Ayr Property Development, at which Angelov was present as was Harris as shareholder, President, and General Manager, the shareholders voted to initiate voluntary bankruptcy proceedings and to prepare a recovery plan for the company.

106.     APD, therefore, through Harris acting in Ayr's parent company capacity, filed bankruptcy in Bulgaria in February 2011 to prevent foreclosure. APD, FIB, and Harris had no business or legal basis to obligate Ayr's asset in the SBP to repay FIB's loans.

107.     The Bulgarian counsel of Ayr, through Harris, filed bankruptcy proceedings as to APD so to require all payment claims against Ayr's assets in SBP to be declared and proven to the Bankruptcy Court that any such claim warranted creditor designation or status.

108.     On February 13, 2012 the Bulgarian Bankruptcy court ruled the FIB had no valid payment claims to be a creditor against Ayr's assets in SBP or APD, and reconfirmed this finding on September 4, 2013, when it ruled that there could be no set of circumstances under which FIB could be a creditor in the case.

109.     As part of the reorganization plan in the ADP bankruptcy proceedings, Ayr's Board of Directors in the United States, on February 14, 2011, issued a letter confirming that "Ayr had 'designated $537,600,241 [€400,000,000] for the SBP in Bulgaria.'"

110.     On or about October 26, 2011, Ayr Logistics' Board of Directors, in the United States,  passed a resolution approving Ayr's reorganization plan which was submitted with regard to SBP.

111.     On or about March 28, 2012, the majority stakeholders of APD—Rudersdal,  All Seas Property 2, and Asset Management—approved the Ayr reorganization plan for APD. (See Exhibit D attached hereto and incorporated by reference herein). These majority stakeholders entered into a written agreement supporting Ayr's reorganization plan for APD.

112.     Pursuant to those conditions, Ayr agreed to undertake the following actions: "(a) pay the creditor ASP2 the agreed value of ASP2's rights in the Reorganization Plan amounting to EUR 10,000,000 (ten million euros) [$12,420,382] to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD; (b) Pay the creditor Asset the agreed value of Asset's rights in the Reorganization Plan amounting to EUR l,300,000 (one million and three hundred thousand Euros) [$1,625,000] to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD."

113.     The "Agreement" stipulated Rudersdal EOOD's reserved the right to join the "Agreement" by entering into and exercising ASP2's rights thereto.  On December 27, 2013, Rudersdal exercised this right and joined the Agreement.

114.     Rudersdal had this right and exercised this right arising from its July 16, 2007 contract with Angelov to purchase the SBP land and development project with the Bulgarian Ministry of Regional Development and Public Works approval for the permit

and right to commence construction (See Exhibit E attached hereto and incorporated herein).  Though the approval was granted by the ministry, the BGN 16.5 million permit fee was not and could not be paid by Angelov.  The right-to-build permit could not issue and Angelov thereby breached his contract with Rudersdal.  The the BGN 16.5 million permit fee could not be paid because the SBP FIB construction loans funds had been diverted to Malta for Mexican bond purchases for Angelov, Harriott and Harris' benefit. When Rudersdal learned of this breach, it demanded a return of the €19 million it had paid to Angelov's FIB, UniCredit Bulbank and Corporate Commercial Bank accounts per their June 2007 SBP purchase and development agreement.  Further, Rudersdal learned that Angelov had designated accounts at these banks whereby the terms allowed the banks to immediately and automatically garnish the assets in those bank accounts to extinguish Angelov designated debts  or  loans.  Angelov failed to return Rudersdal's €19 million which ultimately is the basis of Rudersdal's  claims against Ayr.  After extensive negotiations Angelov did return to Rudersdal approximately €6 million, reducing its Ayr creditor claim $14,908,580.20.

115.     ASP2 sold the Silver Beach Project and the land for  €89 million to Ayr on December 10, 2009.  Based on this transaction ASP2 is creditor of Ayr in the amount of approximately $37,897,480.61.

116.     Asset Management was the vehicle used by Angelov, Harris and FIB to obtain the December 8, 2009 FIB loan, the goal of which was to pay the interest payments on the 2007 and 2008 loans which were a non performing FIB asset.   Based on this transaction Asset Management is creditor of Ayr in the amount of approximately $1,938,115.43.

117.     On November 27, 2013, Ayr, All Seas Property 2, and Asset Management  entered into a "Supplemental Agreement" to the March 28, 2012 Agreement (<u>See</u> Exhibit F attached hereto and incorporated herein by reference).

118.     The Supplemental Agreement states in relevant part: "§4. The parties agree that each and any dispute or claim arising from any of the money transfers servicing the fictitious transactions made by *All Seas Management* or *Blue Finance Limited*, or any controversy over any property right stemming from the payment claims FIB lodged against the property of APD's Estate where such controversy or right or claim concerns any of the rights or liabilities of the parties hereto, or any of the rights or liabilities of the parties to the March 28th 2012 Agreement shall be governed by:

•     The U.S. laws concerning financial fraud, money laundering and corrupt activities, as well as to the provisions set forth in Art.34 and Art.35 of the United Nations Convention Against Corruption, attached hereto;

•    The Parties agree that the March 28, 2012 Agreement and any supplements thereto shall have its effect in the State of New York and therefore shall be domiciled in the State of New York.

•     The U.S. Federal District Court in New York, State of New York shall have subject matter jurisdiction and personal jurisdiction over all the parties hereto. The choice of law shall be New York State Law.

•    The Parties purposefully subject themselves to the laws, courts and jurisdictions of the State of New York, because they question the effectiveness of the rule of law in Bulgaria, and because the principle performance of the Agreements and any supplements thereto is in the State of New York.

•       The Parties agree that the U.S. Federal District Court in New York, the State of New York shall have jurisdiction over any dispute or controversy and/or shall be the one to make a determination or a decision on any rights and/or a claim concerning the exercise of any rights or meeting any liability of any of the parties hereto. More particularly, Ayr Logistics Limited, Inc. has chosen and designated Deutsche Bank, New York, the State of New York as the place of performance under the Agreements and any supplements thereto. Ayr Logistics Limited, Inc. is obligated to open accounts in favour of Asset Management EAD and All Seas Property 2 OOD and make the payments it owes to the said two companies in Deutsche Bank, New York."

119.     Furthermore, pursuant to § 6 of the Supplemental Agreement, the parties explicitly agreed that nothing in this agreement or any previous or concurrent agreements between the parties "may be construed or enforced in a fashion that might give rise to a breach of or be in conflict with the provisions of Art.34 and Art. 35 of the *United Nations Convention Against Corruption*, or the U.S. laws combating financial fraud . . . ."

120.     Rudersdal subsequently adopted this Supplemental Agreement on December 27, 2013, and Ayr was therefore to make payments to Rudersdal at Deutsche Bank in New York.

121.     Ayr's reorganization plan was supported by Oriana Capital Partners LLC with $123,941,834 (€89,000,000) through a trust bank account in HSBC, New York; Syndicated Holdings, LLC with $100,000,000; Seek Foundation, LLC, a Missouri registered company, with $4,875,000 (€3,500,000); and Harriott's base on the Mexican bonds put in the escrow agreement to sell them in the U.S. This reorganization plan, however, was never funded

and the bankruptcy proceedings moved forward and the court ordered the sale of all of APD's assets, including the main asset: the SBP land.

122.     Pursuant to that sale, FIB purchased the SBP land at auction for $65,209,976 (BGN 97.5 million).

123.     On January 14, 2013, the Bulgaria bankruptcy trustee placed the Funds from the sale of the SBP land into accounts with CCB in Bulgaria.

124.     The bank accounts holding the Funds were the largest deposits in CCB at the time.

125.     On May 27, 2013, one year after the March 28, 2012 Agreement, APD confirmed in a letter to Ayr that none of the assets in SBP, which was then subject to liquidation in the course of APD's bankruptcy case in Bulgaria, would be involved in any activity that would violate U.S. law honoring the terms of the March 28, 2012 Agreement.

126.     Also on May 27, 2013, APD and Ayr signed an agreement under which APD accepted and agreed to be bound by "the Clause for choise [sic] of an applicable law and jurisdiction, included in Art. 5 (b) of the March 28, 2012 Agreement" that Ayr and the majority stakeholders had previously entered into.

127.     In his report dated June 26, 2013, Tomov voiced his concerns about FIB funneling money into an account in Malta to Harris at Ayr and asked whether Ayr had knowledge of any such transfers.

128.      In an email response to Tomov's report on or about June 26, 2013, Harris denied knowledge of FIB transferring funds to All Seas Management in a bank account in Valletta, Malta.

129.     Again, in an email of June 28, 2013, Tomov reiterated his concerns about FIB funneling money into the Malta account.

130.     In an email response dated June 29, 2013, Harris again denies any knowledge.

131.    But Harris, in fact, knew that FIB's claims originated in the money transfers to All Seas Management and Blue Finance; that the money was used to purchase the Mexican bonds which were to be sold in the United States; and that Harris had a personal pecuniary interest in the sale of these bonds.

132.    On December 31, 2013, Tomov sent APD and Ayr, through Harris, notice of an audit by the Bulgarian Tax Administration. Tomov further informed Harris in Harris's capacity as General Manager for Ayr that FIB's claims against the Funds in the amount of $65,209,976 (BGN 97,500,000.00), being the proceeds from the liquidation sale of the SBP lands, were in breach of the U.S. Foreign Corrupt Practices Act; the United Nations Convention Against Corruption; and of the U.N. Convention Against Transnational Organized Crime.

133.    Knowing these violations, Harris willfully and intentionally agreed to and did conspire with FIB's plan as evidenced by the June 4, 2010 agreement between Ayr and FIB for the sale and purchase of accounts receivable, notarized in Texas. Harris, moreover, was aware that such activity was a breach of U.S. law and U.N. Conventions.

134.    FIB made several other attempts to gain ownership and control over Ayr's CCB bank account with the Funds: FIB, Angelov, and Harris attempted unsuccessfully to have the funds which were transferred to Valletta Bank in Malta deemed one of APD's debts held by FIB arising from the SBP, but the Bulgarian court ruled FIB was not an APD creditor over that asset either.

135.    After which, FIB attempted, through Torier Partners Limited, a company registered in the BVI, to gain control over Ayr's ownership of the Funds.

136.    FIB's actions through Torier Partners Limited, to acquire the claims Ayr had acquired under the March 28, 2012 Agreement gave the Ayr Trustee Jeffrey H. Mims cause

to file the Complaint and obtain default judgment and a writ of execution against APD and Torier Partners Limited in Case No. 16-03140-bjh in the U.S. Bankruptcy Court for the Northern District of Texas in the amount of $80,315,254.61 (BGN 136,203,427.69) on July 19, 2017, denying FIB and Torier's claim. Torier and its subsidiary are companies which in 2006 were financed by FIB to participate in the privatization of 67 % of Yurii Gagarin, AD, at this time a subsidiary of Bulgartabac Holding. In 2015, Bulgartabac Holding and Peevski, based on the repayment of the debts of Tabak Market and Droslian to CCB, were, respectively, listed as owners of 49% and 18% of Yurii Gagarin, AD.

**Ayr Through APD Loses Control Over the Funds: BNB Conservators Gain Control Over the Funds on June 20, 2014**

137.     Harris and FIB colluded to and successfully did exchange their debt positions regarding the three loans with ownership in the Ayr SBP money in the amount of $65,576,106.

138.     This was effectuated by the following actions by Harris and FIB:

   a.  On October 10, 2014, Harris fraudulently files for No Asset bankruptcy on behalf of Ayr, despite Ayr in fact having an asset in the Funds held in CCB.

   b.  This fraudulent filing by Harris purposefully caused the Funds—what later the U.S. Bankruptcy Court would find to be an Ayr asset—to be for a critical time period outside the reach of the automatic stay of the U.S. Bankruptcy proceedings.

   c.  By this action, Harris purposefully opened the door for FIB to fraudulently list itself as the owner of the four Ayr bank accounts at CCB which held the Funds (there was initially a principal account, and subsequently three spin-off accounts to hold the interest payments pursuant to the terms of CCB's successful bid to house the Funds).

d.  FIB, knowing it was not the rightful owner of the four Ayr CCB bank account funds, fraudulently and purposefully asserted itself as the owner of said accounts.

139.  The Funds should have been an asset of Ayr's SBP and available to pay plaintiffs; however, forces behind the scene caused CCB to be seized and put in receivership.

140.  On June 20, 2014, in the wake of the raid on Bulgarian banks, BNB appointed two Conservators over CCB's bank assets, and on June 25, 2014, Stanislav Georgiev Lyutov and Elena Sdravkova Kostadinchev. We appointed by BNB as replacement CCB Conservators.

141.  On June 22, 2014, BNB announced in a press release that CCB would open for business on July 21, 2014.

142.  Starting in June 2014, the bank was closed for four months despite BNB having stated on April 30, 2014 that CCB was in deed in good financial condition exceeding the general capital requirements mandated by the Bulgarian banking system at that time.  BNB and the BNB  Conservators marshalled all CCB assets based on BNB's direction, including the Funds. They forbade transfer of any assets to external persons, but permitted internal CCB offsetting transfers.

143.  On July 11, 2014, the Bulgarian bankruptcy court in APD's proceedings ordered that the Funds as an asset of Ayr be transferred to Bulgarian Development Bank, AD, a government bank.

144.  On September 25, 2014, APD's Trustee informed the court that BNB and the BNB conservators refused to effectuate the court's July 11, 2014, order to transfer APD's CCB accounts to the Bulgarian Development Bank, AD.

145.  On August 15, 2014, BNB directed the Conservators to, in a limited fashion, make payments on CCB account holders' outstanding CCB loans.

146.     APD had no such loan with CCB.

147.     On October 22, 2014, FIB creates on its server a payment order that APD's CCB bank accounts be titled in favor of FIB. FIB had no CCB loan.

148.     APD's trustee refused to sign or consent to the payment order.

149.      Therefore, on October 24, 2014, upon information and belief, FIB forged the signature of ADP Trustee Apostolov and submitted it to the BNB CCB Conservators to authorize the release of the Funds.

150.     CCB then applied the Funds to satisfy the debts of the Five Companies, and Ayr lost its only bankruptcy asset.

151.     On November 7, 2014, the BNB CCB Conservators issued Order No. 3-2785 freezing the CCB accounting system as of November 6, 2014.

152.     On November 10 and 13, 2014, BNB issued two conforming APD Bank Account statements at the request of the ADP Trustee reflecting an account balance of $65,576,106 (BGN 102,966,946).

153.     On November 17, 2014, BNB through its BNB Conservators over CCB issued a false recording of accounting event as "Reference: 0" dated October 30, 2014 which recorded a transfer of accounts receivables dated October 30, 2014 between FIB as transferor and Cibole Services Incorporated Bulgaria, EOOD, as transferee in the amount of $10,897,435 (BGN 17,000,000); between FIB (transferor) and Droslian Bulgaria, EOOD (transferee) in the amount of $10,776,856 (BGN 16,811,896); between FIB (transferor) and Tabak Market, AD (transferee) in the amount of $22,051,282 (BGN 34,400,000); between FIB (transferor) and Promishleno Stroitelsvo Holding, EAD (transferee) in the amount of $2,934,739 (BGN 4,578,163.30) and  $1,578,413 (BGN

2,462,325.60); and between FIB (transferor) and Vili Vist, EAD (transferee) in the amount of $6,671,153 (BGN 10,407,000).

154.    After the above deductions, the balance in ADP's account should have been approximately $11,094,591 (BGN 17,307,563).

155.    As the bank account had a positive balance there was no basis for the BNB or the BNB Conservators to close the account. However, upon information and belief, on December 1, 2014, the BNB Conservators closed the ADP account, presumably took the balance for themselves or otherwise transferred the funds, and falsely reflected the APD accounts as having a zero balance.

156.    On December 1, 2014, BNB issued an APD Bank Account statement reflecting an October 24, 2014 transfer to FIB, despite the November 6, 2014 freeze order.

157.    Also on December 1, 2014, BNB issued an "Exposition of APD Bulgaria's" CCB accounts which reflected a balance of zero, with an accounting date of November 6, 2014.

158.    Upon information and belief, Ayr's asset APD CCB bank accounts were closed because there were no longer any CCB loans to be paid off.

159.    All of these actions with ADP's accounts holding the Funds were done without the consent or authorization of U.S. Bankruptcy Court Ayr Trustee, which proceedings had commenced on October 10, 2014 and subject to the automatic stay provision of U.S. Bankruptcy law.

160.    BNB and the conservators owed the highest standard of care as fiduciaries to plaintiffs in their capacity of supervising receivership organization and appointed conservators, all of whom oversaw the payment orders related to the Funds.

161.    Based on this activity, FIB ultimately became the title holder in the CCB bank accounts which held The Funds.

### FIB Steals the Funds from Ayr to Relieve Debt of the Five Bulgarian Companies Owned or Controlled by Politician Delyan Peevski

162.     As previously stated, on October 22, 2014, FIB created on its server a payment order that APD's CCB account be titled in favor of FIB.

163.     Upon information and belief, FIB did not have a CCB loan. Therefore, FIB needed a debt holder in order to transfer the Funds because of the pre-existing BNB order which restricted the BNB Conservators to only making payments on the CCB account holders' outstanding CCB loans.

164.     Upon information and belief, Petrol, AD, was a Bulgarian registered company operating a gas station chain business in Bulgaria. The scheme to obtain the Funds from CCB to pay off the debts of the Five Companies was initially to be effectuated through Petrol, AD as a CCB debt holder.

165.     Enter Peevski. Delyan Slavchev Peevski is a politician, oligarch, entrepreneur and media mogul.  He has a sketchy history as a politician popping in and out of parliament and several administrations since 2004. He has been a Member of the Bulgarian Parliament representing the MRF.  In June 2013, Peevski was appointed and confirmed as President of the State Agency for National Security.  He was removed after months of street protests across the entire country of Bulgaria, and NATO States lodged objections to his appointment, which culminated in the fall of the Bulgarian government over his appointment.

166.     Upon information and belief, Peevski operates through his companies registered in his mother's name and a variety of shell companies, which serve to disguise his operational direction of those entities.  Consequently, he effectively controls 90% of Bulgaria's print and television media.

167.     Upon information and belief, Peevski and members of his family were heavily indebted to CCB: by November 2013, they had borrowed more than $268,000,000 (€200,000,000) to acquire media properties and other companies in Bulgaria.

168.     Upon information and belief, Peevski orchestrated and joined the conspiracy in the exercise of the VTB call option for a 79.83 % consolidated interest of Bulgartabac in favor of TGI and Faraj.

169.     The call option was created to allow the privatized shares of Bulgartabac to be transferred to specific entities or persons. These recipients are the hidden beneficiaries of the privatization.

170.     Upon information and belief, three specific forces drove the privatization of Bulgartabac: Peevski, TGI and Faraj.

171.     In 2015, Peevski through his company NSN Investment EOOD, became, within a few month, the official owner in the following Bulgarian companies: 5% ownership of Bulgartabac Holding, and 18% of Yurii Gagarin, AD. Upon information and belief, this was his commission for the orchestration of the VTB Bulgartabac call option and the removal of corporate debts, ultimately in favour TGI and Faraj.

172.     Bulgarian cigarette filter and packaging producer Yurii Gagarin BT was established in 1964 as part of the then communist state-owned tobacco monopoly Bulgartabac. It was transformed into a unit of the state tobacco firm in November 1993 when Bulgartabac was split into a holding structure with 22 subsidiaries. Its product range features cigarette filters, paper boxes, tobacco manufacturing equipment and facilities as well as printing of box labels. Yurii Gagarin BT serves mainly the cigarette-making subsidiaries of Bulgartabac Holding—85% of its 2005 revenue came from deals within the group.

173.     In October 2006, Baranko EOOD, a Bulgarian company, was created to participate in the privatization of Yuri Gagarin BT.  Baranko EOOD is fully-owned by Westwood Invest Limited, a company registered in the BVI and a wholly owned subsidiary of Torier Partners Limited. Baranko EOOD acquired a 67% stake in Yurii Gagarin BT for $18,704,000(€14.1 million) base on privatization deal with Bulgarian Government. This purchase was funded by FIB.

174.     A week after acquiring control of Yurii Gagarin BT, Baranko sold an 18% stake in the company to newly-registered local firm Comso Tabacco, EOOD for $4,918,776 (€3.78 million).

175.     On May 8, 2009 the shareholders changed the company name of Yurii Gagarin BT to Yurii Gagarin, AD which operates a 26,000 square meters manufacturing and administration facilities in the industrial zone of Plovdiv, Bulgaria.

176.     In 2006, FIB financed the privatization of 67% of Yurii Gagarin. In 2014, this debt was still outstanding on FIB books.

177.     In June 2014 the Bulgarian bank system fell into crisis, affecting CCB and FIB.

178.     It was critical for FIB to resolve non-performing old debts in light FIB's request to Bulgarian Government for financial support in the amount of $833,692,284 (BGN 1.2 billion) to bail it out of its financial crisis and cash flow deficit as a result of the run on Bulgarian banks.

179.     Upon information and belief, BNB's supervisory inspection of FIB during the Bulgarian banking crisis did not accept as being compliant FIB accounting records and bank books. BNB criticized FIB's overexposure on bad debt and old, non-performing loans—the three SBP loans.

180.     Upon information and belief, FIB solved its bad debt and old, non-performing loan problems in part by paying off the Five Companies' CCB debt positions in the amount of $65 million.

181.     Thereby, FIB gained $65 million in current loans with the Five Companies at CCB for although the CCB debt was extinguished with CCB, the Five Companies became FIB debtors in the amounts equal to their extinguished CCB debts.

182.     Vassilev from 2000–2003 held the positions of Chairman of the Managing Board and Executive Director of CCB, was the majority shareholder of CCB, and from 2003 until June 20, 2014, when the bank was taken over by BNB, he served as Chairman of the Supervisory Board of CCB.

183.     Vassilev was pressuring Peevski to repay his debts to CCB. Peevski refused and instead demanded Vassilev grant him a share of the businesses that CCB owned. Vassilev refused.

184.     As a result, using his control over many of the Bulgarian media companies, Peevski launched a publicized smear campaign against Vassilev and CCB, alleging that Vassilev had stolen $1 billion from CCB and conspired to have Peevski murdered. His motivation was to avoid repaying the debts the Five Companies owed to CCB, three of which Peevski owned or controlled (Tabak Market, Cibole and Droslian), and the other two of which were owned or controlled by the MRF, the political party in Bulgaria that Peevski led and which was a member of the governing coalition.

185.     Upon information and belief, the ensuing smear campaign was part of a larger campaign to destabilize Bulgarian banks in order to enable government takeover of bank assets, which was accomplished in the Bulgarian bank crisis in 2014. In CCB's case, the attack against CCB had economic and political underpinnings.  Namely, the two VTB call

options for Bulgartabac and Vivacom ownership interests: 79.83% of Bulgartabac Holding, AD including its 22 subsidiary tobacco companies and 33% of Vivacom, AD.

186.    As a result of the smear campaign, in June 2014, depositors withdraw more than $833,692,284 (BGN 1.2 billion) in three days from CCB. Large sums were also drawn from FIB.

187.    Upon information and belief, when Peevski realized that the Funds would be stolen through Petrol's debt with CCB, he instructed FIB to conduct the transaction with the Funds through the Five Companies.

188.    Pointing to the run on CCB and its subsequent fallout, Peevski threatened that he would use his political power to make FIB suffer the same fate.

189.    In fact, FIB had already suffered substantially as a result of the CCB fallout. FIB's lack of capital commenced in 2012 based on a BNB audit from this time period and BNB deemed the 2007, 2008, and 2009 loans to Ayr as risky and problematic. Thus FIB's interest in stealing the Funds was to solve FIB's monetary crisis.

190.    Thus, in or around June 2014, FIB requested from BNB a cash infusion due to its shortfall in the economic crisis. It also approved the use of the Funds according to Peevski's plan, and received more than $833,692,284 (BGN 1.2 billion) in aid from the Bulgarian government, which eliminated the financial problems FIB faced. Nevertheless, FIB still arranged to eliminate the Five Companies' debts through conversion and deceit.

191.    Shortly thereafter, as stated above, FIB used the forged authorization from APD's Bulgarian bankruptcy trustee to approve the transfer of the Funds to FIB which then extinguished the Five Companies' debts. FIB thus acquired approximately $65 million without paying any fair consideration.

192.     FIB engaged in an illegal course of conduct using the SBP which enabled it to unjustly and unlawfully benefit over and over again from the SBP transactions.  Namely, from the purchase transactions of the SBP land three times through: 1) Rudersdal; 2) Ayr; and 3) when FIB bought the land back itself out of the APD bankruptcy auction. FIB benefitted from diverting SBP loan proceeds to Malta. FIB then recaptured its purchase loan money when it stole the Funds and FIB benefitted when Ayr purchased the SBP three loans from 2007, 2008 and 2009 which extinguished the non-performance and staleness of those loans with Ayr becoming the fresh FIB debtor, enhancing its regulatory position as a viable bank.

193.     Defendants thereby, without authority, exercised unlawful control and dominion over the Funds, which were rightfully property of the Plaintiffs. Defendants' unlawful dominion and control over the Funds altered its condition because they changed the ownership of the CCB bank accounts where the Funds were housed from APD, and excluded plaintiffs from exercising their rights to the Funds as SBP investors and Ayr U.S. bankruptcy proceedings creditors.

194.     Defendants owed plaintiffs fiduciary duties arising out of the terms, conditions, policies, understandings, and instructions of the Loans Contracts, Agreements, and reorganization plans to act in good faith, with diligence and fair dealing, and were precluded from self-dealing, which duties the defendants materially breached.

195.     Mellon Bank and Eaton Vance each and all owed plaintiffs a duty arising out of their position as minority shareholders who knew or should have known of the fraudulent scheme to defraud the plaintiffs and upon information and belief were appraised through shareholder reports. As financial institutions, they had the expertise and were in the best position to assess information received. Upon information and belief, they were not merely

passive shareholders and they owned a substantial interest, albeit minority interest of at least ten percent (10%) interest, at least as to Mellon.

**Ayr's Money Extinguishes the Five Companies' CCB Loans as Orchestrated by Peevski, FIB, BNB, and the BNB Conservators of CCB.**

196.     The ultimate goal of the fraud and conspiracy between the First Group and the Second Group was to realize the exercise of the VTB-controlled call options for Bulgartabac Holding and Vivacom.  FIB played a pivotal role for it was the bridge between the First Group and the Second Group.  FIB, based on the Harris, Harriott, Angelov, Ayr and APD banking and other relationships was privy to the Ayr money movement arising from its role with the First Group and conspired with Peevski to design and effectuate the fraudulent taking of Ayr U.S. asset—The Funds.  The mechanism for this fraud and conspiracy was the extinguishment of the Five Companies' CCB debts with the participation of BNB and BNB Conservators.

197.     The First Group agreed to used the 2007, 2008 and 2009 loans obtained by FIB for the SBP for self-enrichment in Mexican bonds.

198.     The First Groups' actions necessarily precluded the realization of the SBP and precluded the issuance of the right-to-build permit required prior to construction or further development.

199.     The First Group colluded and engaged in a deliberately coordinated effort to use SBP for self-gain, used the SBP as the instrument of self-dealing and personal profit, and made it possible for FIB specifically to profit three times: loans, becoming the owner of the SBP land purchased in APD bankruptcy, and benefitting from the stealing of the Funds from CCB trustee APD bank accounts.

200.     The ultimate theft is only made possible by the concerted and coordinated teamwork of both Groups, with FIB and Harris as the key links: First Group's use of SBP

as an instrument to effectuate their fraud and self-profit combined with the Second Group's coordinated efforts in stealing the Funds by, *inter alia*, payment of the Five Companies' non-related CCB loans, with its sights on the multi-million dollar VTB call options for BTH and Vivacom.

201.     The First Group, by its actions turned the SBP into a vehicle for fraud and profited from  with the Second Group to the detriment of Plaintiffs.

202.     Three of the Five Companies (Tabak Market; Droslian Bulgaria; and Cibole) were part of the VTB-held call option related to the privatization of  Bulgartabac Holding and Cibole was part of the VTB-held call option related to Vivacom (33%). The fraudulent satisfaction and extinguishment of their debt increased their value when the call options was exercised, at no cost to the politicians who controlled them (MRF and Peevski), and Peevski increased their value further to his benefit after the privatization of Bulgartabac.

203.     Upon information and belief, the call option was intended to benefit TGI at a fixed agreed-upon price. However, failure to discharge The Five Companies' debts would put the call options at risk due to forced collection of the companies' assets held by CCB as collateral which would have, *inter alia*, negatively impacted the prices of BTH's shares and the integrity of its corporate structure.  As Peevski declined to pay CCB The Five Companies CCB loans after Vassilev made demand for same, CCB had already commenced in this time period collections actions against the non performing loans.

204.     The elimination of the Five Companies' debts, and the release of the shares held as CCB loan collateral, ultimately opened the door for TGI to acquire unencumbered and thereby otherwise unavailable for acquisition, two of the Peevski-controlled Bulgartabac subsidiaries (Tabak Market and Yurii Gagarin) and consolidate its control over

Bulgartabac. The press has reported that TGI and Faraj has been a source of financing for ISIS.

205.    Tabak Market benefited the most from the Ayr funds when its CCB debt was extinguished in the amount of $22,051,282 (BGN 34,400,000) on December 1, 2014, through Peevski's orchestrated conduct and conspiracy with the defendants.

206.    Upon information and belief, Cibole Bulgaria had no corporate activity other than being created by its parent company to serve as the vehicle to purchase and privitize Technoexportstroy, EAD, a Bulgarian registered company, and to procure the funds for this privatization so to participate in the consortium for the Russian Federation Gazprom southern pipeline project sanctioned by the EU and the United States, purchase with a CCB loan.

207.    Cibole Bulgaria benefited from the Funds when its CCB debt was extinguished in the amount of $10,897,435(BGN 17,000,000) on December 1, 2014, through Peevski's orchestrated conduct and conspiracy with the defendants.

208.    Droslian Belize by corporate resolution dated February 26, 2013, authorized the purchase of Baranko EOOD, a company registered in Bulgaria, as well as the taking-over of Baranko's debt with FIB in the amount of $12,748,715 (€9,748,987.79).

209.    Upon information and belief, Droslian Bulgaria has no corporate activity other than being the vehicle to secure the CCB loan for its parent company to purchase Baranko.

210.    Upon information and belief, The funds Droslain Belize used to purchase Baranko came from its subsidiary company Drosliann Bulgaria which obtained a CCB loan. Droslian Bulgaria benefited from the Ayr funds when its CCB debt was extinguished in the amount of $10,776,856 (BGN  16,811,896) on December 1, 2014, through Peevski's orchestrated conduct and conspiracy with the defendants.

211.    Droslian's loan was collateralized with Baranko's 49% shares in Yurii Gagarin, AD.

212.    Upon information and belief, Vili Vist secured a CCB loan to purchase Transstroy Burgas AD, in Burgas, Bulgaria, an already-privatized port construction company, so to participate in the consortium for the Russian Gazprom southern pipeline project sanctioned by the EU and the United States.  Vili Vist's actual owner is Jordan Tsonev, a member of the Bulgarian parliament for MRF.

213.    Upon information and belief, Tsonev defaulted on its CCB loan and then garnered the support of fellow member of parliament, Peevski, who organized the loan repayment. This loan was extinguished with the Funds.

214.    Vili Vist benefited from the Ayr funds when its CCB debt was extinguished in the amount of $6,671,154 (BGN 10,407,000) on December 1, 2014, through Peevski's orchestrated conduct and conspiracy with the defendants.

215.    Upon information and belief, Promishleno Stroitelstvo Holding secured a CCB loan to participate in the consortium for the Russian Gazprom southern pipeline project sanctioned by the EU and the United States.

216.    Promishleno Stroitelstvo Holding benefited from the Ayr funds when its CCB debt was extinguished in the amount of $4,513,133 (BGN 7,040,488) on December 1, 2014, through Peevski's orchestrated conduct and conspiracy with the defendants.

217.    Thus, Ayr's funds were used to start the domino effect to benefit TGI's goal to consolidate BT and its manufacturing and distribution under its umbrella through the call option. To that end, the Funds ultimately provided corporate entities to be sold to TGI debt-free which in turn opened the door for Foraj to gain access to the BT Middle East distribution market through his company Tobacco EMEA Trade Ltd. Tobacco EMEA is

part of the call option payment structure, having paid EFV $21,250,937.00 in exchange for access to the BT Middle East distribution rights resulting in contraband cigarette sales to ISIS.

218.     Upon information and belief, Peevski, for such benefit to TGI, received the following benefits for which he had no income source to support:

   a.   Peevski was 100% owner of NSN Investment, EEOD, which in turn owned 100% of Tabaco Investment, EOOD, which became a 5% shareholder in BTH on August 17, 2015.

   b.   Seven months later on March 18, 2016, Peevski's then closely-held company, Tabaco Investment, EOOD, extracted its 5% BTH position and sold it to TGI for $14,020,256 (BGN 24,311,826). The BT shares on the Bulgarian stock market on March 18, 2016 were being traded for approximately $34 (BGN 50) per share, yet he sold his on the same day for the exaggerated price of $44 (BGN 66) per share.

   c.   Peevski, through his 100% ownership of NSN Investment, EEOD, which on December 15, 2015 became 100% owner of Comso Tabacco, EOOD, a company registered in Bulgaria, which owned 18% of Yuri Gagarin with the outstanding FIB debt arising from the Ayr funds used to pay off the CCB debt. On April 20, 2016, the 18% Yuri Gagarin shares were extracted and sold to TGI for $3,995,040 (BGN 6,866,715) through TGI's daughter company Doreco Commerce, EOOD.

219.     A few months, after the CCB debt extinguishment of the Five Companies, TGI and Faraj exercise the VTB call option for 79.83% of Bulgartabac Holding and Faraj gains full access to the distribution channels in the Middle East region. In August 2015, NSN Investment, a company registered in Bulgaria listing Peevski as the sole owner, was listed

as the sole owner of Tabaco Investment, EOOD. In December 2015, NSN Investment was listed as the sole owner of Comso Tabacco.

220.    Upon information and belief, Comso Tabacco and Tabaco Investment respectively owned 18% in Yurii Gagarin and 5% in Bulgartabac.  Both interests inured to the benefit of Peevski, who sold these two share positions, five and seven months later, on March 18, 2016 and on April 20, 2016, respectively, to TGI, a UAE entity.

221.    Peevski received $14,020,256 (BGN 24 million) for the sale of the 5% shares held in Tabaco Investment and $3,995,040 (BGN 6,866,714) for the 18% shares interest in Yurii Gagarin extracted from Comso Tabacco.

**U.S. Bankruptcy Court in Dallas, Texas Deems Ayr Owner of the Funds**

222.    On October 9, 2014, APD Attorney Maria Nakova advised both Harris in his capacity as President and General Manager for Ayr and the sole Executive Director of APD, and Angelov as then-acting Chairperson of the APD Board of Directors, of the need to take immediate legal action to protect the Funds against any FIB claims to those funds, including bringing the matter before the appropriate U.S. authorities under relevant U.S. law.

223.    Neither Harris nor any of the other defendants took steps to protect the Funds at CCB.

224.    To the contrary, the day after Maria Nakova's instruction to take action, Harris, on October 10, 2014, on behalf of Ayr filed for No Asset bankruptcy in the United States— omitting any mention of the fact that, per Bulgarian court rulings as Harris knew, Ayr did have an asset in the Funds held in CCB and APD.  Harris also left off APD as an asset which was a wholly owned subsidiary of Ayr. Ayr and Harris were compelled, only after Harris' multiple sworn examinations in the U.S. bankruptcy proceeding revealed Ayr had

these two assets, by the US. bankruptcy trustee to amend the No Assets filing and add Ayr's assets, The Funds and APD.

225.     Once the Funds were identified as as asset of Ayr, the U.S. bankruptcy trustee appointed Tomov as Special Counsel to marshall the Ayr's assets, the Funds and the subsidiary APD.

226.     By filing for "No Assets" bankruptcy, Harris with actual intent to defraud did two things simultaneously: (1) he relieved Ayr of its duties under the Agreement and Supplemental Agreement with APD's major stakeholders to make the promised payments through Deutsche Bank, New York, as well as HSBC New York, and (2) he deprived the major stakeholders, i.e., the plaintiffs, of the right to have their claims satisfied out of Ayr's Estate assets in the United States. His action necessarily caused abandonment of the Funds to CCB and, ultimately, purposefully left the door wide open for FIB to take the Funds in a pivotal key role and in a coordinated stealing which benefit inured to Group One and Group Two as averred herein.

227.     On October 22, 2014, attorney Nakova formally advised the Committee of Creditors of ADP that Ayr had filed for bankruptcy in the U.S. and that Ayr's Estate in SBP was under the control and jurisdiction of the U.S. Trustee and U.S bankruptcy law.

228.     The Bulgarian bankruptcy court issued an identical ruling on November 19, 2014 reiterating Nakova's conclusions that Ayr had filed for bankruptcy in the U.S. and that Ayr's Estate in SBP and the Funds was under the control and jurisdiction of the U.S. Trustee and U.S bankruptcy law.

229.     Ayr's bankruptcy filing gave rise to its Trustee's demand that the Funds be transferred to Ayr for the bankruptcy proceeding.

230.     The U.S. Bankruptcy Court ordered APD to turnover the Funds to Ayr's Trustee, holding that those Funds were a U.S. asset belong to Ayr as parent company. The Funds were still presumed to be in CCB, and Ayr therefore as parent company to now-defunct APD was the proper owner of the Funds.

231.     However, by the time of that ruling, the Funds were already stolen, along with any chance for Ayr's creditors, the plaintiffs, to recover in the bankruptcy proceeding.

232.     As a result of the unauthorized and unlawful seizure of the Funds, Ayr's Estate and its creditors, the plaintiffs Rudersdal, ASP2, Asset Management and Tomov, have suffered loss of funds in the amount of approximately $65 million or BGN 102,966,946.

233.     In addition, the balance leftover from the Funds after the Five Companies' debts were extinguished, approximately $11,094,591 (BGN 17,307,563), remains unaccounted for. BNB and the BNB CCB conservators authorized the close of the APD CCB accounts and upon information and belief took the remaining balance of the Funds.

**Bulgarian Courts Lack Jurisdiction Over this Matter**

234.     The European Union courts do not have jurisdiction over this matter. EU law holds that in cases of cross-border torts, personal jurisdiction lies in the place where the damages occurred—in this case, the U.S. Because APD is extinct and was only ever a shell company of Ayr, the Funds that were stolen are an asset of Ayr. Ayr is a U.S. company with its principal place of business therein, and therefore under EU law the United States is the proper forum for this claim.  Furthermore, Ayr is a party to contracts specifying New York at the venue, subjecting the parties to personal and subject matter jurisdiction in New York.

235.     Despite the matter of FIB's theft of the Funds being brought to the Justice Ministry's attention in Bulgarian, the Bulgarian authorities have taken no investigative action.

236.     U.S. Bankruptcy Trustee Jeffrey Mims requested a ruling from the Bulgarian court regarding: (a) its jurisdiction over the Funds stolen from Ayr, which were considered an asset of Ayr in its own United States bankruptcy proceeding; and (b) whether the Bulgarian courts had jurisdiction over the parties for the return of same.

237.     On May 2, 2018, the Appellate Court in Varna, Bulgaria ruled that it did not have jurisdiction on the issues Trustee Mims raised, and at the same time terminated APD's Bulgarian bankruptcy proceedings for lack of Bulgarian assets because any assets were Ayr's assets in the United States and subject to jurisdiction in the United States.

### COUNT I
### Piercing the Corporate Veil and Alter Ego
### (As to Ayr and Harris)

238.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 237 of the Complaint.

239.     From the outset of their involvement with the SBP, neither Ayr nor Ayr's Bulgarian-registered APD was adequately capitalized to engage in business with the SBP, as evidenced by, *inter alia*, Ayr's default on its FIB loans, and the ultimate bankruptcy of both Ayr and APD coupled with the failure of the SBP to get off the ground.

240.     Harris, as part-owner and Director of both Ayr and APD, knowingly and deliberately undercapitalized these entities to be able to avoid obligations that would arise from their operations regarding the SBP, including, but without limitation, obligations to FIB for loans FIB made to both entities for development of the SBP and the obligations of both entities to their investors and creditors, the plaintiffs.

241.     As the founder and President and General Manager of both Ayr and APD, and majority shareholder, Harris completely dominated both Ayr and APD and made all material decisions for both entities, including, but without limitation, the decision to invest in and develop the SBP; the decision to create and use APD as a mere fraudulent shell to

obtain the land for development of the SBP; the decision to engage in fraudulent business dealings with Angelov, Harriott, and FIB; the decision to allow Harriott to use APD and Ayr monies for the fraudulent Mexican bond schemes; and, most importantly, the decision to file for fraudulent No Asset bankruptcy on behalf of Ayr and knowingly and deliberately ignore warnings from Nakova and Tomov by simply doing nothing to protect the Funds from FIB's theft of them from CCB.

242.    The fraudulent activities committed by Harris through Ayr as a mere instrumentality for Harris as its alter ego and in complete unlawful disregard of Ayr's corporate identity, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 77–104, 106–13, 123–30, 134, 224.

243.    Pursuant to the facts averred in the previous paragraph, Harris displayed a reckless and wanton pattern of dealing with the assets of Ayr and APD in a manner designed to further Harris' own interests in pursuing the SBP fraud with the First Group and Second Group and reduce his own potential liability behind the corporate shield of Ayr and APD at the expense of the creditors of APD and Ayr including the plaintiffs, ultimately driving both APD and Ayr into bankruptcy, during which bankruptcy proceedings Harris continued to use Ayr as a shield for defrauding plaintiffs and the U.S. bankruptcy court by deliberately failing to declare APD or the Funds as Ayr assets.

244.    By virtue of the foregoing, Ayr and Ayr through APD primarily transacted the personal business of Harris rather than its own business with Harris the dominator of Ayr to the extent that Ayr lost its separate corporate identity and for all intents and purposes was the alter ego of Harris as evidenced by the facts averred above.

245.     Piercing the corporate veil of Ayr is therefore necessary to achieve justice and the equitable result necessitated by Harris' domination of Ayr and required to right the wrong in the loss of the Funds as a direct result thereof, that is, the return of the Funds, to which plaintiffs as creditors and investors had and have a legal and rightful claim.

246.     Accordingly, the plaintiffs are entitled to disregard the corporate existence of Ayr and APD so as to hold defendant Harris directly personally liable for Ayr and APD's liability to the plaintiffs under the various agreements between Harris and the plaintiffs, arising from Harris' fiduciary relationship with plaintiffs, and stemming from plaintiffs' positions as creditors and investors in the failed SBP which Ayr and APD irresponsibly and fraudulently sought to undertake.

247.     As a direct, proximate, and foreseeable result of the fraud and other wrongs Harris committed as the dominator and alter ego of Ayr as a mere instrumentality to Harris, plaintiffs are entitled to recover the loss of the Funds in the amount of at least $65 million, the exact amount to be proven at trial.

248.     Plaintiffs furthermore request a declaratory judgment that Harris is the alter ego of Ayr and Ayr's subsidiary, APD.

### COUNT II
### Piercing the Corporate Veil and Alter Ego
### (As to FIB and Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

249.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 248 of the Complaint.

250.     From the outset of its involvement with the SBP, FIB was inadequately capitalized to engage in business with the SBP, as evidenced by, *inter alia*, FIB's loan agreements with Ayr, Asset Management, and ASP; FIB's creation of the fabricated coal invoices to craft the appearance of healthy and active loans on its books; and the ultimate fraudulent theft of the Funds against the background of the failure of the SBP to get off the ground.

251.     Minev, Mutafchiev, Mellon Bank, and Eaton Vance, as shareholders of FIB, knowingly and deliberately undercapitalized FIB to be able to avoid obligations and camouflage its officers and shareholders fraudulent conduct arising from FIB's SBP actions, including, but without limitation, FIB's actions and consent to the transfer of SBP construction loan proceeds on the two SBP FIB loans to Bank of Valletta and the third loan of €2 million to FIB's Cypress branch which was to the detriment of their investors and creditors, the plaintiffs.

252.     As shareholders, Minev, Mutafchiev, Mellon Bank, and Eaton Vance completely dominated FIB and made all material decisions, including, but without limitation, the decision to invest in and develop the SBP; the decision to engage in fraudulent business dealings with Angelov, Harriott, and FIB; the decision to forge the payment order authorization to fraudulently and unlawfully retrieve the Funds from CCB; and, upon information and belief, the decision to ignore these suspicious loans and financial activities by FIB of which they knew or should have known as shareholders receiving regular shareholder reports on FIB's financial activities.

253.     The fraudulent activities committed by Minev, Mutafchiev, Mellon Bank, and Eaton Vance through FIB as a mere instrumentality for their own personal gains as its alter egos and in complete unlawful disregard of FIB's corporate identity, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 42–46, 49–51, 64–75, 79–106, 108–15, 120–34, 136–58, 161, 162, 166–75, 181–91, 217-19.

254.     Pursuant to the facts averred in the previous paragraph, Minev, Mutafchiev, Mellon Bank, and Eaton Vance displayed a reckless and wanton pattern of undertaking and/or ignoring FIB's fraudulent financial undertakings in a manner designed to further their own

interests in pursuing the SBP fraud with the First Group and Second Group and reduce their own potential liability behind the corporate shield of FIB at the expense of the creditors of the SBP including the plaintiffs.

255.     By virtue of the foregoing, FIB primarily transacted the personal business of Minev, Mutafchiev, Mellon Bank, and Eaton Vance rather than its own business with these shareholders the dominators of FIB to the extent that FIB lost its separate corporate identity and for all intents and purposes was the alter ego of these shareholders as evidenced by the facts averred above.

256.     Piercing the corporate veil of FIB is therefore necessary to achieve justice and the equitable result necessitated by Minev, Mutafchiev, Mellon Bank, and Eaton Vance's domination of FIB and required to right the wrong in the loss of the Funds as a direct result thereof, that is, the return of the Funds, to which plaintiffs as creditors and investors had and have a legal and rightful claim.

257.     Accordingly, the plaintiffs are entitled to disregard the corporate existence of FIB so as to hold defendants Minev, Mutafchiev, Mellon Bank, and Eaton Vance directly personally liable for FIB's liability to the plaintiffs arising from from plaintiffs' positions as creditors and investors in the failed SBP which FIB irresponsibly and fraudulently sought to fund and ultimately sucked dry of its value in the form of the Funds.

258.     As a direct, proximate, and foreseeable result of the fraud and other wrongs Minev, Mutafchiev, Mellon Bank, and Eaton Vance committed as the dominators and alter egos of FIB as a mere instrumentality to its shareholders, plaintiffs are entitled to recover the loss of the Funds in the amount of at least $65 million, the exact amount to be proven at trial.

259.      Plaintiffs furthermore request a declaratory judgment that Minev, Mutafchiev, Mellon Bank, and Eaton Vance are the alter egos of FIB.

## COUNT III
## Piercing the Corporate Veil and Alter Ego
### (As to Harriott and Grant Capital)

260.      Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 259 of the Complaint.

261.      As the Director of Grant Capital, Harriott completely dominated Grant Capital and made all material decisions for the entity, including, but without limitation, the decision to divert funds from the 2007, 2008, and 2009 FIB loans to Grant Capital in Malta to, *inter alia*, fund the Mexican bond scheme and thereby perpetrate a fraud on the plaintiffs.

262.      The fraudulent activities committed by Harriott through Grant Capital as a mere instrumentality for Harriott as its alter ego and in complete unlawful disregard of Grant Capital's corporate identity, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 47.

263.      Pursuant to the facts averred in the previous paragraph, Harriott displayed a reckless and wanton pattern of dealing through Grant Capital in a manner designed to further Harriott's own interests in pursuing the SBP fraud with the First Group and Second Group and unlawfully reduce his own potential liability behind the corporate shield of Grant Capital at the expense of the plaintiffs.

264.      By virtue of the foregoing, Grant Capital transacted the personal business of Harriott rather than its own business with Harriott the dominator of Grant Capital to the extent that Grant Capital lost its separate corporate identity and for all intents and purposes was the alter ego of Harriott as evidenced by the facts averred above.

265.      Piercing the corporate veil of Grant Capital is therefore necessary to achieve justice and the equitable result necessitated by Harriott's domination of Grant Capital and required

to right the wrong in the loss of the Funds as a direct and proximate result thereof, that is, the return of the Funds, to which plaintiffs as creditors and investors had and have a legal and rightful claim.

266.     Accordingly, the plaintiffs are entitled to disregard the corporate existence of Grant Capital so as to hold defendant Harriott directly personally liable for Grant Capital's participation in the fraud perpetrated on the plaintiffs related to the SBP.

267.     As a direct, proximate, and foreseeable result of the fraud and other wrongs Harriott committed as the dominator and alter ego of Grant Capital as a mere instrumentality to Harriott, plaintiffs are entitled to recover the loss of the Funds in the amount of at least $65 million, the exact amount to be proven at trial.

268.     Plaintiffs furthermore request a declaratory judgment that Harriott is the alter ego of Grant Capital.

<div align="center">

**COUNT IV**
**Piercing the Corporate Veil and Alter Ego**
**(As to Angelov and Blue Finance and All Seas Management)**

</div>

269.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 268 of the Complaint.

270.     As the owner of Blue Finance and All Seas Management, Angelov completely dominated Blue Finance and All Seas Management and made all material decisions for the entities, including, but without limitation, *inter alia*, disguising the money transfers to All Seas Management Ltd., an entity owned and controlled solely by Angelov, and Blue Finance Limited, an entity owned and controlled solely by Angelov, both Marshall Island registered entities, to look like legitimate investments in SBP.

271.     The fraudulent activities committed by Angelov through Blue Finance and All Seas Management as a mere instrumentalities for Angelov as their alter ego and in complete unlawful disregard of Blue Finance and All Seas Management's corporate identities,

including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 55 and 91.

272.     Pursuant to the facts averred in the previous paragraph, Angelov displayed a reckless and wanton pattern of dealing through Blue Finance and All Seas Management in a manner designed to further Angelov's own interests in pursuing the SBP fraud with the First Group and Second Group and unlawfully reduce his own potential liability behind the corporate shield of Blue Finance and All Seas Management at the expense of the plaintiffs.

273.     By virtue of the foregoing, Blue Finance and All Seas Management transacted the personal business of Angelov rather than its own business with Angelov the dominator of Blue Finance and All Seas Management to the extent that Blue Finance and All Seas Management lost their individual separate corporate identities and for all intents and purposes was the alter ego of Angelov as evidenced by the facts averred above.

274.     Piercing the corporate veil of Blue Finance and All Seas Management is therefore necessary to achieve justice and the equitable result necessitated by Angelov's domination of Blue Finance and All Seas Management and required to right the wrong in the loss of the Funds as a direct and proximate result thereof, that is, the return of the Funds, to which plaintiffs as creditors and investors had and have a legal and rightful claim.

275.     Accordingly, the plaintiffs are entitled to disregard the corporate existence of Blue Finance and All Seas Management so as to hold defendant Angelov directly personally liable for Blue Finance and All Seas Management's participation in the fraud perpetrated on the plaintiffs related to the SBP.

276.     As a direct, proximate, and foreseeable result of the fraud and other wrongs Angelov committed as the dominator and alter ego of Blue Finance and All Seas Management as a mere instrumentality to Angelov, plaintiffs are entitled to recover the

loss of the Funds in the amount of at least $65 million, the exact amount to be proven at trial.

277.     Plaintiffs furthermore request a declaratory judgment that Angelov is the alter ego of Blue Finance and All Seas Management.

## COUNT V
## 11 U.S.C. §§ 548 and 550
### Fraudulent Transfer of Debtor's Interest in Property
### (As to FIB, Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

278.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 277 of the Complaint.

279.     Plaintiffs as purchasers of the U.S. Trustee's interests in Ayr's interests pursuant to Ayr's U.S. bankruptcy proceedings bring this claim against defendant Harris, as creator, owner, and Director of both Ayr and Ayr's Bulgarian-registered subsidiary, APD.

280.     The debtor, Ayr by and through Harris, had an interest in the property of the Funds as proceeds from the APD bankruptcy sale of the land held by APD in Bulgaria that was supposed to be used for the SBP. This interest is confirmed by Bulgarian and U.S. court rulings affirming Ayr's ownership of the Funds as an asset, as laid out above in ¶¶ 138, 222, and 224 of the Complaint.

281.     Harris filed for bankruptcy on behalf of Ayr on October 10, 2014.

282.     The Funds were stolen by FIB, as a direct and proximate result of Harris' failure to take steps to protect the funds despite multiple warnings, from CCB on or about October 24, 2014.

283.     Harris committed a fraudulent conveyance when he permitted FIB to seize the Funds held in CCB and which belonged to Ayr as an asset of the defunct Ayr subsidiary, APD.

284.     Harris' allowance of FIB seizing the funds without right functioned for all intents and purposes as a conveyance or transfer.

285.     Accordingly, the transfer was made within one year of the filing of the bankruptcy petition, and at the time of the fraudulent transfer of the Funds, debtor Ayr by and through Harris was insolvent at the time of the transfer and become further insolvent as a result thereof.

286.     The conveyance was made without fair consideration and Ayr, by and through Harris, thus received nothing in return, which was less than a reasonably equivalent value in exchange for such transfer, as FIB paid no fair consideration for the funds, which were in an amount of more than $65 million; FIB exchanged no property nor was any antecedent debt of Ayr to FIB paid off in return for the Funds;  nor did FIB receive the Funds in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the Funds.

287.     Therefore, pursuant to 11 U.S.C. § 550, plaintiffs, as purchasers and rightful holders of the U.S. bankruptcy trustee's rights arising out of the Ayr bankruptcy proceeding, seek to recover, for the benefit of the estate, the property transferred, namely the Funds or the value of such property in an amount no less than $65 million, the exact amount to be proven at trial.

## COUNT VI
### Breach of Contract
### (As to Ayr, Harris, Angelov, and FIB, and
### Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

288.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 287 of the Complaint.

289.     Harris, Angelov, and FIB breached the explicit and material terms of the agreements dated September 15, 2009; June 4, 2010; and December 29, 2009 (hereinafter "the Loans Contracts").

290.     The terms of the Loans Contracts required Harris, Angelov, and FIB to appropriately and responsibly manage the SBP, and properly apply the FIB construction loans related to the SBP.

291.     There was an implied duty of good faith in the performance of the Loan Contracts.

292.     The above defendants failed and/or refused to meet their obligations under the Loans Contracts, and breached the Loans Contracts by, *inter alia*, failing to properly manage and invest plaintiffs' monetary contributions to SBP when they, instead, stole those contributions and failed to disclose their ulterior scheme and actions to the plaintiffs.

293.     Those breaches were material.

294.     Plaintiffs at all times upheld their obligations as creditors and investors under the Loans Contracts.

295.     As a direct, proximate, and foreseeable result of the defendants' breaches, plaintiffs sustained injury and damage, including the loss of the benefit of their bargain, increased costs, expenses and fees, and loss of profits, including, specifically, the loss of their investment in the amount of at least $65 million, the exact amount to be determined at trial.

**COUNT VII**
**Breach of Contract**
**(As to Ayr, Harris, Harriott, Angelov, and FIB, and**
**Minev, Mutafchiev, Mellon Bank, and Eaton Vance)**

296.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 295 of the Complaint.

297.     Harris, Harriott, Angelov, and FIB breached the explicit and material terms of the agreements between them and the plaintiffs dated March 28, 2012 and November 27, 2013 (hereinafter "the Agreements").

298.     The terms of the Agreements required Harris, Harriott, Angelov, and FIB to appropriately and responsibly manage the reorganization project for APD in order to avoid APD having to file for bankruptcy and destroy the means of realizing the SBP.

299.     The terms of the Agreements also obligated these Defendants to comply with U.S. law governing fraud and criminal acts, and New York was the selected forum and U.S. law the choice of law in that chosen forum for all disputes related to the Agreements. All parties consented to this choice of law and choice of forum in signing the Agreements.

300.     There was an implied duty of good faith in the performance of the Agreements.

301.     The above defendants failed and/or refused to meet their obligations under the Agreements, and breached the Agreement by, *inter alia*, failing to properly manage and in fact never taking concrete steps to implement the reorganization of APD in order to save it from bankruptcy, which led in fact to APD filing for bankruptcy in Bulgaria.

302.     Those breaches were material.

303.     Plaintiffs at all times upheld their obligations as creditors and investors under the Agreements.

304.     As a direct, proximate, and foreseeable result of the defendants' breaches, plaintiffs sustained injury and damage, including the loss of the benefit of their bargain, increased costs, expenses and fees, and loss of profits, including, specifically, the loss of their investment in the amount of at least $65 million, the exact amount to be determined at trial.

**COUNT VIII**
**Breach of Contract**
**(As to Angelov)**

305.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 304 of the Complaint.

306.     Angelov breached the explicit and material terms of its July 16, 2007 contract with Rudersdal.

307.     The terms of the contract required Rudersdal to provide €19 million towards obtaining the development and construction project for SBP and for Angelov to appropriately and responsibly obtain the right-to-build contract and pay the accompanying €10 million fee necessary to begin construction of the SBP.

308.     There was an implied duty of good faith in the performance of the contract.

309.     Angelov failed and/or refused to meet his obligations under the contract, and breached the contract by, *inter alia*, failing to pay the permitting fee and obtain the right-to-build contract because the money earmarked for that fee was already gone, as Angelov knew, towards acquiring the Mexican bonds per Angelov's scheme with Harriott and Harris. Angelov failed to return Rudersdal's €19 million and to take any other steps to acquire the funds needed to obtain the construction permit as required by the terms of the contract with Rudersdal.

310.     Those breaches were material.

311.     Rudersdal at all times upheld its obligations under the contract.

312.     As a direct, proximate, and foreseeable result of the defendant's breaches, plaintiff Rudersdal sustained injury and damage, including the loss of the benefit of their bargain, increased costs, expenses and fees, and loss of profits, including, specifically, the loss in the amount of at least $15 million, the exact amount to be determined at trial.

**COUNT IX**
**Tortious Interference with Contract**
**(As to FIB, Minev, Mutafchiev, Mellon Bank, and Eaton Vance)**

313.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 312 of the Complaint.

314.      Based on the July 16, 2007 contract, Rudersdal had a business relationship whereby Angelov had to acquire the necessary right-to-build permit for the SBP as averred above and Rudersdal had to and did pay Angelov a total of €19 million.

315.     Angelov instructed Rudersdal to deposit the €19 million into his various bank accounts, including accounts at FIB in the amount of  €5 million.

316.     FIB had full knowledge of the entire SBP and knowledge of the contract between Angelov and Rudersdal because Angelov negotiated with FIB the terms governing the accounts at FIB where the Rudersdal $6.632.653(€5 million) was deposited. The terms of the FIB accounts provided that any money deposited therein would go automatically toward paying off Angelov's designated debts or loans. Moreover, FIB knew from the Rudersdal payment orders accompanying Rudersdal's FIB deposits into the Angelov designated FIB accounts that the deposits were related to the July 16, 2007 contract, the business relationship with Angelov and SBP and not for Angelov's debt extinguishment.

317.     FIB improperly intentionally interfered with the performance of the July 16, 2007 contract without justification by diverting Rudersdal's deposited funds toward paying off Angelov's designated debts or loans and failing to instead place Rudersdal's funds in an account designated for Rudersdal SBP participation and safeguarding said funds for the purposes Rudersdal had assigned to them, thereby preventing the payment of the permit fee.

318.     As a direct, proximate, and foreseeable result of FIB's tortious interference with the July 16, 2007 contract, plaintiff Rudersdal sustained damages, including the loss of the benefit of their bargain, increased costs, expenses and fees, and loss of profits, including,

specifically, the loss in the amount of at least $6.632.653(€5 million), the exact amount to be determined at trial.

## COUNT X
## Breach of Fiduciary Duty
### (As to Ayr, Harris, Harriott, Angelov, FIB, and Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

319.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 318 of the Complaint.

320.     Harris, Harriott, Angelov, and FIB owed a fiduciary duty to plaintiffs arising out of their contractual and close business relationships and the policies, understandings, and instructions related thereto as described above. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

321.     These defendants breached their fiduciary duties to plaintiffs by failing to safeguard the Funds, by failing to act in accordance with their representations in the Loans Contracts and Agreements between them and the plaintiffs regarding plaintiffs' participation in SBP, by acting in a manner directly adverse to those Loans Contracts and Agreements, by failure to act in good faith in their handling of plaintiffs' investments, by engaging in self-dealing with plaintiffs' investments, and by failing to act with the required diligence in their business dealings with plaintiffs.

322.     In conspiracy with all the other defendants, Harris, Harriott, Angelov, and FIB orchestrated and carried out the theft of the Funds to benefit themselves by using the Funds to invest in the Mexican bonds escrow agreements and in facilitating and acquiescing in the paying off the debt of the Five Companies for personal gain. These benefits were grossly larger than the benefits to which Harris, Harriott, Angelov, and FIB would have

been entitled under the Loans Contracts and Agreements that they had entered into with plaintiffs ostensibly to realize the SBP.

323.     By virtue of the acts and fraudulent conduct averred above, Harris, Harriott, Angelov, and FIB knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights of plaintiffs, breached their fiduciary duties to plaintiffs.

324.     As a direct, proximate, and foreseeable result of the unlawful use and taking of the Funds in contravention to defendants' fiduciary duties, to which plaintiffs never consented and were neither notified nor consulted, the plaintiffs suffered harm in the loss of more than $65 million, the exact amount to be proven at trial.

**COUNT XI**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Ayr, Harris, Harriott, Angelov, FIB,**
**Minev, Mutafchiev, Mellon Bank, and Eaton Vance)**

325.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 324 of the Complaint.

326.     Harris, Harriott, Angelov, and FIB owed a fiduciary duty to plaintiffs arising out of their contractual and close business relationships and the policies, understandings, and instructions related thereto as described above. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

327.     By virtue of the acts and fraudulent conduct averred above, Harris, Harriott, Angelov, and FIB knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights of plaintiffs, breached their fiduciary duties to plaintiffs.

328.     Harris, Harriott, Angelov, and FIB each knew that each among them owed the aforesaid fiduciary duties to the plaintiffs pursuant to their individual fiduciary relationships with the plaintiffs.

329.     As alleged herein, Harris, Harriott, Angelov, and FIB each had actual knowledge that each among them violated their fiduciary duties to plaintiffs, *inter alia*, by reason of the fact that each were co-conspirators in the conspiracy to abscond with plaintiffs' investment in SBP and plaintiffs' right to the Funds; Harris, Harriott, and Angelov were parties to the Agreement and Supplemental Agreement with the plaintiffs regarding the details of the APD reorganization which were never carried out; and through communications between Angelov, Harris, and Harriott regarding funneling some of the Funds into the Mexican bonds scheme.

330.     By virtue of the acts and conduct alleged herein, Harris, Harriott, Angelov, and FIB knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights of plaintiffs, provided substantial assistance to, and aided and abetted, each other among them in breaching their fiduciary duties to plaintiffs by affirmatively assisting, helping conceal, and/or failing to act when required to do so to prevent such breaches from occurring.

331.     As a direct, proximate, and foreseeable result of the foregoing, plaintiffs have sustained damages in the amount of $65 million, the exact amount to be proven at trial.

## COUNT XII
### Breach of Fiduciary Duty
### (As to BNB, Lyutov, and Kostadinchev)

332.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 331 of the Complaint.

333.     BNB and the two CCB BNB-appointed conservators, Lyutov and Kostadinchev, owed a fiduciary duty to plaintiffs arising out of their position as financial overseers and

regulators of CCB once CCB was put in receivership by BNB. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

334.     These defendants breached their fiduciary duties to plaintiffs by failing to safeguard the Funds, by acting in a manner directly adverse to plaintiffs' interest in and ownership of the funds by permitting the to be stolen and used to extinguish the debts of the Five Companies, by failure to act in good faith in their handling of the Funds, by engaging in self-dealing with the Funds, and by failing to act with the required diligence in their capacities as financial regulators in the context of CCB's financial crisis and receivership.

335.     In conspiracy with all the other defendants, BNB and the conservators orchestrated and carried out the theft of the Funds to benefit themselves by using and/or permitting and enabling the Funds to pay off the debt of the Five Companies for personal gain.

336.      By virtue of the acts and fraudulent conduct averred above, BNB and the two conservators knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights of plaintiffs, breached their fiduciary duties to plaintiffs.

337.     As a direct, proximate, and foreseeable result of the unlawful use and taking of the Funds in contravention to defendants' fiduciary duties, to which plaintiffs never consented and were neither notified nor consulted, the plaintiffs suffered harm in the loss of more than $65 million, the exact amount to be proven at trial.

## COUNT XIII
### Aiding and Abetting Breach of Fiduciary Duty
### (As to BNB, Lyutov, and Kostadinchev)

338.      Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 337 of the Complaint.

339.     BNB and the two CCB BNB-appointed conservators, Lyutov and Kostadinchev, owed a fiduciary duty to plaintiffs arising out of their position as financial overseers and regulators of CCB once BNB put CCB in receivership. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

340.     BNB and the two CCB BNB-conservators each knew that each among them owed the aforesaid fiduciary duties to the plaintiffs pursuant to their individual fiduciary status with the plaintiffs.

341.     These defendants breached their fiduciary duties to plaintiffs by failing to safeguard the Funds, by acting in a manner directly adverse to plaintiffs' interest in and ownership of the Funds by permitting the Funds to be retitled in names other than Plaintiffs, by permitting the Funds to be stolen and used to extinguish the debts of non related entities, the Five Companies, by failure to act in good faith in their handling of the Funds, by engaging in self-dealing with the Funds, and by failing to act with the required diligence in their capacities as financial regulators and fiduciaries in the context of CCB's receivership.

342.     In conspiracy with all the other defendants, BNB and the BNB-appointed conservators orchestrated and carried out the theft of the Funds to benefit themselves by using and/or permitting and enabling the Funds to pay off the debt of the Five Companies for personal gain.

343.     By virtue of the acts and conduct averred above, BNB and the two CCB BNB-conservators knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights and ownership interests of plaintiffs, provided substantial

assistance to, and aided and abetted, each other among them in breaching their fiduciary

duties to plaintiffs by affirmatively assisting, helping conceal, and/or failing to act when

required to do so to prevent such breaches from occurring.

344.     As a direct, proximate, and foreseeable result of the foregoing, plaintiffs have

sustained damages in the amount of $65 million, the exact amount to be proven at trial.

### COUNT XIV
### Unjust Enrichment
### (As to all defendants)

345.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein

the averments of paragraphs 1 through 344 of the Complaint.

346.     Through their fraudulent and deceitful actions regarding the Funds, all defendants

gained financial benefits, as set forth above as to each defendant, from the Funds at the the

expense and to the financial loss to the plaintiffs of their entire, respective, investment in

the SBP.  Plaintiffs were deprived of the singular asset to recover as Ayr creditors with the

defendants' unlawful taking of the Funds.

347.     The principles of equity and good conscience demand that all defendants not be

permitted to remain unjustly enriched and that plaintiffs be fully compensated for their

entire loss in the approximate amount of $65 million, the exact amount to be proven at trial.

### COUNT XV
### Fraudulent Concealment
### (As to Ayr, Harris, Harriott, Angelov, FIB, Minev,
### Mutafchiev, Mellon Bank, and Eaton Vance)

348.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein

the averments of paragraphs 1 through 347 of the Complaint.

349.     Defendants Harris, Harriott, Angelov, and FIB had a duty as a result of their special

and fiduciary relationships with plaintiffs as averred above to disclose to plaintiffs all

material facts related to SBP, the APD bankruptcy, and the safeguarding and use of the Funds.

350.     This duty arose from Harris, Harriott, Angelov, and FIB's fiduciary relationship with plaintiffs through their negotiations and contracts for plaintiffs' financial investment in the SBP.

351.     Harris, Harriott, Angelov, and FIB intentionally concealed the fact that the Funds in the CCB accounts had been stolen from the plaintiffs, and the fact that Harris, Harriott, Angelov, and FIB had a scheme to use the funds to enable the BT call option and buy the Mexican bonds and not to develop the SBP as they had represented to plaintiffs in business dealings.

352.     Harris, Harriott, Angelov, and FIB's deliberate failure to disclose their true intent to steal plaintiffs' investment while telling plaintiffs their investment would go to developing the SBP induced plaintiffs to invest in said project, and plaintiffs in fact relied on defendants' failure to disclose that fact.

353.     The fraudulent statements, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–56, 140–50, 140–58, 164–73, 179–89, 218–24.

354.     Each such failure to disclose was the result of the defendants' specific intent to defraud or deceive the plaintiffs out of the Funds.

355.     As a direct, proximate, and foreseeable result of Harris, Harriott, Angelov, and FIB's failure to disclose the fact that they intended to defraud plaintiffs of their investment and that the Funds had been stolen, and of plaintiffs' justifiable reliance and inducement to

act thereon, plaintiffs have sustained damages in the amount of $65 million, the exact amount to be proven at trial.

## COUNT XVI
### Fraudulent Concealment
### (As to BNB, Lyutov, and Kostadinchev)

356.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 355 of the Complaint.

357.     BNB and the two CCB BNB-appointed conservators, Lyutov and Kostadinchev, owed a fiduciary duty to plaintiffs arising out of their position as financial overseers and regulators of CCB once BNB put CCB in receivership. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

358.     BNB and the two CCB BNB-appointed conservators intentionally concealed the fact that FIB and other defendants were engaged in a fraud to become title owner and beneficiary to the Funds (loan repayment), the Funds in the CCB accounts had been stolen from the plaintiffs, and that BNB and the two CCB BNB-appointed conservators orchestrated a scheme to use the Funds to pay off the debts of the Five Companies to CCB in contravention to the Bulgarian court's order that the Funds be moved to a special account at Bulgarian Development Bank.

359.     BNB and the two CCB BNB-appointed conservators' deliberate failure to disclose their true intent to steal plaintiffs' investment and failure to disclose their appropriation of the Funds and application of them to extinguish the Five Companies' debts induced plaintiffs to stay the course and not take action against BNB and the two CCB BNB-

appointed conservators for the failure to safekeep the Funds, and plaintiffs in fact relied on defendants' failure to disclose those facts.

360.    The fraudulent statements, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 62–73, 118–21, 140–58.

361.    Each such failure to disclose was the result of the defendants' specific intent to defraud or deceive the plaintiffs out of the Funds.

362.    As a direct, proximate, and foreseeable result of BNB and the two CCB BNB-appointed conservators' failure to disclose the fact that they intended to defraud plaintiffs of their investment and steal the Funds, and of plaintiffs' justifiable reliance and inducement to act thereon, plaintiffs have sustained damages in the amount of $65 million, the exact amount to be proven at trial.

## COUNT XVII
### Fraud
### (As to all defendants)

363.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 362 of the Complaint.

364.    All defendants knew, or should have known, that the representations they made to the plaintiffs about SBP and the Funds would be reasonably relied upon by the plaintiffs.

365.    Material portions of those representations and information were false, wrong, and inaccurate, and these defendants knew that those representations and information were false, wrong, and inaccurate (the "Misrepresentations").

366.    These defendants fraudulently made the Misrepresentations intending that the plaintiffs would act on the Misrepresentations, and knowing that plaintiffs were likely to rely on the Misrepresentations which, if erroneous, would cause loss or injury.

367.    The content of the Misrepresentations includes, but is not limited to, the following:

a.  Misrepresenting and/or failing to disclose material information regarding the 2007-2009 FIB loans to fund the development of the SBP as set forth above;

b.  Misrepresenting SBP as a suitable investment and viable development plan for plaintiffs to invest in, as set forth above;

c.  Failing to identify and/or alert plaintiffs to all material facts regarding the SBP project development or lack thereof, as set forth above;

d.  Misrepresenting and/or failing to disclose the need for additional funding to realize the SBP, as set forth above;

e.  Misrepresenting and/or failing to disclose the use of plaintiffs' financial investments in SBP to fund the Mexican bond escrow agreement, as set forth above;

f.  Misrepresenting and/or failing to disclose to plaintiffs that the reconstruction plan for APD was never funded and that defendants never intended that it would be, as set forth above;

g.  Misrepresenting and/or failing to disclose to plaintiffs defendants' knowledge of FIB's fraudulent claims as creditor to APD's bankruptcy proceedings, as set forth above;

h.  Misrepresenting and/or failing to disclose to plaintiffs FIB's multiple attempts to present claims to the Funds in the CCB accounts, as set forth above;

i.  Misrepresenting and/or failing to disclose to plaintiffs that the coal contracts were a mere sham to justify the FIB loans, as set forth above;

j.  Misrepresenting and/or failing to disclose to plaintiffs that CCB went into receivership after the run on the Bulgarian banks thus compromising the Funds, as set forth above;

k.  Misrepresenting and/or failing to disclose to plaintiffs that FIB had acquired access to the CCB accounts and that the Funds had been retitled and used to extinguish the Five Companies' unrelated CCB loans, as set forth above;

l.  Misrepresenting and/or failing to disclose to plaintiffs the interference of the Second Group to realize the extinguishment of the Five Companies' CCB debts with the Funds in order to enable the larger goal of the BT call option and close the CCB bank accounts, as set forth above;

m.  Misrepresenting to plaintiffs that Ayr did not possess the Funds as an asset when Harris on Ayr's behalf sought No Asset bankruptcy in Texas when in fact Ayr did, as set forth above;

n.  Misrepresenting and/or failing to disclose to plaintiffs Peevski's role in assisting FIB with FIB's need for government bailout funds;

o.  Failing to disclose to plaintiffs that the Funds were stolen and gone, which fact did not come to light until Ayr bankruptcy proceedings had run their course in Texas and the U.S. Bankruptcy Court declared the Funds to be an Ayr asset, by which time the Funds were long gone, as set forth above;

p.  Misrepresenting and/or failing to disclose to plaintiffs that Harris did not and never intended to take any action to protect the Funds from the onslaught of actions by the other defendants to obtain the Funds, as set forth above.

368.  The Misrepresentations, including the maker, the recipient, and the date and the place of the transmission of the Misrepresentations, are set out in the Complaint at ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–56, 140–50, 140–58, 164–73, 179–89, 218–24.

369.  The plaintiffs did in fact rely on those Misrepresentations.

370.       Their reliance on those Misrepresentations was reasonable and foreseeable.

371.       All defendants made those misrepresentations with the malicious intent to defraud and deceive the plaintiffs, and to induce the plaintiffs' reliance on the Misrepresentations to plaintiffs' injury, harm, loss, and detriment, and plaintiffs were in fact misled and deceived by the Misrepresentations, and in fact reasonably relied on the Misrepresentations.

372.       The Misrepresentations were false and fraudulent, and were known by defendants to be false and fraudulent when made, and thereafter, were made with reckless indifference in disregard for the truth or falsity of the Misrepresentations, displaying a high degree of moral culpability and manifesting a conscious and reckless disregard for the rights of the plaintiffs bordering on criminality.

373.       Defendants had actual knowledge as to the Misrepresentations.

374.       As a direct, proximate, and foreseeable consequence of plaintiffs' reliance on the Misrepresentations plaintiffs have sustained damages in excess of $65 million, the exact amount to be proven at trial.

**COUNT XVIII**
**Aiding and Abetting Fraud**
**(As to all defendants)**

375.        Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 374 of the Complaint.

376.       By the conduct averred above, all defendants made material Misrepresentations to plaintiffs, including omissions of material facts these defendants were required to disclose, concerning, *inter alia*, the use of the Funds and the state of plaintiffs' investment in the SBP.

377.       The defendants made such misrepresentations with intent to defraud plaintiffs, to enable them to loot the Funds maintained at CCB for their own personal benefit.

378. Plaintiffs justifiably and foreseeably relied upon these defendants' misrepresentations and failure to disclose material facts.

379. All defendants each had actual knowledge of and notice that each among them had made misrepresentations of material fact and omitted facts each was required to disclose to plaintiffs.

380. The Misrepresentations were false and fraudulent, and were known by defendants to be false and fraudulent when made, and thereafter, were made with reckless indifference in disregard for the truth or falsity of the Misrepresentations, displaying a high degree of moral culpability and manifesting a conscious and reckless disregard for the rights of the plaintiffs bordering on criminality.

381. These defendants knowingly, wantonly, maliciously, intentionally, and recklessly, with a conscious disregard of the rights of plaintiffs, aided and abetted each among them in perpetrating a fraud on plaintiffs. Specifically, each defendant provided substantial assistance to advance the fraud's commission by, without limitation, the following acts:

    a. Disguising the money transfers to All Seas Management Ltd., an entity owned and controlled solely by Chavdar Angelov, and Blue Finance Limited, an entity owned and controlled solely by Chavdar Angelov, both Marshall Island registered entities, to look like legitimate investments in a large property development project by Ayr, the Silver Beach project, as averred above;

    b. Failing to take any steps to protect the Funds in CCB despite notice and warning from Tomov and APD Attorney Maria Nakova that FIB was pursuing them, as averred above;

c. Filing for fraudulent No Asset U.S bankruptcy on behalf of Ayr to allow FIB to reach around the automatic stay on Ayr's assets to get the Funds after FIB unsuccessfully tried to be declared a creditor of APD, as described above;

d. Collaborating to divert $39,823,594 from the first three SBP loans FIB to the trustee escrow agreement to purchase the ancient Mexican bonds, as described above;

e. Failing to repay any of the loans to FIB on the SBP property, so that APD was eventually forced to declare bankruptcy and the SBP property forced to be sold as a result, as described above; and

f. Using the raid on the banks in Bulgarian to put CCB into receivership by BNB which allowed BNB and the CCB BNB-appointed conservators to re-appropriate the Funds being held at CCB to extinguish the Five Companies' debts in contravention to the automatic stay issued in the U.S. bankruptcy proceedings for Ayr as well as the Bulgarian court's July 11, 2014 order.

382.   Defendants each had actual knowledge of the fraudulent scheme to steal the Funds for the larger, ultimate goal of realizing the BTH and Vivacom call options.

383.   As a direct, foreseeable, and proximate result of all defendants aiding and abetting each other to carry out the fraud, plaintiffs sustained damages in excess of $65 million, the exact amount to be proven at trial.

**COUNT XIX**
**N.Y. Debt. & Cred. Law § 273**
**Fraudulent Conveyance by Insolvent**
**(As to Ayr and Harris)**

384.   Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 383 of the Complaint.

385.     Defendant Harris committed a constructive fraudulent conveyance when he permitted FIB to seize the Funds held in CCB and which belonged to Ayr as an asset of the defunct Ayr subsidiary, APD.

386.     Harris' allowance of FIB seizing the funds without right functioned for all intents and purposes as a conveyance or transfer.

387.     The conveyance was made without fair consideration as FIB paid no fair consideration for the funds, which were in an amount of more than $65 million; FIB exchanged no property nor was any antecedent debt of Ayr to FIB paid off in return for the Funds;   nor did FIB receive the Funds in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the Funds.

388.     By conveying the Funds to FIB, Harris thereby rendered Ayr insolvent as the Funds was the only asset of value which Ayr held that could be used to meet and satisfy its outstanding creditors' claims.

389.     Plaintiffs as creditors and holders of the trustee's claims of Ayr therefore demand that the conveyance in an amount no less than $65 million, the exact amount to be determined at trial, be returned to Ayr and put towards satisfaction of the creditors' claims thereto

### COUNT XX
### N.Y. Debt. & Cred. Law § 276
### Conveyance Made with Intent to Defraud
### (As to Ayr and Harris)

390.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 389 of the Complaint.

391.     Defendant Harris committed an actual fraudulent conveyance when he fraudulently filed for No Asset bankruptcy by failing to disclose Ayr's assets in its subsidiary APD and

in the Funds held in CCB, thereby shielding these assets from the automatic stay on Ayr's assets put in place by the U.S. bankruptcy court and permitting FIB to seize the Funds held in CCB which belonged to Ayr as an asset of the defunct Ayr subsidiary, APD.

392.     Harris' intentional fraudulent bankruptcy filing and subsequent deliberate failure to take action to protect the Funds from FIB's claims despite having been notified of these attempts on several occasions by Nakova and Tomov (see *supra* ¶¶ 127–30, 129, 138, 222, and 224) and subsequent allowance of FIB to seize the funds without right functioned for all intents and purposes as a conveyance or transfer.

393.     The fraudulent bankruptcy filing and conveyance, including the maker, the recipient, and the date and the place of the transmission, are set out in the Complaint at ¶¶ 77–104, 106–12, 123–30, 134–36, 218–23.

394.     The fraudulent conveyance was made without fair consideration as FIB paid no fair consideration for the funds, which were in an amount of more than $65 million; FIB exchanged no property nor was any antecedent debt of Ayr to FIB paid off in return for the Funds;   nor did FIB receive the Funds in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the Funds.

395.     The Funds conveyed to FIB had value out of which the creditors, the plaintiffs, could have realized their portion of their claims against Ayr in its bankruptcy proceedings for their investment in the failed SBP.

396.     By conveying the Funds to FIB, Harris thereby rendered Ayr insolvent as the Funds was the only asset of value which Ayr held that could be used to meet and satisfy its outstanding creditors' claims.

397.    Harris conveyed the Funds to FIB with actual intent to defraud the plaintiffs, as evidence by Harris' deliberate fraudulent filing for bankruptcy for Ayr without declaring the Funds and through Harris' inexcusable failure to take any steps or actions to protect the Funds from FIB's unrightful claims despite Harris' actual knowledge of FIB's attempts so to steal the funds.

398.    Moreover, under oath at two 341 meetings during Ayr's bankruptcy proceedings, Harris upon being questioned about any outstanding assets further failed to declare the Funds, or Ayr's subsidiary APD, thereby deliberately continuing to defraud the U.S. bankruptcy court and the plaintiffs as creditors thereby.

399.    Upon being found out to have failed to declare the Funds in Ayr's bankruptcy proceedings, Harris repeatedly failed to correct this material misrepresentation because he actually, and successfully, intended to defraud the plaintiffs as creditors regarding the Funds as an Ayr asset to which they had a legal claim.

400.    Plaintiffs as creditors and holders of the trustee's claims of Ayr therefore demand that the conveyance in an amount no less than $65 million, the exact amount to be determined at trial, be returned to Ayr and put towards satisfaction of the creditors' claims thereto.

### COUNT XXI
### Negligent Misrepresentation
### (As to all defendants)

401.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 400 of the Complaint.

402.    Defendants had a duty as a result of their special and fiduciary relationships with plaintiffs as averred above to disclose to plaintiffs all material facts related to SBP, the APD bankruptcy, and the safeguarding and use of the Funds.

403.    Defendants knew or should have known, that the representations they made to the plaintiffs about SBP would be relied upon by the plaintiffs, and that their fiduciary relationship as averred above imposed on them the duty to impart correct information to the plaintiffs.

404.    Material portions of those representations and information were false, wrong, and inaccurate, and these defendants knew that those representations and information were false, wrong, and inaccurate (the "Misrepresentations").

405.    These defendants fraudulently made the Misrepresentations intending that the plaintiffs would reasonably act on the Misrepresentations, and knowing that plaintiffs were likely to reasonably rely on the Misrepresentations which, if erroneous, would cause loss or injury.

406.    The content of the Misrepresentations includes the following:

a.    Misrepresenting and/or failing to disclose material information regarding the 2007-2009 FIB loans to fund the development of the SBP as set forth above;

b.    Misrepresenting SBP as a suitable investment and viable development plan for plaintiffs to invest in, as set forth above;

c.    Failing to identify and/or alert plaintiffs to all material facts regarding the SBP project development or lack thereof, as set forth above;

d.    Misrepresenting and/or failing to disclose the need for additional funding to realize the SBP, as set forth above;

e.    Misrepresenting and/or failing to disclose the use of plaintiffs' financial investments in SBP to fund the Mexican bond escrow agreement, as set forth above;

f.  Misrepresenting and/or failing to disclose to plaintiffs that the reconstruction plan for APD was never funded and that defendants never intended that it would be, as set forth above;

g.  Misrepresenting and/or failing to disclose to plaintiffs defendants' knowledge of FIB's fraudulent claims as creditor to APD's bankruptcy proceedings, as set forth above;

h.  Misrepresenting and/or failing to disclose to plaintiffs FIB's multiple attempts to present claims to the Funds in the CCB accounts, as set forth above;

i.  Misrepresenting and/or failing to disclose to plaintiffs that the coal contracts were a mere sham to justify the FIB loans, as set forth above;

j.  Misrepresenting and/or failing to disclose to plaintiffs that CCB went into receivership after the run on the Bulgarian banks thus compromising the Funds, as set forth above;

k.  Misrepresenting and/or failing to disclose to plaintiffs that FIB had acquired access to the CCB accounts and that the Funds had been retitled and used to extinguish the Five Companies' unrelated CCB loans, as set forth above;

l.  Misrepresenting and/or failing to disclose to plaintiffs the interference of the Second Group to realize the extinguishment of the Five Companies' CCB debts with the Funds in order to enable the larger goal of the BT call option and close the CCB bank accounts, as set forth above;

m.  Misrepresenting to plaintiffs that Ayr did not possess the Funds as an asset when Harris on Ayr's behalf sought No Asset bankruptcy in Texas when in fact Ayr did, as set forth above;

n.  Misrepresenting and/or failing to disclose to plaintiffs Peevski's role in assisting FIB with FIB's need for government bailout funds;

o.  Failing to disclose to plaintiffs that the Funds were stolen and gone, which fact did not come to light until Ayr bankruptcy proceedings had run their course in Texas and the U.S. Bankruptcy Court declared the Funds to be an Ayr asset, by which time the Funds were long gone, as set forth above;

p.  Misrepresenting and/or failing to disclose to plaintiffs that Harris did not and never intended to take any action to protect the Funds from the onslaught of actions by the other defendants to obtain the Funds, as set forth above.

407.   The Misrepresentations, including the maker, the recipient, and the date and the place of the transmission of the Misrepresentations, are set out in the Complaint at ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–56, 140–50, 140–58, 164–73, 179–89, 218–24.

408.   The plaintiffs were misled and deceived by the Misrepresentations and did in fact rely on those Misrepresentations.

409.   Their reliance on those Misrepresentations was reasonable and foreseeable.

410.   As a direct, proximate, and foreseeable consequence of that reliance plaintiffs sustained loss, injury, and damage.

411.   As a direct, foreseeable, and proximate result of the Misrepresentations, plaintiffs have sustained damages in excess of $65 million, the exact amount to be proven at trial.

## COUNT XXII
### Negligence
### (As to Ayr, Harris, Harriott, Angelov, FIB,
### Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

412.   Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 411 of the Complaint.

413.     Harris, Harriott, Angelov, and FIB, they owed a fiduciary duty to plaintiffs arising out of their contractual and close business relationships and the policies, understandings, and instructions related thereto as averred above. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

414.     Harris, Harriott, Angelov, and FIB knew or should have known they breached that duty when they took steps to make possible the theft and did in fact steal the Funds and used them to pay of the Five Companies' debts at CCB and purchase the Mexican bonds, which was not the use of the Funds to which plaintiffs had agreed.

415.     Harris, Harriott, Angelov, and FIB's breach of their duty directly, proximately, and foreseeably caused injury to the plaintiffs in the amount of $65 million.

416.     Plaintiffs in fact suffered a loss of approximately $65 million, the exact amount to be proven at trial.

## COUNT XXIII
### Negligence
### (As to BNB, Lyutov, and Kostadinchev)

417.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 416 of the Complaint.

418.     BNB and the two CCB BNB-appointed conservators, Lyutov and Kostadinchev, owed a fiduciary duty to plaintiffs arising out of their position as financial overseers and regulators of CCB once CCB was put in receivership by BNB. As such, they each owed plaintiffs a fiduciary duty including, without limitation, the duties of good faith, fair dealing, honestly, fairness, full disclosure and loyalty towards plaintiffs, and an obligation not to engage in self-dealing.

419.     BNB, Lyutov, and Kostadinchev knew or should have known they breached that duty when they took steps to make possible the theft and did in fact steal the Funds and used them to pay of the Five Companies' debts at CCB, which was not the use of the Funds to which plaintiffs had agreed.

420.     BNB, Lyutov, and Kostadinchev breach of their duty directly, proximately, and foreseeably caused injury to the plaintiffs in the amount of $65 million.

421.     Plaintiffs in fact suffered a loss of approximately $65 million, the exact amount to be proven at trial.

**COUNT XXIV**
**Conversion**
**(As to all defendants)**

422.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 421 of the Complaint.

423.     The Funds stolen were specific and identifiable property, namely, a liquid cash asset in CCB bank accounts,  belonging to the plaintiffs.

424.     Plaintiffs, as investors in the SBP and as Ayr U.S. bankruptcy proceedings creditors, had an ownership interest  and  rightfully possessed and/or were entitled to control the Funds before they were stolen by the defendants.

425.     All defendants exercised unlawful and unauthorized control and dominion over the Funds when they unlawfully stole them from the plaintiffs and distributed them to purchase the Mexican Bonds and/or pay off the debts of the Five Companies deriving direct economic benefit therefrom for themselves.

426.     The defendants' exercise of such unlawful and unauthorized dominion and control over the Funds altered the Funds' condition because they unlawfully changed the ownership status of the bank accounts which housed the Funds in removing APD as the rightful owner, and excluded plaintiffs from exercising their rights over the Funds and

unlawfully deprived plaintiffs of those Funds when the Funds were used to pay off unrelated CCB corporate debts for the sole benefit of defendants.

427.     As a direct, proximate, and foreseeable result, plaintiffs were actually harmed in the loss of at least approximately $65 million which were stolen from the CCB accounts, the exact amount to be proven at trial.

<div align="center">

**COUNT XXV**
**Civil Conspiracy**
**(As to all defendants)**

</div>

428.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 427 of the Complaint.

429.     The First Group, defendants Harris, Harriott, Angelov, and FIB combined by explicit and/or inferred agreement and understanding to accomplish an unlawful act and to use unlawful means to accomplish an act not itself illegal in furtherance of an explicit and/or inferred conspiratorial agreement between the First Group and the Second Group (all defendants) to unlawfully divest plaintiffs of their investment in SBP and interest in the Funds.

430.     The First Group each committed overt acts in furtherance of that agreement including, *inter alia*, negotiating and notarizing documents in New York and Texas related to the SBP Contracts and dealings; opening a bank account in HSBC Bank in New York allegedly to hold funds purportedly designated for APD's reorganization and reconstruction, with no intent to effectuate; fraudulently filing for No Asset bankruptcy for Ayr in Texas despite the fact that APD owed Ayr wich did hold the Funds as an asset; failing to take any steps to protect the Funds in CCB from being stolen by FIB to pay off the Five Companies' debts; and failing to disclose any of these or other wrongdoings to the plaintiffs.

431.    The First Group intentionally participated in furthering this common purpose or plan through fraud, breach of contract, unjust enrichment, fraudulent concealment, breach of their fiduciary duties, conversion, negligence, negligent misrepresentation, and aiding and abetting to realize the conspiracy.

432.    The Second Group participated as co-conspirators intentionally participated in furthering this common purpose or plan through fraud, breach of fiduciary duty, tortious interference with contract, negligent misrepresentation, conversion, unjust enrichment, and aiding and abetting to divest plaintiffs of their investment in order to obtain fees, commissions, and personal gains, to their sole personal benefit.

433.    All defendants as co-conspirators knew, or should have known, of the plan for the theft of the Funds. All defendants as co-conspirators knew, or should have known, that the cover-up of that theft constituted misrepresentation and deceit, and an unlawful conspiracy to wrongfully divest plaintiffs of their property amounting to an international criminal enterprise. All defendants as co-conspirators of each other knew of, or should have known of, and recklessly disregarded the wrongful conduct of the others, and failed to supervise, review, or report on the wrongful conduct which led to the Funds being stolen, and facilitated the wrongful conduct of the other conspirators by such failures.

434.    As a consequence of participation in this conspiracy, all defendants and each of them are liable for the misconduct of the other members of the conspiracy.

435.    All defendants conspired to ensure that the Funds were appropriated for their benefit and profit, with the direct, proximate, and foreseeable loss and damage to plaintiffs including the loss of the benefit of their bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships,

specifically in the amount of $65 million, the exact amount to be proven at trial, pursuant to and in furtherance of the common scheme and agreement of the defendants.

## COUNT XXVI
## Civil RICO 18 U.S.C. 1962(a)–(c)
### (As to all defendants)

436.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 435 of the Complaint.

437.    Plaintiffs each are a "person" within the meaning of 18 U.S.C. 1961(3) and 18 U.S.C. 1964(c) and bring this action pursuant to 18 U.S.C. 1964(a)–(c) of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO").

438.    Defendants each are a "person" within the meaning of 18 U.S.C. 1961(3).

### *Predicate Acts*
### Mail Fraud and Wire Fraud

439.    Beginning in at least July 2007, and continuing through at least 2016, the First Group and Second Group perpetrated a massive fraud against the plaintiffs (see *supra* ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–56, 140–50, 140–58, 164–73, 179–89, 218–24).

440.    In conducting their part of the fraudulent scheme, the First Group made extensive use of the mail and wire in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Without limitation, instructions to open U.S. banking accounts, carry out activities in furtherance of the fraud, material misrepresentations made to plaintiffs, and the negotiation, finalization, and notarization of documents in furtherance of the fraud were sent by the First Group or their authorized agents via mail and wire to and from the United States, and specifically to and from New York.

441.     The fraud would not have been possible had the First Group, their entities, and their authorized agents not used the mail and wire to send and receive the communications in and out of New York.

442.     The First Group in particular, as fiduciaries to the plaintiffs, had a duty to disclose the series of transactions pursuant to which they and the Second Group stole the Funds which rightfully belonged to the plaintiffs. Not only did they fail to disclose the defendants' self-dealing transactions and fraudulent schemes, Harris affirmatively misled the plaintiffs by providing them with oral and written reports in which he misstated, misrepresented, failed to accurately disclose, and actively concealed the state of the SBP project as well as APD and Ayr's financial affairs related to plaintiffs' investments therein. The purpose of the First Group's fraudulent misrepresentations and omissions was to hide the fraud and allow all the defendants to continue their concerted scheme to obtain the Funds and associated personal gain related thereto.

443.     The plaintiffs relied on the First Group's misrepresentations and omissions, which allowed the defendants to steal more than $65 million from the plaintiffs without detection. Had the First Group disclosed the defendants' self-dealing, including, but not limited to, the theft of the Funds, the plaintiffs would not have permitted the transactions in question and would have certainly ended all business dealings with defendants regarding the SBP.

444.     The defendants' fraudulent scheme gives rise to numerous predicate acts of mail and wire fraud under RICO. These acts include, but are not limited to:

   a.   Email exchanges on or about October 13, 2010 between Harris in the U.S. and FIB in Bulgaria discussing and memorializing Ayr's commitment to undertake repayment of the three FIB construction loans of 2007, 2008, and 2009.

b.  FIB authorized and enabled the proceeds by way of FIB-authorized and -issued payment orders sent through the SWIFT banking communications system to Bank of Valletta on the following dates: November 26, 2007; November 29, 2007; November 30, 2007; December 3, 2007; October 8, 2008; December 31, 2009; and January 20, 2010. Thereafter, these payments made through the SWIFT system were converted into a U.S. dollars transaction and necessarily processed through New York, and further through the SWIFT system was transferred to Banco Popular Dominicano, Santo Domingo, Dominican Republic.

c.  Email exchanges on or about June 26, June 28, 2013 and December 31, 2013, between Harris in the U.S. and Tomov in Bulgaria in which Harris three times fraudulently and deceitfully failed to admit knowledge of the scheme with FIB to steal the Funds, or knowledge of any other wrongdoing related thereto.

445.    The scheme between the First Group and the Second Group could not and would not have been carried out without these instances of wire and mail fraud.

446.    These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

**Violations of the Travel Act**

447.    Upon information and belief, Harris, Harriott, and Angelov travelled to and from the U.S., including New York, many times to conduct activities pursuant to the SBP. Because Ayr is based in the United States and the center of gravity of the U.S.-arm of the racketeering activity was in New York, Harris, Harriott, and Angelov frequently had to travel to that state to carry out their illicit scheme in violation of 18 U.S.C. § 1952 (the "Travel Act").

448.     The scheme between the First Group and the Second Group could not and would not have been carried out without Harris, Harriott, and Angelov traveling to the U.S. to effect certain transactions.

449.     Harris, Harriott, Angelov, and FIB's scheme gives rise to several predicate violations of the Travel Act under RICO. These acts include, but, are not limited to:

    a.  In 2007, Angelov traveled from Bulgaria to meet with Harris in the U.S. to approach Harris with the proposal to participate in development of the SBP.

    b.  Travel to Texas to notarize on or about June 4, 2010, the "Mortgage Receivables Sale and Purchase Agreement" between Ayr and FIB for the SBP.

    c.  Angelov also traveled in and around the United States in March 2009, in the summer of 2010, and from November 2010 to March 2011 to meet with Harris and Harriott to discuss and carry out activities pursuant to the fraud.

450.     These violations establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

### Violations of Chapter 11 of the U.S. Code

451.     On October 10, 2014, Harris fraudulently filed for "No Asset" bankruptcy on behalf of Ayr under chapter 11 of the United States Code when, in fact, Ayr held the following: (1) APD, and (2) the Funds in CCB in Bulgarian.

452.     On or about December 3, 2014, Ayr, through Harris, was compelled by the U.S. bankruptcy trustee to amend Ayr's U.S. bankruptcy schedules to reflect that Ayr owned APD.

453.     However, he continued to perpetrate his fraud by not including Ayr's asset in the Funds, which compelled the U.S. trustee to hire Special Counsel Tomov to bring a lawsuit,

the result of which was the U.S. bankruptcy court found the Funds were due to Ayr and belonged to Ayr as an asset.

454.     The scheme between the First Group and the Second Group could not and would not have been carried out without Harris fraudulently filing for No Asset bankruptcy which bought the Second Group the additional time it needed and permitted FIB to get around the automatic stay placed on Ayr assets and perpetrate the theft of the Funds. Harris purposefully used the filing of No Asset bankruptcy to participate in and create a bridge the criminal activity of the First Group and the Second Group.

455.     These violations establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

### *Enterprise*

456.     The SBP, what otherwise would have been a viable business undertaking and development project, constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) and was the first (the "First Enterprise") of two enterprises which were the instruments defendants commandeered and used as vehicles to participate in, conspire, and profit from the scheme to rob the plaintiffs of their investments in the SBP.

457.     CCB, which otherwise was a viable commercial bank, constituted an enterprise within the meaning 18 U.S.C. § 1961(4) and was the second (the "Second Enterprise") of two enterprises which were the instruments defendants commandeered and used as vehicles to participate in, conspire, and profit from the scheme to rob the plaintiffs of their investments in the SBP.

458.     At all times relevant to the allegations in the Complaint, the First Enterprise engaged in, or its activities affected, interstate and/or foreign commerce. The defendants received and used monies from plaintiffs, who are of diverse citizenships including U.S., under the fraudulent guise of developing SBP pursuant to the First Enterprise.

459.     At all times relevant to the allegations in the Complaint, the Second Enterprise engaged in, or its activities affected, interstate and/or foreign commerce. Through the Second Enterprise, defendants fraudulently funneled plaintiffs' investments into various banks, telecommunication company and cigarette manufacturing and distribution businesses and channels touching the U.S., European Union, Russian, Middle Eastern, and other interstate markets and aspects of foreign commerce as averred above.

460.     The concerted purpose of the First Enterprise and the Second Enterprise was, through a series of illicit and illegal devises (principally through fraud and conversion), to wrongfully obtain, either directly or indirectly,  the investment in the SBP that belonged to the plaintiffs in the approximate amount of $65 million.

461.     The First Group, through the leadership of Harris and FIB, masterminded the scheme as to the First Enterprise and their participation in the First Enterprise, along with the participation of the rest of the defendants (see *supra* ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–36).

462.     The Second Group, through the leadership of Peevski, masterminded the scheme as to the Second Enterprise and their participation in the Second Enterprise, along with the participation of the rest of the defendants (see *supra*  ¶¶ 137–58, 164–73, 179–89, 218–24).

463.     Upon information and belief, the First Enterprise and the Second Enterprise includes other individuals and entities whose identities are not currently known.

464.     The major asset targeted by the defendants through the First Enterprise and Second Enterprise, the Funds from the sale of the SBP land in APD's bankruptcy proceedings in Bulgaria, was deemed an asset of Ayr in its bankruptcy proceedings in U.S. Bankruptcy Court in Texas and therefore its loss and the loss of plaintiffs' legal claim to those funds

through the U.S. bankruptcy proceedings were each a domestic injury suffered by plaintiffs in the United States.

465.    Negotiations and notarization of documents related to the SBP scheme occurred in the U.S. including in New York and Texas, and New York bank HSBC Bank was employed by defendants to perpetrate their claim that money to fund the reconstruction and reorganization of APD to save the SBP from bankruptcy would be transferred from HSBC Bank, New York.  This was never the case.

466.    The above-listed racketeering activity consisted of two or more incidents of racketeering activity committed by the defendants. The predicate acts, including the scheme undertaken against the plaintiffs, were committed within ten (10) years of each other, had continuity, and were related pursuant to 18 U.S.C. § 1961(5).

467.    These acts of racketeering constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and were interrelated by distinguishing characteristics, in that they had the same purpose, results, participants, victim, and methods of commission, and in part were directed at the same victim or victims: the plaintiffs.

468.    This racketeering activity was a regular way of conducting the First Enterprise and the Second Enterprise and each member's participation in the Enterprise.

469.    Upon information and belief, the Second Enterprise continues to this day, as CCB is subject to bankruptcy proceedings in Bulgaria as a result of the theft of the Funds and the defendants have attempted to conceal the scheme and thwart plaintiffs' efforts to investigate and uncover the full scope of the fraud, including, specifically, by threatening and instituting frivolous legal proceedings against Tomov to discourage and frighten him from pursuing these claims against the defendants.

### *Relatedness and Continuity*

470.     From at least 2007 and continuing through 2016, in the Southern District of New York and elsewhere, the defendants repeatedly engaged in acts indictable under 18 U.S.C. §§ 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1952 (relating to the Travel Act), and fraud in connection with a case under chapter 11, and thereby continually engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1).

471.     Defendants' violations of 18 U.S.C. §§ 1341, 1343, 1952, and fraud in connection with a case under chapter 11 extended over a period of years and involved distinct and independent criminal acts. They were neither isolated nor sporadic events, but involved regular and repeated violation of law to accomplish the Enterprise's purpose. These acts were related to each other by virtue of (a) common participants: the First Group and the Second Group; (b) a common victim: the plaintiffs, either directly or indirectly through their dealings with the First Group related to the SBP; (c) common methods of commission: complicated financial, corporate, business, and shareholder transactions effectuated through offshore banks, shell companies, and transfer of funds among various banks to hide the theft of the Funds, all designed to obfuscate the transfer of wealth from the plaintiffs to the defendants; and (d) the common purpose of looting the Funds belonging to the plaintiffs regarding the SBP.

### *Injury*

472.     As a proximate, direct, and foreseeable result of the defendants' violations of RICO, 18 U.S.C. § 1962(a)-(c), plaintiffs were injured in their business or property by reason of these violations in that, as a direct, proximate, and foreseeable result of the First Enterprise and Second Enterprise's acts, plaintiffs suffered damages, including the loss of the benefit of their bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships, and fear of economic loss as

well as actual economic loss. Specifically, plaintiffs suffered a loss of their investment of at least $65 million, the exact amount to be proven at trial.

473.      In addition, the scheme left the finances of APD and Ayr in a state of complete crisis, resulting in the bankruptcy of both companies and subsequent negative reverse domino effect in their backlash on their shareholders, creditors, investors and plaintiffs.

### COUNT XXVII
### Civil Rico 18 U.S.C. 1962(d)
### (As to all defendants)

474.      Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 473 of the Complaint.

475.      All defendants unlawfully, knowingly, and willfully conspired to commit activities prohibited by 18 U.S.C. § 1962(a)–(c) as described above, in violation of 18 U.S.C. § 1962(d).

476.      The defendants knew that they were engaged in a conspiracy to commit the predicate acts described above and knew that the predicate acts were part of such racketeering activity, and that participation and agreement was necessary to allow the commission of this pattern of racketeering activity.

477.      The defendants all knowingly agreed to conduct or participate directly or indirectly in the conduct, management, or operation of the First Enterprise and Second Enterprise's scheme to steal from the plaintiffs.

478.      The defendants' violation of 18 U.S.C. § 1962(d) directly, proximately, and foreseeably caused the plaintiffs to suffer the injury described above.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against the above-named Defendants as follows:

I.      With respect to the First Cause of Action (Piercing the Corporate Veil and Alter Ego):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.     Punitive damages in an amount to be determined at trial;

v.      Declaratory judgment that Defendant Harris is the alter ego of Ayr; and

vi.     Such other, further and different relief as this Court deems just and proper.

II.     With respect to the Second Cause of Action (Piercing the Corporate Veil and Alter Ego):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.     Punitive damages in an amount to be determined at trial;

v.      Declaratory judgment that Defendants Minev, Mutafchiev, Mellon Bank, Eaton Vance iare the alter egos of FIB; and

vi.     Such other, further and different relief as this Court deems just and proper.

III.    With respect to the Third Cause of Action (Piercing the Corporate Veil and Alter Ego):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.     Punitive damages in an amount to be determined at trial;

v.      Declaratory judgment that Defendant Harriott is the alter ego of Grant Capital; and

vi.     Such other, further and different relief as this Court deems just and proper.

IV.   With respect to the Fourth Cause of Action (Piercing the Corporate Veil and Alter Ego):

     i.   Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.   Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.   Pre-judgment and post-judgment interest at the maximum rate allowed by law;

     iv.   Punitive damages in an amount to be determined at trial;

     v.   Declaratory judgment that Defendant Angelov is the alter ego of Blue Finance and All Seas Management; and

     vi.   Such other, further and different relief as this Court deems just and proper.

V.   With respect to the Fifth Cause of Action (Fraudulent Transfer of Debtor's Interest in Property):

     i.   Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.   Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.   Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

     iv.   Such other, further and different relief as this Court deems just and proper.

VI.   With respect to the Sixth Cause of Action (Breach of Contract):

     i.   Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.   Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.   Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

     iv.   Such other, further and different relief as this Court deems just and proper.

VII.   With respect to the Seventh Cause of Action (Breach of Contract):

     i.   Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.      Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

VIII.   With respect to the Eighth Cause of Action (Breach of Contract):

i.       Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.      Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

IX.     With respect to the Ninth Cause of Action (Tortious Interference with Contract):

i.       Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.      Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.     Punitive damages in an amount to be determined at trial; and

v.      Such other, further and different relief as this Court deems just and proper.

X.      With respect to the Tenth Cause of Action (Breach of Fiduciary Duty):
i.       Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.      Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

XI.     With respect to the Eleventh Cause of Action (Aiding and Abetting Breach of Fiduciary Duty):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

XII.    With respect to the Twelfth Cause of Action (Breach of Fiduciary Duty):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

XIII.   With respect to the Thirteenth Cause of Action (Aiding and Abetting Breach of Fiduciary Duty):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

iv.     Such other, further and different relief as this Court deems just and proper.

XIV.    With respect to the Fourteenth Cause of Action (Unjust Enrichment):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

iii.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.     Punitive damages in an amount to be determined at trial; and

v.      Such other, further and different relief as this Court deems just and proper.

XV.    With respect to the Fifteenth Cause of Action (Fraudulent Concealment):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

     iv.     Such other, further and different relief as this Court deems just and proper.

XVI.    With respect to the Sixteenth Cause of Action (Fraudulent Concealment):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

     iv.     Punitive damages in an amount to be determined at trial; and

     v.     Such other, further and different relief as this Court deems just and proper.

XVII.    With respect to the Seventeenth Cause of Action (Fraud):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

     iv.     Punitive damages in an amount to be determined at trial; and

     v.     Such other, further and different relief as this Court deems just and proper.

XVIII.    With respect to the Eighteenth Cause of Action (Aiding and Abetting Fraud):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

     iv.     Punitive damages in an amount to be determined at trial; and

     v.     Such other, further and different relief as this Court deems just and proper.

XIX.   With respect to the Nineteenth Cause of Action (Fraudulent Conveyance by Insolvent):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

     iv.     Such other, further and different relief as this Court deems just and proper.

XX.   With respect to the Twentieth Cause of Action (Conveyance Made with Intent to Defraud):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

     iv.     Punitive damages in an amount to be determined at trial; and

     v.     Such other, further and different relief as this Court deems just and proper.

XXI.   With respect to the Twenty-first Cause of Action (Negligent Misrepresentation):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

     ii.     Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

     iii.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

     iv.     Such other, further and different relief as this Court deems just and proper.

XXII.  With respect to the Twenty-second Cause of Action (Negligence):

     i.     Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

   ii.  Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

   iii.  Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

   iv.  Such other, further and different relief as this Court deems just and proper.

XXIII. With respect to the Twenty-third Cause of Action (Negligence):

   i.  Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

   ii.  Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

   iii.  Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

   iv.  Such other, further and different relief as this Court deems just and proper.

XXIV. With respect to the Twenty-fourth Cause of Action (Conversion):

   i.  Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

   ii.  Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

   iii.  Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

   iv.  Such other, further and different relief as this Court deems just and proper.

XXV. With respect to the Twenty-fifth Cause of Action (Civil Conspiracy):

   i.  Judgment in favor of Plaintiffs and against Defendants, jointly and severally;

   ii.  Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

   iii.  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

   iv.  Punitive damages in an amount to be determined at trial; and

   v.  Such other, further and different relief as this Court deems just and proper.

XXVI. With respect to the Twenty-sixth Cause of Action (Civil RICO 18 U.S.C. 1962(a)–(c)):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;
Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

ii.      Pursuant to RICO, reasonable attorney's fees, the costs of suit and all expenses and disbursements incurred in this action;

iii.      Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.      Pursuant to RICO, treble damages in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the statutory code; and

v.      Such other, further and different relief as this Court deems just and proper.

XXVII.      With respect to the Twenty-seventh Cause of Action (Civil RICO 18 U.S.C. 1962(d)):

i.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally;
Damages in an amount no less than $200,000,000, the exact amount of which to be determined at trial;

ii.      Pursuant to RICO, reasonable attorney's fees, the costs of suit and all expenses and disbursements incurred in this action;

iii.      Pre-judgment and post-judgment interest at the maximum rate allowed by law;

iv.      Pursuant to RICO, treble damages in addition to any other damages to which the victim is entitled pursuant to common law or other provisions of the statutory code; and

v.      Such other, further and different relief as this Court deems just and proper.


## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues and counts so triable.

/s/ Sylvia J. Rolinski
SYLVIA J. ROLINSKI, ESQ.
New York Bar No. SR 7798
Rolinski Law Group, LLC
14915 River Road
Potomac, MD 20854
Office  +1-301-987-0202 ext. 1
Fax  +1-301-263-7100
sjr@Rolinski.com

November 27, 2018                              Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW YORK**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| RUDERSDAL, EOOD, | ) | |
| | ) | |
| ALL SEAS PROPERTY 2, OOD, | ) | |
| | ) | |
| ASSET MANAGEMENT, EAD, | ) | |
| | ) | |
| ZAHARI TOMOV, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-11072 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| PHILIP ROBERT HARRIS, | ) | |
| | ) | |
| AYR LOGISTICS LIMITED, INC., | ) | |
| | ) | |
| ANTHONY DENNIS HARRIOTT, | ) | |
| | ) | |
| GRANT CAPITAL | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| FIRST INVESTMENT BANK, AD, | ) | |
| | ) | |
| TSEKO TODOROV MINEV, | ) | |
| | ) | |
| IVAILO DIMITROV MUTAFCHIEV, | ) | |
| | ) | |
| CHAVDAR ANGELOV ANGELOV, | ) | |
| | ) | |
| BLUE FINANCE LIMITED, | ) | |
| | ) | |
| ALL SEAS MANAGEMENT, LTD., | ) | |
| | ) | |
| DELYAN SLAVCHEV PEEVSKI, | ) | |
| | ) | |
| NSN INVESTMENT, EOOD, | ) | |
| | ) | |
| BULGARTABAC HOLDING, AD, | ) | |
| | ) | |
| BULGARIAN NATIONAL BANK, | ) | |
| | ) | |
| STANISLAV GEORGIEV LYUTOV, | ) | |
| | ) | |
| ELENA ZDRAVKOVA | ) | |

KOSTADINCHEV,                                    )
                                                 )
TABAK MARKET, AD,                                )
                                                 )
CIBOLE SERVICES INCORPORATED,                    )
BULGARIA, EOOD,                                  )
                                                 )
ASTERIA BG, EOOD                                 )
a/k/a DROSLIAN BULGARIA, EOOD,                   )
                                                 )
VILI VIST, EAD,                                  )
                                                 )
PROMISHLENO STROITELSTVO                         )
HOLDING, EAD,                                    )
                                                 )
THE BANK OF NEW YORK                             )
MELLON CORPORATION,                              )
                                                 )
EATON VANCE STRUCTURED                           )
EMERGING MARKETS                                 )
EQUITY FUND, LLC,                                )
                                                 )
THE BANK FOR FOREIGN TRADE OF                    )
THE RUSSIAN FEDERATION,                          )
a/k/a VTB BANK                                   )
                                                 )
        Defendants.                              )

# <u>EXHIBITS</u>

EXHIBIT A

*Фрея* **F** *Freya*
*Транслейшънс* **Translations**

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com, freyatranslations@abv.bg

*Превод от английски език*

## CONTRACT FOR FINANCING AND CONSTRUCTION OF THE SILVER BEACH DEVELOPMENT COMPLEX

This agreement is made and entered into, as of the last date written below, by and between:

Ayr Logistics Limited, Inc., USA, with address P.O. Box 1256, Greenville, Texas 75403- 1256, represented by the President Phillip Robert Harris

and

**"ALL SEAS BULGARIA" EOOD**, a company duly incorporated under the Bulgarian laws, entered into the Registry Agency- Commercial Register, with EIK 103318621, having its seat and registered office in Varna, complex "Horizont", Primorski park, pl. No 3, fl. 2, represented by the manager Chavdar Angelov Angelov, Personal ID 6103201066

WHEREAS, "ALL SEAS BULGARIA" EOOD, hereinafter called Silver Beach, with full authority makes an irrevocable firm commitment to provide the necessary project licensing, in-country support, operational support, marketing and marketing for the project herein, and hereby certifies, represents and warrants that it can fulfill the requirements of the project under the terms agreed upon by the signatories hereafter; and

WHEREAS, Ayr Logistics Limited, Inc., hereinafter called Ayr, makes the firm commitment it can provide the financing as well as design, engineering, construction and construction management activities, as

## ДОГОВОР ЗА ФИНАНСИРАНЕ И РАЗВИТИЕ НА КОМПЛЕКС СИЛВЪР БИЙЧ

Настоящото споразумение се изготви и подписа, така както е установено с датата по-долу между страните:

Еър Лоджистикс Лимитед Инк, САЩ, с адрес P.O. Box 1256, Грийнвил, Тексас 75403- 1256, представлявано от Филип Робърт Харис –Президент,

и

**"ОЛ СИЙЗ БЪЛГАРИЯ" ЕООД,** дружество, учредено в съответствие със законодателството на Република България, вписано в Агенция по вписванията – Търговски регистър, с ЕИК 103318621, със седалище и адрес на управление във Варна, комплекс "Хоризонт", Приморски парк, пл. № 3, ет. 2, представлявано от управителя Чавдар Ангелов Ангелов, ЕГН 6103201066

КЪДЕТО, "ОЛ СИЙЗ БЪЛГАРИЯ" ЕООД, от тук нататък наричано Силвър Бийч, с пълни правомощия поема безусловно задължение да осигури необходимите лицензи за проекта, вътрешнодържавна подкрепа, оперативна подкрепа и маркетинг за описания тук проект и с настоящото декларира, свидетелства и гарантира, че може да изпълни всички изисквания за проекта съгласно условията, договорени от подписаните тук страни; и

КЪДЕТО, Еър Лоджистикс Лимитед, Инк, от тук нататък наричани Еър, поема неотменна гаранция, че има възможност да осигури финансирането, както и дизайна, инженерната дейност,

required, as outlined herein and certifies, represents and warrants that it can fulfill the requirements of this agreement and accomplish what is required of it herein under the terms agreed upon by the signatories hereafter.

The Parties therefore agree as follows:

### Article 1:    General

1.1. The project will involve the construction of a complete community on 105 hectares of ground on the Black Sea coast of Bulgaria. The community will consist of but is not limited to a mixed housing complex including a retirement community, individual homes, sea front homes and apartments buildings all totaling 2480 units; a small hospital; mall complex; parking; fishing village; cultural center; amphitheater; marina; beach renovations; religious facilities; solar power park; water-greenery complex; and all utilities including water purification, sewer treatment, roads, electricity distribution, etc.

1.1.1 It is estimated the funds required for the complex's construction including the cost of the land will be approximately Four Hundred Four Million Four Hundred Euros (€404,400,000).

1.1.2 It is estimated the construction will take place over a Forty Eight (48) month period.

1.2 upon the signing of this contract for the realization of the "Silver Beach" project the Parties arrange the financial support and the ownership of the investment project through the incorporation of a New Operating Company (NOC) for the purpose of owning and operating the Community Complex. Upon the formation of the NOC:

1.2.1 The parties shall be issued their shareholding. Ayr shall be issued 60 percent ownership equity in the NOC and Silver Beach 40%.

---

строителството и управлението им, съгласно изискванията и както е уговорено в настоящото и декларира, свидетелства и гарантира, че може да изпълни всички изисквания за проекта съгласно условията, договорени от подписаните тук страни.

Страните се договарят за следното:

### Член 1: Общи условия

1.1. Проектът ще включва построяването на цялостна комунална система от 105 хектара площ на черноморското крайбрежие на България. Тази комунална система ще се състои от, но без да се ограничава до, комплекс от смесено жилищно строителство, включително старчески дом, отделни къщи, къщи с изглед към морето и блокове с апартаменти от общо 2480 жилища; малка болница; мол; паркинг; рибарско селище; културен център; амфитеатър; яхт-клуб; възстановяване на бреговата и плажна ивица; религиозен комплекс; парк за слънчева енергия; комплекс озеленени площи с изкуствени водоеми; и всякакви други комунални съоръжения, включително водопречистване, канализация, пътища, електропреносна мрежа и т.н.

1.1.1. Предвижда се средствата, необходими за построяването на комплекса, включително цената на земята, да бъдат приблизително четиристотин и четири милиона и четиристотин хиляди евро (€404,400,000).

1.1.2. Предвижда се строителството да продължи в период от над четиридесет и осем месеца.

1.2. Със сключването на настоящия договор, по реализацията на проекта " Силвър Бийч" страните договарят финасовото осигуряване и притежанието на инвестиционния проект посредством учредяването на нова действаща компания (НДК), с цел притежаването и развитието на комплекса. При учредяването на НДК:

1.2.1. Страните ще си разпределят капитала на компанията. Еър ще притежава 60 процента от капитала на НДК, а Силвър Бийч – 40 процента.

1.2.2 The NOC shall be operated under a Shareholder's Agreement signed between the Parties on 13.04.2009 and in accordance with the incorporating documents dated 15.09.2009 for the incorporation of "AYR PROPERTY DEVELOPMENT" AD – city of Varna, Republic of Bulgaria.

1.2.3 Ayr shall lodge an application in front of the Bulgarian authorities for the certification of the "Silver Beach" project as a priority investment and for the signing of a Memorandum with the Bulgarian Government for measures of encouragement of the investment project.

1.2.4 All Seas Bulgaria shall ensure the ownership of the rights over the investment terrain and project to the NOC through All Seas Property 2 OOD, city of Varna, Republic of Bulgaria.

1.3 The NOC shall assume the total amount of the financing for the facility's construction upon construction completion and hand-over. Ayr shall hold the mortgage on the facilities until the debt has been repaid in total.

1.4 Ayr shall arrange for the required security deposit to be provided by the construction contractor.

1.6 Ayr shall establish a Project Office to support the project.

Article 2: Financial Support for the Project

2.1 Ayr shall establish a credit line. Said credit line shall be expended in the form of individual payments for billings by the construction firm(s), equipment manufacturer(s), etc. as their billings occur throughout the project's accomplishment. Said credit line shall be available to begin payments within 45 to 60 days from acceptance of the guarantee by Ayr's bankers. It is expected these payments shall be made in a near straight line drawdown throughout the program.

2.2 For each drawdown, the NOC shall advise Ayr of the payment required by validating the contractor's billing invoice

1.2.2. НДК ще функционира съгласно акционерно споразумение, подписано между тях от 13.04.2009 и съгласно учредителните документи от 15.09.2009 г. по учредяването на компанията "ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД - гр. Варна, Република България.

1.2.3. Еър ще подаде заявление пред Българските власти за сертифициране на проекта "Силвър Бийч" със статут на приоритетна и за подписването на меморандум с Българското правителство относно мерките за насърчаване на инвестиционния проект .

1.2.4. Ол Сийз България ще осигури притежанието от НДК на правата върху инвестиционния терен и проект, посредством Ол Сийз Пропърти 2 ООД – Варна, Република България.

1.3. НДК ще поеме общия размер на **финансирането** за изграждането на комплекса при неговото завършване и предаване. Еър ще държат ипотеката върху комплекса до окончателното изплащане на кредита.

1.4. Еър предприема необходимото за осигуряването на изисквания гаранционен депозит от фирмата – строител.

1.6. Еър учредяват офис в подкрепа на проекта.

Член 2: Финансова подкрепа на проекта

2.1. Еър учредяват кредитна линия. Въпросната кредитна линия ще бъде изразходвана под формата на отделни плащания за разходите, фактурирани от строителни фирми, доставка на съоръжения и т.н. при възникването на въпросните разходи в хода на изпълнението на проекта. Въпросната кредитна линия ще бъде в наличност за стартиране на плащанията в срок 45 до 60 дни от приемането на гаранциите от страна на банкерите на Еър. Предвижда се въпросните плащания да се извършват в намаляващ порядък по време на проекта.

2.2. За всяко плащане на разходи, НДК ще уведомява Еър за необходимостта от него чрез заверяване

with at least two verifying signatures. Said validated billing will be forwarded to Ayr. Within ten (10) days of receipt of the validated invoice, Ayr shall transfer the necessary payment to the account specified. Upon the NOC signing contracts with their contractors, the NOC shall provide to Ayr the names and sample signatures of the persons authorized to validate the invoices on behalf of the NOC and the bank name and account number to which the contractor(s) wants payments made.

2.3 Not later than the fifteenth (15th) day of the second month of each Quarter, the NOC shall provide Ayr with an expected drawdown schedule for the following quarter.

2.4 All Seas Bulgaria and the NOC agree the funding provided by Ayr shall be used solely for the development of the project. There shall be no payments for past Consultants or "Finder's Fees".

2.5 During the period of construction, there shall be no interest charged by Ayr on the loaned funds to the NOC and no interest accumulated. Any such interest payments on the loaned funds during the construction period shall be made by Ayr.

2.5.1 The project for the purposes of this contract shall be considered completed, when the complex facilities have been constructed, all equipment installed and tested, and the entire complex is available for occupancy by tenets.

2.6 The repayment of the loaned funds is to be made in equal Quarterly payments over a period of Twenty (20) years. The first Quarterly payment is due on the six (6) month anniversary of the turn-over of the project. Interest, at a fixed annual rate of Five and one half (5.5) percent of the unpaid balance shall be added to each quarterly payment. Loan payments shall be made to the account designated by Ayr. There is no penalty for early repayment.

на разходната фактура с поне два валидиращи подписа. Въпросната заверена фактура ще бъде изпращана на Еър в 10 дневен срок от приемането й, а Еър ще извършва необходимото плащане по посочената банкова сметка. При сключване на договори от страна на НДК с техни подизпълнители, НДК ще осигурява на Еър имената и спесимени от подписите на лицата, упълномощени да заверяват фактурите от страна на НДК и името на банката и номера на сметката на подпизпълнителите, към които е необходимо плащане.

2.3. Не по-късно от петнадесетия (15тия) ден на втория месец на всяко тримесечие, НДК осигурява на Еър график с очакваното разходване на средства за предстоящото тримесечие.

2.4. Ол Сийз България и НДК се съгласяват слдствата, получени от Еър да бъдат използвани единствено за развитието на проекта. Няма да бъде плащано за предишни консултанти или за комисионни на посредници.

2.5. По време на периода на строителство, няма да се начислява лихва от страна на Еър върху отпуснатите на НДК заемни средства и няма да се натрупват лихви. Всякакви плащания за лихви върху отпуснатите средства по време на периода на строителство ще бъдат извършвани от Еър.

2.5.1. За целите на настоящото споразумение, проектът ще се счита за завършен, когато всички сгради в комплекса са построени, оборудването е инсталирано и изпробвано и цялостният комплекс е готов за настаняване на живущите.

2.6. Възстановяването на отпуснатите заемни средства се извършва на равни тримесечни вноски в рамките на период от двадесет (20) години. Първата тримесечна вноска е дължима при навършване на шест (6) месеца от предаването на проекта. Лихва при фиксирана годишна ставка от пет и половина (5.5) процента от неплатената част ще бъде добавяна към всяко тримесечно плащане. Плащанията по

## Article 3: Miscellaneous

3.1. Upon signing this contract, all signed incorporation documents between the Parties for the creation of "AYR PROPERTY DEVELOPMENT" AD, city of Varna, Republic of Bulgaria must be taken into consideration and it shall be intended to meet the needs of the certification of the "Silver Beach" project as a first-class priority investment in accordance with the Encouragement of Investments Act of the Republic of Bulgaria.

3.2 Any changes to the terms and conditions of this contract shall be reduced to writing and signed by or on behalf of both parties hereto.

3.3 The present Contract is subject to signing by the founders of "AYR PROPERTY INVESTMENT" AD, city of Varna, Republic of Bulgaria on date 15.09.2009.

3.4 All valid contract documents will be in the English language.

## Article 4: Taxes

All parties to this agreement are each responsible for their own individual and corporate taxes, as appropriate, regardless of the entity imposing said tax.

## Article 5:      Expenses

Each party shall solely and individually be responsible and liable for any and all expenses and costs incurred as the result of establishing and executing this contract.

## Article 6:      Law

All parties hereto understand and agree to abide by United States Law prohibiting the bribing, favor-giving, or any other financial inducement provided to a foreign government official or any other party for the purpose of obtaining business within the foreign nation.

кредита ще бъдат извършвани по сметка, посочена от Еър. Няма да има неустойки за предсрочни плащания.

## Член 3: Разни

3.1. При сключване на настоящото споразумение, същото отчита подписаните между страните към настоящия момент учредителни документи за създаването на "ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД - Варна, Република България и същото се назначава с оглед нуждите на сертифициране проекта "Силвър Бийч" като приортетна инвестиция съгласно Закона за насърчаване на инвестиите на Република България .

3.2. Всякакви промени в условията и сроковете по този договор могат да се извършват единствено в писмена форма и подписани от двете страни.

3.3. Настоящото споразумение се подписва пристрено от уредителите на "ЕЪР ПРОПЪРТИ ИНВЕСТМЪНТ" АД – гр. Варна, Република България, на дата 15.09.2009 г.

3.4. За валидни ще се считат документите и копията от договора подписани на английски език.

## Член 4: Данъци

Всяка от страните по настоящото споразумение ще поемат собствените си лични корпоративни данъци, без значение от администрацията, която е наложила въпросния данък.

## Член 5: Разходи

Всяка от страните самостоятелно и индивидуално ще поеме разноските и таксите, които се появят за нея в резултат на сключването и изпълнението на настоящия договор.

## Член 6: Законодателство

Всяка от страните по настоящия договор се съгласява и приема да спазва законодателството на САЩ относно забраната за подкуп, предоставяне на услуги и всякакви други финансови подбудителства към представител на представител на чуждо правителство или на друго лице с цел развитие на бизнеса й

в чуждата държава.

The contract shall be governed by the laws of the United Kingdom.

Договорът е подчинен на законодателството на Великобритания.

### Article 7:        Force Majeure

Neither party to the contract is responsible for breech of contract caused by an acts of god, insurrection, civil war, military operations, local emergencies, strikes or other uncontrollable situations as defined by the International Chamber of Commerce, Paris, France.

### Член 7: Форс мажор

Никоя от страните няма да е отговорна за неизпълнение на договора, причинено от природно бедствие, бунт, метеж, гражданска война, военни операции, бедствени положения, протести или други неконтролируеми ситуации, така както са дефинирани от Международната търговска палата, Париж, Франция.

### Article 8:        Arbitration

In the event of any dispute between the parties, the two parties agree to try their utmost to resolve this by friendly negotiations. If the dispute is not resolved within a period of Twenty One (21) days then the disputed matters will be referred to arbitration in accordance with the rules of the International Chamber of Commerce ~ Paris, France. The site of the arbitration shall be determined by the parties as will the identity of the independent arbitrator. The arbitration fee will be born by the losing party.

### Член 8: Арбитраж

В случай на спор между страните, те се съгласяват да положат максимални усилия да го разрешат чрез приятелски преговори. Ако спорът не е разрешен в срок от двадесет и един (21) дни, то същият следва да бъде отнесен към арбитраж в съответствие с правилата на Международната търговска палата, Париж, Франция. Мястото на арбитража ще бъде определено от страните, както и самоличността на независимия арбитър. Таксата за арбитражна процедура ще бъде поета от загубилата страна.

### Article 9:        Contract Signatories

In witness whereof, the parties herein declare that they have read and are fully aware of the interpretation of all the provisions, terms and conditions of this contract and that they have signed herein below thereby entering into this contractual commitment as clearly defined and provided under all the terms, conditions and provisions of this contract and that each signatory is duly authorized to represent the parties hereto.

### Член 9: Изявления на страните

С настоящото страните декларират, че са прочели и са напълно наясно със смисъла на всички разпоредби, срокове и условия на настоящия договор и са го подписали по-долу, с което встъпват в настоящия договор като страни и приемат всичките му условия, срокове и разпоредби и че всяко от лицата, подписали договора, разполага с надлежна представителна власт да представлява страната, от чието име го подписва.

### Article 10: Non-Circumvention

The parties accept and agree to the provisions of the international Chamber of commerce, Paris, France for the non-circumvention and non-disclosure with regards to all and every one of the parties involved in this transaction and contract, additions, renewals, with full reciprocation

### Член 10: Конфиденциалност

Страните се съгласяват и приемат правилата на Международната търговска палата, Париж, Франция за конфиденциалност и неразкриване на информация по отношение на всички страни, включени в настоящата сделка и договор, както и неговите допълнения,

for a period of five (5) years from the date of the execution of this contract.

**Article 11: Uniform Customs and Practices**
International Chamber of Commerce custom and practices shall apply to this contract.

**Article 12: Assignment**
Neither party may assign to a third party its rights, duties, responsibilities and obligations to a third party without written approval of the other party.

Signatories:

For: Ayr Logistics Limited, Inc.
Name: Philip R. Harris

For: ALL SEAS BULGARIA EOOD
Name: Chavdar Angelov

---

подновявания, при пълно взаимодействие, за период от пет (5) години от датата на изпълнение на настоящия договор.

**Член 11: Единни обичаи и практики**
Обичаите и практиките на Международната търговска палата ще намират приложение по настоящия договор.

**Член 12: Правоприемство**
Никоя от страните няма правото да прехвърля на трета страна своите права, задължения и отговорности без писмено одобрение от другата страна.

Страни:

За Еър Лоджистикс Лимитед Инк
Име: Филип Р. Харис

За: Ол Сийз България ЕООД
Име: Чавдар Ангелов

---

*Подписаната, Илка Симеонова Дюлгерова, удостоверявам верността на извършения от мен превод от английски език на български език на приложения документ, ДОГОВОР ЗА ФИНАНСИРАНЕ И РАЗВИТИЕ НА КОМПЛЕКС СИЛВЪР БИЙЧ от 15.09.2009. Преводът се състои от 8 стр.*

*Преводач: ...................... Илка Симеонова Дюлгерова*



EXHIBIT B

| | |
|---|---|
| СПОРАЗУМЕНИЕ ЗА ПОКУПКО-ПРОДАЖБА НА ИПОТЕЧНИ ВЗЕМАНИЯ | MORTGAGE RECEIVABLES SALE AND PURCHASE AGREEMENT |

Днес, 0.7..06..2010 г., в гр. София, Република България,

Между:

ПИБ – „Първа инвестиционна банка" АД, вписана в търговския регистър при Агенция по вписванията с ЕИК 831094393, със седалище и адрес на управление град София, бул. „Драган Цанков" № 37, представлявана от изпълнителните директори Матьо Матеев и Евгени Луканов

ЕЛЛ - Еър Лоджистис Лимитед Инк., дружество, учредено съгласно законите на щата Тексас, САЩ, със седалище на: 459 Чипъндейл драйв, Рокуол, Тексас 75032 САЩ, представлявано от Филип Робърт Харис, гражданин на САЩ, роден на 28. 01. 1943 г., с паспорт № 217696365 издаден от Министерство на вътрешните работи на САЩ на дата 27.12.2006 г. и

ЕПД – „Еър Пропърти Девелопмънт" АД, вписано в търговския регистър при Агенцията по вписванията с ЕИК 200958720, със седалище и адрес на управление град Варна, район Приморски, ж.к. Приморски парк, комплекс Хоризонт № 3, ет. 2, представлявано от изпълнителния директор Филип Робърт Харис, представляван от пълномощника си Захари Желязков Томов, ЕГН 6804120540, от град Варна, бул. "Сливница" № 70, ет. 2, ап. 4, български гражданин, притежаващ л.к. № 111413277, издадена от МВР-Варна на 28.11.2001 г, съгласно пълномощно с нотариална заверка на нотариус от щат

This Mortgage Receivables Sale and Purchase Agreement ("the Agreement") is made on this Fourth, June 2010 in Sofia, Republic of Bulgaria, by and between:

First Investment Bank AD, ("FIB" or "the Bank") duly recorded in the Commercial Register kept at the Registry Agency under EIK (Universal Company Code): 831094393, with principal place of business at Sofia, 37 Dragan Tzankov Boulevard, represented by the Executive Directors Matthew Mateev and Evgeni Lukanov,

ALL – Ayr Logistics Limited Inc., a Corporation organized under the laws of Texas, USA with seat and principal place of business at 459 Chippendale Drive Rockwall, Texas 75032 USA - Texas, USA, represented by Philip Robert Harris, a US citizen, born on 28th January 1943, holder of Passport No.217696365, issued by the US Department of State on December 27, 2006 and

APD - Ayr Property Development AD - duly recorded in the Commercial Register kept at the Registry Agency under EIK: 200958720, with seat and registered office address at Varna, Primorski Regions, Horizont Complex No.3, floor 2, represented by its Executive Director, Philip R. Harris, represented by his proxy Zahari Zhelyazkov Tomov, EGN: 6804120540 from Varna, with address at 70 Slivnitsa Boulevard, floor 2, apt. 4, a Bulgarian citizen, holder of ID Card No. 111413277, issued by the Varna Department of the Bulgarian Ministry of Interior on 28th November 2001, pursuant to Power of Attorney notarized by Gregory Humphries, Notary Public, State of Texas

Тексас Грегъри Хъмфрис и апостил № N-747881 от 20.05.2010 г .

Които страни, като съобразиха, че:

а/ ЕПД е собственик на недвижим имот, наричан по- долу за краткост „инвестиционен терен" за изграждане и развитие на инвестиционния проект на ЕЛЛ с наименование "Силвър Бийч", който имот е подробно описан в акт за собственост: Нотариален акт за покупко - продажба на недвижим имот вх. рег. № 4180/10.12.2009 г. акт № 13, т. XIII, дело № 1878/2009, имотни партиди № 9696, 9665, 9654, представляващ:

- Имот с кадастрален № 02508.88.735 (две хиляди петстотин и осем точка осемдесет и осем точка седемстотин тридесет и пет) с площ от 229, 999 (двеста двадесет и девет декара и деветстотин деветдесет и девет квадратни метра) декара по документ за собственост, а по кадастрална карта, изменена със Заповед КД-14-08-727/24.07.2008г. на Началника на СГКК-Добрич с площ от 212,239 /двеста и дванадесет дка и двеста тридесет и девет кв.м./ декара, находящ се в гр. Балчик, Община Балчик, Област Добрич, местност „Сребрист бряг", трайно предназначение- залесена горска територия, при съседи имоти кад. №№ 373, 734, 162;

- Имот с кадастрален № 02508.88.736 (две хиляди петстотин и осем точка осемдесет и осем точка седемстотин тридесет и шест) с площ от 240, 006 (двеста и четиридесет декара и шест квадратни метра) декара, по документ за собственост, а по кадастрална карта, изменена със Заповед КД-14-08-727/   24.07.2008г.   на Началника на СГКК-Добрич с площ от

and apostilled under Certificate No N-747881 of May 20, 2010.

RECITALS:

a) APD is owner of a real estate hereinafter referred to as 'investment land' where ALL will implement its construction and development project under the name of "Silver Beach"; such property is described in detail in a deed of title – a notary deed of sale and purchase of a real estate duly recorded under No. 4180/10.12.2009, deed No.13, volume XIII, case No.1878/2009, property batches with Nos.9696, 9665, 9654, respectively, which land is of details as shown below:

- A land property of cadastre No.02508.88.735 (two thousand five hundred and eight point eighty-eight point seven hundred thirty-five) with area of 229.999 decars (two hundred twenty-nine decars and nine hundred ninety-nine square meters) as per document showing ownership, while in the cadastre map as amended with order No. КД-14-08-Б-897/17.05.2007 of the head of Geodesy Cartography and Cadaster Office ("SGKK") in Dobrich such property's area is 212.239 decars (two hundred and twelve decars and two hundred and thirty-nine square meters), located in the town of Balchik, Municipality of Balchik, district Dobrich, the Srebristia Braig (Silver Beach area) with a permanent afforested forest area designation, neighboring to properties with cadastre numbers as follows: 373, 734, 162, respectively;

- A land property of cadastre number:02508.88.736 (two thousand five hundred and eight point eighty-eight point seven hundred thirty-six) with area of 240.006 decars (two hundred and forty decars and six square meters), as per document showing ownership, while in the cadastre map as amended with order No. КД-14-08-727/24.07.2008 of the Head of Geodesy Cartography and Cadaster Office

251,424 /двеста петдесет и един дка и четиристотин двадесет и четири кв.м. / декара, находящ се в гр. Балчик, Община Балчик, Област Добрич, местност „Сребрист бряг", трайно предназначение— залесена горска територия, при съседи имоти кад. №№ 343, 313, 386, 737, 629; 162 и

- Имот с кадастрален № 02508.88.734 (две хиляди петстотин и осем точка осемдесет и осем точка седемстотин тридесет и четири) с площ от 578, 716 (петстотин седемдесет и осем декара и седемстотин и шестнадесет квадратни метра) декара по документ за собственост, а по кадастрална карта, изменена със Заповед КД-14-08-727/ 24.07.2008г. на Началника на СГКК-Добрич с площ от 579,063 /петстотин седемдесет и девет дка и шестдесет и три кв.м. / декара, находящ се в гр. Балчик, Община Балчик, Област Добрич, местност „Сребрист бряг", трайно предназначение – залесена горска територия при съседи имоти кад. №№ 02508. 88. 373, 02508. 88. 162, 02508.88. 735, 02508. 88. 780.

б/ ПИБ е ипотекарен кредитор спрямо собствения на ЕПД инвестиционен терен, съгласно договори за учредяване на ипотека:

- Нотариален акт за учредяване на договорна ипотека № 5, том I, вх.рег. № 247 от 19.02.2010г., по описа на Служба по вписванията гр.Балчик за обезпечаване срочното погасяване на вземанията на банката от "Асет мениджмънт" ЕАД, ЕИК 103921587 по Договор за банков кредит № 014LD-L-000006/29.12.2009, върху нмоти ПИ № 02508.88.734 ; ПИ № 02508.88.736;

("SGKK") in Dobrich such property's area is 251.424 (two hundred fifty-one decars and four hundred twenty-four square meters) located in the town of Balchik, Municipality of Balchik, district Dobrich, the Srebristia Braig (Silver Beach area) with a permanent afforested forest area designation, neighboring to properties with cadastre numbers as follows: 343, 313, 386, 737, 629; 162, respectively, and

- A land property of cadastre number 02508.88.734 (two thousand five hundred and eight point eighty-eight point seven hundred thirty-four) with area of 578.716 decars (five hundred seventy-eight decars and seven hundred and sixteen square meters) as per document showing ownership, while in the cadastre map as amended with order No.KD-14-08-727/24.07.2008 Head of Geodesy Cartography and Cadastre Office ("SGKK") in Dobrich such property's area is 579.063 (five hundred seventy-nine decars and sixty-three square meters), located in the town of Balchik, Municipality of Balchik, district Dobrich, the Srebristia Braig (Silver Beach area) with a permanent afforested forest area designation, neighboring to properties with cadastre numbers as follows: 02508.88. 373, 02508.88. 162, 02508.88. 735 and 02508.88.780, respectively;

b) FIB is the lender of funds for the investment land owned by APD under the mortgage contracts shown below:

- a notary deed for establishing of a contractual mortgage under No.5, volume I, ref.No.247 dated 19the February 2009 in the list kept at the Registry Office in the town of Balchik where such contractual mortgage shall secure the collection of the Bank's receivables within a fixed time from Asset Management EAD, EIK (universal company code) 103921587 under a Bank Loan Agreement No.014LD-L-000006/29.12.2009; such contractual

- Нотариален акт № 56, том VIII, вх.рег. № 3670 от 03.10.2008 г., дело № 2138/08 г. по описа на Служба по вписванията гр.Балчик, за обезпечаване вземанията на банката от "Порт инвестмънт девелопмънт-България 2" ЕАД, ЕИК 148117384 по Договор за банков кредит № 014LD-L-000002 от 02.10.2008 г. в размер на 1 000 000 /един милион/ евро върху имот ПИ № 02508.88.736;

- Нотариален акт № 40, том I, рег. № 1226 от 31.03.2009 г., дело № 366/09 г по описа на Служба по вписванията гр.Балчик, за обезпечаване вземанията на банката от "Порт инвестмънт девелопмънт-България 2" ЕАД, ЕИК 148117384 по Договор за банков кредит № 014LD-L-000002 от 02.10.2008 г., чийто размер е увеличен от 1 000 000 /един милион/ евро на 2 500 000 /два милиона и петстотин хиляди/ евро с анекс №1 от 31.03.2009 г. върху следния имот: ПИ № 02508.88.736

- Нотариален акт № 152, том II, вх.рег. № 4949 от 23.11.2007 г., дело № 3070/07 г., за обезпечаване вземанията на банката от "Порт инвестмънт девелопмънт-България 2" ЕАД по Договор за банков кредит № 39КР-АА-2510 от 22.11.2007 г. в размер на 30 000 000 /тридесет милиона/ евро върху следните недвижими имоти: ПИ № 02508.88.734, ПИ № 02508.88.735 и ПИ № 02508.88.736.

- Нотариален акт № 177, том I, рег. № 2451 от 27.06.2008 г., дело № 1340/08 г., за обезпечаване вземанията на банката от „Порт инвестмънт девелопмънт-България 2" ЕАД по

mortgage is established over land properties with Nos. 02508.88.734 and 02508.88.736, respectively;

- a notary deed No.56, volume VIII, ref. No. 3670 dated 3rd October 2008, case No.2138/08 in the list kept at of Registry Office in the town of Balchik where such contractual mortgage shall secure the collection of the Bank's receivables from Port Investment Development – Bulgaria 2 EAD with EIK: 148117384 under a Bank Loan Agreement No.014LD-L-000002 dated 2nd October 2008 in the amount of EUR 1,000,000 (one million Euros) over land property with No.02508.88.736;

- a notary deed No.40, volume I, ref. No.1226 dated 31st March 2009, case No. 366/09 in the list kept at the Registry Office in the town of Balchik for securing the collection of the Bank's receivables from Port Investment Development – Bulgaria 2 EAD with EIK:148117384 under a Bank Loan Agreement No.014LD-L-000002 dated 2nd October 2008, where the amount of the above has been increased from EUR 1,000,000 (one million Euros) to EUR 2,500,000 (two million and five hundred thousand euros) by virtue of Annex No.1 of 31st March 2009 and the land property concerned is of No.02508.88.736

- A notary deed No. 152, volume II, ref. No. № 4949 dated 23rd November 2007, case № 3070/07, for securing the Bank's receivables from Port Investment Development Bulgaria 2 EAD under a Bank Loan Agreement No.39КР-АА-2510 dated 22nd November 2007 in the amount of EUR 30,000,000 (three million Euros) for the land properties with Nos. 02508.88.734, 02508.88.735 and 02508.88.736, respectively;

- A notary deed No. 177, volume I, ref.No.2451 dated 27th June 2008, case No.1340/08, executed for securing the Bank's receivables from Port Investment

Договор за банков кредит № 39КР-АА-2510 от 22.11.2007 г. и анекс №1 от 26.06.2008 г. в размер на 30 000 000 /тридесет милиона/ евро върху следните недвижими имоти: ПИ № 02508.88.734, ПИ № 02508.88.736 и ПИ № 02508.88.735.

- Нотариален акт № 55, том II, рег. № 3668 от 03.10.2008 г., дело № 2136/08 г., за обезпечаване вземанията на банката от „Порт инвестмънт девелопмънт-България 2" ЕАД по Договор за банков кредит № 39КР-АА-2510 от 22.11.2007 г., анекс №1 от 26.06.2008 г. и анекс №2 от 30.09.2008 г. върху следните недвижими имоти: ПИ № 02508.88.734, ПИ № 02508.88.736 и ПИ № 02508.88.735

- Нотариален акт № 41, том I, рег. № 1227 от 01.04.2009 г., дело № 367/09 г., за обезпечаване вземанията на банката от Порт инвестмънт девелопмънт-България 2" ЕАД по Договора за кредит, анекс №1 от 26.06.2008 г., анекс №2 от 30.09.2008 г. и анекс №3 от 31.03.2009 г. върху следните недвижими имоти:

в / Със свое писмо от 05.01.2010 г. за ангажимент ЕЛЛ е гарантирал пред ПИБ да плати пълния размер на ипотечните задължения с цел придобиване правата на кредитор по подробно описаните по – горе вземания, обезпечен с вписаните върху инвестиционния терен ипотечни актове собственост от ЕПД;

се подписа настоящото споразумение за следното:
1. 1. ЕЛЛ и ПИБ, при условията на солидарност от една страна и ПИБ, от друга страна, се договарят в случай, че ЕЛЛ плати по сметка на ПИБ IBAN 27FINV915010EUR43521 сумата от 31,297,827 евро (тридесет и един милиона двеста деветдесет и седем

Development Bulgaria 2 EAD under a Bank Loan Agreement 39KP-AA-2510 dated 22nd November 2007 and Annex No.1 dated 26th June 2008 in the amount of EUR 30,000,000 (thirty million Euros) for the land properties of nos.02508.88.734, 02508.88.736 and 02508.88.735, respectively;

- A notary deed No. 55, volume II, ref. No.3668 dated 3rd October 2008, case No.2136/08, for securing the Bank's receivables from Port Investment Development Bulgaria 2 EAD under a Bank Loan Agreement No.39KP-AA-2510 dated 22nd November 2007, Annex No.1 dated 26th June 2008 and Annex No.2 dated 30th September 2008 for the land properties with nos.02508.88.734, 02508.88.736 and 02508.88.735, respectively;

- A notary deed No. 41, volume I, ref. № 1227 dated 1st April 2009, case No.367/09, for securing Bank's receivables from Port Investment Development Bulgaria 2 EAD under the above Bank Loan Agreement, Annex No.1 dated 26th June 2008, Annex No. 2 dated 30th September 2008 and Annex No. 3 dated 31st March 2009 for the land properties mentioned above;

c) In a Letter of Commitment of 5th January 2010 ALL has given a guarantee to FIB that ALL shall pay in full all mortgage debts for the purpose of acquiring Lender's rights of the receivables detailed above that have been secured by the mortgages as duly recorded over the investment land owned by APD;

The Parties have agreed as follows:

1. ALL and APD jointly, of the first part, and FIB, of the second part, hereby agree that providing that ALL credits the bank account of FIB IBAN 27FINV915010EUR43521 with the amount of EUR 31,297,827 (thirty one

хиляди осемстотин двадесет и седем евро) в срок до 07.07.2010 г., представляваща пълния размер на вземанията на банката, в това число главници, лихви, разноски и комисиони по следните договори за кредит: по договор за кредит № 014LD-L-000006/29.12.2009 г. с кредитополучател "Асет мениджмънт" ЕАД, ЕИК 103921587, по договор за кредит № 014LD-L-000002 от 02.10.2008 г. с кредитополучател "Порт инвестмънт девелопмънт-България 2" ЕАД, ЕИК 148117384, по договор за кредит № 39КР-АА-2510 от 22.11.2007 г. с кредитополучател "Порт инвестмънт девелопмънт-България 2" ЕАД, ЕИК 148117384, които средства служат целево за погасяване на тези задължения към ПИБ, ПИБ се задължава, след получаването на това плащане, да прехвърли на ЕЛЛ правата си по подробно описаните по- горе вземания, ведно с правата си по ипотечните актове, индивидуализирани в т. б) по-горе.

2. Разходите, таксите и разноски в това число и такси по нотариални заверки и вписвания по прехвърлянето на вземанията, ведно с правата по ипотечните актове са за сметка на ЕЛЛ .

3. Страните приемат и се съгласяват, че вътрешните отношения между ЕПД и ЕЛЛ са непротивопоставими на правата и законните интереси на ПИБ, и никоя от страните ЕПД и ЕЛЛ не могат да предявяват оспорвания или възражения спрямо ПИБ, основаващи се тези техни вътрешни отношения.

4. Страните се договарят при изпълнение на договореното в чл. 1, прехвърлянето на вземанията по кредитите и учредените по тях ипотеки да се извърши в срок до 20.07.2010 г.

5. Страните се договарят, че с

million two hundred ninety seven thousand eight hundred twenty seven euro) by 07th July 2010, where such amount constitutes the entire amount of the receivables of the Bank including principal amounts, interest accrued, costs and fees as incurred under Loan Agreement No.014LD-L-000006/29.12.2009 where the Borrower is Asset Management EAD, EIK: 103921587, under Loan Agreement No.014LD-L-000002 dated October 2nd 2008 where the Borrower is Port Investment Development Bulgaria 2 EAD with EIK:148117384 and those under Loan Agreement No.39KP-AA-2510 dated November 22nd 2007 where the Borrower is Port Investment Development Bulgaria 2 EAD, with EIK:148117384, which funds shall be used especially for payment of the above liabilities to FIB, then FIB shall, upon receipt of such payment, assign to ALL their rights of the receivables as described in detail above along with their rights over the mortgage deeds as identified in section B) of the preamble hereinabove.

2. All costs, fees and expenses, including all and any notarization fees, receivables transfer recording fees and the rights over the mortgage deeds shall be borne by ALL.

3. The parties hereto agree and accept that all internal relationship between ALL and APD shall not contradict, affect, nor be in conflict whatsoever with the lawful rights and interests of FIB and none of APD or ALL shall be able to oppose, challenge or assert contentions against FIB where such contentions are relying on the internal relationship between APD and ALL.

4. The parties agree that providing that the parties perform as set forth in Section 1 above the transfer of such loan receivables and related mortgages must be made no later than 20th July 2010.

5. The parties further agree that

изпълнението на договореността по чл.1, предоставените от акционерите на ЕПД писма за ангажимент от дата 05.01.2010 г. да бъдат предадени на Еър Лоджистикс Лимитед Инк. и Ол Сийз България ЕООД /Варна, България/ в оригинал и свободни от всякакви ангажименти.

Настоящото споразумение се подписа в три еднообразни екземпляра на български и английски, по един за всяка от страните.

При несъответствие в превода приоритет има текстът на български език.

upon proper performance under Section 1 above all originals of the letters of commitment of 5th January 2010 as produced by APD's shareholders shall be delivered back to Ayr Logistics Limited Inc and All Seas Bulgaria EOOD, Varna, Bulgaria, and shall not have any further commitment.

This Agreement was drawn and executed in three identical counterparts both in English and Bulgarian and each of the parties hereto shall be entitled to one.

In case of discrepancies originating from the translation, the Bulgarian text takes priority.

За ПМБ:

For FIB:

За ЕПД:

For APD:

За ЕЛЛ:

For ALL:

State of Texas, USA
County of Rockwall

Before me on this day personally appeared Philip R. Harris, known to me to be the person whose name is subscribed to the foregoing instruction and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office this 4th day of June, 2010

Notary Public, State of Texas

SARA DEANNE FEAZELL
Notary Public
State of Texas
My Comm. Exp. 07-09-2013

1

# EXHIBIT C

To:    ASET MANAGEMENT EAD

29 December 2009

Re:    *PAYMENT ORDER*

Dear Mr. Hubenov,

This is to remind you that under Coal Delivery Contract No.ASETBLUFIN/01-BG dated 22nd December 2009 executed by and between your company and ours you have undertaken to make at least 50% advance payment in the amount of EUR 4,000,000 no later than 31st December 2009.

Please make all arrangements necessary to cause payment of the amount of EUR 4,000,000.00, which you must have paid by December 31st 2009. OR make the entire advance payment due in the amount of EUR 8,000,000.00 by remitting any such amounts to the bank account detailed below:

> FIRST INVESTMENT BANK PLC
> VARNA, BULGARIA
> BIC CODE: FINVBGSF
> IBAN: BG 89 FINV 91501000135357
> BENEFICIARY: PORT INVESTMENT DEVELOPMENT BULGARIA 2 EAD

We have executed a loan agreement with   PORT INVESTMENT DEVELOPMENT BULGARIA 2 EAD and we hereby give you instructions to directly remit the above amount payable by you to the above ban account.

Such bank transfer shall be acknowledged as an adnavce payment of the amount you must have paid by 31st December 2009 in accordance with Contract No.ASETBLUFIN/01-BG dated 22nd December 2009 as executed between out two companies.

Edmond Magliette
For BLUE FINANCE LTD

EXHIBIT D



*Фрея* **Freya**
*Транслейшънс* **Translations**

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

| AGREEMENT | СПОРАЗУМЕНИЕ |
|---|---|
| This Agreement was signed this 28th March 2012 at Varna, Bulgaria, by and between the persons holding interest in the approval of the Reorganization Plan as proposed by <u>Ayr Logistics Limited, Inc.</u>, Texas, USA, ("**Ayr**") in the bankruptcy proceedings of <u>Ayr Property Development AD</u> (Ayr's investment vehicle) before the District Court of Targovishte, Bulgaria, ("**the Bankruptcy Court**") hearing commercial case No.14/2011 ("the bankruptcy case"). The Bankruptcy Court in its ruling of 15th February 2012 has scheduled a meeting of the creditors of Ayr Property Development AD ("**APD**") for 17th April 2012 to deliberate and vote on the reorganization plan for APD ("**the Reorganization Plan**"). | Днес, 28.03.2012 год., в гр. Варна, България, се подписа настоящото споразумение между заинтересованите лица от одобрението на оздравителния план предложен от Ъър Лоджистикс Лимитед Инк (щат Тексас, САЩ) в производството по несъстоятелност на Ъър Пропърти Девелопмънт АД (инвестиционно предприятие на Ъър Лоджистикс Лимитед Инк), водено пред Окръжния съд на гр.Търговище, България (търговско дело № 14/2011 година), разглеждането и гласуването на който оздравителен план от събранието на кредиторите на Ъър Пропърти Девелопмънт АД, е насрочено за 17.04.2012 год., съгласно определение на съда по несъстоятелността от 15.02.2012год. |
| WHEREAS, | |
| A. This Agreement was signed upon due discussion thereof as requested by the following creditors of APD: | (А) Настоящото споразумение се подписа след предварително обсъждане, проведено по искане на следните кредиторите на Ъър Пропърти Девелопмънт: |
| • <u>All Seas Property 2 OOD</u> ("**ASP2**") having an account receivable ("**AR**") in the amount of <u>EUR 10,000,000</u> (ten million Euros) owed to them and negotiated for recovery under the proposed Reorganization Plan by way of transforming said AR into shares of stock in the capital of <u>New Co Property Investment AD</u> ("**New Co**"), a company Ayr has acquired for the purposes of the <u>Eco Dream Project</u> – as per the **Section V** of the | • Ол Сийз Пропърти 2 ООД (ОСП 2), чието парично вземане е номинирано в оздравителния план за изплащане в размер на 10 000 000 (десет милиона евро) посредством трансформацията му в акционерно участие в капитала на Ню Ко Пропърти Инвестмънт АД, притежавано от Ъър Лоджистикс Лимитед Инк във връзка с проекта "Еко Дрийм" – Раздел V "Формула по ликвидация на вземанията на |

**Reorganization Plan:** *"Liquidation Formula for the Receivables of APD's Non-Bank Creditors with Claims Accepted for Satisfaction under Art.722 Para 1 (8) of the Commerce Act"*;

- Asset Management EAD ("**Asset**") having an account receivable ("**AR**") in the amount of EUR 1,300,000 (one million and three hundred thousand Euros) owed to them and negotiated for recovery under the proposed Reorganization Plan by way of transforming said AR into shares of stock in the capital of New Co, a company Ayr has acquired for the purposes of the Eco Dream Project – as per the **Section V** of the **Reorganization Plan** *"Liquidation Formula for the Receivables of APD's Non-Bank Creditors with Claims Accepted for Satisfaction under Art.722 Para 1 (8) of the Commerce Act"*

B. ASP2 and Asset requested this Agreement to be concluded as a condition to be met before they agree to support the Reorganization Plan for APD as proposed by Ayr for the following considerations:

- The Reorganization Plan relies on the financial support to be provided by Mr. Anthony Harriott as instructed by Ayr and in furtherance of the Contract of Mandate Ayr and Mr Harriott executed on 19th January 2011 in that regard, and in the fashion agreed in the *Memorandum of Ayr Logistics Limited, Inc.'s Commitment to Provide Financially for the Reorganization Plan Intended to Repay Liabilities and Discharge Obligations of Ayr*

небанковите кредитори на **Еър Пропърти Девелопмънт АД с прието вземане за удовлетворяване по чл. 722, ал.1 , т.8 на ТЗ"** от оздравителния план;

- Асет Мениджмънт ЕАД (АСЕТ), чието парично вземане е номинирано в оздравителния план за изплащане в размер на 1 300 000 (един милион и триста хиляди евро) посредством трансформацията му в акционерно участие в капитала на Ню Ко Пропърти Инвестмънт АД, притежавано от Еър Лоджистикс Лимитед Инк във връзка с проекта "Еко Дрийм" – **Раздел V "Формула по ликвидация на вземанията на небанковите кредитори на Еър Пропърти Девелопмънт АД с прието вземане за удовлетворяване по чл. 722, ал.1 , т.8 на ТЗ"** на оздравителния план;

(Б) Настоящото споразумение е изискано от страна на ОСП2 и Асет като безусловно условие за подкрепата на оздравителния план на Еър Лоджистикс Лимитед Инк, предложен за Еър Пропърти Девелопмънт АД, и мотивирано със следните съображения:

- Оздравителният план е рефериран с подкрепата на финансовите активи на г-н Антъни Хариът, действащ по възлагане на Еър Лоджистикс Лимитед Инк, съгласно подписания за целта договор за мандат от 19.01.2011 г., така както това е посочено в подписания на 02-03 юли 2011 г. **"Меморандум за финансово осигуряване на оздравителния план на Еър Лоджистикс Лимитед Инк за изплащане и погасяване на**

*Property Development AD, Bulgaria, to its Creditors*, signed on 2nd and 3rd July 2011. **None of the commitments or promises made thereunder has ever been fulfilled;**

- On 2nd December 2011 a meeting of APD creditors took place where Ayr's President and General Manager Mr. Philip Harris confirmed and restated that funds in the amount of 225,000,000 (two hundred and twenty five million Euros) were secured and in place for implementing the Reorganization Plan. He set 15th February 2012 as the deadline before or on which all the necessary bank deposits and guarantees for the implementation of the Reorganization Plan would be in place. Despite those assurances, however, 15th February 2012 – the deadline set and the date of the Creditors' meeting scheduled to discuss and vote on the Reorganization Plan – came to pass inconsequentially.

- On 15th December 2011 another meeting of the Creditors of APD was held and Ayr confirmed before the Meeting that a deposit of USD 22,000,000 (twenty two million US dollars) had been made. Said funds were intended to be the initial amount dedicated to the Reorganization Plan and had to be remitted in portions to the special lawyer's account with UniCredit Bulbank AD within 1st March 2012 – 15th April 2012. Discussion and voting of the Reorganization Plan for APD was once again rescheduled, this time for 17th April 2012.

C. Having being assured on a number of subsequent occasions that Ayr would

задълженията на Еър Пропърти Девелопмънт АД към кредиторите на Еър Пропърти Девелопмънт АД". Понастоящем, нито един от поетите с този Меморандум ангажименти не е изпълнен.

- На проведеното събрание на кредиторите на Еър Пропърти Девелопмънт АД, на 02.12.2011 г., Президентът и Генерален мениджър на Еър Лоджистикс Лимитед Инк, г-н Филип Харис, потвърди финансова осигуреност на оздравителния и на инвестиционния план в обем на 225 000 000 (двеста двадесет и пет милиона евро), посочвайки краен срок за снабдяване на оздравителния план с всички предвидени в него банкови гаранции и депозити в срок до 15.02.2012 г. Въпреки тези уверения, до 15.02.2012 г., за която дата е насрочено следващото събрание на кредиторите, което да разгледа и гласува оздравителния план, Еър Лоджистикс Лимитед Инк не са изпълнили поетите ангажименти за представяне на обещаните депозити и гаранции в срок до 15.02.2012 г.

- На проведено събрание на кредиторите на Еър Пропърти Девелопмънт АД от дата 15.12.2011 г., Еър Лоджистикс Лимитед Инк потвърди наличието на открит начален депозит в обем 22 000 000 (двадесет и два милиона щатски долара), предназначен за встъпителен баланс по оздравителния план, дължим по откритата за целта специална адвокатска сметка в УниКредит Булбанк АД, в периода 01.03.2012-15.04.2012 год. Обсъждането и гласуването на оздравителния план отново е отложено за 17.04.2012 г.

(В) Приемайки, че финансовите ангажименти на Еър Лоджистикс Лимитед

fulfil their financial commitments to the Reorganization Plan for APD, the creditors ASP2 and Asset have agreed to support it, provided that the following conditions are met:

- If Ayr unconditionally undertakes to pay the ARs owed to ASP and Asset, respectively, as pre-agreed in Section V Para 9 (a.a) and (a.b) of the Reorganization Plan for APD - *"Liquidation Formula for the Receivables of APD's Non-Bank Creditors with Claims Accepted for Satisfaction under Art.722 Para 1 (8) of the Commerce Act"*;

- If Ayr unconditionally agrees to fulfil its financial commitments to ASP and Asset, regardless of whether or not or how the Reorganization Plan will be implemented, and regardless of whether or not or how the investment plan for the Eco Dream Project, for which New Co has been made responsible, will come to be realized;

- If Ayr unconditionally agrees to fulfil its financial commitments to ASP and Asset under the Reorganization Plan for APD at Ayr's risk and responsibility no later than 36 months after the Bankruptcy court has made its decision on the Reorganization Plan for APD.

NOW THEREFORE, and seeking to ensure ASP2's and Asset's support for the Reorganization Plan at the discussion and vote to be held at the meeting scheduled for 17th April 2012 by virtue of a court order in

---

Инк са действително осигурени така, както се настоява последователно в исканията за подкрепа на оздравителния план, предложен за Еър Пропърти Девелопмънт АД, кредиторите ОСП 2 и Асет, формулират подкрепата си за плана при изпълнение на следните изисквания:

- Еър Лоджистикс Лимитед Инк да поеме безусловното задължение да изплати предварително съгласуваните с оздравителния план права на ОСП2 и Асет, както са предвидени в б.(а.а.) и б. (а.б.), параграф 9 на Раздел V **"Формула по ликвидация на вземанията на небанковите кредитори на Еър Пропърти Девелопмънт АД с прието вземане за удовлетворяване по чл. 722, ал.1 , т.8 на ТЗ"**;

- Еър Лоджистикс Лимитед Инк да се съгласи да изпълни поетите с оздравителния план финансови ангажименти към ОСП2 и Асет, независимо от реализацията на оздравителния план за Еър Пропърти Девелопмънт АД и независимо от реализацията на инвестиционния план за проекта "Еко Дрийм", възложен за осъществяване чрез "Ню Ко – Пропърти Инвестмънт" АД;

- Еър Лоджистикс Лимитед Инк да се съгласи да изпълни финансовите си ангажименти, поети към ОСП2 и Асет с оздравителния план, на собствен риск и отговорност, в срок до 36 календарни месеца, считано от окончателното произнасяне на съда по несъстоятелността по оздравителния план за Еър Пропърти Девелопмънт АД;

При посочените по-горе обстоятелства и с цел осигуряване подкрепата на ОСП2 и Асет при обсъждането и гласуването на предложения от Еър Лоджистикс Лимитед Инк оздравителен план за Еър Пропърти

that regard, the parties hereto:

**Ayr Logistics Limited, Inc.**, a corporation organized in 1995 under the laws of Texas, USA, and having registered office at 459 Chippendale Drive, Rockwall, Texas 75032, USA, and represented by Philip Robert Harris, President and General Manager, acting through his legal representative Counsel Zahari Tomov, attorney at law, (member of the Varna Bar and having law office address at Varna 4 Paraskeva Nikolau St, floor 2, office 3) as duly appointed by a power of attorney of 18th July 2011 (bearing the certification of the Consular Department of the Ministry of Foreign Affairs of the Republic of Bulgaria dated 5th August 2011, hereinafter referred as "Ayr", of the first part,

And

**All Seas Property 2 OOD**, a commercial company registered under the laws of Bulgaria and having EIK (Company number): 148073564, based in Varna and having registered office address at Varna, 3 Nikola Vaptsarov St., entrance G, Office Centre, 8th floor, office 21, as represented by the Manager Lilyana Borisova, and

**Asset Management EAD** having EIK: 103921587 and registered office address at the town of Targovishte, 1 Tsar Assen St., and represented by the Executive Director Nikolay Hubenov, hereinafter refereed to as "**the Creditor**" or "**the Creditors**", of the second,

## THE PARTIES HAVE AGREED AS FOLLOWS:

1. The Creditors hereby agree and promise Ayr, that they shall play an active part in the deliberations and vote in support of the Reorganization Plan proposed for

---

Девелопмънт АД, насрочени за 17.04.2012 г. от съда по несъстоятелността на Еър Пропърти Девелопмънт АД, представените тук страни:

1. **Еър Лоджистикс Лимитед, Инк.**, учредено през 1995 г., съгласно законите на щата Тексас, САЩ, със седалище: 459 Чипъндейл Драйв, Рокуол, Тексас 75032, САЩ, представлявано от Филип Робърт Харис, Президент и Генерален мениджър, чрез адвокат Захари Томов, Адвокатска колегия – гр. Варна, ул. Параскева Николау № 4, ет. 2, офис № 3, назначен с пълномощно от 18.07.2011 г., заверено от Дирекция "Консулски отношения" при МВнР на Република България на дата 05.08.2011 год., от една страна, означавана по-долу за удобство като "**Еър**",

и

2. **"Ол Сийз Пропърти 2" ООД**, търговско дружество, регистрирано съобразно законодателството на Република България, ЕИК:148073564, със седалище в гр. Варна и адрес на управление ул. „Никола Вапцаров" № 3, вх.Г, офис център, ет. 8-ми, офис 21, представлявано от управителя Лиляна Борисова, и

"**Асет Мениджмънт" ЕАД**, ЕИК:103921587, представлявано от Николай Хубенов – Изпълнителен директор, с адрес: гр.Търговище, ул. Цар Иван Асен № 1, означавани за удобство като "**Кредитора или Кредиторите**",

## Постигнаха съгласие за следното:

1. Кредиторите се съгласяват и задължават към Еър да участват активно в обсъжданията и да гласуват в подкрепа на оздравителния план предложен за Е

APD at the General Meeting of the Creditors scheduled for 17th April 2012 to that effect.

2. Ayr hereby agrees and undertakes to fulfil at their own risk and responsibility certain financial commitments to the Creditors as follows:

(a) pay the creditor ASP2 the agreed value of ASP2's rights in the Reorganization Plan amounting to EUR 10,000,000 (ten million Euros) to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD.

(b) Pay the creditor Asset the agreed value of Asset's rights in the Reorganization Plan amounting to EUR 1,300,000 (one million and three hundred thousand Euros) to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD.

3. Ayr and the Creditors hereby agree that by fulfilling the commitments made in Art.2 of this Agreement, Ayr shall acquire and assume and enter into to the rights of ASP2 and Asset as defined in the Reorganization Plan for APD and that both ASP2 and Asset shall be deemed to be completely satisfied and shall assert no claims against Ayr and its subsidiaries APD and New Co.

4. Ayr and the Creditors hereby agree that this Agreement shall supersede all

Пропърти Девелопмънт АД, на насроченото за целта общо събрание на кредиторите за 17.04.2012 г.

2. Еър се съгласява и задължава, на собствен риск и отговорност, да изпълни следните финансови задължения към Кредиторите:

(а) Да изплати на Кредитора ОСП2 сумата от 10 000 000 (десет милиона евро) по открита за целта специална сметка в полза на ОСП2 в Дойче банк, Ню Йорк, представляваща стойността на съгласуваните в оздравителния план права на ОСП2, което плащане се дължи в срок до 36 календарни месеца, считано от датата на окончателното произнасяне по оздравителния план, предложен за Еър Пропърти Девелопмънт АД;

(б) Да изплати на Кредитора Асет сумата от 1 300 000 (един милион и триста хиляди евро) по открита за целта специална сметка в полза на Асет в Дойче банк, Ню Йорк, представляваща стойността на съгласуваните в оздравителния план права на Асет, което плащане се дължи в срок до 36 календарни месеца, считано от датата на окочателното произнасяне по оздравителния план, предложен за Еър Пропърти Девелопмънт АД;

3. Кредиторите и Еър се съгласяват и договарят, че с изпълнението на поетите по чл.2 от настоящото споразумение задължения, Еър придобива и встъпва във всички правата на ОСП2 и Асет така, както са посочени в оздравителния план за Еър Пропърти Девелопмънт АД, както и че ОСП2 и Асет са напълно удовлетворени и нямат никакви претенции към Еър Лоджистикс Лимитед Инк, и към неговите предприятия - Еър Пропърти Девелопмънт АД и Ню Ко – Пропърти Инвестмънт АД.

4. Кредиторите и Еър, се съгласяват, че

preceding agreements on the method and manner of payment of ASP2's and Asset's rights, including all primary agreements made by and between Ayr and ASP2 on the acquisition of the lands and the Silver Beach investment enterprise of 10th December 2009 and by and between Ayr and Asset of 8th August 2009 on the application for a bank loan in support and in favour of Ayr's agreements with FIB for rescheduling and buyout of the mortgage rights over the Silver Beach Project.

5. ASP2 and Ayr hereby agree that ASP2 shall render their agreement with ASB for the transfer of the AR from the sale price of the transaction for the sale of the Silver Beach investment enterprise dated 10th December 2009, null and void by reason of ASB's default on making the payment of such price as agreed.

6. Ayr and the Creditors hereby expressly agree on the following additional provisions:

(a) **Enforcement of the Agreement:**

This Agreement shall enter in force immediately when ASP2 and Asset render their joint support of the approval of APD's Reorganization Plan, when the matter is put to vote at the General Meeting of APD's Creditors scheduled for 17th April 2012.

(b) **Choice of governing law and jurisdiction:**

All matters arising from this Agreement including, but not limited to interpreting the will of the parties thereto, the validity of the

настоящото споразумение преурежда всички предходни договорености относно реда и начина на изплащане правата на ОСП2 и Асет, включително и изначалните договорености с ОСП 2 по придобиване на земята и инвестиционното предприятие "Силвър бийч" от дата 10.12.2009 г., както и договореността с Асет от 08.12.2009 г. за ползване на банков кредит в подкрепа и в полза на договаряшията на Еър с Първа инвестиционна банка АД за преструктуриране и изкупуване на ипотечните права в проекта "Силвър бийч".

5. Кредитора ОСП2 и Еър се съгласяват и договарят ОСП2 да анулира договореността с Ол Сийз България ООД за прехвърляне на вземането за продажната цена по сключената на 10.12.2009 г. сделка за покупко-продажба на инвестиционното предприятие "Силвър бийч", поради неизпълнение на договореното заплащане на тази цена от страна на Ол Сийз България ООД.

6. Кредиторите и Еър депозират изричното свое съгласие върху следните допълнителни клаузи:

(а) Клауза за влизане в сила на настоящото споразумение:

Настоящото споразумение влиза в сила незабавно с депозиране на едновременната подкрепа на ОСП2 и Асет в полза на одобрението на оздравителния план за Еър Пропърти Девелопмънт АД при неговото гласуване от събранието на кредиторите на Еър Пропърти Девелопмънт АД, насрочено за 17.04.2012 г.

(б) Клауза за избор на приложимо право и юрисдикция:

Всички въпроси, произтичащи от настоящото споразумение, като изброените по-долу, но не само - тълкуване на волята на съдоговорителите

Agreement, fulfilment of the parties' obligations, the consequences from the performance of this Agreement, its violation and the consequences therefrom shall be settled by the parties in an amicable manner in observance of the good commercial and investment practices recognized by the international and the US laws.

If the parties fail to reach such amicable resolution and the dispute still exists, the parties shall refer the dispute for resolution to the competent court having jurisdiction over the principal place of business of Ayr.

(c) **Compensation for damages caused by default on the agreements:**

Each of the parties hereby undertakes to compensate the other party in case of any default on the above agreements by paying a lump sum penalty of 18% (eighteen percent) of the relevant value of ASP2's right (if the default affects their accounts receivable) and the relevant value of Asset's right (if the default affects their accounts receivable) respectively.

(d) **Option for joinder of parties**

In observance with the representations made and advance consent given in Para 12, Section VIII "Formula for covering the interests involved in the implementation of the Reorganization Plan regarding the claims asserted by Rudersdal EOOD" of the Reorganization Plan for APD, ASP2 and Ayr hereby agree that:

(i) Rudersdal EOOD shall

валидност на споразумението, изпълнение на задълженията, последици от изпълнението на споразумението, нарушение на споразумението и последици на нарушението - ще се уреждат по приятелски начин според стандартите на добрата търговска и инвестиционна практика, познати в международното право и законите на САЩ.

В случай на невъзможност за изграждане на съгласие по приятелски начин и наличието на спор между страните по настоящото споразумение, компетентен да реши всеки един такъв спор ще бъде съда по място на управление на Еър.

(в) **Клауза за обезщетение при нарушение на договореностите:**

Всяка от страните по настоящото споразумение се съгласява да обезщети другата страната в случаите на допуснато нарушение на установените по –горе договорености, като заплати еднократна неустойка в обем на 18 % (осемнадесет процента), изчислена върху съответната стойност на правото на ОСП2 (в случай на нарушение свързано с това вземане), съответно върху стойността на правото на Асет (в случай на нарушение свързани с това вземане).

(г) **Опция за присъединяване:**

Съответно на номинацията и предварително депозираното съгласие по параграф 12, раздел VIII "Формула на покритие на интересите по приложение на оздравителния план спрямо предявеното вземане от Рудерсдал ЕООД" от оздравителния план за Еър Пропърти Девелопмънт АД, Кредиторът ОСП2 и Еър се договарят:

(г.а.) Рудерсдал ЕООД има запазени

enjoy a reserved right to join as a party to this Agreement by entering into ASP2's rights hereby agreed and exercising such rights together with ASP2, where the intercompany relationships between Rudersdal and ASP2 shall concern and be enforceable against Ayr to the extent and in the manner defined in Section VIII of the Reorganization Plan and as set forth herein below;

(ii) Fulfilment of Ayr's obligation under Para 2(a) of this Agreement shall be deemed to be duly made and Ayr shall be released from any responsibility to Rudersdal EOOD, if Ayr notifies Rudersdal EOOD of the right-extinguishing payment made to ASP2's bank account, when ASP2's bank account with Deutsche Bank, New York, is credited with the EUR 10,000,000 (ten million Euros) due, and instructs the simultaneous performance under Section VIII of the Reorganization Plan. Ayr hereby undertakes to notify Rudersdal as detailed above, irrespective whether or not Rudersdal has joined as a party to this Agreement.

(iii) ASP2 and Ayr hereby agree that the EUR 10,000,000 (ten million Euros) credited to ASP2's bank account with Deutsche Bank, New York shall be blocked in favour of Rudersdal EOOD for a 30 days-term as of the date on which the notice of simultaneous performance under Section VIII of the Reorganization Plan is given. If Rudersdal EOOD fails to join as a party to this Agreement or refuses to accept the notice for simultaneous performance under Section VIII of the Reorganization Plan at the expiration of the above 30 days-term, all commitments made by Ayr in favour of Rudersdal EOOD under the Reorganization Plan shall be deemed to be fulfilled and ASP2 shall

право да се присъедини като страна по настоящото споразумение, встъпвайки в договорените права на ОСП2 и наред с ОСП2, като вътрешните отношения между тях са относими и противопоставими на Еър толкова и така, както това е посочено в раздел VIII на оздравителния план и както е определено в следващите точки:

(г.б.) Изпълнението на задължението на Еър, посочено в параграф 2(а) на настоящото споразумение, се зачита като надлежно изпълнено и освободено от всякаква отговорност спрямо Рудерсдал ЕООД, ако със заверката на откритата специална сметка в Дойче банк-Ню Йорк на името на ОСП2 с дължимата сума от 10 000 000 (десет милиона евро), Еър уведоми Рудерсдал ЕООД за извършеното погасително плащане към ОСП2, с указание за едновременно изпълнение по раздел VIII на оздравителния план. Това уведомление се дължи независимо от това дали Рудерсдал ЕООД се е присъединило към настоящото споразумение.

(г.в.) Кредиторът ОСП2 и Еър се договорят платените по специалната сметка на ОСП2 в Дойче банк-Ню Йорк 10 000 000 (десет милиона евро) да бъдат блокирани в полза на Рудерсдал ЕООД за срок от 30 дни, считано от датата на уведомлението за едновременно изпълнение по раздел VIII на оздравителния план. В случай че Рудресдал ЕООД не се присъедини към настоящото споразумение или не акцептира уведомлението на едновременно изпълнение по раздел VIII на оздравителния план, с изтичането на 30-дневния срок всички поети ангажименти от Еър с оздравителния план в полза на Рудресдал ЕООД се погасяват, а единствено ОСП2 остава отговорен към

remain solely responsible to Rudersdal EOOD.

## 7. Closing provisions

(a) This Agreement was drawn and signed in four uniform copies, one for each of the parties thereto and one to be accepted by Rudersdal EOOD.

(b) Rudersdal's joinder to this Agreement is not a requirement and shall stipulate no condition for enforcement of the Agreement as defined by the parties thereto in Para 6(a) above.

(c) This Agreement was drawn and signed in both English and Bulgarian; the English version shall prevail and have priority over the Bulgarian in the interpretation of the will of the parties and in the event of any dispute thereunder.

For Ayr Logistics Limited Inc.:

_____
Zahari Tomov, Attorney at law
(Duly appointed by POA of 18th July 2011)

For All Seas Property 2 OOD:

_____
Lilyana Borisova, Manager

For Asset Management EAD:

_____
Nikolay Hubenov, Executive Director

---

Рудерсдал ЕООД.

**7. Заключителни разпоредби:**

(а) Настоящото споразумение се състави и подписа в четири еднообразни екземпляра - по един за всяка от договорящите се страни и един предназначен за акцептиране от Рудерсдал ЕООД.

(б) Присъединяването на Рудерсдал ЕООД към настоящото споразумение не е изискване и не поставя условие за влизането му в законна сила, както това е определено от договарящите се страни по-горе в параграф 6 (а).

**(в) Настоящото споразумение се състави и подписа на английски и български език, като английския език е водещия и има предимство при тълкуване на волята на страните в случай на спор.**

За Еър:

_____
Адв. Захари Томов
(по пълномощно от 18.07.2011)

За ОСП 2:

_____
Лиляна Борисова – Управител

За Асет:

_____
Николай Хубенов – Изпълнителен директор

---

*The undersigned, Boriana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Agreement of 28 March 2012. This translation has 10 pages.*

*Translator:* _____ *Boriana Ilieva Stefanova*



# EXHIBIT E

| | |
|---|---|
| **ПРЕДВАРИТЕЛЕН ДОГОВОР** | **PRELIMINARY AGREEMENT** |
| **за продажба на недвижим имот** | **for the sale of real estate** |

**ПРЕДВАРИТЕЛЕН ДОГОВОР**

**за продажба на недвижим имот**

На **16.07.2007г. в гр. Варна**, Република България, между следните страни:

1/

**„ОЛ СИЙЗ ПРОПЪРТИ 2"** ООД, търговско дружество, регистрирано по ф. д. № 5276/ 2006 год. по описа на Варненски окръжен съд, вписано в Регистъра на търговските дружества и техните клонове, воден при същия съд, под № 3, том 672, стр. 10, с ЕИК по Регистър БУЛСТАТ 148073564, със седалище в гр. Варна и адрес на управление Приморски парк, комплекс „хоризонт", пл. 3, ет. 2, представлявано от управителя ДИАНА ГЕОРГИЕВА КОЛЕВА, ЕГН 6712250975, в качеството си на собственик на следните 3 /три/ недвижими имота, находящи се в гр. Балчик, община Балчик, област Добрич, местността „Сребристия бряг", съставляващи по кадастралната карта, одобрена със заповед № 300-5-5/04.02.2004 г. на Изпълнителния директор на АК, изменена със заповед № КД-14- 08-Б-897/17.05.2007 г. на началника на Службата по кадастъра - гр. Добрич, а именно:

- поземлен имот 02508.88.736 с площ 240 006 /двеста и четиридесет хиляди и шест/ кв. метра при граници по скица № 8419/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич;
- поземлен имот 02508.88.735 с площ 229 999 /двеста двадесет и девет хиляди деветстотин деветдесет и девет/ кв. метра при граници по скица № 8418/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич;
- поземлен имот 02508.88.734 с площ 578 716 /петстотин седемдесет и осем хиляди седемстотин и шестнадесет/ кв. метра при граници по скица № 8418/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич,

които имоти към настоящия момент са със статут на горски фонд.

наричан в договора **„Продавач" от една страна**

и

**PRELIMINARY AGREEMENT**

**for the sale of real estate**

Today **16th July 2007 in Varna**, Republic of Bulgaria, by and between:

1/

**'ALL SEAS PROPERTY 2'OOD**, a company duly registered under commercial file No. 5276/2006 of the register of the Varna District Court, entered into the Register of the Commercial companies held by the latter under No.3, vol.672, page 10, EIK (Unified Identification Code) according to BULSTAT register 148073564 registered and residing at 2nd Floor- Horizont Building, Sea Garden, 9000 Varna, represented by its Manager Diana Georgieva Koleva, in the capacity of owner of the following 3 /three/ real estates, located in Balchik, Municipality of Balchik, District of Dobrich, "Srebristiya Bryag" area, representing as per cadastral plan, approved by order No.300-5-5/04.02.2004 of the Executive Director of Cadastre Agency and, amended by order No. KD-14-08-B-897/17.05.2007 of the Head of the Cadastre Office - city of Dobrich, namely:

- real estate 02508.88.736, total area 240'006 /two hundred forty thousand and six/ square meters, with borders according to layout plan No.8419/17.05.2007, issued by the Head of the Cadastral Office - city of Dobrich;
- real estate 02508.88.735, total area 229'999 /two hundred twenty nine thousand nine hundred ninety nine/square meters, with borders according to layout plan No.8418/17.05.2007, issued by the Head of the Cadastral Office - city of Dobrich;
- real estate 02508.88.734, total area 578'716 /five hundred seventy eight thousand seven hundred and sixteen/ square meters, with borders according to layout plan No.841817.05.2007, issued by the Head of the Cadastral Office - city of Dobrich,

representing a part of the Forestry Fund

hereinafter referred to **as „ Seller" as one Party**

and

**2/**

**КАРСТЕН МИХАЕЛ БЕРГЕР**, гражданин на Кралство Дания, персонален номер 281157-0241, роден на 28.11.1957 година в КОПЕНХАГЕН, Кралство Дания, живущ в гр. Копенхаген, притежаващ паспорт № 102650148 издаден на 23.09.2004г., от Полицейска служба Глоструп, в качеството си на едноличен собственик и управител на „РУДЕРСДАЛ" ЕООД, дружество в процес на регистрация, седалище и адрес на управление: гр. Варна , бул. „Княз Борис I"№ 57,

наричано в договора **"Купувач"** от друга **страна,**

се сключи предварителен договор за продажба на следния недвижим имот при следните условия:

## I/ ПРЕДМЕТ НА ДОГОВОРА.

1. Предмет на договора са условията, при които страните се задължават една към друга да сключат окончателен договор за продажбата на следните 3 /три/ недвижими имота, взети заедно като едно цяло, наричани по – нататък в договора общо „терен" или „имот", находящи се в гр. Балчик, община Балчик, област Добрич, местността „Сребристия бряг", съставляващи по кадастралната карта, одобрена със заповед № 300-5-5/04.02.2004 г. на Изпълнителния директор на АК, изменена със заповед № КД – 14- 08-Б-897/17.05.2007 г. на началника на Службата по кадастъра - гр. Добрич, а именно:

- поземлен имот 02508.88.736 с площ 240'006 /двеста и четиридесет хиляди и шест/ кв. метра при граници по скица № 8419/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич;
- поземлен имот 02508.88.735 с площ 229'999 /двеста двадесет и девет хиляди деветстотин деветдесет и девет/ кв. метра при граници по скица № 8418/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич;
- поземлен имот 02508.88.734 с площ 578'716 /петстотин седемдесет и осем хиляди седемстотин и шестнадесет/ кв. метра при граници по скица № 8418/17.05.2007 г., издадена от Началника на службата по кадастъра – Добрич;

**2/**

**CARSTEN MICHAEL BERGER**, citizen of the Kingdom of Denmark, Personal number 281157-0241, born on 28.11.1957 in Copenhagen, Kingdom of Denmark, resident of the city of Copenhagen, holder of passport № 102650148 issued on 23.09.2004 by Glostrup Police Department, in his capacity of sole owner and manager of "RUDERSDAL" EOOD – in the process of registration, with seat and address of management: city of Varna, 57 Knyaz Boris I Blvd,

Hereinafter referred to as **"Buyer" as the other Party,**

This preliminary agreement was signed for the sale of real estate under the following conditions:

## I/ SUBJECT MATTER OF THE AGREEMENT

1.The subject matter of the agreement includes the terms under which the Parties undertake to enter into a final agreement for the sale of the following 3 /three/ real estates, considered hereinafter as an inseparable whole, hereinafter referred to as „land" or „property", located in Balchik, Municipality of Balchik, District of Dobrich, "Srebristiya Bryag" area, representing as per cadastral plan, approved by order No.300-5-5/04.02.2004 of the Executive Director of Cadastre Agency and, amended by order No. KD-14-08-B-897/17.05.2007 of the Head of the Cadastre Office - city of Dobrich, namely:

- real estate 02508.88.736, total area 240'006 /two hundred forty thousand and six/ square meters, with borders according to layout plan No.8419/17.05.2007, issued by the Head of the Cadastral Office - city of Dobrich;
- real estate 02508.88.735, total area 229'999 /two hundred twenty nine thousand nine hundred ninety nine/square meters, with borders according to layout plan No.8418/17.05.2007, issued by the Head of the Cadastral Office - city of Dobrich;
- real estate 02508.88.734, total area 578'716 /five hundred seventy eight thousand seven hundred and sixteen/ square meters, with borders according to layout plan No.841817.05.2007, issued by the Head of the Cadastral Office - city of Dobrich,

2

които имоти към настоящия момент са със статут на горски фонд.

Посочените скици са неразделна част от настоящия договор.

**II/ ЦЕНА.**

2. Страните се договарят покупко-продажбата на терена да се извърши за цена общо в размер на 37'753'956 /тридесет и седем милиона седемстотин петдесет и три хиляди деветстотин петдесет и шест/ евро, като цената е формирана при съгласие на страните за цена на 1 /един/ кв. метър от всеки от трите имота 36 /тридесет и шест/ евро, дължима както следва:

а/ към момента на прехвърляне на собствеността с договор в нотариална форма – част в размер на 20'974'420 /двадесет милиона деветстотин седемдесет и четири хиляди четиристотин и двадесет/ евро;

б/ останалата част от цената в размер на 16'769'536 /шестнадесет милиона седемстотин шестдесет и девет хиляди петстотин тридесет и шест/ евро при изпълнение на **съществено условие** по следващия раздел III, съответно на задълженията на продавача, дължащи по време прехвърлянето на собствеността, като за обезпечение на тази част от вземането по цената Продавачът ще впише законна ипотека.

2.1. Разноските по сключване на окончателния договор /местен данък, нотариален хонорар и такси за вписването/ ще се поемат от двете страни по равно.

**III. СЪЩЕСТВЕНО УСЛОВИЕ ЗА ПРИДОБИВАНЕ НА СОБСТВЕНОСТТА И ФОРМИРАНЕТО НА ПРОДАЖНАТА ЦЕНА. СЪДЪРЖАНИЕ НА ДОГОВОРА В НОТАРИАЛНА ФОРМА. ПОСЛЕДИЦИ НА НЕСБЪДВАНЕ НА СЪЩЕСТВЕНОТО УСЛОВИЕ И ЗАДЪЛЖЕНИЯ НА СТРАНИТЕ ВЪВ ВРЪЗКА С ТОВА ЗА СКЛЮЧВАНЕ НА ДОГОВОР, ПО СИЛАТА НА КОЙТО СОБСТВЕНОСТТА ВЪРХУ ТЕРЕНА ДА БЪДЕ ПРИДОБИТА ОТНОВО ОТ ПРОДАВАЧА СРЕЩУ ОПРЕДЕЛЕНА ПОКУПНА ЦЕНА.**

3. Съществено условие, формиращо съгласието на купувача за покупката на имота и,

representing a part of a State Forestry Fund.

Above listed layout plans are integral parts of the present agreement.

**II/ PRICE**

2. The Parties agree that the sale and purchase transaction of the land shall be done for the total price of € 37'753'956 /thirty seven million seven hundred fifty three thousand nine hundred fifty six Euros/, as the price is formed by mutual agreement between the parties to price of € 36 /thirty six Euros/ per square meter of each of the three real estates, due as follows:

a/ upon the transfer of the ownership with a notarized contract – a partial amount of €20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty Euros/;

b/ the rest of the price amounting to €16'769'536 /sixteen million seven hundred sixty nine thousand five hundred thirty six Euros/ upon execution of a **Material condition** under the next section III, respectively the obligations of the Seller in the period of transfer of the ownership, whereas the Seller shall register a valid mortgage as a security of this part of the amount due.

2.1. The expenses concerning the signing of the Final Agreement /local tax, notary fee and all other charges regarding the registration of the Final Agreement into the Docket Book/ shall be divided equally and covered by both parties.

**III. MATERIAL CONDITION FOR ACQUIRING THE OWNERSHIP OF THE REAL ESTATE AND SELL PRICE FORMATION. CONTENT OF THE NOTARIZED CONTRACT. CONSEQUENCES FROM NO FULFILLMENT OF A MATERIAL CONDITION AND OBLIGATIONS IN RELATION WITH THE SIGNING OF A CONTRACT BY VIRTUE OF WHICH THE OWNERSHIP OVER THE LAND SHALL BE RE-ACQUIRED BY THE SELLER AGAINST A SPECIFIED PURCHASE PRICE.**

3. A material condition forming the Buyer's consent for the purchase of the property and

3

съответно, за договорения размер на покупната цена, е осъществяване след прехвърляне на собствеността от продавача на купувача с договора в нотариална форма по чл. 1 на декларираната от продавача принципна възможност за бъдеща промяна до 31.12.2007 г. изцяло за сметка и с усилията и съдействието на продавача на статута на имота от имот, причислен към горския фонд в урегулиран имот – урбанизирана територия за жилищно застрояване с възможно застрояване при минимален КИНТ 0.6.

4.Ненастъпването на промяната на статута на имота в смисъла и срока по предходната точка, страните определят като **прекратително условие** на договора **в интерес на купувача, с настъпването на което и доколкото купувачът се е позовал на това,** страните се задължават да сключат договор, по силата на който купувачът да продаде на продавача по настоящия договор собствеността върху терена срещу цена, **равняваща се на получената от последния по чл. 2, б. „а" сума в размер на** 20'974'420 /двадесет милиона деветстотин седемдесет и четири хиляди четиристотин и двадесет/ евро, увеличена с всички направени от Купувача разходи във връзка с придобиване на терена и ведно с лихвите върху така увеличената сума за периода от плащането по този договор до датата на придобиване на имота в размер на тримесечния евро либор, увеличен с два пункта, като разходите за това прехвърляне на собствеността са за сметка на продавача. В случай на непозоваване от купувача на прекратителното условие се приема, че е налице хипотеза на упражнена опция на право за запазване на собствеността и отношенията се уреждат в съответствие с правилата, договорени по-долу относно тази опция .

4.1. С оглед на договореното в предходните разпоредби страните се задължават окончателният договор в нотариална форма да бъде сключен със следното съдържание по този и следващите членове:

а/ Страните се договарят покупко-продажбата на терена да се извърши при цена от 36 /тридесет и шест/ евро за квадратен метър от всеки имот или общо в размер на 37'753'956 /тридесет и седем милиона седемстотин петдесет и три хиляди деветстотин петдесет и шест/ евро, като част в размер на 20'974'420 /двадесет милиона деветстотин седемдесет и четири

respectively – the agreed amount of the purchase price is the realization upon a transfer of ownership from the Seller to the Buyer with a notarized contract under Art.1 of the declared by the Seller general possibility for a future change not later than 31.12.2007 fully at the expenses of and with the efforts and cooperation of the Seller of the status of the property from a property part of the forestry fund into a regulated real estate – urban territory for housing construction with a possible construction at KINT /Development Intensity Coefficient/ of 0.6 at the least.

4. The nonoccurrence of the change in the status of the property in the sense and within the time limit under the previous article, the Parties define as a **Condition for termination** of the agreement **to the benefit of the Buyer, upon whose accurance and to the extend the latter has referred to it** the Parties undertake to sign an agreement, by virtue of which the Buyer shall sell to the Seller under the current agreement the ownership over the land for a price **equal to the received by the latter under the current agreement, Art.2, b. "a"** €20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty Euros/ increased with all expenses incurred by the Buyer in the process of acquisition of the land and, so increased, together with the interest for the period beginning with the payment under the current agreement and ending with the acquisition of the land at interest rate equal to the three-month Euro Libor increased with 2 /two/ points, whereas the expenses for the transfer of the ownership are on behalf of the Seller. If the Buyer does not refer to the **condition for termination** it is assumed that there is a present assumption of an exercised option of the right to retain the ownership and the relations shall be regulated by the rules agreed for this option hereinafter.

4.1. In compliance with the provisions of the foregoing articles the Parties undertake to sign the Final Agreement certified by a notary public, with the following content of the following articles:

a/ The Parties agree that the sale and purchase of the land shall be done at the price of €36 /thirty six Euros/ per square meter of each real estate in the total amount of €37'753'956 /thirty seven million seven hundred fifty three thousand nine hundred fifty six Euros/, as a portion in the amount of €20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty

| | | |
|---|---|---|
| хиляди четиристотин и двадесет/ евро купувачът заплаща при подписване и вписване на окончателния договор за покупко-продажба в книгите за вписванията съгласно с договорения в **раздел V, т. 9.3.** механизъм, а остатъкът от цената до размера на общата цена в размер на 16 769 536 /шестнадесет милиона седемстотин шестдесет и девет хиляди петстотин тридесет и шест/ купувачът поема задължение да заплати в срок от десет работни дни, считано от датата, на която продавачът е предоставил на купувача издадена заповед на Министъра на земеделието и горите или друг компетентен в бъдеще адм. орган за изключването на терена от горския фонд и смяна на предназначението му в урбанизирана територия за жилищно застрояване с указан размер на таксата, дължима към държавата за изключването от горски фонд, ако такава купувачът е длъжен да заплати. Заповедта следва да е постановена при наличен одобрен и влязъл в сила ПУП - ПРЗ за терена с КИНТ най – малко 0.6. | | Euros/ of the total amount the Buyer shall pay upon the signing of the Final Agreement for sale and purchase and its registration into the Docket Book according to the provisions of **Section V, art.9.3** and the remaining part up to the total price in the amount of €16'769'536 /sixteen million seven hundred sixty nine thousand five hundred thirty six Euros/ the Buyer undertakes to pay within 10 /ten/ working days from the date at which the order of the Minister of the Agriculture and Forestry or another competitive administrative body has been issued to the effect of its exclusion from the Forestry Fund and the change of its purpose to that of urban territory of housing construction with a set amount of the fee, due to the State for the exclusion from the Forestry Fund if it is the duty of the Buyer to pay one. The order should be enacted upon the presence of an approved and effective Detailed Structural Plan (DSP) – Regulation and Development Plan (RDP) for the land, KINT (Development Intensity Coefficient) of at least 0.6. |
| б/ Дължимите такси и каквито и да било други разходи във връзка с изготвянето и одобряването на ПУП - ПРЗ за терена, както и за смяна на предназначението му от горски фонд в урбанизирана територия – УПИ за жилищно застрояване, вкл. и таксата за изключване на имота от горския фонд, които биха били дължими от купувача в качеството му на собственик на терена, са за сметка на продавача, който ще поеме задължение към купувача да ги заплати от името на собственика. В случай, че таксата за изключване на терена от горския фонд се дължи от купувача като собственик на имота по силата на адм. акт за изключването на терена от горския фонд или по силата на закона при изключването на имота от горския фонд в бъдеще, то купувачът има право да я заплати директно на държавата, като прихване задължението си за заплащане на остатъка от покупната цена срещу несрещното задължение на продавача да поеме за своя сметка заплащането на тази такса до размера на реално платената на държавата такса за изключване. Остатъкът от покупната цена след прихващането се заплаща в договорения размер. | | b/ The fees due and any other expenses related to the elaboration and approval of the DSP-RDP for the land, as well as expenses related to the change of its purpose from forestry fund to urban territory - Land plot in regulation for housing building, including the fee for exclusion of the land from the forestry fund, which would be due by the Buyer in his capacity of owner of the land, are at the expense of the Seller who shall assume the obligation to the Buyer to pay the expenses on behalf of the owner. In case that the exclusion fee is due by the Buyer as an owner of the land by virtue of an administrative act for the exclusion of the land from the forestry fund or by virtue of the law at the exclusion of the land from the forestry fund in the future, then the Buyer has the right to pay the fee directly to the State in deducting his obligation to pay the rest of the purchase price against the counter obligation of the Seller to assume at his own expense the payment of this fee to the amount of the real paid state fee for the exclusion. The rest of the purchase price after the deduction shall be paid in the agreed amount. |
| **4.2.** В случай, че в договорения по чл. 3 срок не бъде осъществена промяната на статута в смисъла по същия член, страните се договарят едновременно със сключването на ескроу споразумението по този договор да възложат на ескроу агентите, ведно със съответните пълномощия, мандат, по силата на който, | | **4.2.** In case that within the time limit under Art.3 no change of the status under the said article has been executed, the Parties agree at the time when the escrow arrangement is made under this Agreement to assign to the Escrow Agents, together with the relevant authorizations, a mandate by virtue of which the Escrow Agents shall finalize the sale |

ескроу агентите да извършат в нотариална форма покупко-продажба на терена, по която Купувачът, придобил по окончателния договор имота и действайки вече като продавач, да прехвърли собствеността върху терена, а Продавачът, прехвърлил собствеността върху имота на Купувача и действайки вече като купувач, да придобие собствеността върху терена, при условия и предпоставки, изброени в следващите букви по този член от договора. Разпоредбата по този член представлява предварителен договор, чието действие, съответно насрещните задължения на страните за прехвърляне на собствеността срещу заплащане на покупната цена, е поставено в зависимост от сбъдване на следните предпоставки и условия :

а/ Предпоставки :
- Теренът в договорените срокове не е установен като урегулиран терен за жилищно застрояване и за същия не е издадена до 31.12.2007 г. заповед за изключването му от горския фонд, съответно за промяна на предназначението му, с което е настъпило **прекратителното условие** по **чл. 4**, уговорено в интерес на купувача, като последният се е позовал на настъпилото прекратително условие;

б/ Условия:
- Продавачът или купувачът, или двамата едновременно, въз основа на осъществяване на предпоставките по **б. „а" от този член** са заявили писмено искане пред ескроу агентите за упражняване на мандата за покупка на терена и продавачът е превел по ескроу сметката за плащане на Купувача получената от него част от договорената продажна цена в размер на 20'974'420 /двадесет милиона деветстотин седемдесет и четири хиляди четиристотин и двадесет/ евро, увеличена с всички направени от Купувача разходи във връзка с придобиване на терена и ведно с лихвите върху така увеличената сума за периода от плащането по този договор до датата на придобиване на имота в размер на тримесечния евро либор, увеличен с два пункта, както и необходимите суми за разноски по продажбата, с оглед тази сума да бъде преведена на купувача /продавач по сделката след настъпване на прекратителното условие/ като покупна цена, съответно да бъдат платени и всички разходи по тази покупко-продажба. Падежът за сключване на договора е седем работни дни, считано от датата, на която продавачът по основния и купувач по този

and purchase transaction before a notary public, and the Buyer having acquired the land as described above and acting as a Seller to transfer the ownership of the land, and the Seller, having transferred the ownership of the land to the Buyer and acting as a buyer to acquire the ownership of the land under the conditions and prerequisites, stated in the following items under the current article of the present Agreement. The provisions herein constitute a Preliminary agreement whose effect, respectively - the counter-obligations of the Parties to transfer the ownership against a payment of the purchase price, shall depend on the occurrence of the prerequisites and conditions below:

a/ Prerequisites :
- Within the agreed terms, the land is not a regulated residential area and until 31.12.2007 an order for its exclusion from the forestry fund and change of its purpose has not been issued, and thus the **termination condition** under **Art. 4** has occurred, which is agreed in the interest of the Buyer and the latter has referred to the occurred termination condition;

b/ Conditions:
- On the basis of the regulations of the prerequisites of **б."а" of this article**, the Seller or the Buyer, or both simultaneously, have made a written request before the Escrow Agents for exercising the mandate for purchase of the land and the Seller has transferred into the escrow account for payments under the contract to the Buyer the received part of the agreed sell-price amounting to €20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty Euros/, increased with all expenses made by the Buyer in the process of acquisition of the land, together with the interest for the period beginning with the payment under the current agreement and ending with the acquisition of the land, at interest rate equal to the three-month Euro Libor increased with 2 /two/ points, as well as the amounts necessary for the procedure of the sale in order to transfer this sum to the Buyer /Seller in the deal after occurrence of the termination condition/ as a purchase price and cover all the expenses of this sale-purchase transaction. The time limit for the conclusion of the final Agreement is 7 /seven/ working days from the date, on which the Seller under the final Agreement and a Buyer under this preliminary Agreement has been advised of the

предварителен договор е уведомен за позоваването на прекратителното условие, съответно са му предоставени документите от значение за изчисление на покупната цена и дължимите такси. В този случай всички разходи по продажбата, както и направените разходи за промяна на статута на терена от горски фонд в урегулиран терен за жилищно застрояване са за сметка на Продавача. Направените разходи, с които следва да се увеличи сумата от 20'974'420 /двадесет милиона деветстотин седемдесет и четири хиляди четиристотин и двадесет/ евро, се доказват със съответните документи, които се предоставят на продавача лично или чрез неговия ескроу агент, ведно с позоваването на прекратителното условие по предходната буква. Информация за размера на лихвата също следва да бъде представена в писмен вид на страната, която следва да заплати покупната цена, ведно с останалите документи от значение за нейното определяне в бъдеще, съгласно с договореното по – горе. В случай, че при желание от страна на купувача за сключване на окончателния договор по тази точка, продавачът по основния и купувач по този договор не е депозирал дължимата цена, предварителният договор може да бъде обявен за окончателен по реда на чл. 19, ал. 3 ЗЗД по иск на купувача по основния и продавач по договора по тази точка с осъдително решение спрямо задължената страна за заплащане на покупната цена, постановено ведно с обявяване на договора за окончателен.

**в/ Срок:**
- Мандатът се дава и договаря със срок на валидност петнадесет работни дни, считано от датата, на която най-късно е следвало Продавачът да удостовери установяването на терена като урегулиран такъв за жилищно застрояване със сменено предназначение по силата на заповед за изключването му от горския фонд, с изтичането на който срок и при липсата на упражнено право от страна на Продавача по предходната б."б" или при липсата на упражнено право от страна на Купувача чрез писмено искане пред ескроу агентите за упражняване на мандата за продажба на терена, мандатът се прекратява по право. В тези случаи се прилагат и правилата, договорени в следващата разпоредба за „правото на опция за запазване на собствеността".

4.3. Страните договорят в полза на Купувача правото на първа и единствена опция

referring to the termination condition and has been provided with the documents significant of the calculation of the purchase-price and due charges respectively. In this case all costs in the sale, and the expenses made in the procedure of the change of status from forestry fund to housing development land in regulation shall remain at the expense of the Seller. The expenses made, increasing the amount of €20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty Euros/, shall be proven by the respective documents to be presented to the Seller himself or though Seller's escrow agent, together with the referring to the termination condition according to the previous item of the current article. The information about the total amount of the interest must be presented in writing to the party obliged to pay the purchase-price, together with the rest of the documents significant of a future calculation of the latter in accordance with agreed hereinabove.

In case the Buyer is willing to conclude the final Agreement under this item but the Seller under the final agreement and a Buyer under the present agreement has not deposited the due price, the preliminary agreement can be proclaimed final according to provisions of Art.19, item 3 of the Obligations and Contracts Act (OCA) according to the claim of the Buyer under the main agreement and Seller under the present agreement according to the current item by a condemnable decision towards the obliged party to pay the purchase-price, announced together with the proclamation of the final agreement.

**c/ Time limit:**
- The mandate shall be granted and valid for 15 /fifteen/ days from the date on which the Seller would at latest certify that the land is regulated for residential housing with a transformed purpose by virtue of an order for exclusion of the land from the forestry fund. The mandate shall be terminated by right after the expiration of this time limit and in lack of exercised right on behalf of the Seller under the previous p."b" or in case that the Buyer has not exercised his right by written request before the Escrow Agents to exercise the mandate for selling the land. In these cases the rules under the provision "the right to exercise the option to preserve ownership" shall apply.

4.3. The Parties agree on the favor of the Buyer the right of first and unique option to

да прекрати едностранно мандата, възложен на ескроу агентите по предходната точка и да запази собствеността върху терена въпреки настъпването на на прекратителното условие по чл. 4, означавано за краткост на всякъде по – долу „право на опция за запазване на собствеността" , при следните хипотези :

а/ Купувачът е заявил, въпреки обстоятелството, че за терена не е налице постановена заповед за изключването му от горския фонд и поради това същият не е с променен статут като урегулиран такъв за жилищно застрояване в договорения срок – 31.12.2007 г., че желае да запази собствеността и прекратява мандата на ескроу агента за продажба на терена на Продавача, което право се упражнява в срока,  договорен за мандата за покупко-продажба по **чл. 4.2. ,б. „в"**;

б/Купувачът не е упражнил правото си на опция за запазване на собствеността по б. „а", но и не е заявил в срока на мандата пред ескроу агента искане за упражняване на мандата за продажба на терена на Продавача при условията на чл. 4, нито е заявил желание лично да сключи сделката по чл.4.2., като едновременно с това и Продавачът не е заявил нито лично , нито пред ескроу агента, искане в срока на мандата за покупко-продажба на терена, при което се е стигнало до прекратяване на мандата поради изтичане на неговия срок;

в/Продавачът и единствено той е заявил искане за упражняване на мандата за покупка на терена при условията на чл. 4, но не е превел по ескроу сметката дължимата сума по чл. 4, съответно **чл. 4.2. б. „б"**, като в този случай за продавача остава задължението за заплащане на неустойката по **чл.4.4.б.а.„а.а"**.

г/ В тези случаи Купувачът остава задължен и дължи плащането на остатъка от продажната цена до пълния договорен размер от 36 /тридесет и шест / евро на квадратен метър при съобразяване на разпоредбата на **чл.4.1.б.„б"** от настоящия договор;

**4.4.** Отговорност на страните за неизпълнение на задължения за заплащане на цената и оезпечения.

а/ Отговорност на Продавача :

**а.а.** Продавачът се задължава да заплати

terminate unilaterally the mandate, granted to the Escrow Agents as set forth in the previous article and to preserve the ownership over the land, despite the occurrence of the termination condition under Art.4, hereinafter referred to as "right to exercise the option to preserve ownership" under the following assumptions:

a/ the Buyer has declared, despite the fact that concerning the land there is no issued order for its exclusion from the forestry fund and therefore its status is unchanged into a regulated for residential housing in the agreed time limit - 31.12.2007, that he is willing to preserve  the ownership and shall cancel the mandate of the Escrow Agents for selling the land to the Seller, that right is exercised within the time limit agreed for the mandate for sale and purchase under **Art.4.2.b,„c"**;

b/ the Buyer has not exercised his right to exercise the option to preserve ownership under b. "a"  and during the mandate he has not submitted before the Escrow Agent  a request for exercising the mandate for sale of the land of the Seller under the provisions of Art.4, nor has he stated his willingness to conclude the deal under Art.4.2, and in the same time the latter has not requested before the Escrow Agent to purchase the land, and as a result the mandate is terminated because of the expiry of its term;

c) Only the Seller has declared request for exercising a mandate for purchase of the land under the provisions of art.4, but he has not paid the due amount to the escrow account under art.4, respectively **Art.4.2b."b"**, in this case an obligation of the Seller is to pay a penalty under **Art.4.4.6.a.„a.a"**.

d/ In all these cases the Buyer shall be obliged and owe to pay the rest of the selling price up to the full agreed amount of €36 /thirty six Euros/ per square meter according to the provision of **Art.4.1.b."b"** of the this Agreement ;

**4.4.** Liability of the parties for failure to fulfill obligations to pay the price and compensation.

a/ Seller's Liability:

**a.a.** The Seller undertakes to pay

на Купувача неустойка в размер на 10 /десет/ процента от общата покупна цена по чл. 2, ако са налице условията по чл. 4.3., б. „в", както и ако не е внесъл по ескроу сметката цената и другите суми по чл. 4, съответно чл. 4.2., б. „б" при възникнало задължение за това от негова страна съобразно с разпоредбите на чл. 4, съответно чл. 4.2.

а.б. Продавачът за обезпечение на задължението си за заплащане на неустойка по предходната б. "а.а", издава менителница, приета за плащане от ОЛ СИЙЗ БЪЛГАРИЯ ЕООД, за заплащане на договорената по предходната точка неустойка в полза на Купувача, която менителница се предава за съхранение на ескроу агентите. За обезпечение на задължението за заплащане на покупната цена по договора
по чл. 4, съответно чл. 4.2., ОЛ СИЙЗ БЪЛГАРИЯ ЕООД подписва с купувача по основание договор договор за поръчителство и се задължава солидарно .

а.в. При евикция на купувача от имота или част от него и в случай, че продавачът е привлечен в процеса като помагач на страната на купувача съгласно с чл. 191, ал. 2 ЗЗД, то продавачът дължи неустойка в размер на 10% /десет процента/ от цялата покупна цена в размер на 37'753'956 /тридесет и седем милиона седемстотин петдесет и три хиляди деветстотин петдесет и шест/ евро,  на основание чл. 189, ал. 1, изр. трето ЗЗД във връзка с чл. 92 ЗЗД, като в този случай продавачът може да развали договора изцяло или частично  по отношение на частта от имота, от която е съдебно отстранен .

а.г. В горните случаи се прилага чл. 309 ТЗ, като страните предварително заявяват, че размерът на неустойката, договорен по- горе, не е прекомерен.

а.д. Продавачът за обезпечение на задължението си за заплащане на неустойка по предходната б. „а.г", издава менителница, приета за плащане от ОЛ СИЙЗ БЪЛГАРИЯ ЕООД, за заплащане на договорената по предходната точка неустойка в полза на Купувача, която менителница се предава за съхранение на ескроу агентите. За обезпечение на задължението за връщане на цялата или част от покупната цена прп разваляне на договора

compensation to the Buyer of 10 % /ten per cent/ of the total purchase price under art.2 in the event that the conditions under Art.4.3.(b) "c" are met, as well as in the event of failure to remit the price and the other amounts specified in Art.4, respectively Art. 4.2 (b) "b" as obliged to do to the escrow account according to the provision of Art.4, respectively Art.4.2.

a.b. The Seller shall issue a bill of exchange as collateral for their liability to pay compensation under the former sub-clause „a.a", which bill of exchange is to be approved for payment by ALL SEAS BULGARIA OOD and will be used to pay the compensation specified in the previous sub-clause in favour of the Buyer, and which will also be placed in escrow  with the Escrow Agents; In order to secure obligation to pay the purchase-price under the agreement, as well as to make the payment of the purchase-price under the agreement under **Art.4**, respectively **Art.4.2**, ALL SEAS BULGARIA EOOD shall sign with the Buyer on grounds of a contract, a Contract for Guarantee and shall be obliged on a joint basis accordingly.

a.c. In the event of eviction of the Buyer from the land or a part of the land and in the event when the Seller is involved as a party assisting the Buyer according to art.191, par.2 of the Obligations and Contracts Act (OCA), then the Seller shall owe a penalty in the amount of 10% /ten per cent/ of the total purchase-price of €37'753'956 /thirty seven million seven hundred fifty three thousand nine hundred fifty six Euros/ by virtue of art.189, par.1, third sentence of the OCA with regard to art. 92 of the OCA, whereas the Seller has the right to terminate the contract wholly or partially as regards to the part of the land, which he is removed from by virtue of a court decision.

a.d. For the above events the provision of the Article 309 of the Commercial Act shall apply, and the Parties shall declare in advance that the amount of the penalty, above agreed, is reasonable.

a.e. In order to secure the obligation to pay the penalty according to previous item "a.d." the Buyer shall issue a bill of exchange, accepted by ALL SEAS BULGARIA EOOD, to secure the payment of the agreed in the previous item penalty in favor of the Buyer, whereas the bill of exchange shall be given into escrow agents charge. In order to secure the obligation to restore the whole or the paid part of the purchase-price in case of termination of the agreement in full or partially in the event of full

9

изцяло или частично при цялостна или, съответно частична евикция ОЛ СИЙЗ БЪЛГАРИЯ ЕООД подписва с купувача по основания договор за поръчителство и се задължава солидарно.

**б/ Отговорност на Купувача:**

б.а. За обезпечаване на вземането по чл.2 б."б" на Продавача за остатъка от продажната цена до пълния размер, а именно 16'769'536 /шестнадесет милиона седемстотин шестдесет и девет хиляди петстотин тридесет и шест/, Продавачът има право да впише законна ипотека върху терена едновременно със сключване на окончателния договор. Ипотеката за това вземане служи за обезпечаване и в хипотезата на упражнено право на опция за запазване на собствеността, независимо от случая, в който конкретно се осъществява същата;

4.5. Плащането на цената на терена по този договор, в това число и при упражняване на мандата, възложен на ескроу агентите за покупко-продажба на имота по чл. 4.2. във връзка с чл. 4, както и при упражнено право на опция за запазване на собствеността, се извършва по ескроу сметка, открита от двамата ескроу агенти в Инвестбанк АД –Варна, при условията и начина на усвояване, договорени в платежния механизъм на ескроу споразумението.

**IV.ЗАДЪЛЖЕНИЯ НА СТРАНИТЕ, УСЛОВИЯ ЗА ИЗИСКУЕМОСТ, ПОРЕДНОСТ НА ИЗПЪЛНЕНИЕТО НА НАСРЕЩНИТЕ ЗАДЪЛЖЕНИЯ И ДОКАЗВАНЕ.**

5. Страните се договарят изпълнението на настоящия договор да се извърши при следните условия :

(а) В срок до шестдесет дни, считано от датата на настоящия договор, Продавачът следва да удостовери по съгласувания тук начин правото си на собственост върху терена, без ограничения и каквито и да са тежести върху последния, като декларира и гарантира, че към момента на подписване на окончателния договор за покупко-продажба в нотариална форма по отношение на терена няма да има: учредени други права на собственост или други права, които могат да

eviction, respectively - partial eviction, ALL SEAS BULGARIA EOOD shall sign with the Buyer on grounds of contract a Contract of Guarantee and shall be liable on joint basis accordingly.

**b/ Buyer's liabilities:**

b.a. As security for the collectibles under **Art. 2 b."b"** of the Seller for the remainder up to the total amount, which is €16'769'536 /sixteen million seven hundred sixty nine thousand five hundred thirty six Euros/ the Seller shall be entitled to record a legal mortgage upon the Land and enter into an final agreement. The mortgage related to this receivable shall be used as collateral under the assumption of the right to exercise the option to preserve ownership regardless of the specific manifestation of this assumption;

4.5. The payment of the Land Price hereunder, inclusive of the exercising the mandate granted to the Escrow Agents for the sale and purchase of the Property under Article 4.2 with regard of art. 4 and the right of option to preserve ownership as exercised shall be made into an escrow payment account open by both Escrow Agents at the First Investment Bank AD, Varna, under the terms and method of use of the funds as set forth in the method of payment clause of the escrow arrangement.

**IV.OBLIGATIONS OF THE PARTIES, CHARGEABILITY OF CONDITIONS, ORDER OF EXECUTION OF THE COUNTER-OBLIGATIONS AND RELEVANT PROOFS.**

5. The parties agree to perform this Agreement under the terms as shown below:

(a) Within sixty days starting from the date hereof and by the method prescribed herein the Seller shall produce proofs of their right of ownership on the Land free from any limitations or encumbrances of the latter whatsoever, by making a statement and giving a guarantee that as of the time the entire Sale and Purchase Agreement is signed before a Notary Public the Land is free from: any rights of ownership over it or from any other rights that might hinder the Buyer, any lend-lease agreements entered into

противостоят на Купувача; сключени и непрекратени договори за наем, както и за каквото и да било друго ползване; няма да има никакви вещни тежести, ипотеки, особени залози и други обезпечения, нито някакви вещни, фискални, облигационни, реституционни и други права и претенции на трети лица;  по отношение на терена или части от него няма да съществуват вписани искови молби, висящи съдебни и извънсъдебни спорове, изпълнителни, отчуждителни и обезпечителни производства и процедури, по отношение на терена няма да има наложени възбрани или други обезпечителни мерки;

(б) В срок до шестдесет дни, считано от датата на настоящия договор, Продавачът да удостовери по съгласувания тук начин, че теренът не съставлява защитена зона, попадаща в НАТУРА 2000 съгласно с приетия с Решение № 122 на Министерски съвет обнародвано в държавен вестник брой 21 от дата 09.03.2007 г., страница 6, план на Националната екологична мрежа, както и да пристави документ за Допускане за изработване на ПУП върху терена с КИНТ най – малко 0.6;

(в) В деня на сключване на настоящия договор страните да сключат договор (Ескроу споразумение) с двамата ескроу агенти, за откриване и управление на ескроу сметка, чрез която следва да се извърши плащането на:

а/ частта от  договорената цена на терена по чл.2., б. „а" при сключване на договора в нотариална форма за продажба на имота;

б/ остатъка от договорената цена на терена по **чл.2., б. „б"**;

в/ договорената цена по договора за покупко-продажба на терена съгласно с **чл. 4.2, б. „б"**  при настъпване на прекратителното условие по чл. 4 и останалите предпоставки по **чл.4.2.** ;

(г) В срок до 5 /пет/ работни  дни от датата на сключване на настоящия договор Купувачът да завери ескроу сметката със сумата от 2'097'442 /два милиона деветдесет и седем хиляди четиристотин четиридесет и две/ евро,

and still in force, as well as any agreements granting rights to use the property in one way or the other; any encumbrances, mortgages, special pledges or other collaterals, or from any real rights, fiscal rights, bond rights, restitutionnal or any other rights or claims of third parties; with regard to the land or parts of it there exist not any filed claims, pending lawsuits or out-of-court disputes, nor any executory  actions, alianatory proceedings, nor collateral security procedures, and that the land shall be free from any attachments or other security measures;

(b) Within sixty days starting from the date hereof and by the method prescribed herein the Seller shall produce proofs showing that the Land is not listed as a  protected area under NATURA 2000 pursuant to the National Ecological Network Plan, adopted by Resolution No. 122 of the Council of Ministers, published in the State Gazette No.21 of 9th March 2000, p.6;, the Seller shall also produce a document showing permission to make a Detailed Structural Plan of the Land of KINT (Development Intensity Coefficient) of 0.6 at the least;

(c) On the day of the  present Agreement conclusion the Parties shall enter into an agreement (Escrow Arrangement) with the two Escrow Agents to open and operate an escrow account, through which payment of the items shown below shall be made:

a/ that portion of the Land Price as agreed in Article 2 (a) upon signing of the Property  Sale Agreement before a Notary Public;

b/ the remainder of the Land Price as set forth in **Art. 2 b. "b"**;

c/ the Land Price as specified in the Sale and Purchase Agreement in **Art.4, b. "b"** in the event that a termination condition under **Art.4** and the rest of the prerequisites under **Art.4.2.** to this effect occur;

(d) Within 5/five/ working days starting from the date of the conclusion of the present agreement the Buyer shall remit into the opened escrow account the amount of €2'097'442 /two million ninety seven thousand four hundred forty

11

като предоставен на разположение депозит за плащане на част от договорената цена по чл. 2, б.„а" от раздел II, съответно по б. „а" от настоящия член;

(д) В срок до 20.08.2007 г. да завери същата със сумата от 18'876'978 /осемнадесет милиона осемстотин седемдесет и шест хиляди деветстотин седемдесет и осем/ евро,като предоставен на разположение депозит за плащане на останалата част от договорената цена по чл. 2, б. "а" от раздел II, съответно по б. "а" от настоящия член;

(е) В срок до датата на сключване на окончателния договор да завери ескроу сметката със сума, равняваща се на половината от дължимите за сключване на окончателния договор в нотариална форма такси и други разноски.

6. (а) Изпълнението на условията по предходната разпоредба се доказва чрез удостоверителни и/или диспозитивни документи както следва: Титул за собственост върху терена, удостоверяващ и легитимиращ правото на собственост върху терена на името на Продавача; Удостоверение за липсата на вещни тежести върху имота; Данъчна оценка с удостоверена от съответната данъчна служба липса на данъчни задължения за имота ; Скица или скици, посочващи индивидуалното месторазположение на имота; Удостоверение, че имотът не попада в защитените зони от НАТУРА 2000; Удостоверение за Допускане за изработване на ПУП върху терена с КИНТ най – малко 0.6; Договор за откриване и управление на ескроу сметка, сключен с ескроу агентите; Договор за възлагане на поръчка /мандат/ от продавача и купувача съответно с двамата ескроу агенти по чл. 4, съответно чл.4.2. от настоящия договор; Извлечение за депозираната от Купувача сума по ескроу сметката.

(б) Изпълнението на условията по предходната разпоредба се извършва чрез представяне на документите на Ескроу агентите, ангажирани от страните да обслужат договореното между тях разплащане, както и чрез предоставянето им на разположение на Купувача, за което Продавачът или неговият ескроу агент известява писмено Купувача. Купувачът в срок от 10 /десет работни/ дни, считано от датата на известяването му за

two Euros/ in the form of a deposit that may be used in order to pay the Price as agreed in Art. 2 "a" of Section II, and pursuant to **sub-clause "a"** hereof;

(e) Within the period until 20.08.2007 the Buyer shall remit into the escrow account the amount of €18'876'978 /eighteen million eight hundred seventy six thousand and nine hundred seventy eight Euros/, in the form of a deposit that may be used in order to pay the remaining part up to the price as agreed in **Art. 2 "a"** of Section II, and pursuant to **sub-clause "a"** hereof;

(f) By the date of conclusion of the final agreement the Buyer shall remit into the escrow account the amount equal to the half of all charges due for the conclusion and notarization of the final agreement and all other related expenses.

6. (a) Meeting the conditions specified in the previous clause needs to be proved by producing of certification or provisional documents such as: a Title of Ownership on the Land showing the legitimate right of ownership on the Land by the Seller; A Tax Assessment showing that the Property is free and clear from any tax liabilities; a Title Report showing that the Property is clear of any encumbrances; a layout plan or plans showing the exact location of the Property; a certificate showing that the Property is not listed as a protected area under the NATURA 2000; produce a document showing permission to make a Detailed Structural Plan of the Land of KINT (Development Intensity Coefficient) of 0.6 at the least; an agreement (Escrow Arrangement) entered into with the Escrow Agents to open and operate an escrow account; a Contract of Mandate signed by and between the Seller and the Buyer respectively with the two Escrow Agents under Art.4 and Art.4.2 hereof; A Statement of Account showing that an amount into the Escrow Account has been deposited by the Buyer.

(b) The conditions set out in the above clause shall be met by producing of the documents before the Escrow Agent, engaged by the Parties to take care of the payment as agreed by and between these, as well as by making such documents available to the Buyer, by Seller's or their Escrow Agent's notification in writing to this effect to the Buyer. The Buyer shall, within 10 (ten business) days starting from the date of the above notification to produce the documents, make inspection of the facts

представянето на документите, е длъжен да извърши проверка върху установените с тях обстоятелства.

(в) Купувачът, след като извърши проверката в указания в чл.6, б. „б" срок, е длъжен да потвърди в тридневен срок от изтичане на същия срок дали приема или не въз основа на документалното установяване - предмет на проверката, изпълнението на условията по чл. 5, б. „а" и б. „б", като при потвърдено приемане страните са длъжни в срок до 48 часа, считано от изтичане на срока по чл. 6, б.„б", да сключат окончателен договор за покупко-продажба на терена в нотариална форма при условията по раздел II и раздел III от настоящия договор. Мястото, часа и нотариуса за сключване на окончателния договор се известяват на Купувача и Продавача от Ескроу агентите по плащанията най-късно в срока по чл.6 б. „б". За приемане се счита и липсата на изричен отказ от страна на Купувача да потвърди изпълнението на условията по чл.5, б.„а"      и „б", както и приемането на документалната установеност на установяваното с документите изпълнение на същите условия.

7. Изпълнението на договорените условия по чл. 5 в договорените срокове, доказано посредством документите по чл. 6, б." а" и извършено по начина, договорен в чл. 6, б. „б" и б. „в", съгласно изричната воля на страните се въздига като предпоставка за изискуемост на задължението за сключване на сключване на окончателен договор за покупко-продажба на терена със съдържание съгласно раздел II и III от настоящия договор и съставлява при неосъществяване на кое и да е от условията в сроковете, предвидени в същите разпоредби, прекратително условие на настоящия предварителен договор.

8. Отказът на която и да е от страните, при доказано изпълнение на договорените условия в чл. 5, б. „а" и б. „б" за сключване на окончателен договор за покупко-продажба на терена при условията и със съдържание съгласно раздел II и III по – горе, наричан още необоснован отказ, ще съставлява виновно неизпълнение на задължението й ще задължава неизправната страна да заплати на изправната неустойка за цялостно неизпълнение в размер на 10% /десет процента/ от общата покупна цена, дължима от купувача, а именно 37 753 956 /тридесет и седем милиона седемстотин петдесет и три хиляди

proved by such documents.

(c) Having made the inspection within in the time limit specified in **Art.6 "b"** the Buyer shall, within three days after the above time limit has expired, confirm pursuant to the facts established by such inspection whether or not they accept that the conditions under **Art. 5 "a" and "b"** have been met, and in the event of an acceptance confirmed the Parties shall enter into an entire (final) sale and purchase agreement for the Land before a Notary Public under the provisions set out in Sections II and III hereof by 48 hours at the latest after the time limit specified in Art.6(b) has expired.  The Escrow Agents shall notify the Buyer and the Seller for the place, time and the Notary Public before whom the final agreement shall be entered into within the time limit specified in Art.6 (b). The lack of an explicit refusal on Buyer's part to confirm whether the conditions under **Art.5 (a) and (b)** have been met, as well as the act of accepting the facts established by the documents produced and showing that such conditions have been met shall be deemed an acceptance.

7. Fulfillment of the conditions set out in Art. 5 within the time limits as specified and duly proved by the documents required by Art. 6 (a), and performed in the manner prescribed in Art. 6 (b) and (c), pursuant to the explicitly expressed declaration of intention of the Parties shall be deemed a **prerequisite of chargeability of the obligation to enter into an entire (final) agreement** for purchase and sale of the Land, and the contents of such agreement shall comply with Sections II and III hereof and the failure to meet any condition within the time limits specified therein shall also be deemed **a termination condition** hereof.

8. In the event of a Party refusing to enter into an entire agreement when all the conditions under Art. 5 (a) and (b) providing for such entire agreement for purchase and sale of the Land under the terms and wording as those set forth in Sections II and III above,  such refusal shall be termed as a groundless refusal and shall be deemed to be a default failure to perform obligations while obliging the party at default to pay to the Party not at default a compensation for entire failure to perform to the amount of Euro 10% /ten per cent/ of the total purchase price payable by the Buyer, namely €37'753'956 /thirty seven million seven hundred

деветстотин петдесет и шест/ евро. При необоснован отказ за сключване на окончателния договор, изправната страна може да поиска обявяването му за окончателен по реда на чл.19, ал.3 от Закона за задълженията и договорите или да развали договора при условията на чл.87 , ал.1 от Закона за задълженията и договорите, като предупреди неизправната страна, че в случай на неизпълнение на задължението за сключване на окончателен договор в срок от седем дни от датата на уведомлението, предварителният договор ще се счита за развален. В случай на разваляне на договора се ангажира и отговорността на неизправната страна за заплащане на наустойката за цялостно неизпълнение. Уведомлението се извършва в писмена форма на посочения адрес за кореспонденция или на ескроу агентите най-късно в срок до 24 часа от датата, на която е следвало да се сключи окончателният договор за покупко-продажба.

### V. ПЛАТЕЖЕН МЕХАНИЗЪМ НА ЕСКРОУ СПОРАЗУМЕНИЕТО ПО чл. 5, б. „в".

**9.1.** Плащането на първата част от цената по покупко-продажбата на терена в размер на 20'974'420 /двадесет милиона деветстотин седемдесет и четири хиляди четиристотин и двадесет/ евро се извършва от Купувача в полза на Продавача, чрез заверка на ескроу сметката на два пъти в указаните по чл.5, б.„в" и б.„г" размери и срокове;

**9.2.** Плащането на остатъка от цената по покупко-продажбата на терена в договорения размер от 16'769'536 /шестнадесет милиона седемстотин шестдесет и девет хиляди петстотин тридесет и шест/ евро при променен статут на урегилиран терен за жилищно застрояване, изключен от горския фонд, се извършва чрез доплащане на сумата от Купувача в полза на Продавача , чрез заверка на ескроу сметката в следния порядък:

а/ сумата от 1'667'954 /един милион шестстотин шестдесет и седем хиляди деветстотин петдесет и четири евро/, представляваща 10% от дължимата стойност, в срок до десет работни дни от датата на вписване на окончателния договор за покупко-продажба по чл. 6, б. „в";

fifty three thousand nine hundred fifty six Euros/. In the event of groundless refusal to sign the entire agreement the Party that is not at default may demand that it is announced an entire one under the procedure set forth by Art.19, paragraph 3 of the Obligations and Contracts Act, or may discharge of it under the provisions of Art.87, paragraph 1 the Obligations and Contracts Act by notifying the party at default  that in the event of failure to meet their obligation to enter into an entire agreement within seven days after the date of such notice the preliminary agreement shall be deemed discharged. In the event that the agreement is discharged the party at default shall assume responsibility to pay the compensation for entire failure to perform. Such notice shall be given in writing at the address indicated or to the Escrow Agents within 24 hours after the date when the entire sale and purchase agreement had been supposed to be entered into.

### V. METHOD OF PAYMENT OF THE ESCROW ARRANGEMENT UNDER Art. 5, "c".

**9.1.** Payment of the first portion of the price for the land in the amount of € 20'974'420 /twenty million nine hundred seventy four thousand four hundred twenty Euros/ shall be made by the Buyer in favor of the Seller, by crediting of the duly opened for the purpose escrow account twice as agreed in **Art.5, "c" and "d"** hereof.

**9.2.** Payment of the remainder of the price for the land in the contractual amount of € 16'769'536 /sixteen million seven hundred sixty nine thousand five hundred thirty six Euros/ when the status of the land has been changed into that of a housing development land in regulation that has been deleted from the forestry fund list, shall be made by an additional payment to the amount of €16 /sixteen Euros/ per square meter and is payable by the Buyer in favor of the Seller, by crediting of the Escrow Account in the following order:

a/ the amount of €1'667'954 /one million six hundred sixty seven thousand nine hundred fifty four Euros/, representing 10% /ten per cent/ of the amount due, within 10 /ten/ working days after the date of the entry of the final sale contract in the Docket Book under **Art. 6, b. „c";**

б/ сумата от 15'101'582 /петнадесет милиона сто и една хиляди петстотин осемдесет и две евро евро/, представляваща остатъка от дължимата стойност, в срок до 20.09.2007г.;

**9.3. (а)** Депозираната сума по **чл. 9.1.** се усвоява от Продавача с представяне пред ескроу агентите на документите, посочени в чл. 6, б. „а" ведно с договор за продажба в нотариална форма, вписан в Агенцията по вписванията, доказващ сключване на **ОКОНЧАТЕЛЕН** договор за покупко-продажба на терена, предмет на настоящия договор, удостоверяващ, че Продавачът е притежавал собствеността върху терена и е прехвърлил тази собственост върху Купувача, че теренът не съставлява защитена зона включена в НАТУРА 2000, както и че има Допускане за изработване на ПУП върху терена с КИНТ най – малко 0.6, и че за същият не съществуват данъчни и вещни тежести, придружени с платежно искане за усвояване на цената.

**(б)** Срокът на действие на депозита на първоначалната вноска по цената на терена по ескроу сметката се договаря до 5 / пет / работни дни, след най-късната дата на която е следвало да се извърши покупко-продажбата, с изтичането на който срок и при условие че в рамките му не е постъпило платежно искане от Продавача, придружено с посочените по-горе документи, сумата се освобождава незабавно в полза на Купувача, а ескроу споразумението се прекратява по право.

**9.4.(а)** Депозираната сума по **чл. 9.2.** се усвоява от Продавача в срока по **чл. 4.1., б. „а"** с представяне на удостоверение от Община Балчик или друг компетентен административен орган, че за терена е влязъл в сила подробен устройствен план с възможно застрояване с КИНТ най – малко 0.6 със скица за същия и влязла в сила заповед на Министъра на Земеделието за смяна на предназначението на терена от горски фонд в статут на урегулиран терен за жилищно застрояване. В случай, че в заповедта е указана като дължима от купувача като собственик на терена такса за изключване на терена от горския фонд, то за усвояване на част от цената, равняваща се на дължимата такса, Продавачът следва да представи и доказателства, че е заплатил от името на купувача дължимата такса. В противен случай частта от покупната цена, рвняваща се на

b/ the amount of €15'101'582 /fifteen million one hundred and one thousand five hundred eighty two Euros/, representing the remainder of the amount due, within 20.09.2007;

**9.3. (a)** The deposited amount under **Art. 9.1** shall be reclaimed by the Seller by producing to the Escrow Agents the documents, specified in art. 6, b. „a" along with a notarized contract of sale, registered in the Docket Office, certifying the conclusion of a FINAL sale and purchase agreement for the land, subject matter of the present Agreement, showing that the Seller has had ownership of the land and had transferred it to the Buyer, that the land is not a protected area, included in NATURA 2000, and also that there is a permission to make a Detailed Structural Plan of the Land of KINT (Development Intensity Coefficient) of 0.6 at the least, and that the land is free and clear of tax and real encumbrances, along with the payment demand order for the use of the price.

**(b)** The time limit of the deposit of the initial payment of the price of the land into the escrow account shall be negotiated not later than 5 /five/ working days after the last date for the sale and purchase will be carried out, after the expiry of such term, providing that its timeframe a payment demand order has not been submitted by the Seller, accompanied by the documents listed above, the amount shall be released immediately in favor of the Buyer, and the Escrow Arrangement shall be terminated by right.

**9.4.(a)** The deposited amount under **Art. 9.2.** shall be reclaimed by the Seller according to the time limit inder **Art. 4.1., b.„a"** upon producing of a certificate by Balchik Municipality or other competent administrative body, showing that a detailed structural plan of the Land has come into force, allowing development with KINT of 0.6 at the least along with a layout plan of the same and that an order by the Minister for Agriculture for the change of the purpose of the land from Forestry fund into a housing development land in regulation has come into force. In the event that a fee for the deletion of the land from the forestry fund list is required as due by the Buyer, acting as owner of the land, the Seller needs to produce proofs showing payment of the above fee due on behalf of the Buyer in order to reclaim the portion of the price equal to the fee due. Otherwise, the part of the purchase price, equal to the fee due by the Buyer for the

дължимата от купувача такса за изключване на терена от горския фонд, остава по ескроу сметката и може да бъде заплатена по писмено искане на купувача по сметка на държавата.

(б) Срокът на действие на депозита на дължимия остатък от купувача по покупна цена на терена по ескроу сметката се договаря в период от 5 / пет / работни дни , считано от последната датата, на която е следвало да се извърши проверката по представените: удостоверението за влизане в сила на подробния устройствен план за терена със скица за същия и заповед на Министъра на Земеделието за смяна на предназначението на терена от горски фонд в статут на урегулиран терен за жилищно застрояване, с изтичането на който срок и при условие, че в рамките му не е постъпило платежно искане от Продавача придружено с посочените по-горе документи, сумата се освобождава незабавно в полза на Купувача, а ескроу споразумението се прекратява, освен ако страните и ескроу агентите договорят писмено други условия и срокове с Анекси към този договор и към ескроу споразумението, или в договора за възлагане на мандата на ескроу агентите за извършване на покупо-продажба по чл. 4.2.

## V. ЗАКЛЮЧИТЕЛНИ РАЗПОРЕДИ.

**Параграф 1.** Промените в настоящия договор се извършват само по взаимно писмено съгласие на страните.

**Параграф 2.** Нищожността на коя и да е от клаузите на настоящия договор или допълнително уговорените условия, доколкото не налага изменине в същественото съдържание на договореностите, не води до нищожност на друга клауза или на договора като цяло. В противен случай страните дължат да договорят съответното изменение и допълнение на настоящия договор, като запазят смисъла и съдържанието на първоначалната договореност. В случай че невъзможност за постигане на такава договореност, страните възлагат определяне съдържанието на последната по запазване и съхраняване на първоначално заявената от тях воля за запазване валидността на договора на съда .

**Параграф 3.** За всеки спор относно съществуването, действието и валидността на

deletion of the land from the forestry fund list, shall remain in the Escrow Account and may be paid into the account of the State upon a written request of the Buyer

**(b)** The time limit to deposit the rest of the purchase price of the land due by the Buyer into the escrow account shall be contracted for a period of 5 /five/ working days, from the last date on which a check of the presented documents will be performed: a certificate showing that a detailed structural plan of the Land has entered into force, is to be submitted along with a layout plan of the same and the order of the Minister of Agriculture for the change of the purpose of the land from Forestry fund into a housing development land in regulation, after the expiry of that term and under the condition that within such timeframe a payment demand order has not been submitted by the Seller accompanied by the documents listed above, the amount shall be released immediately in favor of the Buyer, and the escrow arrangement shall be terminated, unless the Parties and the escrow agents settle in writing other conditions and terms by Annexes to this Agreement and to the escrow arrangement, or in the contract granting a mandate to the escrow agents for the performance of the sale and purchase under art. 4.2.

## V. FINAL PROVISIONS.

**Paragraph 1.** Amendments of this Agreement shall be made in writing by mutual consent of the Parties.

**Paragraph 2.** The nullity of any of the clauses or the additional arrangements herein, as far as it does not necessitate modifications of the substantial content of the arrangements, shall not entail nullity of any other clause or the entire Agreement. Otherwise the Parties have to negotiate the relevant modification and supplementing of the present Agreement, by preserving the meaning and content of the original arrangement intact. In the event of failure to make such an arrangement, the Parties shall refer to the Court the defining of the content of the latter in order to preserve the meaning of their will as stated by them initially to maintain the validity of the Agreement.

**Paragraph 3.** Any dispute regarding the existence, the force and the validity of the

постигнатите между страните договорености или във връка с тяхното нарушаване, включително спорове и разногласия относно: дейтвителността, тълкуването, прекратяването, изпълнението и неизпълнението им, както и за всички неуредени в този договор въпроси, се прилага българското действащо към датата на настоящия договор законодателство, като страните уреждат отношенията си чрез споразумение. При непостигане на съгласие облигационните спорове по този и по предходния член се отнасят за решаване пред Варненски районен или окръжен съд, съгласно правилата за родовата подсъдност, а вещните спорове във връзка с договора – пред компетентния съд съгласно правилата за местна подсъдност .

**Параграф 4/1/** Страните договарят следните адреси и лица за уведомления и кореспонденция , както следва :

За Купувача

За Продавача

**/2/** Последните адреси и лица подлежат на потвърждаване в ескроу споразумението и в договора за възлагане на мандат на ескроу агента за покупко – продажба на терена по чл.2.2. , като в противен случай задължителни са адресите и лицата посочени в последното.

**Параграф 5.** Този договор се състави едновременно на английски и български език, като при конфликт на редакциите, се прилага редакцията дадена с български език при изясняване на конфликтното съдържание от договореността .

**Параграф 6. /1/** Този Договор влиза в сила само ако Страните са сключили Договора (Ескроу споразумението) по чл.1.2(в) и Договори за възлагане на поръчка /мандат / с ескороу агентите. В противен случай подписването му от Страните няма никакви правни последствия.

**/2/** Влязъл в законна сила, настоящият договор поражда права и задължения и за правоприемниците на Страните.

**/3/** Ескроу агенти по смисъла на

arrangements made between the Parties or regarding their breach, including any disputes or disagreement on their validity, interpretation, termination, performance or failure to perform, as well as all and any issues that are not settled herein the Bulgarian current legislation as of date of the present Agreement shall apply, and the Parties shall settle any such disputes by mutual agreement. In the event of failure to reach an agreement, any contractual disputes concerning the current and the preceding article shall be referred to the Varna Regional or District Court, in compliance with the rules of the subject matter jurisdiction, and the property disputes related to the Agreement shall be referred to the competent court in compliance with the personal jurisdiction rules.

**Paragraph 4/1/** The mailing addresses and contact persons for notification or correspondence between the Parties shall be as follows:

For the Buyer

For the Seller

**/2/** The listed above mailing addresses and persons needs to be confirmed by the Escrow Arrangement and by the contract for the granting of mandate to the escrow agent for the sale and purchase of the land under art. 2.2, otherwise mailing addresses and persons listed above shall prevail.

**Paragraph 5.** This Agreement has been drawn in both English and Bulgarian languages, and in the event of a conflict between the two versions, the Bulgarian version shall prevail in order to clarify the content of the provisions in conflict.

**Paragraph 6. /1/** This Agreement shall come into force only if the Parties have concluded the Arrangement (The Escrow Arrangement) under art.1.2(c) and the Contract of Mandate with the Escrow Agents. Otherwise, its signing by the parties shall bring no legal consequences.

**/2/** Once it has come into force, the present Agreement shall create rights and obligations for the legal successors of the Parties.

**3.** Escrow Agents as defined herein shall be

17

настоящия договор са адвокатите Боян Илиев Жеков,ЕГН 5906051028, адвокатска колегия Варна, гр. Варна, ул. „Граф Игнатиев" № 17 и Захари Желязков Томов ЕГН 6804120540 , адвокатска колегия Варна , гр.Варна , улица Параскева Николау №4 , ет.2 , а ескроу сметка е съвместна специална клиентска сметка с титуляр Боян Илиев Жеков, която може да бъде задължавана единствено заедно от двамата ескроу агенти и преводи от която могат да се правят само по указани изрично от купувача и продавача сметки или по изрично нареждане на последните към двамата ескроу агенти по сметка на държавата или съответна община за заплащане на дължими такси и други държавни вземания, с платежно основание настоящия договор.

/4/ Договори за мандат с ескроу агентите по смисъла на настоящия договор са договори, сключени както следва:
а/първи договор между купувача като поръчител и адвокат Боян Илиев Жеков като довереник;
б/втори договор между продавача като поръчител и адвокат Захари Желязков Томов като довереник,
като предмет на договорите са предпоставките и условията, при които доверениците ще изпълняват от името и за сметка на поръчителите действия по изпълнение на техните насрещни задължения **по чл. 4.2.** от настоящия предварителен договор.

**Параграф 7.** За всички неуредени въпроси страните дължат решаването им в писмена форма и чрез преговори .

**Параграф 8.** Във всички случай на виновна неизправност, включително и в случаите на превратно упражняване на права, водещо до препятстване упражняването на права на другата страна или до препятстване изпълнението на задълженията, вкл. и бездействие по отношение на административни процедури, виновната страна дължи да обезщети изправната под формата на неустойка договорена в размер на 10% /десет процента/ от цялата покупна цена в размер на 37 753 956 /тридесет и седем милиона седемстотин петдесет и три хиляди деветстотин петдесет и шест/ евро.

**Параграф 9.** Страните по договора си дължат съдействие за постигане на договорения резултат, в това число и за изпълнение на

Boyan Iliev Jekov, Attorney at law, ID No. 5906051028, Varna Bar, Varna, ul. Graf Ignatiev № 17 and Zahari Zhelyazkov Tomov, ID No. 680412050, Varna Bar, ul. Paraskeva Nikolau 4, et.2, and the Escrow Account shall be a special client account, jointly held by the two Escrow Agents, with Principal Boyan Iliev Zhekov, which account may be only debited by the two escrow agents jointly and transfers from which may be made to account explicitly indicated by the Seller and Buyer or, by explicit instruction of the Seller and the Buyer to the two escrow agents - to state or municipal bodies' accounts respectively, in order to make payments of fees or other state collectibles that might be due with reason for payment the present agreement.

4/ Contracts of mandate with the Escrow Agents under this Agreement represent contracts concluded as follows:
a/ First contract between the Buyer as a Assignor and Mr. Boyan Iliev Zhekov, Attorney at law, as an Assignee;
b/ Second contract between the Seller as a Assignor and Mr. Zachari Tomov, Attorney at law, as an Assignee;
and the subject matter of both contracts are the prerequisites and conditions under which the Assignees shall act, on behalf and at the expenses of the Assignors, in order to perform their counter obligations under **Art. 4.2.** in this preliminary agreement.

**Paragraph 7.** All unsettled issues shall be settled by the Parties through negotiations and in writing.

**Paragraph 8.** In any event of guilty default, including the cases of wrongful exercise of rights, leading to obstructing the exercising of rights of the other Party or to the obstructing the performance of the obligations, including failure to take action in relation to administrative procedures the Party at default shall compensate the one not at default by paying a penalty of 10% /ten per cent/ of the total purchase price to the amount of €37'753'956 /thirty seven million seven hundred fifty three thousand nine hundred fifty six Euros/.

**Paragraph 9.** The Parties are obliged to cooperate with each other in order to achieve the contracted result, including also the counter rights and obligations, as far as the same is requested in

18



насрещните права и задължения, доколкото същото е поискано в писмена форма и придружено с нужното пояснение за търсеното съдействие. За осигуряване на дължимото съдействие от страна на купувача след придобиване на собствеността в качеството му на собственик за провеждане на процедурите по изработка и одобрение на ПУП- ПРЗ за имота, както и в административно производство за смяна на предназначението на имота чрез изключването му от горския фонд и причисляването му към урбанизираните територии, вкл. и в административните производства по издаване на необходимите удостоверителни и диспозитивни административни актове за пълно комплектоване на преписката, купувачът е длъжен да снабди продавача с необходимите пълномощни, като на упълномощителя се дължи пълен отчет по хода на посочените административни процедури.

**Параграф 10.** При бездействие от страна на Продавача по отношение на съответните административни процедури , Купувачът има право от свое име и за сметка на Продавача да извърши съответните действия .

**Параграф 11.** В случаите на упражнени права от Купувача по чл.19 , ал.3 ЗЗД , то заплащането на цената се дължи солидарно и от Ол Сийз България ЕООД –гр.Варна, за което са и учредени договорите за поръчителството .

Този договор се състави в четири еднообразни екземпляра – по един за всяка от страните и по един за двамата ескроу агенти, всеки от които състоящ от 20 страници, подписана всяка една от страните.

Всички подписващи потвърждават, че са прочели горното СПОРАЗУМЕНИЕ и чрез техните инициали и подписи декларират, че имат пълна оторизация да подпишат документа за и от името на страната, за която те полагат своя подпис.

Договора в своя завършен вариант задължително се приподписва и от правните консултанти участвали в преговорите, изготвянето и съгласуването на окончателната редакция на договора .

В неразделна част от настоящият договор

writing and accompanied by the necessary explanation for the cooperation sought. To ensure such cooperation, the Buyer after acquiring the Property, in his capacity of an owner for the performance of the procedures for preparation and approval of the  Detailed structural plan- Regulation and Development Plan for the Property, as well as in the administrative proceedings for the change of the purpose of the Property through its exclusion from the Forestry fund and its enlisting as  an urban area, including in the administrative proceedings for the issuance of the necessary certifying and supplementary administrative acts for the entire completing of the correspondence, the Buyer shall furnish the Seller with all necessary authorizations and  the Seller shall report on the progress of such procedures.

**Paragraph 10.** In the event of omission by the Seller concerning the respective administrative procedures, the Buyer has the right on his own behalf and at Seller's expense to perform the relevant actions.

**Paragraph 11.** In the events of exercised rights by the Buyer according to Art.19, item 3 of the Obligations and Contracts Act (OCA), payment of the price is due jointly by ALL SEAS BULGARIA EOOD – Varna, which is the purpose of the conclusion of the Contracts for Guarantee.

This Agreement has been drawn in four identical copies – one for each of the Parties and one for each Escrow Agent – of 20 pages each, and signed by each Party.

All the undersigned confirm that they have read the above AGREEMENT and by putting their initials and signatures below, they declare, that they are authorized signatories.

The complete version of the Agreement must also be signed by the legal consultants, involved in the negotiations, preparation and harmonization of its final version.

The following enclosures are  integral parts of

се прилагат: Документи удостоверяващи легитимацията на страните и лицата ,които ги представляват при неговото подписване; Менителница за плащане на неустойката от Ол Сийз България ЕООД –гр.Варна ; Договор за поръчителство за плащане по цената по **чл.4.2.б."б"** от Ол Сийз България ЕООД – гр.Варна; Договор за поръчителство за плащане по цената по **чл.4.4.б."а.д."** от Ол Сийз България ЕООД –гр.Варна ;

За Купувача:

За Продавача:



the present Agreement, namely: Documents certifying the legitimacy of the parties and their representatives at the signing of the present Agreement; Bill of exchange for securing the payment of penalty by ALL SEAS BULGARIA EOOD - Varna; Contract of Guarantee to secure the payment of the price under **Art.4.2."b"** by ALL SEAS BULGARIA EOOD – Varna; Contract of Guarantee to secure the payment of the price under **Art.4.4."a.e."** by ALL SEAS BULGARIA EOOD – Varna.

For the Buyer:

For the Seller:

# EXHIBIT F

| ДОПЪЛВАЩО СПОРАЗУМЕНИЕ | SUPPLEMENTAL AGREEMENT |
|---|---|
| Днес, 27-и ноември 2013 г., в гр.Варна, България, се подписа настоящото допълнително споразумение между страните по споразумението от 28.03.2012 г., базирано на фактите и доказателствата, разкрити в хода на проведеното разследване, отнасящо се до легитимността и валидността на представените в производството по несъстоятелност водено спрямо Еър Пропърти Девелопмънт АД ("ЕПД") платежни искове от Първа инвестиционна банка АД ("ПИБ"), отхвърлени с Решение №2 от 08.02.2013 г. по т.д.№ 82/2011 от Търговищкия окръжен съд. | This Supplemental Agreement was made this 27th day of November 2013 by and between the parties to the Agreement of 28th March 2012 to incorporate the mutual understanding of the parties on the facts and evidence that have come to the fore upon the completion of the investigation as to the legitimacy and validity of the payment claims asserted by First Investment Bank AD (**FIB**) in the bankruptcy case of Ayr Property Development AD (**APD**) and denied by Decision No.82 entered on February 8, 2013 by the Targovishte District Court in Case 82/2011 with such court. |
| **Всяка една от страните:** | **Each of the parties below:** |
| 1. **Ол Сийз Пропърти 2 ООД**, търговско дружество, регистрирано съгласно законодателството на Република България, ЕИК:140873564, със седалище и адрес на управление в гр.Варна, ул."Никола Вапцаров" №3, вх.Г, офис център, ет.8, офис 21, представлявано от управителя Георги Мирчев, лично и чрез адв.Димитър Янакиев, АК Варна, | 1.**All Seas Property 2 OOD**, a company incorporated under the laws of the Republic of Bulgaria and having EIK (Company number):140873564, and seat and registered office address at Varna, 3 Nikola Vaptsarov St., entrance G, Office Centre, 8th floor, office 21, as represented by its Manager Georgi Mirchev acting in person and through Attorney Dimitar Yanakiev (Varna Bar); |
| 2. **Асет Мениджмънт ЕАД**, търговско дружество, регистрирано съгласно законодателството на Република България, ЕИК:103921587, със седалище и адрес на управление в гр.Търговище, ул.Цар Иван Асен № 1, представлявано от Изпълнителните директори Николай Хубенов и Светлозар Касабов, лично и чрез адв. Димитър Янакиев; | 2.**Asset Management EAD**, a company incorporated under the laws of the Republic of Bulgaria and having EIK: 103921587, and seat and registered office address at Targovishte, 1 Tzar Assen St., as represented by the Executive Directors Nikolay Hubenov and Svetlozar Kassabov each acting in person and through Attorney Dimitar Yanakiev; |
| 3. **Еър Лоджистикс Лимитед Инк.**, учредено през 1995 г., съгласно законите на щата Тексас, САЩ, със седалище : 459 Чипъндейл Драйв, Рокоул, Тексас 75032, САЩ, представлявано от Филип Робърт Харис, Президент и Генерален мениджър, чрез адвокат Захари Томов, АК – гр.Варна, назначен с пълномощно от 18.07.2011 г., заверено от Дирекция "Консулски оношения" при МВнР на Република България на дата 05.08.2011 г., | 3.**Ayr Logistics Limited, Inc.,** a company incorporated in 1995 under the laws of Texas, USA and having seat at 459 Chippendale Drive, Rockwall, Texas 75032, USA, as represented by the President and General Manager Phillip Robert Harris acting through Attorney Zahari Tomov (Varna Bar) retained and authorized in that regard by a power of attorney made on July 18, 2011 and duly certified by the Consular Department at the Bulgarian Ministry of Interior on August 5, 2011; |
| **Се съгласява със следното:** | **Has consented to and agreed as follows:** |

**§1.** Извършените през 2007 и 2008 год. по сметката на *Ол Сийз Мениджмънт* (Република Маршалови острови), в банка Валета (Малта), финансирани със средствата по банковите заеми предоставени от ПИБ на *Порт Инвестмънт Девелопмънт – България 2 ЕАД* с договори за банков заем № 39КР-АА-2510 от 22.11.2007 г. и № 014LD-L-000002 от 02.10.2008 г., обслужват фиктивни сделки и не осъществяват вложения в проекта "Силвър бийч". Тези сделки и трансфери стоят извън обхвата на споразумението от 09.12.2009 г. и обхвата сделките от 10.12.2009 г., прехвърлящи правата върху проекта "Силвър бийч" и собствеността върху инвестиционните терени в този проект;

**§2.** Извършените през 2009 и 2010 год. разплащания по сделките на *Блу Финанс Лимитед* (Република Маршалови острови), финансирани със средствата по банковия заем предоставен от ПИБ на Асет Мениджмънт ЕАД, № 014LD-L-000006 от 29.12.2009 г., обслужват фиктивни сделки и не осъществяват вложения в проекта Силвър бийч. Тези сделки и трансфери стоят извън възложенията на Асет Мениджмънт ЕАД мандат от 08.12.2009 г. от *Еър Лоджистикс Лимитед Инк* и *Ол Сийз България ЕООД*, действащи в качеството си на учредители на ЕПД, възлагащ срещу възнаграждение ползването на банков заем от 8 милиона евро от ПИБ;

**§3.** *Еър Лоджистикс Лимитед Инк.*, както и имуществото в масата на несъстоятелността на ЕПД, не са задължени с тези трансфери и сделки, като Еър Лоджистикс Лимитед Инк остава задължен към Ол Сийз Пропърти 2 ООД да изплати в пълния обем цената по придобиване на правата и собствеността върху проекта Силвър бийч и инвестиционните терени в него, както това е договорено в споразумението от 09.12.2009 г, регистрирано под № 7201 в

**§1.** The money transfers made back in 2007 and 2008 to the bank account of <u>*All Seas Management*</u> (the Marshall Islands) with the Bank of Valetta, Malta, used funds borrowed by Port Investment Development – Bulgaria 2 EAD and lent by FIB under bank loan agreements of Nos.39KP-AA-2510 of 22nd November 2007 and 014LD-L-000002 of 2nd October 2008, respectively. These money transfers were purportedly servicing transactions, which however were fictitious and were anything but investment in the Silver Beach Project. The said transactions and the money transfers related to them were outside and beyond the scope of Agreement dated December 9, 2009 and had nothing to do with the transactions concluded for the transfer of rights held in the Silver Beach Project or the rights of ownership in the investment lands thereunder.

**§2.** The money transfers made back in 2007 and 2008 to the bank account of <u>*Blue Finance Limited*</u> (the Marshall Islands) with the Bank of Valetta, Malta, used funds borrowed by <u>Asset Management EAD</u> and lent by FIB under bank loan agreement No. 014LD-L-000006 of 29th December 2009. These money transfers were purportedly servicing transactions, which however were fictitious and were anything but investment in the Silver Beach Project. The said transactions and the money transfers related to them were outside and beyond the scope of the mandate APD incorporators *Ayr Logistics Limited, Inc.* and *All Seas Bulgaria EOOD* gave to <u>Asset Management EAD</u> instructing the latter to borrow an 8-million-euro loan from FIB in return for a good an valuable consideration.

**§3.** Neither *Ayr Logistics Limited, Inc.* nor the property of APD's bankruptcy estate ("**APD's Estate**") are bound in any way whatsoever by the said transactions or the money transfers related thereto, while at the same time *Ayr Logistics Limited, Inc.* remains liable to All Seas Property to for the full amount of the price payable for Ayr's acquiring the rights in and ownership of the Silver Beach Project and its lands as agreed under the December 9, 2009 Agreement, which was recorded under reg.No.7201 in the

канцеларията на Варненския нотариус Николай Дюлгеров, с лиценз номер 484 на Нотариалната камара.

**§4.** Страните се съгласяват всеки един спор или иск който може да възникне в резултат на извършените трансфери обслужили фиктивните сделки на Ол Сийз Мениджмънт и Блу Финанс Лимитед, или пък което и да имуществено право породено от платежните искове на ПИБ, предявени спрямо имуществото в масата на несъстоятелността на ЕПД, когато този спор, право и/или иск се отнася до правата и задълженията на страните по настоящото допълващо споразумение и /или до правата и задълженията по споразумението от 28.03.2012, да бъде подчинен на:

- Законите на САЩ имащи отношение към финансовите измами, прането на пари и корупцията, и на разпоредбите на чл.34 и чл.35 от Конвенцията ООН срещу корупцията, приложена към настоящото;

- Страните се съгласяват, че мястото на изпълнение на Договора от 28.03.2012 г. и всички допълнения към него е в щата Ню Йорк и следователно мястото им на изпълнение ще бъде в щата Ню Йорк.

- Федералният окръжен съд в Ню Йорк, щата Ню Йорк, притежава местна и родова компетентност спрямо всички страни по настоящото. Изборът на приложимо право са законите на щата Ню Йорк.

- Страните нарочно се подчиняват на законите, съдилищата и юрисдикцията на щата Ню Йорк, понеже питаят съмнения към ефективността на принципите на правовата държава в България и понеже основното изпълнение на договорите и всички техни допълнения е в щата Ню Йорк.

- Страните се съгласяват, че Федералният Окръжен съд в Ню Йорк, щата Ню Йорк е компетентен да разгледа всеки един такъв спор и/или да се произнесе по всяко едно право

records kept at the offices of the Varna Notary Public Nikolay Dyulgerov (commissioned under No.484 by the Chamber of Notaries Public).

**§4.** The parties agree that each and any dispute or claim arising from any of the money transfers servicing the fictitious transactions made by *All Seas Management* or *Blue Finance Limited*, or any controversy over any property right stemming from the payment claims FIB lodged against the property of APD's Estate where such controversy or right or claim concerns any of the rights or liabilities of the parties hereto, or any of the rights or liabilities of the parties to the March 28th 2012 Agreement shall be governed by:

- The U.S. laws concerning financial fraud, money laundering and corrupt activities, as well as to the provisions set forth in Art.34 and Art.35 of the *United Nations Convention Against Corruption,* attached hereto;

- The Parties agree that the March 28, 2012 Agreement and any supplements thereto shall have its effect in the State of New York and therefore shall be domiciled in the State of New York.

- The U.S. Federal District Court in New York, State of New York shall have subject matter jurisdiction and personal jurisdiction over all the parties hereto. The choice of law shall be New York State Law.

- The Parties purposefully subject themselves to the laws, courts and jurisdictions of the State of New York, because they question the effectiveness of the rule of law in Bulgaria, and because the principle performance of the Agreements and any supplements thereto is in the State of New York.

- The Parties agree that the U.S. Federal District Court in New York, the State of New York shall have jurisdiction over any dispute or controversy and/or shall be the one to make a determination or a decision on any rights and/or a claim concerning

и/или иск отнасящ до упражняване на правата и/или изпълнението на задълженията на представените тук страни. По-специално Еър Лоджистикс Лимитид Инк. е избрал и номинирал Дойче банк в Ню Йорк, като място на изпълнение по договорите и всички допълнения към тях. Еър Лоджистикс Лимитед Инк е задължен да открие сметка в полза на Асет Мениджмънт ЕАД и Ол Сийз Пропърти 2 ООД и да извърши дължимото към тях плащане в Дойче Банк, Ню Йорк;

§5. В случай на възникване на спор или упражняване на правата „произтичащи от Споразумението от 28.03.2012 и от настоящото допълващо споразумение, и едновременно с това възникне или се установи основание за провеждане на процедури от преюдициално значение, независимо от техния характер и естество, като например – провеждане на разследване от страна на властите на САЩ притежавани правомощия да разследват финансови измами, пране на пари и корупция, постановяване на конфискационни мерки или предприемане на обезпечителни действия, когато това може да засегне имуществените права на всяка една от представените тук страни, действието на посочени тук договорености се удължава с толкова, колкото е необходимо според случая.

§6. Настоящото допълващо споразумение е неразделна част от споразумението подписано на 28.03.2012 и тълкуването и приложението на последното се подчинява изцяло на посочените по-горе договорености, които имат преимущество и ограничават действието на всяка предходна договореност, която може да възпрепятства правата на която и да е представените тук страни. Нито една договореност между страните преди и по време действието на настоящото допълващо споразумение, не може да се тълкува или прилага по начин, който води до нарушаване и конфликт с разпоредбите на чл.34 и чл.35 от Конвенцията на ООН срещу корупцията, и Законите на САЩ

the exercise of any rights or meeting any liability of any of the parties hereto. More particularly, Ayr Logistics Limited, Inc. has chosen and designated Deutsche Bank, New York, the State of New York as the place of performance under the Agreements and any supplements thereto. *Ayr Logistics Limited, Inc.* is obligated to open accounts in favour of *Asset Management EAD* and *All Seas Property 2 OOD* and make the payments it owes to the said two companies in Deutsche Bank, New York.

§5. In the event of any dispute arising from or over the exercise of the rights stemming from the March 28, 2012 Agreement or from this Supplemental Agreement, and if certain basis or grounds for conducting any preliminary procedure of whatever nature or purpose, such as - an investigation by the competent U.S. authorities of financial fraud or money laundering or corruption cases need to be launched, or confiscation orders are issued or any other protective measures need to be imposed - should simultaneously arise and where any of those might affect any of the property rights held by any of the parties hereto, the duration and effect of this Agreement shall be extended as deemed fit in any specific case.

§6. This Supplemental Agreement shall be an integral part of the March 28, 2012 Agreement and shall be construed and applied according to the above provisions, which shall prevail and shall supersede any earlier agreements or arrangements that might obstruct or restrict the exercise of the rights of any of the parties hereto. Nothing in any previous agreements reached earlier or concurrently with this Agreement by and between the parties hereto may be construed or enforced in a fashion that might give rise to a breach of or be in conflict with the provisions of Art.34 and Art. 35 of the *United Nations Convention Against Corruption,* or the U.S. laws combatting financial fraud,

отнасящи се до финансовите измами, прането на пари и корупцията.

**§7.** Настоящото споразумение се подписа присъствено от лицата представляващи договарящите се страни, съставено на английски и български език, като английския език има предимство при тълкуване и определяне съдържанието на волята на страните в случай, че възникне такъв спор

**За Ол Сийз Пропърти 2 ООД:**

Георги Мирчев – Управител

Адв. Димитър Янакиев

**За Асет Мениджмънт ЕАД:**

Николай Хубенов – Изп.директор

Светлозар Касабов – Изп.директор

Адв. Димитър Янакиев

**За Еър Лоджистикс Лимитед Инк :**

Адв. Захари Томов по пълномощно от 18.07.2011

money laundering and corruption.

**§7.** This Agreement was drawn up in English and in Bulgarian and was signed by each party hereto in person. In the event of any dispute should arise over the interpretation or meaning of the will and intention of the Parties hereto the English version shall prevail.

**For All Seas Property 2 OOD:**

Georgi Mirchev, Manager

Dimitar Yanakiev, Attorney-at-law

**For Asset Management EAD:**

Nikolay Hubenov, Executive Director

Svetlozar Kassabov, Executive Director

Dimitar Yanakiev, Attorney-at-law

**For Ayr Logistics Limited, Inc.:**

Zahari Tomov, Attorney-at-law, acting under power of attorney dated July 18, 2011