UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUDERSDAL, EOOD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 1:18-cv-11072-GHW-RWL |
| v. | ) |
| | ) |
| PHILIP ROBERT HARRIS, et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF LAZAR TOMOV

1. My full name is Lazar Vladimirov Tomov. As a member of the Sofia Bar, I am duly licensed to practice law in Bulgaria.

2. I graduated in 1984 from the Faculty of Law of the University St. Clement of Ohrid, Sofia with a diploma in law with distinction. In 1993, I received a LLM degree in International Business Law (*magna cum laude*) from the Faculty of Law of the Katholike Universiteit, Leuven, Belgium. I also studied in 1994 international and comparative law at the Academy of American and International Law, Dallas, USA, and European Union ("EU") law at the Academy of European Law, Florence, Italy, and in 1995 financial law and arbitration at Queen Mary and Westfield College, University of London, United Kingdom.

3. I am the founding partner of Tomov & Tomov, a law firm located in Sofia, Bulgaria. I am the head of my firm's arbitration practice and have served as counsel in domestic and international arbitration proceedings. I have been appointed as a co-arbitrator and presiding arbitrator in more than 80 cases. I also have served as an expert witness on points of Bulgarian law in international arbitrations and litigations. In addition to my arbitration matters, I advise

clients on various matters involving Bulgaria's banking laws. In particular, I have extensive experience with the laws applicable to the Bulgarian National Bank ("BNB").

4. My curriculum vitae is attached as Exhibit 1. Attached as Exhibit 2 is a list of all other documents cited in and attached to this Declaration as Exhibits. Exhibits 3-5 and 32-33 are Bulgarian statutes and English translations published by APIS, a publicly-available Bulgarian law database. Exhibits 6-7 and 11-31 are true and correct copies of Bulgarian court decisions and other Bulgarian court filings, along with certified translations thereof. Exhibits 8-10 are true and correct copies of publicly-available BNB resolutions, along with certified translations thereof.

5. I make this declaration in support of BNB's Motion to Dismiss the Amended Complaint filed by Rudersdal EOOD, All Seas Property 2 OOD, Asset Management EAD, and Zahari Tomov (collectively, "Plaintiffs") in the above-captioned action (the "Amended Complaint" or "Am. Compl."). I am fully familiar with the facts and circumstances set forth below. Except as noted otherwise, each of the statements in this declaration is based on my personal knowledge.

I. THE BULGARIAN NATIONAL BANK

6. The legal status, governance and powers of BNB are set forth in the Bulgarian National Bank Act (the "BNBA"). *See* Exhibit 3 (BNBA).

7. Article 1(1) of the BNBA designates BNB as the central bank of the Republic of Bulgaria. *See id.* at Art. 1(1). BNB has a separate juridical personality. *See id.* BNB contracts and holds property in its own name. *See id.* at Art. 55. BNB does not have the juridical personality of a commercial company, obtained through the process of incorporation and registration under the Commerce Code. Rather, BNB has a separate juridical personality, conferred directly by the BNBA itself. The BNBA also serves as a Charter (Articles of Association) of BNB.

8. BNB has no shares. To the extent BNB has surplus funds at the end of its financial year, BNB is obligated to transfer that excess to the state budget. *See id.* at Art. 8(4).

9. The mission and powers of BNB are set forth in Article 2 of the BNBA. BNB's main objective is to maintain the pricing stability of the country by maintaining the stability of the national currency, the Bulgarian lev (BGN), and to implement monetary policy in compliance with the BNBA. *See id.* at Art. 2(1). The same provision sets forth BNB's three main powers, namely to implement monetary policy, facilitate the establishment of payment systems, and supervise the commercial banks in Bulgaria. *See id.*

### A. Structure and Governance of BNB

10. Under the BNBA, the governing organs of BNB are the Governing Council (the "GC"), the Governor, and the three Deputy-Governors. *See id.* at Art. 10.

11. The GC consists of the Governor, the three Deputy Governors, and three other ordinary members. *See id.* at Art. 12(1)-(3). The Governor and the three Deputy Governors are appointed by the National Assembly, whereas the remaining members of the GC are appointed by the President of Bulgaria. *Id.*

12. Pursuant to Article 44 of the BNBA, BNB itself and its governing organs shall be independent from other Bulgarian state organs. *See id.* at Art. 44.

### B. BNB as Banking Supervisor

13. Pursuant to Article 2(6) of the BNBA, "The Bulgarian National Bank shall regulate and exercise supervision of the activities of the other banks in Bulgaria with a view to maintaining the stability of the banking system and protecting the interests of depositors." *Id.* at Art. 2(6). Article 79 of the Bulgarian Credit Institutions Act (the "BCIA") states that BNB shall exercise supervision over banks in Bulgaria. *See* Exhibit 4 (BCIA) at Art. 79(1). That supervision is exercised according to the BCIA rules. *See* Exhibit 3 (BNBA) at Art. 20(3).

14. Pursuant to its regulatory functions, BNB has the power to adopt ordinances on the regulation of banking activities. *See id.* at Art. 16(5); Exhibit 4 (BCIA) at Art. 13. As of the time of the events described in the Amended Complaint, BNB had adopted ordinances on banking operations, including, among other things, rules for (i) granting licenses for banking activity (Ordinance No. 2 on the Licenses, Approvals and Permissions Granted by the Bulgarian National Bank pursuant to the BCIA)); (ii) regulatory capital of banks (Ordinance No. 8 on Banks' Capital Buffers); (iii) liquidity requirements for banks (Ordinance No. 11 on Bank Liquidity Management and Supervision); (iv) internal control systems of banks (Ordinance No. 7 on Organization and Risk Management of Banks); and (v) auditing of banks for regulatory purposes (Ordinance No. 14 on the Content of the Audit Report for Supervisory Purposes).

15. Pursuant to Article 185 of the Bulgarian Administrative Procedure Code (the "BAPC"), BNB's normative administrative acts are subject to review and control by the Bulgarian administrative courts. *See* Exhibit 5 (BAPC) at Arts. 185, 208, 146.

16. When exercising its supervisory functions over a bank, BNB has the power to, among other things, (i) grant, modify or revoke a license for banking activity; (ii) approve or request the dismissal of a member of the management of a bank; and (iii) collect periodic financial information. *See* Exhibit 4 (BCIA) at Art. 103. If a bank is in danger of insolvency, BNB is empowered to put the bank under special supervision in order to rehabilitate it, and to appoint conservators (special supervisors). *See id.* at Arts. 106 & 115.

17. When placing a bank under special supervision, BNB may, among other things: (i) dismiss the members of the Management and Supervisory Boards; (ii) suspend in part or in full the execution of the bank's activities or obligations; (iii) reduce the interest on the bank's liabilities

to the average market rate; or (iv) stipulate conditions and additional requirements for the disposal of the bank's property. *See id.* at Art. 116(2).

18. When a bank is put under special supervision, the conservators have the power to, among other things: (i) exercise all the powers of the Supervisory and the Management Boards of the bank placed under special supervision; (ii) access all the documents related to the meetings of the Supervisory and Management Boards; (iii) have unlimited access to and control over the premises of the bank, the accounting and other documents, the property and the subsidiaries of the bank; (iv) take actions and measures aimed at the rehabilitation of the bank; and (v) undertake other day-to-day activities of the bank as necessary to facilitate its rehabilitation. *See id.* at Arts. 106-111.

19. In Paragraph 133 of the Amended Complaint, the Plaintiffs allege that "BNB assumed management of the allegedly distressed bank, including complete control of all payments and transfers." This is incorrect as a matter of Bulgarian law. Rather, under Bulgarian banking laws and regulations, BNB does not engage in the day-to-day operations of banks under special supervision, and does not participate in decision-making about individual accounts or transactions. Rather, as distinguished from BNB's regulatory supervision, the conservators are the parties authorized to make decisions on the day-to-day operations of banks under special supervision.

20. When BNB exercises its supervisory power over a particular bank, including in the case of special supervision, it acts as an organ of the Bulgarian state, exercising governmental (public law) authority. Under BCIA Article 151(3), BNB's actions have the legal nature of individual administrative acts, and are subject to appeal before the Supreme Administrative Court (the "SAC") on the grounds set forth in Article 146 of the BAPC. *See* Exhibit 4 (BCIA) at Art.

151(3). This has been further confirmed by Joint Procedural Order No. 54 of the Bulgarian Cassation Court (the "SCC") and the SAC, a copy of which is attached as Exhibit 6, at p. 4.

21. BCIA Article 79 generally limits BNB's liability "for any detriment inflicted in the exercise of [its] supervisory functions" to willful misconduct. Exhibit 4 (BCIA) at Art. 79(e).

22. A conservator appointed by BNB, in a bank under special supervision, is not an employee or a civil servant of BNB. Rather, he/she is a private person who replaces the management of the bank and exercises its functions, and, accordingly, acts in the name and on behalf of the bank under special supervision. *See id.* at Art. 107. This is confirmed by the Joint Procedural Order No. 38 of the SCC and the SAC, a copy of which is attached as Exhibit 7, at pp. 3-4.

## II. BNB'S SPECIAL SUPERVISION OF CORPORATE COMMERCIAL BANK

23. BNB placed Corporate Commercial Bank ("CCB"), a Bulgarian bank, under special supervision on June 20, 2014, by adopting Governing Council Decision No. 73 ("Resolution No. 73"). A copy of Resolution No. 73 is attached as Exhibit 8. This Resolution was issued under BCIA Articles 115 and 116.

24. Under Resolution No. 73, BNB: (i) prohibited CCB from performing licensed banking activities; (ii) suspended the performance of CCB's obligations; (iii) suspended the voting rights of CCB shareholders owning more than 10% of CCB's shares; (iv) dismissed the members of CCB's Management Board and CCB's Supervisory Board; and (v) appointed two special supervisors to run the bank. *See* Exhibit 8 (BNB Resolution No. 73) at 2-3.

25. On June 25, 2014, BNB adopted a resolution replacing the original supervisors with Mr. Stanislav Georgiev Lyutov and Ms. Elena Zdravkova Kostadinchev (together, the "Conservators"). *See* Exhibit 9 (BNB Resolution No. 77).

26. On August 15, 2014, BNB adopted a resolution allowing transfers between accounts held in CCB so that borrowers could repay loans to the bank. *See* Exhibit 10.

27. Under BCIA Article 107(6), no CCB transactions could be effected without authorization of the Conservators. As noted above, under Bulgarian banking laws and regulations, the Conservators were responsible for day-to-day payments and transfers at CCB, including with respect to the Funds, as defined below. Nothing in BNB resolutions 73 and 104 required BNB to be notified about specific transactions conducted by the Conservators.

### III. BULGARIAN COURTS ISSUED FINAL DECISIONS REGARDING THE MORTGAGES OVER APD'S BULGARIAN PROPERTY

28. Plaintiffs acknowledge in the Amended Complaint that Ayr Property Development, AD ("APD") was a subsidiary of Ayr Logistics Limited, Inc. ("Ayr"). *See* Am. Compl. ¶ 4.

29. A review of the court orders from the proceedings relating to APD establishes that Plaintiffs Rudersdal EOOD, All Seas Property 2 OOD, Asset Management EAD, and Zahari Tomov, and Ayr actively litigated and resolved all claims relating to the funds that ultimately were deposited in APD's CCB bank account, and which are at issue in the Amended Complaint.

30. APD was reportedly formed in 2009 for the purpose of implementing a real estate development project for its U.S. shareholder, Ayr in Bulgaria.

31. APD's land in Bulgaria (the "Land") was encumbered by mortgages (the "Mortgages") held in the name of First Investment Bank, AD ("Fibank"). The Mortgages secured loans that Fibank issued to another Ayr subsidiary, Port Investment Development Bulgaria 2 OOD ("Port Investment"), and Plaintiff Asset Management (the "Loans"). Beginning in 2010, Fibank filed complaints in various Bulgarian courts to confirm that it had valid receivables under the Loans. Port Investment and various of the Plaintiffs contested these Fibank complaints, but, ultimately, eight decisions were issued by Bulgarian courts rejecting these defenses and confirming

Fibank's receivables. The two decisions attached are indicative, and show that the issues now raised by the Plaintiffs in this action were already litigated to conclusion in Bulgaria. *See* Exhibit 11 and Exhibit 12. Port Investment and various of the Plaintiffs then filed claims to have these court decisions nullified, but the Bulgarian courts held that those claims should have raised during the appellate process in the prior proceedings, and could not be used to relitigate the original cases. The two decisions attached are indicative, and show that Plaintiffs were attempting simply to relitigate the issue of whether Fibank had valid receivables. *See* Exhibit 13 and Exhibit 14. Fibank also obtained Writs of Execution for its receivables. *See* Exhibit 15.

32. In 2011, APD filed for bankruptcy in Bulgaria. Plaintiffs acknowledge in the Amended Complaint that this was done "to prevent foreclosure." (Am. Compl. ¶ 98) The Bulgarian court appointed a trustee (the "APD Trustee").

33. Plaintiffs All Seas Property 2, Asset Management, and Rudersdal appeared in the bankruptcy proceedings and were approved by the Bulgarian court as creditors. *See* Exhibit 16 and Exhibit 17.

34. In 2012, Ayr, in its capacity as a shareholder of APD, submitted to the Bulgarian court a plan for APD's reorganization that had been approved by APD's creditors. *See* Exhibit 18 and Exhibit 19.

35. The Bulgarian court ultimately denied Ayr's proposed reorganization plan, declared APD bankrupt, and ordered liquidation of APD's assets. *See* Exhibit 18. That decision was confirmed on appeal. *See* Exhibit 19. Plaintiffs All Seas Property 2 OOD and Asset Management EAD sought leave to appeal this ruling, which was denied.

36. In November 2012, the Bulgarian court authorized the sale of APD's property, including the Land. *See* Exhibit 20. The APD Trustee then sold the Land in a public auction to the only bidder, Fibank, for BGN 97,500,000 (the "Funds"). *See* Exhibit 21.

37. In January 2013, the APD Trustee placed the Funds in an interest-bearing account at CCB. The selection of CCB was approved by both the Bulgarian court and APD's creditors, which included various of the Plaintiffs here. *See* Exhibits 22-25.

38. In May 2013, Fibank presented its Writs of Execution to the Bulgarian court overseeing APD's bankruptcy, and requested payment of the sums due, which exceeded the amount of the Funds. *See* Exhibit 15.

39. In July 2014, the Bulgarian court confirmed that Fibank was a valid mortgage creditor entitled to priority under Bulgarian law. *See* Exhibit 26. The Bulgarian court ordered the APD Trustee to transfer the Funds to Fibank, up to the amount of its receivables. This order was not disturbed on appeal.

40. Also, the APD Trustee filed five complaints seeking a declaration from the Bulgarian courts that Fibank's mortgages over the Land were null and void. Various of the Plaintiffs here were parties to those complaints. Each of those complaints was dismissed, and each of those dismissals was upheld on appeal. The Bulgarian courts held that the complaints were inadmissible because the APD Trustee was attempting to relitigate issues already resolved in the earlier actions confirming Fibank's receivables. The attached decision is indicative. *See* Exhibit 27.

41. I am aware that Plaintiffs attached to the Complaint two agreements that purport to show Plaintiffs All Seas Property 2, Asset Management EAD, and Rudersdal EOOD transferring

9

to Ayr their purported claims against APD. *See* Complaint (Nov. 27, 2018) at Ex. D ("Agreement" dated March 28, 2012) and Ex. F ("Supplemental Agreement" dated November 27, 2013).

42. In February 2016, the APD Trustee filed an updated creditors list, including Ayr as a creditor of APD based on Ayr's purported purchase of accounts receivable from Asset Management EAD, All Seas Property 2 OOD, and All Seas Bulgaria EOOD. *See* Exhibit 28. Various other creditors filed objections to Ayr's inclusion on the APD creditor list. *See id.* Ayr's U.S. bankruptcy trustee was represented in the proceedings by Zahari Tomov, now a Plaintiff here, who filed arguments in response to the creditors' objections. *See id.* at 2.

43. In July 2016, the Bulgarian court rejected the APD Trustee's updated creditors list that included Ayr. *See id.* This decision was not disturbed on appeal.

44. I am not aware of any ruling by any Bulgarian court authorizing Ayr, or any party to whom Ayr purported to transfer claims, to assert any rights derived from APD's interests in the Land (or any other property), nor has any Bulgarian court authorized Ayr or any party to bring lawsuits in the United States based on APD's purported rights in the Land (or any other property).

45. In December 2016, APD's Trustee informed the Bulgarian court that after paying the costs of the case for that month, there would be no means to cover the continuing costs of the bankruptcy proceedings. *See* Exhibit 29. Pursuant to Bulgarian law, the Bulgarian court invited APD's creditors, which included the Plaintiffs, to prepay the costs required to cover the insolvency proceedings for 2017 and stated that, if those costs were not paid, the bankruptcy proceedings would be terminated. *See id.* APD's creditors failed to pay, and no request was made to keep the bankruptcy proceedings open. *See id.* Accordingly, on January 19, 2018, the court terminated the APD bankruptcy. *See id.*

46. That ruling was appealed, including by Plaintiff Tomov in his purported capacity as Special Representative of Ayr's U.S. bankruptcy trustee. *See* Exhibit 30. The order terminating the APD bankruptcy proceedings was affirmed. *See id.* Ayr filed a request for leave to appeal to the Supreme Court of Cassation, Bulgaria's highest court. Leave to appeal was denied, and the decision terminating APD's bankruptcy proceedings became final. *See* Exhibit 31.

47. In Paragraph 262 of the Amended Complaint, Plaintiffs allege that "May 2, 2018, the Appellate Court in Varna, Bulgaria ruled that it did not have jurisdiction on the issues Trustee Mims raised, and at the same time terminated APD's Bulgarian bankruptcy proceedings for lack of Bulgarian assets because any assets were Ayr's assets in the United States and subject to jurisdiction in the United States." (Am. Compl. ¶ 262.) That is not correct.

48. The appellate decision terminating the bankruptcy proceedings was based on APD's creditors' failure, after notice, to pay the required costs necessary to continue the proceedings, despite receiving express notice of the consequences for failing to do so. *See* Exhibit 30. However, the Bulgarian court did <u>not</u> rule that it lacked jurisdiction over the issues raised by the appeal, nor did it rule that any assets "were Ayr's assets in the United States" or subject to jurisdiction in the United States. None of those points appear in the ruling.

49. Under Article 739(2) of the Bulgarian Commerce Act, the termination of the APD bankruptcy also extinguished all unsatisfied claims in that proceeding. Accordingly, prior to this action being filed, Ayr and the Plaintiffs had attempted to litigate in Bulgarian courts their claims regarding purported rights in the Land and the Funds, those claims had failed, and any other claims in the APD bankruptcy had been extinguished.

IV.     THE BULGARIAN LEGAL SYSTEM

50.     The Bulgarian Constitution is based on the principles of separation of powers and the rule of law. Article 117(2) mandates that the judicial branch of the government is independent from the executive branch of government and judges decide cases only on the basis of the applicable law. *See* https://www.unece.org/fileadmin/DAM/env/pp/compliance/Communications/Bulgaria_NGO_DEN/Annex_3_Constitution_of_the_Republic_of_Bulgaria.pdf.

51.     The Constitution and the Judicial System Act, which implements the constitutional provisions, contain strong guarantees for the independence of the judicial system. Article 130 of the Constitution states that the judicial system is governed by the Supreme Judicial Council ("SJC"). Under Article 130 of the Constitution, the SJC determines the number of the courts in the country and the number of the judges in these courts. It appoints, promotes, demotes, transfers, and discharges from office all judges. It also checks the work of judges and imposes disciplinary liability on them for professional misconduct. Under Article 117 of the Constitution, the judicial system also has a budget of its own. The budget is approved and administered by the SJC.

52.     The main guarantees for independence of the judges are their life tenure and their immunity. Article 129 of the Constitution provides for life tenure of Judges after five years in office and following a performance appraisal and decision by the SJC. After that, they may be discharged from office only for very limited reasons.

53.     Litigants who file claims in Bulgarian courts have procedures available to them to compel documents and witnesses that might be relevant to their claims. Litigants also have the option to appeal an adverse decision through a two-tiered appeals system. Non-nationals of Bulgaria, including U.S. parties, have full access to Bulgaria's courts to assert claims.

54. I note that Plaintiffs contend that, "The European Union courts do not have jurisdiction over this matter. EU law holds that in cases of cross-border torts, personal jurisdiction lies in the place where the damages occurred—in this case, the U.S." (Am. Compl. ¶ 259) As a matter of European law, upon which Plaintiffs claim to rely, this statement is wrong.

55. In the case of purely economic losses, the Court of Justice of the European Union ("CJEU") has held that the place where the harmful event occurred is where the damage first arose and does not extend to all places where adverse consequences can be felt. *See Kronhofer v. Maier*, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A62002CC0168, at ¶¶ 19-21; *Marinari v. Lloyds Bank*, https://eur-lex.europa.eu/legal-content/HR/TXT/?uri=CELEX:61993CJ0364.

V. **PLAINTIFFS' SUBSTANTIVE CLAIMS UNDER BULGARIAN LAW**

56. I also note that Plaintiffs allege in the Amended Complaint (e.g., Am. Compl. ¶¶ 360-372) that BNB and the Conservators owed a fiduciary duty over the Funds deposited at CCB. This is incorrect. No such duty exists under Bulgarian law.

57. Bulgarian law does provide a remedy for criminal claims based on misrepresentation, conversion, fraud, and conspiracy. *See* Bulgarian Criminal Code Article 209 (fraud), Article 206 (conversion), Article 212 (fraud through documents), Articles 308-316 (forgery of documents).[1] There also is a civil remedy for these claims, because under Bulgarian law every crime also is a civil tort, a principle confirmed by the Supreme Cassation Court.

58. Under Bulgarian law, general tort liability is regulated by Articles 45 and 49 of the Obligations and Contracts Act ("OCA"). In contrast to common law systems which have a catalogue of separate torts, in Bulgarian law, tortious conduct is regulated by a single general tort

---

[1] The Criminal Code is available at: https://www.legislationline.org/documents/section/criminal-codes/country/39/Bulgaria/show

provision in Article 45, which reads: "Every person must redress the damage he has guiltily caused to another person . [. . .]"

59. Vicarious liability, i.e. the liability of any third party who has an ability or duty to control or direct the acts of the prime tortfeasor, including the liability of an employer for the acts of the person to whom work has been assigned, is regulated by OCA Articles 47-49. Regarding liability of an employer, OCA Article 49 reads: "One who has assigned a work to another shall be liable for the damage caused by the latter during, or in connection with, the performance thereof."

60. The liability of the state and its organs for torts is specifically regulated by the Act on Liability of the State and Municipalities for Harm ("State Liability Act"). Article 1(1) states "The State and municipalities shall be liable for any harm inflicted on natural and legal persons by unlawful acts, actions or inactions of their organs and officials upon or in connection with the performance of administrative activity." *See* Exhibit 32 (State Liability Act) at Art. 1(1). Articles 2 and 2b of the State Liability Act provide for liability of other State organs whose activity is not administrative in nature, such as courts and the Prosecution Office. *See id.* at Arts. 2-2b.

61. Liability under the State Liability Act is a specific type of general civil law tort liability under OCA Articles 45 and 49, a principle confirmed by the Bulgarian courts. In an action based on OCA Articles 45 and 49, and on Article 1 of the State Liability Act, when the tort is committed by several persons, they can be jointly and severally liable. The tort liability of state organs or agencies arising under the general tort provisions of OCA Articles 45 and 49 is determined in the civil law courts, or, if under Article 1 of the State Liability Act, in the administrative courts.

62. Accordingly, Plaintiffs have several options to assert potential claims against BNB. They could attempt to assert tort claims (i) under OCA Articles 45 and 49 in the civil law courts,

or (ii) under Article 1 of the State Liability Act in the administrative courts. Plaintiffs also could, under Article 208 of the Bulgarian Criminal Procedure Code, file a complaint against BNB with the Prosecution Office. *See* Exhibit 33 (Criminal Procedure Code) at Art. 208. If a prosecution was commenced, Plaintiffs also could, at the start of a criminal case before the criminal courts commence civil law claims for damages against the defendants pursuant to Articles 84-88 of the Criminal Procedure Code. *See id.* at Arts. 84-88.

\* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 30, 2019.

_____
Lazar Tomov