UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUDERSDAL, EOOD, *et al.* | ) Case No. 18-cv-11072 (GHW-)-(RWL) |
| | ) |
| | ) [rel. 19-cv-01762] |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Declaration of |
| PHILIP ROBERT HARRIS, *et al.* | ) Zahari Zhelyazkov Tomov |
| | ) |
| Defendants. | ) |
| | ) |

# DECLARATION OF ZAHARI ZHELYAZKOV TOMOV IN SUPPORT OF PLAINTIFFS' CLAIMS

I, Zahari Zhelyazkov Tomov, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that:

1.     I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are, in all things, true and correct;

2.     I am a solo practicing attorney registered and in good standing with the Varna Bar Association in Varna, Bulgaria, under personal lawyer number No.1100038590 issued on 25 April 2001, with law office address at: Beli Lilii Street No.30, Floor 3, Suit 13, Varna, 9000, Republic of Bulgaria.  My email address is: zahari.tomov@gmail.com.

3.     On May 16, 2016, I was retained as Special Bulgarian Counsel to the United States Bankruptcy Trustee, Jeffrey H. Mims, in the Chapter 7 bankruptcy proceedings for the U.S. entity, Ayr Logistics Limited Inc. (Ayr), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (Ayr Bankruptcy Court): case No. 14-34940-bjh-7.  The initial purpose of my appointment was to represent the US Trustee in

1

Bulgaria on all matters relating to Ayr and the stolen Ayr bankruptcy estate asset, $65,000,000 (BGN102,946,966) (The Funds) held in Corporate Commercial Bank (CorpBank) in Sofia, Bulgaria.

4.      Commencing on May 18, 2017 and again on June 9, 2017, I unearthed and discovered new evidence revealing the preexisting plan by Defendants to steal the Ayr bankruptcy estate asset. This happened unfortunately only a few days after an ancillary proceeding in the Ayr bankruptcy matter was closed. *See* **Exhibit [10]** and **Exhibit [19]**.

5.      On November 13, 2017, as a result of the research and newly discovered facts and evidence, the Ayr Bankruptcy Court granted Ayr Trustee's motion to extend the scope of my powers as Special Counsel for Ayr Trustee to include investigating potential claims against any party that participated in the taking of funds from the Ayr Property Development's (APD) bank accounts. See **Attachment [A]** – *Court Order Granting Trustee of Ayr motion to amend the scope of employment of Zahari Tomov, Attorney at Law, as special counsel pursuant to 11 U.S.C.§ 327(E), Case 14-34940-bjh7, Doc 68 Filed 11/13/17.*

6.      Based on my work as Special Bulgarian Counsel to Ayr Trustee in the multiple cases arising from Ayr's U.S. Bankruptcy proceedings, my professional experience and expertise I submit this Declaration in support of the United States District Court for the Southern District of New York having and retaining jurisdiction over the claims against the defendants in *case No. 18-cv-11072 (GHW-)-(RWL) [rel. 19-cv-01762]* and in support of the oppositions to Defendants Motions to Dismiss in this case.

### I. EXHIBITS.

Attached to this Declaration are exhibits, which support my averments, such as:

Attached as **Exhibit 1** is a certified copy of the Ayr's Letter to Matthew Mateev, Chairman of the Managing Board and Executive Director of First Investment Bank AD (Fibank), dated January 27, 2011.

Attached as **Exhibit 2** is a certified true copy of Letter of Reference by Regions Financial Corporation dated December 29, 2010 in support of Ayr's Reorganization plan.

Attached as **Exhibit 3** is a certified copy of the Ayr's Board Resolution dated February 4, 2011.

Attached as **Exhibit 4** is a certified copy of Ayr's Reorganization plan for APD filed August 16, 2011.

Attached as **Exhibit 5** is a certified copy of duly notarized power of attorney by Philip Harris in his capacity of President of Ayr as witnessed by Rhonda R Davis, Notary Public, State of Texas, dated July 18, 2011.

Attached as **Exhibit 6** is a certified copy of Ayr Board Resolution dated October 26, 2011.

Attached as **Exhibit 7** is a certified copy of of Ayr Board Resolution dated March 7, 2012.

Attached as **Exhibit 8** is a certified copy of Transcript of the Minutes of APD Creditors Meeting held on April 17, 2012 in support of Ayr's Reorganization plan for APD.

Attached as **Exhibit 9** is a certified copy of APD Bankruptcy Court Ruling No.75 dated April 18, 2012 confirming APD Creditors approval of Ayr's Reorganization plan for APD.

Attached as **Exhibit 10** is a certified copy of the Declaration of Chavdar Angelov Angelov dated May 18, 2017.

Attached as **Exhibit 11** is a certified copy of the Declaration of Jeffrey L. McClanahan dated September 6, 2018.

Attached as **Exhibit 12** is a certified copy of the Declaration of Chavdar Angelov Angelov dated October 3, 2018

Attached as **Exhibit 13** is a certified copy of MT 799 Swift communication exchange between Investbank, AD, the Bank of America and the National Bank of New York, NY, USA, within October 28, 2010 – January 3, 2011.

Attached as **Exhibit 14** is a certified copy of Ayr Logistics Limited, Inc., e-mail to the Chairman of the Managing Board and Executive Director of First Investment Bank, AD Matthew Mateev, dated November 14, 2010.

Attached as **Exhibit 15** is a certified copy of Ayr letter to the National Bank of the Republic of Bulgaria (BNB) dated December 20, 2010.

Attached as **Exhibit 16** is a certified copy of Ayr Logistics Limited, Inc., letter of damages to Investbank, AD, Fibank, UniCredit Bulbank, AD, dated December 3, 2010.

Attached as **Exhibit 17** is a certified copy of the Loan Participation Notes due 2014 Series 2012-1, $150,000,000 to Corpbank, dated August 7, 2012.

Attached as **Exhibit 18** is a certified copy of the Annual Report of Bulgartabac-Holding, AD,(BTH), dated 2010,2011,2012,2013 and 2014

Attached as **Exhibit 19** is a certified copy of the Declaration of Tzvetan Radoev Vassilev dated June 9, 2017.

Attached as **Exhibit 20** is a certified copy of the Contract for Assignment of Receivable between EFV International Financial Ventures Limited (EFV) and TCI Middle East FZE (TGI), dated November 7, 2013.

Attached as **Exhibit 21** is a certified copy of the Statement of Judge Rumyana Chenalova dated May 11, 2015

Attached as **Exhibit 22** is a certified copy of the Statement of Trustee Daniela Kuceva dated May 11, 2015

Attached as **Exhibit 23** is a certified copy of APD Trustee Report dated August 15, 2016.

Attached as **Exhibit 24** is a certified copy of Draft of Payment letter No. 9764 created by Fibank dated October 22,2014.

Attached as **Exhibit 25** is a certified copy of Forensic Handwriting Examination on the Payment Order No. 9764 dated Oct 24,2014.

Attached as **Exhibit 26** is a certified copy of Corpbank reference in favour Fibank as an owner of APD's bank account dated December 1, 2014.

Attached as **Exhibit 27** is a certified copy of Corpbank reference in favour Five companies as an owner of APD's bank account dated November 17,2014

Attached as **Exhibit 28** is a certified copy of BNB Instructions dated August 24, 2014.

Attached as **Exhibit 29** is a certified copy of the BNB's register for debt payment in Corpbank after June 20, 2014

Attached as **Exhibit 30** is a certified copy of Order No.3-3 dated January 6, 2015 by the Conservators for Corpbank.

Attached as **Exhibit 31** is a Corpbank statement of APD's bank account dated December 1,2014.

Attached as **Exhibit 32** is a certified copy of Transcript of the Minutes of the meeting with attorney Tordor Nenov dated February 20, 2016.

Attached as **Exhibit 33** is a certified copy of Transcript of Court Hearing in case No.187/2018 as held at the Varna Court of Appeals, Bulgaria, dated May 2, 2018.

Attached as **Exhibit 34** is a certified copy of Synopsis of Case-pertinent Preliminary Rulings of The Court of Justice of the European Union to cross-border bankruptcy.

Attached as **Exhibit 35** is a certified copy of Ayr Trustee's Letter dated January 7, 2016 to APD Trustee.

Attached as **Exhibit 36** is a certified copy of Ayr Trustee's Letter to APD Trustee dated March 3, 2016.

Attached as **Exhibit 37** is a certified copy of Ayr Trustee Stipulation clarifying the causes of action sold, filed July 9, 2018.

Attached as **Exhibit 38** is a certified copy of Ayr Trustee's Complaint to the EU Commission (EC) against Bulgaria and seeking from the EC to launch an investigation of alleged breach of UN, USA and EU law by Bulgaria, filed February 28, 2019;

Attached as **Exhibit 39** is a chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to justice in the Bulgarian court over the past 20 years.

Attached as **Exhibit 40** is a certified copy of "Friendly Warning" email dated May 21, 2016.

Attached as **Exhibit 41** is a certified copy of Ayr Trustee's Motion challenging the Settlement Agreement between UniCredit Bulbank,AD and Fibank, filed June 21, 2016.

Attached as **Exhibit 42** is a certified copy of Payment order dated November 26, 2015, by UniCredit Bulbank, AD, paid $14,343(BGN 22,520).

Attached as **Exhibit 43** is a certified copy of Ruling No.545 dated December 2, 2015 of Shumen District Court to resume APD bankruptcy case and directed APD Trustee to submit a report on the costs incurred in collection of receivables and replenishment of APD's Estate.

Attached as **Exhibit 44** is a certified copy of Delivery and Acceptance Statement between Kota Energy, AD, and Special Bulgarian Counsel of Trustee of Ayr, dated June 24, 2016.

Attached as **Exhibit 45** is a certified copy of Notice No.42 dated June 25, 2016 of Kota Energy, AD, for prepayment of court cost of $19,108(BGN 30,000) to resume of APD bankruptcy case.

Attached as **Exhibit 46** is a certified copy of Ruling No.586 dated September 15, 2016 of Varna Appeal Court determined that there existed no adequate rules or legal remedies within APD bankruptcy proceedings for investigation or forcing the parties to return the Funds they had taken away from APD bank accounts with Corpbank.

Attached as **Exhibit 47** is a certified copy of Ruling No.589 dated September 16, 2016 of Varna Appeal Court determined that there existed no adequate rules or legal remedies within APD bankruptcy proceedings for investigation or forcing the parties to return the Funds they had taken away from APD bank accounts with Corpbank.

Attached as **Exhibit 48** is a certified copy of Ruling No.457 dated December 16, 2016 of Shumen District Court, ordering a prepayment of court costs in the amount of BGN 60,000.

Attached as **Exhibit 49** is a certified copy of Judgment of District Court of Shumen No.5 dated January 19, 2018.

Attached as **Exhibit 50** is a certified copy of the Motion of appeal complaint filed by Trustee of Ayr dated January 25, 2018.

Attached as **Exhibit 51** is a certified copy of the Cassation complaint filed by Trustee of Ayr dated July 18, 2018.

Attached as **Exhibit 52** is a certified copy of the Fibank's Statement of Claim in APD Bankruptcy procedure.

Attached as **Exhibit 53** is a certified copy of the Ruling of Supreme Cassation Court, Sofia, Bulgaria, No.728 dated July 30, 2012.

Attached as **Exhibit 54** is a certified copy of the Judgment of the District Court of Targovishte No.3 dated 8 February 2013.

Attached as **Exhibit 55** is a certified copy of the FIB's payment claim dated May 21, 2013.

Attached as **Exhibit 56** is a certified copy of the Trustee of APD's Report dated June 20,2014.

Attached as **Exhibit 57** is a certified copy of the Ruling of District Court of Targovishte No. 179 dated September 2,2013.

Attached as **Exhibit 58** is a certified copy of the Order of EU Court (Fifth Chamber) dated September 9. 2014, case C-488/13.

Attached as **Exhibit 59** is a certified copy of the Work Meeting Minutes of Committee of Creditors of APD dated September 2, 2016.

Attached as **Exhibit 60** is a certified copy of the Ruling of Appeal Court of Varna No.731 dated November 13, 2013.

Attached as **Exhibit 61** is a certified copy of the Ruling of Appeal Court of Varna No.735 dated November 14, 2013.

Attached as **Exhibit 62** is a certified copy of the Motion of All Seas Property 2 OOD and Asset Management EAD to Trustee of APD dated July 3, 2014.

Attached as **Exhibit 63** is a certified copy of the List of creditors of APD dated July 9, 2014.

Attached as **Exhibit 64** is a certified copy of the Judgment against Ayr Property Development, AD, Doc.13 Filed 03/14/17, case 16-03139-bjh.

Attached as **Exhibit 65** is a certified copy of the Judgment against Ayr Property Development, AD, Doc.37 Filed 11/13/17, case 16-03140 –bjh.

Attached as **Exhibit 66** is a certified copy of the Judgment against Torier Partner Limited, Doc.27 Filed 07/19/17, case 16-03140-bjh.

Attached as **Exhibit 67** is a certified copy of the APD's Bank Account Statement as of 13 November 2014.

Attached as **Exhibit 68** is a certified copy of the Judgment of the District Court of Targovishte No.16 dated May 3, 2011.

Attached as **Exhibit 69** is a certified copy of the Certificate of the Committee of Creditors of APD dated September 3, 2014.

Attached as **Exhibit 70** is a certified copy of the Minutes of Court Hearing dated 10 January 2013, in case No.82/2011.

Attached as **Exhibit 71** is a certified copy of the Ayr's Notice to the Minister of Justice of the Republic of Bulgaria dated November 19, 2013.

Attached as **Exhibit 72** is a certified copy of the Ayr's Notice to the Prosecutor General of the Republic of Bulgaria dated November 19, 2013.

Attached as **Exhibit 73** is a certified copy of the Declaration of Philip Harris dated December 4, 2013.

Attached as **Exhibit 74** is a certified copy of the Letter of Philip Harris to Attorney Maria Nakova dated December 1,2013.

Attached as **Exhibit 75** is a certified copy of the Resolution of BNB No.104 dated August 15,2014.

Attached as **Exhibit 76** is a certified copy of the Sale of account receivable agreement between FIB and Vili Vist EAD dated June 13, 2014.

Attached as **Exhibit 77** is a certified copy of the Notary Notice of Corpbank to execution bank loan debt of Vili Vist EAD dated May 30, 2014.

Attached as **Exhibit 78** is a certified copy of the Notary Notice of Corbank to execution of bank loan debt of Droslian Bulgaria EOOD dated May 29, 2014.

Attached as **Exhibit 79** is a certified copy of the Bank Loan Agreement Droslian Bulgaria EOOD dated February 27,2013.

7

Attached as **Exhibit 80** is a certified copy of the Notary Notice of Corpbank  to execution bank loan debt of Cibole Serices Incorporated  Bulgaria EOOD dated June 19, 2014.

Attached as **Exhibit 81** is a certified copy of the Philip Harris filed Petition for Ayr Bankrupt "No Assets".

Attached as **Exhibit 82** is a certified copy of the Resolution of BNB No.73 dated June 20,2014.

Attached as **Exhibit 83** is a certified copy of the Ruling of Targovishte District Court No. 38 dated January 14,2013.

Attached as **Exhibit 84** is a certified copy of the Ruling of Targovishte District Court No. 304 dated July 11,2014.

Attached as **Exhibit 85** is a certified copy of the Ruling of Varna Appeal Court dated December 12,2013.

Attached as **Exhibit 86** is a certified copy of the Trustee of APD Request to be removed dated July 11, 2014.

Attached as **Exhibit 87** is a certified copy of the Ruling of Shumen District Court No.318 dated July 18,2014.

Attached as **Exhibit 88** is a certified copy of the Transcript of court hearing in case 16-03138-bjh dated May 4,2017.

Attached as **Exhibit 89** is a certified copy of the BNB's Supervision Report to FIB for 2012.

Attached as **Exhibit 90** is a certified copy of the EU Commission approves liquidity support for Bulgarian banks June 30, 2014.

Attached as **Exhibit 91** is a certified copy of the Fibank Restructuring Plan dated October 31,2014.

Attached as **Exhibit 92** is a certified copy of the Trustee of APD reports dated April 24, 2016.

Attached as **Exhibit 93** is a certified copy of the Trustee of APD reports dated February 22,2016.

Attached as **Exhibit 94** is a certified copy of the Letter by TC-IME AD dated October 23, 2015.

Attached as **Exhibit 95** is a certified copy of the List of shareholder of IPK Rodina EAD.

Attached as **Exhibit 96** is a certified copy of the Incorporate Certificate of IPK Rodina AD.

Attached as **Exhibit 97** is a certified copy of the Incorporate Certificate of Gasproekt Jug AD.

Attached as **Exhibit 98** is a certified copy of the Email correspondence of Chavdar Angelov with FIB dated October 2, 2009 about start of negotiation with Philip Harris and Ayr.

Attached as **Exhibit 99** is a certified copy of the Fibank email dated October 2, 2009 to invitation of Philip Harris to start negotiation.

Attached as **Exhibit 100** is a certified copy of the Philip Harris and Chavdar Angelov email discussion about negotiation with Fibank dated December 17, 2009.

Attached as **Exhibit 101** is a certified copy of the Philip Harris and Matthew Mattev email correspondence dated August 5 and 6, 2010.

Attached as **Exhibit 102** is a certified copy of the Letter by Syndicated Holdings LLC to FIB dated October 4, 2010.

Attached as **Exhibit 103** is a certified copy of the Expert Opinion of Carl F. Waid SWIFT MT 799 in support bank account Oriana Capital Partners dated November 6, 2010.

Attached as **Exhibit 104** is a certified copy of the Expert Opinion Colvin Financial Group of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010.

Attached as **Exhibit 105** is a certified copy of the Expert Opinion Wallace Financial Group, Inc. Expert Opinion of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010.

Attached as **Exhibit 106** is a certified copy of the Philip Harris email dated December 1, 2010 about conversation with Bank of America about Swift to bank account Oriana Capital Partners.

Attached as **Exhibit 107** is a certified copy of the Philip Harris email dated December 3, 2010 Message from Bank of America about Swift to bank account Oriana Capital Partners.

Attached as **Exhibit 108** is a certified copy of the Email of Shawn Delbridge Program Manager of Oriana Capital Partners LLI dated January 20,2011 about Swift to bank account Oriana Capital Partners.

Attached as **Exhibit 109** is a certified copy of the Philip Harris email correspondence with Chavdar Angelov dated February 23, 2011 about Mexican bond.

Attached as **Exhibit 110** is a certified copy of the Philip Harris email correspondence with Anthony Harriott dated February 24, 2011 about Mexican bond.

Attached as **Exhibit 111** is a certified copy of the Declaration by Syndicated Holding LLC dated February 2011 to support Ayr's Reorganization Plan for APD.

### II.EXPERT OPINION

7.      The evidence pertaining to this matter I have studied and discovered shows that the Bulgarian forum is not an available judicial forum for this case. The Bulgarian forum has no jurisdiction over the Defendants' actions that caused US domestic damages to Plaintiffs in New York, the State New York, United States of America. The Defendants were aware or should have been aware that their actions were in breach and violation of the US laws. The Defendants could have reasonably foreseen that their actions would haul them into Court in New York.

8.      APD Bankruptcy Court (pending at the Targovishte District Court until December 12, 2013, and then transferred to the Shumen District Court after December 12, 2013) exercised its authority and its sovereign power when petitioned to determine whether it had jurisdiction over the claims arising from the theft of The Funds, being funds belonging to Ayr and originating from its development project Silver Beach. APD Bankruptcy Court *declined* jurisdiction over the matter and dismissed APD bankruptcy case. By so doing APD Bankruptcy Court cut off *the only link that connected* Bulgaria to Defendants' liability for returning The Funds they stole and used for their personal gain in pursuit of their private interests. APD Bankruptcy Court held that there existed no factual or legal grounds that might have justified a decision on its part to determine jurisdiction over the claims lodged against the Defendants and based on the theft of The Funds. In APD Bankruptcy Court's view the theft of The Funds was only a good enough reason for it to dismiss APD bankruptcy case. *See* **Exhibit [33], Exhibit [35], Exhibit [50], Exhibit [51], Exhibit [59].**

9.      The claims arising from the theft of The Funds and Ayr's right to The Funds is undisputed. Both the Ayr Bankruptcy Court and Ayr Trustee in Ayr's bankruptcy proceedings determined the validity and right of Ayr Creditors to The Funds. *See* **Exhibits [37].**

### A) There is a close connection between the claims brought and jurisdiction of this New York court forum.

10.      Defendants Philip R. Harris (<u>Harris</u>) and Fibank in 2010 reached a mutually beneficial agreement which enhanced their respective, yet different, economic interests and

needs. The parties agreed to exchange or swap positions they held in certain loans and in certain Mexican bonds, respectively (The Swap). To both parties the place of performance of said agreement was New York, New York. The Swap was based on Fibank's prospective share in the profit from a certain Mexican bonds deal and it was agreed to be effectuated and performed through the Oriana Capital Partners bank account opened and held at HSBC, New York and under the laws of the State of New York. *See* **Exhibit [1]**, **Exhibit [11]** and **Exhibit [12]**.

11.     The parties, Harris and Fibank, agreed and designated the State of New York as the place of performance and closure of Harris and Fibank agreement. Their actions and agreements were purposeful, deliberate and hardly coincidental. From the very beginning Harris and Ayr repeatedly named, entered into contracts and agreements at all times designating the State of New York as the chosen place of performance and eventually made New York the financial center of Ayr's overseas Silver Beach Project (SB project). Harris and Ayr set, agreed and designated *Deutsche Bank, New York*, as the place of performance for the Ayr-proposed Reorganization Plan for Ayr's company, APD. *See* **Exhibits [2-9]**. Harris and Ayr chose New York to be the place to consolidate the payment claims lodged in APD bankruptcy case. NY laws were crucial for the success of the Harris-and-Ayr consolidation of all the court recognized valid payment claims arising from the SB project. See **Exhibit [62]** and **Exhibit [63]**. Harris set and designated *HSBC, New York*, as the bank and venue for the funding and implementation of Ayr's overseas SB project. *See* **Exhibit [12]**, **Exhibit [13]**, **Exhibit [14]**, **Exhibit [15]** and **Exhibit [16]**.

12.     Designating New York as the place of performance and financial center of Ayr's SB project both contractually and monetarily had two necessary purposes for Harris: 1) trust in, rule of law and protections in the New York courts and New York banks; and 2) New York boosted Ayr's credibility which lead to Ayr becoming the sole creditor of The Funds (the proceeds from the SB project lands sale). *See* **Exhibit [1]**, **Exhibit [2]**, **Exhibit [15]**, **Exhibit [16]**, **Exhibit [62]** and **Exhibit [63]**.

13.     The fingerprints of the State of New York are all over the Defendants activities, their civil conspiracy and the facts of this case having chosen New York as the place of performance and payments arising from this case and many other business ventures and interests.

14.     Over the course of almost 5 years Harris and Fibank's business model and agreements set New York as the place of performance on numerous occasions. Harris' business contacts with the State of New York expose a model of Harris and Fibank's

intentionally created by them and regularly maintained business relations in the State of New York through numerous business activities, numerous email communications, the use of SWIFT messages and the use of New York banking institutions. *See* **Exhibit [1] and Exhibits [12-16]**.

14-a.   The Swap Deal negotiations between Fibank, Angelov, Harris and Ayr started in April 2009.  The negotiations were conducted by e-mail and telephone from New York and Maryland, where Angelov being a Green Card holder resided from 1995 -2012. Harris and Ayr involved other entities in these negotiations, such as: 1) Ayr's consultants for their business projects – Commerce Commodities, Oregon, and Target Financial Services, Oregon, represented by their Managing Partner Karin Lin Du Val Preuit; and 2) Ayr's financial partner in their business project – Syndicated Holdings LLC represented by their Manager and owner James McGee. Fibank, Angelov and Harris concentrated the organization and implementation of the swap deal in HSBC. Harris and Ayr, Fibank, Angelov, Anthony Harriot and HSBC, NY agreed that Oriana Capital Partners LLC would serve as the escrow agent of the swap deal. Harris and Ayr, Fibank, Angelov, Anthony Harriot and HSBC agreed that financing and payment of the Swap deal would be made through the Oriana Capital Parners bank account opened with HSBC. See Declaration Chavdar Angelov dated October 3,2018, see_Declaration Jeffrey McClanahan dated September 24, 2019, see **Exhibits [98+111]**.

14-b.   During this entire negotiation process from the United States with Rudersdal, Angelov kept Fibank informed of every development of the Rudersdal negotiations, transactions and agreements. Rudersdal was lead to believe that Fibank and Angelov intended to and would invest approximately 30 million euros in the SBP and signed the Preliminary Agreements for SBP in the summer of 2007 with All Seas Property 2, OOD, Angelov's company to which PID had transferred its ownership in the SBP for a short 30 day period to effectuate the transaction with Rudersdal. Acting in reliance on Angelov's representations form New York and Maryland and in good faith Rudersdal made the promised payment thereunder of 4,367,000 Euro (approximately $5,000,000) to Angelov's controlled bank accounts with First Investment Bank, AD ("Fibank") in Bulgaria. What Rudersdal did not know at the time was that Fibank and Angelov had invested said 30 million euros elsewhere, in the Mexican Bonds purchase. Rudersdal was further mislead that the SBP licensing fees of BGN 16,528,709 (approx. $10,000,000) that needed to be paid would be paid out of those EUR 30,000,000 Fibank and Angelov promised to ensure. In late 2007 when Rudersdal eventually learned that SBP would not get the licensing needed it had no other option but to

cancel the SBP deal, having already invested approx. 20,000,000 euros in it. Fibank and Angelov not only frustrated Rudersdal's SBP purchase transaction, but took advantage of Rudersdal's first payment of 4,367,000 Euro made in good faith and did not bat an eye nor shy away from using said money to discharge the debts Angelov-controlled companies owed to Fibank. In 2009 Ayr bought the SBP becoming thus its owner, and in 2012 Fibank took it over. In the beginning of December 2012 and through the Swap deal Fibank succeeded in getting back the BGN 97,500,000 it paid for the purchase of the SBP lands by stealing The Funds at Corpbank acting in collusion with the other Defendants.

15.     Fibank, which has invested much in obtaining its Diners Club license, has chosen CT Corporation Systems, 111, Eight Avenue, New York, NY 10011 to act as its agent in registering Fibank under the Foreign Account Tax Compliance Act ("FATCA"). Fibank and its majority shareholders Defendants Tseko Minev and Ivaylo Mutafchiev made their investments in BH Air conditional on the latter's obtaining a U.S. license for flights to and from New York.

16.     Defendant Foreign Trade Bank of the Russian Federation ("VTB") pursued its economic and business interests within the USA at its New York-based VTB Capital, Inc. Cornered by the sanctions imposed by the USA and the EU on the Russian Federation, VTB opted for restructuring of its business in New York. In September 2018, VTB transferred its ownership interest to the Management of VTB Capital Inc., located in NY. VTB Capital Inc. has since been renamed Xtellus Capital Partners Inc., website: www.xtelluscapital.com. Thereafter, VTB Capital Inc. (a/k/a Xtellus Capital Partners Inc) was still designated by VTB to act as US chaperoning broker for VTB Group. Thus, VTB preserved its economic activity and interests in the USA, and in particular New York.

17.     Defendant VTB further chose the State of New York on multiple occasion as the place of performance and payment: 1)  when VTB exercised the call option for Vivacom AD which it received as a benefit of the taking of The Funds; 2) the conversion into a 24% Vivacom shareholder interest in favor of Tennenbaum Capital Partners, LLC, Los Angeles, https://tennenbaumcapital.com   and   Castle   Hill   Capital,   LLC,   Pennsylvania, https://www.castlehill.capital, arising because those entities funded the VTB $150 million Vivacom call option purchase. These transactions occurred with and through a New York bank, Defendant Bank of New York Mellon. See **Exhibit [17]**.

18.     Defendant Bulgartabac Holding AD (BTH) has decades of contacts with the State of New York using the banking system of the State of New York to make payments arising from its US contracts for tobacco and cigarette products in the USA. *See* **Exhibit [18]**.

19.     Defendant Delyan Peevski (Peevski) packers the interests of Harris and Fibank in The Swap to use them when: 1) he coordinated the forced sale of Tzvetan Vassilev's interest in the BTH call option for 79.83% of BTH, held through EFV International Financial Ventures Limited, in favor of TGI, *See* **Exhibit [19]** and **Exhibit [20]**; and 2) he coordinated the forces sale of the Vivacom call option in favor of VTB and the interest to Tennenbaum and Castle Hill noted above. *See* **Exhibit [21], Exhibit [22], Exhibit [94], Exhibit [95] and Exhibit [96]**.

20.     Defendant BNB assisted execution of the Peevski's plan by allowing Ayr's The Funds to be use in favor of: 1) The Swap deal, *See* **Exhibit [76], Exhibit [89], Exhibit [90] and Exhibit [91]**; 2) The closing of the debts of the Five Companies Defendants to Corpbank, *See* **Exhibit [77], Exhibit [78], Exhibit [79], Exhibit [80]**; and 3) The Peevski and VTB's economic interest in the call option of BTH and the call option of Vivacom, **See Exhibit [19], Exhibit [20], Exhibit [21], Exhibit [21], Exhibit [22], Exhibit [94], Exhibit [95], Exhibit [96]**.

### B) The Swap agreed by Fibank and Harris back in 2010 came to fruition in early December 2014 when Ayr's money-The Funds- at Corpbank was eventually taken[1].

21.     The civil conspiracy plan cleverly devised and meticulously followed through for the sole purpose of divesting Ayr of its Funds in the overseas SB project had a foreseeable direct effect resulting in breach of the laws of the State of New York.

22.     Defendants Harris and Fibank's 2010 swap agreement came to fruition resulting in legitimizing Fibank's payment claims as assets of bank account Oriana Capital Partners in HSBC, NY, by the taking of Ayr's Funds held at Corpbank in APD's bank accounts. Until the taking of the Funds, Fibank's multiple attempts to legitimize its payment claims failed one after the other.

23.     The APD Trustee on June 20,2014 refused to honor Fibank's payments claims acting in strict observance of United Nations Convention Against Corruption ("UNCAC") and in recognition of U.S. laws. *See* **Exhibit [56]**.

24.     On October 22, 2014, Fibank drew up a document named 'Payment order"; it then planted the then current APD Trustee's signature upon it, presented the fabricated document to BNB-appointed Corpbank Conservators, Defendants Lutov and Kostadinchev,

---

[1] See Attachments (D), (E) and (F).

supervised by Defendant BNB, and used it to take control of APD Corpbank bank accounts. *See* **Exhibits [23-26]**.

25.     Once Fibank was recognized by BNB and its Conservators as the holder of the APD accounts, Fibank quickly disposed of the Funds to the benefit of the Five Company Defendants related to Peevski: Tabak Market AD, Cibole Services Incorporated Bulgaria EOOD, Asteria Bulgaria EOOD, Promishleno Stroitelstvo Holding, EAD, and Vili Vist EAD. *See* **Exhibit [27]**.

26.     Fibank, BNB, the Conservators let the Five Company Defendants use The Funds to repay their debts to Corpbank. Knowing that the payment of the debts of the Five Company Defendants is illegal BNB and Conservators do nothing to get back Ayr's funds. Moreover, BNB and Conservators *reduced to zero and closed* APD's bank accounts to cover up the bank robbery. *See* **Exhibit [28-31], Exhibit [92] and Exhibit [93]**.

27.     Fibank, so to cover up its actions, persuaded one of the APD Creditors Committee members (by paying $1,910,828 (BGN3,000,000) to said member) to assist it in closing APD bankruptcy case. *See* **Exhibit [32]**.

28.     The Swap was the foundational mechanism for the conspiracy to take Ayr's Funds when the opportunity became was manufactured and became ripe, in conjunction with the Defendants BNB and Conservators take over and their collective failed administration of Corpbank.

29.     October 10, 2014, Harris fraudulently filed a no asset US bankruptcy for Ayr. However, his fraudulent "No Assets" bankruptcy filing prevented Ayr from meeting its obligations to its creditors, who had consolidated their payment claims against Ayr's Silver Beach Project. Ayr's "No Assets" bankruptcy fraud violated the laws of the State of New York because of the Supplementation Agreement dated November 27, 2013, which contractually set New York as the venue, forum and choice of law.

30.     The two bankruptcy filings, namely Ayr's "No Assets" bankruptcy and APD's Bulgarian bankruptcy, had one common goal, *i.e.*, to siphon off The Funds from APD's accounts in Defendants' favor and to increase Defendants' economic profit and corporate shareholder interest, **See Exhibit [1], Exhibit [10], Exhibit [11], Exhibit [12], Exhibit [19], Exhibit [20], Exhibit [76], Exhibit [77], Exhihit [78], Exhibit [79], Exhibit [80], Exhibit [89], Exhibit [90], Exhibit [91]**. As a consequence two things resulted against Ayr's creditors: 1) the elimination of Ayr creditors' economic rights to be paid per the Supplementation Agreement, and 2) the breach of Ayr creditors' rights to be paid in a secure venue at the New York office of Deutsche Bank, New York, New York, **See Exhibit [74]**.

**C) Judging by the relentless nature of the pursuit of economic interests in New York by Defendants it is only logical to presume that the Defendants could have reasonably expected to be hauled into the Court of New York and held responsible for their violating the laws of this State.**

31.     The presumption that the *Choice of Jurisdiction Clause*, which Ayr Creditors insisted on in each and every agreement that eventually caused the consolidation of all payment claims into the SB Project, would be acknowledged, recognized and enforced is factually and legally supported. *See* **Exhibit [1]**, **Exhibit [2]**, **Exhibit [3]**, **Exhibit [15]**, **Exhibit [62]**, **Exhibit [63]**, **Exhibit [89]**.

32.     All main Ayr's agreements or arrangements in place regarding the Silver Beach project are related exclusively with New York and governed by New York laws on the basis of Ayr's SB project designated as a project of the bank account Oriana Capital Partners opened with HSBC, New York. *See* **Exhibit [1]**, **Exhibit [16]**, **Exhibit [74]**.

33.     Bulgarian law, in particular, Art.93 (1) of the Bulgarian Private International Law Code (PILC) recognizes the sovereign right of the parties to choose the law and venue applicable to their contracts[2].

34.     Similarly, in cross-border torts, Bulgarian law provides that third parties are bound by the law, jurisdiction and venue set forth in a contract their actions effect.   In particular, Art.105(3) of PILC[3] makes paramount the place where *the UNCAC-specified tort*

---

[2] **PILC, Article 93(1):** Contracts shall be governed by the law chosen by the parties. Any such choice must be expressed or clearly demonstrated by the terms of the contract or by the circumstances where under the contractual relationship evolves.

[3] **PILC, Article105:** (1) The obligations arising out of a tort or delict shall be governed by the law of the State within whose territory the direct damage arises or is likely to arise (*lex loci delicti commissi*). (2) Where the author of the tort or delict and the person sustaining damage both have their habitual residence or a place of business in the same State at the time when the damage occurs, the law of that State shall apply. (3) Notwithstanding the provisions of Paragraphs (1) and (2), if it appears from the circumstances as a whole that the tort or delict is manifestly more closely connected with another State, the law of that other State shall apply. A manifestly closer connection may be based on a pre-existing relationship between the parties, such as a contract that is closely connected with the tort or delict in question.

or *delict*- is manifestly more closely connected with a country where the economic interests of the parties has been trampled upon and with the law applicable to their business interest.

35.     The civil conspiracy group divested Ayr's creditors of their rightful claims submitted exclusively to the jurisdiction and to the laws of the State of New York. The APD Bankruptcy Court viewed or used the theft of the $65,000,000 as a pretext or good enough reason to justify the closing of APD bankruptcy case.

36.     Despite the APD Bankruptcy Court not being blind to Defendants actions in the taking of Ayr's Funds, the only conclusion the APD Bankruptcy Court reached was that none of the actions in the taking of Ayr's Funds caused any Bulgarian domestic damage whatsoever, including in the APD's bankruptcy proceeding. Therefore, it closed APD's Bankruptcy case for lack of assets in the bankruptcy estate.

### D) The APD Bankruptcy Court have held that it does not have jurisdiction over the compensation claims asserted in Ayr's US bankruptcy proceeding.

37.     Ayr's U.S. Trustee Mims filed at least five complaints before the Bulgarian courts seeking to ascertain whether or not the APD Bankruptcy Court: 1) had any international jurisdiction over the compensation claims asserted in Ayr's US bankruptcy proceeding; and 2) had any international jurisdiction over the persons or entities that devised and effectuated the fraudulent scheme in the taking of the Ayr Funds. The APD Bankruptcy Court dismissed each of the complaints and declined international jurisdiction. *See* **Exhibit [33]**.

38.     Based on EU Law on cross-border bankruptcy, the court in New York is the sole venue having exclusive jurisdiction over the instant case. *See* **Exhibit [34]**.

39.     Pursuant to EU law on cross-border bankruptcy as set forth in recital (13), Article 2(h) and Article 3 of EU Regulation (EC) No.1346/2000 of 29 May 2000, international jurisdiction over cross-border bankruptcy proceedings (EU Regulation) is determined by 3 elements: 1) the "*center of main interests*" factor; 2) in the case of *a letter-box* or *a shell company,* the EU Regulation disregards the place-of-registration-factor of the insolvent corporate *letter box* debtor; and 3) the EU Regulation disregards the location of an insolvent debtor's assets if such assets fail to meet the criteria of the definition for

"*establishment*", namely, as set forth in Article 2(h), an entity "with a minimum level of organization and a degree of stability for the purpose of pursuing an economic activity".

40.     APD is nothing more than Ayr's wholly owned "letter box" or "shell" subsidiary created for the sole purpose of holding the Silver Beach Project land and project. APD failed to meet any Article 2(h) criteria for an establishment/entity. APD failed to meet any of the 2(h) requirements for it had: 1) no structural organization at all; 2) no personnel to conduct any business activities; and 3) no capacity to pursue economic activity. Therefore, APD cannot be treated as a stand-alone and/or autonomous entity, separate from Ayr.

41.     Ayr and Harris intentionally linked the entire process of funding, acquiring and implementing the Silver Beach Project to the State of New York. Establishing New York as Ayr's "*center of main interest*" for the Silver Beach Project is a fact equally recognizable and perceived by all Defendants, as well as Ayr's creditors, the Bulgarian government authorities and the APD Bankruptcy Court alike. See **Exhibit [1], Exhibit [2], Exhibit [4], Exhibit [15], Exhibit [16], Exhibit [62], Exhibit [63] and Exhibit [74].**

42.     Ayr was not only the sole owner of the property in the Silver Beach Project, but also owned, having consolidated, all valid payment claims arising from said project. None of the rights or obligations under the Silver Beach Project could be regarded as a stand-alone right or obligation of APD or as being separate from Ayr.

43.     Further, Plaintiffs instant claims were originally born out of the Ayr US bankruptcy proceeding as US Trustee claims. The instant claims were never deemed APD bankruptcy assets, nor were they recognized as such by the APD Bulgarian Trustee or in the APD Bankruptcy Court.

44.     Considering the connections of Plaintiffs' economic interests to New York, and taking into account that the Defendants' pursuit of their business and economic interests had sufficient connection to the State of New York, such as: 1) the Oriana Capital Partners bank account set up with HSBC, NY; 2) involvement of several NY-based entities, such as: Deutsche Bank, NY, Bank of America, NY, CT Corporation Systems, NY; VTB Capital, Inc., NY; 3) New York banking and payments, 4) New York commerce; 5) New York transportation systems and 6) the laws of the State of New York, it is reasonable to conclude that the matter at dispute must only be resolved in a New York Court.

45.     The Defendants misused APD's bankruptcy converting it into a convenient container vessel into which they loaded all their foul payment claims arising from Angelov's loans borrowed from both Fibank and UniCredit and sent it overseas to New York for unloading. See **Exhibit [1], Exhibits [10-12] and Exhibits [35-36].**

18

46.     Neither the Ayr Bankruptcy Court nor the APD Bankruptcy Court found sufficient legal or factual grounds for jurisdiction over the instant claims, thus leaving the court in New York as the only one having exclusive jurisdiction over the instant case. *See* **Exhibit [37]** and **Exhibit [38]**.

47.     Defendants' breach of contract with New York as the place of performance, namely, at Deutsche Bank, NY, is a clear-cut case of cause-and-effect. The Supplementation Agreement on its face and by its explicit terms sets NY and NY laws as controlling, therefore, Bulgaria has no legal or other interest to entertain the instant claims arising from this breach of NY laws.

48.     Restricting Ayr's access to its SB Project money kept at Corpbank, i.e., what Defendant BNB did after June 20, 2014 or Ayr's fraudulent filing for "No Assets" Bankruptcy on October 10, 2014, along with the cleverly devised and followed-through fraudulent plan to take Ayr's money for the purpose of pursuing certain parties' interests in the call options for 76% of Vivacom and 79.83% of BTH, are only milestones that marked the onset and progress of the predatory scheme serving the exchange of economic interests between Fibank and Harris that eventually abolished Ayr creditors' rights.

### E) The choice of governing law and venue clauses in the agreements by which Ayr consolidated Ayr creditors' claims as supported by and compliant with the provisions of Art.34 and Art.35 UNCAC points to New York as the place of jurisdiction.

49.     The Bulgarian forum does not recognize the rights of victims of corruption, money laundering and financial frauds to bring actions in court seeking protection and compensation for the damages. Bulgaria has no laws to address any of these issues.

50.     Although the Bulgarian forum and laws do not recognize the right of the victims under UNCAC to file claims in court and seek protection and compensation for the damages sustained, it is incumbent upon the Bulgarian forum to make sure that any judgments, orders or decisions entered by the forum of the State of New York on the claims asserted herein are internationally recognized and duly enforced. The Republic of Bulgaria became a signatory to the UNCAC on September 20, 2006.

51.     By virtue of UNCAC (ratified by the EU on November 12, 2008) all orders of courts in the State of New York delivered on the claims brought against the defendants for eliminating plaintiffs' right to get paid in Deutsche Bank, NY, are internationally recognizable and enforceable within the EU, to which Bulgaria is a member.

**F) The Bulgarian forum fails to satisfy the constitutional requirements of due process and fair play for the claims brought against the defendants as exemplified below – *See* Exhibits [21], Exhibit [22], Exhibit [32], Exhibit [38] and Exhibit [39].**

52.     Pursuant to Art.758 of the Bulgarian Commerce Act (CA)[4], the bankruptcy proceedings for APD conducted in Bulgaria should have complied with Ayr Trustee's requests urging the APD Bankruptcy Court to take action against the persons/entities that took Ayr's money away and make them return the money. APD Trustee also requested from the APD Bankruptcy Court to authorize such actions. The APD Bankruptcy Court however refused to do as requested and instead closed APD bankruptcy case thus effectively shielding the defendants and failing to administer justice.

53.     Without any justification the APD Bankruptcy Court would refuse to hear compensation claims lodged against BNB for damages caused by BNB's management of banks in trouble, even when the damages arise from business assets. Here the damages arise from the BNB and Conservators management of CCB. On August 22,2014 BNB instructed the Conservators of CCB that all deposit and debt operations in CCB after June 20, 2014 and above $127,388 (BGN 200,000) should be subject to BNB prior approval, See **Exhibit [28]**. Then BNB recorded the debt settlement operations of the Five Companies Defendants with Corpbank as valid. *See* **Exhibit [29]**.

54.     Defendants Fibank, Minev and Mutafchiev repeatedly use the Bulgarian forum as an instrument to legitimize their bad acts. In 2015 and 2016, Defendants Fibank, Minev and Mutafchiev sought the **support of the Bulgarian forum to legitimize the theft of The Funds**. *See* **Exhibit [32], Exhibit [40]** and **Exhibit [41]**. Defendants Fibank, Minev

---

[4] **Bulgarian Commerce Act, Art. 758:** "A receiver in bankruptcy (trustee) appointed in a decision of a foreign court shall have the rights envisaged in the state where the bankruptcy proceedings are instituted, to the extent they do not contradict the public order rules of the Republic of Bulgaria".

and Mutafchiev having been cornered by Ayr Trustee's investigation and efforts to return the stolen Funds, used the APD Bankruptcy Court in 2018 to close APD's bankruptcy case, thereby permanently shutting the door to Ayr Trustee's legitimate demands that the money they had taken be returned to its rightful owner. *See* **Exhibit [32]**, **Exhibit [35]** and **Exhibit [43]**.

55.     At the onset, the APD bankruptcy estate had $65M asset, the Funds. After they were stolen, on November 26, 2015, UniCredit Bulbank, as a member of the creditor committee paid, $14,343(BGN 22,520) in court costs. After the UniCredit Bulbank payment of costs, the court on December 2, 2015, allowed the matter to proceed and entered an order requesting the Bulgarian APD Trustee to submit an action plan for the return of the estate asset and a budget for same. *See* **Exhibit [42-43]**.

56.     On June 25, 2016, Kota Energy,AD, as a member of the creditor committee paid an additional $19,108(BGN30,000) in court costs, the funds having been advanced to Kota Energy,AD, from attorney Zahari Tomov in his capacity as Special Counsel to the US Ayr Trustee Mims. *See* **Exhibits [44-45]**.

57.     On September 15 and 16, 2016, the Varna Appeals Court held that the Bulgarian Bankruptcy Court did not have rules and procedures to allow for the investigation of the wrongful taking of the Funds nor a mechanism to compel the return of the estate asset. *See* **Exhibits [46-47]**.

58.     In December 16, 2016, the APD Bankruptcy Court held that the estate lacked assets after the taking - See Ruling No. 457, See **Exhibit [48]**. Despite the previous rulings that the court lacked rules or a mechanism to either investigate or secure the return of the estate asset, the Court made the incongruous demand that the creditors pay $38,216 (BGN60,000) in additional costs for actions that could not be taken by the Trustee.

59.     On January 19, 2018, the APD Bankruptcy Court closed APD bankruptcy proceedings. *See* **Exhibit [49]**. The creditors did not advance any further funds to the bankruptcy proceedings as there was no basis for the court to demand $38,216 (BGN60,000) which was a false pretext to add to the closure of the bankruptcy proceedings. The wrongful taking of the Funds did not mean that the bankruptcy estate had no asset but rather, it was missing and required an authorized party to retrieve it.

60.     Although the Ayr Trustee was such authorized person, the actions of the Bulgarian bankruptcy court shut the door and cut off any investigative opportunity of the Ayr Trustee. Moreover, it provided an umbrella of protection over the Defendants engaged in the wrongful taking. The APD Bankruptcy Court's course of action toward dismissal of APD

bankruptcy case violates Bulgarian Commerce Act, Art. 632 (2), which provides in pertinent part that: "the resumption [of stayed bankruptcy proceedings] shall be allowed if the requester proves there are sufficient assets..."[5]. As it was known who absconded and benefitted from the Funds, the recovery from them the estate asset was viable and yet the case was closed in violation of said provision.

61.    At the request of Ayr Trustee Mims I, acting as his Special Counsel, filed a motion to the Appeals Court seeking from such court to determine whether: 1) the APD Bankruptcy Court had jurisdiction over the wrongful taking of the Funds and thereby would open APD's bankruptcy proceedings; and 2) if the APD Bankruptcy Court had no jurisdiction over the wrongful taking of the Funds, whether APD Bankruptcy Court had jurisdiction over the Ayr's US bankruptcy claims. Whatever the determination it would require the Varna Appeals Court to reopen APD bankruptcy proceedings. *See* **Exhibit [33]** and **Exhibit [50]**. The Varna Appeals Court found that it did not have jurisdiction over those two matters and upheld the trial court's decision to close APD bankruptcy proceedings for lack of estate assets.

62.    The Bulgarian courts simply followed Defendant Peevski's instructions to cause or make it possible for Peevski's plan to acquire the call options for 76% of Vivacom and for 79.83% of BTH, respectively, as held by VTB, to come to fruition. *See* **Exhibit [19-22]**.

63.    Defendants indeed feel quite *"at home"* in the Bulgarian forum and courts where they are above the law, which sadly is true, and that is why they felt free to follow through their audacious plan to steal U.S. overseas capital worth of $65,000,000 as held in Corpbank in broad daylight. Defendants' feeling safe and untouchable by the law has evolved to a blatant disregard for and outright opposition to the role of, importance for and effect of, the U.S. laws on Ayr's overseas capitals. *See* **Exhibits [21-22], Exhibit [32], Exhibit [35], Exhibit [38], Exhibit [43], Exhibit [48], Exhibit [49], Exhibit [50] and Exhibit [51]**.

64.    None of the compensation claims brought against the Defendants have any chance getting a fair and just hearing nor will justice be provided by Bulgarian courts.

---

[5] **Bulgarian Commerce Act,** *Decision for Termination of the Proceedings Art.632*(**2**): "Stayed bankruptcy proceedings may be resumed in a period of one year from the registration of the decision referred to in Para 1 at the request of the debtor or a creditor. The resumption shall be allowed **if the requester proves there are sufficient assets** or **if he deposits the necessary amount for prepaying the initial expenses referred** to in Art. 629b"

Holding the Defendants liable is impossible in Bulgarian courts because: 1) the practice of clandestine backdoor arrangements; 2) payments to judges; 3) instructions to judges in Defendants favor; 4) allocation of cases to prearranged judges; 5) manipulating the discovery process and admission of evidence in court proceedings in their favor; and 6) judgments entered in their favor. Defendants dictate and orchestrate the judicial process in Bulgaria to fit their economic interests.

65.     The Bulgarian judiciary is so paralyzed by Defendants' economic interests that it dare not and will not afford a fair hearing of Plaintiffs' claims.

66.     Being captive of Defendants' business interests, the APD Bankruptcy Court shirks its responsibility to serve justice and resolve matters fairly even when facts and supporting evidence dictates otherwise. The APD Bankruptcy Court conjured all the procedural tricks it could think of and jumped through hoops to dodge hearing, let alone adjudicating, the matters raised by Ayr Trustee and questioning: 1) the validity of Fibank claiming payment from The Funds (the proceeds from the sale of SP project lands amounting to $65,000,000); 2) the legitimacy of Defendants conduct eventually resulting in their taking away of The Funds that had been deposited for safe-keeping by virtue of a court order; and 3) whether the Bulgarian court had jurisdiction over the matter of Defendants' liability for damages or the compensation claims arising from Ayr's bankruptcy. The APD Bankruptcy Court went out on a limb to avoid addressing, let alone dealing with, those matters by merely dismissing APD bankruptcy case, which ironically was the one and only connection of the instant lawsuit to the Bulgarian forum.

### G) The multitude of facts related to Plaintiffs' claims points solely to the court in New York as the adequate forum with no alternative.

67.     Apart from the fact that judgements and adjudications of the court in New York are internationally recognised and enforceable, NY is the forum having exclusive jurisdiction over the matter for several stand-alone reasons: 1) the agreed Choice of Law And Venue Clauses; 2) Defendants enjoying NY laws to pursue their business interests; 3) the UNCAC rules and U.S. laws; 4) The affirmation the State of New York as the place of performance and closure of Harris and Fibank swap agreement; 5) The affirmation the State of New York as the place of performance and closure of the agreement to consolidate the claims against Ayr's SB project. The NY Court is the only forum where the parties will get due process and fair trial, where justice will be served in full compliance with the U.S. Congress-set requirements as the Constitution of the U.S.A. mandates.

68.     The case-pertinent facts and supporting evidence underlying the causes of action for Plaintiffs claims are solid enough to refute per se any insinuations of purported 'forum shopping'. See **Exhibit [1]**, **Exhibit [2]**, **Exhibit [15]**, **Exhibit [16]**, **Exhibit [37]**, **Exhibit [62]** and **Exhibit [63]**.

69.     It was as early as December 3, 2010 that Harris gave Notice of Damages to Investbank, to Fibank and to UniCredit Bulbank warning them that any action for damages inflicted by their wrongful and hostile interference with any of Ayr's agreements or arrangements in place regarding the Silver Beach project would be brought in New York and would be governed by New York laws on the basis of Ayr's SB project designated account Oriana Capital Partners opened with HSBC, NY. *See* **Exhibit [16]**: **"Be advised that in the event of failure to act as demanded you will be held responsible to Ayr Logistics Limited Inc and our US partners for such unlawful and hostile interference with Ayr's investment agreements, arrangements and commitments, which interference has a direct effect within the USA as the place where arrangements related both to such payment transaction and to entire financing process for the investment project are being made, maintained and taken of."** On December 20, 2010 Julian Bartlett, attorney and legal adviser to the Ayr Group of companies worldwide gave a notice in that regard to BNB as well. *See* **Exhibit [15]**.

70.     No reasonable person would have foreseen that the $65,000,000 (BGN102,946,966), placed on deposit with Corpbank in furtherance of the APD Bankruptcy Court order and kept there from February 2013 till the time when BNB took Corpbank into conservatorship, would be so outrageously robbed in broad daylight under the benevolent eye of BNB, at that, thus abolishing Ayr Creditors' economic interests and legitimate rights to obtain payment via Deutsche Bank, NY.

71.     No reasonable person would have thought that Harris (and Ayr) would collude with Fibank and BNB when it was Harris himself that back in 2010 strongly advised Fibank, among others, against any attempts at hostile interference with Ayr's SB project-related agreements and arrangements subject to performance within New York and further warning them that anyone attempting such interference would be hauled to a New York court and be held liable for resulting damages.

### H) APD Bankruptcy Court has had its chance, and took it, when it exercised jurisdiction over all matters it found to be in its remit and nothing

**can change that fact. The instant Plaintiff claims lodged against the Defendants are different from the matters adjudicated in Bulgarian courts.**

72.    *Res judicata* effect of Judgment No.3 entered on February 8, 2013.

73.    Indeed, the only payment claim Fibank did assert in APD's bankruptcy within the statutory term was for $63,694 (BGN100,000) and was based on three bank loans Fibank had extended of Nos.39-KP-AA-2510 of 22.11.2007, 14-LD-L-000002 of 02.10.2008 and 14-LD-L-000006 of 29.12.2009, respectively, the Agreement of June 4, 2010 and the contractual mortgages created as security for said three bank loans. *See* **Exhibit [52]**.

74.    By virtue of Ruling No.728 of July 30, 2012 entered by the Supreme Cassation Court the matter of said Fibank's claim was remanded to the trial court (the APD Bankruptcy Court, Targovishte District Court) for further proceedings in Case No.82/2011. On February 8, 2013 the Targovishte District Court entered Judgment No.3 by which it denied Fibank's claim in its entirety and dismissed Case 82/2011. *See* **Exhibit [54]**.

75.    Fibank failed to appeal from the trial court's judgement Judgment No.3 of February 8, 2013, thus pursuant to Art.296 (2) of the Bulgarian Civil Procedure Code[6] Judgement No.3 of February 8, 2011 entered into full force and effect making the so dismissed interlocutory action a *res judicata* case. Therefore. pursuant to Art.694 (8) of the Bulgarian Commerce Act[7] Judgment No.3 became mandatorily enforceable with respect to APD Bankruptcy case.

76.    Pursuant to Art.298 (1) of Bulgarian Civil Procedure Code[8] when Judgement No.3 of February 8, 2013 became fully effective it precluded Fibank from filing a new payment claim based on the same grounds as the one already denied in APD bankruptcy case.

77.    Therefore, given the res judicata effect of Judgment No.3 entered on February 8, 2013 Fibank may no longer rely on either The Three bank loans (Nos.39-KP-AA-2510 of November 22,2007, 14-LD-L-000002 of October 2, 2008 and 14-LD-L-000006 of December

---

[6] **Bulgarian Civil Procedure Code, Art.296** "The following decisions shall enter in force - (2) against which no appellate or cassation complaint has been filed within the term, specified by the law"

[7] **Bulgarian Commerce Act, Art.694 (8)**: "A declaratory judgement in full effect under (1) above shall be legally binding to all relations between the parties to the bankruptcy proceedings, including the debtor, the trustee in bankruptcy and all the creditors".

[8] **Bulgarian Civil Procedure Code, Art.298 (1)** "The decision shall enter into effect only between the same parties, for the same claim and for the same grounds."

29, 2009) or the Agreement of June 4, 2010 or the mortgage contracts securing said three bank loans as valid grounds for its claim on the money it paid to buy the lands of the SB project. On May 21, 2013 Fibank did file the same claims, nevertheless. See **Exhibit [55]**.

78.   Fibank's claims filed on May 21, 2013 have never been proved incontestable or subject to satisfaction in APD bankruptcy.

79.   Pursuant to Art.691[9] and Art.722 (1)(1)[10] of Bulgarian Commercial Act payment in satisfaction of above Fibank's claims may only be allowed, if said claim have been conclusively proved as incontestable (i.e. by virtue of an enforceable court judgment granting the claims in their entirety and adjudicated in a lawsuit to which APD trustee in bankruptcy has been a party). No such lawsuit was ever brought or could ever be brought for two distinct reasons: 1) the existence of Judgment No.3 entered on February 8, 2013 having a res judicata effect. See **Attachment B**: Code of Civil Procedure Chapter 23 "Effect of Judgments"; and 2) the fact that APD bankruptcy case was dismissed (Fibank claims against APD's estate were unsubstantiated). *See* **Attachment C** – Bulgarian Commercial Law, Chapter 43, Submission of Creditor Claims.

80.   Fibank's claims of May 21, 2013 were filed after the expiration of the procedural deadlines set forth in Art.685 (1)[11] and Art.688 (1)[12] of the Bulgarian Commerce Act.

---

[9] **Bulgarian Commerce Act, Article 691:** "Incontestable Claims - Claims ascertained in a declaratory judgment that has entered in full force and effect and has been delivered after the date of the court decision to open bankruptcy proceedings, to which the trustee/receiver in bankruptcy is a party, shall not be subject to appeal".

[10] **Bulgarian Commerce Act, Article 722** "Order of the Claims" **(1):** "When the cashed-in property is   allocated, the claims shall be redeemed in the following order: **1.** (amended, SG No. 70/1998, SG No. 105/2005) Claims secured by a pledge or mortgage or distraint or prohibition registered in pursuance of the procedure under the Registered Pledges Act"

[11] **The Bulgarian Commerce Act Art.685 (1):** "Creditors shall submit their claims in writing to the bankruptcy court within one month upon entry into the Commercial Registry of the court decision opening bankruptcy proceedings."

[12] **The Bulgarian Commerce Act Art.688 (2):** "Claims submitted after the term under Art. 685 (1) has expired and no later than two months of its expiration shall be entered into the list of submitted claims and shall be proceeded as set forth in the law. Claims that have arisen

81.    That crucial two-month limitation period for filing any additional claims in APD bankruptcy, apart from claims already filed and subsequently denied in case No. 82/2011, started to run on the date when Judgment No.16 of May 3, 2011 – the judgment by which the Targovishte District Court opened the bankruptcy proceeding for APD – was published on the Bulgarian Commercial Register. See **Exhibit [68]**. Said Judgement was thus published under ref.#: 20110510150602 on May 10, 2011. See **Exhibit [69]**.

82.    Fibank's May 21,2013 claims were irreversibly precluded with the expiration of the two-month limitation period set forth in Art.688 (1) of the Bulgarian Commerce Act, which expired as early as July 11, 2011; hence payment in satisfaction of such claims out of APD bankruptcy estate is unlawful. APD Bankruptcy Court was well aware of the above and never authorised any payment under Fibank's May 21, 2013 claims.

**I) APD Bankruptcy Court could not and did not find any grounds to reverse APD Trustee's decision of June 20, 2014 to refuse to comply with Fibank's May 21, 2013 payment claims based on the three bank loans and the contractual mortgages thereunder – See Exhibit [56].**

83.    Reversal of APD Trustee's decision of June 20, 2014 denying Fibank's payment claims is neither factually nor legally supported, because: 1) Fibank never contested APD Trustee's refusal and never sought from the APD Bankruptcy Court to reverse it; 2) the provisions of UNCAC, of the U.S. laws against money laundering, corruption and financial fraud with U.S. overseas capitals are a force to be reckoned with, rather than disregarded; 3) Fibank has no valid incontestable claims subject to payment in APD bankruptcy case; and 4) none of the court adjudications in APD Bankruptcy case on handling the money deposited with Corpbank authorized any of Defendants' activities carried out for the purpose of taking away The Funds for their personal gain and benefit;

84.    APD Bankruptcy Court never reversed APD Trustee's June 20, 2014 refusal.

**J) APD Bankruptcy Court found none factual or legal grounds to establish jurisdiction over: 1) the theft of the money deposited in Corpbank; 2) Defendants' liability and obligation to return the money they had taken.**

prior to the date of opening of the bankruptcy proceedings may no longer be submitted after the latter time limit has expired."

85.     APD Bankruptcy Court declined jurisdiction over this case and never examined: 1) the instructions given by the EU Court of Justice in its Ruling of September 9, 2014 in case C-488 concerning resolving the issues raised by Fibank's May 21, 2013 claims in APD Bankruptcy case, See **Exhibit [57]** and **Exhibit [58]**; 2) Ayr Trustee's requests of January 7, 2016 for investigating into the theft of the money and restoring such money, See **Exhibit [35]**; 3) APD Creditors Committee requests – the latest one filed on September 2, 2016 and concerning the measures and actions that needed to be taken in APD bankruptcy case for recovery of the money taken by the Defendants, See **Exhibit [59]**; 4) Ayr Trustee's motion requesting from the APD Bankruptcy Court to determine whether or not it had jurisdiction over the claims arising from the theft of the money; that request was made before Ayr Trustee filed the claims against the Defendants in a U.S. Court. See **Exhibit [33]**, **Exhibit [50]** and **Exhibit [51]**.

86.     APD Bankruptcy Court viewed the theft of Ayr's money from Corpbank only as the barely sufficient grounds it needed to shield the Defendants against the long arm of the law and on January 19, 2018 dismissed APD's bankruptcy case. In so doing APD Bankruptcy Court washed its proverbial hands from having to deal with the matter in Bulgaria once and for all.

87.     APD Bankruptcy Court departed from its own earlier rulings, namely: 1) Ruling No.545 of December 12, 2015 concerning the preparation of a plan for the actions and measures to be taken for restoring the money taken by the Defendants from Corpbank's accounts, See **Exhibit [43]**. APD Bankruptcy Court obviously never had any interest in taking any actions for restoring Ayr's money taken by the Defendants; 2) Ruling No.731 of November 13, 2013, See **Exhibit [60]**, and Ruling No. 735 of November 14, 2013, See **Exhibit [61]**. Apparently, the APD Bankruptcy Court had little interest in following a procedure which might have made it possible for it to look into and resolved with the issues raised by Fibank's May 21, 2013 claims.

### K) The APD Bankruptcy Court duly exercised its sovereign right when it declined jurisdiction over the case and its decision, despite his hostility to the laws, must be honored. The Bulgarian forum is not an alternative forum to the jurisdiction of the New York Court.

88.     Fibank and Harris' agreement to subject their economic interests in The Swap to the laws and the jurisdiction of the State of New York on the one hand, and annihilation of

Ayr's creditors arrangements set out in the Supplemental Agreement, on the other, make it clear that all avenues to resolving this case lead to the Court of New York.

89.     By listing Ayr as the major holder of the proceeds generated from Ayr's SB Project land as early as July 9, 2014 APD Trustee recognized the legitimacy and validity of Ayr's consolidation of the claims in the SB Project under the agreements with Ayr's creditors. See **Exhibit [62]** and **Exhibit [63]**.

90.     The Ayr Bankruptcy Court, also recognized said consolidation of claims in case No.16-03139-bjh, See **Exhibit [64]** and in case No.16-03140-bjh, See **Exhibit [65]** and **Exhibit [66]**.

91.     The Swap agreed by Fibank and Harris back in 2010 came to fruition in early December 2014 when Ayr's money at Corpbank was eventually taken away (See **Exhibit [67]**) and was the ultimate result of a number of predicate acts, such as: 1) Ayr's fraudulent filing for "No Assets" bankruptcy; 2) listing of Fibank holder of the rights to handle Ayr's money with Corpbank; 3) subsequent listing the Five Companies in Fibank's place and stead as holders of the rights to handle Ayr's money at Corpbank; 4) subsequent use of Ayr's money for discharging the debts of the Five Companies owed to Corpbank; 5) Reducing to zero and closing the APD bank accounts; 6) successful pursuit of Peevski's economic interests in the call option for Bulgartabac Holding AD; and 7) successful pursuit of VTB economic interests in the call option for Vivacom AD.

92.     Defendants' undue enrichment is the direct effect from the swap transaction abolishing Ayr Creditors' rights and economic interests.

93.     As the agreed swap of economic interests submitted the latter to the laws and jurisdiction of the New York Court, so did the agreements for consolidation of Ayr creditors' claims and economic interests. Defendants could have reasonably foreseen that their actions might hale them into the court of New York, of which Harris and Ayr warned in December 2010 (See **Exhibit [15]** and **Exhibit [16]**) and as shown in the documents on the basis of which on July 9, 2014 APD Trustee listed Ayr as the holder of the claims in APD bankruptcy case. See **Exhibit [62]** and **Exhibit [63]**.

94.     Bulgarian forum's dependency on Defendants' economic interests imprinted on a number of rulings and decisions it delivered in APD bankruptcy case so as to neutralize Ayr Trustee's powers make its crystal clear that Bulgaria is *not* the *adequate* forum where constitutional requirements of fair play and due process with respect to Plaintiffs' claims against the Defendants will be met.

**L. Payment of the price under the Swap relied on The Funds which the Defendants took away and used them to discharge the debts the Five Companies owed to Corpbank (The Peevski Plan). Arrangements for and implementation of the Peevski Plan itself that abolished Ayr creditors' economic right and interests were in breach of the laws of the State of New York and have had a direct effect in New York (NY Direct Effect)[13]**

95.     Harris and Ayr submitted the agreements for and involving SB Project's property, rights and obligations to the laws of the USA and the State of New York against corruption, money laundering and fraud, See **(Exhibit [1], Exhibit [15] and Exhibit [16]).**

96.     Relying on the facts and documents concerning the three bank loans' money being transferred to All Seas Management and Blue Finance Limited as exposed in the course of the proceedings in Case No.82/2011, on the one hand, and on Judgment No.3 delivered by the Targovishte District Court on February 8, 2013 in said case, on the other, Harris and Ayr refuted the claim that the liabilities under the three bank loans should be repaid from Ayr's SB Project funds as illegitimate pursuant to the provisions of FCPA, UNCAC and the UN Convention against transnational organized crime. **See (Exhibit [54]), Exhibit [70], Exhibit [71], Exhibit [72] and Exhibit [73].**

97.     To ensure protection of Ayr's money in the SB Project, Harris and Ayr entered in the Supplemental Agreement of November 27, 2013 expressly making the use of the money subject to the laws of the State of New York combating corruption, money laundering and fraud. Harris and Ayr instructed both APD Trustee Counsel and Chavdar Angelov to take precaution and prevent any activity that might be in breach of NY laws, warning them of the ensuing liability for using SB Project money to repay Fibank's claims under the three bank loans. **See Exhibit [74].**

98.     Cornered by the facts that 1) Fibank's claims were denied by Judgment No.3 with prejudice that APD Bankruptcy court delivered on February 8, 2013 in case No.82/2011; and that 2) Fibank failed to bring valid payment claims in APD's bankruptcy within the statutory terms, the Defendants saw in Peevski Plan a chance for Fibank to get the money it invested in the Swap back and close the deal, especially in the light of the fact that since 2011

---

[13] See Attachments (D), (E) and (F).

Fibank had been waiting for payment thereunder as agreed with Harris and Ayr, See **Exhibit [1], Exhibit [10], Exhibit [12] and Exhibit [89]** .

99.     The Peevski Plan was entirely based on and relied on two things: first, it was BNB's Resolution No.104 of August 15, 2014, which authorized anyone who had a desposit with Corpbank and owed a debt to Corpbank to repay their debt from their respective deposit in Corpbank, **See Exhibit [75],** and second on BNB's prescribed instructions of August 22, 2013 for managing the collection of each and any debt owed to Corpbank and exceeding the amount of BGN 200,000 **(See Exhibit [28]).**

100.     **The Peevski Plan.** Given that neither Ayr nor APD or Fibank had any outstanding debts to Corpbank, the Peevski Paln contemplated the use of The Funds for repayment of the debts the Five Companies owed to Corpbank. To set the Plan in motion, however, the Five Companies and Fibank had to be listed as holders of APD's bank accounts with Corpbank first in order to meet the requirements set in Resolution No.104 of August 15, 2014.

101.     Fibank and the Five Companies agreed that Fibank would transfer the title to the money in APD's bank accounts over to the Five Companies and when the Five Companies would have discharged their debts to Corpbank with The Funds, they would then become liable to Fibank as much. In return Fibank would be able to get the money agreed with Ayr and Harris under the swap. **See Exhibit [76], Exhibit [77], Exhibit [78], Exhibit [79] and Exhibit [80].**

102.     BNB and the Conservators facilitated Peevski Plan by doing the following: (1) they included Fibank on the list of entities entitled to handle The Funds on deposit in APD accounts with Corpbank (**See Exhibit [27]**); (2) they included the Five Companies on the list of entities entitled to handle The Funds on deposit in APD accounts with Corpbank, **(See Exhibit [28])**; (3) recorded the transfer of right to handle The Funds from Fibank over to The Five Companies, **(See Exhibit [29])**; (4) they caused The Funds ($54,558,843(BGN85,657,385)) to be assumed by The Five Companies to discharge the latters' debts to Corpbank, **(See Exhibit [29])**; (5) then they wrote off said Five Companies' debts along with the collaterals put up as security thereof, **(See Exhibit [29])**; (6) Reduced the residual APD accounts balances from **$11,025,192(BGN 17,309,551.59)** to zero, **(See Exhibit [31], Exhibit [67]), See Exhibit [92] and Exhibit [93]**; and (7) promptly closed APD's accounts, **See Exhibit [92] and Exhibit [93].**

103.    Defendants' actions have had a direct effect in New York and violated the November 27, 2013 Supplemental Agreement provisions. It was pursuant to the latter that APD Trustee included Ayr as APD's largest creditor in the List of Creditors of July 9, 2014, **(See Exhibit [63])**.

104.    The success of the Peevski Plan abolished Ayr creditors' rights and economic interests in the agreed payments via Deutsche Bank, NY, and thus had a direct effect within New York.

105.    The part Peevski Plan gave to Harris and Ayr was to keep The Funds away from the reach of US Bankruptcy law – a part they played well when on October 10, 2014 Harris filed for No Assets bankruptcy on behalf of Ayr with the court in Dallas, Texas. **See Exhibit [81]**.

106.    Peevski's part was to keep The Five companies (controlled by him) afloat and secure BNB and the Conservators' assistance to that end, **(See Exhibit [19], Exhibit [21], Exhibit [22] and Exhibit [32]**.

107.    What BNB and the Conservators were tasked with was to cause the arrangements made by and between Fibank and The Five Companies take effect. BNB and the Conservators did as told and caused APD's accounts to be reduced to zero and then closed as soon as The Five Companies' debts to Corpbank were discharged and written off.

108.    BTH, which controlled Tabac Market and Yurii Gagarin, AD, was tasked with providing assistance to Tabak Market,AD and Droslian Bulgaria,EAD (now renamed Asteria) in the latters' part they played in Peevski's Plan, as a result of which said companies' debts to Corpbank  - secured by said companies assets - were repaid and written off. It was crucial for BTH to bail out Tabak Market, AD and Yurii Gagarin, AD, when Corpbank initiated a forced collection of their debts some time before June 20, 2014 when BNB took over, because these two companies, being responsible for the BT brands cigarette production and distribution, were the cornerstones of BTH. So this was what BTH gained from the conspiracy. **See Exhibit [82]**.

109.    The fashion in which Peevski's Plan was implemented is a typical example of hostile and intentional interference in Ayr's agreements and arrangements based on the SB project. Interestingly enough, back in 2010 it was Harris himself acting on behalf of Ayr that warned BNB, Fibank, UniCredit and Investbank of the legal consequences of any such interference. Defendants chose to ignore the reasonably foreseeable consequences from their interference with and abolishment of Ayr Creditors' rights and interests arising from the

November 27, 2013 Agreement, namely: that sooner or later Defendants would be held liable for what they did and would eventually be haled to a New York court.

### III. Arguments against Emil Emanuilov, Lazar Tomov, Chavdar Zlatev and Svetlozar Popov's conclusions in their declarations in support of BNB's Motion to Dismiss and of Fibank's Motion to Dismiss

110.   I have reviewed and am familiar with the averments in the Amended Complaint filed in the *Rudersdal, et. al. v. Harris, et. al.* Litigation.

111.   I have reviewed and am familiar with the declaration of Lazar Tomov dated November 1, 2019, filed on behalf of BNB in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

112.   I have reviewed and am familiar with the declaration of Emil Emanuelov dated August 21, 2019, filed on behalf of Fibank in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

113.   I have reviewed and am familiar with the declaration of Chavdar Zlatev and Svetlozar Popov dated August 16, 2019, filed on behalf of Fibank in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

114.   I have reviewed and am familiar with the declaration of Philip Harris dated August 21, 2019, filed on behalf of Philip Harris in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

115.   False are the conclusions drawn in the abovementioned declarations and in the Defendants motions to dismiss. The following statements and conclusions are false: 1) that it is not BNB, but Corpbank Conservators are the ones to blame and the ones to be held liable for the damages resulting from the mismanagement of deposits at Corpbank and of debts owed to Corpbank[14]; 2) that APD bankruptcy court authorized the use of Ayr's Funds in satisfaction of Fibank's payment claims filed in APD bankruptcy case[15]; 3) that APD Creditors' were the ones to blame for the dismissal of APD bankruptcy case on account of

---

[14] Para 19, 20, 21, 22 of Declaration of Lazar Tomov dated August 30, 2019;

[15] Para 39 of Declaration of Lazar Tomov dated August 30, 2019; Section 1 (2), Section C (2) of Memorandum of BNB dated August 30,2019; Para 10 of Declaration of Chavdar Zlatev and Svetlozar Popov dated August 16,2019; Background of Memorandum of Fibank dated August 30,2019.

their failure to prepay the court-required bankruptcy costs[16];  4) that Bulgarian judiciary is independent and fully equipped to meet the constitutional requirements for due process ad fair trial[17]; 5) that Bulgarian court is the court having jurisdiction over the claims filed against the Defendants in a NY Court[18]; 6) that the causes of action underlying Plaintiffs' claims filed in NY court were so 'adjusted' as to fit in nicely to Plaintiffs' objective, which purportedly was 'forum shopping'[19]; 7) Jurisdiction over Plaintiffs' claims is restricted by the Ayr Bankruptcy court's Judgment in case# 16-3138-bjh dated May 5, 2017[20].

116.    Those false conclusions are refuted by the force of the facts, the supporting evidence and by virtue of law as shown in the next paragraphs.

117.    ***Da mihi factum, dabo tibi ius*** ('Give me the facts, I will give you law').

118.    ***Ubi culpa est, ibi poena subesse debet*** ('Where the fault is, there the punishment ought to be visited' or 'Where the crime is committed, there ought the punishment to be undergone'). BNB played a leading role in the processes of managing and administration of deposits at Corpbank, and the management and collection of debts owed to Corpbank[21] in the period following June 20, 2014. BNB's primary role in those processes is clearly demonstrated in BNB's own resolutions, its managerial decisions concerning Corpbank and the records it kept with respect to Corpbank, such as: Resolution No 104 dated August 15,2014 (**Exhibit [75]**), BNB Instructions to Corpbank Conservators of August 22,2014 (**Exhibit [28]**) and BNB-kept register of discharged debts to Corpbank (**Exhibit [29]**). BNB's distancing itself from and shifting the responsibility for the syphoning of The Funds and subsequent closing of APD's accounts at Corpbank to the Conservators who did what they did in furtherance of the very instructions BNB gave to them, if nothing else, is a

---

[16] Para 45 of Declaration of Lazar Tomov dated August 30, 2019.

[17] Para 50 of Declaration of Lazar Tomov dated August 30, 2019; Section III (B) of Memorandum of BNB dated August 30,2019; Section III (B) of Memorandum of Fibank dated August 30,2019; Section II of Memorandum of Peevski dated August 30,2019;

[18] Para 58, 61 of Declaration of Lazar Tomov dated August 30, 2019; Section IV of Memorandum of BNB dated August 30,2019; Para 10,12 of Declaration of Emil Emanuilov dated August 21, 2019; Section I, III (A) (C) of Memorandum of Fibank dated August 30,2019.

[19] Section III (A) of Memorandum of BNB dated August 30,2019.

[20] Section I of Memorandum of Fibank dated August 30,2019.

[21] See previous paragraphs 20, 24, 25, 26, 53, 91, 99, 102

flagrant example of lack of integrity, but further it's a breach of its fiduciary responsibilities and false on the part of BNB.

118-a.  Bank deposits management and debt collection for Corpbank are nothing more than manifestations of a typical commercial assets administration process, which is not and may not be deemed immune or insulated from litigation or prosecution, especially when it results in abolishment of economic rights and property[22]. In terms of international law against money laundering, corruption and financial fraud the mere act of introducing a plea of immunity from prosecution for activities that only served the economic interests of the participants in: 1) the Mexican bonds deal the money for which came from The Three Bank Loans; 2) the Swap; 3) the civil conspiracy and its *modus operandi*; 4) unauthorized use of Ayr's Funds for payment under the Swap, is taking things beyond reason.

119.    Fibank did file once a proper payment claim well within the preclusive two-month's allowable time period to file claims in APD's bankruptcy. Said claim was admitted and heard by the Targovishte District Court in Case No.82/2011. Case 82/2011 and was dismissed by Judgment No.3 entered on February 8, 2013 (**Exhibit [54]**). By said Judgment the Targovishte District Court denied Fibank's claim for payment of $63,694.00 (BGN 100,000.00) based on the Three Bank Loans, the mortgages thereunder and the June 4th 2010 Agreement. Fibank never appealed from Judgment No.3. The latter became irreversible and has a res judicata effect. Moreover, Fibank failed to file further claims in APD's bankruptcy within the two-month-preclusive time limit as set in Art.688 (1) of the Bulgarian Commerce Act.

120.    *Quod non est in actis, non est in mundo* ("What is not kept in records does not exist"). Bulgarian court did not find even a single factual or legal grounds which, if it had, but did not, might have presumably justified a court order authorizing payments in satisfaction of Fibank's claims filed in APD's bankruptcy on May 21, 2013, but that never happened nor may it ever happen for it is prohibited by: 1) Res judicata effect[23]; 2) effect of being time-barred[24]; 3) International laws against laundering money[25]. There exist, indeed, court orders made in APD's bankruptcy that address the matter of handling and expenditure of the funds kept on deposit in APD's bank accounts at Corpbank and those are: Ruling

---

[22] See previous paragraphs 28,69, 70, 71, 91, 97, 99,100, 101, 103,107, 109

[23] See previous paragraphs 72, 73, 74, 75, 76, 77

[24] See previous paragraphs 80, 81, 82

[25] See previous paragraphs 83, 84

No.38 dated January 14,2013, **Exhibit [83]**, and Ruling № 304 dated July 11,2014, **Exhibit [84]**. Allegations of the sort that the actions of disposal of APD's funds on deposit with Corpbank or their expending, and the subsequent closing of APD's bank accounts, were all actions taken in furtherance of a court order to that effect, are not only unsupported, but wrong as well.

121.   *Caecus non iudicat de colore* ('A blind man should not judge of colours"; 'A blind man does not judge color"). Dismissal of APD's bankruptcy case is the shield APD'a bankruptcy court put up to protect Defendants from Ayr's Trustee's demands in furtherance of Ayr Trustee's legitimate exercise of powers. On January 7, 2016 Ayr Trustee first addressed Bulgarian court and kept doing so seeking from the latter to open an inquiry within APD's bankruptcy proceeding into Defendants' disposing of and expending Ayr's Funds at Corpbank **(Exhibit |35|)** and cause the return of the funds so taken away. Dismissal of APD's bankruptcy case was the result of a series of procedural tricks and manoeuvres meticulously selected by the new APD's bankruptcy court, i.e. the Shumen District Court (ShDC), to which APD's case was transferred on December 12, 2013 after the Varna Court of Appeals (VCA) so ordered, thus replacing the Targovishte District Court, which Fibank found to be rather inconvenient and disobedient. **Exhibit [85]**. The Shumen District Court was aware that Defendants' actions that eventually caused APD's bank accounts with Corpbank to be closed lacked legitimacy and were never court-authorized. So, on December 2, 2015 **(Exhibit [43])** it had to acknowledge the necessity of steps to cause the return of the funds so taken away and directed Bulgarian APD Trustee to prepare and submit an action plan to that effect in a two-month term.

121-a.   For three long years the Shumen District Court's ("ShDC ") Ruling No.545 was effectuated. The ShDC did nothing to cause any remedial action to be taken, choosing to turn a blinds eye, instead, thus obstructing the return of the funds of $65,000,000 (BGN 102,946,966) Defendants had stolen. In September 2016 the VCA came to the rescue of Defendants' economic interests and took a course towards undermining Ruling No.545. The VCA first issued Ruling No.586 on September 15, 2016 **(Exhibit [46])** and then followed with Ruling No.589 of September 16, 2016 **(Exhibit [47])**, wherein the VCA pronounced that there existed no procedural rule or legal means that might have made possible an inquiry into Defendants conduct and actions, let alone making the latter return the funds the stole from APD's accounts with Corpbank.

121-b.   The VCA's adjudications as stated out in its Ruling No.586 on September 15, 2016 and in Ruling No.589 on September 16, 2016 is simply not true for several reasons: 1) On November 14, 2013 in an earlier Ruling No.735 the VCA concluded that any payment in in APD's bankruptcy satisfaction of a claim, which had never been proven incontestable, would lead to issuance of a writ of execution against the beneficiary of that payment compelling said beneficiary to return the money so received; 2) By virtue of Art.726 of the Bulgarian Commerce Act[26] (CA) uncontested claims only (see Article 691[27], *id.*) may be satisfied in the course of APD's bankruptcy.

121-c.   In Section II of her Report of June 20, 2014 (**Exhibit [56]**) APD Trustee conducted a thorough analysis of the facts that preclude payment in satisfaction of Fibank's claims filed on May 21, 2013 in APD's bankruptcy case. APD Trustee specifically highlighted the absence of any court order or determination ordering or authorizing APD Trustee to effectuate payment in advance[28] in satisfaction of Fibank's claims. Article 726 CA however explicitly prohibits advance payment in satisfaction of a contestable and unproven claim. Until such claim will have been litigated and determined incontestable as per Art.691 CA, the trustee in bankruptcy sets aside the amount of such claim in a special bank account; 2) Fibank's May 21, 2013 payment claims were precluded[29] at the time of their filing, hence those have not been and may not be determined incontestable in APD's bankruptcy. APD Bankruptcy court has never authorized any payment in satisfaction of said claims, nor may do so.

---

[26] **Article 726 of Bulgarian Comercial Act:**  "Article 726 1) For a claim litigated through the court, the adequate amount shall be set aside in the distribution account. 2) In case only the security or the privilege has been litigated, the claim shall be included as unsecured up to the settlement of the argument, the amount which the creditors would have received for a secured claim being set aside in the distribution account"

[27] **Article 691 of Bulgarian Comercial Act:**  "Not subject to objections shall be claims determined in a judicial decision in force delivered after the date of the decision for institution of the bankruptcy proceedings with the participation of the receiver in bankruptcy."

[28] Payment in satisfaction of unproven or contestable claims that fail to meet the requirements of Art.691 CA  - what the ones Fibank filed in APD bankruptcy were.

[29] Res judicata efect and Time barrier effect

121-d. When the ShDC and then the VCA blocked the taking of actions in furtherance of Ruling No.545 they actually pushed APD's bankruptcy case onto the path leading to dismissal and from that time onwards it was perfectly clear that the case would be pushed to closure for lack of assets/property of APD's estate[30], thus opening the door to the taking of Ayr's funds at Corpbank.

122.     ***Sapienti sat*** ("A word is enough for the wise"). The conclusion that APD's bankruptcy case dismissal was caused by APD Creditors' failure to prepay bankruptcy proceedings costs cannot be more wrong. Here is why: 1) it is the bankruptcy case where as a result of VCA's adjudications, namely: Ruling No.586 of September 15, 2016 and Ruling No.589 of September 16, 2016, the VCA put up a shield to protect the Bulgarian Defendants and let them walk away from their responsibility for the theft of the funds and go unpunished for their liability for the resulting damages; 2) it is the bankruptcy proceeding where for years on end the court could not cause ShDC Ruling No.545 of December 2, 2015 to be properly followed through or initiate steps against the Bulgarian Defendants and make them return Ayr's funds they had stolen; 3) it is the bankruptcy proceeding where the ShDC wielded the fee prepayment requirement – that is prepayment of the cost of taking measures against Bulgarian Defendants to make the latter return the funds they have stolen - as a tool to further push APD's bankruptcy to closure, quite contrary to Art.620 (5) CA[31] providing for an exemption from said requirement in such cases.

123.     Wrong is the conclusion that Bulgarian law is well-developed, especially in the light of the fact that:

1)     In its Ruling No.586 of September 15, 2016, as well as in Ruling No.587 dated September 16,2019, the VCA had to concede that there was a lacuna in Bulgarian law, meaning that the court had no adequate rules or legal means it could apply to cause the Bulgarian Defendants to return the funds they had stolen, hence it could only do as much as to close APD's bankruptcy case on January 19, 2018;

2)     by their adjudications the ShDC and the VCA not only obstructed the measures that might have been taken against the Bulgarian Defendants and might have caused the latter return the funds at issue, by said courts undermined the rule of law and

---

[30] See paragraphs 55, 56, 57,58, and 59

[31] **Bulgarian Commerce Act, Art.620(5):** "In respect of cases instituted for constitution of the bankruptcy estate and for avoidance actions no state fees shall be collected in advance."

rendered international laws against money laundering, corruption and terrorist financing inconsequential. The very laws on the protection of which APD Trustee relied when on June 20, 2014 **(Exhibit [56])** she refused to satisfy Fibank's payment claims filed on May 21, 2013 **(Exhibit [55])**;

3)      Causing thus APD bankruptcy case to be closed the ShDC and the VCA shut Ayr Trustee out and made it impossible for Ayr Trustee to exercise his powers, despite being fully recognized by the provisions of Art.758 CA, and demand that adequate measures be taken against the Defendants to make them return Ayr's Funds[32] they had stolen, despite the express provision in that regard set forth in;

4)      The ShDC and the VCA favoured Defendants Fibank, Mutafchiev and Minev's aspirations to have APD's case closed (Exhibit 32) once and for all failing to follow the procedure prescribed in Art.734 (1) and (2) of the Bulgarian Commerce Act[33] and in gross violation of the requirements for case dismissal as set forth in Art.735 (1)(1) and (2) (*id.*)[34]. It was in early 2016 that Defendants Fibank, Mutafchiev and Minev colluded with UniCredit Bulbank, AD[35] – which at the time was sitting on APD Creditors Committee – to push APD's bankruptcy proceeding to closure no matter what.

124.    ***Nemo judex in causa sua*** ("No-one is judge in his own cause"). Defendants' conclusion that Bulgarian forum is independent cannot be more wrong in the light of the fact that Defendants' economic interests are untouchable and above the law thanks to that very Bulgarian court where certain judges, who hold key positions in the Bulgarian judiciary and who are controlled by and accountable to none other but the Bulgarian Defendants, serve

---

[32] See previous paragraphs 37, 52, 60, 61, and 85.

[33] **Bulgarian Commerce Act, Art. 734:** "(1) The court shall convene a conclusive meeting of the creditors within 14 days after receiving the account of the receiver in bankruptcy.

(2) (amend. - SG 38/06) The meeting shall hear the report of the distribution of the amounts collected upon the conversion into cash and of the remaining unpaid claims. The meeting shall pass a resolution also of the unsellable objects from the bankruptcy estate."

[34] **Bulgarian Commerce Act, Art. 735:** (1) The bankruptcy proceedings shall be closed by means of a judicial decision, when:

1. the debts have been paid;

2. the bankruptcy estate has been depleted.

[35] See previous paragraph 54.

Defendants' economic interests and resolve in all cases in which Defendants have economic interests in the latter's favour. Key positions are ones where it is possible to: 1) orchestrate allocation of cases to certain judges who willingly serve Defendants' economic interests[36], **(Exhibit [21]), (Exhibit [32]),** (Exhibit [85]); 2) orchestrate the appointment/dismissal of Trustees and using such Trustees as a tool for achieving and pursuing Defendants' unlawful economic interests, **(Exhibit [22]), (Exhibit [86])**.

124-a.    In the course of APD bankruptcy Bulgarian Defendants wielded their influence on the individuals holding the above key judicial positions and succeeded to: 1) cause the non-convenient forum, namely: the Targovishte District Court, to be replaced by the more obedient Shumen District Court; 2) remove APD Trustee Mrs.Ganka Kolyovska who did not succumb to the pressure; 3) appoint Mr. Martin Apostolov, who had close connections to the Peevski family, the new Trustee for APD, **See Exhibit [19], Exhibit [21], Exhibit [22], Exhibit [32], Exhibit [94], Exhibit [94], Exhibit [96]**; 4) block the enforcement of Ruling No.545 of December 2, 2015 for years; and 5) caused APD bankruptcy case to be dismissed using the lack of assets in APD's Estate caused by the taking of the Funds kept at Corpbank as procedurally legitimate – at least on the face -grounds for dismissing the case.

125.    ***Cessante causa, cessat effectus*** ("When the cause ceases, the effect ceases"). APD bankruptcy case had to be dismissed in order to ensure protection of Defendants' economic interests against Ayr Trustee's actions seeking to recover Ayr's funds stolen by the Defendants. APD bankruptcy case is the only connection between the Bulgarian forum and the claims born out of the theft of Ayr's money[37] in Ayr's bankruptcy case. As soon as APD bankruptcy case was dismissed, the necessity for and the obligations of said bankruptcy proceeding to take steps for recovering the money taken by the Defendants and then hand it over to Ayr Trustee, ceased to exist. The fingerprints of Defendants' economic interests being protected by the court are all over the acts of court entered in that period, such as: 1) the Shumen District Court's failure for over three years – up until APD bankruptcy case was dismissed on January 19, 2018 – to follow the instructions of the European Court of Justice in Luxemburg (given on September 9, 2014 in case No. C-488/13) to hear and resolve the issues brought in APD's bankruptcy by Fibank's May 21, 2013 claims **(Exhibit [57]), (Exhibit**

---

[36] See previous paragraphs 62, 63 and 64.

[37] See previous paragraphs 8, 36, 37, 52, 60, 61 and 85.

[58]). By the said instructions the EU Court in Luxemburg required from APD Bankruptcy Court to apply the fundamental principles and provisions of the Bulgarian law[38] and EU law[39]; 2) the Shumen District Court disregarded and failed to comply with the instructions of Ruling No.731 dated November 13, 2013 (**Exhibit [60]**), and Ruling No.735 dated November 14, 2013 (**Exhibit [61]**). The Varna Court of Appeals required from APD Bankruptcy Court to hear and resolve the issues stemming from Fibank's May 21, 2013 claims filed in APD Bankruptcy by applying the procedure for examining and approving the draft-distribution list of APD Trustee for distributing the money from the sale of Ayr's Silver Beach Project lands.

125-a. *Non omnis error stultitia est* ("Not every *mistake* is a foolish one"). By its Ruling No.318 of July 18, 2014 (**Exhibit [87]**) the ShDC denied APD Trustee's draft distribution list for distribution of the estate money as submitted in furtherance of the VCA ruling in that regard. The ShDC blocked the process of following the September 9, 2013 instructions of the EU Court of Justice and those of the Varna Court of Appeals of November 13 and 14, 2013. By so doing the ShDC attempted to wahs its proverbial hands of its obligations arising out of the operation of: 1) the *Res judicata* effect; 2) the time barrier effect; and 3) the international laws against money laundering. By dismissing APD bankruptcy case the ShDC avoided the consequences that ensue by operation of the law, which consequences would have been unfavorable for Fibank's May 21, 2013 payment claims.

126.   **Ratio est anima legis** ("The reason of law is the soul of law"). Another false conclusion of the Defendants is that the claims brought before the New York Court fall under the jurisdiction of the Bulgarian forum. The claims brought before the New York Court originated from Ayr's bankruptcy i.e. from the theft of Ayr's funds. The theft was detrimental to Ayr creditors's interests (the Plaintiffs) and served the Swap deal between Fibank, Harris and Ayr. These claims fall within the powers of Ayr Trustee who on November 20, 2017, having obtained the approval of Ayr's Bankruptcy Court in USA, transferred the causes of action against the Defendants under the RICO Act (**Exhibit [37]**) to Ayr's creditors. According to the Bulgarian laws and the EU laws the claims lodged against the Defendants are outside the reach of the Bulgarian forum's jurisdiction.

---

[38] See previous paragraphs 22, 31, 32, 33, 34, and 35.

[39] See previous paragraphs 10, 11, 12, 13, 14, 36, 38, 39, 40, 41, 42 and 43.

126-a.  Since these claims are based on the RICO Act, they may not be brought before the Bulgarian forum for there exist fundamental bars, such as: 1) Bulgarian law does not recognize the rights of victims of corruption to bring claims for damages caused and resulting from corruption, money laundering and financial fraud[40] as such right is recognized by Art.34 and Art.35 of the UN Convention against corruption; 2) Pursuant to Art.26 (1) and (2) of the Bulgarian Civil Procedure Code (CPC) Plaintiffs may not file claims before the Bulgarian Court different from the ones filed under RICO, because such claims are within the powers of Ayr Trustee[41]; 3) the Varna Court of Appeals found no factually or legally supported grounds to determine Bulgarian jurisdiction over the Trustee's claims against the Defendants originating from Ayr's bankruptcy case and from the theft Ayr's Funds[42];

126-b.  Establishing New York as the centre of main interest[43] of: 1) the Silver Beach Project; 2) the Mexican bonds deal; 3) the swap deal between Fibank, Harris and Ayr; and 4) the consolidation of Ayr's claims, plays a key role for determining the jurisdiction over the RICO claims against the Defendants.

127.  *Imprimatur secretum veritas mysterium* ("Even when a secret is printed, the truth is always a mystery"). The RICO claims have never been brought before Ayr's Bankruptcy Court, they were first brought before the New York Court. The causes of action for these claims although born out of Ayr's bankruptcy and resulting from the theft of Ayr's Finds are outside the reach of the claims Ayr Trustee lodged against Fibank and APD in case 16-03138-bjh.

127-a.  While examining and resolving the matters of jurisdiction in case No.16-03138-bjh, Fibank being a co-conspirator in the civil conspiracy concealed certain facts and evidence concerning: 1) the connection between the swap and the civil conspiracy; 2) the participants in the civil conspiracy and their role in the conspiracy; 3) how Ayr's funds have

---

[40] See previous paragraphs 49, 50 and 51.

[41] **Bulgarian Civil Procedure Code Art.26:** "1) Parties to civil lawsuits are the persons, on who's behalf and against whom the lawsuit is being handled. (2) Except the cases provided for by a law, nobody can claim on his own behalf someone's else rights before a court."

[42] See previous paragraphs 36, 37, 52, and 61.

[43] See previous paragraphs 8, 10, 11, 12, 13, 14, 22, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, and 43.

been used for completing the swap deal; and 4) the trampling effect of Defendants' actions upon Ayr's and Ayr creditors' deal for consolidating Ayr's claims.

127-b. Fibank, which is the only conspirator that was also a party to case No.16-03138-bjh, is well familiar with these facts and evidence and quite presumptuously assumed that the truth about the civil conspiracy – its creation, its participants and their roles – would remain secret forever. Thus Fibank maliciously gained undue and unfair advantage compared to Ayr Trustee and Ayr's Bankruptcy Court in hearing and determining the matter of jurisdiction over case No.16-03138-bjh. **(Exhibit [88])**.

128. *Vere scire est per causas scire* (Truly to know is to know through their causes). The facts and evidence shown in the preceding paragraph (127-a), which are important for determining the causes of action for the RICO claims and the jurisdiction over such claims, were first discovered on May 18, 2017 **(Exhibit [10])** and then on June 9, 2017 **(Exhibit [19])**[44]. These discoveries pushed into the right direction the process of investigating the causes of action against the persons who participated in and/or enriched themselves from the civil conspiracy to steal Ayr's Funds. This investigative process supported by the discoveries made on May 18, 2017 and June 9, 2017 further expanded in 2018 to cover the additional declarations of September 6, 2018 **(Exhibit [11])** and October 3, 2018 **(Exhibit [88])**[45].

128-a. By hiding the truth about the participants in the civil conspiracy and the economic interests pursued by them, Fibank deprived the U.S. Court hearing case No.16-03138-bjh from the possibility to consider and weigh the grounds for bringing claims under RICO against the Defendants. The legal importance of these facts and exhibits, which are different from those examined by the Court for the purpose of determining its jurisdiction in case 16-03138-bjh, cannot be influenced or diminished by the Order of the U.S. Court of May 15, 2017 and therefore on November 20, 2017 Ayr's Bankruptcy Court approved the transfer of the causes of action against the Defendants to Ayr's creditors.

129. *Argumenta non numeranda, sed ponderanda sunt* (Evidence is to be weighed, not counted). The conclusion that the jurisdiction over the claims brought against the Defendants before the New York Court is fabricated for the purpose of "forum shopping" is also incorrect for the following reasons: 1) the centre of main interest of the economic

---

[44] See previous paragraphs 4 and 5.

[45] See previous paragraphs 10, 11, 12, 14, 22, 30, and 45.

interests of the participants in the Mexican bonds deal, the swap deal and the consolidation of Ayr's Silver Beach claims, although independent of each other, is in New York; 2) the organization and the manner of devising the civil conspiracy and its methods, actions and the theft of Ayr's Funds in Corpbank were directed at and committed to ensure that Fibank would get its money under the swap deal and thus this deal would be both saved and completed; 3) saving the swap deal and bringing the swap deal to an end under the operation of the civil conspiracy and with the assistance of the participants in the civil conspiracy trampled upon the consolidation deal between Ayr and its creditors and upon their economic rights and interests.

130.   ***Conditio, sine qua non*** (A condition, without which it could not be) The facts and exhibits hidden by Fibank, Harris and Ayr in case 16-03138-blh and concerning: 1) the economic interests in the swap deal; 2) the participants in the civil conspiracy; and 3) the manner of operation of the civil conspiracy; date far before the discovery of the causes of action for the claims filed by the Plaintiffs before the New York Court. On November 20, 2017 Ayr Trustee acting with the approval of Ayr's Bankruptcy Court authorized Ayr Creditors to bring such claims. Ayr's creditors becoming Plaintiffs with respect to the claims brought against the Defendants is not something they could have planned or controlled in advance. Ayr's creditors did not have the opportunity to plan and influence the facts that formed the causes of action for these claims.[46] **(Exhibit [37]).**

130-a.   Establishing New York as the centre of main interest of: 1) Ayr's Silver Beach Prokect; 2) the Mexican bonds deal; 3) the swap; and 4) the consolidation of the claims under Ayr's Silver Beach Project, follow an overall five-years-model of Harris' and Ayr's business contacts with New York. **(Exhibit [89]).**

130-b.   The credible reputation and trust in New York's financial system, New York laws and jurisdiction are equally important for such economic interests, irrespective of who is the holder of such interest – either Harris, Ayr, Harriot, Grant Capital Investment, Fibank, Minev, Mutafchiev, Angelov, All Seas Management, Blue Finance Limited or the four creditors (the Plaintiffs). **(Exhibit [1]), (Exhibit [2]), (Exhibit [10]), (Exhibit [11]), (Exhibit [15]), (Exhibit [16]).**

---

[46] See previous paragraphs 22, 24, 25, 26, 27, 28, 29, 30, 41, 47, and 48.

130-c.  There is nothing specific in nominating New York as the place of performance of the consolidation deal agreed with Ayr's creditors that might allow any reasonable grounds to treat the Supplemental Agreement differently compared to the agreements and commitments in Ayr's Silver Beach Project, the Mexican bonds deal and in the swap. **(Exhibit [15]), (Exhibit [16]), (Exhibit [74])**.

130-d.  It is not the agreements and commitments of the November 27, 2013 Supplemental Agreement, but rather Defendants' trampling upon such agreement as co-conspirators in the civil conspiracy that served the interest of Harris, Ayr and Fibank in completing the swap deal, that based the claims brought against the Defendants **(Exhibit 35)**. Ayr's creditors never had the possibility to reasonably predict and/or influence the civil conspiracy created by the Defendants and the manner of operation of such conspiracy.

130-e.  The *"Forum shopping"* argument fabricated by the Defendants is neither factually nor logically or legally supported [47]. Like Ayr's creditors Defendants had all reasonable grounds to take into account Harris' warnings made on December 3, 2010 **(Exhibit [16])**, December 15, 2010 **(Exhibit [15])** and December 1, 2013 **(Exhibit [11])** about the responsibilities and jurisdiction that would ensue if the laws of the New York against money laundering, corruption and financial fraud are breached, which in turn will affect Ayr's agreements and commitments in Ayr's Silver Beach Project.

*[The remainder of this page is left blank intentionally]*

---

[47] See previous paragraphs 69, 95 and 97.

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date   October 3, 2019                    Respectfully submitted,

Varna, Republic of Bulgaria

By:

**LIST OF CITED DOCUMENTS IN THE DECLARATION OF ZAHARI**

**TOMOV DATED OCTOBER 3, 2019**

| EXHIBIT NO. | DOCUMENT |
|---|---|
| Attachment (A) | Court Order Granting Ayr Trustee's Motion to amend the scope of employment of Attorney Zahari Tomov as special counsel pursuant to 11 U.S.C. § 327(E), Case 14-34940-bjh7, Doc 68, Filed 11/13/17 |
| Attachment (B) | Bulgarian Civil Procedure Code, Chapter twenty-three, EFFECT OF COURT DECISIONS |
| Attachment (C) | Bulgarian Commerce Act, Chapter Forty-three,  SUBMISSION OF CLAIMS |
| Attachment (D) | PowerPoint Presentation "The Birth of Swap Deal, June 4, 2010 – June 20, 2014» |
| Attachment (E) | PowerPoint Presentation "The Birth of Peevski's Plan, June 20, 2014 – October 10, 2014» |
| Attachment (F) | PowerPoint Presentation «Execution of Peevski's plan, October 10, 2014 – December 1, 2014» |
| Exhibit 1 | Certified copy of Ayr's Letter to Matthew Mateev, Chairman of the Managing Board and Executive Director of First Investment Bank AD, dated January 27, 2011 |
| Exhibit 2 | Certified true copy of Letter of Reference by Regions Financial Corporation dated December 29, 2010 in support of Ayr's Reorganization plan |
| Exhibit 3 | Certified copy of Ayr's Board Resolution dated February 4, 2011 |
| Exhibit 4 | Certified copy of Ayr's Reorganization plan for APD filed August 16, 2011 |
| Exhibit 5 | Certified copy of a notarized power of attorney by Philip Harris acting as President of Ayr as witnessed by Rhonda R. Davis, Notary of Public, State of Texas, dated July 18, 2011 |
| Exhibit 6 | Certified copy of Ayr Board Resolution dated  October 26, 2011 |
| Exhibit 7 | Certified copy of Ayr Board Resolution dated  March 7, 2012 |
| Exhibit 8 | Certified copy of Transcript of Minutes of APD Creditors Meeting held on April 17, 2012 in support of Ayr's Reorganization plan for APD |
| Exhibit 9 | Certified copy of APD Bankruptcy Court Ruling No.75 dated April 18, 2012 confirming APD Creditors approval of Ayr's Reorganization plan for APD |
| Exhibit 10 | Certified copy of Declaration of Chavdar Angelov Angelov dated May 18, 2017 |
| Exhibit 11 | Certified copy of Declaration of Jeffrey L. McClanahan dated September 6, 2018 |
| Exhibit 12 | Certified copy of Declaration of Chavdar Angelov Angelov dated October 3, 2018 |
| Exhibit 13 | Certified copy of MT 799 Swift communication exchange between Investbank, AD, the Bank of America and the National Bank of New York, NY, USA, within October 28, 2010 – January 3, 2011 |

| Exhibit 14 | Certified copy of Ayr Logistics Limited, Inc. e-mail to the Chairman of the Managing Board and Executive Director of First Investment Bank, AD Matthew Mateev, dated November 14, 2010 |
| --- | --- |
| Exhibit 15 | Certified copy of Ayr letter to the National Bank of the Republic of Bulgaria re: Investbank, AD dated December 20, 2010 |
| Exhibit 16 | Certified copy of Ayr Logistics Limited, Inc., letter of demages to Investbank, AD, First Investment Bank, AD, UniCredit Bulbank, AD, dated December 3, 2010 |
| Exhibit 17 | Certified copy of Loan Participation Notes due 2014 Series 2012-1, $150,000,000 to Corpbank dated August 7, 2012, See pages 28, 31 and page 148, Section "Facility Agreement" |
| Exhibit 18 | Certified copy of Annual Report of Bulgartabac-Holding AD, dated 2010, 2011, 2012, 2013 and 2014 |
| Exhibit 19 | Certified copy of Declaration of Tzvetan Radoev Vassilev dated June 9, 2017 |
| Exhibit 20 | Certified copy of Contract for Assignment of Receivable between EFV International Financial Ventures Limited and TCI Middle East FZE, dated November 7, 2013 |
| Exhibit 21 | Certified copy of Statement of Judge Rumyana Chenalova dated May 11, 2015 |
| Exhibit 22 | Certified copy of Statement of Trustee Daniela Kuceva dated May 11, 2015 |
| Exhibit 23 | Certified copy of APD Trustee Report dated August 15, 2016 |
| Exhibit 24 | Certified copy of Draft of Payment letter No. 9764 created by Fibank dated October 22,2014 |
| Exhibit 25 | Certified copy of Forensic Handwriting Examination on the Payment Order No. 9764 dated Oct. 24, 2014 |
| Exhibit 26 | Certified copy of Corpbank's reference in favour Fibank as an owner of APD's bank account dated December 1, 2014 |
| Exhibit 27 | Certified copy of Corpbank reference in favour The Five Companies as owners of APD's bank account dated November 17, 2014 |
| Exhibit 28 | Certified copy of BNB Instructions dated August 24, 2014 |
| Exhibit 29 | Certified copy of BNB's register of debt  payment in Corpbank after June 20, 2014 |
| Exhibit 30 | Certified copy of Order No.3-3 dated January 6, 2015 of Corpbank's Conservators |
| Exhibit 31 | Corpbank's Statement of APD's bank account dated December 1, 2014 |
| Exhibit 32 | Certified copy of Transcript of Minutes from the meeting with Attorney Tordor Nenov dated February 20, 2016 |
| Exhibit 33 | Certified copy of Transcript of Court Hearing in case No.187/2018 as held at the Varna Court of Appeals, Bulgaria, dated May 2, 2018 |
| Exhibit 34 | Certified copy of Synopsys of Case-pertinent Preliminary Rulings of The Court of Justice of the European Union to cross-border bankruptcy |

| Exhibit 35 | Certified copy of Ayr Trustee's Letter dated January 7, 2016 to APD Trustee |
|---|---|
| Exhibit 36 | Certified copy of Ayr Trustee's Letter to APD Trustee dated March 3, 2016 |
| Exhibit 37 | Certified copy of Ayr Trustee Stipulation clarifying the causes of action sold, filed July 9, 2018 |
| Exhibit 38 | Certified copy of Ayr Trustee's Complaint to the EU Commission against Bulgaria and seeking from the EC to launch an investigation of alleged breach of UN, U.S. and EU law by Bulgaria, filed February 28, 2019 |
| Exhibit 39 | Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to justice in the Bulgarian court over the past 20 years |
| Exhibit 40 | Certified copy of a"Friendly Warning" e-mail dated May 21, 2016 |
| Exhibit 41 | Certified copy of Ayr Trustee's Motion challenging the Settlement Agreement between UniCredit Bulbank, AD and First Investment Bank, AD filed June 21, 2016 |
| Exhibit 42 | Certified copy of Payment order dated November 26, 2015, by  UniCredit Bulbank, AD, paid BGN 22,520 |
| Exhibit 43 | Certified copy of Ruling No.545 dated December 2, 2015 of the Shumen District Court resuming APD bankruptcy case and directing APD Trustee to submit a report on the costs incurred for collection of accounts receivable and replenishment of APD's Estate |
| Exhibit 44 | Certified copy of Delivery and Acceptance Statement between Kota Energy, AD, and the Special Bulgarian Counsel of Ayr Trustee, dated June 24, 2016 |
| Exhibit 45 | Certified copy of Notice No.42 dated June 25, 2016 of Kota Energy, AD, for prepayment of court cost of BGN 30,000 to resume of APD bankruptcy case |
| Exhibit 46 | Certified copy of Ruling No.586 dated September 15, 2016 of the Varna Court of Appeals, holding that there existed no adequate rules or legal remedies within APD bankruptcy proceedings for investigation or forcing the parties to return the Funds they had taken away from APD bank accounts with Corpbank |
| Exhibit 47 | Certified copy of Ruling No.589 dated September 16, 2016 of the Varna Court of Appeals holding that there existed no adequate rules or legal remedies within APD bankruptcy proceedings for investigation or forcing the parties to return the Funds they had taken away from APD bank accounts with Corpbank |
| Exhibit 48 | Certified copy of Ruling No.457 dated December 16, 2016 of the Shumen District Court ordering a prepayment of court costs in the amount of BGN 60,000 |
| Exhibit 49 | Certified copy of Judgment No.5 of the Shumen District Court dated January 19, 2018 |
| Exhibit 50 | Certified copy of  Motion of Appeal filed by Ayr Trustee dated January 25, 2018 |
| Exhibit 51 | Certified copy of Cassation Complaint filed by Ayr Trustee dated July 18, 2018 |
| Exhibit 52 | Certified copy of Fibank's Statement of Claim in APD Bankruptcy proceedings |
| Exhibit 53 | Certified copy of Ruling No.728 of the Supreme Court of Cassation dated July 30, 2012 |

| Exhibit 54 | Certified copy of Judgment No.3 of the Targovishte District Court dated February 8, 2013 |
| Exhibit 55 | Certified copy of FIB's payment claim dated May 21, 2013 |
| Exhibit 56 | Certified copy of APD Trustee's Report dated June 20, 2014 |
| Exhibit 57 | Certified copy of Ruling No. 179 of the Targovishte District Court dated September 2, 2013 |
| Exhibit 58 | Certified copy of the Order of EU Court (Fifth Chamber) dated September 9, 2014 in case C-488/13 |
| Exhibit 59 | Certified copy of the Work Meeting Minutes of APD Creditors Committee dated September 2, 2016 |
| Exhibit 60 | Certified copy of Ruling No.731 of the Varna Court of Appeals dated  November 13, 2013 |
| Exhibit 61 | Certified copy of Ruling No.735 of the Varna Court of Appeals dated  November 14, 2013 |
| Exhibit 62 | Certified copy of Motion of All Seas Property 2 OOD and Asset Management EAD to APD Trustee dated July 3, 2014 |
| Exhibit 63 | Certified copy of the List of creditors of APD dated July 9, 2014 |
| Exhibit 64 | Certified copy of the Judgment against Ayr Property Development, AD, Doc.13 Filed 03/14/17, case 16-03139-bjh |
| Exhibit 65 | Certified copy of the Judgment against Ayr Property Development, AD, Doc.37 Filed 11/13/17, case 16-03140 –bjh |
| Exhibit 66 | Certified copy of the Judgment against Torier Partner Limited, Doc.27 Filed 07/19/17, case 16-03140-bjh |
| Exhibit 67 | Certified copy of APD's Bank Account Statement dated November 13,2014 |
| Exhibit 68 | Certified copy of Judgment No.16 of the Targovishte District Court dated May 3, 2011 |
| Exhibit 69 | Certified copy of Certificate of APD Creditors Committee of dated September 3, 2014 |
| Exhibit 70 | Minutes of Court Hearing dated 10 January 2013, in case No.82/2011, pages 17,18,19,20 |
| Exhibit 71 | Ayr's Notice to the Minister of Justice of the Republic of Bulgaria dated November 19, 2013 |
| Exhibit 72 | Ayr's Notice to the Prosecutor General of the Republic of Bulgaria dated November 19, 2013 |
| Exhibit 73 | Declaration of Philip Harris dated December 4, 2013 |
| Exhibit 74 | Letter of Philip Harris to Attorney Maria Nakova dated December 1,2013 |
| Exhibit 75 | Resolution of BNB No.104 dated August 15,2014 |
| Exhibit 76 | Sale of account receivable agreement between FIB and Vili Vist EAD dated June 13, 2014 |
| Exhibit 77 | Notary Notice of Corpbank to execution bank loan debt of Vili Vist EAD dated |

| | May 30, 2014 |
|---|---|
| Exhibit 78 | Notary Notice of Corbank to execution of bank loan debt of Droslian Bulgaria EOOD dated May 29, 2014 |
| Exhibit 79 | Bank Loan Agreement Droslian Bulgaria EOOD dated February 27,2013. |
| Exhibit 80 | Notary Notice of Corpbank to execution bank loan debt of Cibole Serices Incorporated Bulgaria EOOD dated June 19, 2014 |
| Exhibit 81 | Philip Harris filed Petition for Ayr Bankrupt No Assets dated October 10,2014 |
| Exhibit 82 | Resolution of BNB No.73 dated June 20,2014 |
| Exhibit 83 | Ruling of Targovishte District Court No. 38 dated January 14,2013 |
| Exhibit 84 | Ruling of Targovishte District Court No. 304 dated July 11,2014 |
| Exhibit 85 | Ruling of Varna Appeal Court dated December 12,2013 |
| Exhibit 86 | Trustee of APD Request to be removed dated July 11, 2014 |
| Exhibit 87 | Ruling of Shumen District Court No.318 dated July 18,2014 |
| Exhibit 88 | Transcript of court hearing in case 16-03138-bjh dated May 4,2017 |
| Exhibit 89 | BNB's Supervision Report to FIB for 2012 dated 2013 |
| Exhibit 90 | EU Commission approves liquidity support for Bulgarian banks June 30, 2014 |
| Exhibit 91 | Fibank Restructuring Plan dated October 31,2014 |
| Exhibit 92 | Trustee of APD reports dated April 24, 2016 |
| Exhibit 93 | Trustee of APD Report dated February 22,2016 |
| Exhibit 94 | Letter by TC-IME AD dated October 23, 2015 |
| Exhibit 95 | List of shareholder of IPK Rodina EAD |
| Exhibit 96 | Incorporate Certificate of IPK Rodina AD |
| Exhibit 97 | Incorporate Certificate of Gasproekt Jug AD |
| Exhibit 98 | Email correspondence of Chavdar Angelov with FIB dated October 2, 2009 about start of negotiation with Philip Harris and Ayr |
| Exhibit 99 | Fibank email dated October 2, 2009 to invitation of Philip Harris to start negotiation |
| Exhibit 100 | Philip Harris and Chavdar Angelov email discussion about negotiation with Fibank dated December 17, 2009 |
| Exhibit 101 | Philip Harris and Matthew Mattev email correspondence dated August 5 and 6, 2010 |
| Exhibit 102 | Letter by Syndicated Holdings LLC to FIB dated October 4, 2010 |
| Exhibit 103 | Expert Opinion of Carl F. Waid SWIFT MT 799 in support bank account Oriana Capital Partners dated November 6, 2010 |
| Exhibit 104 | Expert Opinion Colvin Financial Group of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010 |
| Exhibit 105 | Expert Opinion Wallace Financial Group, Inc. Expert Opinion of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010 |

| Exhibit106 | Philip Harris email dated December 1, 2010 about conversation with Bank of America about Swift to bank account Oriana Capital Partners |
|---|---|
| Exhibit 107 | Philip Harris email dated December 3, 2010 Message from Bank of America about Swift to bank account Oriana Capital Partners |
| Exhibit 108 | Shawn Delbridge Program Manager of Oriana Capital Partners LLI dated January 20,2011 about Swift to bank account Oriana Capital Partners |
| Exhibit 109 | Philip Harris email correspondence with Chavdar Angelov dated February 23, 2011 about Mexican bond |
| Exhibit 110 | Philip Harris email correspondence with Anthony Harriott dated February 24, 2011 about Mexican bond |
| Exhibit 111 | Declaration by Syndicated Holding LLC dated February 2011 to support Ayr's Reorganisation Plan for APD |