# EXHIBIT 18



BULGARTABAC
OPEN TO THE FUTURE

# A N N U A L   R E P O R T

## of the Board of Directors

## on the activity of

## Bulgartabac-Holding AD

## in 2014



**BULGARTABAC**
OPEN TO THE FUTURE

*Annual Management Report on the activity of Bulgartabac-Holding AD in 2014*

## 2. Development of the activity and status of the company in 2014, together with a description of the main risks faced by the company

### 2.1. Development of the activity in 2014

Pursuant to Article 5, par. 1 of the Articles of Association, the object of activity of Bulgartabac-Holding AD is: "Management of shareholdings and financial resources; foreign and domestic trade; research, engineering and production activities; participation in Bulgarian and foreign entities and in their management; intellectual property transactions".

The company was issued a durable permit No 1011 / 21 December 2004 by the Council of Ministers to carry on industrial processing of tobacco.

### 2.1.1. Tobacco buy-up and industrial processing

The processes of buy out and industrial processing of tobacco, crops 2013 and 2014, were carried out on behalf and on expense of Pleven-BT EAD.

Tobaccos were purchased at market prices by classes.

### 2.1.2. Trade in tobacco

To meet the needs of its own cigarette production for Bulgarian tobacco is a priority for the Company and therefore, the purchase of raw tobacco in the Bulgarian market conforms to the needs of Bulgartabac Group; thus, the quantities available for sale outside the Group will be limited. The external sales of tobacco entirely depend on the production needs for Bulgarian tobacco and the available quantities of such tobacco.

For the needs of cigarette production for raw tobacco, tobacco, tobacco stems and reconstituted tobacco of foreign origin are imported / supplied. The main sources for purchasing high quality large leaf Virginia and Burley tobaccos are the countries with the most developed production and international trade – Brazil, Zimbabwe, USA, Malawi, Argentina, and India. Besides, tobacco of other origin, such as Kenya, Uganda, Guatemala, Italy, etc, is purchased as well. Tobacco stems and reconstituted tobacco with good quality characteristics are bought from different countries and regions. Bulgartabac-Holding AD mediates in the overall process of purchasing the required quantities of imported raw tobacco by its subsidiaries – joint stock companies. The trade policy is directed towards achieving effectiveness of purchases and timeliness and uninterruptedness of supplies.

### 2.1.3. Manufacturing of tobacco products

Bulgartabac-Holding AD pursues an active policy of developing and improving the existing cigarettes brands and creating new ones with modern design and high quality, compliant with the latest achievements in the sphere of cigarette manufacturing for the domestic market and for export.

In 2014, activities aimed at securing cigarette manufacturing with tobacco, tobacco stems and reconstituted tobacco were carried out, as well as updating the technological documentation, implementing technological projects and projects for development of new cigarette brands for the local market and for export.



# A N N U A L   R E P O R T

## of the Board of Directors

## on the activity of

## Bulgartabac-Holding AD

## in 2013



BULGARTABAC

*Annual Management Report on the activity of Bulgartabac-Holding AD in 2013*

## 2. *Development of the activity and status of the company in 2013, together with a description of the main risks faced by the company*

### 2.1. *Development of the activity in 2013*

Pursuant to Article 5, par. 1 of the Articles of Association, the object of activity of Bulgartabac-Holding AD is: "Management of shareholdings and financial resources; foreign and domestic trade; research, engineering and production activities; participation in Bulgarian and foreign entities and in their management; intellectual property transactions".

The company was issued a durable permit No 1011 / 21 December 2004 by the Council of Ministers to carry on industrial processing of tobacco.

### 2.1.1. Tobacco buy-up and industrial processing

The processes of buy out and industrial processing of tobacco, crops 2012 and 2013, were carried out on behalf and on expense of Pleven-BT EAD.

Tobaccos were purchased at market prices by classes determined by the companies – tobacco processors, which have participated in the market.

The dynamic growth in production and the ambitious plans to strengthen its position in international markets allowed to Group to take active part in the end of 2013 and the beginning of 2014 in the buy-up campaign for Bulgarian tobacco, reaffirming its positions as a reliable and long-lasting partner for local growers.

### 2.1.2. Trade in tobacco

To meet the needs of its own cigarette production for Bulgarian tobacco is a priority for the Company and therefore, the purchase of raw tobacco in the Bulgarian market conforms to the needs of Bulgartabac Group; thus, the quantities available for sale outside the Group will be limited. The external sales of tobacco entirely depend on the production needs for Bulgarian tobacco and the available quantities of such tobacco.

Depending on the needs of the subsidiaries Bulgartabac-Holding AD conducts intra-group transactions; in 2013 total 807 tons of industrially processed tobacco were sold to group companies.

For the needs of cigarette production for raw tobacco, tobacco, tobacco stems and reconstituted tobacco of foreign origin are imported / supplied. The main sources for purchasing high quality large leaf Virginia and Burley tobaccos are the countries with the most developed production and international trade – Brazil, Zimbabwe, USA, Malawi, Argentina, and India. Besides, tobacco of other origin, such as Kenya, Uganda, Guatemala, Italy, etc, is purchased as well. Tobacco stems and reconstituted tobacco with good quality characteristics are bought from different countries and regions. Bulgartabac-Holding AD mediates in the overall process of purchasing the required quantities of imported raw tobacco by its subsidiaries – joint stock companies. The trade policy is directed towards achieving effectiveness of purchases and timeliness and uninterruptedness of supplies.



BULGARTABAC
OPEN TO THE FUTURE

# R E P O R T

## of the Board of Directors

## on the activity of

## Bulgartabac Group

## in 2012



BULGARTABAC
OPEN TO THE FUTURE

*Annual Management Report on the Activity of Bulgartabac Group in 2012*

Tobacco/tobacco stems sold by Bulgartabac Group for exports, Intra-Community supplies and domestic sales to non-related parties in 2012 amounted to 1,812 tons, and the intra-group sales of manufactured finished products – tobacco and expanded tobacco stems was 7,644 tons.

For the needs of cigarette production for raw tobacco, Virginia and Burley tobaccos, tobacco stems Virginia and Burley and reconstituted tobacco are purchased and respectively, imported/supplied. The main sources for purchasing high quality large leaf Virginia and Burley tobaccos are the countries with the most developed production and international trade – Brazil, Zimbabwe, USA, Malawi, Argentina, and India. Where appropriate and if there are economic grounds to do that, tobacco of other origin, such as Kenya, Uganda, Guatemala, Italy, etc, are purchased as well. Tobacco stems and reconstituted tobacco with good quality characteristics are bought from different countries and regions. In 2012, more than 10 thousand tons of tobacco, tobacco stems and reconstituted tobacco, were imported/supplied.

### 2.4.3. Manufacturing of tobacco products

Bulgartabac-Holding AD pursues an active policy of developing and improving the existing cigarettes brands and creating new ones with modern design and high quality, compliant with the latest achievements in the sphere of cigarette manufacturing for the domestic market.

In 2012, activities aimed at securing cigarette manufacturing with tobacco, tobacco stems and reconstituted tobacco were carried out. Technological developments and projects involving tobacco products and cigarette for the local market and for exports as well as actualization of the technological documentation were made.

In pursuance with Art. 35(c)(2) of the Tobacco and Tobacco Products Act, a list of the contents of the chemical substances of all cigarette brands sold on the domestic market was drawn up. The list was given to the Institute of Tobacco and Tobacco Products (ITTP), Markovo village.

### 2.4.4. Trade in tobacco products

### Domestic market of tobacco products

The policy pursued by Bulgartabac-Holding AD during 2012 is entirely consistent with the market conditions and is subject to the aim of increasing the volumes sold in the domestic market and achieving a growth in the company's market share.

The net revenue for Bulgartabac Group from sales of cigarettes for the domestic market, by years, is as follows:

| | |
|---|---|
| 2012 | BGN 78,496 thousand |
| 2011 | BGN 72,156 thousand |
| 2010 | BGN 60,234 thousand |

The volume of sales in the domestic market in 2012 is equal to that achieved in 2011, despite of the lower cigarette consumption with the reason being the ban on smoking in public areas that came into force in



*Translation from Bulgarian*

# A N N U A L    R E P O R T

## of the Board of Directors

## on the activity of

## Bulgartabac-Holding AD

## in 2011

\*

### 2.2.2. Trade in tobacco

#### Tobacco export

Tobacco supply in 2011 was directed mainly to tobacco dealers operating in the sector, thus on the one hand allowing the maintenance and activation of export possibilities, and on the other hand reducing significantly existing trade risks. Risks related to payment of tobacco sold were cut down to the minimum and no tobacco deliveries were made under deferred payment conditions to markets and firms at risk.

In 2011, tobaccos were sold under contracts concluded in 2009, 2010, and 2011. The export structure for this period includes also lots of crops 2008, 2009, and 2010, as also some small quantities of crop 2006. Compared with 2010, during 2011 there was a decrease in the total volume of tobacco sold to unrelated parties in terms of quantity and amount, and respectively, a decrease in the trade representation fees payable upon tobacco export.

In 2011, the total quantity of own tobacco sold for export, Intra Community Supplies and domestic sales was 882.7 tons of tobacco amounting to BGN 4,199.3 thousand.

The total quantity of tobacco sold by Bulgartabac Group to unrelated parties during 2011 was 2,083 tons amounting to BGN 10,121.7 thousand.

In 2011, the major markets of consumption of Bulgarian oriental and large leaf tobacco, outside Bulgartabac Group, are summarized in the table below:

| Export/ Intra Community Supplies and domestic sales by Bulgartabac Group, by markets | 2011 | |
|---|---|---|
| | tons | BGN'000 |
| EU | 364.8 | 1 354.8 |
| Egypt | 478.9 | 2 619.4 |
| Indonesia | 7.6 | 44.8 |
| Belarus | 157.0 | 1 709.1 |
| Switzerland | 9.9 | 82.6 |
| USA | 53.3 | 187.7 |
| Domestic market (in the country) | 1 011,5 | 4 123,3 |

**Note**: The biggest quantity of tobacco sold in the domestic market has been purchased by companies – tobacco dealers registered and operating in the territory of Republic of Bulgaria and therefore, they are intended for subsequent export or Intra-Community supplies

#### Tobacco import

For the needs of cigarette production, the Bulgartabac Group companies import Virginia and Burley tobaccos, tobacco stems and reconstituted tobacco. The main sources for purchasing high quality large leaf Virginia and Burley tobaccos are the countries with the most developed production and international trade – Brazil, Zimbabwe, USA, Argentina, Kenya and Malawi. Tobacco stems are imported mainly from China and Argentina, and reconstituted tobacco from France due to the sufficiently good quality characteristics and good trade terms and conditions. In 2011, 12,265.6 tons of raw tobacco were imported for the amount of USD 62,427 thousand and EUR 2,492 thousand. The increase in the total volume of imported tobacco in terms of quantity and price has led to a higher amount of revenue from trade



*Translati*

# A N N U A L   R E P O R T

## of the Board of Directors

## on the activity of

## Bulgartabac-Holding AD

## for 2010

The quantities of tobacco, crop 2009, purchased by Bulgartabac-Holding AD, were as follows:

Kaba Koulak            -    848 tons
Basma                  - 1 988 tons
Total                  2 836 tons amounting to BGN 11 412 thousand

The industrial processing of purchased quantities of crop 2009 was done in 2009 and 2010.

Pleven-BT AD performed the processing of tobacco, crop 2009, purchased by the Holding in pursuance of a service contract concluded between Bulgartabac-Holding AD and Pleven-BT AD. The finished products in 2010 were 2,558 tons with book value of BGN 14,270 thousand. The industrial processing ended on 09 July 2010.

During Q'4, the Board of Directors of Bulgartabac-Holding AD took a decision to replace Pleven-BT AD as a party to the contracts for manufacturing and purchasing with tobacco growers of groups Basma, Kaba Koulak and Burley varieties, crop 2010. The purchasing of group Burley started late in the year and 99 tons of raw tobacco were purchased by its end. The purchasing of these three groups of varieties was done by Pleven-BT AD in accordance with the purchase contracts concluded.

As of crop 2010, tobaccos were purchased from tobacco growers at the market prices set by each one of the certified firms. The Board of Directors of Bulgartabac-Holding AD approved the following purchase prices by classes in BGN/kg. of purchased tobacco for groups Basma, Kaba Koulak and Burley:

| Class | Burley | Kaba Koulak | Basma |
|-------|--------|-------------|-------|
| I     | 3,90   | 3,80        | 7,35  |
| II    | 2,60   | 3,10        | 4,85  |
| III   | 1,40   | 1,85        | 1,90  |

## 2.2.2. Trade in tobacco

### Tobacco export

Bulgartabac-Holding AD traditionally exports oriental and large leaf tobacco under conditions of high competition and performs its activity in selling tobacco under conditions of liberalized tobacco market. Tobacco supply is directed mainly to leading tobacco dealers in the sector, thus on the one hand allowing the maintenance and activation of export possibilities, and on the other hand reducing significantly existing trade risks. Risks related to payment of tobaccos sold are cut down to the minimum, and no tobacco deliveries are made under deferred payment conditions to markets and firms at risk.

In 2010 Bulgartabac Holding offered to the international market quantities of tobaccos, available and free to be marketed, which were successfully bound with contracts for their further sales. Despite the lower overall volume of tobacco sold in terms of quantity, and the partial sell-out of contract-bound tobaccos, the agreed higher export prices contributed to the rise of business efficiency and respectively of sales revenue. Higher average selling prices were reached (BGN 6.55/kg. of tobacco) as compared to (BGN 4.68/kg. of tobacco) in 2009. The overall quantity of exported own tobacco, Intra-Community Supplies and domestic sales to unrelated parties in 2010 was 1,194.2 tons in the amount of BGN 7 827,6 thousand.

The major markets of consumption of Bulgarian oriental and large leaf tobacco, together with their relative share in the total amount of sales, are summarized in the table below:

| Sale of tobacco owned by Bulgartabac-Holding AD, by markets in 2010 | | |
|---|---|---|
| *Market* | *Quantity (tons)* | *Relative share* |
| USA | 97.2 | 8,1% |
| EU | 758.9 | 63,6% |
| Indonesia | 267.5 | 22,4% |
| Bosnia | 32.4 | 2,7% |
| Domestic market | 38.1 | 3,2% |
| **Total :** | **1194.1** | **100,0%** |

**Note**: The biggest quantity of tobacco sold in the domestic market have been purchased by affiliates of companies – tobacco dealers registered and operating in the territory of Republic of Bulgaria and therefore, they are intended for subsequent export or Intra-Community supplies.

*Tobacco import*

For the needs of cigarette production and on the grounds of contracts of trade representation, the Holding is mediating in the overall process of purchasing by the subsidiaries of the required quantities of raw tobaccos from imports, and its activities cover the selection of tobaccos by regions and qualities, contracting, delivery and coordination of payments to sellers. Virginia and Burley tobaccos, tobacco stems and reconstituted tobacco are imported for the needs of manufacturing. The main sources for purchasing high quality large leaf Virginia and Burley tobaccos are the countries with the most developed production and international trade – Brazil, Zimbabwe, USA, Argentina and Malawi. Tobacco stems are imported mainly from China and Argentina, and reconstituted tobacco from France due to the sufficiently good quality characteristics and good trade terms and conditions. In 2010, 8,227,760.00 kg of raw tobacco were imported for the amount of USD 42,386,138.00 and EUR 1,828,180.00.

The operating results from the sales of own tobacco (exports, Intra Community Supplies and domestic sales to unrelated parties) by Bulgartabac-Holding AD at 31 December 2010 accrued as of the beginning of the year are as follows:

| Sales of own tobaccos (Exports, Intra Community Supplies and Domestic Sales to unrelated parties) by Bulgartabac-Holding AD | |
|---|---|
| 31 December 2010 | 31 December 2009 |
| 1,194.2 tons | 3,154.1 tons |
| BGN   7,827.6 thousand | BGN  14,756.1 thousand |

*Intra-Group sales of Bulgarian tobacco*

# EXHIBIT 19

**To:**     The Department of Justice
            Office of Justice Programs
            National Institute of Justice
            810 7th Street, NW
            Washington, D.C. 20531

            Pursuant to article 6, paragraph 3 of the
            UN Convention against corruption Convention

**In re:**  Case No. 14-34940-bjh-7; Adv. Proceeding No. 16-03138-bjh,
            UNITED STATES BANKRUPTCY COURT FOR THE
            NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

### DECLARATION OF TZVETAN RADOEV VASSILEV

I, Tzvetan Radoev Vassilev, declare, pursuant to 28 U.S.C. § 1746(1), under penalty of perjury under the laws of the United States of America that:

1. I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are, in all things, true and correct.

2. I am a Bulgarian citizen, with registered address: 78 Krichim Str., Sofia e-mail: antoaneta-vasileva@yahoo.com. I am fluent in both written and spoken English. I have a bachelor degree at economics and my professional carrer has been mainly in the banking sector. During the period between 2011 and 2014 I participated in the International Advisory Board of the US Atlantic Council as its member.

3. As the majority owner of Corporate Commercial Bank AD during the period between 2000 and 2003 I was Chairman of the Managing Board and Executive Director of Corporate Commercial Bank AD and during the period between 2003 and 20 June 2014 I was the Chairman of the Supervisory Board of Corporate Commercial Bank AD.

4. Acting as a person who was directly involved in the management of Corporate Commercial Bank AD for more than 14 years, I agreed to make this statement on the truthfulness of the facts detailed below.

5. I hereby issue this declaration being fully aware of and knowing that the facts I confirmed below are directly related to the claims filed by the Trustee in Bankruptcy of Ayr Logistics Limited, Inc. ("Ayr")

1

against the Defendants in Adv. Proceeding No. 16-03138-bjh, namely Ayr Property Development AD ("APD") and First Investment Bank AD ("FIB").

6. On May 30, 2017 I received a copy of the Complaint (Doc.1 filed on October 10, 2016 and Doc.7 filed on 11/04/16), a copy of APD's Answer to Plaintiff's Complaint (Doc.21, filed on January 17, 2017), a copy of FIB's Motion to Dismiss the Complaint (Doc.22, filed on January 17, 2017), a copy of APD's Memorandum in Support of the Complaint (Doc.30, February 8, 2017), which were produced to me as attachment to Request of Ref. No.388 sent by Counsel Zahari Tomov acting as the Special Bulgarian Counsel for Ayr's Trustee in furtherance of the Order issued by the United States Bankruptcy Court for the Northern District of Texas on May 10, 2016 in case No. 14-34940-bjh-7, of which Order I also have a copy.

7. I hereby issue this Declaration in response to Counsel Tomov's request made in his Letter of Ref. No.388 for disclosing the truth and declaring the facts known to me regarding the money transactions from the bank accounts opened by the Trustee in bankruptcy of Ayr Property Development AD ("APD") in Corporate Commercial Bank AD ("CCB"), as follows:

- CCB was the highest bidder and won the auction for choise of a bank where to deposit the monetary funds from the bankruptcy estate, organized by the bankruptcy court and the Trustee of APD, case No 14/2011 by the docket kept at the Targovishte District Court;
- The contract was signed with the approval of the bankruptcy court on 14 January 2013;
- By 20 June 2014 the interests from APD's deposit were accumulated monthly at separate accounts with APD as their holder, and for the whole period CCB paid in favor of the bankruptcy estate more than 6 mln. BGN (Bulgarian leva).
- After 20 June 2014 CCB's management was undertaken by the National Bank of Bulgaria, through the appointed liquidators.

8. On 20 June 2014 CCB was put under special survey lance by the Bulgarian National Bank, which was as a response of my refusal to fulfill the request of the Movement for Rights and Freedoms, the political party whose support was given for the establishment of the Government in power by this moment, to transfer part of the business activities and business companies financed by the bank, to persons, specified by the Movement's active member and Member of the Parliament – Delyan Peevski.

9. In the middle of June 2014 CCB was under the organized attack by the Government, Prosecutor's Office, media, as a result of which more than 1.2 bln BGN were withdrawn. In order to keep its payment balance, CCB needed a temporary state aid, which was denied by the Government and the management of the bank was undertaken by the National Bank.

10. During the same period: 20 – 23 June 2014, First Investment Bank AD (FIB) also fell into a serious liquid crisis. With the support of the Movement for Rights and Freedoms, the Government saved FIB from going bankrupt by granting it for this purpose state aid in the amount of 1.2 billion BGN.

11. Despite the financial aid approved by the European Commission in support of the rescue plan for the banking sector in Bulgaria, in total amount of 3.5 billion BGN, CCB was denied participation in this rescue plan with the purpose of bankrupting the bank and stealing its assets and the business financed by the bank. The whole process was performed under the survey lance of the Bulgarian National Bank and with the active participation of the liquidators appointed by it.

12. Cibole Services Incorporated Bulgaria EOOD, Droslian Bulgaria EOOD and Tabac Market AD are companies connected with Delyan Peevski.

13. To my knowledge and according to the publications Cibole Services Incorporated Bulgaria EOOD, Droslian Bulgaria EOOD, Tabac Market AD and Bulgartabac Holding AD are all consolidated in the portfolio of the company TGI Middle East FZE, incorporated in Dubai, UAE. Bulgartabac Holding AD is a public company which sales shares at the Sofia stock exchange.

14. TGI Middle East FZE refinanced a debt of Livero Establishments, a Liechtenstein company, based on an agreement signed on 11 July 2013 with EFV International Financial Venture Limited, a company incorporated in the British Virgin Islands, pursuant to which agreement EFV transferred monetary accounts receivable in total amount of 45 414 388 Euros from Livero Establishment, incorporated in Liechtenstein, which funds had been used for payment under the privatization agreement for Bulgartabac Holding AD.

   * Livero Establishment was the owner of BT Invest, a company incorporated in Vienna, Austria, holder of nominal 80% of the capital of Bulgartabac Holding AD, acquired under a privatization agreement signed with the cooperation and under the control of the Movement for Rights and Freedoms. Soon after TGI Middle East FZE acquired the shares from Bulgartabac Holding AD, Livero Establishment was declared in liquidation.

15. The mechanism as a result of which TGI Middle East FZE acquired the ownership over the tobacco monopolist, is an example of a hidden privatization of the tobacco monopol controlled by the Movement for Rights and Freedoms, which is in violation of the rules for stock exchange. British American Tobacco, who was asked in 2011 to withdraw from participating in the privatization of Bulgartabac Holding AD, now in 2017 will pay for only several of the commercial brands cigarettes owned by Bulgartabac Holding AD the amount of 100 mln Euros, which is entirely comparable amount with the price for which the tobacco monopol was privatized.

16. After the closure of CCB on 20 June 2014, through Delyan Peevski TGI Middle East FZE managed to consolidate also Technomarket AD, a company indebted towards CCB for 30 mln Euros. Once again this debt was written off from the accounting balance of the bank by CCB's liquidators.

17. During the short period from CCB's closure up to the end of year 2014, TGI Middle East FZE, with the aid of FIB and Delyan Peevski managed to achieve consolidation of the business assets and the

3

market share held by the following companies controlled by DelyanPeevski and the Movement for Rights and Freedoms: Cibole Services Incorporated Bulgaria EOOD (shareholder in Technoexportstroy AD, a Bulgarian construction company having business in Iraq, Libya and African countries), Droslian Bulgaria EOOD, Tabac Market AD and Technomarket AD, as well as the tobaccomonopolist Bulgartabac Holding AD. Thus Peevski, through TGI Middle East FZE, became the biggest "foreign investor" in Bulgaria without investing a single cent.

18. FIB managed to avoid bankruptcy thanks to the support and financial aid granted by the Government and the Movement for Rights and Freedoms, and became the main financial partner and crediting bank for the business conveyed by the companies indebted to CCB and consolidated by TGI Middle East FZE.

19. What is the exact distribution of the 102 964 238 BGN transferred by FIB from APD's accounts in CCB, between FIB and the companies consolidated by TGI Middle East FZE, I am not aware. I am not aware whether FBI and TGI Middle East FZE have undertaken any obligation for certain amounts and in what distribution, if any, to compensate Ayr Logistics Limited Inc and Ayr Property Development AD, and their creditors respectively, for the 102 964 238 BGN transferred from APD's accounts in CCB in favor of Droslian Bulgaria EOOD, Cibole Services Incorporated Bulgaria EOOD, Tabac Market AD, PromishlenoStroitelstvo Holding AD, ViliVist AD.

20. I declare under penalty of perjury under the laws of the United States of America (28 U.S.Code §1746) that the foregoing is true and correct.

I, the undersigned, drew up and signed this Declaration in English on the date and place shown below and delivered its original to the Special Bulgarian Counsel for Ayr Trustee Attorney Zahari Tomov.

Beograd, Serbia
Date: June 9, 2017                    DECLARED BY:

                                      TzvetanRadoevVassilev

                    *Tzvetan Vassilev*

4

# EXHIBIT 20

## CONTRACT
## for Assignment of Receivables

Today, 07/11/2013, the present contract is concluded by and between the parties hereafter specified for the assignment of a money receivables (hereinafter referred to as the **"Contract")**

**"EFV International Financial Ventures Limited"**, having its registered office at Trident Chambers, Wickham's Cay 1, Road Town, Tortola, British Virgin Islands, with company number 345007, represented by its Corporate Director Jargo Limited, duly represented by Mr. Walter Stresemann,

shortly referred to as the *Assignor,* on one side, and on the other

**"TGI Middle East FZE"**, registered under № 159063 on 14.05.2013 in the Registry of Dubai, OAE, Jebel Ali Free Zone, with address of management at P.O. Box 40992, Dubai, UAE, represented by its Director - Mr. Ventsislav Cholakov,

referred to as the *Assignee*

(The Assignor and the Assignee jointly referred to as *"Parties"*, whereas each one separately as *"Party"*)

*The Parties hereby agree on the following:*

### Subject of contract

**1.** Through the present contract, the Assignor („EFV International Financial Ventures Limited") herewith assigns, fully and for consideration to the Assignee TGI Middle East FZE"), its money receivable from the debtor Livero Establishment, registered under № FL-0002.373.383-3 on 27.05.2011 in the Companies Registry in Lichtenstein, with domicile and address of management in Ruggell, 9491 Industriestrasse 26, Liechtenstein (hereinafter referred to as the *"Assigned Receivable"* or solely as the *Receivable*).

### Assigned receivable

**2.** The Assigned receivable at the total amount of EUR 45 414 388 (forty five million four hundred fourteen thousand three hundred eighty eight euro), out of which EUR 38 613 593 principal and EUR 6 800 795 interest as of the time of signing of this Contract, as the Receivable has arisen on the grounds of the following loan agreements, signed between the borrower Livero Establishment and the lender (assignor) „EFV International Financial Ventures Limited", and namely – *(i)* loan agreement dated 23.09.2011 for the amount of EUR 59 000 000, for a term of 3 (three) years, at annual interest at the amount of 4 % for the first six months and 8 % for the remainder the loan term, *(ii)* Annex to loan agreement, signed on 23.09.2011 dated 19.06.2013 for a term of 3 (three) years, at annual interest at the amount of 4 % for the first six months and 8 % for the remainder the loan term, *(iii)* loan agreement dated 10.07.2012, for a term of 3 (three) years, at annual interest at the amount of 4 % per year, *(iv)*



Annex to Loan agreement, signed on 23.09.2011 dated 20.12.2012 for a term of 3 (three) years, at annual interest at the amount of 4 % for the first six months and 8 % for the remainder the loan term.

2.1. The above receivable shall be assigned by the Assignor to the Assignee together with all interest, security (established pledges and/or others) and/or other appurtenances to the Receivable, as well as all interests due (accrued), but not paid till the moment of the transfer and with all future interests.

2.2. The assignment of the Receivable shall be deemed executed as of the time of signing the present Contract by the Parties.

## Price of the assignment (the cessation) and manner of payment

**3.** The Assignor shall assign its Receivable to the Assignee for a price of **EUR 45 414 388 (forty five million four hundred fourteen thousand three hundred eighty eight euro)**, payable in 10 (ten) business days term, as of signing of this Contract, in the bank and bank account of the Assigner.

**Bank: Coutts & Co Ltd**
**Stauffacherstrasse 1**
**8022 Zurich**
**Switzerland**
**IBAN: CH3408620110831172001**
**Swift: COUTCHZZ**
**Receiver: „EFV International Financial Ventures Limited"**

3.1. The Assignee shall not owe any interest until the expiry of the term under item 3 above, whereas it may pay the price for the Assigned Receivable before term (before the final term). Following the expiry of the term under item 3, should the price for the Assigned Receivable is not paid, the Assignee shall owe an interest for delay amounting to the three-month Euribor, increased by 10 points on the not-paid price.

3.2. The payment of the price shall be deemed executed at the time of crediting the above bank account with the due amount.

3.3. After paying the price, the Assignor warrants that he shall deem settled all rights and obligations with the Assignor with reference to this Agreement, as well as with the debtor of the Assigned Receivable- Livero Establishment.

## Obligations of the Assignor

**4.** The Assignor undertakes to notify the debtor "Livero Establishment" for the Assigned Receivable within five working days as of signing of this Contract and payment of the price under item 3 above, by sending to the debtor a written notification for the executed assignment (cessation), wherein it shall specify the Assignee ("TGI Middle East FZE") as the new creditor (recipient) of the Receivable.

**5.** The Assignor undertakes to submit to the Assignee all written documents substantiating the Receivable, in original, within five working days term, as of signing of the Contract.

**6.** The Assignor („EFV International Financial Ventures Limited") shall be liable for the existence of the Receivable described in item 2 of the present Contract at the time of assignment thereof. The Assignor shall not be liable for the solvency of the debtor "Livero Establishment".



**7.** As of the time of signing the Present Contract hereof the Assignor is obligated not to make any disposal actions with the transferred Receivable under the Present Contract.

### Governing law and jurisdiction

**8.** For issues not settled in the present Contract, the provisions of the effective legislation of Lichtenstein shall apply.

**9.** Any dispute as to the interpretation and/or performance of the present Contract shall be settled through agreement by the Parties and in the absence of agreement, the dispute shall be referred for resolution to the competent court in Lichtenstein, as per the applicable Lichtenstein procedural law.

### Additional provisions

**10.** The Parties hereby undertake not to disclose to third persons information regarding clauses of the present Contract and/or the performance thereof, whereas they shall deem the Contract confidential, except for the cases and/or persons stipulated by the law.

**11.** The present Contract shall take effect and be binding for the Parties as of the time of signing hereof.

**12.** Any subsequent amendment and/or addition to the contract shall have effect for the Parties if executed in writing and signed by them.

**13.** The present Contract is an integral part of the Framework Contract for acquisition of shares (Founder's Rights) and acquisition of receivables, signed on the date 07/11/2013, between the assignor "Panim Foundation" and the Assignee "TGI Middle East FZE" ("the *Framework Contract*"), as for the matters not settled in this Contract the provisions of the Framework Contract shall be applied.

The present Contract was drawn up and signed by the Parties in two identical copies, each in English language, one for each Party.

**ASSIGNOR:**
(„EFV International Financial Ventures Limited")

**ASSIGNEE :**
("TGI Middle East FZE")

TGI Middle East FZE
P. O.Box: 40992
Dubai, U.A.E.



**GRUNDBUCH- UND
ÖFFENTLICHKEITSREGISTERAMT
FÜRSTENTUM LIECHTENSTEIN**

# ÖFFENTLICHKEITSREGISTER-AUSZUG

| Registernummer | Rechtsnatur | | Eintragung | Löschung | Übertrag | |
|---|---|---|---|---|---|---|
| **FL-0002.373.383-3** | **Anstalt** | | 27.05.2011 | | von:<br>auf: | 1 |

Alle Informationen

| Ei | Lö | Firma bzw. Name | | Ref | Sitz |
|---|---|---|---|---|---|
| 1 | | **LIVERO Establishment** | | 1 | Ruggell |

| Ei | Lö | Anstaltsfonds | Liberierung | Anstaltsanteile | Ei | Lö | Repräsentanz/Zustelladresse |
|---|---|---|---|---|---|---|---|
| 1 | | CHF 30'000.00 | CHF 30'000.00 | | 1 | | c/o FIBEKO Treuhandanstalt<br>Industriestrasse 26<br>9491 Ruggell |

| Ei | Lö | Zweck | Ei | Lö | Geschäftsadresse |
|---|---|---|---|---|---|
| 1 | | Anlage und Verwaltung von (eigenem) Vermögen aller Art inklusive Immobilien,<br>Übernahme und Halten von Beteiligungen an Unternehmen oder anderen Rechten;<br>der Betrieb eines nach kaufmännischer Art geführtes Gewerbe ist in jedem Fall aus-<br>geschlossen. | | | |

| Ei | Lö | Bemerkungen | Ref | Statutendatum |
|---|---|---|---|---|
| | | | 1 | 26.05.2011 |

| Ei | Lö | Besondere Tatbestände | Ref | Publikationsorgan |
|---|---|---|---|---|
| | | | 1 | Landeszeitungen |

| Ei | Lö | Zweigniederlassung (en) | Ei | Lö | Zweigniederlassung (en) |
|---|---|---|---|---|---|
| | | | | | |

| Zei | Ref | TB-Nr | TB-Datum | Zei | Ref | TB-Nr | TB-Datum |
|---|---|---|---|---|---|---|---|
| SCR | 1 | 13695 | 27.05.2011 | | | | |

| Ei | Ae | Lö | Angaben zur Verwaltung | Funktion | Zeichnungsart |
|---|---|---|---|---|---|
| 1 | | | Hasler, Markus Manfred, StA: Liechtenstein, 9491 Ruggell | Mitglied des Verwaltungsrates | Einzelunterschrift |
| 1 | | | Kranz, lic.iur. Michael, StA: Liechtenstein, 9491 Ruggell | Mitglied des Verwaltungsrates | Einzelunterschrift |

Vaduz, 27.05.2011 11:42 AA



Beglaubigter Auszug:

Arno ABERER

Dieser Auszug aus dem Öffentlichkeitsregister des Fürstentums Liech-
tenstein hat ohne die nebenstehende Originalbeglaubigung keine Gül-
tigkeit. Er enthält alle gegenwärtig für diese Firma aktuellen Eintragun-
gen sowie allfällig gestrichene Eintragungen. Auf besonderes Verlan-
gen kann auch ein Auszug erstellt werden, der lediglich alle gegenwär-
tig aktuellen Eintragungen enthält.

# CERTIFICATE OF INCUMBENCY

NAME OF COMPANY:  EFV INTERNATIONAL FINANCIAL VENTURES LTD

INCORPORATION DATE:  23rd September, 1999

COMPANY REGISTRATION NUMBER:  345007

AUTHORIZED SHARE CAPITAL: US$50,000.00 divided into 50,000 shares with a par value of US$1.00 each

STATUS OF THE COMPANY:  Good Standing

The Company was automatically re-registered as a Business Company under the BVI Business Companies Act on January 1, 2007.

| **CURRENT DIRECTORS** | **DATE OF APPOINTMENT** |
|---|---|
| Jargo Limited | 22nd June, 2009 |
| Authorized to bind the company by sole signature | |
| Walter Stresemann | 15th September, 2009 |
| Authorized to bind the company by sole signature | |

| **CURRENT SHAREHOLDER** | **NO. OF SHARES HELD** |
|---|---|
| Lorrell Ltd | 1,000 |

We, Trident Trust Company (B.V.I.) Limited, being the Registered Agent/Registered Office of the above Company, at Trident Chambers, Wickhams Cay 1, P.O. Box 146, Road Town, Tortola, British Virgin Islands, hereby certify that according to our records the above information is correct.

**ROAD TOWN, TORTOLA**
**BRITISH VIRGIN ISLANDS**

Dated the 8th day of February, 2013.

Authorised Signatory
For and on behalf of
TRIDENT TRUST COMPANY (B.V.I.) LIMITED
Registered Agent

## APOSTILLE

(Convention de La Haye du 5 octobre, 1961)

1. Country                                : British Virgin Islands

This public document

2. Has been signed by                     : Gail Carrington

3. Acting in the capacity of              : Notary Public

4. Bears the Seal/Stamp of                : Gail Carrington

## CERTIFIED

5. At                                     : Road Town, Tortola

6. On                                     : The 8th day of February, 2013

7. By                                     :  **Deputy Governor**

8. No.                                    :  6271055

9. Seal/Stamp                             : 

10. Signature

**Deputy Governor**

I, Gail Carrington, Notary Public of SAMUELS RICHARDSON & CO., 2nd Floor, Wattley Building, P.O. Box 3410, Road Town, Tortola, British Virgin Islands, duly admitted and sworn in the British Virgin Islands, do hereby certify and confirm that the signature which appears on the attached Certificate of Incumbency dated February 8, 2013 of **EFV INTERNATIONAL FINANCIAL VENTURES LTD** ("the Company") is that of Lyntai M. Abraham, who is a duly authorised representative of Trident Trust Company (B.V.I.) Limited, Registered Agent of the Company.

Dated this 8th day of February, 2013.



Gail Carrington
Notary Public
British Virgin Islands



# EXHIBIT 21

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number 06/15 02

TRANSLATION FROM BULGARIAN TO SERBIAN LANGUAGE

(*Seal: Milijan Popov, court interpreter for Bulgarian language, Belgrade*)


OPINION


of Rumiana Metodieva Chenalova
Judge of the Court of the City of Sofia


It is my goal to hereby illustrate, through certain facts, the events and codependences, the existing perversities and grave erosions of values in the social life, and particularly the judicial system of Republic of Bulgaria. My motive for doing so is my perception of justice and my belief that tacit acceptance of reality is a mere social instinct and a spiritual death. I am aware of the risks involved, but am also aware that the truth should be told in due time. Everything else is mere hypocrisy and fear.

A part of the problems related to the judicial system is possibly rooted in the manner of appointment of staff in the judiciary – through the High Judicial Council. A part of members of the High Judicial Council come from the parliamentary quota, which brings into serious doubt their objectivity and impartiality. Election of members from the rank of judges, public prosecutors and investigators was preceded by an organized lobbying for particular individuals. It was made known to the public through the media that delegate assembly of public prosecutors from the Plovdiv judicial area was organized informally, by means of telephone conversations. Due to incomprehensible reasons, the public prosecutor Rumen Boev, who became later on an elected member of the High Judicial Council, and a part of the group surrounding the Attorney General failed to suffer any consequences of their lobbying activities, as opposed to some other public prosecutors. I have learnt personally from the former President of the Court of the City of Sofia that members of the High Judicial Council were determined in advance and approved by members of the Government. It would suffice to search the minutes from sessions of the High Judicial Council in order to see that its decisions are basically influenced from the positions of the Attorney General and president of the Supreme Administrative Court Georgi Kolev.

The unprincipled position of members of the High Judicial Council in comparison with other identical cases is a sufficient example of a lack of autonomy and independence of members of the High Judicial Council. Moreover, minutes from its sessions clearly show a tendency to maintain formality in decision-making, which seriously affects the rights of particular magistrates and the magistrate community. What lacks is a debate in the disputed cases, voting is predestined by the existence of two main groups within the High Judicial

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH    broj / number 06/15 02

Council – the one of the Association of Judges and the other surrounding the Attorney General.

**Remark of the court interpreter[1]**: the back of the 1st page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Bond between the 1st and 2nd page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

2 (two) signatures: Fani Shutova, signed by her own hand.

As a proof of the aforesaid, I shall take the liberty of stating the obviously different position of members of the High Judicial Council with respect to the so-called *removal from duty*, within the meaning of the *Act on Judicial Authority* of Republic of Bulgaria, article 232, which represents a serious mandatory measure in the sense of the right to employment warranted for by the Constitution.

In cases where there is a proposal for disciplinary removal from office made by the disciplinary council that is elected randomly, the *Act on Judicial Authority* provides for an option of filing a request for removal from office of a magistrate for the period of up to 6 months. Review of such proposal and the decision upon it compels the High Judicial Council to make a serious evaluation in terms of several circumstances – whether a particular disciplinary council has been authorized to make such a request; whether the violation at hand is a disciplinary violation under the *Act on Judicial Authority* of Republic of Bulgaria; whether the nature thereof requires the magistrate to be deprived of the right to exercise judicial authority; and whether the principle of proportionality has been maintained between the social interest and the right of the magistrate. Upon the proposal of the disciplinary council, the High Judicial Council has rendered in the disciplinary case number 33/2014, which was later on adjoined with disciplinary case number 1/2015, the decision on my removal from duty for the period of six months. The fact that the disciplinary council was composed from the ranks of persons having filed the proposal for initiation of the disciplinary proceeding was ignored. This has breached the fundamental principles of the administrative procedure. It was also ignored that two alleged violations do not justify the removal from duty as an adequate disciplinary measure and that ordering of the maximum six-months period has had no grounds or motive. It was after the rendering of such decision that I have realized

---

[1] This is the remark of the court translator who made the translation from the original document made in Bulgarian to Serbian language.

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number 06/15 92

that appointment of members to the High Judicial Council was made informally – upon the verbal instructions of the Attorney General and the president of the Supreme Administrative Court – and that it was motivated by the fact that such actions of the High Judicial Council shall look nice in the then forthcoming report of the European Commission. Irrespective of the fact that such a decision affected my constitutional rights, I was not even informed thereof, nor was the review of the proposal published as a part of the agenda of the High Judicial Council's session. This kind of approach to deciding on the faith of a magistrate is impermissible, not only from the legal standpoint, but also with a view to the principles of ethics and equity, and humanity in general.

The position of the High Judicial Court was completely different in the case of a proposal filed by the Attorney General for removal from duty of the president of the Court of the City of Sofia. First of all, the Attorney General has himself informed judge Janeva on his forthcoming actions, and that she shall be summoned by the High Judicial Council for examination on the day of review of the proposal. Moreover, that proposal was based upon the underlying launching of a criminal proceeding, which treats explanations – or examinations – as a procedural and investigative action that may not be undertaken by an employee of judiciary.

**Remark of the court interpreter**: the back of the 2<sup>nd</sup> page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Bond between the 2<sup>nd</sup> and 3<sup>rd</sup> page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

2 (two) signatures: Fani Shutova, signed by her own hand.

All actions undertaken by the High Judicial Council were pre-agreed between Janeva, Georgi Kolev and Attorney General.

Removal of the President of the Court of the City of Sofia has made an impression that the High Judicial Council acts without any compromises and equally towards everyone. The real goal was to prevent Janeva from becoming the accused in the *Chervei* (*Worm*) case, which was surrounded by tension created in the public. A day later, the Attorney General has stated before the students of the University in Veliko Trnovo that perpetrations made by the

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH        broj / number 06/15.02

President of the Court of the City of Sofia are not all that serious. This was followed by the opinion of the member of the High Judicial Council, Rumen Boev, that removal from duty caused by initiation of a criminal procedure violates materially the rights of the removed magistrate, wherefore the law must prescribe a deadline for it. A similar opinion was not repeated when another magistrate was removed from duty on the same grounds.

The abovementioned circumstances are only a minuscule fragment of numerous examples of unprincipled standpoints assumed by the High Judicial Council in decision-making, which is an ultimate indicator of selective positions on the matters of principle in terms of different issues, cases and individuals. The underlying reason for that is rooted in the obvious dependence of the High Judicial Council upon the political conjuncture of the state and the guidelines of behavior set by persons being the major official duty incumbents – the Attorney General and the President of the Supreme Administrative Court. Their interests are not personal in nature, but are in line with the interests of the economic oligarchy or the representatives thereof. In relation thereto, I shall invoke what I have realized myself during the discussions with the President of the Court of the City of Sofia on the systematically organized meetings with the Member of the Parliament, Delyan Peevski, Attorney General and President of the Supreme Administrative Court. Those meetings were to determine the events to come, including the actions of the High Judicial Council, faiths of magistrates, developments in individual cases and people's faiths – all with the aim of making an economic and political influence.

I have knowledge on the existing permanent weekly contacts that were maintained between the President of the Court of the City of Sofia and the MP Delyan Peevski, as well as on the links of the latter with the Attorney General of Republic of Bulgaria. Such meetings are related to assignments and decision-making in particular cases. In that sense, in cases known as *KTB, TV7, Bolkan News, Petrol, TCM* and others, the president of the court has made certain requests towards D. Peevski, using thereby the dependence of judges to whom those cases were distributed - that involved unresolved disciplinary proceedings, sending out to business trips, warnings of alleged checkups of particular judges by DANS - the State Agency for National Security followed by promised patronage by Peevski and Attorney General. This was conducted through an attorney at law, who served as an intermediary, who has contacted with the attorney of Peevski being introduced as Sasho. It is essential to state that interests of Peevski come down to particular cases and the outcome thereof. In fact, the goal is to suck out the monies from the First Investment Bank through the court files involving it.



OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number 06 15 02

**Remark of the court interpreter**: the back of the 3<sup>rd</sup> page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Bond between the 3<sup>rd</sup> and 4<sup>th</sup>page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

2 (two) signatures: Fani Shutova, signed by her own hand.

In the case known as *KTB* there was a previous preparation made with respect to the motion for launching of the bankruptcy procedure and the date of filing thereof. Distribution of the court case was not made randomly, nor was the selection of the *questor* of KTB and the bankruptcy manager. I have learnt myself from Janeva and her intermediary that it was the interest of Peevski to purchase for peanuts the assets of KTB through the furtherance of the bankruptcy proceeding over the bank, and that the launching of the criminal proceeding was made under the auspices of the Attorney General with the aim of realization of the Peevski's plan. This kind of control was also exercised in case of the appeals filed upon the refusal of the Registration Agency of Republic of Bulgaria to make certain registrations that concerned Peevski. In practical terms, his goal was to acquire, with intermediation and realizations made by the President of the Court of the City of Sofia, the total control over the distribution of court files in line with Peevski's requests and financial favoring. One of his primary goals was to assume control over the firms close to Tzvetan Vassilev and to ruin them. In practice, this was done through the control of outcomes in the proceedings pending on petitions or appeals against the refusals by the Registration Agency and motions for cessation in line with the Bulgarian *Commercial Act*, article 536. The control over judges was exercised by means of suggested checkups of criminal records and checkups by DANS - the State Agency for National Security.

In case of a refusal to act upon the issued instructions, or a danger of disclosure thereof, the individual concerned would be discredited. That way, there was no reaction to a grave interference with the impartiality of the judicial system after the announcement of the *Belvedere* case by the French ambassador. At the same time, after the statements of the Prime Minister in relation to the *Worm* case, the High Judicial Council has urgently declared that to be an impermissible interference with the work of the Public Prosecutor's Office, being the only one entitled to evaluate who is to be summoned as an accused and convicted by the court. Moreover, it turned out, according to the statement of Attorney General, that violations made in the process of dissolution of the Court of the City of Sofia in course of the Worm

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number

case have been known to him as of November 2014. At the same time, up until the month of January 2015 the High Judicial Council was not convened, nor were the perpetrators prosecuted. However, in the *Belvedere* case, the actions of the High Judicial Council were swift. Launching of the disciplinary proceeding; launching of another disciplinary proceeding for the checkup illegally performed by a member of the High Judicial Council close to Attorney General, Galya Georgieva. Removal from duty on account of filing of the proposal for disciplinary removal from duty for the following violations - applied in the *Octopus* case, two minutes from the court hearings signed only by the president and secretary, and lack of the decision on the request for removal of security measures in the case currently pending before SAS[2].

**Remark of the court interpreter**: the back of the 4th page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Bond between the 4th and 5th page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

2 (two) signatures: Fani Shutova, signed by her own hand.

The coalescence of the judicial with political authorities is obvious, so as is the employment of various methods of control and repression against a potential source of information, aimed at its discrediting. Alongside with that, the court is being used for dissolution and destruction of companies and banks, financial favoring through distribution of commissions, control of competing firms or individuals and seizure of their properties. In practice, the justice has become leverage for control, extortion, intimidation and annihilation in the interest of certain political figures using the newly established methods of redistribution of wealth and economic interests. In the nineties there were racketeering and blackmail. Today, unfortunately, the court enactments determine new owners of some of the most prominent commercial enterprises and their assets. It is gruesome that this happens in the circumstance of friendly relations and support of the Attorney General.

Even more dreadful is the situation involving criminal cases. In that sense the President of the Court of the City of Sofia was given an instruction by the Attorney General that a condemning conviction must be rendered in the case against Tzvetan Tzvetanov. For that purpose, the reporting judge in the matter was not assigned randomly, but was briefed

---

2 This sentence is translated literally from the translation into Serbian, which hardly makes sense.

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number 06/15.02

and instructed by his seniors. In the same manner were assigned the lay judges, who were informed of the outcome of the proceeding. In the appellate proceeding before the Court of Appeals, an influence was made to the appellate judicial panel to uphold the judgment rendered in first instance. The basic principles and rules of the criminal procedure are being trampled, and an environment is created for the criminal prosecution to be employed for pressurizing, control and retribution. A significant role in achievement of such goals is played through the control of the media, which successfully manipulate the public opinion through false or biased presentation of facts. Fixation on a particular issue over a longer period of time and selective comments serve to cover the actual goals, discredit unfavorable persons and structures, and turn the distorters of social values into heroic figures.

All the aforesaid do not exhaust all the events I have been a reluctant or a deliberate witness of, nor has it been an intention of mine. My goal was to mark the existing correlations within the judicial system, as well as their goals, courses of action and the imminent results. If I should fail to comprehend all of the above, I would begin to doubt the veracity of this dreadful reality. It is inane to speak of morality and values of any particular individual when the state is in danger; when freedom of a nation and its right to demand equity dissolve irrecoverably due to the fear of saying the truth, the mistrust that is turning into despair, and the consents granted for the sake of mere survival. The entrance to Bulgaria still bears no sign *Leave All Hope Ye Who Enter*; but someone has started to write it.

**Remark of the court interpreter**: the back of the 4<sup>sh</sup> page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Bond between the 5<sup>th</sup> and 6<sup>th</sup> page is certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

2 (two) signatures: Fani Shutova, signed by her own hand.

I do not know what is to follow in the forthcoming months, or what is going to happen with me, but I do know that this that is happening now is to determine the future of our children, and that we are obliged to pay the price and assume responsibility if we have our conscience and heart.

<div align="right">

Signature: Rumiana Chenalova; signed by her own hand

Rumiana Chenalova

</div>



OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH          broj / number

On March 11, 2015, I **FANI SHUTOVA**, Notary Public for the area of the Rayon Court Petrich, registration number **511** of the Chamber of Public Notaries, hereby certify the identity of this copy with its **original**, being a private document presented to me by:

**LAZAR EVGENIEV KARDALIEV, Bulgarian personal number: 7203050160**
**ADDRESS: SOFIA – the bearer**

The original document did not contain any overstrikes, supplements, corrections, or other particularities.

Registration number: **2148**          Charged fees: (none)
NOTARY PUBLIC: Fani Shutova, signed by her own hand

Certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

**Translation number: Reg. br. 136/15**
I hereby confirm that the above document that was presented to me in Bulgarian language has been authentically translated into Serbian language.

(*Illegible signature*)

(Seal: Court Translator for the Bulgarian language, Milijan Popov, Belgrade. Court translation for Bulgarian language – Belgrade, Djevdjelijska Street no. 61/11, telephone number: 011 2407379; 2420826; 063/353573; 064/1649818, appointed by the Ministry of Justice, by the Ruling no. 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/95-18 dated September 25, 1995.

*Remark of the court interpreter for the English language: each page of the document contains the title "Translation from Bulgarian to Serbian" and the round seal of the court interpreter for Bulgarian language, Mr. Milijan Popov of Belgrade.*

I hereby certify that the above translation is in full conformity with the original in the Serbian language.
Ref. no.: 06/15.02
Novi Sad, on _____ 17, 20 15



# EXHIBIT 22

OVERENI PREVOD SA SRPSKOG NA ENGLESKI JEZIK
CERTIFIED TRANSLATION FROM SERBIAN TO ENGLISH                    broj/number: 08/15

TRANSLATION FROM BULGARIAN TO SERBIAN LANGUAGE

(Seal: Milijan Popov, court translator for the Bulgarian language, Belgrade)

## STATEMENT

Of Daniela Sergeeva Kuceva, Bulgarian personal number 7910106130,
entered into the list of persons eligible to be appointed as bankruptcy managers, set
forth by the Ministry of Justice of Republic of Bulgaria pursuant to the Order no. LS-04-
462, published in the *Official Gazette of Republic of Bulgaria* no. 52 of June 29, 2007

In course of my acting in the capacity of a bankruptcy manager, I have become a witness of
various figures' from the Bulgarian *political elite* exerting a fundamental pressure on the court
and the bankruptcy manager in terms of undertaking certain procedural actions in particular
bankruptcy cases, with the aim of serving the interests of one particular party in the judicial
procedure.

As of early 2014 I was appointed by the Court of the City of Sofia as a temporary bankruptcy
manager of several entities, which were of a particular *interest* to certain figures from the
*political elite* of Republic of Bulgaria. One of such entities was TEHNOLOŠKI CENTAR -
INSTITUT ZA MIKROELEKTRONIKU A.D, known to the public as one of the entities
controlled by the banker Tzvetan Vassilev.

Upon my assuming of the duty of the bankruptcy manager of TEHNOLOŠKI CENTAR -
INSTITUT ZA MIKROELEKTRONIKU A.D. I was summoned to a meeting by Vladimira
Janeva, the President of the Court of the City of Sofia, where I was explained that the
company TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D. has been
particularly *important* for the Member of the Parliament Delyan Peevski, wherefore all my
actions in course of the bankruptcy proceeding need to be undertaken only upon the explicit
orders and instructions to be given solely by Delyan Peevski. The president of the Court of
the City of Sofia has stated to have been maintaining personal contact with Delyan Peevski,
and to have been discussing with him the developments in the bankruptcy proceeding.
However, I was told that I shall get the exact orders in terms of specific actions to be
undertaken by me from a person to be designated by her, i.e. and *intermediary*, who was
having standing relations with lawyers of Delyan Peevski. It became clear to me in that
meeting that a public war is about to break out between Delyan Peevski and the majority
owner of the *Corporate Commercial Bank* A.D. Tzvetan Vassilev. By launching the

BE..... NI RESU... SA-SRPSKOG NA... ESRI - EZ...
CE...IFIED TRANSLATION FROM SERBIAN TO ENGLISH             ...j...bei....

bankruptcy proceeding and appointing a temporary bankruptcy manager, Peevski would be managing to gain control over TC-IME A.D. and to cause significant damage to both Vassilev and the *Corporate Commercial Bank* A.D. I have made a remark immediately that undertaking of procedural actions at cross purposes by me could create serious problems for both myself and the court. However, I was reassured that the *entire state machinery is supporting us in the war against the banker Tzvetan Vassilev.*

*Daniela Sergeeva Kuceva; signed by her own hand*

*Note of the court interpreter: the back of the 1ˢᵗ page is certified by a round seal: Republic of Bulgaria – Notary Public no. 511, Fani Shutova, appointed for the Rayon Court in Petrič.*

*Bond between the 1ˢᵗ and 2ⁿᵈ page is certified by a round seal: Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*
*2 (two) signatures: Fani Shutova, signed by her own hand.*

In fact, during the bankruptcy proceeding I have not undertaken any action in my capacity of the bankruptcy manager to infringe the interests of TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D. The activities undertaken by me as the bankruptcy manager of that entity were subject to control of the Ministry of Justice, which found no violations on my part. Nevertheless, I have undertaken certain actions in spite of my explicit disagreement, due to pressure and intimidation suggesting that otherwise there shall be certain actions undertaken in order for me to be denied the right to act as a bankruptcy manager. As an example, I was coerced by the *intermediary* to enter into the agreement on securing the documentation, tangible property and software massives owned or kept by TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D in the offices of the entity situated in Sofia, Bul. Tzar Boris III no. 159, 6ᵗʰ floor, with the security company *Delta Gard OOD*, subject to a monthly remuneration that was inacceptable for me. In my opinion, the President of the Court of the City of Sofia herself made selection of the security company with which the agreement was supposed to be concluded. The sheet of paper that was delivered to me by the *intermediary*, which contained the name and telephone numbers of the security company that was to be hired, had been written by the hand of the President of the Court of the City of Sofia. On the other hand, the amount of remuneration for rendered security services was determined by the *intermediary* in my presence, obviously without any address to the pricing market mechanisms applicable to the pertinent service industry and particularities of the object of security.

Again due to the pressure and intimidation employed by the *intermediary*, I gave my consent to entering into the agreement on pledge over temporary certificates owned by the company in favor of the *Corporate Commercial Bank AD*, which served as collaterals of bank loans between the bank and TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D.

My lack of willingness to issue consent to the above displeased in particular the President of the Court of the City of Sofia. What followed was the waiving of fingers at me, aggressive behavior and intimidation by my deprivation of the right to act as a bankruptcy manager. Through her contacts with allied judges in the District Court of Varna and the political influence of her patron materialized in Delyan Peevski, the President of the Court of the City of Sofia has succeeded in influencing the courts in Varna, which eventually deprived me of the right to act as a bankruptcy manager. This was a demonstration of force and aggressiveness of the acting state machinery, and the *severe punishment* of the *deserving disobedient*.

*Daniela Sergeeva Kuceva; signed by her own hand*

*Note of the court interpreter: the back of the 2<sup>nd</sup> page is certified by a round seal: Republic of Bulgaria – Notary Public no. 511, Fani Shutova, appointed for the Rayon Court in Petrič.*

*Bond between the 2<sup>nd</sup> and 3<sup>rd</sup> page is certified by a round seal: Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon. 2 (two) signatures: Fani Shutova, signed by her own hand.*

And last, but not least, I should mention my presence in the meeting organized by the *intermediary* with Teodor Tanev, the Executive Manager of TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D, Biser Lazov, the company accountant and Aleksandar Angelov, known as the lawyer of Delyan Peevski.

The goal of the meeting was to discuss the different options for pumping-out of company assets and takeover of other entities controlled by Tzvetan Vassilev. Discussion between the abovementioned persons has made it clear to me that not only Delyan Peevski, but also other Bulgarian politicians have a serious appetite for BTK (*Vivakom*). In the meeting there were discussed possible actions related to change of composition of BTK's Board of Directors and Supervisory Board, which resembled the ones exerted in Bulgaria over the 1990s. Nevertheless, I would say that this meeting has been unfruitful, because the participants have failed to discover legal mechanisms for realization of their goals.

During my acting as a temporary bankruptcy manager of TEHNOLOŠKI CENTAR - INSTÍTUT ZA MIKROELEKTRONIKU A.D, I was compelled almost daily by the *intermediary* to meet with either him, or the persons close to him. In my presence there were made comments on several occasions on the ambitions of politically powerful persons to take over the companies controlled by Tzvetan Vassilev, and on the explicit actions to be undertaken in that respect. In those meetings, the participants have discussed on numerous occasions the development of the bankruptcy proceeding over the *Corporate Commercial Bank A.D*, and the manner of distribution of its case, and the destiny of the bank's assets.

Bearing in mind all the aforesaid, which has become known to me in my capacity of a temporary bankruptcy manager of TEHNOLOŠKI CENTAR - INSTITUT ZA MIKROELEKTRONIKU A.D, I am of the opinion that there is in progress an aggressive political attempt of taking over the business from the banker Tzvetan Vassilev, which is being undertaken by the political and economic circle surrounding DPS (*Pokret za prava i slobode – The Movement for Rights and Freedoms*) and politicians from other parties, who are using their serious influence in the key areas, such as the judiciary, Public Prosecutor's Office, the National Bank of Bulgaria, the National Revenue Agency, the National Security etc.

<div align="center">

**Daniela Sergeeva Kuceva**

</div>

---

On March 11, 2015, I **FANI SHUTOVA**, Notary Public for the area of the **Rayon Court Petrich**, registration number **511** of the Chamber of Public Notaries, hereby certify the identity of this copy with its **original**, being a private document presented to me by:

**LAZAR EVGENIEV KARDALIEV, Bulgarian personal number: 7203050160**
**ADDRESS: SOFIA – the bearer**

The original document did not contain any overstrikes, supplements, corrections, or other particularities.

Registration number: **2149**       Charged fees: (none)
NOTARY PUBLIC: Fani Shutova, signed by her own hand

---

Certified by a round seal: *Republic of Bulgaria – Notary Public number 511, Fani Shutova, area of appointment: the Court of the Petrich Rayon.*

Translation number: Reg. br. 135/15



I hereby confirm that the above document that was presented to me in Bulgarian language has been authentically translated into Serbian language.

(*Illegible signature*)

(Seal: Court Translator for the Bulgarian language, Milijan Popov, Belgrade)

Court translation for Bulgarian language – Belgrade, Djevdjelijska Street no. 61/11, telephone number: 011 2407379; 2420826; 063/353573; 064/1649818, appointed by the Ministry of Justice, by the Ruling no. 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/95-18 dated September 25, 1995.

*Remark of the court translator for the English language: each page of the document contains the title "Translation from Bulgarian to Serbian" and the round seal of the court interpreter for Bulgarian language, Mr. Milijan Popov of Belgrade.*

I hereby certify that the above translation is in full conformity with the original in the Serbian language.

Ref. no.: 68/15

Novi Sad, on May 14, 20 15

# EXHIBIT 23



*Фрея*  *Freya*
*Транслейшънс* *Translations*

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## AYR PROPERTY DEVELOPMENT AD (APD)
Declared bankrupt, Case No.730 in the docket of the Shumen District Court for 2013

### TRUSTEE IN BANKRUPTY (LIQUIDATOR)
Ganka Kolyovska (Mrs)
Sofia, Musagenitsa Residential Area
1a Kl. Ohridski Boulevard, Office 2
Tel: 02 870 05 02, 0888391174
E-mail: syndic@abv.bg


To:     Zahari TOMOV, Attorney at law
        Special Bulgarian Counsel for the
        Trustee in Bankruptcy for Ayr Logistics Limited Inc (Ayr)


*In re.: Trustee Jeffrey H. Mims letter requesting payment of 20th July 2016, letter of Ref. No.370 of 27th July 2016 and letter of Ref. No. 373 of 8th August 2016*


**DEAR MR. TOMOV,**

In reply to your above quoted letters including the letter of Trustee Jeffrey H. Mims dated 20th July 2016, which I received from you, acting as his representative on 28th July 2016, please be advised as follows:

The Trustee in bankruptcy may dispose of funds of the bankruptcy estate only by virtue of a written permission delivered by the Bankruptcy Court in advance and upon submission of evidence for the existence of sufficient funds and grounds for payment.

SEEK Foundation LLC, acting as a creditor under Art.717n of the Commercial Act ("CA") was included in the Partial Distribution List No.1, drawn an published by the Trustee, which has not been approved by the court.

As of present funds, comprising and representing a bankruptcy estate, which might be distributable to and in favour of APD's creditors, are **Not-Available**, that is to say the bankruptcy estate has fallen into a de facto inability to execute the payment due to its depletion. Therefore no grounds exist for demanding any payment in favour of a creditor/creditors under Art.658, Para 1(9) CA.

The document you quoted in your letter of Ref. No.373 of 8th August 2016, namely the Payment Order of filing No.9764 of 24th October 2014, which was enclosed in the case file under filing No. 9764 of 24th October 2016, is a letter of the trustee, which definitely could not be considered to be **a payment order**. Pursuant to the Bulgarian law and the Bulgarian payment system, a payment document is a strict formal sample document, which contains mandatory attributes (details) specified by the Ministry of Finance. Such document is of dispositive nature (order) and cannot be replaced by a notice letter. Therefore I cannot comment the document enclosed. All official and legal evidence available with me concerning the bank transactions made under the special bank account(s) of APD (declared bankrupt) are enclosed in the case file.

2

Each creditor, who believes that he/she is a holder of claims for payment can file such claims wherever and however he/she may deem fit, but all and any further acts of the trustee shall depend entirely on the acts delivered by the Bankruptcy Court.

15<sup>th</sup> August 2016

<div align="center">

Yours truly,

*Signed (ill.)*
Ganka Kolyovska, Trustee

</div>

*Rectangular stamped seal of the Trustee reading:*

"Ganka Kolyovska, Bankruptcy Trustee
Case 730/2013 before the
Shumen District Court"

---

*The undersigned Boryana Ilieva Stefanova hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Letter from Ganka Kolyovska to Attorney Zahari Tomov dated 15<sup>th</sup> August 2016. This translation has 2(two) pages.*

Translator: _____
Boryana Ilieva Stefanova

## "ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД

в несъстоятелност, т.д. № 730 по описа за 2013 година на ШОС

**СИНДИК**
Ганка КОЛЬОВСКА
София, кв."Мусагеница"
Бул. „Кл. Охридски" 1а, оф.2
Тел. 02 870 05 02, 0888391174;
e-mail: syndic@abv.bg

До:
**Адв. Захари ТОМОВ**
Представител на на синдика на
„ЕЪП ЛОДЖИСТИКС ЛИМИТИД ИНК"

**ОТНОСНО: искане за плащане от синдик Джефри Х. Мимс от 20.07.2016 г. писмо изх. №370 от 27.07.2016 година и писмо изх. №373 от 08.08.2016 година.**

### УВАЖАЕМИ ГОСПОДИН ТОМОВ,

В отговор на цитираните по-горе писма, вкл. и искането на Синдик Джефри Х.Мимс от 20.07.2016 г., получено чрез Вас като негов представител на 28.07.2016 г., Ви уведомявам за следното:

Разпореждане с паричии средства от масата на несъстоятелността, синдикът извършва само по силата на предварително получено писмено разрешение на съда по несъстоятелност, след представяне на доказателства за наличие на достатъчно количество паричиа маса и основания за плащане.

„СИЙК ФУНДЕЙШЪН ЛЛС", в качеството на кредитор по реда на чл. 717н от ТЗ бе включен от синдика в изготвената и публикувана Частична сметка за разпределение №1, която не бе одобрена от съда.

Към настоящия момент паричии средства, представляващи маса на несъстоятелността, която може да се разпределя в полза на кредиторите на „ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД в несъстоятелността **няма**, т.е. паричната маса на несъстоятелност е фактически е изчерпана. По тази причина не е на лице основание за искане по реда на чл. 658, ал.1, т.9 от ТЗ за плащане в полза на кредитор /кредитори/.

Цитираният от Вас документ „Платежно нареждане, вх. №9764/24.10.2014 година в писмо изх. №373 от 08.08.2016 г., приложен по делото с вх.№9764/24.10.2016 г., представлява писмо на синдика, което категорично не може да се счита за **платежно нареждане**. Съгласно българското законодателство и платежната система на България, документът платежно нареждане е строго формален и съдържа задължителни реквизити определени от Министерство на финансите. Този документ е разпоредителен /диспозитивен/ и същият не може да бъде заместен с уведомително писмо. По тази причина не мога да коментирам приложения документ. Всички официални и законни доказателства, с които разполагам, свързани с извършени банкови операции по особеиата банкова сметка /и/ на „ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД в несъстоятелност са приложени по делото.

Всеки кредитор, който счита, че има претенции за плащане, може да представи същите, където и както намери за добре, но последващите действия на синдика са изцяло зависими от актовете на съда по несъстоятелността.

15.08.2016 г.

Ганка Кольовска С уважение,
СИНДИК                Синдик Ганка Кольовска

1



**Фрея**  **Freya**
**Транслейшънс**  **Translations**

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

*Rectangular seal reading:*
"Corporate Commercial Bank AD
Head Office
Our ref.9764 dated 24th October 2014"

**To:**     Elena Zdravkova Kostadinchev
Stanislav Georgiev Lyutov
Appointed conservators pursuant to Art.105 of the Law on
Credit Institutions of Corporate Commercial Bank AD, duly
recorded in the Commercial Registry kept at the Registry
Agency under EIK (Company number): 831184677 and having
registered office address at Sofia, 10 Graf Ignatiev St.

## PAYMENT ORDER

**Given by:**     Martin Milchev Apostolov,
Trustee in bankruptcy for
AYR PROPERTY DEVELOPMENT AD (declared bankrupt) and
having EIK: 200958720 and registered office address at
Targovishte 7700, Lilia St., bl.4, Section B, 1st floor, apt.2

Correspondence address: Sofia, 60 Deyan Belishki St.,
5th floor, apt. 15

**Re:**     Payment under Art.717n CA in favour of First Investment Bank
AD from the accounts held by Ayr Property Development AD
(declared bankrupt)

Dear Mrs Kostadinchev:
Dear Mr Lyutov:

AYR PROPERTY DEVELOPMENT AD (declared bankrupt) ("APD") having
EIK: 200958720 is a company that has been declared bankrupt under Art.710
of the Commerce Act ("CA") in case 14/2011 in the docket kept at the
Targovishte District Court, which case has been converted to case 730/2013
before the Shumen District Court pursuant to the provisions of Art.23 Para 3
of the Civil Procedure Code ("CPC") and by virtue of a ruling made by the
Varna Court of Appeals.

Pursuant to Ruling No.318 of 18th July 2014 delivered in case 730/2013 by
the Shumen District Court and later affirmed by Ruling No.630 of 25th

2

September 2014 in case No.528/2014 before the Varna Court of Appeals, now in full force and effect since 18th October 2014, the Bankruptcy court ordered APD's Trustee to meet the obligations arising from Art.717n CA.

Acting as the Trustee for APD I have received a payment notice given by First Investment Bank AD urging me to cause the payment of BGN 102,964,238.26 (*one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva*) from the money in the insolvent debtor's deposit and current accounts (in the amounts of BGN 97,500,00; BGN 2,464,238.46; BGN 2,000,000 and BGN 1,000,000, respectively).

This is to advise you that I am causing the payment of BGN 102,964,238.26 (*one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva*) to First Investment Bank AD from the money available in the current accounts shown below and held by the Trustee for the insolvent debtor with Corporate Commercial Bank AD, to which accounts the proceeds from the sale of the insolvent debtor's property have been remitted: a deposit account where money in the amount of 97,500,000 BGN is kept, a current account of balance BGN 2,464,238.26, a deposit account  where 2,000,000 BGN are kept on deposit and another deposit account of deposit in the amount of 1,000,000 BGN.

In view of the above please note that First Investment Bank AD is from now on the sole holder of the accounts receivable owed to such bank in the amount of BGN 102,964,238.26 (*one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva*) and currently kept in the accounts with CCB shown below and having the insolvent debtor's trustee as their holder; those are the accounts to which the proceeds from the sale of the insolvent debtor's property have been remitted: (i) a deposit account where money in the amount of 97,500,000 BGN is kept, (ii) a current account of balance BGN 2,464,238.26, (iii) a deposit account where 2,000,000 BGN are kept on deposit and (iv) another deposit account of deposit in the amount of 1,000,000 BGN.

Yours truly,

*Signed ill.*
Martin Apostolov

**Trustee in bankruptcy**

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Payment Order of ref.9764 dated 24th October 2014 by Martin Apostolov, trustee in bankruptcy for APD. This translation has 2 (two) pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*

Дело.
9375'-638

**КОРПОРАТИВНА ТЪРГОВСКА БАНКА АД**
Централно управление
по м 9767 24 10-04

До

Елена Здравкова Костадинчева
Станислав Георгиев Лютов,
квестори съгласно чл. 105 от Закона за кредитните
институции на „Корпоративна търговска банка" АД,
вписано в Търговския регистър при Агенция по
вписванията с ЕИК 831184677, със седалище и адрес на
управление: гр. София, ул. „Граф Игнатиев" № 10

# НАРЕЖДАНЕ ЗА ПЛАЩАНЕ

От

Мартин Милчев Апостолов, с адрес за кореспонденция:
гр. София, ул."Деян Белишки" № 60, ет. 5, ап. 15, синдик на
„Еър Пропърти Девелопмънт" АД (в несъстоятелност), ЕИК
200958720, със седалище и адрес на управление:
гр. Търговище 7700, Лилия, бл. 4, тяло Б, ет. 1, ап. 2

<u>ОТНОСНО:</u> плащане по чл. 717 н ТЗ в полза на „Първа
инвестиционна банка" АД от сметки на „Еър Пропърти
Девелопмънт" АД (в несъстоятелност)

Уважаема г — жо Костадинчева,
Уважаеми г — н Лютов,

„Еър Пропърти Девелопмънт" АД, ЕИК 200958720, е дружество, което съгласно
разпоредбата на чл. 710 ТЗ е обявено в несъстоятелност по търг. дело № 14/2011 г. по
описа на Окръжен съд Търговище, което в съответствие с нормата на чл. 23, ал. 3 ГПК и с
определение на Апелативен съд Варна е преобразувано в търг. дело № 730/2013 г. по
описа на Окръжен съд Шумен.

Съгласно Определение № 318 от 18.07.2014 г. по търг. дело № 730/2013г. на
Окръжен съд Шумен, потвърдено с Определение № 630/25.09.2014 г. по ч. в. търг. дело №
528/2014 г. по описа на Апелативен съд Варна, влязло в законна сила на 18.10.2014 г.,
съдът по несъстоятелността е указал на синдика на "Еър Пропърти Девелопмънт"АД да
изпълнили задълженията си, произтичащи от чл. 717 н ТЗ.

1

„Първа инвестиционна банка" АД е отправила към мен покана в качеството ми на синдик на „Еър Пропърти Девелопмънт" АД, ЕИК 200958720, за плащане на сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от следните депозитни и разплащателни сметки на несъстоятелния длъжник (в размер на 97 500 000 лв., 2 464 238.26 лв, 2 000 000 лв., и 1 000 000 лв.).

С оглед на изложеното Ви уведомявам, че предавам на „Първа инвестиционна банка" АД сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от депозитните и разплащателни сметки открити при Корпоративна търговска банка АД, с титуляр синдика на несъстоятелния длъжник, по които е преведена сумата от осребряването на имуществото собственост на несъстоятелния длъжник, а именно депозитна сметка с наличност от 97 500 000 лв., разплащателна сметка с наличност от 2 464 238.26 лв, депозитна сметка с наличност от 2 000 000 лв. и депозитна сметка с наличност от 1 000 000 лв.

Предвид изложеното считайте „Първа инвестиционна банка" АД за единствен титуляр на вземането за плащане на сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от депозитните и разплащателни сметки открити при Корпоративна търговска банка АД, с титуляр синдика на несъстоятелния длъжник, по които е преведена сумата от осребряването на имуществото собственост на несъстоятелния длъжник а именно депозитна сметка с наличност от 97 500 000 лв., разплащателна сметка с наличност от 2 464 238.26 лв, депозитна сметка с наличност от 2 000 000 лв. и депозитна сметка с наличност от 1 000 000 лв.

С уважение: ................

Мартин Апостолов

синдик

2

# EXHIBIT 24




**Фрея**
**Транслейшънс**

**Freya**
**Translations**

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## WORKING DRAFT

**To:**   **Elena Zdravkova Kostadinchev**
**Stanislav Georgiev Lyutov**
Appointed conservators pursuant to Art.105 of the Law on Credit Institutions of Corporate Commercial Bank AD, duly recorded in the Commercial Registry kept at the Registry Agency under EIK (Company number) 831184677 and having registered office address at Sofia, 10 Graf Ignatiev St.

## PAYMENT ORDER

**Given by:**   **Martin Milchev Apostolov,**
Trustee in bankruptcy for AYR PROPERTY DEVELOPMENT AD (declared bankrupt) and having EIK: 200958720 and registered office address at Targovishte 7700, Lilia St., bl.4, Section B, 1st floor, apt.2

Correspondence address: Sofia, 60 Deyan Belishki St., 5th floor, apt. 15

***Re:***   Payment under Art.717n CA in favour of First Investment Bank AD from the accounts held by Ayr Property Development AD (declared bankrupt)

Dear Mrs Kostadinchev:
Dear Mr Lyutov:

AYR PROPERTY DEVELOPMENT AD (declared bankrupt) ("APD") having EIK: 200958720 is a company that has been declared bankrupt under Art.710 of the Commerce Act ("CA") in case 14/2011 in the docket kept at the Targovishte District Court, which case has been converted to case 730/2013 before the Shumen District Court pursuant to the provisions of Art.23 Para 3 of the Civil Procedure Code ("CPC") and by virtue of a ruling made by the Varna Court of Appeals.

Pursuant to Ruling No.318 of 18th July 2014 delivered in case 730/2013 by the Shumen District Court and later affirmed by Ruling No.630 of 25th September 2014 in case No.528/2014 before the Varna Court of Appeals, now in full force and effect since 18th October 2014, the Bankruptcy court ordered APD's Trustee to meet the obligations arising from Art.717n CA.

Acting as the Trustee for APD I have received a payment notice given by First Investment Bank AD urging me to cause the payment of BGN 102,964,238.26 (one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva) from the money in the insolvent debtor's deposit and current accounts (in the amounts of BGN 97,500,00; BGN 2,464,238.26; BGN 2,000,000 and BGN 1,000,000, respectively).

This is to advise you that I am causing the payment of BGN 102,964,238.26 (one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva) to First Investment Bank AD from the money available in the current accounts shown below and held by the Trustee for the insolvent debtor with Corporate Commercial Bank AD, to which accounts the proceeds from the sale of the insolvent debtor's property have been remitted: a deposit account where money in the amount of 97,500,000 BGN is kept, a current account of balance BGN 2,464,238.26, a deposit account  where 2,000,000 BGN are kept on deposit and another deposit account of deposit in the amount of 1,000,000 BGN.

In view of the above please note that First Investment Bank AD is from now on the sole holder of the accounts receivable owed to such bank in the amount of BGN 102,964,238.26 (one hundred and two million nine hundred sixty four thousand two hundred and thirty-eight point twenty-six Bulgarian leva) and currently kept in the insolvent debtor Trustee's accounts with CCB shown below and to which accounts the proceeds from the sale of the insolvent debtor's property have been remitted: a deposit account where money in the amount of 97,500,000 BGN is kept, a current account of balance BGN 2,464,238.26, a deposit account  where 2,000,000 BGN are kept on deposit and another deposit account of deposit in the amount of 1,000,000 BGN.

Yours truly,

.....................

Martin Apostolov

Trustee in bankruptcy

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document — Working Draft of Payment Order by Martin Apostolov, trustee in bankruptcy for APD. This translation has 2 (two) pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*



До

**Елена Здравкова Костадинчев**
**Станислав Георгиев Лютов,**
квестори съгласно чл. 105 от Закона за кредитните
институции на „**Корпоративна търговска банка" АД**,
вписано в Търговския регистър при Агенция по
вписванията с ЕИК 831184677, със седалище и адрес на
управление: гр. София, ул. „Граф Игнатиев" № 10

# НАРЕЖДАНЕ ЗА ПЛАЩАНЕ

От

**Мартин Милчев Апостолов**, с адрес за кореспондеция:
гр. София, ул."Деян Белишки" № 60, ет. 5, ап. 15, синдик на
„**Еър Пропърти Девелопмънт" АД** (в несъстоятелност), ЕИК
200958720, със седалище и адрес на управление:
гр. Търговище 7700, Лилия, бл. 4, тяло Б, ет. 1, ап. 2

<u>**ОТНОСНО:**</u> плащане по чл. 717 н ТЗ в полза на „Първа
инвестиционна банка" АД от сметки на „Еър Пропърти
Девелопмънт" АД (в несъстоятелност)

Уважаема г – жо Костадинчев,
Уважаеми г – н Лютов,

„Еър Пропърти Девелопмънт" АД, ЕИК 200958720, е дружество, което съгласно
разпоредбата на чл. 710 ТЗ е обявено в несъстоятелност по търг. дело № 14/2011 г. по
описа на Окръжен съд Търговище, което в съответствие с нормата на чл. 23, ал. 3 ГПК и с
определение на Апелативен съд Варна е преобразувано в търг. дело № 730/2013 г. по
описа на Окръжен съд Шумен.

Съгласно Определение № 318 от 18.07.2014 г. по търг. дело № 730/2013г. на
Окръжен съд Шумен, потвърдено с Определение № 630/25.09.2014 г. по ч. в. търг. дело №
528/2014 г. по описа на Апелативен съд Варна, влязло в законна сила на 18.10.2014 г.,
съдът по несъстоятелността е указал на синдика на "Еър Пропърти Девелопмънт"АД да
изпълнили задълженията си, произтичащи от чл. 717 н ТЗ.

1

„Първа инвестиционна банка" АД е отправила към мен покана в качеството ми на синдик на „Еър Пропърти Девелопмънт" АД, ЕИК 200958720, за плащане на сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от следните депозитни и разплащателни сметки на несъстоятелния длъжник (в размер на 97 500 000 лв., 2 464 238.26 лв, 2 000 000 лв., и 1 000 000 лв.).

С оглед на изложеното Ви уведомявам, че предавам на „Първа инвестиционна банка" АД сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от депозитните и разплащателни сметки открити при Корпоративна търговска банка АД, с титуляр синдика на несъстоятелния длъжник, по които е преведена сумата от осребряването на имуществото собственост на несъстоятелния длъжник а именно депозитна сметка с наличност от 97 500 000 лв., разплащателна сметка с налияност от 2 464 238.26 лв, депозитна сметка с наличност от 2 000 000 лв. и депозитна сметка с наличност от 1 000 000 лв.

Предвид изложеното считайте „Първа инвестиционна банка" АД за единствен титуляр на вземането за плащане на сумата от 102 964 238.26 лв. (сто и два милиона деветстотин шестдесет и четири хиляди двеста тридесет и осем лева и двадесет и шест стотинки) от депозитните и разплащателни сметки открити при Корпоративна търговска банка АД, с титуляр синдика на несъстоятелния длъжник, по които е преведена сумата от осребряването на имуществото собственост на несъстоятелния длъжник а именно депозитна сметка с наличност от 97 500 000 лв., разплащателна сметка с налияност от 2 464 238.26 лв, депозитна сметка с наличност от 2 000 000 лв. и депозитна сметка с наличност от 1 000 000 лв.

С уважение: ....................................

Мартин Апостолов

синдик

2

# EXHIBIT 25

*Фрея*
*Транслейшънс*

*Freya*
*Translations*

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

*(Cover page)*

**Independent Forensic Laboratory**
**1 Pop Hariton St., Varna**
**Telephone: 0898 725 375; 0898 727 499**

*Company logo*

### FORENSIC HANDWRITING EXAMINATION

Examination requested by:     Zahari Tomov, Attorney at law
Date: 17th August 2015, Varna

Prepared by:    *signature /illegible/*
                *signature /illegible/*

### *(Page 1)*
### EXAMINATION REPORT
#### No. 120

On this 28th August 2015[1] the undersigned Emil Angelov Atanassov and Tsenko
Marinov Tsachev acting as forensic examiners prepared this Report on the forensic
handwriting examination as requested by Zahari Tomov, attorney at law.

### PURPOSE OF THE REQUEST

To ascertain whether or not the signatures affixed to the documents listed below are
identical:

-   Document of Ref. #10 of 18th December 2014 filed with the District Court;
-   Declaration under Art.655 of the Commerce Act of 11th July 2014 certified by
    a Notary Public;
-   Declaration under Art.6561, Para 1 of the Commerce Act of 11th July 2014
    certified by a Notary Public
-   Payment Order No.9764 of 24th October 2014l
-   Document of Ref. #6230 of 25th November 2014 filed with the District Court;
-   Document of Ref. #6147 of 20th November 2014 filed with the District Court;
-   Document of Ref. #6036 of 17th November 2014 filed with the District Court;
-   Document of Ref. #6229 of 25th November 2014 filed with the District Court;
-   Document of Ref. #5106 of 25th September 2014 filed with the District Court

### SUBJECT OF THE FORENSIC EXAMINATION

---

[1] An obvious typo the date should read "18[th] August 2015", (Translator's note).




The handwriting identified in the signatures affixed to the following documents:

- Document of Ref. #10 of 18th December 2014 filed with the District Court;
- Declaration under Art.655 of the Commerce Act of 11th July 2014 certified by a Notary Public;
- Declaration under Art.655 of the Commerce Act of 11th July 2014 certified by a Notary Public;
- Payment Order No.9764 of 24th October 2014;
- Document of Ref. #6230 of 25th November 2014 filed with the District Court;
- Document of Ref. #6147 of 20th November 2014 filed with the District Court;
- Document of Ref. #6036 of 17th November 2014 filed with the District Court;
- Document of Ref. #6229 of 25th November 2014 filed with the District Court;
- Document of Ref. #5106 of 25th September 2014 filed with the District Court.

## QUESTIONS THE FORENSIC EXAMINATION MUST ANSWER

Whether or not the signatures on the documents below were put by the same person?

- Document of Ref. #10 of 18th December 2014 filed with the District Court;
- Declaration under Art.655 of the Commerce act of 11th July 2014 certified by a Notary Public;
- Declaration under Art.6561, Para 1 of the Commerce act of 11th July 2014 certified by a Notary Public;
- Payment Order No.9764 of 24th·October 2014;
- Document of Ref. #6230 of 25th November 2014 filed with the District Court;
- Document of Ref. #6147 of 20th November 2014 filed with the District Court;
- Document of Ref. #6036 of 17th November 2014 filed with the District Court;
- Document of Ref. #6229 of 25th November 2014 filed with the District Court;
- Document of Ref. #5106 of 25th September 2014 filed with the District Court.

## EXAMINATION METHODS AND RESULTS

Several independent methods of examination were used to determine the handwriting and movement habits as well as different magnifying instruments for visual inspection and other special forensic equipment (such as an USB microscope with a large range of magnification levels and additional lighting, an Optika–LAB2 microscope, UV light).

The objects of the examination – documents containing signatures – were presented to us in photocopies. In general, the lack of the original documents makes a criminalistics analysis impossible, so we examined the signatures affixed out of context as a graphic object only. The examination of a photocopied document makes the analysis of certain graphic features hard to do. Nevertheless, when sufficient individual features exist and these are deemed important enough, more often than not the theory and practice of both national and worldwide criminalistics allow for a conclusive positive or negative (in most cases probable) answer to be reached.

The documents produced for examination show only referent numbers, dates and the signatures affixed to each of them and juxtaposed against any of the phrases: "Signature" or "Declared by" or "Respectfully submitted" (i.e. the content was hidden).

The signatures affixed to the documents examined have a mixed structure: at the beginning the initial part of the letter M and the letter A, the middle part containing

stroke and loop like (connected loops) elements resembling the Bulgarian letter "ш" [ʃ], a loop-shaped initials and additionally a C-shaped element. The handwriting features visible in the signatures show a moderate to high skilled handwriting, simple structure, predominant straightforward and loop like shape and counter-clockwise direction of inscription, leftward slant (except for signature No.6 affixed on the Payment Order, which has a rightward slant), moderately connected, increased size, moderately vertically extended (extended in the initials part) and moderately horizontally extended, medium pen pressure.

The comparative analysis of the general handwriting features of the handwriting used in the questioned signatures has shown the following similarities and differences:

| General features | Objects examined | Object No.6 |
|---|---|---|
| Transcription | Mixed | Mixed |
| Structure | Simple | Simple |
| Handwriting skill | Moderate to high skilled | Moderate to high skilled |
| Shape | Straightforward-loop like | Straightforward-loop like |
| Direction | Counterclockwise | Counterclockwise |
| Size | Increased | Increased |
| Connectedness | Moderate | Moderate |
| Slant | Leftward | Rightward |
| Extended Spacing | Moderate spacing, vertically increased at the initials section | Moderate spacing, vertically increased at the initials section |
| Pressure | Medium | Medium |

The comparative analysis has shown that some individual handwriting features coincide and the more prominent are: (Photocopies of the signatures 1 through 10)

- Positioning of the hand movement in writing the initial part of the letter M – low above the baseline – Number 1;

- Shape of movement in drawing the initial part of the letter M – curved and angular – Number 2;

- Horizontally extended movement in drawing the first loop-like component of the letter M – condensed – Number 3;

- Structure of movements in drawing the first loop-like component of the letter M – concave at the upper right side – Number 4;

- Structure of movements in drawing the first component when compared to the drawing of the second component of the letter M – larger – Number 5




- Type of connection - how the letter M and the letter A connect – a visible space – Number 6;

- Positioning of the hand movement in writing the initial dot of the letter A – above the mid-line - Number 7;

- Size of movements in drawing the letter A when compared to the letter M – expanded – Number 8;

- Relative construction of movements in drawing the first and second component of the letter A – razor-like – Number 9;

- Type of connectedness in drawing the letter A to the middle part of the signature – a visible space –Number 10;

- Relative positioning of movements in drawing the beginning dot of the middle part – in line with the initial dot of the letter A – Number 11;

- Direction of movement in drawing the upper dots of the Cyrillic-letter-"Ш"-like middle part – downward – Number 12;

- Relative positioning of vertical movements in drawing the second component in comparison to the first component of the "Ш"-like middle part – higher – Number 13;

- Positioning of movements in drawing the initials when compared to the letter A – parallel – Number 14;

- Relative positioning of movements in drawing the ending dot of the initials – above the baseline, middle – Number 15;

- Relative positioning of movements in drawing the beginning curvature of the "C"-like component – in the middle of the middle part of the signature – Number 16.

The feature similarities found in the course of the comparative analysis are stable, rare and standalone. Some are of greater identification value. They form a standalone aggregate on the basis of which it can be concluded that one and the same person put the signatures subject to examination.

Upon analyzing the technique of putting the signatures the examination has found has follows:

- The signature placed on the document entitled Payment Order of ref. No.9764 of 24th October 2014 as shown in the above Table has a rightward slant when compared to all the rest (Photocopy 6);

- The stroke-like elements of the same signature are surrounded by dots or dot-like traces (no such elements are to be found in any of the rest signature samples) – (Photocopy 6);

- The highest points of the first loop of the letter M and of the initials are indistinctive (as if cut off) – (Photocopy 6);

The above findings (and the dissimilarities found while analyzing the signature) make it possible to assume with a great degree of likelihood that the signature added to Payment Order of ref. No.9764 dated 24th October 2014 was probably scanned or copied from another document, cut out and then reproduced on the one examined here. The dots surrounding the stroke-like elements of the signature might be the residual image that appears when certain parts of the document, from which the signature was taken, were obliterated.

A conclusive opinion can only be given upon examination of the original of Payment Order of ref.9764 dated 24th October 2014.

To illustrate the forensic examination a Table showing 10 (ten) photocopies of signatures was made and is attached hereto.

### CONCLUSION:

The signatures put to the documents below:

- Document of Ref. #10 of 18th December 2014 filed with the District Court;
- Declaration under Art.655 of the Commerce act of 11th July 2014 certified by a Notary Public;
- Declaration under Art.6561, Para 1 of the Commerce act of 11th July 2014 certified by a Notary Public;   .
- Payment Order No.9764 of 24th October 2014;
- Document of Ref. #6230 of 25th November 2014 filed with the District Court;
- Document of Ref. #6147 of 20th November 2014 filed with the District Court;
- Document of Ref. #6036 of 17th November 2014 filed with the District Court;
- Document of Ref. #6229 of 25th November 2014 filed with the District Court;
- Document of Ref. #5106 of 25th September 2014 filed with the District Court

Have been made by the same individual.

It is likely that the signature standing on Payment Order No.9764 of 24th October 2014 has been fabricated, e.g. photocopied or scanned, then cut out and placed/inserted in the questioned document (a case of the so-called "theft of a signature").

Forensic Experts:     1. *Signed ill.*

2. *Signed ill.*

*(The last page)*

Table showing 10 (ten) photocopies of signatures:

(Photocopies follow)

N.B.: All similarities are marked in red and numbered accordingly in each sample.

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Forensic Handwriting Examination and Report No.120 dated 28th August 2015. This translation has five (5) pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*



Независима лаборатория за криминалистически
изследвания
гр.Варна, ул."Поп Харитон"  № 1,  тел. 0898 725375;
0898 727499

-------------------------------------------------------------------------
-----------------------------------------------------



# Е К С П Е Р Т И З А

## „Съдебно- почеркова" експертиза

Възложена  от :  адвокат Захари Томов

Дата:  17.08.2015 г.   гр.Варна

ИЗГОТВИЛИ:

COPY

# ПРОТОКОЛ

## № 120

Днес, 28.08.2015 год. , подписаният Емил Ангелов Атанасов и Ценко Маринов Цачев– експерт- криминалисти /вещи лица/ , съставихме настоящия протокол за извършена  "Съдебно- почеркова и техническа " експертиза , възложена по искане на адвокат Захари Томов

## ОБСТОЯТЕЛСТВА ПО ИСКАНЕТО
Установяване идентичност на изпълнение на подписите положени в следните документи:;
-с вх. № 10/18.12.2014 г. на Окръжен съд
-Нот. заверена Декларация по чл.655 от ТЗ с дата 11.07.2014 г.
-Нот. заверена Декларация по чл.6561 ал.1 от ТЗ с дата 11.07.2014г.
-Нареждане за плащане с № 9764/24.10.14
-с вх. № 6230/25.11.2014 г. на Окръжен съд
-с вх.№ 6147/20.11.2014г. на Окръжен съд
-с вх.№ 6036/17.11.2014г. на Окръжен съд
-с вх.№ 6229/25.11.2014г. на Окръжен съд
-с вх.№ 5106/25.09.2014г. на Окръжен съд

## ОБЕКТИ Н А ЕКСПЕРТИЗАТА
Почеркът, отразен в подписите положени в следните документи:;
-с вх. № 10/18.12.2014 г. на Окръжен съд- №1
-Нот. заверена Декларация по чл.655 от ТЗ с дата 11.07.2014 г.-№2
-Нот. заверена Декларация по чл.6561 ал.1 от ТЗ с дата 11.07.14г.-№3, №5
-Нареждане за плащане с № 9764/24.10.14- №6
-с вх. № 6230/25.11.2014 г. на Окръжен съд-№7
-с вх.№ 6147/20.11.2014г. на Окръжен съд-№8
-с вх.№ 6036/17.11.2014г. на Окръжен съд-№9
-с вх.№ 6229/25.11.2014г. на Окръжен съд-№10
-с вх.№ 5106/25.09.2014г. на Окръжен съд- №4

## ЗАДАЧИ НА ЕКСПЕРТИЗАТА
Подписите, положени в положени в следните документи:;
-с вх. № 10/18.12.2014 г. на Окръжен съд
-Нот. заверена Декларация по чл.655 от ТЗ с дата 11.07.2014 г.
-Нот. заверена Декларация по чл.6561 ал.1 от ТЗ с дата 11.07.2014г.
-Нареждане за плащане с № 9764/24.10.14

-с вх. № 6230/25.11.2014 г. на Окръжен съд
-с вх.№ 6147/20.11.2014г. на Окръжен съд
-с вх.№ 6036/17.11.2014г. на Окръжен съд
-с вх.№ 6229/25.11.2014г. на Окръжен съд
-с вх.№ 5106/25.09.2014г. на Окръжен съд
**, изпълнени ли са от едно и също лице?**

ИЗСЛЕДВАНЕ, МЕТОДИ И РЕЗУЛТАТИ:

Използвани бяха независими един от друг методи за установяване писмено- двигателния навик, увеличителни прибори за визуално наблюдение и друга специализирана криминалистическа техника /, USB- микроскоп с различна степен на увеличение и допълнителна светлина, микроскоп „Optika-LAB 2", УВ- светлина./.

Разгледани като общ обект на изследването, документите с подписи  - обекти представляват ксероксно копие. По принцип, липсата на оригинал не позволява да бъде извършен оглед от криминалистическа гледна точка   и поради това подписите бяха изследвани самостоятелно, като графичен обект извън останалия контекст . Изследването на документ копие затруднява анализа на някои графически признаци. Независимо от това обаче, при наличието на достатъчен брой частни признаци и при оценяване на тяхната значимост, криминалистическата теория и практика у нас и в чужбина не изключва достигането на положителен или отрицателен /най-често вероятен/ идентификационен отговор.

Представените на изследване документи са без основния текст само с посочени входящи номера и датиране с положени подписи в долната дясна част срещу „Подпис", „Декларирам" „С уважение"

Изследваните подписи в посочените документи са изпълнени със смесена транскрипция, включваща: начална част от изписване на буква „М" и буква „А" , средна част от щриховидни- примковидни елементи /слята примка/ наподобяваща буква „ш", примковиден  параф и допълнителен „С" образен елемент. Почеркът, отразен в подписите е с между средна и висока степен на обработеност , прост по строеж, преобладаваща праволинейно- примковидна форма и лявоокръжна посока, ляв наклон / с изключение на подпис под № 6 в Нареждане за плащане с десен наклон/, средно свързани .увеличен размер, средно разтегнат по вертикала /разтегнат в парафната част/ и средно по хоризонтала, среден натиск.

При сравнителното изследване на почерка, с който са изпълнени изследваните подписи се установиха следните резултати /съвпадения и различия/ при сравняване на общите признаци :

| Общи признаци | Обекти на изследване | Обект №6 |
|---|---|---|
| транскрипция | смесена | смесена |
| строеж | прост | прост |
| обработеност | м/у средна и висока | м/у средна и висока |
| форма | праволинейно-примковидна | праволинейно-примковидна |
| посока | лявоокръжна | лявоокръжна |
| размер | увеличен | увеличен |
| свързаност | средно | средно |
| наклон | ляв | десен |
| разтегнатост | средна, увеличена в парафната част по вертикала | средна, увеличена в парафната част по вертикала |
| натиск | среден | среден |

При сравнителното изследване се установиха и съвпадения в частни признаци на почерка по-характерни от които са: /ФК-1-10 /

-разположение на движенията при изпълнение началната точка на буква „М" - ниско над редовата линия– т.1

-форма на движенията при изпълнение началната част на буква „М" – дъго- ъгловидна- т.2

-разтегнатост на движенията по хоризонтала при изпълнение на първи примковиден елемент на буква „М" – сбита- т.3

-стоеж на движенията при изпълнение първи примковиден елемент на буква „М" – вдлъбната в горната дясна част- т.4

-размер на движенията при изпълнение на първи спрямо втори елемент на буква „М"- по- голям - т.5

-вид на връзката при изпълнение на буква „М" с буква „А" - интервална - т.6

-разположение на движенията при изпълнение началната точка на буква „А" – на средната линия- т.7

-размер на движенията при изпълнение на буква „А" спрямо буква „М" – по- голям- т.8

-относителен строеж на движенията при изпълнение на първи и втори елемент на буква „А"- „остриеобразна" - т.9

-вид на връзката при изпълнение на буква „А" със средната част на подписа - интервална- т.10

-относително разположение на движенията при изпъленине началната точка на средната част – на линията на началната точка на буква „А"- т.11

-посока на движенията при изпъленине горните точки на „ш" – образната средна част – низходяща- т.12

-относително разположение на движенията по вертикала при изпълнение на втори спрямо първи елемент на средната /ш- образна/ част- по- високо- т.13

-разположение на движенията при изпълнение парафнатата част спрямо буква „А" – успоредно- т.14

-относително разположение на движенията при изпъленине заключителната точка на парафа – над редовата линия, средно- т.15

-относително разположение на движенията при изпълнение началната дъговидна част на „С" – образния елемент- в частта на средната част на подписа- т.16

Установените в хода на сравнителното изследване съвпадащи признаци са устойчиви , рядко срещащи се и самостоятелни. Някои от тях с голяма идентификационна стойност. Те образуват индивидуална съвкупност, достатъчна за извода, че изследваните подписи са изпълнени от едно и също лице.

При извършеното техническо изследване на подписите се установи следното:

-подписът положен в Нареждане за плащане с № 9764/24.10.14г. , както бе поосечено в таблицата е с десен наклон в сравнение с останалите подписи- /ФК-6/

-около щриховидните елементи на същия подпис се наблюдават точковидни елементи /при останалите подписи липсват/- ФК-6

-върха на първи примковиден елемент на буква „М" и на парафа са неотчетливи /като отрязани/- ФК-6

Посочените по- горе констатации / различията и при изследването на подписа/ ни дават основание да се допусне, че изследваният подпис в Нареждане за плащане с № 9764/24.10.14г. е възможно да е бил сканиран с копиращо устройство тип скенер от друг документ и да е монтиран върху изследвания. Точковидните елементи около щрихите на подписа, да са останали от премахване на отделни елементи от документа , от които е прехвърлен подписа.

Категорично заключение може да се направи при изследване на оригинала на Нареждане за плащане с № 9764/24.10.14г..

За онагледяване на експертизата се изготви фототаблица съставена от 10 /десет/ фотокопия  и приложени към протокола.

### ЗАКЛЮЧЕНИЕ:

Подписите, положени в положени в следните документи:;
-с вх. № 10/18.12.2014 г. на Окръжен съд
-Нот. заверена Декларация по чл.655 от ТЗ с дата 11.07.2014 г.
-Нот. заверена Декларация по чл.6561 ал.1 от ТЗ с дата 11.07.2014г.
-Нареждане за плащане с № 9764/24.10.14

-с вх. № 6230/25.11.2014 г. на Окръжен съд
-с вх.№ 6147/20.11.2014г. на Окръжен съд
-с вх.№ 6036/17.11.2014г. на Окръжен съд
-с вх.№ 6229/25.11.2014г. на Окръжен съд
-с вх.№ 5106/25.09.2014г. на Окръжен съд
**, са изпълнени  от едно и също лице.**

Изследваният подпис в Нареждане за плащане с № 9764/24.10.14г. е възможно да е технически възпроизведен върху документа /т.н. „кражба на подпис"/.

COPY

ЕКСПЕРТ: 1. ...............................

2. ...............................





ФК- 1-10  Фотокопия на изследваните подписи

Забележка:  с червен цвят и еднозначни цифри са посочени съвпадащите признаци

# EXHIBIT 26



## Фрея ✦ Freya
## Транслейшънс ✦ Translations

**Преводи от и на чужди езици**

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

**CORPORATE COMMERCIAL BANK**

01/12/2014 10:16:14  (Accounting date 06/11/2014)

| | |
|---|---|
| Holder: | **AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY)** |
| Account: | Short-term deposits in BGN of business entities |
| Analytic No.: | 1613 290120 01 8 |
| IBAN: | BG21 KORP 9220 2029 0120 01 |
| Currency: | BGN |
| Balance at the beginning of the period: | 97,500,000.00 |

**BANK ACCOUNT STATEMENT**

| | |
|---|---|
| **Parameters:** | |
| Period: from – to: | 6ᵗʰ November 2014 – 6ᵗʰ November 2014 |
| Amount: from – to: | No limitation |
| Type of operations: | All types |
| Type of Statement: | Detailed Statement |
| Status: | Accounted |

| Accounted on | Value Date | Bank order No. | Details of payment | Debit/ Credit | Amount | Balance | Status |
|---|---|---|---|---|---|---|---|
| 06/11/2014 | 06/11/2014 | 146062 | Termination of deposit. Interest accumulated on Deposit transaction No.29428 upon ex-officio termination made on 24ᵗʰ October 2014 pursuant to Notice of Cession No.9764/24ᵗʰ Oct. 2014 BGN 2,708.33 interest accrued | Credit | 2,708.33 | 97,502,708.33 | Accounted |
| 06/11/2014 | 24/10/2014 | 146063 | Multi-line Payment Order ACCOUNTED TRANSFER OF RECEIVABLES OF FILING NO.9764/24.OCT.2014 BETWEEN THE CEDENT – AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY) AND THE CESSIONARY – FIRST INVESTMENT BANK AD PURSUANT TO APPROVED DECISION NO.461 OF THE CONSERVATORS OF CORPORATE COMMERCIAL BANK IN FURTHERANCE OF ORDER NO.3-273 OF 27ᵀᴴ OCT. 2014 | Debit | 97,502,708,33 | 0.00 | Accounted |
| 06/11/2014 | 24/10/2014 | 288581 | Interest Interest accrued on deposit transaction No. 29428 | Credit | 108,441.67 | 108,441.67 | Accounted |
| 06/11/2014 | 24/10/2014 | 288582 | Deposit Maturity Date Interest accrued on deposit's maturity date. Transaction No.29428 | Debit | 108,441.67 | 0.00 | Accounted |

*The undersigned, Boryona Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Bank Account Statement from Corporate Commercial Bonk AD. This translation has 1 (one) page.*

Translator: _____

*Boryana Ilieva Stefanava*

 КОРПОРАТИВНА ТЪРГОВСКА БАНКА АД

01.12.2014 10:16:14 (Сч. Дата: 06.11.2014)

| | |
|---|---|
| Титуляр | ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД В НЕСЪСТОЯТЕЛНОСТ |
| Сметка | Приети срочни депозити от търговски предприятия в лев |
| Аналитичен номер | 1613 290120 01 8 |
| IBAN | BG21 KORP 9220 2029 0120 01 |
| Валута | BGN |
| Салдо в началото на периода | 97 500 000.00 BGN |

## Извлечение

| | |
|---|---|
| Параметри | |
| Период от - до | 06.11.2014 - 06.11.2014 |
| Сума от - до | Няма ограничение |
| Тип операция | Всички |
| Тип извлечение | Детайлно |
| Статус | Осчетоводена |

| Дата осч. | Вальор | Бордеро No. | Основание | Дт / Кт | Сума | Салдо | Статус |
|---|---|---|---|---|---|---|---|
| 06.11.2014 | 06.11.2014 | 148062 | Прекратяване на депозит<br>Опазване на 'Депозитни сделки' номер 29428,<br>при служебно прекратяване към 24.10.2014<br>съгласно уведомление за прием 9784/24.10.2014<br>Начислена лихва в размер на 2708.33 BGN. | Кт | 2 708.33 | 97 502 708.33 | Осчетоводена |
| 06.11.2014 | 24.10.2014 | 148063 | Многоредово бордеро<br>ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ<br>С ВХ.N.9784/24.10.2014<br>МЕЖДУ ЦЕДЕНТ ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД И<br>И ЦЕСИОНЕР ПЪРВА ИНВЕСТИЦИОННА БАНКА АД,<br>СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.481 НА КВЕСТОРИТЕ<br>НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. 3-2732/27.10.2014 | Дт | 97 502 708.33 | 0.00 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 289581 | Опазване<br>Опазване на 'Депозитни сделки' номер 29428, | Кт | 108 441.67 | 108 441.67 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 289582 | Падеж по депозит<br>Опазване на депозки на падеж, Сделка номер 29428 | Дт | 108 441.67 | 0.00 | Осчетоводена |



# Фрея Freya
# Транслейшънс Translations

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533

e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## CORPORATE COMMERCIAL BANK

01/12/2014 10:16:01  (Accounting date 06/11/2014)

| | |
|---|---|
| Holder: | AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY) |
| Account: | Short-term deposits in BGN of business entities |
| Analytic No.: | 1613 290120 02 5 |
| IBAN: | BG91 KORP 9220 2029 0120 02 |
| Currency: | BGN |
| Balance at the beginning of the period: | 2,000,000.00 |

## BANK ACCOUNT STATEMENT

| | |
|---|---|
| **Parameters:** | |
| Period: from – to: | 6th November 2014 – 6th November 2014 |
| Amount: from – to: | No limitation |
| Type of operations: | All types |
| Type of Statement: | Detailed Statement |
| Status: | Accounted |

| Accounted on | Value Date | Bank order No. | Details of payment | Debit/ Credit | Amount | Balance | Status |
|---|---|---|---|---|---|---|---|
| 06/11/2014 | 24/10/2014 | 146064 | Multi-line Payment Order ACCOUNTED TRANSFER OF ACCOUNTS RECEIVABLE OF FILING No.9764/24.OCT.2014 BETWEEN THE CEDENT – AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY) AND THE CESSIONARY – FIRST INVESTMENT BANK AD PURSUANT TO APPROVED DECISION No.461 OF THE CONSERVATORS OF CORPORATE COMMERCIAL BANK IN FURTHERANCE OF ORDER No.3-273 OF 27TH OCT. 2014 | Debit | 2,000,000.00 | 0.00 | Accounted |
| 06/11/2014 | 06/11/2014 | 295063 | Interest Interest accrued on deposit transaction No. 39033 | Credit | 313.18 | 313.18 | Accounted |

*The undersigned, Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Bank Account Statement from Corporate Commercial Bank AD. This translation has 1 (one) page.*

Translator: _____

*Boryana Ilieva Stefanova*



ЕВРОПЕЙСКА
ТЪРГОВСКА БАНКА АД

01.12.2014 10:18:01 (Сч. Дата: 06.11.2014)

| | |
|---|---|
| Титуляр | ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД В НЕСЪСТОЯТЕЛНОСТ |
| Сметка | Приети срочни депозити от търговски предприятия в лев |
| Аналитичен номер | 1613 290120 02 5 |
| IBAN | BG91 KORP 9220 2029 0120 02 |
| Валута | BGN |
| Салдо в началото на периода | 2 000 000.00 BGN |

**Извлечение**

| | |
|---|---|
| **Параметри** | |
| Период от - до | 06.11.2014 - 06.11.2014 |
| Сума от - до | Няма ограничение |
| Тип операции | Всички |
| Тип извлечение | Детайлно |
| Статус | Осчетоводена |

| Дата осч. | Вальор | Бордеро No. | Основание | Дт / Кт | Сума | Салдо | Статус |
|---|---|---|---|---|---|---|---|
| 06.11.2014 | 24.10.2014 | 148064 | Многоредово бордеро ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ С ВХ.Н.9784/24.10.2014 МЕЖДУ ЦЕДЕНТ ЕЪР ПРОПЪРТИ ДИВЕЛОПМЪНТ АД/Н/ И ЦЕСИОНЕР ПЪРВА ИНВЕСТИЦИОННА БАНКА АД, СЪГЛАСНО ОДОБРЕНО РЕШЕНИЕ N.461 НА КВЕСТОРИТЕ НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. 3-2732/27.10.2014 | Дт | 2 000 000.00 | 0.00 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 295063 | Описание Описание на "Депозитна сметка" номер 39033. | Кт | 313.18 | 313.18 | Осчетоводена |



# *Фрея* **Freya**
# *Транслейшънс* *Translations*

**Преводи от и на чужди езици**

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## CORPORATE COMMERCIAL BANK

01/12/2014 10:15:46  (Accounting date 06/11/2014)

| | |
|---|---|
| Holder: | **AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY)** |
| Account: | Short-term deposits in BGN of business entities |
| Analytic No.: | 1613 290120 03 2 |
| IBAN: | BG64 KORP 9220 2029 0120 03 |
| Currency: | BGN |
| Balance at the beginning of the period: | 1,000,000.00 |

**BANK ACCOUNT STATEMENT**

**Parameters:**

| | |
|---|---|
| Period: from – to: | 6th November 2014 – 6th November 2014 |
| Amount: from – to: | No limitation |
| Type of operations: | All types |
| Type of Statement: | Detailed Statement |
| Status: | Accounted |

| Accounted on | Value Date | Bank order No. | Details of payment | Debit/ Credit | Amount | Balance | Status |
|---|---|---|---|---|---|---|---|
| 06/11/2014 | 24/10/2014 | 146068 | Multi-line Payment Order ACCOUNTED TRANSFER OF ACCOUNTS RECEIVABLE OF FILING No.9764/24.OCT.2014 BETWEEN THE CEDENT – AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY) AND THE CESSIONARY – FIRST INVESTMENT BANK AD PURSUANT TO APPROVED DECISION No.461 OF THE CONSERVATORS OF CORPORATE COMMERCIAL BANK IN FURTHERANCE OF ORDER No.3-273 OF 27TH OCT. 2014 | Debit | 1,000,000.00 | 0.00 | Accounted |
| 06/11/2014 | 06/11/2014 | 295900 | Interest Interest accrued on deposit transaction No. 40116 | Credit | 514.81 | 514.81 | Accounted |

*The undersigned, Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Bank Account Statement from Corporate Commercial Bank AD. This translation has 1 (one) page.*

Translator: _____

Boryana Ilieva Stefonova





**Фрея** **Freya**
**Транслейшънс** **Translations**

**Преводи от и на чужди езици**
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## CORPORATE COMMERCIAL BANK

01/12/2014 10:15:31  (Accounting date 06/11/2014)

| | |
|---|---|
| Holder: | **AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY)** |
| Account: | Special bank accounts of business entities in BGN |
| Analytic No.: | 1731 290120 01 7 |
| IBAN: | BG74 KORP 9220 1029 0120 51 |
| Currency: | BGN |
| Balance at the beginning of the period: | 2,464,442.00 |

**BANK ACCOUNT STATEMENT**

**Parameters:**

| | |
|---|---|
| Period: from – to: | 6th November 2014 – 6th November 2014 |
| Amount: from – to: | No limitation |
| Type of operations: | All types |
| Type of Statement: | Detailed Statement |
| Status: | Accounted |

| Accounted on | Value Date | Bank order No. | Details of payment | Debit/ Credit | Amount | Balance | Status |
|---|---|---|---|---|---|---|---|
| 06/11/2014 | 24/10/2014 | 146069 | Multi-line Payment Order ACCOUNTED TRANSFER OF ACCOUNTS RECEIVABLE OF FILING No.9764/24.OCT.2014 BETWEEN THE CEDENT – AYR PROPERTY DEVELOPMENT AD (IN BANKRUPTCY) AND THE CESSIONARY – FIRST INVESTMENT BANK AD PURSUANT TO APPROVED DECISION No.461 OF THE CONSERVATORS OF CORPORATE COMMERCIAL BANK IN FURTHERANCE OF ORDER No.3-273 OF 27TH OCT. 2014 | Debit | 2,464,238,26 | 203.74 | Accounted |
| 06/11/2014 | 06/11/2014 | 148935 | Interest Interest accrued – | Credit | -20.53 | 183.21 | Accounted |
| 06/11/2014 | 06/11/2014 | 288582 | Deposit Maturity Date Interest accrued on deposit's maturity date. Transaction No.29428 | Credit | 108,441.67 | 108,624.88 | Accounted |
| 06/11/2014 | 06/11/2014 | 306010 | Aggregate fee collection Commission calculated at the Bank's rates | Debit | 7.50 | 108,617.38 | Accounted |

*The undersigned, Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Bank Account Statement from Corporate Commercial Bank AD. This translation has 1 (one) page.*

Translator: _____
*Boryana Ilieva Stefanova*

 

КОРПОРАТИВНА
ТЪРГОВСКА БАНКА АД

01.12.2014 10:15:31 (Сч. Дата: 06.11.2014)

| | |
|---|---|
| Титуляр | ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД В НЕСЪСТОЯТЕЛНОСТ |
| Сметка | Особени сметки на търговски предприятия в левове |
| Аналитичен номер | 1731 290120 01 7 |
| IBAN | BG74 KORP 9220 1029 0120 51 |
| Валута | BGN |
| Салдо в началото на периода | 2 464 442.00 BGN |

## Извлечение

| | |
|---|---|
| Параметри | |
| Период от - до | 06.11.2014 - 06.11.2014 |
| Сума от - до | Няма ограничение |
| Тип операции | Всички |
| Тип извлечение | Детайлно |
| Статус | Осчетоводена |

| Дата осч. | Вальор | Бордеро No. | Основание | Дт / Кр | Сума | Салдо | Статус |
|---|---|---|---|---|---|---|---|
| 06.11.2014 | 24.10.2014 | 145069 | Многоредово бордеро ОСЧЕТОВОДЕНО ПРЕКЛАСИРАНЕ НА ВЗ/-МАНЕ С ВХ.Н.9764/24.10.2014 МЕЖДУ ЦЕДЕНТ ЕЪР ПРОПЪРТИ ДИЛЕЛОПМЪНТ АД М И ЦЕСИОНЕР ПЪРВА ИНВЕСТИЦИОННА БАНКА АД, СЪГЛАСНО ОДОБРЕНО РЕШЕНИЕ N.461 НА КВЕСТОРИТЕ НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАГРЮНД.N. 3-3732/27.10.2014 | Дт | 2 464 238.26 | 203.74 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 145035 | Опмсание Опмсание - | Кр | -20.53 | 183.21 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 365302 | Падеж по депозит Опмсаване на депозит на падеж. Сделка номер 29426 | Кр | 106 441.67 | 106 624.88 | Осчетоводена |
| 06.11.2014 | 06.11.2014 | 306010 | Маскирано събирана такса комисионна по тарифа на банката | Дт | 7.50 | 106 617.38 | Осчетоводена |

---

VCSBank

Стр. 1 от 1

# EXHIBIT 27



# *Фрея* **Freya**
## *Транслейшънс* **Translations**

### Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

17th November 2014, 17:30:22 (Recorded on 6th November 2014)
Corporate Commercial Bank AD – Sofia          page 1

6th November 2014/ 146120

Reference: 0

30th October 2014 / 1

Details of transfer:

--------------------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10209 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Sibole Services Incorporated Bulgaria EOOD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

--------------------------------------------------------------------------------

Sibole Services Incorporated Bulgaria EOOD

First Investment Bank

| | | | |
|---|---|---|---|
| 1711 000543 02 5 | 17,000,000.00 Debit | 17,000,000.00 | 30/10/2014 BGN |
| 1.000000      0 | | | |
| 1713 458162 02 0 | 17,000,000.00 Credit | 17,000,000.00 | 30/10/2014 BGN |
| 1.000000      0 | | | |

*The undersigned Boryana Ilieva Stefonova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. No. 10209 of 30th October 2014. This translation has 1 (one) page.*

Translator:
Boryana Ilieva Stefanova

17.11.2014,17:30:22(Сч.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

06.11.2014 / 146120
РЕФЕРЕНЦИЯ: 0
30.10.2014 / 1

Основание:
-------------------------------------------------
ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.Н.10209/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР СИБОЛЕ СЪРВИСИС ИНКОРПОРЕЙТИД
БЪЛГАРИЯ ЕООД,
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. 3-2732/27.10.2014
-------------------------------------------------
     СИБОЛЕ СЪРВИСИС ИНКОРПОРЕЙТИД БЪЛГАРИЯ ЕООД
     ПЪРВА ИНВЕСТИЦИОННА БАНКА

1711 000543 02 5          17 000 000.00  Dt     17 000 000.00  30.10.2014  BGN
1.000000       0
1713 458162 02 0          17 000 000.00  Kt     17 000 000.00  30.10.2014  BGN
1.000000       0



# Фрея ⟨F⟩ Freya
## Транслейшънс    Translations

### Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

/ 146124

Reference: 0

30th October 2014 / 1

Details of transfer:

-------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10208 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Droslian Bulgaria EOOD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

-------------------------------------------------------------------

Droslian Bulgaria EOOD

First Investment Bank

| | | | | | |
|---|---|---|---|---|---|
| 1711 000543 02 5 | | 16,811,896.00 | Debit | | 16,811 |
| 896.00 | 30th October 2014 | BGN 1,000,000 | 0 | | |
| 1713 467671 02 0 | | 16,811,896.00 | Credit | | 16,811 |
| 896.00 | 30th October 2014 | BGN 1,000,000 | 0 | | |

*The undersigned Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. Na. 10208 of 30th October 2014. This translation has 1 (one) page.*

Translator: 
       *Boryana Ilieva Stefanova*

146124
РЕФЕРЕНЦИЯ : 0
30.10.2014 / 1

ОСНОВАНИЕ :
-----------------------------------------------
ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.N.10208/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР ДРОСИЛМАН БЪЛГАРИЯ ЕООД
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЕ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N.З-2732/27.10.2014
-----------------------------------------------
ДРОСИЛМАН БЪЛГАРИЯ ЕООД
ПЪРВА ИНВЕСТИЦИОННА БАНКА

1711 000543 02 5           16 811 896.00 Dt        16 811
896.00  30.10.2014  BGN 1.000000        0
1713 467671 02 0           16 811 896.00 Kt        16 811
896.00  30.10.2014  BGN 1.000000        0





## Фрея Транслейшънс / Freya Translations

**Преводи от и на чужди езици**

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533

e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

17th November 2014, 17:29:05 (Recorded on 6th November 2014)
Corporate Commercial Bank AD – Sofia            page 1

6th November 2014/ 146126

Reference: 0

30th October 2014 / 1

Details of transfer:

-----------------------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10206 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Tabak Market AD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

-----------------------------------------------------------------------------------

Tabak Market AD

First Investment Bank

| | | | | |
|---|---|---|---|---|
| 1711 000543 02 5 | 34,400,000.00 Debit | 34,400,000.00 | 30/10/2014 | BGN |
| 1.000000    0 | | | | |
| 1713 333467 02 0 | 34,400,000.00 Credit | 34,400,000.00 | 30/10/2014 | BGN |
| 1.000000    0 | | | | |

*The undersigned Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. No. 10206 of 30th October 2014. This translation has 1 (one) page.*

*Translator:* _____

Boryana Ilieva Stefanova

17.11.2014,17:29:05(Сч.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

06.11.2014 / 146126
РЕФЕРЕНЦИЯ: 0
30.10.2014 / 1

Основание:
-------------------------------------------------
ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.Н.10206/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР ТАБАК МАРКЕТ АД,
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. 3-2732/27.10.2014
-------------------------------------------------
    ТАБАК МАРКЕТ  АД
    ПЪРВА ИНВЕСТИЦИОННА БАНКА

1711 000543 02 5          34 400 000.00  Dt     34 400 000.00  30.10.2014  BGN
1.000000        0
1713 333467 02 0          34 400 000.00  Kt     34 400 000.00  30.10.2014  BGN
1.000000        0





**Фрея**
**Транслейшънс**

**Freya**
**Translations**

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

17th November 2014, 17:26:40 (Recorded on 6th November 2014)
Corporate Commercial Bank AD – Sofia          page 1

6th November 2014/ 146146

Reference: 0

30th October 2014 / 1

Details of transfer:

-----------------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10210 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Promishleno Stroitelstvo Holding EAD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

-----------------------------------------------------------------------------

Promishleno Stroitelstvo Holding EAD

First Investment Bank

| | | | | |
|---|---|---|---|---|
| 1711 000543 02 5 | 4,578,163.33 Debit | 4,578,163.33 | 30/10/2014 BGN | |
| 1.000000          0 | | | | |
| 1713 000522 07 8 | 4,578,163.33 Credit | 4,578,163.33 | 30/10/2014 BGN | |
| 1.000000          0 | | | | |

*The undersigned Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. No. 10210 of 30th October 2014. This translation has 1 (one) page.*

Translator: _____
Boryana Ilieva Stefanova

17.11.2014,17:26:40(Сч.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

06.11.2014 / 146146
РЕФЕРЕНЦИЯ: 0
30.10.2014 / 1

Основание:
------------------------------------------------------
ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.Н.10210/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР ПРОМИШЛЕНО СТРОИТЕЛСТВО ХОЛДИНГ ЕАД,
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. З-2732/27.10.2014
------------------------------------------------------
ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД
ПЪРВА ИНВЕСТИЦИОННА БАНКА

1711 000543 02 5              4 578 163.33  Dt       4 578 163.33  30.10.2014  BGN
1.000000       0
1713 000522 07 8              4 578 163.33  Kt       4 578 163.33  30.10.2014  BGN
1.000000       0





## Фрея Транслейшънс

## Freya Translations

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533

e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

17th November 2014, 17:25:57 (Recorded on 6th November 2014)
Corporate Commercial Bank AD – Sofia          page 1

6th November 2014/ 146147

Reference: 0

30th October 2014 / 1

Details of transfer:

----------------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10210 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Promishleno Stroitelstvo Holding EAD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

----------------------------------------------------------------------------

Promishleno Stroitelstvo Holding EAD

First Investment Bank

| | | | |
|---|---|---|---|
| 1711 000543 01 8 | 2,462,325.67 Debit | 2,462,325.67 | 30/10/2014 BGN |
| 1.000000       0 | | | |
| 1713 000522 08 5 | 2,462,325.67 Credit | 2,462,325.67 | 30/10/2014 BGN |
| 1.000000       0 | | | |

*The undersigned Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. No. 10210 of 30th October 2014. This translation has 1 (one) page.*

Translator: 

*Boryana Ilieva Stefanova*

17.11.2014,17:25:57(Сч.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

06.11.2014 / 146147
РЕФЕРЕНЦИЯ: 0
30.10.2014 / 1

Основание:

--------------------------------------------------

ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.Н.10210/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР ПРОМИШЛЕНО СТРОИТЕЛСТВО ХОЛДИНГ ЕАД,
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. 3-2732/27.10.2014

--------------------------------------------------

ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД
ПЪРВА ИНВЕСТИЦИОННА БАНКА

| | | | |
|---|---|---|---|
| 1711 000543 01 8 | 2 462 325.67  Dt | 2 462 325.67  30.10.2014  BGN | |
| 1.000000        0 | | | |
| 1713 000522 08 5 | 2 462 325.67  Kt | 2 462 325.67  30.10.2014  BGN | |
| 1.000000        0 | | | |





### Фрея Freya
### Транслейшънс Translations

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533

e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

17th November 2014, 17:23:33 (Recorded on 6th November 2014)
Corporate Commercial Bank AD – Sofia          page 1

6th November 2014/ 146151

Reference: 0

30th October 2014 / 1

Details of transfer:

-------------------------------------------------------------------------------

Recorded transfer of accounts receivable in the books under Ref. No. 10204 of 30th October 2014 made by and between First Investment Bank AD acting as the Cedent and Vili Vist EAD, acting as the Cessionary pursuant to approved Decision No.461 issued by the Conservators of Corporate Commercial Bank AD and in furtherance of Order No.3-2732 of 27th October 2014.

-------------------------------------------------------------------------------

Vili Vist EAD

First Investment Bank

| | | | | |
|---|---|---|---|---|
| 1711 000543 02 5 | 10,407,000.00 Debit | 10,407,000.00 | 30/10/2014 BGN | |
| 1.000000          0 | | | | |
| 1713 512809 02 8 | 10,407,000.00 Credit | 10,407,000.00 | 30/10/2014 BGN | |
| 1.000000          0 | | | | |

---

*The undersigned Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Recorded Transfer of accounts receivable in the books under Ref. No. 10204 of 30th October 2014. This translation has 1 (one) page.*

Translator: _____

Boryana Ilieva Stefanova



17.11.2014,17:23:33(Сч.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

06.11.2014 / 146151
РЕФЕРЕНЦИЯ: 0
30.10.2014 / 1

Основание:
------------------------------------------------
ОСЧЕТОВОДЕНО ПРЕХВЪРЛЯНЕ НА ВЗЕМАНЕ
С ВХ.Н.10204/30.10.2014
МЕЖДУ ЦЕДЕНТ ПЪРВА ИНВЕСТИЦИОННА БАНКА АД
И ЦЕСИОНЕР ВИЛИ ВИСТ ЕАД,
СЪГЛАСНО ОДОБРЕНО РЕШЕНИЯ N.461 НА КВЕСТОРИТЕ
НА КТБ АД И В ИЗПЪЛНЕНИЕ НА ЗАПОВЕД N. З-2732/27.10.2014
------------------------------------------------
ВИЛИ ВИСТ ЕАД
ПЪРВА ИНВЕСТИЦИОННА БАНКА

1711 000543 02 5          10 407 000.00 Dt      10 407 000.00 30.10.2014 BGN
1.000000        0
1713 512809 02 8          10 407 000.00 Kt      10 407 000.00 30.10.2014 BGN
1.000000        0

# EXHIBIT 28



*Фрея Транслейшънс*
*Freya Translations*

Преводи от и на чужди езици
гр. Варна, ул. Кирил и Методий № 1
Email: freyatranslations@gmail.com

*Translation from Bulgarian*

*(BNB Logo)*

### BULGARIAN NATIONAL BANK

**Dear Conservators,**

Pursuant to Art.107 (3) of the Law on Credit Institutions (LCI) and in view of our duty to supervise how the conservators handle the property of the bank placed under conservatorship on an on-going-basis and their strict adherence to the restrictions imposed on such bank with respect to its fulfilment of its obligations, this is to hereby instruct you that in your conservator capacity you shall do as follows:

1. Submit a weekly report on the first day of the week following the reported week on all payments made under Art.119 (3)(4) LCI over the preceding week, which report shall contain details of each and every debt with respect to which a payment has been made. It is our understanding that as of present it is not possible to make any payment under Art.119 (3)(1) through Art.119(3)(3) LCI on account of the fact that a bank taken into conservatorship (or the supervised bank) has no access to any payment system, hence no final settlement can be achieved.

2. Notify the Bulgarian National Bank of each and any forthcoming payment exceeding BGN 200,000 (*two hundred thousand Bulgarian levs or its respective foreign currency equivalent*) seven days prior to actual payment and supply the BNB with all relevant information about the debt being so paid. Such payment can only be made if the BNB has not objected to the term set for such payment. No restrictions to that effect shall apply to money transfers between accounts with the supervised bank or between accounts with different banks when such money transfers need to be made for the supervised bank handling expenses purposes.

**Respectfully yours,**

**Neli Kordovska,**
**BNB Deputy Governor and  Head of Banking Supervision Division**

**Dimitar Kostov,**
**BNB Deputy Governor and Head of Banking Division**

1 Knyaz Alexander Square, Sofia 1000, tel.:02 9145 9; fax: 02 980 24 25




**2**

Addendum Form 1

Letter/memo/opinion No._____ Date:_____

From: _____

To:    Mr Lichev

For the purpose of:

☐ Information

☐ Opinion

☐ Reply

☐ Proposition

☐ Taking action in furtherance of the above

☐ Other _____ *For your information!*_____

_____

_____

To be done by: _____

Date: 22nd August 2014     /s/ (ill.)

Conservators:

_____          _____
Elena Zdravkova Kostadinchev           Stanislav Georgiev Lyutov

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct English translation of the Bulgarian original of the attached document — BNB Letter of Instructions to the Conservators for the bank taken into conservatorship, dated 22nd August 2014. This translation has 2 (two) pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*



# Българска народна банка

ДО

КВЕСТОРИТЕ НА

„КОРПОРАТИВНА

ТЪРГОВСКА БАНКА" АД

И  НА   „ТЪРГОВСКА   БАНКА

ВИКТОРИЯ" АД

УВАЖАЕМИ КВЕСТОРИ,

Във връзка с упражняването на постоянен контрол върху действията на квесторите по разпореждане с имуществото на поставената под специален надзор банка, в това число и за стриктното спазване ограниченията, наложени на банката по отношение изпълнението на нейните задължения, на основание чл. 107, ал.3 от ЗКИ, Ви указваме следното:

1. Квесторите са задължени да представят на седмична база, в първия работен ден на следващата седмица, отчет за извършените през изминалата седмица плащания с основание чл.119, ал.3, т. 4 ЗКИ, като за всяко плащане се посочват конкретни данни за задължението, по което е извършено плащането. Приемаме, че към настоящия момент извършване на плащания по чл. 119, ал.3, т. 1-3 не е възможно да се извършва, поради това че банките поставени под специален надзор не разполагат с директен достъп до платежните системи с окончателност на сетълмента.

2. За всяко предстоящо плащане надхвърлящо 200 хил.лв. (или съответната валутна равностойност) квесторите уведомяват БНБ в  седмодневен срок преди извършването му, като предоставят съответната информация за задължението, по което ще се изврши плащането. Плащането може да се изврши ако  БНБ не е възразила в срока по изр. първо. Това не се отнася за преводи от една сметка на банката в друга, в една и съща или в различни банки, когато това се налага за нуждите на плащания, свързани с издръжка на банката.

С УВАЖЕНИЕ,

НЕЛИ КОРДОВСККА                    ДИМИТЪР КОСТОВ

ЗА ПОДУПРАВИТЕЛ НА БНБ          ПОДУПРАВИТЕЛ НА БНБ

РЪКОВОДЕЩ УПРАВЛЕНИЕ            РЪКОВОДЕЩ УПРАВЛЕНИЕ

„БАНКОВ НАДЗОР"                      „БАНКОВО"

пл. „Княз Александър i" № 1, 1000 София, тел. 02 9145 9,
факс 02 980 24 25

**Приложение 1**

Писмо, докладна записка, становище No...................../ дата............

От: ....................................................................................................................

До:

Г-н / Г-жа ........ *Личе С*

☐  За сведение

☐  За становище

☐  За отговор

☐  За предложение

☐  За изпълнение

☐  Други *За информация!*

....................................................................................................................

....................................................................................................................

....................................................................................................................

Срок за изпълнение .......................................................................

Дата:........ *22.08.2017*

Квестори:

.....................................................          ...........................................

...лена Здравкова Костадинчев                    Станислав Георгиев Лютов

# EXHIBIT 29

(Excerpts)



<u>Information pursuant to art. 62, par. 12, item 3 of the Credit Institutions Law</u>

Information regarding entities, sole propriatores and legal subjects who made notices for transfer of their account receivable after the date on which the bank was put into special supervision (20 June 2014)

| Name | Transaction value | | Type |
|---|---|---|---|
| | Currency | Amount | |
| First Investment Bank AD | BGN | 7 040 489 | Cession |
| First Investment Bank AD | BGN | 17 000 000 | Cession |
| First Investment Bank AD | BGN | 10 407 000 | Cession |
| First Investment Bank AD | BGN | 34 400 000 | Cession |
| First Investment Bank AD | BGN | 16 811 896 | Cession |

*Notes:*

- *The amounts listed in the above table have been rounded off to the nearest whole digit;*
- *The above table includes notifications about endorsements of accounts receivable (cessions) submitted in the bank after the bank had been put into special supervision;*
- *In cases when an entity has made more than one notification to the bank for endorsements of accounts receivable and/or the notification for endorsement of accounts receivable included more than one transaction, they were included in the table as a separate entry.*

<u>Information pursuant to art. 62, par. 12, item 3 of the Credit Institutions Law</u>

Information regarding entities, sole propriatores and legal subjects who made notices for set-offs after the date on which the bank was put into special supervision (20 June 2014)



(List of CCB's debtors who used monetary amounts from deposit accounts in CCB for deductions of their obligations)

| Name | Transaction value | | Type |
|---|---|---|---|
| | Currency | Amount | |
| Vili Vist Bulgaria EAD | BGN | 10 407 000 | Deduction |
| Droslian Bulgaria EOOD | BGN | 16 811 896 | Deduction |
| Promishleno Stroitelstvo Holding EAD | BGN | 7 040 489 | Deduction |
| Cibole Services Incorporated Bulgaria EOOD | BGN | 17 000 000 | Deduction |
| Tabac Market AD | BGN | 34 400 000 | Deduction |

*Notes:*

- *The amounts listed in the above table have been rounded off to the nearest whole digit;*

- *The above table includes notifications about deductions submitted in the bank after the bank had been put into special supervision;*
- *In cases when an entity has made more than one notification to the bank for deduction and/or the notification deduction included more than one transaction, they were included in the table as a separate entry.*

This translation has been made by Dimitar Blagovestov Yanakiev, Attorney-at-Law, member of the Bar Association in the city of Varna, Republic of Bulgaria:

/Dimitar Yanakiev/

**Информация по чл.62, ал.12, т.3 от Закона за кредитните институции**
Информация за юридически лица, еднолични търговци и неперсонифицирани правни субекти, които са съобщили за прехвърляне на вземането си след поставяне на банката под специален надзор (20.06.2014г.):

| НАИМЕНОВАНИЕ | Стойност на сделката | | Вид на сделката |
|---|---|---|---|
| | Валута | Сума | |
| ЗБЕЙ.БГ АД | EUR | 494 000 | Цесия |
| ATH.PLEXIDAS AND SONS S.A | EUR | 2 900 000 | Цесия |
| B.R.E. S.A | EUR | 1 300 000 | Цесия |
| CLARTEX MOVERS LIMITED/КЛАРТЕКС МУВЪРС ЛИМИТЕД | EUR | 337 035 | Цесия |
| LOUDRIP INVESTMENTS LIMITED | EUR | 186 000 | Цесия |
| | USD | 286 000 | Цесия |
| NORWOOD TRADING LIMITED | EUR | 38 000 | Цесия |
| | USD | 107 000 | Цесия |
| RADIANT TECHNOLOGY INC | USD | 2 967 000 | Цесия |
| | EUR | 137 000 | Цесия |
| А.В.БИЛДИНГС АД | BGN | 164 000 | Цесия |
| АГРО ФИНАНС АДСИЦ | BGN | 3 444 700 | Цесия |
| АГРОМАХ ХОЛИДЕЙ ЕООД | EUR | 2 369 000 | Цесия |
| АГРОМАХ ХОЛИДЕЙ ЕООД | BGN | 185 000 | Цесия |
| АДВОКАТСКО ДРУЖЕСТВО МАКСИМОВА-НИКОЛОВА | BGN | 1 200 | Цесия |
| АДОНИС-45 ООД | EUR | 288 340 | Цесия |
| | BGN | 110 000 | Цесия |
| АЛЕКСАНДЪР ПОПОВ ИНВЕСТ ЕООД | BGN | 108 000 | Цесия |
| АЛФА ТРАКИНГ АД /В НЕСЪСТОЯТЕЛНОСТ/ | BGN | 238 200 | Цесия |
| АМЛОГ ООД | BGN | 290 000 | Цесия |
| | EUR | 141 887 | Цесия |
| АНИМАТО МЮЗИК ЕООД | BGN | 428 700 | Цесия |
| | EUR | 87 094 | Цесия |
| АНИМАТО МЮЗИК ПЪБЛИШИНГ ЕООД | BGN | 163 660 | Цесия |
| АРКОН КОНСУЛТ ООД | USD | 530 511 | Цесия |
| АРКОН КОНСУЛТ ООД | BGN | 284 717 | Цесия |
| АРКУС АСЕТ МЕНИДЖМЪНТ АД | BGN | 265 000 | Цесия |
| АРКУС БЪЛГАРИЯ АД | EUR | 34 694 | Цесия |
| АРМАКО АД | USD | 1 711 566 | Цесия |
| | BGN | 418 175 | Цесия |
| АРМАР КОРПОРЕЙШАН ДЖЕНЕРАЛ ТЕХНИКАЛ КО-ОПЕРЕЙШАН ООД | EUR | 100 000 | Цесия |
| АРМАР КОРПОРЕЙШАН ДЖЕНЕРАЛ ТЕХНИКАЛ КО-ОПЕРЕЙШАН ООД | EUR | 158 658 | Цесия |
| АРСЕНАЛ АД | USD | 503 638 | Цесия |
| | BGN | 189 340 | Цесия |
| | EUR | 5 772 | Цесия |
| АСТ СОФИЯ ООД | BGN | 225 000 | Цесия |
| АСТРА АСЕТ МЕНИДЖМЪНТ АД | BGN | 27 293 | Цесия |
| АТГ АД | BGN | 2 379 846 | Цесия |
| | USD | 34 700 | Цесия |
| | EUR | 6 190 | Цесия |
| БАЛКАН МК ЕООД | EUR | 2 544 000 | Цесия |
| БАЛКАН МК ЕООД | EUR | 622 260 | Цесия |
| БАЛКАН МК ЕООД | EUR | 3 246 254 | Цесия |
| БДЖ ТОВАРНИ ПРЕВОЗИ ЕООД | EUR | 664 743 | Цесия |
| БДЖ ТОВАРНИ ПРЕВОЗИ ЕООД | BGN | 2 590 694 | Цесия |
| БЛЕК СИЙ ЕСТЕЙТ МЕНИДЖМЪНТ ЕООД | BGN | 605 000 | Цесия |
| БРАЙТ ИНЖЕНЕРИНГ ООД | USD | 66 599 | Цесия |
| БРАЙТ ИНЖЕНЕРИНГ ООД | BGN | 328 000 | Цесия |
| БРАЙТ ИНЖЕНЕРИНГ ООД | USD | 63 000 | Цесия |
| БРОМАК ЕООД | EUR | 10 828 750 | Цесия |
| БРОМАК ЕООД | EUR | 17 117 000 | Цесия |
| БРОМАК ЕООД | EUR | 2 200 000 | Цесия |
| БРОМАК ЕООД | EUR | 5 783 556 | Цесия |
| БРОМАК ЕООД | EUR | 5 649 934 | Цесия |
| БС ЮНИВЪРС - ЕООД | EUR | 50 000 | Цесия |
| БСУ ЕАД | BGN | 2 905 533 | Цесия |
| БТК НЕТ ЕООД | BGN | 810 000 | Цесия |
| БУЛГАРГАЗ ЕАД | BGN | 12 385 438 | Цесия |
| БУРГАСКИ СВОБОДЕН УНИВЕРСИТЕТ | BGN | 7 328 673 | Цесия |

| | | | |
|---|---|---|---|
| БЪЛГАРСКА АГЕНЦИЯ ЗА ЕКСПОРТНО ЗАСТРАХОВАНЕ/БАЕЗ/ ЕАД | BGN | 2 800 000 | Цесия |
| БЪЛГАРСКА ИНДУСТРИАЛНА И ТЪРГОВСКА КОРПОРАЦИЯ АД | EUR | 100 000 | Цесия |
| БЪЛГАРСКА ИНДУСТРИАЛНА И ТЪРГОВСКА КОРПОРАЦИЯ АД | EUR | 8 200 000 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 34 786 200 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 39 294 045 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 981 340 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 17 632 661 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 309 480 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 5 580 000 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 5 575 000 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 16 258 640 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 2 994 564 | Цесия |
| БЪЛГАРСКА ТЕЛЕКОМУНИКАЦИОННА КОМПАНИЯ ЕАД | BGN | 5 766 521 | Цесия |
| БЪЛГАРСКА ТЪРГОВСКО-ПРОМИШЛЕНА ПАЛАТА | BGN | 994 634 | Цесия |
| БЪЛГАРСКА ТЪРГОВСКО-ПРОМИШЛЕНА ПАЛАТА | EUR | 205 546 | Цесия |
| БЪЛГАРСКА ФОНДОВА БОРСА-СОФИЯ АД | BGN | 1 752 000 | Цесия |
| БЪЛГАРСКИ ЕНЕРГИЕН ХОЛДИНГ ЕАД | BGN | 21 069 935 | Цесия |
| БЪЛГАРСКИ ЕНЕРГИЕН ХОЛДИНГ ЕАД | EUR | 4 256 245 | Цесия |
| В И В - ИЗОМАТИК ООД | BGN | 500 000 | Цесия |
| В И В - ИЗОМАТИК ООД | EUR | 1 795 182 | Цесия |
| В И В - ИЗОМАТИК ООД | BGN | 4 880 998 | Цесия |
| ВАРНА ЗАПАД ИНДУСТРИАЛНА ЗОНА ЕАД | BGN | 2 730 157 | Цесия |
| ВЕГА МЕДИКАЛ ООД | BGN | 297 255 | Цесия |
| ВЕЛГРАФ АСЕТ МЕНИДЖМЪНТ АД | EUR | 1 330 411 | Цесия |
| ВЕЛГРАФ АСЕТ МЕНИДЖМЪНТ АД | EUR | 9 500 000 | Цесия |
| ВИ АЙ ДЖИ ПРОПЪРТИС БЪЛГАРИЯ  АД | BGN | 542 072 | Цесия |
| ВИКТОРИЯ ЗАД | BGN | 2 780 623 | Цесия |
| ВИКТОРИЯ ЗАД | EUR | 921 019 | Цесия |
| ВИКТОРИЯ ЗАД | USD | 11 017 | Цесия |
| ВИРДЖИНИЯ ПЪБЛИШИНГ ЕООД | BGN | 11 100 | Цесия |
| ВИРДЖИНИЯ РЕКЪРДС ЕООД | BGN | 259 332 | Цесия |
| ВИРДЖИНИЯ РЕКЪРДС ЕООД | EUR | 38 417 | Цесия |
| ВОДЕН ЦИКЪЛ 2011 ДЗЗД | BGN | 4 590 | Цесия |
| ВОДСТРОЙ - ИПС ДЗЗД | BGN | 60 070 | Цесия |
| ВАРНЕНСКИ СВОБОДЕН УНИВЕРСИТЕТ ЧЕРНОРИЗЕЦ ХРАБЪР | USD | 1 965 632 | Цесия |
| ВАРНЕНСКИ СВОБОДЕН УНИВЕРСИТЕТ ЧЕРНОРИЗЕЦ ХРАБЪР | BGN | 50 127 | Цесия |
| ВАРНЕНСКИ СВОБОДЕН УНИВЕРСИТЕТ ЧЕРНОРИЗЕЦ ХРАБЪР | EUR | 771 856 | Цесия |
| Г И М КОНСУЛТ АД | EUR | 550 000 | Цесия |
| Г И М КОНСУЛТ АД | EUR | 1 410 000 | Цесия |
| ГАЛИНИ-Н ЕООД | BGN | 1 800 000 | Цесия |
| ГБС - АУГУСТА ДЗЗД | BGN | 24 280 | Цесия |
| ГБС и ПАРТНЬОРИ ДЗЗД | BGN | 118 470 | Цесия |
| ГЕОКАД 93 ЕООД | BGN | 130 268 | Цесия |
| ГЛОБЪЛ КЕМИКЪЛС СЪЛЮШЪНС ЕООД | EUR | 677 000 | Цесия |
| ДАТЕКС ООД | EUR | 2 369 000 | Цесия |
| ДАТЕКС ООД | EUR | 1 089 261 | Цесия |
| ДАТЕКС ООД | EUR | 442 000 | Цесия |
| ДЕКОТЕКС АД | EUR | 411 151 | Цесия |
| ДЕКОТЕКС АД | BGN | 983 306 | Цесия |
| ДЖЕНЕРИС АД | BGN | 240 000 | Цесия |
| ДЖЕНЕРИС АД | BGN | 83 514 | Цесия |
| ДЖЕНЕРИС АД | BGN | 87 034 | Цесия |
| ДЗЗД ИНТЕГРИРАНИ ИНФРАСТРУКТУРИ ГАБРОВО | BGN | 108 260 | Цесия |
| ДЗЗД ПСВ | BGN | 2 880 | Цесия |
| ДЗЗД ЦАРЕВЕЦ 2013 | BGN | 286 802 | Цесия |
| ДИГТЕХ АД | EUR | 148 585 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | EUR | 555 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | BGN | 1 619 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | BGN | 117 706 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | BGN | 1 690 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | BGN | 1 848 | Цесия |
| ДИЛИНГОВА ФИНАНС.КОМПАНИЯ  АД | BGN | 509 000 | Цесия |
| ДОГОВОРЕН ФОНД  ТИ БИ АЙ ХАРМОНИЯ | EUR | 55 120 | Цесия |
| ДОГОВОРЕН ФОНД АДВАНС КОНСЕРВАТИВЕН ФОНД | BGN | 1 147 000 | Цесия |
| ДОГОВОРЕН ФОНД АЛФА ЛИКВИДНИ СРЕДСТВА | BGN | 130 744 | Цесия |
| ДОГОВОРЕН ФОНД АЛФА ЛИКВИДНИ СРЕДСТВА | BGN | 165 008 | Цесия |

| | | | |
|---|---|---|---|
| ДОГОВОРЕН ФОНД АЛФА ЛИКВИДНИ СРЕДСТВА | BGN | 248 948 | Цесия |
| ДОГОВОРЕН ФОНД АЛФА ЛИКВИДНИ СРЕДСТВА | BGN | 143 325 | Цесия |
| ДОГОВОРЕН ФОНД АРКУС БАЛАНСИРАН | BGN | 100 000 | Цесия |
| ДОГОВОРЕН ФОНД АРКУС ДИНАМИЧЕН | BGN | 200 000 | Цесия |
| ДОГОВОРЕН ФОНД АСТРА КЕШ | EUR | 1 596 500 | Цесия |
| ДОГОВОРЕН ФОНД АСТРА КОМОДИТИ | EUR | 90 977 | Цесия |
| ДОГОВОРЕН ФОНД АСТРА ПЛЮС | EUR | 82 672 | Цесия |
| ДОГОВОРЕН ФОНД ДСК АЛТЕРНАТИВА | BGN | 1 400 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК АЛТЕРНАТИВА | BGN | 100 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ЕВРО АКТИВ | BGN | 2 200 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК СТАБИЛНОСТ - ЕВРОПЕЙСКИ АКЦИИ | BGN | 1 050 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК СТАБИЛНОСТ - АМЕРИКАНСКИ АКЦИИ | BGN | 100 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК СТАНДАРТ | BGN | 2 334 113 | Цесия |
| ДОГОВОРЕН ФОНД ДСК СТАНДАРТ | BGN | 1 040 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК СТАНДАРТ | BGN | 2 000 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ФОНД НА ПАРИЧНИЯ ПАЗАР | BGN | 3 350 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ФОНД НА ПАРИЧНИЯ ПАЗАР | BGN | 2 500 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ФОНД НА ПАРИЧНИЯ ПАЗАР | BGN | 1 400 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ФОНД НА ПАРИЧНИЯ ПАЗАР В ЕВРО | BGN | 600 000 | Цесия |
| ДОГОВОРЕН ФОНД ДСК ФОНД НА ПАРИЧНИЯ ПАЗАР В ЕВРО | BGN | 921 935 | Цесия |
| ДОГОВОРЕН ФОНД ЕЛАНА ЕВРОФОНД | BGN | 165 419 | Цесия |
| ДОГОВОРЕН ФОНД ИНВЕСТ КЕПИТЪЛ-ВИСОКОДОХОДЕН | BGN | 80 000 | Цесия |
| ДОГОВОРЕН ФОНД КОМПАС ЕВРОСТАБИЛНОСТ | BGN | 204 163 | Цесия |
| ДОГОВОРЕН ФОНД КОМПАС ПРОГРЕС | BGN | 404 246 | Цесия |
| ДОГОВОРЕН ФОНД КОМПАС СТРАТЕГИЯ | BGN | 223 185 | Цесия |
| ДОГОВОРЕН ФОНД КОНКОРД ФОНД - 6 ПАРИЧЕН | BGN | 2 550 000 | Цесия |
| ДОГОВОРЕН ФОНД СЪГЛАСИЕ ПРЕСТИЖ | BGN | 300 000 | Цесия |
| ДОГОВОРЕН ФОНД СЪГЛАСИЕ ПРОФИТ | BGN | 300 000 | Цесия |
| ДОГОВОРЕН ФОНД ТИ БИ АЙ ДИНАМИК | EUR | 174 711 | Цесия |
| ДОГОВОРЕН ФОНД ТИ БИ АЙ ЕВРОБОНД | EUR | 36 054 | Цесия |
| ДОГОВОРЕН ФОНД ТИ БИ АЙ КОМФОРТ | EUR | 71 750 | Цесия |
| ДОГОВОРЕН ФОНД ТИ БИ АЙ СЪКРОВИЩЕ | EUR | 10 558 | Цесия |
| ДРУЖЕСТВО ПО ЗЗД КАБИЛЕ | BGN | 9 600 | Цесия |
| ДСК УПРАВЛЕНИЕ НА АКТИВИ АД | BGN | 19 575 026 | Цесия |
| ДУНА ЛАЙН ЕООД | EUR | 148 000 | Цесия |
| ДЪРЖАВНА КОНСОЛИДАЦИОННА КОМПАНИЯ ЕАД | BGN | 1 304 000 | Цесия |
| Е.МИРОЛИО ЕАД | EUR | 23 000 000 | Цесия |
| Е.МИРОЛИО ЕАД | EUR | 1 700 000 | Цесия |
| | EUR | 5 000 000 | Цесия |
| | EUR | 2 000 000 | Цесия |
| ЕИРА ДЗЗД | BGN | 43 520 | Цесия |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 7 703 | Цесия |
| | BGN | 115 134 | Цесия |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 10 798 736 | Цесия |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 495 008 | Цесия |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 114 422 | Цесия |
| ЕРАТО ДЗЗД | BGN | 2 550 | Цесия |
| ЕТС ТЕХНОЛОДЖИ ДЗЗД | BGN | 82 770 | Цесия |
| ЕФОРИЯ ДЗЗД | BGN | 4 680 | Цесия |
| ЗАД БУЛСТРАД ВИЕНА ИНШУРЪНС ГРУП АД | BGN | 4 474 949 | Цесия |
| ЗАД БУЛСТРАД ВИЕНА ИНШУРЪНС ГРУП АД | BGN | 2 380 041 | Цесия |
| ЗАСТРАХОВАТЕЛНА КОМПАНИЯ ОЛИМПИК - КЛОН БЪЛГАРИЯ | EUR | 667 815 | Цесия |
| ЗАСТРАХОВАТЕЛНА КОМПАНИЯ ОЛИМПИК - КЛОН БЪЛГАРИЯ | BGN | 1 832 429 | Цесия |
| ЗД БУЛ ИНС АД | BGN | 303 947 | Цесия |
| ЗД БУЛ ИНС АД | EUR | 3 890 487 | Цесия |
| ИНВЕСТ МЕНИДЖМЪНТ ООД | EUR | 4 090 474 | Цесия |
| ИНВЕСТ МЕНИДЖМЪНТ ООД | EUR | 536 860 | Цесия |
| ИНВЕСТ МЕНИДЖМЪНТ ООД | EUR | 1 022 600 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 120 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 160 091 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 494 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 90 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 35 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | USD | 166 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 25 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 55 000 | Цесия |

| | | | |
|---|---|---|---|
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 335 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 4 500 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 120 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 6 792 069 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 364 523 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 172 140 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 185 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 15 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 998 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 219 768 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 118 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 562 121 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 410 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 296 294 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 32 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 64 863 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 132 400 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 368 097 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 411 151 | Цесия |
| | BGN | 983 306 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 241 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 2 369 000 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | EUR | 93 720 | Цесия |
| ИНДУСТРИАЛНИ ИНВЕСТИЦИИ АД | BGN | 1 403 | Цесия |
| ИНТЕРПРЕД-СВЕТОВЕН ТЪРГОВСКИ ЦЕНТЪР СОФИЯ АД | BGN | 500 000 | Цесия |
| ИНФРАБИЛД ДЗЗД | BGN | 133 570 | Цесия |
| ИНФРАСТРОЙ ЕООД | BGN | 372 870 | Цесия |
| ИНФРАСТРОЙ ЕООД | BGN | 113 423 | Цесия |
| К КЕПИТАЛ АД | EUR | 1 350 000 | Цесия |
| К КЕПИТАЛ АД | EUR | 1 370 486 | Цесия |
| КАЛИПСО ДЗЗД | BGN | 72 170 | Цесия |
| КЕПИТЪЛ ИНВЕСТМЪНТ АД | BGN | 20 071 000 | Цесия |
| КЕПИТЪЛ ИНВЕСТМЪНТ АД | BGN | 1 174 137 | Цесия |
| КЕПИТЪЛ ИНВЕСТМЪНТ АД | BGN | 8 770 864 | Цесия |
| КЕПИТЪЛ ИНВЕСТМЪНТ АД | EUR | 3 270 336 | Цесия |
| КЕПИТЪЛ ИНВЕСТМЪНТ АД | EUR | 1 636 068 | Цесия |
| КИА МОТОРС БЪЛГАРИЯ АД | EUR | 224 000 | Цесия |
| КИМТЕХ-БЪЛГАРИЯ ООД | BGN | 2 454 000 | Цесия |
| | USD | 1 540 000 | Цесия |
| КИМТЕХ-БЪЛГАРИЯ ООД | USD | 66 599 | Цесия |
| | BGN | 328 000 | Цесия |
| | USD | 63 000 | Цесия |
| КОМИДОР АД | EUR | 225 000 | Цесия |
| КОМПАС ИНВЕСТ АД | BGN | 184 080 | Цесия |
| СДРУЖЕНИЕ КОНФЕДЕРАЦИЯ НА ТРУДА ПОДКРЕПА | BGN | 476 054 | Цесия |
| КООПЕРАЦИЯ ЦЕНТРАЛЕН КООПЕРАТИВЕН СЪЮЗ | EUR | 8 299 871 | Цесия |
| КООПЕРАЦИЯ ЦЕНТРАЛЕН КООПЕРАТИВЕН СЪЮЗ | EUR | 8 029 850 | Цесия |
| КОСМОС ЕНЕРДЖИ ЕООД | USD | 56 500 | Цесия |
| КОСМОС ЕНЕРДЖИ ЕООД | USD | 69 520 | Цесия |
| КОСМОС ЕНЕРДЖИ ЕООД | USD | 56 500 | Цесия |
| КОСМОС ФИНАНС ЕООД | BGN | 8 500 | Цесия |
| КОСМОС ФИНАНС ЕООД | USD | 16 500 | Цесия |
| КОСМОС ФИНАНС ЕООД | USD | 40 000 | Цесия |
| КОТОНС ИНДУСТРИ БЪЛГАРИЯ АД | EUR | 223 435 | Цесия |
| КРИСТАЛ ОЙЛ ТРЕЙДИНГ ЕООД | BGN | 369 465 | Цесия |
| КСМ СТРОЙ ООД | EUR | 210 000 | Цесия |
| КЪНСТРАКШЪН ЕНД РИПЕЪР ЕООД | BGN | 216 666 | Цесия |
| | USD | 435 743 | Цесия |
| ЛИТЕКС АД | BGN | 1 626 936 | Цесия |
| ЛИТЕКС ГАЗ ЕООД | BGN | 114 428 | Цесия |
| МАКС СЕЛЕКТ ЕООД | BGN | 98 353 | Цесия |
| МАКС СЕЛЕКТ ЕООД | BGN | 595 301 | Цесия |
| МАКС СЕЛЕКТ ЕООД | BGN | 393 | Цесия |
| МЕДИА СЕЙЛС ООД | BGN | 557 210 | Цесия |
| МЕДИА СЕЙЛС ООД | BGN | 196 440 | Цесия |
| МЕДИА СЕЙЛС ООД | BGN | 177 000 | Цесия |

| | | | |
|---|---|---|---|
| МЕДИА СЕЙЛС ООД | BGN | 183 915 | Цесия |
| МЕДИЯ ИНТЕР ГРУП ЕООД | BGN | 1 800 | Цесия |
| МЕЖДУНАРОДНА ФОНДАЦИЯ СВ.СВ.КИРИЛ И МЕТОДИЙ | EUR | 568 947 | Цесия |
| МЕТАЛ АД | BGN | 450 658 | Цесия |
| МЕТАЛ АД | USD | 518 020 | Цесия |
| МЕТАЛИКА-АБ ЕООД | USD | 2 050 000 | Цесия |
| МЕХАТРОНИКА АД | BGN | 122 232 | Цесия |
| МЕХАТРОНИКА АД | BGN | 750 000 | Цесия |
| МИКРОФИНАНСИРАЩА ИНСТИТУЦИЯ ДЖОБС ЕАД | BGN | 8 400 000 | Цесия |
| МИРАТ ГРУП ООД | BGN | 403 200 | Цесия |
| МОЛЕКЮЛАР СОЛУШЪНС БЪЛГАРИЯ ЕООД | BGN | 758 850 | Цесия |
| МПА ХАНДЕЛС БЪЛГАРИЯ ЕООД | BGN | 121 122 | Цесия |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 63 000 | Цесия |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 357 111 | Цесия |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 357 561 | Цесия |
| НАЦИОНАЛНА КОМПАНИЯ ИНДУСТРИАЛНИ ЗОНИ ЕАД | BGN | 2 028 387 | Цесия |
| НАЦИОНАЛЕН ГАРАНЦИОНЕН ФОНД ЕАД | BGN | 13 000 000 | Цесия |
| НЕЗАВИСИМОСТ- 40 АД | BGN | 62 000 | Цесия |
| НИКРИ ЕООД | EUR | 786 416 | Цесия |
| НУРТС ДИДЖИТЪЛ ЕАД | BGN | 7 369 000 | Цесия |
| НЮ ДИЗАЙН АЙДИЪС АД | BGN | 586 644 | Цесия |
| ОДИТ 2007 МС ЕООД | BGN | 8 822 | Цесия |
| ОПЕЛ-НЕШЕВ ООД | BGN | 4 816 000 | Цесия |
| ПАЛАДИУМ ЕООД | EUR | 120 000 | Цесия |
| ПГ ХИДРО ПАРТНЬОРИ ДЗЗД | BGN | 161 400 | Цесия |
| ПИ ЕС АЙ АД | BGN | 486 128 | Цесия |
| ПИРГОС ХИДРО ДЗЗД | BGN | 5 710 | Цесия |
| ПИРГОСПЛОД АД | BGN | 850 000 | Цесия |
| ПМУ АД | BGN | 685 170 | Цесия |
| ПМУ АД | BGN | 1 500 000 | Цесия |
| ПМУ АД | BGN | 1 433 428 | Цесия |
| ПРИМА ДИВЕЛОПМЪНТ АД | BGN | 196 000 | Цесия |
| ПРИМА ДИВЕЛОПМЪНТ АД | BGN | 804 000 | Цесия |
| ПРИМАВОКС ЕООД | BGN | 149 490 | Цесия |
| ПРОАКТА ЕООД | BGN | 25 007 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 7 040 489 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 17 305 649 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 34 400 000 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 17 000 000 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 16 811 896 | Цесия |
| ПЪРВА ИНВЕСТИЦИОННА БАНКА АД | BGN | 10 407 000 | Цесия |
| ПЪТИЩА ПЛОВДИВ АД | EUR | 2 369 000 | Цесия |
| РЕМОНТСТРОЙ АД | BGN | 4 101 352 | Цесия |
| РТ ИНЖЕНЕРИНГ-Н АД | BGN | 6 760 344 | Цесия |
| САФИН АД | EUR | 1 403 247 | Цесия |
| СДРУЖЕНИЕ ДРУЖЕСТВО ЗА КОЛЕКТИВНО УПРАВЛЕНИЕ В ЧАСТНА ПОЛЗА ПРАВАТА НА ПРОДУЦЕНТИТЕ НА ЗВУКОЗАПИСИ И МУЗИКАЛНИ ВИДЕОЗАПИСИ И НА АРТИСТИТЕ ИЗПЪЛНИТЕЛИ-ПРОФОН | BGN | 4 500 000 | Цесия |
| СЕВЪН МЕДИА СЕЙЛС ЕНД КОНСУЛТИНГ АД-В ЛИКВИДАЦИЯ | BGN | 27 339 | Цесия |
| СЕВЪН МЕДИА СЕЙЛС ЕНД КОНСУЛТИНГ АД-В ЛИКВИДАЦИЯ | BGN | 2 656 | Цесия |
| СЕВЪН МЕДИА СЕЙЛС ЕНД КОНСУЛТИНГ АД-В ЛИКВИДАЦИЯ | BGN | 2 000 | Цесия |
| СЕВЪН МЕДИА СЕЙЛС ЕНД КОНСУЛТИНГ АД-В ЛИКВИДАЦИЯ | BGN | 27 339 | Цесия |
| СИМОВ И СИЕ ООД | BGN | 636 678 | Цесия |
| СИСТЕМИ АВТОМАТИКА ТЕХНОЛОГИИ/САТ/ ЕООД | EUR | 227 064 | Цесия |
| СИСТЕМИ АВТОМАТИКА ТЕХНОЛОГИИ/САТ/ ЕООД | EUR | 948 438 | Цесия |
| СИТИ МЕТАЛ ЕООД | BGN | 108 700 | Цесия |
| СПЕЦИАЛИЗИРАНА БОЛНИЦА ЗА РЕХАБИЛИТАЦИЯ - ЗДРАВЕ ЕАД | BGN | 633 000 | Цесия |
| СТАЛ 2007 ЕООД | EUR | 95 370 | Цесия |
| СТАЛ 2007 ЕООД | EUR | 2 520 000 | Цесия |
| СТОПАНСКИ ТЪРГОВСКИ КОМПЛЕКС ЕООД - В ЛИКВИДАЦИЯ | BGN | 2 067 457 | Цесия |
| СТРОЙМОНТАЖ ЕООД | BGN | 499 000 | Цесия |
| СТРОЙМОНТАЖ ЕООД | BGN | 1 592 000 | Цесия |
| СТРОЙ-ЦЕМ ООД | BGN | 6 500 000 | Цесия |
| СТРОЙ-ЦЕМ ООД | BGN | 4 060 000 | Цесия |
| СТС ХОЛДИНГ ГРУП ООД | BGN | 180 000 | Цесия |
| СЪГЛАСИЕ АСЕТ МЕНИДЖМЪНТ - АД | BGN | 250 000 | Цесия |

| | | | |
|---|---|---|---|
| СЪНЛАЙТ ЕЪР ЕАД | USD | 784 110 | Цесия |
| ТЕЖКО МАШИНОСТРОЕНЕ АД-В ЛИКВИДАЦИЯ | BGN | 2 683 663 | Цесия |
| ТЕМА ООД | BGN | 216 688 | Цесия |
| ТЕРЕС ДЗЗД | BGN | 3 400 | Цесия |
| ТЕХНО РЕЗИДЕНШЪЛ ПАРК ЕАД | BGN | 263 000 | Цесия |
| ТИ БИ АЙ АСЕТ МЕНИДЖМЪНТ ЕАД | BGN | 173 273 | Цесия |
| ТРЕЙДМЕКС АД | USD | 141 493 | Цесия |
| ТРЕЙС-СОФИЯ ЕАД | BGN | 372 870 | Цесия |
| ТРЕЙС ГРУП ХОЛД АД | BGN | 1 800 000 | Цесия |
| ФИНАНС ИНФО АСИСТАНС ЕООД | EUR | 5 500 000 | Цесия |
| ФИНАНСОВО КОНСУЛТИРАНЕ АД | BGN | 50 000 | Цесия |
| ФОНДАЦИЯ ЛИБЕРТАРИАНСТВО | EUR | 711 884 | Цесия |
| ХЕЛИТРАНС АД | BGN | 1 238 708 | Цесия |
| ЦЕНТРАЛЕН ДЕПОЗИТАР АД | BGN | 155 000 | Цесия |
| ЦЕНТРАЛЕН ДЕПОЗИТАР АД | BGN | 1 000 000 | Цесия |
| ЦЕНТРАЛНА АВТОГАРА АД | BGN | 204 507 | Цесия |
| ЦЕНТРАЛНА КООПЕРАТИВНА БАНКА АД | EUR | 9 500 000 | Цесия |
| ЦЕНТРАЛНА КООПЕРАТИВНА БАНКА АД | EUR | 5 500 000 | Цесия |
| ЦЕНТРАЛНА КООПЕРАТИВНА БАНКА АД | EUR | 500 778 | Цесия |
| ЧЕРНОМОРИЕ 2011 ООД | EUR | 2 000 000 | Цесия |
| ЮНИОН ТРАНС СЪРВИЗ БЪЛГАРИЯ 2000 ЕООД | EUR | 980 000 | Цесия |

Забележки:

- посочените в таблицата суми са закръглени до най-близкото цяло число

- в таблицата по-горе са включени *постъпилите* в банката в периода след поставянето й под специален надзор съобщения за прехвърляне на вземания /цесия/

- в случаите, в които едно лице е отправило към банката повече от едно съобщение за прехвърляне на вземания и/или ако в отправено към банката съобщение за прехвърляне на вземания са налични няколко сделки, същите са отразени в таблицата на отделен ред

**Информация по чл.62, ал.12, т.3 от Закона за кредитните институции**

Информация за физически лица, които са направили волеизявление за прихващане след поставяне на банката под специален надзор (20.06.2014 г.):

| Име | Стойност на сделката | | Вид на |
|---|---|---|---|
| | Валута | Сума | сделката |
| DAKON CHRISTOPHER/ДЕЙКЪН КРИСТОФЪР | EUR | 314 500 | Прихващане |
| VICTOR ZOZAYA SERVERA | BGN | 373 672 | Прихващане |
| АЛБЕНА БОРИСОВА БЛИЗНАШКА | USD | 50 000 | Прихващане |
| БОНКА ДРАГОМИРОВА КРЪСТЕВА | BGN | 968 | Прихващане |
| БОРИСЛАВ ДОНЧЕВ БЕЕВ | EUR | 272 365 | Прихващане |
| БОРЯНА РОЗИНОВА МИЛЕВА | BGN | 950 | Прихващане |
| БОРЯНА РОЗИНОВА МИЛЕВА | BGN | 950 | Прихващане |
| ВАЛЕНТИНА СТЕФАНОВА ГЕНЧЕВА | BGN | 725 | Прихващане |
| ВАЛЕРИ ГЕОРГИЕВ ГАДЖЕВ | BGN | 52 000 | Прихващане |
| ВАЛЯ ИВАНОВА КУШЕВА | BGN | 1 410 | Прихващане |
| ВАЛЯ ИВАНОВА КУШЕВА | BGN | 1 410 | Прихващане |
| ВАНУХИ БЕДРОС АРАКЕЛЯН | EUR | 1 780 | Прихващане |
| | BGN | 1 565 | Прихващане |
| ВАНЯ ВАСИЛЕВА СИНГЕЛУДИ | BGN | 729 | Прихващане |
| | EUR | 401 | Прихващане |
| ВАСИЛ ГЕОРГИЕВ ЦОКОНОВ | BGN | 1 892 | Прихващане |
| | EUR | 2 003 | Прихващане |
| ВАСИЛ НИКОЛОВ ИГНАТОВ | BGN | 1 265 | Прихващане |
| ВЕРА РАЧЕВА ИЛИЕВА | EUR | 50 000 | Прихващане |
| ВИЛИМИРА ДАНАИЛОВА БЕЕВА | EUR | 292 241 | Прихващане |
| ГАЛИНА НИКОЛАЕВА ПЕЙЧЕВА | BGN | 4 784 | Прихващане |
| ГЕОРГИ НИКОЛОВ МЪРКОВ | EUR | 45 160 | Прихващане |
| ГЕОРГИ НИКОЛОВ МЪРКОВ | USD | 236 421 | Прихващане |
| ГРИГОР МИНЧЕВ АНДРЕЕВ | BGN | 120 000 | Прихващане |
| ДЕСИСЛАВА ЕМИЛЕВА ПЕТРОВСКА | BGN | 4 623 | Прихващане |
| ДЕСИСЛАВА ЛАЗАРОВА БОРИСОВА | BGN | 4 919 | Прихващане |
| ДИАН ИЛИЕВ БРАТАНОВ | BGN | 3 892 | Прихващане |
| ДИАНА ИЛИЕВА АТАНАСОВА | BGN | 35 000 | Прихващане |
| ДИМИТЪР ИВАНОВ ДИМИТРОВ | EUR | 39 000 | Прихващане |
| ДИМИТЪР СТЕФАНОВ ВЪРТИГОВ | BGN | 87 034 | Прихващане |
| ЕМИЛ ЦВЕТКОВ ВАСИЛЕВ | USD | 49 000 | Прихващане |
| ЖАЙР ЕТВАРТ АГОПЯН | USD | 36 000 | Прихващане |
| | USD | 59 000 | Прихващане |
| ЖАЙР ЕТВАРТ АГОПЯН | EUR | 64 865 | Прихващане |
| ЖАЙР ЕТВАРТ АГОПЯН | BGN | 438 000 | Прихващане |
| ЖАЙР ЕТВАРТ АГОПЯН | EUR | 302 885 | Прихващане |
| ЖАСМИНА ВАСИЛЕВА ВЕЛЕВА | BGN | 14 500 | Прихващане |
| ЖАСМИНА ВАСИЛЕВА ВЕЛЕВА | BGN | 11 400 | Прихващане |
| ЗДРАВКО ЖИВКОВ БОСАКОВ | EUR | 52 594 | Прихващане |
| ИВАЙЛО АТАНАСОВ МИНЧЕВ | USD | 26 000 | Прихващане |
| ИВАЙЛО КОЛЕВ КОЛЕВ | BGN | 88 013 | Прихващане |
| ИВАЙЛО НИКОЛОВ ИВАНОВ | BGN | 2 676 | Прихващане |
| ИВАН ГЕОРГИЕВ ПУКНЕВ | BGN | 1 691 | Прихващане |
| ИВАН ДРАГНЕВ СТОЙКОВ | EUR | 39 500 | Прихващане |
| ИВАН МИНЕВ НОЙКОВ | BGN | 3 568 | Прихващане |
| ИВАН ЯНЕВ БУНКОВ | BGN | 10 512 | Прихващане |
| ЙОРДАН ДИМИТРОВ КАЦАРСКИ | BGN | 570 | Прихващане |
| КАМЕН АНАСТАСОВ ХАРИЗАНОВ | BGN | 15 507 | Прихващане |
| КАМЕН АНАСТАСОВ ХАРИЗАНОВ | BGN | 113 195 | Прихващане |
| КРАСИМИР ВЕЛИЧКОВ МИТЕВ | BGN | 122 232 | Прихващане |
| ЛИЛКО ЛИЛКОВ ХАДЖИЕВ | BGN | 5 168 | Прихващане |
| ЛИЛЯНА ТОДОРОВА МАСЛЕНКОВА | BGN | 14 000 | Прихващане |
| МАРИАНКА ГЕОРГИЕВА АНТОВА | BGN | 650 | Прихващане |
| МАРИЯНА СТОИЛОВА МИЛАНОВА | BGN | 450 | Прихващане |
| МАЯ КИРИЛОВА ДОЙЧИНОВА | BGN | 1 957 | Прихващане |
| МИЛОСЛАВ ЙОРДАНОВ ГЕОРГИЕВ | EUR | 37 500 | Прихващане |
| МИРОСЛАВ НИКОЛАЕВ БОЯДЖИЕВ | BGN | 5 229 | Прихващане |
| НЕДЬО ЛАЗАРОВ ГЕОРГИЕВ | BGN | 1 937 | Прихващане |
| НИКОЛА ХРИСТОВ НИКОЛОВ | BGN | 27 001 | Прихващане |

| | | | |
|---|---|---|---|
| НИКОЛИНА БОРИСОВА КОСТАДИНОВА | EUR | 400 | Прихващане |
| НИКОЛИНА БОРИСОВА КОСТАДИНОВА | EUR | 1 150 | Прихващане |
| ПЕТЪР РУМЕНОВ ТОПАЛДЖИЕВ | BGN | 551 | Прихващане |
| ПЕТЬО ХРИСТОВ БЛЪСКОВ | USD | 500 882 | Прихващане |
| РАНГЕЛ РУМЯНОВ СТОЙЧЕВ | BGN | 1 593 | Прихващане |
| РУМЕН ИВАНОВ ИВАНОВ | USD | 15 000 | Прихващане |
| РУМЯНА СЛАВЕВА ТОДОРОВА | EUR | 840 | Прихващане |
| РУМЯНА СЛАВЕВА ТОДОРОВА | BGN | 3 | Прихващане |
| САВИНА ВАСИЛЕВА БОРИСОВА | BGN | 1 296 | Прихващане |
| САШКА ГЕОРГИЕВА КИРИЛОВА | EUR | 27 900 | Прихващане |
| СВЕТОСЛАВ  ИВАНОВ МЕТАНОВ | BGN | 83 514 | Прихващане |
| СТОЯН ПАНЧЕВ ПЕТРОВ | EUR | 16 000 | Прихващане |
| ТЕОДОРА ВАЛЕРИЕВА КАРАДАЧКА | EUR | 5 000 | Прихващане |
| ТЕОДОРА ПЕТРОВА ТАНЕВА | BGN | 50 000 | Прихващане |
| ХРИСТО ПЕТКОВ ПЕТКОВ | EUR | 82 431 | Прихващане |
| ХРИСТО ПЪРВАНОВ РУСИНОВ | BGN | 36 000 | Прихващане |
| ЦВЕТЕЛИНА БОРИСОВА ЧЕЛЕБИЕВА-ИГНАТОВА | EUR | 4 122 | Прихващане |
| ЦВЕТОЗАР ЙОРДАНОВ ДИМИТРОВ | EUR | 46 398 | Прихващане |
| ЮЛИЯН НИКОЛОВ ПЕТКОВ | BGN | 68 500 | Прихващане |
| ЮЛИЯН НИКОЛОВ ПЕТКОВ | BGN | 40 800 | Прихващане |
| ЮЛИЯН НИКОЛОВ ПЕТКОВ | BGN | 50 480 | Прихващане |

Забележки:
- посочените в таблицата суми са закръглени до най-близкото цяло число
- в таблицата по-горе са включени *постъпилите* в банката в периода след поставянето й под специален надзор волеизявления за прихващане.

- в случаите, в които едно лице е отправило към банката повече от едно волеизявление за прихващане и/или ако е отправено към банката волеизявление за прихващане са налични няколко сделки, същите са отразени в таблицата на отделен ред.

**Информация по чл.62, ал.12, т.3 от Закона за кредитните институции**
Информация за юридически лица, еднолични търговци и неперсонифицирани правни субекти, които са направили волеизявление за прихващане след поставяне на банката под специален надзор (20.06.2014 г.):

| НАИМЕНОВАНИЕ | Стойност на сделката | | Вид на сделката |
|---|---|---|---|
| | Валута | Сума | |
| DOMO RETAIL S.A. | BGN | 19 497 | Прихващане |
| DOMO RETAIL S.A. | BGN | 121 122 | Прихващане |
| DOMTECH HOLDING AG/ ДОМТЕХ ХОЛДИНГ АГ | BGN | 35 212 191 | Прихващане |
| DOMTECH HOLDING AG/ ДОМТЕХ ХОЛДИНГ АГ | BGN | 12 812 249 | Прихващане |
| | EUR | 2 530 670 | Прихващане |
| АВИОНАМС - АД | BGN | 762 315 | Прихващане |
| АВИОНАМС - АД | EUR | 47 000 | Прихващане |
| АВИОНАМС - АД | BGN | 642 509 | Прихващане |
| АВИОНАМС - АД | BGN | 45 000 | Прихващане |
| АВИОНАМС - АД | BGN | 8 642 784 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 50 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 300 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 300 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 15 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 25 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | USD | 10 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | USD | 42 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | USD | 26 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 16 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | EUR | 150 000 | Прихващане |
| АГП ДИВЕЛОПМЪНТ АД | BGN | 263 000 | Прихващане |
| АГРО - Ж.А ООД | BGN | 4 938 151 | Прихващане |
| | EUR | 688 417 | Прихващане |
| | USD | 257 397 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 165 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 80 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 48 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 50 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 66 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 48 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | EUR | 67 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | EUR | 21 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | EUR | 26 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | EUR | 21 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 420 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 418 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 170 000 | Прихващане |
| АГРОКОМПЛЕКТ ЕАД | BGN | 130 000 | Прихващане |
| АРВЕН АД | EUR | 2 000 000 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 155 000 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 49 000 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 50 500 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 189 127 | Прихващане |
| АРКАДИЯ СЪРВИС АД | EUR | 61 242 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 22 000 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 151 600 | Прихващане |
| АРКАДИЯ СЪРВИС АД | EUR | 19 650 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 101 430 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 54 744 | Прихващане |
| АРКАДИЯ СЪРВИС АД | BGN | 219 230 | Прихващане |
| АРКУС АД | EUR | 137 000 | Прихващане |
| | USD | 2 967 000 | Прихващане |
| АРКУС АД | EUR | 38 000 | Прихващане |
| | USD | 107 000 | Прихващане |
| АРКУС АД | BGN | 3 508 411 | Прихващане |
| АРКУС АД | EUR | 31 320 | Прихващане |
| АРКУС АД | USD | 26 448 | Прихващане |
| АРКУС АД | BGN | 8 822 | Прихващане |
| АРКУС АД | EUR | 34 694 | Прихващане |
| АРКУС АД | BGN | 17 305 649 | Прихващане |

| | | | |
|---|---|---|---|
| АРКУС АД | EUR | 4 399 321 | Прихващане |
| АРКУС АД | USD | 2 724 434 | Прихващане |
| АРКУС АД | BGN | 1 136 389 | Прихващане |
| АРКУС АД | BGN | 842 867 | Прихващане |
| АСМ КОНСУЛТ ЕООД | BGN | 335 000 | Прихващане |
| АФЛИК БЪЛГАРИЯ ЕАД | BGN | 309 480 | Прихващане |
| Б.Л. ЛИЗИНГ АД | EUR | 224 000 | Прихващане |
| Б.Л. ЛИЗИНГ АД | EUR | 1 089 261 | Прихващане |
| БГ ТОМИ ЕООД | BGN | 215 000 | Прихващане |
| БКС-ЗАПАД  АД | USD | 269 273 | Прихващане |
| БКС-ЗАПАД  АД | BGN | 81 103 | Прихващане |
| БКС-ЗАПАД  АД | EUR | 220 000 | Прихващане |
| БКС-ЗАПАД  АД | USD | 19 020 | Прихващане |
| | EUR | 141 324 | Прихващане |
| | BGN | 598 | Прихващане |
| БМТ- ИНВЕСТ  АД | BGN | 200 000 | Прихващане |
| БУЛПАЛ  ООД | EUR | 593 247 | Прихващане |
| БЪЛГАРСКА БАНКА ЗА РАЗВИТИЕ АД | BGN | 500 000 | Прихващане |
| БЪЛГЕРИАН ЕЪРУЕЙЗ ГРУП ЕАД | EUR | 8 422 910 | Прихващане |
| БЪЛГЕРИАН ЕЪРУЕЙЗ ГРУП ЕАД | EUR | 16 507 525 | Прихващане |
| БЪЛГЕРИАН МИНЕРАЛ ТРЕЙДИНГ АД | BGN | 137 000 | Прихващане |
| | BGN | 185 000 | Прихващане |
| БЪЛГЕРИАН МИНЕРАЛ ТРЕЙДИНГ АД | BGN | 47 822 | Прихващане |
| | EUR | 185 815 | Прихващане |
| | USD | 336 450 | Прихващане |
| БЪЛГЕРИАН МИНЕРАЛ ТРЕЙДИНГ АД | BGN | 44 000 | Прихващане |
| | BGN | 671 117 | Прихващане |
| | BGN | 90 000 | Прихващане |
| В 9 ООД | EUR | 125 000 | Прихващане |
| В 9 ООД | EUR | 137 360 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 90 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 22 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 17 188 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 3 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 135 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 62 500 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 39 700 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 152 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 172 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 55 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 288 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 48 700 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 56 900 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 111 168 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 73 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 37 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 212 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 69 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 31 232 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | USD | 20 500 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 1 020 478 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 123 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | EUR | 57 647 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | USD | 103 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 276 332 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 244 000 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 149 490 | Прихващане |
| В И ВГД ОРАНЖЕРИИ ПЕТРИЧ ООД | BGN | 665 830 | Прихващане |
| ВИАСТРОЙ АД | BGN | 187 372 | Прихващане |
| ВИЛИ ВИСТ ЕАД | BGN | 10 407 000 | Прихващане |
| ВИНИ БЪЛГАРИЯ АД | EUR | 410 000 | Прихващане |
| ВИНИ БЪЛГАРИЯ АД | BGN | 368 097 | Прихващане |
| ГЕНТО МИЛЛ ООД | EUR | 287 000 | Прихващане |
| ГЕНТО МИЛЛ ООД | EUR | 96 625 | Прихващане |
| | USD | 111 977 | Прихващане |
| ГЕНТО МИЛЛ ООД | BGN | 189 620 | Прихващане |

| | | | |
|---|---|---|---|
| ГЕНТО МИЛЛ ООД | EUR | 894 380 | Прихващане |
| | BGN | 1 621 362 | Прихващане |
| ГЕНТО МИЛЛ ООД | EUR | 88 180 | Прихващане |
| | BGN | 82 656 | Прихващане |
| ГЕНТО МИЛЛ ООД | BGN | 96 000 | Прихващане |
| ГЕНТО МИЛЛ ООД | BGN | 1 281 630 | Прихващане |
| ГЕНТО МИЛЛ ООД | EUR | 118 400 | Прихващане |
| ГЕОПРИБОР ЕАД | BGN | 1 433 428 | Прихващане |
| ГИПС АД | EUR | 860 869 | Прихващане |
| ГИПС АД | BGN | 185 000 | Прихващане |
| ГИПС АД | EUR | 15 000 | Прихващане |
| ГИПС АД | BGN | 364 523 | Прихващане |
| ГИПС АД | EUR | 160 091 | Прихващане |
| ГИПС АД | EUR | 93 720 | Прихващане |
| ГИПС АД | EUR | 411 151 | Прихващане |
| | BGN | 983 306 | Прихващане |
| ГИПС АД | BGN | 241 000 | Прихващане |
| ГИПС АД | EUR | 210 000 | Прихващане |
| ГИПС АД | EUR | 32 000 | Прихващане |
| ГИПС АД | EUR | 64 863 | Прихващане |
| ГИПС АД | EUR | 132 400 | Прихващане |
| ГИПС АД | EUR | 494 000 | Прихващане |
| ГИПС АД | BGN | 90 000 | Прихващане |
| ГИПС АД | EUR | 35 000 | Прихващане |
| ГИПС АД | USD | 166 000 | Прихващане |
| ГИПС АД | BGN | 25 000 | Прихващане |
| ГИПС АД | EUR | 2 369 000 | Прихващане |
| ГИПС АД | EUR | 55 000 | Прихващане |
| ГИПС АД | BGN | 4 500 000 | Прихващане |
| ДЗЗД БАЛКАН ГОЛД - КОНТРАКС | BGN | 117 000 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | BGN | 360 000 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | BGN | 523 290 | Прихващане |
| | EUR | 653 837 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | EUR | 180 524 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | BGN | 226 936 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | USD | 134 800 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ИНВЕСТ ЕАД (ГЕНИМЕКС ИНВЕСТ ЕАД) | USD | 69 535 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ПЕТРОЛ ПРОДУКТС ЕАД (ГЕНИМЕКС ОЙЛ ЕАД) | BGN | 567 506 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ПЕТРОЛ ПРОДУКТС ЕАД (ГЕНИМЕКС ОЙЛ ЕАД) | BGN | 331 666 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ПЕТРОЛ ПРОДУКТС ЕАД (ГЕНИМЕКС ОЙЛ ЕАД) | EUR | 36 660 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ПЕТРОЛ ПРОДУКТС ЕАД (ГЕНИМЕКС ОЙЛ ЕАД) | EUR | 7 630 | Прихващане |
| ДИ ЕНД ДИ ДЖИ ПЕТРОЛ ПРОДУКТС ЕАД (ГЕНИМЕКС ОЙЛ ЕАД) | BGN | 57 000 | Прихващане |
| ДОМ СТАРА ПЛАНИНА АД | BGN | 348 000 | Прихващане |
| | BGN | 20 200 | Прихващане |
| ДРАГАНОВСКИ М ЕООД | EUR | 29 000 | Прихващане |
| | BGN | 2 219 | Прихващане |
| ДРАГАНОВСКИ М ЕООД | USD | 4 000 | Прихващане |
| ДРОСЛИАН БЪЛГАРИЯ ЕООД | BGN | 16 811 896 | Прихващане |
| ДУНАРИТ АД | BGN | 50 000 | Прихващане |
| ДУНАРИТ АД | EUR | 30 000 | Прихващане |
| ДУНАРИТ АД | BGN | 27 293 | Прихващане |
| ДУНАРИТ АД | EUR | 1 596 500 | Прихващане |
| ДУНАРИТ АД | EUR | 90 977 | Прихващане |
| ДУНАРИТ АД | EUR | 82 672 | Прихващане |
| ДУНАРИТ АД | BGN | 864 644 | Прихващане |
| | USD | 377 836 | Прихващане |
| ДУНАРИТ АД | BGN | 181 804 | Прихващане |
| | BGN | 719 818 | Прихващане |
| ДУНАРИТ АД | EUR | 1 033 214 | Прихващане |
| | BGN | 535 629 | Прихващане |
| ДУНАРИТ АД | BGN | 47 894 | Прихващане |
| | USD | 231 795 | Прихващане |
| | EUR | 1 128 498 | Прихващане |
| | BGN | 1 944 143 | Прихващане |
| ДУНАРИТ АД | BGN | 50 000 | Прихващане |
| ДУНАРИТ АД | BGN | 165 419 | Прихващане |

| | | | |
|---|---|---:|---|
| ДУНАРИТ АД | EUR | 30 000 | Прихващане |
| ДУНАРИТ АД | BGN | 226 745 | Прихващане |
| ДУНАРИТ АД | EUR | 23 000 000 | Прихващане |
| ДУНАРИТ АД | USD | 335 000 | Прихващане |
| ДУНАРИТ АД | BGN | 1 325 000 | Прихващане |
| ДУНАРИТ АД | EUR | 148 000 | Прихващане |
| ДУНАРИТ АД | EUR | 55 120 | Прихващане |
| ДУНАРИТ АД | BGN | 173 273 | Прихващане |
| ДУНАРИТ АД | EUR | 36 054 | Прихващане |
| ДУНАРИТ АД | EUR | 174 711 | Прихващане |
| ДУНАРИТ АД | EUR | 71 750 | Прихващане |
| ДУНАРИТ АД | EUR | 10 558 | Прихващане |
| ДУНАРИТ АД | BGN | 210 000 | Прихващане |
| ДУНАРИТ АД | BGN | 47 000 | Прихващане |
| ДУНАРИТ АД | BGN | 48 600 | Прихващане |
| ДУНАРИТ АД | BGN | 320 000 | Прихващане |
| ДУНАРИТ АД | BGN | 1 650 000 | Прихващане |
| ДУНАРИТ АД | BGN | 231 000 | Прихващане |
| ДУНАРИТ АД | BGN | 162 000 | Прихващане |
| ДУНАРИТ АД | EUR | 1 300 000 | Прихващане |
| ДУНАРИТ АД | USD | 530 511 | Прихващане |
| ДУНАРИТ АД | BGN | 284 717 | Прихващане |
| ДУНАРИТ АД | BGN | 2 454 000 | Прихващане |
| | USD | 1 540 000 | Прихващане |
| ДУНАРИТ АД | EUR | 130 900 | Прихващане |
| ДУНАРИТ АД | EUR | 920 000 | Прихващане |
| ДУНАРИТ АД | USD | 2 218 405 | Прихващане |
| ДУНАРИТ АД | BGN | 246 000 | Прихващане |
| ДУНАРИТ АД | USD | 503 638 | Прихващане |
| | EUR | 5 772 | Прихващане |
| | BGN | 189 340 | Прихващане |
| ДУНАРИТ АД | BGN | 139 000 | Прихващане |
| ДУНАРИТ АД | BGN | 500 000 | Прихващане |
| ДУНАРИТ АД | EUR | 2 520 000 | Прихващане |
| ДУНАРИТ АД | BGN | 95 070 | Прихващане |
| ДУНАРИТ АД | BGN | 25 007 | Прихващане |
| ДУНАРИТ АД | USD | 2 050 000 | Прихващане |
| ДУНАРИТ АД | EUR | 24 000 | Прихващане |
| ДУНАРИТ АД | BGN | 129 767 | Прихващане |
| ДУНАРИТ АД | BGN | 107 000 | Прихващане |
| ЕВРОБИЛД  2003 ЕООД | EUR | 1 165 376 | Прихващане |
| ЕДК АД | USD | 56 500 | Прихващане |
| ЕДК АД | USD | 69 520 | Прихващане |
| ЕДК АД | USD | 56 500 | Прихващане |
| ЕКЗОТИК  2000 ООД | EUR | 74 000 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 94 000 | Прихващане |
| ЕКЗОТИК  2000 ООД | EUR | 946 974 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 962 000 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 298 000 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 40 000 | Прихващане |
| | EUR | 125 300 | Прихващане |
| | BGN | 128 707 | Прихващане |
| | USD | 360 000 | Прихващане |
| | USD | 8 000 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 559 124 | Прихващане |
| ЕКЗОТИК  2000 ООД | BGN | 248 404 | Прихващане |
| ЕКО ПАЗАРИ ЕООД | BGN | 196 000 | Прихващане |
| ЕКО РИЗОРТ ЕАД | BGN | 3 509 198 | Прихващане |
| | EUR | 152 399 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 6 760 344 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 5 806 647 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 71 654 | Прихващане |
| | EUR | 127 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 40 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 369 465 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 16 000 | Прихващане |

| | | | |
|---|---|---|---|
| ЕЛИТ ПЕТРОЛ АД | EUR | 677 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 70 000 | Прихващане |
| | EUR | 139 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 311 139 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 676 609 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 636 678 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 147 533 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 2 379 846 | Прихващане |
| | USD | 34 700 | Прихващане |
| | EUR | 6 190 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 158 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 201 548 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 331 637 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 7 600 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 4 816 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 24 961 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 2 166 122 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 371 017 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 8 798 505 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 162 191 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 194 304 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 757 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 3 244 205 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 164 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 223 435 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 179 300 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 509 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 23 500 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 310 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 4 060 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 13 861 | Прихващане |
| | EUR | 38 378 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 34 615 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 2 664 619 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 116 337 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 138 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 108 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 191 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 16 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 938 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 67 861 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 260 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 700 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 1 832 429 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 103 912 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | EUR | 90 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 1 147 000 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | BGN | 1 949 890 | Прихващане |
| ЕЛИТ ПЕТРОЛ АД | USD | 197 940 | Прихващане |
| ЕМ ПРОДЖЕКТ 1 ЕООД | BGN | 5 575 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 92 395 | Прихващане |
| | USD | 130 642 | Прихващане |
| | EUR | 51 376 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 7 703 | Прихващане |
| | BGN | 115 134 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 115 963 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 508 995 | Прихващане |
| | EUR | 36 376 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 155 412 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 100 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 130 268 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 155 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 17 320 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 40 319 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 16 819 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 16 819 | Прихващане |

| | | | |
|---|---|---|---|
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 24 725 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 36 351 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 1 111 891 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 665 269 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 8 500 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 38 473 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 266 883 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 45 153 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 216 666 | Прихващане |
| | USD | 435 743 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 65 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 306 272 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 114 421 | Прихващане |
| | BGN | 495 008 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 159 666 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 110 727 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 568 947 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 118 314 | Прихващане |
| | USD | 18 727 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 353 167 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 240 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 100 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 419 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 216 688 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 6 829 | Прихващане |
| | EUR | 8 106 | Прихващане |
| | BGN | 128 812 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 16 500 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 52 197 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 48 171 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 1 033 064 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 264 000 | Прихващане |
| | USD | 322 500 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 1 553 119 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 363 712 | Прихващане |
| | EUR | 267 593 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 1 226 780 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 912 837 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | USD | 40 000 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 334 636 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 3 857 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | BGN | 1 845 253 | Прихващане |
| ЕНЕРГИЙНА ФИНАНСОВА ГРУПА АД | EUR | 7 877 | Прихващане |
| ЕНЕРГОРЕМОНТ- ХОЛДИНГ АД | BGN | 48 400 | Прихващане |
| ЕТ ИВЕНА КОМЕРС - Валентин Шотев | BGN | 1 500 000 | Прихващане |
| ЕТ СЕРГЕЙ ТЕОФИЛОВ ДЕЛИЕВ | EUR | 30 902 | Прихващане |
| ЗКПУ "НОВ ЖИВОТ" | BGN | 28 840 | Прихващане |
| ИМИДЖ КОНСУЛТИНГ ЕООД | BGN | 43 293 | Прихващане |
| ИН ГРУП АД | USD | 12 000 | Прихващане |
| ИН ГРУП АД | BGN | 297 255 | Прихващане |
| ИН ГРУП АД | EUR | 2 405 000 | Прихващане |
| ИНВЕСТ МЕНИДЖМЪНТ ООД | BGN | 758 850 | Прихващане |
| ИНТЕРАКТИВ МЕДИА СЪРВИСИЗ ЕООД | USD | 784 110 | Прихващане |
| | BGN | 1 174 137 | Прихващане |
| | EUR | 100 000 | Прихващане |
| | BGN | 138 481 | Прихващане |
| | EUR | 223 846 | Прихващане |
| | EUR | 100 000 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 998 000 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | EUR | 219 768 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 118 000 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 562 121 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 61 083 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | EUR | 12 006 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | EUR | 296 294 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 108 260 | Прихващане |

| | | | |
|---|---|---|---|
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 286 802 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 172 140 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 1 403 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 6 792 069 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 1 183 296 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 605 000 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | BGN | 185 000 | Прихващане |
| ИНФРАСТРУКТУРНА КОМПАНИЯ АД | EUR | 65 000 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | BGN | 340 088 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | EUR | 10 798 736 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | BGN | 1 894 011 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | BGN | 304 467 | Прихващане |
| | EUR | 56 767 | Прихващане |
| | USD | 17 559 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | BGN | 154 241 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | EUR | 950 000 | Прихващане |
| КИМПЕКС ЕНЕРДЖИ АД | BGN | 66 543 | Прихващане |
| КОРСИ МАУНТИН РИСОРТ АД | BGN | 225 000 | Прихващане |
| КОРСИ МАУНТИН РИСОРТ АД | EUR | 204 000 | Прихващане |
| КОРСИ МАУНТИН РИСОРТ АД | BGN | 225 000 | Прихващане |
| КОСМОС ЕНЕРДЖИ ЕООД | USD | 1 520 000 | Прихващане |
| КОСМОС ЕНЕРДЖИ ЕООД | USD | 1 640 423 | Прихващане |
| КОСТЕНЕЦ - ХХИ АД | EUR | 13 268 732 | Прихващане |
| КРИДО К ЕООД | BGN | 4 735 | Прихващане |
| КРИДО К ЕООД | BGN | 4 735 | Прихващане |
| ЛАЙВ ДИЗАЙН ООД | BGN | 981 340 | Прихващане |
| ЛЕКС ПРОПЪРТИС АД | BGN | 60 000 | Прихващане |
| ЛИТЕКС КОМЕРС АД | EUR | 17 609 | Прихващане |
| ЛИТЕКС КОМЕРС АД | BGN | 156 965 | Прихващане |
| ЛИТЕКС КОМЕРС АД | BGN | 204 507 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 11 807 045 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 1 031 700 | Прихващане |
| | EUR | 894 973 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 307 065 | Прихващане |
| | EUR | 162 000 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 458 000 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 205 546 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 121 737 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 11 087 671 | Прихващане |
| ЛИТЕКС МОТОРС АД | USD | 79 289 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 217 190 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 1 430 194 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 4 253 550 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 2 026 398 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 890 345 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 1 401 525 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 1 969 664 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 1 389 861 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 2 283 423 | Прихващане |
| ЛИТЕКС МОТОРС АД | BGN | 20 478 172 | Прихващане |
| ЛИТЕКС МОТОРС АД | EUR | 117 618 | Прихващане |
| ЛОМСКО ПИВО АД | BGN | 291 566 | Прихващане |
| ЛОМСКО ПИВО АД | EUR | 100 000 | Прихващане |
| ЛОМСКО ПИВО АД | USD | 21 159 | Прихващане |
| ЛОМСКО ПИВО АД | BGN | 84 171 | Прихващане |
| | BGN | 1 118 985 | Прихващане |
| ЛОМСКО ПИВО АД | BGN | 400 610 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 85 320 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 595 822 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 142 797 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 3 383 691 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 226 043 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 176 387 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | EUR | 158 658 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 850 000 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 171 408 | Прихващане |

| | | | |
|---|---|---|---|
| МАКС СЕЛЕКТ ЕООД | BGN | 173 800 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | EUR | 328 680 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 140 950 | Прихващане |
| МАКС СЕЛЕКТ ЕООД | BGN | 193 657 | Прихващане |
| МЕК БАЛКАН ЕООД | EUR | 3 246 254 | Прихващане |
| МЕС КО ММ 5 ЕООД | EUR | 622 260 | Прихващане |
| МИНИ МАРИЦА ИЗТОК ЕАД | EUR | 4 256 245 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 144 076 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 243 571 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 200 021 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 63 000 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 66 800 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 380 000 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 370 000 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 344 554 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | BGN | 472 630 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 308 370 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | BGN | 1 094 000 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | BGN | 237 157 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 5 199 597 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 61 364 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 543 946 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 108 933 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | USD | 3 159 372 | Прихващане |
| НАФТЕКС ПЕТРОЛ ЕООД | EUR | 22 000 | Прихващане |
| НИККОМЕРС 01 ЕООД | BGN | 5 618 000 | Прихващане |
| НИККОМЕРС 01 ЕООД | BGN | 77 619 | Прихващане |
| НОВИ ЕНЕРГИЙНИ И ИНДУСТРИАЛНИ ТЕХНОЛОГИИ АД | BGN | 685 170 | Прихващане |
| НУРТС БЪЛГАРИЯ АД | BGN | 51 852 757 | Прихващане |
| НЮ ТРЕЙД ГРУП АД | EUR | 625 000 | Прихващане |
| НЮ ТРЕЙД ГРУП АД | BGN | 633 000 | Прихващане |
| НЮ ТРЕЙД ГРУП АД | BGN | 8 299 871 | Прихващане |
| НЮ ТРЕЙД ГРУП АД | EUR | 225 000 | Прихващане |
| НЮ ТРЕЙД ГРУП АД | EUR | 2 000 000 | Прихващане |
| ОРФЕАС ООД | EUR | 256 000 | Прихващане |
| ОРХИДЕЯ-СЕМЕЙСТВО ГЕОРГИЕВИ ВЕЛИН ГЕОРГИЕВ ЕТ | BGN | 516 000 | Прихващане |
| ПАРТНЕР ЛИЗИНГ АД | EUR | 310 000 | Прихващане |
| ПАРТНЕР ЛИЗИНГ АД | EUR | 201 094 | Прихващане |
| ПАРТНЕР ЛИЗИНГ АД | EUR | 2 300 773 | Прихващане |
| ПАРТНЕР ЛИЗИНГ АД | EUR | 118 000 | Прихващане |
| ПАРТНЕР ЛИЗИНГ АД | EUR | 284 935 | Прихващане |
| ПЕРФЕКТ ООД | EUR | 553 159 | Прихващане |
| | USD | 47 659 | Прихващане |
| | BGN | 23 752 | Прихващане |
| ПЕРФЕКТ ООД | BGN | 51 937 | Прихващане |
| ПЕРФЕКТ ООД | BGN | 545 474 | Прихващане |
| ПЕРФЕКТ ООД | USD | 37 750 | Прихващане |
| ПИРГОСПЛОД АД | BGN | 4 101 352 | Прихващане |
| ПИРГОСПЛОД АД | BGN | 3 607 408 | Прихващане |
| ПИРГОСПЛОД АД | EUR | 163 324 | Прихващане |
| ПЛАНАСАТ АД | BGN | 5 245 575 | Прихващане |
| ПЛАНАСАТ АД | BGN | 8 711 085 | Прихващане |
| ПРИСТАНИЩЕН ТЕРМИНАЛ РУСЕ-ЗАПАД АД | BGN | 26 320 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 2 704 000 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 198 238 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 557 210 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | USD | 141 493 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 34 367 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 3 600 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 478 052 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 36 000 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 31 848 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 6 907 977 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 414 113 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 130 434 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 2 550 | Прихващане |

| Name | Currency | Amount | |
|---|---|---|---|
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 4 680 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 24 280 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 7 000 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | EUR | 513 069 | Прихващане |
| | BGN | 308 832 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 7 040 489 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 118 470 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 60 070 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 2 880 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 4 590 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 43 520 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 5 710 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 3 400 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 72 170 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 161 400 | Прихващане |
| ПРОМИШЛЕНО СТРОИТЕЛСТВО -ХОЛДИНГ ЕАД | BGN | 82 770 | Прихващане |
| ПСГ АД | BGN | 499 000 | Прихващане |
| ПСГ АД | BGN | 8 400 | Прихващане |
| ПСГ АД | BGN | 34 500 | Прихващане |
| ПСГ АД | BGN | 1 200 | Прихващане |
| ПСГ АД | BGN | 9 600 | Прихващане |
| ПСГ АД | BGN | 1 592 000 | Прихващане |
| ПСГ АД | BGN | 1 800 | Прихващане |
| ПЪТСТРОЙ ООД | BGN | 130 480 | Прихващане |
| РИЗЪРВ КЕПИТАЛ АДСИЦ | BGN | 305 072 | Прихващане |
| РИЗЪРВ КЕПИТАЛ АДСИЦ | EUR | 375 000 | Прихващане |
| РИЗЪРВ КЕПИТАЛ АДСИЦ | EUR | 97 680 | Прихващане |
| РИЗЪРВ КЕПИТАЛ АДСИЦ | EUR | 97 680 | Прихващане |
| РИСК ИНЖЕНЕРИНГ АД | BGN | 11 412 749 | Прихващане |
| | EUR | 3 795 471 | Прихващане |
| | USD | 684 007 | Прихващане |
| РИСК ИНЖЕНЕРИНГ АД | EUR | 291 655 | Прихващане |
| | USD | 14 263 | Прихващане |
| РИСК ИНЖЕНЕРИНГ АД | EUR | 120 441 | Прихващане |
| РИСК ИНЖЕНЕРИНГ АД | EUR | 134 612 | Прихващане |
| РИСК ИНЖЕНЕРИНГ АД | BGN | 725 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ ЕООД | EUR | 1 544 | Прихващане |
| | BGN | 51 402 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 661 123 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | USD | 141 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 2 497 | Прихващане |
| | EUR | 6 250 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 6 250 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 82 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 2 001 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 586 644 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 248 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 51 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 229 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 220 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | EUR | 2 544 000 | Прихващане |
| РИСК ИНЖЕНЕРИНГ-Д ЕООД | BGN | 24 000 | Прихващане |
| РИЦ 3 ЕООД | EUR | 32 000 | Прихващане |
| РОСТЕР ООД | BGN | 30 822 | Прихващане |
| | EUR | 30 720 | Прихващане |
| РУБЕЛЛА БЮТИ АД | BGN | 750 000 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 20 071 000 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 373 473 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 351 948 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 100 000 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 232 999 | Прихващане |
| РУБИН ИНВЕСТ АД | BGN | 3 591 853 | Прихващане |
| РУБИН ИНВЕСТ АД | EUR | 3 270 336 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | EUR | 44 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | EUR | 66 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | BGN | 100 609 | Прихващане |

| | | | |
|---|---|---|---|
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | USD | 215 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | BGN | 8 725 558 | Прихващане |
| | EUR | 805 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | BGN | 938 388 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | EUR | 36 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | BGN | 289 844 | Прихващане |
| | EUR | 48 190 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | BGN | 414 096 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД АД | EUR | 1 440 000 | Прихващане |
| РУСЕНСКА КОРАБОСТРОИТЕЛНИЦА ЗАПАД | EUR | 65 000 | Прихващане |
| | USD | 4 000 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 20 000 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 227 064 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 580 760 | Прихващане |
| | EUR | 132 810 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 234 868 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | BGN | 274 536 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | BGN | 60 400 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | BGN | 179 000 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | BGN | 1 032 282 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | BGN | 450 658 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 300 000 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 57 704 | Прихващане |
| | BGN | 89 250 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | USD | 518 020 | Прихващане |
| САНА СПЕЙС ХОТЕЛ ХИСАРЯ АД | EUR | 186 000 | Прихващане |
| | USD | 286 000 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | BGN | 10 900 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | BGN | 289 447 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | EUR | 86 437 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | EUR | 76 232 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | EUR | 330 000 | Прихващане |
| СЕМБОДИА БЪЛГАРИЯ ЕООД | EUR | 54 728 | Прихващане |
| СИ ЕН ДЖИ МАРИЦА ООД | BGN | 12 385 438 | Прихващане |
| СИБОЛЕ СЪРВИСИС ИНКОРПОРЕЙТИД БЪЛГАРИЯ ЕООД | BGN | 8 770 864 | Прихващане |
| СИБОЛЕ СЪРВИСИС ИНКОРПОРЕЙТИД БЪЛГАРИЯ ЕООД | BGN | 17 000 000 | Прихващане |
| СИБОЛЕ СЪРВИСИС ИНКОРПОРЕЙТИД БЪЛГАРИЯ ЕООД | EUR | 1 636 068 | Прихващане |
| СЪНИ-ТЕРА 2007 АД | EUR | 1 373 048 | Прихващане |
| ТАБАК МАРКЕТ АД | BGN | 34 400 000 | Прихващане |
| ТАРГЕТ МЕДИА ЕООД | BGN | 965 560 | Прихващане |
| ТАРГЕТ МЕДИА ЕООД | BGN | 303 190 | Прихващане |
| | USD | 563 942 | Прихващане |
| ТЕЛИШ АД | EUR | 815 229 | Прихващане |
| | USD | 58 424 | Прихващане |
| | EUR | 5 900 | Прихващане |
| | EUR | 50 000 | Прихващане |
| | BGN | 207 000 | Прихващане |
| ТЕЛИШ АД | BGN | 80 800 | Прихващане |
| ТЕЛИШ АД | BGN | 3 125 224 | Прихващане |
| ТЕЛИШ АД | EUR | 149 950 | Прихващане |
| ТЕЛИШ АД | EUR | 107 112 | Прихващане |
| | BGN | 62 986 | Прихващане |
| | EUR | 110 000 | Прихващане |
| | USD | 177 864 | Прихващане |
| ТЕЛИШ АД | BGN | 234 000 | Прихващане |
| | EUR | 33 600 | Прихващане |
| | BGN | 540 000 | Прихващане |
| | EUR | 46 000 | Прихващане |
| ТЕЛИШ АД | BGN | 892 695 | Прихващане |
| | BGN | 714 137 | Прихващане |
| | USD | 14 215 | Прихващане |
| ТЕХНО РЕЗИДЕНШЪЛ ПАРК 2 ЕАД | BGN | 16 258 640 | Прихващане |
| ТЕХНОМАРКЕТ БЪЛГАРИЯ АД | EUR | 40 080 | Прихващане |
| ТЕХНОМАРКЕТ БЪЛГАРИЯ АД | EUR | 5 000 000 | Прихващане |
| ТЕХНОМАРКЕТ БЪЛГАРИЯ АД | EUR | 3 700 000 | Прихващане |
| ТЕХНОМАРКЕТ БЪЛГАРИЯ АД | EUR | 351 033 | Прихващане |

| | | | |
|---|---|---|---|
| ТЕЦ МАРИЦА ИЗТОК 2 ЕАД | BGN | 21 069 935 | Прихващане |
| ТЕЦ МАРИЦА ИЗТОК 2 ЕАД | BGN | 445 000 | Прихващане |
| ФИНАНС ИНЖЕНЕРИНГ АД | BGN | 89 717 | Прихващане |
| ФИНАНС ИНЖЕНЕРИНГ АД | BGN | 30 145 | Прихващане |
| | EUR | 3 548 | Прихващане |
| ФИНИНВЕСТ ЕООД | USD | 581 592 | Прихващане |
| | BGN | 190 000 | Прихващане |
| | USD | 57 385 | Прихващане |
| | EUR | 11 000 | Прихващане |
| | BGN | 50 000 | Прихващане |
| | BGN | 100 000 | Прихващане |
| | BGN | 740 000 | Прихващане |
| ФРУКТО СЛИВЕН АД | EUR | 50 000 | Прихващане |
| ФРУКТО СЛИВЕН АД | EUR | 48 000 | Прихващане |
| ФРУКТО СЛИВЕН АД | EUR | 80 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 3 107 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 878 719 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 124 830 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 200 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | EUR | 35 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 48 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 140 720 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | USD | 985 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | USD | 985 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 495 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | EUR | 67 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | BGN | 123 100 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | EUR | 100 000 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | EUR | 183 063 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | USD | 1 965 632 | Прихващане |
| ХЕЛТ ЕНД УЕЛНЕС АДСИЦ | USD | 267 939 | Прихващане |
| | EUR | 47 000 | Прихващане |
| ХИМИМПОРТ АД | EUR | 9 806 114 | Прихващане |
| ХИМИМПОРТ АД | EUR | 110 950 | Прихващане |
| ХЛЯБ И ХЛЕБНИ ИЗДЕЛИЯ ЕООД | BGN | 286 691 | Прихващане |
| | EUR | 38 942 | Прихващане |
| | USD | 29 902 | Прихващане |
| ХОЛДИНГ БЪЛГАРСКИ ДЪРЖАВНИ ЖЕЛЕЗНИЦИ ЕАД | EUR | 664 743 | Прихващане |
| ХОЛДИНГ БЪЛГАРСКИ ДЪРЖАВНИ ЖЕЛЕЗНИЦИ ЕАД | BGN | 2 590 694 | Прихващане |
| ХОЛДИНГ КООП ЮГ АД | BGN | 573 100 | Прихващане |
| ХОЛДИНГ КООП ЮГ АД | BGN | 611 292 | Прихващане |
| ЦЕНТРАЛНА КООПЕРАТИВНА БАНКА АД Скопје | EUR | 500 778 | Прихващане |
| ЧАЙКА АД | EUR | 140 000 | Прихващане |
| ЧЕРНО МОРЕ-2001 АД | BGN | 360 000 | Прихващане |
| ЮЖЕН БРЯГ - ПРИМОРСКО - КИТЕН ООД | EUR | 69 000 | Прихващане |
| ЮНИТ КЕПИТЪЛС АД | EUR | 442 000 | Прихващане |

Забележки:

- посочените в таблицата суми са закръглени до най-близкото цяло число
- в таблицата по-горе са включени *постъпилите* в банката в периода след поставянето й под специален надзор волеизявления за прихващане.

- в случаите, в които едно лице е отправило към банката повече от едно волеизявление за прихващане и/или ако в отправено към банката волеизявление за прихващане са налични няколко сделки, същите са отразени в таблицата на отделен ред.

# EXHIBIT 30





*Фрея* **FF** *Freya*
*Транслейшънс* *Translations*

**Преводи от и на чужди езици**
гр. Варна, ул. Кирил и Методий № 1
Email: freyatranslations@gmail.com

*Translation from Bulgarian*

*Logo of Corporate Commercial Bank AD*

## CORPORATE COMMERCIAL BANK AD
### 10 Graf Ignatiev St., Sredets District, 1000 Sofia

### ORDER No. 3-3
#### Sofia, January 6, 2015

With reference to Resolution No.138 of November 6, 2014 of the Managing Board of the Bulgarian National Bank on revoking Corporate Commercial Bank AD's license for banking operations, the bankruptcy proceedings for Corporate Commercial Bank AD (CCB) pending in case No.75749/2014 with the VI-4th panel of judges of the Sofia City Court and pursuant to Art.3 (2) (3) of the Bank Insolvency Act, we hereby

### ORDER AS FOLLOWS:

1. Any collection of accounts receivable of debtors of CCB AD by debiting of checking and other bank accounts with CCB AD of the debtors under loans and/or third parties who had put up collaterals as security under the relevant loan agreements, including guarantors and joint debtors shall be suspended.

2. In case any accounting operations for collection of CCB's receivables from borrowers have been carried out within the time period from revoking of CCB's license for banking operations to the date of this Order by debiting bank accounts of CCB clients with their balances prior November 6, 2014, reversal operations shall be performed for recovering the loan(s) and deposit(s) respectively to their former status prior the debiting of the bank account(s).

3. After the reversal operations under clause 2 of this Order are performed, the relevant interests on delayed payment under the loan agreements shall be accrued.

This Order shall be brought to the knowledge of the officers of Crediting Department and Information Technologies Department.

The Head of Crediting Department and the Head of Information Technologies Department shall be responsible to monitor the implementation of this Order.

**Conservators:**

_____/s/(ill.)_____                                    _____/s/(ill.)_____
Elena Zdravkova Kostadinchev                Stanislav Georgiev Lyutov
*Round seal of Corporate Commercial Bank AD, Sofia*

*The undersigned, Boryana Ilieva Stefanova, hereby attest that this is a true and correct English translation from the Bulgarian original of the attached document – Order No. 3-3 of 6th January 2015 of the conservators of Corporate Commercial Bank, AD. This translation has 1 (one) page.*

Translator: _____
        *Boryana Ilieva Stefanova*



КОРПОРАТИВНА
ТЪРГОВСКА БАНКА АД

## КОРПОРАТИВНА ТЪРГОВСКА БАНКА АД
=======================================================================
гр. София 1000, район Средец, ул. „Граф Игнатиев" № 10

### ЗАПОВЕД

No. 3-3

София, 06.01 2015 г.

Във връзка с Решение №138 от 06.11.2014г. на УС на БНБ относно отнемане лицензията на КТБ АД за извършване на банкова дейност, наличието на открито производство по несъстоятелност срещу КТБ АД по т.д. №7549/2014г. на СГС, VI-4-ти състав и на основание чл.3, ал.2 и ал.3 от Закона за банковата несъстоятелност, с настоящото

### НАРЕЖДАМЕ:

1. Да се преустанови събирането на вземания срещу длъжници на КТБ АД чрез дебитиране на разплащателни и друг вид банкови сметки в КТБ АД на длъжниците по кредити и/или на трети лица, учредили обезпечения по съответния договор за кредит, вкл. поръчители и солидарни длъжници.

2. В случай че в периода от отнемане лицензията на КТБ АД за извършване на банкова дейност до датата на настоящата заповед са вземани счетоводни операции по събиране на вземания на КТБ АД към кредитополучатели чрез дебитиране на сметки на клиенти на КТБ АД със салдата им отпреди 06.11.2014г., да се вземат сторниращи операции по възстановяване на кредита, респ. депозита в състоянието отпреди дебитиране на сметката.

3. След вземане на сторниращите операции по реда на т.2 от настоящата заповед да се начислят дължимите съобразно договора за кредит лихви за забава.

Настоящата заповед да се сведе до знанието на служителите от Управление „Кредитиране" и Управление „Информационни технологии".

Контролът по изпълнението на заповедта се възлага на Началник Управление „Кредитиране" и на Управление „Информационни технологии".

КВЕСТОРИ:

.............................................                         .............................................

Елена Здравкова Костадинчев                         Станислав Георгиев Лютов

# EXHIBIT 31



## Фрея
## Транслейшънс

## Freya
## Translations

### Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533

e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

01.12.2014, 10.45 a.m. ([accounting entry] of 6th November 2014)
Corporate Commercial Bank AD, Sofia                               page.1

Exposure of Ayr Property Development AD (declared bankrupt) having Bulstat No: 200958720

| Entry of record | Bank account | Cur-rency | Balance | Opened on | Movement registered |
|---|---|---|---|---|---|
| 1613 290120 01 8 | BG 21 KORP 9220 20 29012001 | BGN | 0.00 Cr. | 14 January 2013 | 14 October 2014 |
| 1613 290120 02 5 | BG 91 KORP 9220 20 29012002 | BGN | 313.18 Cr. | 17 January 2014 | 20 October 2014 |
| 1613 290120 03 2 | BG 64 KORP 9220 20 29012003 | BGN | 514.81 Cr. | 10 April 2014 | 20 October 2014 |
| 1731 290120 01 7 | BG 74 KORP 9220 10 29012051 | BGN | 108,617.38 Cr. | 12 February 2013 | 27 October 2014 |
| 4594 100 290120 19 01 7 | BG 39 KORP 9220 10 29012099 | BGN | 0.00 Cr. | 14 January 2013 | |
| 4963 1613 290120 01 2013 9 | | BGN | 0.00 Cr. | 15 January 2013 | 14 January 2014 |
| 4963 1613 290120 01 2014 2 | | BGN | 0.00 Cr. | 2 January 2014 | 5 November 2014 |
| 4963 1613 290120 02 2014 9 | | BGN | 0.00 Cr. | 20 January 2014 | 20 October 2014 |
| 4963 1613 290120 03 2014 5 | | BGN | 0.00 Cr. | 11 April 2014 | 20 October 2014 |
| 4963 1713 290120 01 2013 4 | | BGN | 0.00 Cr. | 4 June 2013 | 27 January 2014 |
| 4963 1713 290120 01 2014 8 | | BGN | 0.00 Cr. | 2 January 2014 | 5 November 2014 |

*The undersigned, Baryana Ilieva Stefanovo, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document: Bank Accounts Exposure of Ayr Property Development AD, issued by Corporate Commercial Bank AD. This translation has 1 (one) page.*

Translator: _____
*Boryano Ilieva Stefanova*

.12.2014,10:15:10(Св.06.11.2014) КОРПОРАТИВНА ТБ АД-СОФИЯ стр.1

Сповиция на ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД В НЕСЪСТОЯТЕЛНОСТ, ЕГН/БУЛСТАТ 200958720

| Партида | Банкова сметка | Вал | Салдо | Открита на | Движена на |
|---|---|---|---|---|---|
| 1613 290120 01 8 | BG 21 KORP 9220 20 29012001 | BGN | 0.00 Kt | 14.01.2013 | 14.10.2014 |
| 1613 290120 02 5 | BG 91 KORP 9220 20 29012002 | BGN | 313.18 Kt | 17.01.2014 | 20.10.2014 |
| 1613 290120 03 2 | BG 64 KORP 9220 20 29012003 | BGN | 514.81 Kt | 10.04.2014 | 20.10.2014 |
| 3731 290120 01 7 | BG 74 KORP 9220 10 29012051 | BGN | 108 617.38 Kt | 12.02.2013 | 27.10.2014 |
| 4594 100 290120 19 01 7 | BG 39 KORP 9220 10 29012099 | BGN | 0.00 Kt | 14.01.2013 | |
| 4963 1613 290120 01 2013 9 | | BGN | 0.00 Kt | 15.01.2013 | 14.01.2014 |
| 4963 1613 290120 01 2014 2 | | BGN | 0.00 Kt | 02.01.2014 | 05.11.2014 |
| 4963 1613 290120 02 2014 9 | | BGN | 0.00 Kt | 20.01.2014 | 20.10.2014 |
| 4963 1613 290120 03 2014 5 | | BGN | 0.00 Kt | 11.04.2014 | 20.10.2014 |
| 4963 1731 290120 01 2013 4 | | BGN | 0.00 Kt | 04.06.2013 | 27.01.2014 |
| 4963 1731 290120 01 2014 8 | | BGN | 0.00 Kt | 02.01.2014 | 05.11.2014 |

# EXHIBIT 32



*Фрея*
*Freya*
*Транслейшънс*
*Translations*

**Преводи от и на чужди езици**
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

Republic of Bulgaria, Varna, 3 Nikola Yonkov Vaptsarov St.,
Office Centre, 8th floor, office 22; tel.: +359 52 712 666; fax: +359 52 712 533;
Email: zachari.tomov@gmail.com

Our ref. **305-A** of May 12th 2016

### A transcript of the Part One of the video of the meeting held with UniCredit Bulbank's representative Attorney Todor Nenov on 20th February 2016

**Duration:** 14:37:01 – 15:06:52 pm

**Identification code:** 20022016/6000000

**Attendees of the meeting:**

VS – Vladimir Skochev, attorney at law
TN – Todor Nenov, attorney at law
ZT – Zahari Tomov, attorney at law

*Beginning of the Part One of the video:*

VS: Coffee or tea?

TN: No, thanks, I'll help myself with one of these

VS: OK.

TN: Hello, I decided not to wander around, I'm a little early, but I decided to ring the bell

ZT: I'm waiting some workers for upstairs. I have such sideboards, which fell down and later if we have time we will go upstairs, I would like to use the opportunity to…

TN: I can wait, if you have something to organize….

ZT: No, no we're comfortable here.

TN: I, among other things, don't have much to tell you, except not to give up.

ZT: In my opinion, what I managed to find out, Vladi and I talked about it, I even asked him to attend the meeting. Have a seat Vladi. Then we have to…, well we have to select some resolutions, right

TN: Yes, we must, we must.

ZT: Which in my opinion must not be interim, but resolutions directed to something more final.

TN: No. So, I got this that was Maya's (Fezliyska) idea. Well now the question is that I realize that now it's not the time for you to give up completely and get it over with all this, what Maya rampantly wants and seeks is to bring all this to

an end, because she retired on 1st February. This case is very burdensome for her. She regards it as the biggest failure in her entire career.

ZT:   Excuse me, do you mind if I smoke?

TN:   No, of course not.

ZT:   Well this case became really very complicated…. And frankly it started to get beyond….

TN:   Yes, she is in this situation

ZT:   So, you've seen the updated List.

TN:   Well, in fact it caused the biggest cataclysm and this here… the last one, here number four, the last one …. Maya (Fezliyska), thought that you do this….

ZT:   Are you talking about Kota's position?

TN:   For All Seas Bulgaria.

ZT:   Which one are we talking about?

TN:   On page three. No. We're talking about this one. No, she (*Trustee Kolyovska*) first sent one file (*the Updated List*)…, and then another one, so we're looking at this one. She sent it to us, of course. Here it is.

ZT:   We're talking about All Seas Bulgaria, right?

TN:   Yes

TN:   UniCredit holds a pledge, two pledges over the accounts receivable (AR) of All Seas Bulgaria.

ZT:   Yes. But if you look, I mean, for example the whole story, from the beginning, because the situation is as follows: All Seas Bulgaria in the end…, the originator for Bulbank, these are the rights, liabilities, all the things the two loans of UniCredit comprise.

TN:   Yes. Exactly.

ZT:   One of them was [extended] by HV Biochim, (*ZT answers the phone and says: "I can't talk right now"*) and the other one for … million, which was directly financed by UniCredit. So we write All Seas Bulgaria in this box. For this entry you have, if I'm not mistaken…, yes 68 million…

TN:   Which you had the courtesy to do for UniCredit and Ayr Property to enter as a co-debtor.

ZT:   We're talking about the agreement of 1st November 2010?

TN:   Yes, correct.

ZT:   By virtue of which Ayr Property Development joined as a co-debtor.

TN:   Yes and created the mortgage.

ZT:   Right. What is the idea? I want to know what is your vision. What is the idea of Maya and UniCredit?

TN:   Well, probably I will not be able to systemize the issues very well…. But while I was travelling I tried to… but I have not…. they are not systemized.

ZT:   Ok, it's not a problem.

TN:   Well, that's why I started with this, that Maya, I want to help her for pure humane reasons; she wants to be out of all this somehow. This is point 1; and

point 2 is that Maya has absolutely no faith in the claim, which we filed and our opinions differ about this.

ZT:   Which claim?

TN:   The one about FIB's (*First Investment Bank*) unjust enrichment.

ZT:   Right. OK.

TN:   She wrote specifically. Professor Kalaydzhiev gave an opinion. You see, I'm working on this, I wrote the Statement of Claim. You know it. In fact we forwarded it to each other back and forth to coordinate it. He (*counsel Skochev*) gave me the documents, which I needed, didn't he? It was all joint work.

She wrote specifically. Professor Kalaydzhiev gave an opinion. You see, I'm working on this, I wrote the Statement of Claim. You know it. In fact we forwarded it to each other back and forth to coordinate it. He (*counsel Skochev*) gave me the documents, which I needed, didn't he? It was all joint work.

Maya said: "NO. Don't pretend to be so naïve. You're well aware that this is not going to work." I said to her: "Clear or not, that's it, we have to act."

I asked professor Kalaydzhiev for his opinion and he said first that: "This claim has no chances to succeed, because the Court is bound to ascertain *ex-officio* the invalidity of Trustee Apostolov's acts and hold that in fact nothing has been handed over to FIB. FIB has not enriched itself at all. In this case everything is in the bankruptcy estate of Corporate Commercial Bank."

In my opinion the professor was entirely wrong about this. Because unjust enrichment is the result of factual shifting; and whether or not any legal cause or any prior legal grounds stand behind it is another issue. The fact is that the collaterals have been taken back. They have ceded [assigned] to all their… and etc.

But she said that FIB will never afford to lose this case.

And now they are playing some sort of a really weird show with this termination and addressing the Court of Appeals. Then suddenly at some point a ruling against us appeared on the system. FIB however alleged that…

ZT:   Which Ruling?

TN:   Of the Sofia Court of Appeals, because the [Sofia] City Court dismissed it. We appealed. Oh. First we arranged the table and employed "Georgiev, Todorov and Co" for a preposterous fee for a purpose of winning the case. Well that in a way is insulting for a lawyer. But I don't mind that much.

Indeed, it really turned out, I've checked, that in the Court's internal system a Ruling to the contrary appeared. There was a reply to… The panel of judges was unique. The deputy presiding judge was notorious with some "detours". Plus two seconded judges. That's it.

ZT:   Do you have the feeling that FIB was involved in all this?

TN:   Absolutely! It was FIB!

Everything was arranged backstage, but FIB in the end did not pay. Or at least that's what rumours say. Because meanwhile Maya found this Petar Petrov, who is the boss of ULEN (*a company for ski and winter tourism controlled by the owners of FIB – Ivaylo Mutafchiev and Tseko Minev*), who is a close to and a personal lawyer of erh…. she told you that (*speaking to counsel Skochev*). She speaks openly about this. So thus she got in contact with Minev and Mutafchiev. They in turn assigned a person called Ivo. Ivo, I don't remember his family name, but you've met him by the way, he said, some years ago. He is a member of the Managing Board and head of bad loans.

ZT:   Is he one of FIB's organization?

TN:   Yes. FIB. Yes.

ZT:   ... I visited FIB.

TN:   Yes. Yes. That's right. He said that some investor has come and said that there was a hurricane and he couldn't pay, because there was a hurricane.

ZT:   Yes, it was as you say it.

TN:   He tells this story so funny. So, higher authorities have instructed this guy, despite his strong unwillingness, to negotiate. He was the guy, who... when this story with the person Apostolov happened, when Apostolove came to the bank [*Bulbank*] and said "I'm under coerce to give the money." We said: "Don't give it. Only solely if we reach an agreement with FIB."

ZT:   When did Apostolov come? Before ...

TN:   Before. And you know what, this Fezliyska, you have no idea how she spoke to him with a high tone. She told him: "If you dare doing something with this money, you're going to prison for sure right away, at this very minute."

ZT:   Well then, why did he do it?

TN:   Well he said, he almost burst into tears. After that, he came twice to be scolded about. He said he was forced and threatened physically and extremely seriously. First the big-muscle guys of Litex pressed him and after that ...

ZT:   That was PETROL's idea to enter in a cession [agreement] wasn't it?

TN:   Yes. Initially the arrangements were made for PETROL, but then Peevski found out and...it was a terrible mess, but then they got to him and made him

As you know, he sent me... Do you remember the word file I sent you (*the draft version of the payment order dated 22nd October 2014*) that was written by Branimir someone, he is...

ZT:   He is the legal advisor of FIB. What was his family name?

VS:   Dimitrov.

ZT:   Right.

TN:   That's why Maya said: "We have no changes, they will beat the hell out of us."

ZT:   Where? In court?

TN:   "They'll pay... next time they will pay for it. We have instances and they will tear us to pieces!"

ZT:   What is the situation with the Sofia Court of Appeals?

TN:   Oh, now our case is in the Sofia City Court. The Appellate Court veered around, they swung it with a very good ruling, they replaced it and remanded it. Replaced it and remanded it.

ZT:   Because FIB didn't pay?

TN:   Yes, they replaced the ruling. Yes, I swear to that.

ZT:   What are you telling me, that the judges delivered a ruling, while waiting for FIB's money, right?

TN:   Yes. Within the system and at the last moment, when they are not paid...

ZT:   They didn't give them the money as promised?



5

TN:    No they didn't. And they replaced the ruling.

ZT:    That's horrible!

TN:    You have no idea. The situation is...

ZT:    ... the first time, when.... Alright, tell me...

TN:    Then I said to Maya, "Well these things happen. People think... When I was a judge there was a lady judge, who used to say: "You must learn to go to sleep with no idea how to solve the case, because after you sleep over it, you may come up with something else in the morning.... and that sort of thing."

       Another idea flashed across her mind!

TN:    Ha-ha...no, not driven by hunger, not by hunger at all. The situation is just .... You can't even imagine it!

ZT:    What is the official position of Bulbank, its management?

TN:    Well, the official position is that...; indeed Kazini doesn't interfere very much in this case, but Levon on the other hand, keeps a close eye on it.

ZT:    So, what is his opinion?

TN:    .... And he asked Dancho and Itso to make a calculation, meaning that the bank has spent over 1 million so far for charges, costs and fees.

ZT:    For what? In the end your claim is for 68 million!

TN:    Yes, but its gone ...

ZT:    No, that's another issue. But the question is that you have 68 million. The question is what does Bulbank do as an institution, as the holder of the rights, what? Does it give up such rights?

TN:    ....give up! For the purpose of receiving some money from FIB. Now the negotiations are...I'll tell you then, if we have more time!

ZT:    I've devoted all the time.

TN:    So, the negotiations started and in the course of these negotiations FIB said...

       Well, before the start of these negotiations, Maya and I created a scenario: "So you're going to tell this like that. You're going to tell that like this. About the case, about restoring back to the [bankruptcy] estate, about the claims seeking to invalidate and for all these issues as a whole." Including, if you remember, I asked you back then (*referring to counsel Skochev*) about information about the American issue. To startle them with the American issue. Everything we can.

       They however, like a stain on all these matters, which you know she has explained to them at great length, said: "Don't bother us at all. We've settled this issue. This issue is over for us."

ZT:    Who said that?

TN:    Oh, was it Ivan, Ivo, Ivo Ivanov or Ivaylo, a Ivo...

ZT:    Ivaylo Ivanov

TN:    Yes, I think that was ...

ZT:    This is a young guy, who is in...

TN:    Well, he's not that young.

ZT:    He was...

TN:    Yes, yes, a member of the Managing Board of First Investment Bank.

And said: "We however want to terminate the proceedings. The management, acting through Mr. Petrov was notified about your desire. And we are ready. And we are paying not for something specific, but just to get rid of it and set our minds at rest. So we set the following conditions: 1. UniCredit denies its claim. 2. Closing the bankruptcy proceedings; and 3. Expiration of the term for the claims seeking invalidation."

The first condition is entirely dependant on Bulbank's will, the second requires action and regarding the third – we shall wait for it to occur as a future uncertain event, from the trustees."

ZT:    I hear you very well. I'm going to ask you to let me... it is very important for me to find out the logic of these matters. The management on the one hand has a claim, which is included in the List, for 68 million.

TN:    Well yes, but... it has never been..., all is lost.

ZT:    That's a different subject. But they know, they have 68 million? They're of the opinion that from Bulbank's point of view...

TN:    .... all is lost.

ZT:    ... these 68 million in fact are no longer of interest?

TN:    Absolutely!

TN:    there is a Schmidt, who is the head of the risk.

ZT:    What, of Bulbank?

TN:    Yes. According to him, who stated definitely, that all this is regarded as a total loss – absolute zero and he is very angry that investments are made and fees are paid for something, which value, as AR, is zero. This is an absolute zero in UniCredit. They have lost absolutely and entirely all hopes for getting any money somehow, unless with FIB.

ZT:    What is FIB's proposal for Bulbank?

TN:    Well, Maya Fezliyska called and gave the cue, negotiations started and she said: "We want 10 million levs to back up."

And by the way all figures we speak of are in levs. I'm telling you this now, to avoid any misunderstandings. Ten million levs.

ZT:    That was Bulbank's proposal?

TN:    Yes. They responded with sheer laughter. Dancho Hristov joined. He is the head of bad credits. I believe he held two meetings.

ZT:    Dancho Hristov from ...?

TN:    No, that is the head of problematic loans in UniCredit.

ZT:    Then who is Schmidt in Bulbank?

TN:    Who?

ZT:    Schmidt.

TN:    Schmidt is the head of the risk. He is the chief head of all non-performing loans.

ZT:    And Dancho Hristov is...?



TN:   He is the chief of UniCredit's problematic loans. So now, after long negotiations, we have a proposal put on the table. They give a million for the first proposal. I'm wording it like this. They didn't say it with these very words. But, it means one million to help you out.

ZT:   Bulgarian levs?

TN:   Yes, levs. And one million conditional for the other two.

Maya has firmly stated, that whether or not there will be any claims for invalidation, since the bank is not responsible for that, this cannot be set as a condition, so this condition will drop. Regarding the one million. The second will be given when the bankruptcy proceedings are terminated, this is why I'm here now.

ZT:   So, this one million, these are your relationships, between Bulbank and FIB, in the first case in the Sofia City Court!

TN:   The first ... yes. And..

ZT:   Because FIB did not pay and the ruling was not reversed against...

TN:   Well, it's not as you put it. We were going to bring it to cassation; and the Cassation [Court] might have reversed the decision.

ZT:   Well, the one million, which in fact has something to do with us, figuratively speaking, with this one million the bankruptcy proceedings will be closed, right?

Can this thing first be... how can I say this, can this somehow be...?

TN:   Yes, it can, as a condition, as a condition assigned in escrow account.

ZT:   No. I mean as a vision of the final outcome ahead of time. We put an end to everything. No 68 million, nor anything. We don't care about Ayr Property. We don't care about anything.

TN:   Yes, yes.

ZT:   This is the final...

TN:   Yes, absolutely.

ZT:   I'm surprised!

TN:   Why are you surprised?

ZT:   Because it's a lot of money!

TN:   No, listen. It was at that time when she (*Maya Fezlyiska*) came up with the idea. I think that it occurred to her in course of the negotiations we had.

I think we can agree on this. If we really – that's in her line of reasoning – are responsible for what we are responsible. If Unicredit does one thing or another... then, from that point onwards it's for others to decide... We cannot be responsible for what the trustees might do, nor for what Seek Foundation might do, nor for Ayr Logistics.

Now we start from here – I think it's right and FIB should accept it, or at least it's quite likely to be accepted – you can file the same lawsuit as ours. You have the statement of claim. You know on what grounds it was denied, you can also read the ruling of the appellate court judges, who – apparently after the altercation – looked into the facts and made a relatively decent ruling. It is a possibility that our counsels might have hinted to the court what should be

the right ruling. So there we have a firm ground, and SEEK may opt for the same transaction as we did. It will not necessary to have the bankruptcy case still pending to do it. What is more, undue enrichment is the precise [claim] and it will even resonate better if the bankruptcy case gets terminated.

ZT:   (speaking inaudibly)

TN:   Yes. Actually what you said in the beginning, i.e. that I am here to put an end to it all, that's not the case. As for the traces leading to FIB... You can pursue them in the USA, despite the fact that the bankruptcy case has been closed.

My offer, or at least what I could persuade Maya to do, is to divide the money in half, the money from the second tranche – intended for the termination of the case.

That's my offer.

ZT:   It's not the most important thing now.

TN:   Ok, right, it's something I myself cannot put my finger on yet.

ZT:   The most important thing for me was to understand whether there existed any willingness to work it out and make a lasting decision to...

TN:   We are certain that it must not...

ZT:   Let me get this straight - they mustn't or they won't?

TN:  They will not. O rather they think they don't stand a chance. And there's no need to give any more money, including the money I mentioned last, which is practically nothing. Was it 22 thousand?

------End of Part One of the video of the meeting held on 20th February 2016. This part ends at 15:06:52 hours Bulgarian time-----

Attorney Tomov's explanations are in parenthesis.

## DECLARATION OF AUTHENTICITY

The undersigned, Attorney Zahari Tomov, hereby confirm that everything said in this first part of the video (out of four in total) of the meeting held in the afternoon of Gebruary 20th 2016 at the law office of Attoney Zahari Tomov at 8 Nikola Vaptsarov St, 8th floor, Varna, Bulgaria, is true and correct.

This Transcript is to be used in court for the purposes of case No.14-34940-BJH-7 in the United States Bankruptcy Court for the Northern District of Texas.

Drawn up by:                          (Signed)
12 May, 2016, Varna, Bulgaria              Attorney Zahari Tomov

---

*The undersigned Boryana Ilieva Stefanova hereby certify that this is a true and correct translation from Bulgarian into English of the attached document – Part One of the video of the meeting held on 20° February 2016. This translation has 8 [eight] pages.*

Translator: _____
              *Boryana Ilieva Stefanova*

Република България, гр.Варна, улица Никола Йонков Вапцаров № 3,
офисен център, етаж 8, офис № 22, тел:+35952712666,
факс: +35952712533, Е-мейл : zachari.tomov@gmail.com

Изходящ № 305-А/12.05.2016 г.

Стенограма на първата част от записа на

срещата, проведена на 20.02.2016 г., с представителя на УниКредит Булбанк АД,
адвокат Тодор Ненов

**Времетраене:** 14:37:01 – 15:06:52, следобедно време.

**Идентификационен код :** 20022016/ 6000000

**Участници в срещата:**
ВС- адвокат Владимир Скочев
ТН- адвокат Тодор Ненов
ЗТ- адвокат Захари Томов

*Начало на първата част от записа:*

ВС - Кафенце, чайче?

ТН - Не, ще взема едно от тези.

ВС – Добре.

ТН - Здравейте, реших да не обикалям, подраних малко, но реших да позвъня.

ЗТ - Аз чакам горе едни работници. Имам едни такива плоскости, които се отлепиха
и после, ако остане време ще се качим , използвам възможността да .....

ТН - Аз мога да изчакам, ако нещо организационно ....

ЗТ - Не, не, тука ни е комфортно.

ТН - А пък аз, освен всичко друго, така нямам много неща да ти кажа, освен да не се
предаваме.

ЗТ – Според мен, това което успях да разбера, с Влади разменихме няко думи, даже
го помолих да присъства на срещата. Седни Влади. След което трябва, нали, да се
изберат някакви решения.

ТН - Да трябва, трябва.

ЗТ - Които според мен са не междинни, а решения, които са ориентирани към нещо по-крайно.

ТН – Не. Значи аз го разбрах, това беше идеята на Мая (Фезлийска). Сега въпросът е в това, че аз си давам сметка, че за вас не е момента съвсем да се предавате и да приключвате цялата работа, това което Мая неистово се стреми и иска да приключи, защото тя се пенсионира на 1-ви февруари. Тежи й много тоя случай. Смята, че това е най-големия провал в цялата й кариера.

ЗТ - Извинявайте, имате ли нещо против да запаля.

ТН - Не, не разбира се, че не.

ЗТ - Ами да случаят стана много комплециран .....и честно да излиза от ......

ТН - Да, тя е точно в тази ситуация.

ЗТ - Ами горе - долу видяхте актуализирания списък.

ТН - Значи той предизвика най-големия катаклизъм  и да ето това тук, последното, ето четири,  последното... Мая (Фезлийска), реши , че това го правите ....

ЗТ - Говорите са позицията на Кота ?

ТН - За Ол Сийз България.

ЗТ - За кое говорим?

ТН- На трета страница.  Не. Ето за това говорим. Не, тя  (синдик Кольовска) първо пусна един файл  (актуализирания списък)..., пък след това друго, затова ето това гледаме. Тя ни го изпрати разбира се. Ето го.

ЗТ - Говорим за Ол Сийз България ?

ТН – Да.

ТН - УниКредит има залог, два залога върху вземането на Ол Сийз България.

ЗТ – Да. Но, ако погледнеш, според мене, примерно цялата история от самото начало, защо ситуацията е следната: Ол Сийз България в крайна сметка ..., първоизточника на Булбанк, това са правата, задълженията, всичко което е сложено, това са по двата кредита , които са на Уникредит.

ТН - Да. Точно така .

ЗТ - Единият беше 2006 от HV Биохим, (вдига телефона и казва "не мога да говоря сега"), а другия от  ... милиона, който директно е финансиран от Уникредит. Значи слагаме го Ол Сийз България в тази клетка. Срещу това вие имате, ако не се лъжа, да 68 милиона ...

ТН - Което вие сте направили като жест спрямо Уникредит и Еър Пропърти да

встъпи като съдлъжник.

ЗТ - Говорим за споразумението от 1ви ноември 2010 г.!

ТН - Да, точно така.

ЗТ - С което Еър Пропърти Дивелопмънт стъпва като съдлъжник.

ТН - Да и дава ипотека .

ЗТ – Така. Каква е идеята. Искам да знам каква е вашата визия. Каква е идеята на Мая и на Уникредит

ТН - Сега може би не мога да ти подредя нещата достатъчно добре ... Но докато пътувах си подреждах...ама нямам ... , не са подредени.

ЗТ - Не, няма проблем.

ТН - Значи аз затова започнах с това, че Мая, тука вече  в чисто човешки план искам да й съдействам, тя иска по някакъв начин да излезе от цялата тая работа. Това е точка 1. А точка 2 е, че Мая, абсолютно никаква вяра няма на иска, който сме предявили  и тука имаме с нея различия.

ЗТ - За кой иск ?

ТН - Този за неоснователно обогатяване на ПИБ.

ЗТ - Добре, ОК.

ТН - Тя е писала конкретно. Професорът Калайджиев, даде едно становище. Значи аз работя по това нещо, аз написах исковата молба.  Знаеш. Всъщност ние си я меткахме напред-назад, за да я съгласуваме. Нали,  той ми даде документите (адвокат Скочев), които ми трябваха. Всичко беше съвместна работа.

Мая каза - "НЕ, Ти, вика, не се прави чак толкова на наивен. Ясно ти е че няма да стане". Абе викам - "ясно или не, толкова трябва да действаме".

Взех становище от професор Калайджиев, който каза първо – "Предявяването на този иск няма никакви шансове, тъй като съдът е длъжен служебно да констатира нищожността на действието на синдик Апостолов и да каже, че всъщност на ПИБ нищо не е предадено. ПИБ с нищо не се е обогатила. И в този случай всичко е в масата на несъстоятелността на Корпоративна търговска банка."

Тука професорът според мен изобщо не е прав. Защото неоснователното обогатяване е резултат от фактическо разместване.  А дали зад него стои правна кауза, някаква, предварително правно основание, това е отделен въпрос. Факт е, че обезпеченията са вдигнати. Че те са си цедирали на всичките тия там  техните  и прочее и така нататък.

Но тя казва, че ПИБ никога няма да се остави да загуби това дело.

И сега ми разиграват някакъв, наистина много особен театър с прекратяването, отиването в апелативния съд. И в един момент се оказва, че в системата излиза определение срещу нас. ПИБ обаче, твърдят че ...

ЗТ - Кое определение?

ТН - Софийският апелативен, щото градския прекрати.  Ние обжалвахме . А ! Първо подредихме масата и сложихме "Георгиев Тодоров и Ко." с фантастичен хонорар, с цел да се спечели делото. Нали,  това  в някаква степен е обидно за адвокат. Но не ми е толкоз.

И действително, наистина се оказа, аз проверих, че във вътрешната система на съда се е появило едно определение в обратен смисъл. Реплика е имало спрямо ... Съставе е уникален . Заместник председателката на съда е известна с някакви забежки. Плюс двама командировани съдии . Това е.

ЗТ - Имаш ли усещането, че ПИБ е имала пръст в цялата тази работа ?

ТН – Абсолютно! ПИБ са !

Да цялата работа е подредена, но ПИБ накрая не са платили. Поне така твърдят. Защото междувременно Мая чрез един Петър Петров, който е шеф на Юлен (контролираната от собствениците на ПИБ, Ивайл Мутафчиев и Цеко Минев, компания, развиваща ски и зимен туризъм) и с много близък личен адвокат на ..., тя ти ги е казвала (обръща се към адвокат Скочев). Тя си разказва жената, няма задръжки. Влезе във връзка с Минев и Мутафчиев. Те, по тоя повод възложиха на един Иво. Иво не знам кой си, с който сте се срещали между другото, той каза, преди години. Той е член на управителния съвет и шеф на необслужваните им кредити

ЗТ - От структурата на ПИБ?

ТН – Да, на ПИБ. Да.

ЗТ - ….. ходих до ПИБ.

ТН - Да, да. Точно така.Той каза, че бил  дошъл инвеститор и каза, че има ураган, че не могъл да си плати, щото има ураган .

ЗТ - Да така беше.

ТН - Да, той това го разказва много весело. Та същият този му било наредено отгоре, въпреки неговото силно нежелание, да преговаря.  А той е човекът, който, когато стана историята с лицето Апостолов, когато лицето Апостолов дойде в банката (Булбанк) и каза - "Натискат ме да дам парите". И ние казахме - "Няма да даваш. Единствено и само, ако се стигне до споразумение с ПИБ."

ЗТ - Апостолов кога дойде? Преди да...

ТН – Преди. И тази Фезлийска нямате представа какъв тон му държа. И му каза - "Абсолютно в затвора и то моментално отиваш, ако си позволиш каквото и да е, да направиш с тези пари."

ЗТ - Добре тогава, защо го е направил?

ТН - Ами, той твърди, почти се разрева човека. Идваше на килимчето два пъти,  след това. Че е бил принуден физически и заплашвали го изключително силно. Първо

биячите на Литекс го били натискали, а след това ...

ЗТ - Това е идеята за "Петрол" да се направи цесия?

ТН – Да. Първоначално е било подредено за "Петрол", но Пеевски научил и   ... станала страшна разправия и го хванали, и го накарали.

И нали той ми прати .... Помниш ли, аз ти го изпратих уордовския файл (работния вариант на платежното нареждане от 22.10.2014),  който е написан от Бранимир не знам къв си, той е .....

ЗТ – Той, Бранимир е юрисконсулт на ПИБ. Как му беше фамилията?

ВС - Димитров.

ЗТ - Добре.

ТН -  И затова Мая каза - "нямаме шансове, ще ни бият като маче у дерек".

ЗТ - Къде ? В съда ?

ТН -  Ще платят .... ,  следващия път ще си платят.  Ние имаме инстанции и ще ни попилеят !

ЗТ – Какво е положението в Софийски апелативен съд ?

ТН - А, в Софийски градски смс.  А, апелативен, обърнаха го с едно много добро определение, подмениха и го върнаха . Смениха и го върнаха.

ЗТ - Щото ПИБ не си платиха ?

ТН - Да. Смениха определението. Да бе честна дума.

ЗТ - Искаш да ми кажеш, че съдиите издадоха определение, чакайки парите от ПИБ, а ?

ТН - Да. Вътре в системата и в последния момент, когато не им се плати...

ЗТ - Не им дадоха парите, които са им обещали ?

ТН -  Не им ги дадоха. И смениха определението .

ЗТ - Ужас!!

ТН - Нямаш си на представа. Положението е....

ЗТ - ... Първия път, когато ... Добре, кажи ми ...

ТН - И аз й викам на Мая – "Е, ми случва се.  Хората мислят. Аз имах една съдийка, когато и аз бях  съдия, която казаше : " Трябва се научиш да спиш с ненамислени дела, щото като се наспиш на сутринта може да ти хрумне друго... и такива работи."

Хрумнало й друго!

ТН - Ха-ха.... не, не от глад, не е от глад изобщо. Ситуацията е просто ..., не можеш да

си представиш !

ЗТ - Каква е официалната позиция на Булбанката, като мениджмънт?

ТН - Значи официалната позиция е, че наистина, наистина Казини не се бърка много в този казус, обаче Левон го следи много изкъсо .

ЗТ - И какво е неговото мнение?

ТН - ... и поиска Данчо и Ицо да направят сметка, че банката дотука е дала над 1 млн за такси, разноски и хонорари.

ЗТ - За какво? Е, нали имате за 68 милиона претенции !

ТН - Да ама няма вече ...

ЗТ - Не, това е друга тема. Но въпросът е, вие имате 68 милиона. Въпросът е Булбанк, като институция, като носител на правата, какво ? Отказва се от тези права?

ТН - ...да се откаже! С цел да получи някакви пари от ПИБ . И сега преговорите са .... Казвам ти тогава, ако има повече време !

ЗТ – Аз съм отделил цялото време.

ТН - Значи преговорите започват и в хода на тези преговори ПИБ казват...

Значи преди да почнат тия преговори с Мая и си правим сценарий : Значи това, така ще кажеш. Онова, така   ще кажеш. Делото, връщането в масата, отменителните искове и изобщо всички работи. Включително, тогава значи, ако си спомняте, аз тогава те помолих (към адвокат Скочев) за информация за американската работа. Да ги стресираме по американска линия. Всичко, което може.

Те обаче, абсолютно като петно на всички тия неща, които, тя нали, така им обяснява пространно, казват "Абе въобще не ме занимавай. Ние тоя въпрос сме го уредили. Тоя въпрос за нас вече е приключил".

ЗТ -  Кой го казва това?

ТН - Оф, Иван, Иво, Иво Иванов ли или Ивайло, някой си Иво..

ЗТ - Ивайло Иванов

ТН - Да, мисля, че това...

ЗТ - Това е едно младо момче, което  е в ....

ТН - Абе, не е чак толкова млад .

ЗТ - Той беше ...

ТН - Да, да, член на управителния съвет в Първа инвестиционна банка.

И казва - "Ние обаче искаме производството да го затворим. Ръководството, чрез г-н Петров е уведомено за вашето желание. И сме готови . И даваме пари не за друго, а

просто, за да го махнем от главата си и да се успокоим. И поставяме следните условия: 1. Отказ от иска на Уникредит Булбанк, 2. Прекратяване на делото по несъстоятелност, и 3. Изтичане на срока за отменителни искове."

Първото изцяло зависи от волята на Булбанк, за второто иска се действие, а за третото ще се чака като бъдещо несигурно събитие , от синдиците."

ЗТ – Чувам те много добре. Ще те моля да ми позволиш ..., за мен е много важно да вляза в логиката на нещата. От една страна, мениджмънта разполага с претенция, която е сложена в списъка за 68 милиона .

ТН - Е да де, но ... никога не е било...... , всичко е загубено.

ЗТ - Това е друга тема. Но знаят, че имат 68 милиона ? Те са на мнение, че от гледна точка на Булбанк ...

ТН - ... всичко е загубено.

ЗТ - ... тези 68 милиона на практика вече не представляват интерес?

ТН – Абсолютно !

ТН - Има един Шмит, който е шеф на риска.

ЗТ - Това на Булбанк ли?

ТН - Да. Според който категорично, всичко това се води на абсолютно на нула и е много ядосан, че за нещо, което е със стойност нула като вземане, се правят инвестиции и се плащат хонорари. Това е абсолютна нула в Уникредит. Напълно, изцяло са загубили всякаква надежда, че могат да получат пари по някакъв начин, освен с ПИБ.

ЗТ - А предложението на ПИБ за Булбанк какво е?

ТН - Сега, значи, Мая Фезлийска се обажда, подава сигнал, почват преговорите и тя казва: "Искаме 10 милиона, за да се откажем."

А, между другото всичко се води в лева. Отсега ти казвам, за да няма недоразумения. Десет милиона лева.

ЗТ - Това е предложението на Булбанк?

ТН – Да. Те реагират с абсолютен смях. Включва се Данчо Христов. Той е шеф на лошите кредити. Провежда две срещи според мене.

ЗТ - Данчо Христов от ... ?

ТН - Не, това е шефа на Уникредит,проблемни кредити.

ЗТ - А кой е Шмит в Булбанк ?

ТН - Кой?

ЗТ – Шмит.

ТН - Шмит е шефа на риска. Той е  главния шеф на всички необслужвани кредити,

ЗТ - А Данчо Христов е  ...?

ТН - Той е на проблемни кредити. И сега в момента, след дълги преговори, в момента стои на масата предложение.  Милион   дават за първото предложение. Аз го формулирам така. Те не са го казали точно така. Но, значи  един милион, за да ви помогнем.

ЗТ - Лева?

ТН - Да, лева. И един милион условен за другите две неща.

Мая категорично е казала, че за това нещо, дали ще има или няма да има отменителни искове, след като банката не отговаря, не може да има някакво условие, така че това условие ще отпадне. При единия милион. А вторият ще дойде в момента, когато се прекрати производството по несъстоятелност, за което всъщност идвам тука.

ЗТ - Значи този един милион, това са вашите отношения като  Булбанката   и като ПИБ, по първото дело, в Софийски градски съд !

ТН - Първия ..... да. Като......

ЗТ  - Защото ПИБ не си е платил и не се е обърнало определението срещу ...

ТН - Е, не може така да го кажеш. Ние щяхме да ходим на касация. И Касационния (съд) може да се обърне решението.

ЗТ – Е, единия милион, който фактически има някакви отношения към нас, образно казано, с единия милион прекратява производството по несъстоятелност? 

Това нещо първо може ли да бъде …, как да го кажа, това може ли да бъде по някакъв начин, да...?

ТН – Може, като условие, като възлагателно условие по ексроу сметка  .

ЗТ – Не. Имам предвид като крайно виждане във времето. Слагаме крайна точка на всичко. Ни 68 милиона, ни нищо. Не ни интересува Еър Пропърти. Не ни интересува нищо ?

ТН - Да, да.

ЗТ - Това е крайната...

ТН - Да, абсолютно.

ЗТ – Изненадан съм!

ТН - Защо се изненадваш?

ЗТ - Защото много пари !

ТН – Не. Сега ще ти кажа. Значи тука беше нейната идея (Мая Фезлийска). Аз мисля, че изниква в хода на преговорите на които бяхме.

Мисля, че можем спокойно да се уговорим така. Ако ние наистина, това по нейния принцип, отговаряме за това, за което отговаряме. Ако Уникредит направи едно, второ или трето действие. От там нататък, какво ще направят другите .... Нали, ние не можем нито за синдиците да отговаряме, нито за Сий Фаундейшън, нито за Еър Лоджистикс Лимитед.

Сега, ако стъпим на тази основа, което мисля, че е коректно и ПИБ ще го приеме, т.е. има добра степен на вероятност, вие може да си заведете абсолютно същото дело, като нашето. Имате исковата молба. Знаете какво е по мотиви отказа, ще видите и определението на апелативния съд, който явно след разправията е седнал и го е написал сравнително прилично определение. По-скоро може би му е подсказано как да го напише от нашите адвокати. И в тази ситуация имаме сравнително добра основа, на която Сийк Фаундейшън може да направи същата транзакция като нас. Като за тази транзакция не е необходимо делото по несъстоятелност да е висящо. Даже неоснователното необогатяване в този случай е точно, по-силно ще бъде, ако делото бъде прекратено.

ЗТ - ........ (не се чува разбираемо)

ТН - Да, така че всъщност това, с което ти започна, че идвам с идеята, за да слагаме черта на всичко, не е точно така. Значи следите към ПИБ ... Може в Америка да продължите да си ги гоните, въпреки прекратяването на делото по несъстоятелност.

Предложението ми е, което извръзнах от Мая, е делим на половина парите, които са от втория транш, свързано с прекратяването на производството по несъстоятелност.

Това ми е предложението.

ЗТ - Това е нещо, което седи на по-заден план.

ТН – Добре. Добре. То всъщност и аз не мога да го подредя.

ЗТ - За мене беше важно да видя волята и трайното решение да направим....

ТН - Убедени сме, че тука не трябва въобще да се...

ЗТ - Добре, не трябва или просто не искат?

ТН - Не искат. Не. Не смятат, че има някакъв шанс. И не трябва да се дават още пари, включително сега тези последните пари, които са нищо. 22 хиляди ли бяха !

**Край на първата част на запис на срещата, проведена на 20.02.2016, 15:06:52, следобед, българско време.**

В скоби са направените от адвокат Томов пояснения.

## ДЕКЛАРАЦИЯ ЗА АВТЕНТИЧНОСТ:

Долуподписаният, адвокат Захари Томов, потвърждавам верността и автентичността на записа, представящ първата част от общо четирите части

записи на цялата среща, проведена следобеда на 20.02.2016, в адвокатския офис на адвокат Захари Томов: България, гр.Варна, улица Никола Вапцаров, №3 г, ет. 8.

Настоящата стенограма се изготви и представя за послужване по дело № 14-34940-BJH-7, водено пред Федерален съд по несъстоятелност за Северен окръг на щата Тексас.

Съставил настоящата стенограма:
България, Варна,
12.05.2016 г.

Адвокат Захари Томов

# EXHIBIT 33

**Фрея**
**Транслейшънс**

**Freya**
**Translations**

Преводи от и на чужди езици
гр. Варна, бул.Св.Св. Кирил и Методий № 1
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## TRANSCRIPT

### (of a Court Hearing)

**YEAR: 2018**

**THE CITY OF VARNA**

**THE COURT OF APPEALS**

**COMMERCIAL DIVISION**

The Varna Court of Appeals held a public session on May 2, 2018. The court panel consisted of:

**PRESIDING JUDGE: MAGDALENA NEDEVA**
**Panel judges: RADOSLAV SLAVOV**
**ZHENYA DIMITROVA**

**Secretary/Court reporter:**   Desislava Chipeva

Commercial Case No.187 in the docket for 2018 as reported by the Presiding Judge was brought before the Court.

*Pursuant to Art.150 of the Civil Procedure Code (CPC) the instant court session was voice recorded. All participants were duly informed.*

The Court called the parties to the case at 16:01 hours. There appeared the following parties:

Counsel Yanakiev

On behalf of **Silver Beach EAD**, *Appellant*;

The Appellant is duly summoned; the Counsel is duly authorized and admitted by the Court;

Counsel Zahari Tomov

On behalf of **Ayr Logistics Limited, Inc.**, *Appellant*;

The Appellant is duly summoned; the Counsel is duly authorized and admitted by the Court;

**Ayr Property Development EAD (declared bankrupt),** *Appellee*
**IS NOT REPRESENTED;**

**Trustee Ganka Kolyovska,**



Duly summoned
## DOES NOT APPEAR, NOT REPRESENTED

*Attorney Yanakiev:*   In my opinion, there exist no procedural obstacles, however, since the instant proceeding is subject to rules for public court hearings in bankruptcy proceedings, we object to the presence of persons who are not parties to this proceeding.

*Attorney Tomov:*     In my view, no procedural obstacles exist that might bar the further proceedings. However, before hearing the complaints on their merits, I insist that the Court make a determination on our request for a preliminary ruling first.

Upon verifying that the parties to the present case had been duly summoned the Court found that there existed no procedural obstacles and that the case could proceed, and therefore, the Court

### RULED:

**THE CASE MAY PROCEED;**

**THE MOTION ON APPEAL** together with a **RESPONSE** filed in accordance with Ruling No.234 of April 3, 2018 as duly served on the Parties **ARE TO BE REPORTED.**

The Court further reported that a motion of filing No.2555 of April 30, 2018 was submitted by First Investment Bank AD (FIB) containing written comments on the merits of the Motion on Appeal.

The Court gave an opportunity to Legal Advisor Kirilova to make comments on behalf of FIB.

*Legal Advisor Kirilova:* We have submitted our written comments, even though we were served copies of the Appeals, and have stated our opinion in our capacity of a creditor having rights under Article 717n of the Commercial Act (CA) and being a party to the bankruptcy proceeding. We have presented our arguments regarding the Appeals. We ask the Court to deny the Appeals. We further request to be admitted to today's hearing in our capacity of Art.717n CA creditor.

*Attorney Yanakiev:* The matter of FIB's participation and its alleged creditor capacity has been addressed more than once in the course of the bankruptcy proceeding. The *List of Allowed Claims And Creditors* of the insolvent debtor is a public one and has



been uploaded on the Commercial Register webpage. FIB is not shown on that List, so I think the Bank and its representative should not be allowed to take part in the present hearing.

*Attorney Tomov:* Our position is that it would be good if FIB were to participate in the present hearing. Our arguments are mostly based on the fact that the question of whether or not the instant Court has international jurisdiction has been raised at two distinct bankruptcy proceedings that are however connected, and to the extent to which the matter on non-contractual obligations falls within the scope of each of these, FIB's participation in the instant proceeding might be somewhat justified. Ayr Trustee's Motion on Appeal itself has arisen from a certain conduct and certain acts and actions, which have given rise to certain non-contractual obligations, some of which are directly related to FIB. That is why I believe FIB should be allowed to participate in this hearing, especially if reference for a preliminary proceeding [*is made before the ECJ*] where matters such as international jurisdiction, applicable laws and adequate forum need to be determined, for the simple reason that when FIB is a party to such proceedings, any decisions or determinations made therein will be binding upon the Bank. Although I support Counsel Yanakiev's request I would rather leave it to the Court to decide.

The Court retired to deliberate at 16:09 hours.

The Court resumed the hearing at 16:15 hours.

Having deliberated the matter and having taken into account that FIB was a legitimate Art.717n CA creditor, hence had no creditor capacity in the bankruptcy proceeding, the Court found that there were no valid legal grounds that might have legitimize FIB's becoming a party to the instant appellate proceeding and

**RULED**:

FIB's motion to become a party to the instant proceeding **IS DENIED**.

Next, the Court reported that Attorney Zahari Tomov filed a Motion under Art.267 TFEU under No.2462 on April 25, 2018. The Motion sought from the Court to make a reference for preliminary ruling on certain legal standards as contained in EU legal framework that applied to the grounds underlying the Motion on Appeal from the Shumen District Court Order No.5 delivered on January 19, 2018 in Case730/2013, which Motion on Appeal was filed by Ayr Trustee acting through his Special Bulgarian Counsel.

*Attorney Yanakiev*:      I am familiar with the Motion.

The Court the reported that a Supplemental Motion of filing No.2566 of April 30, 2018 completed with exhibits was also lodged by Attorney Tomov in support of the main Motion.

A Motion and Comments was filed by APD's Trustee Ganka Kolyovska under filing No. 2601 on May 2, 2018, where she expressed her opinion that neither the alleged violations of the substantive law nor the allegation that the trial court erred when it delivered the challenged court order were well-grounded or sufficiently proven.

The Court made the said Motion and Comments available to the parties.

*Attorney Yanakiev*: I have read APD Trustee's opinion. I pray the Court to admit it, but I object to its reasoning and find it unsubstantiated, especially the legal conclusions drawn there, which are wrong. APD Trustee erred in her interpretation of both the law and the factual background. I respectfully move the Court to deny Trustee Kolyovska's motion and the underlying reasoning.

*Attorney Tomov*:      What Trustee Kolyovska showed the Court is irrelevant to the matter in dispute, for nothing in her Motion and Comments either refutes or challenges any of the submitted facts, or exhibits, or conclusions of law.

The Court gave Counsel Yanakiev the opportunity to have his say on Attorney Tomov's motion for a reference for preliminary ruling.

*Attorney Yanakiev*:      I am familiar with the motion. I think it is admissible so I pray to the Court to admit it. I think it raises important questions that need to be answered first before a proper solution is found. The case law cited there is well established and beyond dispute. I leave it to the Court to decide whether or not to grant the motion and take action to open the relevant procedure under art.267 TFEU.

Since the motion under Art.267 TFEU was lodged with the Court prior to today's court hearing, the Court issued Ruling No.304 of May 2, 2018 and presented it to the parties.

*Attorney Tomov:*      The request for a preliminary ruling, despite not being subject to appeal is an act that might be amended in the course of the proceedings of the case. That's why I am asking the Court for a leave to amend it and pray the Court to consider it anew for the following reasons I am going to show the Court and which I believe the Court will take into consideration before making its assessment: Why are we

here? Why have we made that request? Well, what we have are two bankruptcy proceedings that are objectively connected. The element of connection presupposes two things that need to happen: to determine the scope of each proceeding regarding the matter of connected actions, which affects both of them. There's one complication though – the Regulation on insolvency provides for a set of legal remedies, while the Regulation on non-contractual obligations provides for further ones. The said complication however raises a question that is yet to be answered. The US bankruptcy proceeding claims to be the judicial forum having jurisdiction over the case, based on the theory for financial loss of assets having a US-tax status as a result of certain performed acts that are not only beyond the scope and authority of the acts of court delivered in the Bulgarian bankruptcy proceeding, but are in breach thereof. Before taking any action under the U.S. law the U.S. Bankruptcy court acting through Ayr Trustee sought to investigate and examine the case law of the European Court in Luxembourg with regard to the matter of what is the scope of authority and powers of the Bulgarian court entertaining APD's bankruptcy case, and whether or not it has international jurisdiction. The reason for this being certain acts of court delivered in the course of the Bulgarian bankruptcy proceeding, namely: Judgment No.63 handed down by the VCA in Case No.470/2011, where the VCA clearly and precisely held that APD was Ayr's investment enterprise. The VCA based its judgment on facts, which the court ascertained and its judgment has entered into full force and effect. APD does not carry out any business activities independently; it is entirely dependent on Ayr's managerial decisions and on Ayr's financing. If it is true, then said fact apparently is fully compliant with the provision of Art.3 (1) of the Insolvency Regulation. Provision of Art.3 (1) of the Insolvency Regulation makes it possible for the Bulgarian court to determine whether or not it is the court of the State where APD's bankruptcy proceeding was opened based on the presumption of being the "centre of main interests", which presumption, however, is easily rebuttable. As the VCA held in its Judgment No.63 the centre of main interests of APD is situated within the U.S.A at the place where the company on the managerial and financial decision APD is fully dependent on, has its seat. Hence, we find ourselves in a situation where the available facts and evidence refute the said presumption. The CJEU in its established case law relying on the Regulation and its provisions, more specifically Art.3 (2), Art.3 (4)., Art.36 and Art.37 has consistently concluded that: opening of a bankruptcy proceeding within the EU makes the State where the proceedings have been opened first to be deemed the State of the first bankruptcy, which however does not validate such a bankruptcy case as the main proceeding. The CJEU further says that a bankruptcy proceeding that is opened later, no matter where, thus extending the reach of the

Regulation, is closely related to the one that was opened first. Then the court of the State of the first opened proceeding – Bulgaria in this case – must determine the scope of that bankruptcy proceeding and resolve the matter of international jurisdiction. The matter of international jurisdiction takes precedence, for when an action based on the centre of main interests is brought along with a connected action based on the Regulation on non-contractual obligations, then any and all court determination or judgment made on such actions will be internationally recognized. So, it is at this point that I need the Court to reconsider its opinion. If the Bulgarian Court insists on keeping the effect of its ruling, which is not subject to appeal, then it means that the Bulgarian bankruptcy proceeding is thus denying international jurisdiction over the connected actions based on non-contractual obligations. As a result the Bulgarian banks and the persons that are involved in the taking away of assets worth over 113 Million Bulgarian levs will then have to submit to the international jurisdiction of the court order and judgments delivered by U.S. Courts. This is exactly what I need to bring to the attention of the Court and ask it to take into account while considering my Motion for Reconsideration. In presenting the Motion for Reconsideration I respectfully ask the Court to admit my Written Comments on the matters related the application of Art.267 TFEU. There I have briefly outlined the criteria the CJEU applies to similar situations in order to answer the question why the Bulgarian Court must hear and determine on the matter of the nature of APD's bankruptcy proceeding, i.e. whether it is the main one or the territorial one, and if it is a territorial one, whether it has been converted to a secondary one. If, on the other hand, none of those matters have been resolved, does it qualify as a breach of EU regulations? If we so easily forgo the application of EU regulations, then none of the banks will be able to withstand either U.S. jurisdiction or the applicable U.S. law.

The Court retired to deliberate at 16:30 hours.

The Court resumed the hearing at 16:41 hours.

Having looked into the Motion for Reconsideration of the its Ruling on the request for preliminary ruling [to the EUCJ], the instant Court held that there existed no good reasons to modify its earlier ruling, because the issues raised by the Appellant refer to previous stages of the bankruptcy proceeding where the trial court delivered determinations or judgments, which have entered into full force and effect now, and the issues so raised are irrelevant to the matter before this Court and subject matter of the instant proceeding of assessing whether or not the preconditions set in Art.632 Para 4 CA exist.

The above ruling was made, but the Presiding Judge dissented. The Presiding Judge was of the opinion that the Motion at issue had to be heard and decided on in camera.

*Attorney Tomov:*     I maintain the Motion.

*Attorney Yanakiev:*     On behalf of my Client I maintain the Motion, too.

The parties stated that they have no additional evidential requests.

The Court found that the legal dispute at hand was clarified from factual and legal point of view and, therefore,

**RULED:**

**The case is to proceed with assessment on the merits.**

*Attorney Tomov*:     Despite the Court's ruling on the request for preliminary ruling, we maintain that that the grounds underlying out Motion on Appeal are sufficient to produce the outcome we are seeking. The reasons for this opinion of ours are: our complaints are of omissions to act both on the part of Trustee Kolyovska and of the Bankruptcy court. Their respective omission to act is related to their respective obligation to cause the recovery of the money which belongs to bankruptcy estate and which was taken away by third parties. There are two Rulings made by the VCA – Ruling No.586 of 15 September 2016 and Ruling No.589 of 16 September 2016, where the court held that legal means or procedures were available to APD's bankruptcy proceeding that might have made the investigation of the facts concerning the source of rights and obligations for recovery of the money wrongly disposed of by FIB in favor of third parties and a certain private enforcement agent in favor of Investbank possible. From the perspective of the above VCA's two court rulings Trustee Kolyovska's omission to act seem to be fully accounted for. On the other hand, the legitimate interest presented in Ayr's Motion on Appeal from the Dismissive Order (Court Order No.5 delivered on January 19, 2018) may not be maintained or pursued further if the national court has declined international jurisdiction over the rights exercised by Ayr Trustee. Hence, Ayr Trustee might henceforth pursue its legitimate interest on the grounds of the rights that have arisen for Ayr Trustee from the [court's] refusal to apply Art.20 of the Insolvency Regulation and that are granted under the Regulation governing non-contractual obligations, and the provisions of which extend the reach of the applicable law and grant international jurisdiction to the judicial forum at the place where Ayr and its creditors have suffered a

financial loss of over 113 Million Bulgarian levs; the criterion for the latter is among the major factors for determining non-contractual liabilities especially when taken together with the only judicial forum that has international jurisdiction over the matters concerning those rights and liabilities that arise from non-contractual obligations. Just as a reminder, the source of non-contractual obligations is a matter decided by the national forum in two acts of court handed down in the course of APD's bankruptcy. One is Ruling No.731 where the court clearly held as to the "when", "how", "in what fashion" and "under what conditions" a mortgage creditor might get satisfaction of its claim based on a mortgage. Apparently, nothing of what the court ordered in the said Ruling had been complied with, for as Trustee Kolyovska's reports and the ones submitted by APD's Creditor's Committee have made it clear, what did happen was that FIB, having decided that it was time it took the reins and acting in collusion with Corpbank's Conservators and five other entities, simply disposed of the money available in APD's bank account with Corpbank. There exist not one document or exhibit in the case file that opposes to or denies these facts. Quite to the contrary, rather, Trustee Kolyovska's reports have confirmed said facts. As for the source of the money in the amount of  11 Million Bulgarian levs that was awarded by Private Enforcement Agent Zahari Dimitrov to Investbank, the award was in breach of APD Bankruptcy court order to stay the enforcement action, where the Bankruptcy court held that insofar as the enforcement action was against a receivable of APD's Estate it should be stayed pursuant to Art.638 (2) CA with reference to Art.634 CA. So, with all those well-known facts and given the circumstances, under which we filed our Motion on Appeal, we no longer feel a need to pursue our legitimate interest in this forum any further, for the simple reason that this is not the forum that has jurisdiction over such matters.

*Attorney Yanakiev*:    I respectfully ask the Court to reverse the Shumen District Court Order No.5 on the grounds submitted by the Motion on Appeal and remand the case to the Bankruptcy court directing it to take further actions to collect the dues and recover the money to APD's Estate.

*Attorney Tomov*:    In my view, given the instant court's own earlier orders, namely: Ruling No.586 dated 15 September 2016 and Ruling No.589 made on 16 September 2016, where the VCA held that it was impossible for APD's bankruptcy proceeding to resolve the issues raised for lack of a legal procedure or a remedy in that regard, and in the light of the fact that said rulings have entered in full force and effect and that Trustee Kolyovska has stated that APD's Estate has been depleted, it is impossible for the trial court to take any further action, for APD's bankruptcy proceeding




has no access to any legal means or remedies that might be resorted to. What I saying is that it would not be proper to ask the instant Court to give any such directions.

The panel of judges stated that it would enter an order within the statutory term and that Ayr Trustee's Counsel had 7 days, commencing this day, to submit a Motion of Defense in writing.

The court hearing was closed at 16:52 hours.

These Minutes were taken down during the hearing.

**Presiding Judge: ---**

**Court Reporter: ---**

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct English translation of the Bulgarian document attached hereto – Transcript of a Court Hearing held on May 2, 2018 at the Varna Court of Appeals in appellate case 187/2018. This translation has 9 (nine) pages.*

*Translator: _____ Ilka Simeonova Dyulgerova*

# П Р О Т О К О Л

**ГОДИНА 2018**                                                           **ГР.ВАРНА**
**АПЕЛАТИВЕН СЪД**                                   **ТЪРГОВСКО ОТДЕЛЕНИЕ**
**На 02 май**                                                            **ГОДИНА 2018**
В публично заседание в следния състав:

**ПРЕДСЕДАТЕЛ:МАГДАЛЕНА НЕДЕВА**
**ЧЛЕНОВЕ:РАДОСЛАВ СЛАВОВ**
**ЖЕНЯ ДИМИТРОВА**

Секретар Десислава Чипева
Сложи за разглеждане докладваното от Председателя на състава  търговско дело
**№ 187** по описа за  **2018**  година
*На  основание  чл.150  ГПК,  заседанието  се  провежда  с  осъществяване  на*
*звукозапис. За това обстоятелство участниците в процеса са уведомени.*
На именното повикване в 16:01  часа се явиха:
Въззивникът „Силвър бийч“ ЕАД, редовно призован, представлява се от адв.
Янакиев, редовно упълномощен и приет от съда от преди.
Въззивникът Еър Лоджнстикс лимитед инк, редовно призован, представлява се от
адв. Захари Томов, редовно упълномощен и приет от съда от преди.
Въззиваемата страна Ейр пропърти девелопмънт АД /в несъстоятелност/, редовно
призована, не се представлява.
Синдикът  Ганка  Янева  Кольовска,  редовно  призован,  не  се  явява,  не  се
представлява.
**Адв.Янакиев:** - Считам, че не са налице пречки от процесуален характер, но
доколкото настоящото производство се подчинява на правилата за разглеждане на дела
в открито заседание съгласно производствата за несъстоятелност,  възразяваме срещу
присъствието на лица, които не са участници и страни в настоящото производство.
**Адв.Томов:** - Считам, че няма процесуални пречки за хода на делото. Считам, че
преди навлизането по същество и разглеждане на жалбите по същество съобразно
техните основания доколкото сме въвели искане за преюдициално тълкуване
настояваме да се произнесете по него.
Съдът, с оглед редовното призоваване на страните намира, че не съществуват
процесуални пречки за даване ход на делото, поради което

# О П Р Е Д Е Л И :

## ДАВА ХОД НА ДЕЛОТО  И ДОКЛАДВА ВЪЗЗИВНАТА ЖАЛБА

И постъпилия отговор, съобразно определение на съда № 234/03.04.2018 г. , което
е връчено на страните.
Съдът докладва постъпила молба с вх. № 2555/30.04.2018 г. от Първа
инвестиционна банка АД гр. София с изразено становище по съществото на жалбата.
Юр.к Кирилова представя пълномощно от името на Първа инвестиционна банка
АД гр. София.
Съдът дава възможност на юр.к. Кирилова да изрази становище от името на
Първа инвестиционна банка.
**Юр.к.Кирилова:** - Ние сме депозирали становище доколкото не ни са връчени
препис от жалбите, в което излагаме нашето виждане в качеството си на участвал в
развито производство по несъстоятелност кредитор с права по чл. 717н ТЗ. Изложили

сме аргументите по повод жалбите. Искането ни е да оставите жалбите без уважение. Правим искане да участваме в настоящото производство като участник в самото производство по несъстоятелиост като кредитор с права по чл.717н от ТЗ.

**Адв.Янакиев: -** Въпросът с участието на ПИБ и нейното качество като кредитор е многократно разглеждан по делото за несъстоятелност. Списъкът с приетите вземания и кредиторите на несъстоятелното дружество е публичен, вписан е в ТР. Там ПИБ не фигурира, така че  считам за недопустимо участието на банката и неин представител в настоящото производство.

**Адв.Томов:-** Нашата позиция е, че би било добре участието на ПИБ в настоящото производство. Аргументите ни са преди всичко обърнати към това, дотолкова доколкото е  повдигнат въпрос за международната компетентност и юрисдикцията на съдебния форум в две различни производства по несъстоятелност, които имат своята свързаност и дотолкова доколкото обхватът на действие на едното и другото производство по несъстоятелност се отнася до  извъндоговорните задължения, мисля че би било разумно донякъде участието на ПИБ в хода на настоящото производство. Самите основания, с които е въведено самото обжалване от страна на синдика на  Еър Лоджистикс лимитед инк визират поведение, действия и актове, които са посочени като източник на извъндоговорни задължения и част от тях се отнасят към ПИБ. В този смисъл, считам че участието в това производство евентуално участието в едно преюдициално  производство, където  трябва  да  бъдат  решени  въпросите  за международната компетентност, за приложимия правен ред, за  съдебния форум, би било добре и уместно ПИБ да има легитимация от части, дотолкова доколкото ще позволи да бъде обвързана и със съдебните актове. Участията в подобни производства би било желателно, тоест нашето становище съобразно казаното до тук е, че би било добре да участва ПИБ. Подкрепям искането, но оставам на преценката на съда.

Съдът се оттегля на съвещание в 16:09 часа.

Съдебното заседание продължи в 16:15 часа.

Съдът след съвещание като взе предвид, че Първа инвестиционна банка АД гр. София има качеството на кредитор с права по чл. 717н от ТЗ и следователно не е кредитор на масата на несъстоятелността, намира че няма правно основание същата да бъде конституирана като страна в настоящото въззивно производство, поради което и

# О П Р Е Д Е Л И:

**Оставя без уважение**  искането на Първа инвестиционна банка АД гр. София за участие в настоящото производство.

Съдът докладва постъпила молба с вх. № 2462/25.04.18 г. по чл. 267 от ДФЕС с вносител адв. Захари Томов с предмет Преюдициално тълкуване на норми от правната рамка на ЕС, приложими към основанията на подадената от синдика на Еър Лоджистикс Лимитед Инк чрез неговия особен представител, апелативна жалба срещу прекратително решение № 5 от 19.01.18 г. постановено от ШОС по т.д. № 730/13 г.

**Адв.Янакиев:-** Запознат съм с молбата.

Съдът докладва допълнителна молба с вх. № 2566/30.04.2018  ведно с приложения г. също от адв. Томов, депозирана във връзка с основната молба.

Постъпила е молба - становище с вх. № 2601/02.05.18 г. от синдика на „Еър пропърти девелопмънт" АД   Ганка Кольовска, която изразява становище, че наведените в жалбите твърдения за нарушение на материалния закон и необоснованост на обжалваното решение са недоказани и неоснователни.

Съдът предоставя становището на синдика Кольовска на страните за запознаване с него.

**Адв.Янакиев:** - Запознах се със становището. Моля същото да се приеме по делото, но възразявам срещу неговата обоснованост и основателността и законосъобразността на правните изводи, които са изложени в него, които считаме за неправилни. Неправилно е тълкуван законът и неправилно е тълкувана фактическата обстановка. Моля по същество да не приемете доводите и искането отправено от синдика Кольовска.

**Адв.Томов:** - Считаме, че това, което е посочено от синдик Кольовска е неотносимо към спора, дотолкова доколкото нито опровергава, нито оспорва фактическите твърдения факти и доказателства и правните доводи.

Съдът дава възможност на адв. Янакиев да изрази становище по молбите за преюдициално запитване, която е внесена от адв. Томов.

**Адв.Янакаиев:** - Имах възможно да се запозная с тях. Моля да бъдат приети, считам че са допустими. Изложените въпроси са правилни и необходими с оглед разрешаването на казуса. Цитираната от колегата съдебна практика е трайна, постоянна и непротиворечива. Оставам на съда да прецени дали да уважи молбата и да открие съответната процедура по чл. 267 от ДФЕС.

Съдът доколкото е сезиран с молбата по чл.267 от ДФЕС преди съдебно заседание се е произнесъл с определение № 304/02.05.2018 г., което предоставя на страните за запознаване.

**Адв.Томов:** - Искането за преюдициално тълкуване макар и необжалваемо е акт, който може да бъде изменен в хода на делото. В тази връзка правя постъпки за изменение на акта и за преразглеждането му, съобразено със следните фактори, които мисля, че съдът след като ги чуе ще има възможност да прецени и да съобрази следното: Защо сме тук и защо сме отправили това искане? Има две производства по несъстоятелност, които очевидно имат обективен елемент на свързаност. Този елемент на свързаност предполага две неща да се определи обхвата на действие на всяко едно от двете производства по отношение на свързаните искове, които се отнасят и към едното и към другото. Усложнението в случая произтича от възможности, които предоставя Регламентът за несъстоятелността и съответно Регламентът, който е за извъндоговорните задължения. Това усложнение обаче комуникира на един въпрос, който е станал нерешен. Процедурата, която се води в САЩ за производство по несъстоятелност, има претенциите да сложи ръка като съдебен форум, основано на теорията и практиката за финансова загуба, причинена на авоари, които имат данъчен статут в САЩ, въз основа на действия, които не попадат в обхвата, напротив са в нарушение на актовете издадени в българското производство по несъстоятелност. Преди обаче да предприеме тази постъпка за завеждане на исковете, които се предоставят от Федералното законодателство, Федералният съд по несъстоятелността чрез синдика е възложил проучването на практиката, която е постановена и установена в съда на Люксембург и за да се определи обхвата на действие и международната компетентност на съда по несъстоятелността на „Еър пропърти девелопмънт" АД. Причините, за да бъде направено това, са актовете, които са произнесени от българското производство по несъстоятелност, а именно с решение № 63 постановено от ВАпС по т.дело № 470/2011 г. ясно и точно е постановено и е посочено, че „Еър пропърти девелопмънт" АД е инвестиционно предприятие на Еър Лоджистикс лимитед инк. Основанията за това, с което ние сме съгласни, са фактически и те са посочени в решението на ВАпС, което е влязло в законна сила. „Еър пропърти девелопмънт" АД няма собствена стопанска дейност, зависи изцяло от управленските решения на Еър Лоджистикс лимитед инк и „Еър пропърти

девелопмънт" АД зависи от финансирането. Ако това е така, очевидно е, че този факт се съгласява с разпоредбата на чл. 3 §1 от Регламента за несъстоятелността. Този регламент, тази разпоредба от него, визират възможността на българския съд да определи, че е съд на Държавата по образуване на производство по несъстоятелност на „Еър пропърти девелопмънт" АД ползвайки оборимата презумция за център на основна дейност. Очевидно обаче, че фактите, на които почива решение № 63, ясно и точно посочват, че центъра на основна дейност на „Еър пропърти девелопмънт" АД се намира в САЩ по седалището на компанията, чиято управленски решения и действия зависи дейността на „Еър пропърти девелопмънт" АД. Следователно ние сме изправени в хипотезата, в която имаме факти и доказателства опровергаващи действието на презумцията. Практиката на Съда на Европейския съюз ясно и точно позовавайки Регламента и неговите разпоредби, а именно разпоредбите на чл. 3 § 2, §4 от чл.3 чл. 36, чл.37 стига до ясния извод и заключение в тази практика, а то е следното: Образуването на първо производство по несъстоятелност на територията на Европейския съюз предоставя правото на Държавата, в случая България, да се счита като Държава на образувано първо производство по несъстоятелност, но това не означава, че това е производството по несъстоятелност, което има статута на главно производство по несъстоятелност. Разбира се съдът на Европейския съюз посочва, ако възникне второ производство по несъстоятелност и между това второ производство по несъстоятелност, където и да е, в която и да е държава, разширявайки географското приложение на Регламента, установява връзки с първо образуваното производство по несъстоятелност. Тогава националната държава в случая България трябва да разгледа и да произнесе обхвата на действие на това производство по несъстоятелност плюс международната компетентност. Този въпрос на международната компетентност има още по- засилено действие, защото когато бъде представен иск основан на центъра на основна дейност със свързания с него иск, какъвто е Регламента за извъндоговорните задължения, това означава, че ще имаме признат международен статут на решенията, които ще бъдат произнесени по тези искове. И тук идва момента защо искам да преразгледате становище си. Ако българският съд запази действието на необжалваемо определение, това означава, че българската процедура по несъстоятелност се отказва да признае съществуване на международна компетентност по свързаните искове основани на извъндоговорните задължения. Практическият резултат на това нещо ще бъде, че българските банки, лицата, които са взели участие в отнемането на повече от 113 000 000 лв. ще бъдат поставени по международната компетентност, юрисдикцията и задължителната сила на произнесените решения от страна на Американските федерални съдилища. Това е единственото, което искам да обърна внимание на съда при разглеждане на молбата ми за изменение. Ще помоля съда, отправяйки молбата за изменение да приемете писмената защита, която съм подготвил по въпросите отнасящи се до чл. 267 от ДФЕС. Те дават много стегнато, за разлика от всичко останало, критериите приложени от съда на Люксембург по отношение на въпросите защо българския съд трябва да разгледа и да произнесе въпроса, какъв характер е производството по несъстоятелност на „Еър пропърти девелопмънт" АД, главно, частично и ако е частично преобразувано ли е във вторично. Ако са пропуснати тези моменти, има ли нарушение на европейските регулации, но да се откажем толкова лесно от приложението на европейските регулации, това означава, че нито една банка няма да може да издържи на юрисдикцията и на приложимите правила в САЩ.

Съдът се оттегля на съвещания в 16:30 часа.

Съдебното заседание продължи в 16:41 часа.

Съдът след като се запозна с молбата за изменение на произнесеното от въззивния състав определение по искането за отправяне на преюдициално запитване, намира че

липсват основания за изменение на така постановеното определение, тъй като формулираните от въззивната страна въпроси касаят предходни фази на производството по несъстоятелността, приключили с влезли в сила решения и респ. нямат отношение към преценката за наличие на предвидените в чл. 632 ал.4 от ТЗ предпоставки, какъвто е предметът на настоящото въззивно производство.

Настоящото определение е постановено при особено мнение на Председателя на съдебния състав, който счита, че молбата следваше да бъде разгледана в закрито заседание и произнесена в същото това заседание.

**Адв.Томов:** - Поддържам жалбата, която сме предоставили на съда.

**Адв.Янакиев:-** От името на упълномощителя ми „Силвър бийч" ЕАД поддържам депозираната от нас въззивна жалба.

Страните заявиха, че нямат други искания по доказателствата.

Съдебният състав счете спора за изяснен от фактическа и правна страна, поради което

# О П Р Е Д Е Л И:

## Дава ход на делото по същество:

**Адв.Томов: -** С оглед произнесения въпрос по преюдициалното тълкуване, ние не считаме, че основанията, с които въвели обжалването биха могли да постигнат търсения правен резултат с тях. Причините да считаме към днешна дата, това се свежда до следното: Оплакванията са за бездействие от страна на синдик Кольовска и бездействие от страна на съда по несъстоятелността. Бездействията адресират задължения отнасящи се до възстановяване на паричната маса в несъстоятелността, която е разпоредена от и в полза на трети лица. След като обаче имаме две постановени определения от страна на Апелативен съд № 586 от 15.09.16 г. и определение № 589/16.09.16 г., в които се казва, че производството по несъстоятелност, водено срещу „Еър пропърти девелопмънт" АД не разполага с правни средства и процедурни правила по изследване на фактическия състав, а именно източника на права и задължения за възстановяване на паричните фондове, разпоредени от ПИБ и в полза на трети лица и от ЧСИ в полза на Инвестбанк. Това автоматично се равнява, че действително бездействието на синдик Кольовска намира основание в посоченото в двете определения от септември 2016 г. от страна на ВАпС. От друга страна правният интерес представен с жалбата на Еър Лоджистикс лимитед инк за отмяна на прекратителното решение № 5/19.01.18 г. не може да бъде продължен и поддържам при условие, че Националният съдебен форум не поддържа международна компетентност по правата упражнявани в това производство от страна на синдика на Еър Лоджистикс лимитед инк. В тази връзка очевидно, че правният интерес на синдика на Еър Лоджистикс лимитед инк се свежда до реализиране на правата, които произтичат от отказа за прилагане на чл. 20 от Регламента за несъстоятелността и са предоставени от Регламента за извъндоговорните задължения, които разширяват обхвата на приложимото право и обосновават международна юрисдикция на мястото където Еър Лоджистикс лимтед инк и неговите кредитори в производството по несъстоятелност търпят финансова загуба от 113 000 000 лв. и повече милиона лева, което освен като основен принципен критерий на Регламента за извъндоговорната задълженост се допълва и с тясната връзка на единствения съдебен форум, който в случая остава притежаващ международна компетентност да разгледа и да произнесе правата и задълженията и отговорностите имащи за източник извъндоговорни задължения. Между другото източникът за извъндоговорни задължения произтича от два акта произнесени в Националния съдебен форум в

производство по несъстоятелност на „Еър пропърти девелопмънт" АД, едното е определение № 731, в което ясно и точно е посочено, кога, как, по какъв начин, при какви предпоставки, при какви условия един ипотекарен кредитор може да постигне плащане на предявените от него платежни искове основани на ипотека. Това очевидно не се е случило дотолкова доколкото от известните факти представени от докладите на Комитета на кредиторите и синдик Кольовска, просто ПИБ,   квесторите на Кооперативна търговска банка  и пет компании са се разпоредили с наличните суми по банковите сметки, приемайки, че трябва да вземат нещата в свои ръце и контрол. Това не е оспорено и отречено в нито един документ и доказателство по делото, напротив ползва се и с признанията на синдик Кольовска.  Що се отнася до източника на останалите пари и образно казано  11 000 000 лв.  разпоредени от ЧСИ Димитрова в полза на Инвестбанк, то очевидно същите са извършени в нарушение на издаденото разпореждане от съда по несъстоятелността на „Еър пропърти девелопмънт" АД, че въз основа на чл. 638 ал.2 ТЗ връзка с чл. 634 а ТЗ изпълнителното производство водено в  полза на Инвестбанк доколкото засяга парично взимане от масата на несъстоятелността на  „Еър пропърти девелопмънт" АД трябва да бъде спряно. При всички тези факти и обстоятелства,  които са известни, ние считаме, че липсва основание за поддържане на правен интерес, при фактите и обстоятелствата, при които сме заявили обжалването,  тъй като липса съдебен форум,  който да ги произнесе.

**Адв.Янакиев:** - Моля въз основа на изложените в жалбата факти да постановите решение, с което да отмените атакуваното решение № 5 на ШОС, като върнете делото на съда по несъстоятелността  с исканите задължителни указания относно дължимите действия по събиране и възстановяване  масата на несъстоятелността на „Еър пропърти девелопмънт" АД / в несъстоятелност/

**Адв.Томов:** - Моето разбиране е, че даване на указания е невъзможно предвид влезлите в сила определения № 586/15.09.16 г.  и № 589/16.09.16 г. произнесени от АС Варна, в които се казва, че производството по несъстоятелност на „Еър пропърти девелопмънт" АД / не разполага с правни способи и средства, тоест очевидно след като е влязло в сила този процесуален акт и след като синдик Кольовска ясно посочи, че фактически масата на несъстоятелността е изчерпана, ние няма как да процедираме правни способи, които не  са припознати в производството по несъстоятелност   водено   спрямо   на   „Еър   пропърти   девелопмънт"   АД   /в несъстоятелност/.   В този смисъл права репликата, е е некоректно поддържане на искане за даване на указания.

Съдебният състав обяви, че ще се произнесе с надлежен съдебен акт в определения от закона срок като дава възможност на процесуалния представител на въззивника Еър Лоджистикс лимитед инк да представи писмена защита в 7 – дневен срок от днес.

Разглеждането на делото приключи в 16:52 часа.

**ПРОТОКОЛЪТ** е изготвен в съдебно заседание.


ПРЕДСЕДАТЕЛ:


СЕКРЕТАР:

# EXHIBIT 34

Synopsys of Case-pertinent Preliminary Rulings of
The Court of Justice of the European Union

# International Jurisdiction in trans-border insolvency matters involving the so-called 'connected claims' according to the European Court of Justice Case-law under Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings.

## A Review

### By Zahari Tomov, Attorney at Law

Admitted to the Varna Bar and having law office at

Varna, 30 Beli Lilii St., 3rd floor, apr.13, and email: zahari.tomov@gmail.com,

Acting as the Special Bulgarian Counsel for the Trustee for Ayr Logistics Limited, Inc.

*In re:* **Case No.14-34940-bjh-7**, **Bankruptcy of Ayr Logistics Limited, Inc.** as represented by Trustee Jeffrey H. Mims at the U.S. Bankruptcy Court for the Northern District of Texas, U.S.A.

*In re:* **Case No. 187/2018, Bankruptcy of Ayr Property Development**, AD as represented by Trustee Ganka Kolyovska, in the docket of the Varna Appeal Court, Republic of Bulgaria, a court hearing scheduled for May 2, 2018 at 2.30 p.m. in appellate case No.187/2018.

---

## Case C-328/12:

### OPINION OF ADVOCATE GENERAL SHARPSTON
### DELIVERED ON 10 SEPTEMBER 2013

§ 27 - «To interpret the Regulation as applying only in circumstances where there is a cross-border element involving at least two EU Member States would lead to significant uncertainty and would frustrate the effectiveness and efficiency of proceedings» or of any proceeding conducted within the EU, for that matter."

§ 24 – "As set out in the Recitals the objectives of the Regulation that can be derived therefrom may not be construed in a fashion restricting the cross-border element to relations between two EU Member States only."

§§ 29,31,46 – "Once an insolvency proceeding is opened within the Community the court entertaining it may not refuse to apply one or another of the rules set in the EU law on account of the fact that the second insolvency proceeding with which the first one is connected has been opened in a non-EU member State."

1

### JUDGMENT OF THE COURT (FIRST CHAMBER)
### 16 JANUARY 2014

§ 20 – «With regard to the question which arises, when making this determination, of whether, in order for the Regulation to apply, there must in any event be cross-border elements in the sense that only situations involving connecting factors with two or several Member States fall within the Regulation's scope, it is to be observed that a general and absolute condition of this kind does not result from the wording of the Regulation's provisions».

§ 25 – «… insolvency proceedings falling within the Regulation's field of application 'have universal scope and aim at encompassing all the debtor's assets'. The latter objectives may encompass not solely relations between Member States but, by their nature and in accordance with their wording, any cross-border situation.»

§ 28 – "…in order to determine which court has jurisdiction to open insolvency proceedings, the centre of the debtor's main interests must be determined at the time when the request to open insolvency proceedings has been lodged.»

§ 33 – "… promotion of foresee ability as regards bankruptcy and liquidation jurisdiction and, therefore, of legal certainty…" are among the main objectives of the Regulation that the court that opened an insolvency proceeding in a EU Member State must pursue."

§ 35 – "In fact, the presumption is that "The criterion, established by the Regulation, for determining the court which has jurisdiction to decide that action, namely the criterion of the centre of the debtor's main interests, is normally foreseeable for the defendant, who may take it into account at the time when he participates, with the debtor, in an act liable to be set aside in insolvency proceedings"[1].

<div align="center">*****</div>

### Case C-396/09

### OPINION OF ADVOCATE GENERAL KOKOTT
### DELIVERED ON 10 MARCH 2011

---

[1] All decisions as to what steps need to be taken and what transactions concluded with respect to the Silver Beach Project, including arrangements for the payment claims asserted as investment in the Project, were made by Ayr in the USA. From both factual and legal perspectives could have reasonably foreseen the consequences that might ensue from its unauthorized acts of disposal of the money to the detriment of Ayr, i.e. that the Bank should have expected, with a higher degree of probability, to be haled into a U.S. court, which - according to the EU Regulation on cross-border bankruptcy – is the court having jurisdiction over Ayr Trustee's individual compensation claims.

§ 40 – "…'the concept of the centre of main interests is peculiar to the Regulation. Therefore, it has an autonomous meaning and must therefore be interpreted in a uniform way, independently of national legislation."

§ 53 – "…by using the concept of the centre of main interests, the regulation aims to base jurisdiction on the place which is identifiable by its creditors as being the place with which the company objectively demonstrates the closest links. If the registered office of the active company constituted a mere letterbox and the centre of its main interests therefore lay in another place, it is not appropriate to nevertheless then base jurisdiction on the registered office after the removal of the company from the register.» [2]

§ 54 – "…even in the case of a company which has been closed down, the presumption in Article 3(1) can still be rebutted if it is proven that prior to closing down, the company did not have the centre of its main interests in the State of the registered office. Then the place of the last centre of its main interests prior to closing down is decisive."[3]

§ 58 – «… the presumption laid down in Article 3 in favour of the registered office can be rebutted only if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect. As a possible example of a rebuttal of the presumption, the Court of Justice cited the case of a letterbox company not carrying out any business in the territory of the Member State in which its registered office is situated.»

§ 62 – «… 'the centre of main interests is taken as meaning a place with which a debtor regularly has very close contacts, in which his manifold commercial interests are concentrated and in which the bulk of his assets is for the most part situated. The creditor is also very familiar with that place'».[4]

---

[2] APD is a "letterbox" – created, fully controlled and managed by Ayr for the Silver Beach Project purposes – a fact acknowledged by the Bulgarian court and by APD Trustee, and by third parties with whom Harris and Ayr negotiate.

[3] Closing of APD's bankruptcy proceeding and APD's removal from the register is not any obstruction at all if Ayr needs to establish: that APD is just a «letterbox company», that it does not meet the criteria for an «establishment» and that its centre of main interests is situated at the place where Ayr's seat is, namely, in the USA, and based on such findings obtain a court determination as to whether or not the Bulgarian court has international jurisdiction and the scope of its authority concerning APD's bankruptcy proceeding on Ayr's bankruptcy claims.

[4] All persons that have filed payment claims against APD's Estate are conducting negotiations with Ayr (by email or by post) on how to settle the debts, thus recognizing Ayr as the centre of main interests of APD. Likewise, the ones that negotiated the design and development of the SB Project, as well as financing thereof, did so with Ayr. Ayr is the dominant factor that even the Balchik Mayor's Office identified and acknowledged as such when they gave their support to Ayr for the SB Project. The persons or entities Ayr conducted such negotiations with come from different countries – USA, Bulgaria, Russia, Canada, Denmark. This alone is indicative of the fact that USA was and is easily identifiable as the centre of main interests

§ 65 – «… in order to establish the centre of commercial interests, a comprehensive overall assessment must be made from the creditors' perspective.»

§ 66 – «…[any] isolated assessment of individual factors is ruled out from the outset. Neither the location of immovable property of the insolvency debtor, nor the location of rented property in relation to which it has concluded lease agreements with another company, nor the existence of a contract between the insolvent company and a banking institution situated in a certain Member State constitute in themselves factors which make it possible to conclusively determine the centre of main interests.»[5]

§ 67 – «…[the Regulation] also refrained from taking assets as a focal point for the purposes of defining the centre of main interests. Therefore merely taking as a basis the location of the substantial assets of the company is ruled out.»

§ 78 - «… '"place of operations" describes a place at which economic activities, whether commercial or industrial or of a professional nature are carried on in the market. […] economic activity requires human means implies that a minimum level of organisation must exist. A place of operations at which an activity is only occasionally carried on may not be described as an establishment. ... How the activity appears to the outside world is decisive, not the purposes which the debtor pursues with this activity'.»[6]

§ 79 – «…As with the rebuttal of the presumption pursuant to the second sentence of Article 3(1) of the regulation, the existence of assets alone is not in itself sufficient […]. The referring court must instead examine whether human means and a minimum level of organisation existed there.»[7]

b – «…If a company has, in a Member State other than that in which it has its registered office, immovable property, a lease agreement concluded by the debtor company with another company in respect of […], and a contract with a banking institution, this can only be sufficient for the company to be regarded

---

where APD is concerned, despite the existing differences in the respective national laws of the countries those persons or entities come from.

[5] The facts of being the owner of a parcel of land in Bulgaria or the holder of certain bank accounts with the Corporate Commercial Bank are irrelevant, because (i) APD is a letterbox company, (ii) the centre of its main interests is in the USA and (iii) it does not meet the Insolvency Regulation criteria for «establishment».

[6] All decisions on transactions or actions to be taken with respect to the Silver Beach Project are made by Ayr in the USA, for it is from there that Ayr controls the economic activities and runs the businesses of the companies belonging to Ayr Group. Indeed, FIB's email letter to Ayr dated October 9, 2009 expressing FIB's desire to reach an agreement with Ayr on Ayr's repurchase of the payment debts allegedly owed to FIB - as purportedly arising from FIB's "investment" in the SB Project, but in reality those "debts" being nothing more than cooked-book ones - makes it clear that the centre of main interests of APD is easily identifiable (i.e. that it is within the USA) and its role is crucial.

[7] APD has no office, no hired employees, does not carry out any activity, has no economic assets and is fully dependant on Ayr's managerial and financial decisions.

as having an 'establishment' within the meaning of Article 3(2) of Regulation No 1346/2000, if these factors individually or as a whole, on the basis of a permanently established organisational structure, are embedded in a place of operations where the debtor carries out a non-transitory economic activity with human means and goods.»

## JUDGMENT OF THE COURT (FIRST CHAMBER)
## 20 OCTOBER 2011

**§ 51** – «The presumption in the second sentence of Article 3(1) of the Regulation may be rebutted, however, …if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect.»

**§ 53** – «… the presence of company assets and the existence of contracts for the financial exploitation of those assets in a Member State other than that in which the registered office is situated cannot be regarded as sufficient factors to rebut the presumption laid down by the European Union legislature unless a comprehensive assessment of all the relevant factors makes it possible to establish, in a manner that is ascertainable by third parties, that the company's actual centre of management and supervision and of the management of its interests is located in that other Member State.»

**§ 55** – «… It must be inferred from this that, in principle, it is the location of the debtor's main centre of interests at the date on which the request to open insolvency proceedings was lodged that is relevant for the purpose of determining the court having jurisdiction.»[8]

**§ 59** – "The presumption that a company's centre of main interests is the place of its registered office may be rebutted by a comprehensive assessment of all objective and complex factors that makes it possible to establish, in a manner that is ascertainable by third parties, that the company's actual centre of management and supervision and of the management of its interests is located elsewhere in a State different from the State where its registered office is located."

**§ 64** - "The term 'establishment' within the meaning of Article 3(2) of the Regulation must be interpreted as requiring the presence of a structure consisting of a minimum level of organisation and a degree of stability necessary for the purpose of pursuing an economic activity. The presence alone of immovable assets (in this case) in isolation or bank accounts does not, in principle, meet that definition."

---

[8] As early as the time when Judgment No.63 was entered the VCA acknowledged that fact that as of the time of opening the insolvency proceeding against APD its centre of main interests – APD being Ayr's investment vehicle – was located at the place where Ayr acting in USA.

***** 

## Case C-191/10

### JUDGMENT OF THE COURT (FIRST CHAMBER)
### 15 DECEMBER 2011

§ 18 -  «… an establishment within the meaning of the case-law of the Court [means] a structure with a minimum level of organisation and a degree of stability for the purpose of pursuing an economic activity»

§ 25 – «… in the system established by the Regulation for determining the competence of the Member States, which is based on the centre of the debtor's main interests, each debtor constituting a distinct legal entity is subject to its own court jurisdiction …»

§ 29 – «… a court of a Member State that has opened main insolvency proceedings against a company, on the view that the centre of the debtor's main interests is situated in the territory of that Member State, can, under a rule of its national law, join to those proceedings a second company whose registered office is in another Member State only if it is established that the centre of that second company's main interests is situated in the first Member State. …» [9]

§ 31 – «… 'the "centre of main interests" should correspond to the place where the debtor conducts the administration of his interests on a regular basis and [which] is therefore ascertainable by third parties» [10]

§ 32 – It is «… [the European Union] legislature's intention to attach greater importance to the place in which the company has its central administration as the criterion for jurisdiction…».

§ 34 – It is only «…where the bodies responsible for its management and supervision are in the same place as its registered office and the management decisions of the company are taken, in a manner that is ascertainable by third parties» that «the presumption in the second sentence of Article 3(1) of the Regulation is wholly applicable. »

§ 35 – «… In that event, the simple presumption laid down by the European Union legislature in favour of the registered office of that company can be rebutted if factors which are both objective and ascertainable by third parties enable it to

---

[9] Ayr's bankruptcy enjoys the right and is entitled under the Insolvency Regulation to file individual claims for compensation against those third parties that have inflicted a damages to Ayr's creditors.

[10] APD Trustee, the Bulgarian Court and all persons that had negotiations with Ayr regarding their filed payment claims were well aware and knew that APD was a letterbox, a shell company that Ayr created, managed and supervised from the place of Ayr in the USA.

6

be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect.»

§ 38 – «… intermixing of property [of two insolvency proceedings having cross-border aspects] does not necessarily imply a single centre of interests. Indeed, it cannot be excluded that such intermixing may be organised from two management-and-supervision centres situated in two different Member States.»

§ 39 - «… the mere finding that the property of those companies has been intermixed is not sufficient to establish that the centre of the main interests of the company concerned by the action is also situated …» in the State where its registered office address is. An overall assessment of all the relevant factors that allows it to be established, in a manner ascertainable by third parties, where the actual centre of management and supervision of the company is.

**\*\*\*\*\***

---

## Case C- 557/13

### JUDGMENT OF THE COURT (FIRST CHAMBER)
### 16 APRIL 2015

**§§ 40, 41, 42, 43** – Accordingly, in order to set aside the application of Art.20 of the Regulation, one must first establish – under the conditions for exceptions as set in Art.13 – that a right in rem falling within Art.5 was exercised, and that in view of ensuring legal certainty and upon assessment of all pertinent aspects of the case, it might be reasonably expected for such exercised right in rem, despite being detrimental to the creditors, to stand, and that it will not and may not be avoided under the laws appicable to such right.[11]

**\*\*\*\*\***

---

## Case C-310/14

### JUDGMENT OF THE COURT (SIXTH CHAMBER)
### 15 OCTOBER 2015

---

[11] First Investment Bank failed to meet the requirements of Art.13 of the Insolvency Regulation, thus failing to establish its right to retain the money it took away to the detriment of Ayr at a time that occurred after October 10, 2014. Moreover said actions were neither based nor made in exercise of the rights, which FIB alleged to have had under the mortgage contracts, because such actions were not supported by any act of the Court delivered in the bankruptcy proceeding for APD. First Investment Bank's actions are in violation of the UN Convention against corruption and applicable US law against money laundering, financial fraud, corruption.

**§§ 20÷41** – Art.13 of the Insolvency Regulation do not apply in situations where the detrimental acts carried out by third parties thus benefiting from the disposal of the assets of the bankruptcy estate occurred after the opening of the insolvency proceeding against the debtor.

*****

### Case C-54/16

### OPINION OF ADVOCATE GENERAL

#### DELIVERED ON 2 MARCH 2017

**§ 38** – «The purpose of Article 13 of Regulation 1346/2000 is to protect the legitimate expectations of the person who benefited from the act detrimental to all the creditors. That provision appears to be based on the assumption that that person has legitimate expectations concerning the stability of the act assessed in the light of the law to which it is subject and cannot be taken unawares by the operation of the *lex fori concursus* as a result of the opening of insolvency proceedings.»

**§§ 43, 44** – «… the party concerned must not only seek to avoid application of the law of the State of the opening of insolvency proceedings but must also 'claim' it» but also that «… the burden of proof that the conditions laid down in Article 13 of Regulation No.1346/2000 have been met lies with the party 'relying on that article.»

**§ 63** – «… Application of the exception laid down in Article 13 of Regulation No 1346/2000 requires procedural activity on the part of the party which benefited from the act detrimental to all the creditors.»[12]

*****

### Case C-649/13

### OPINION OF ADVOCATE GENERAL MENGOZZI

#### DELIVERED ON 29 JANUARY 2015

**§ 23** - «…the decisive criterion for identifying the area within which an action falls is not the procedural context of that action, but its legal basis. According to that approach, it must be determined whether the right or obligation which forms the basis of the action has its source in the ordinary rules of civil and commercial law or in derogating rules specific to insolvency proceedings."[13]

---

[12] Without court authorization, First Invest Bank took the matter in its own hands and then acting together with five certain companies – debtors of CCB – and CCB's conservators they used the money available in APD's accounts to discharge the debts of the said companies and to put a veil on their actions the closed the bank accounts. No order or similar instrument of the Court hearing APD's bankruptcy has ever authorised or supported such actions.

[13] The source of First Investment Bank liabilities in this case is–unlawful interference in third parties' economic relationships, violating US law and causing damages in USA.

**§ 31 -** «An additional rule on jurisdiction was introduced into the scheme of the regulation by the judgment in Seagon (C-339/07, EU:C:2009:83), in which the Court held that Article 3(1) of the regulation must be interpreted as also conferring international jurisdiction on the Member State within the territory of which insolvency proceedings have been opened to hear and determine actions which derive directly from those proceedings and which are closely connected to them."

**§ 33 -** Centralisation of international jurisdiction over the claims in the main bankruptcy proceeding and in the secondary bankruptcy proceeding should be determined by and within the actions, which 'derive directly from those proceedings and which are closely connected to them', apart from this principle the main bankruptcy proceeding has no such jurisdiction in respect of actions, which derive directly from those proceedings and which are closely connected to them, and vice versa.

**§ 36 –** "…[interpreted] the geographical scope of the regulation, extending it beyond solely 'European' cross-border insolvency proceedings and including both those characterised by foreign elements situated both inside and outside the territory of the European Union and purely 'international' proceedings, in which any foreign element is situated outside the European Union."

**§ 39 –** " [This led to] the establishment in the regulation of two different criteria for determining jurisdiction, namely that based on the centre of the debtor's main interests, which determines the courts having jurisdiction to open main proceedings, and that based on an establishment, which permits the opening of secondary proceedings."

**§ 58 –** "…any disputes concerning whether certain of the debtor's assets come under one of those sets of proceedings or the other may be brought before either one of those courts. The jurisdiction of those courts to hear and determine such disputes is therefore concurrent."

**§ 61 –** "An action designed to determine whether one or more elements of the debtor's estate fall within the scope of the main proceedings or the secondary proceedings may be brought either before the court of the Member State where the main proceedings have been opened or before that of the Member State where the secondary proceedings have been opened.[14]

**§ 72 –** "… debtor's participation in the research and development activities of a group of companies and/or which are concerned with exploitation of the results of those activities […] they should be determined to be situated within the

---

[14] The result from Ayr Trustee's request brought before the Varna Court of Appeals in case 187/2018 for determining the scope and international jurisdiction of BF over Ayr's bankruptcy claim showed that BF has no international jurisdiction over them and declined having such.

territory of the Member State where the debtor who has contributed to those research and development activities and who has exploited the results thereof to develop its business has its centre of activities."

§ 73 –"…in order to determine whether assets of a debtor fall within the scope of the effects of the secondary proceedings, the court seised must establish whether those assets were situated within the territory of the Member State in which those proceedings have been opened on the date on which the judgment opening them became effective and that the location of those assets must be determined on the basis of the criteria concerning the centre of debtor's main interest and the contribution to such business operations, which resulted in the acquisition of the assets and the use of the results from such operations for debtor's development.[15]

### JUDGMENT OF THE COURT (FIRST CHAMBER)

### 11 JUNE 2015

§ 28 – «… the decisive criterion for identifying the area within which an action falls not the procedural context of that action, but its legal basis. According to that approach, it must be determined whether the right or the obligation which forms the basis of the action has its source in the ordinary rules of civil and commercial law or in derogating rules specific to insolvency proceedings (judgment in *Nickel & Goeldner Spedition*, C-157/13, EU:C:2014:2145, paragraph 27). [16]

*****

### Case C – 339/2007

### JUDGMENT OF THE COURT

### 12 FEBRUARY 2009

§ 20 – «… the regulation should be confined to provisions governing jurisdiction for opening insolvency proceedings and judgments which are delivered directly on the basis of the insolvency proceedings and are closely connected with such proceedings.»[17]

---

[15] APD, being Ayr's shell company – established, controlled and managed by Ayr – had no contribution to the acquisition of the Silver Beach Project; the economic benefits from such project have been planned and managed b Ayr and the latter also took the obligations and liabilities arising from and related to this project, subjecting them to US jurisdiction.

[16] First Investment Bank's actions are in violation of the UN Convention against corruption and applicable US law against money laundering, financial fraud, corruption.

[17] The result from Ayr Trustee's request brought before the Varna Court of Appeals in case 187/2018 for determining the scope and international jurisdiction of BF over Ayr's bankruptcy claim showed that BF has no international jurisdiction over them and declined having such.

10

# EXHIBIT 35

Jeffrey H. Mims, Trustee
Founders Square
900 Jackson Street, Suite 560
Dallas, Texas 75202
(214) 210-2913
jeffm@chfirm.com
January 7, 2016

Via E-Mail and Federal Express

Ganka Kolyovska (Mrs), Trustee
Sofia, Musagenitsa residential area
1a Kl. Ohridski Boulevard, Office 2
Tel: 02 870 05 02, 0888391174
E-mail: syndic@abv.bg

Appointed Trustee in Bankruptcy for Ayr Property Development AD
By virtue of Ruling No.566 of 15th December 2015 issued by
The Shumen District Court, Commercial Division
In case 730/2013

*Re: In re Ayr Logistics Limited Inc., Case No. 14-34940-BJH-7 (Bankr. N.D. Tex.)*

Dear Trustee Kolyovska:

    I am Jeffrey H. Mims, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Ayr Logistics Limited Inc. ("Ayr") in the above-referenced bankruptcy case. As you are aware, on October 10, 2014, a voluntary bankruptcy case was commenced by Ayr for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "US Bankruptcy Court").[1]

    I was contacted by Counsel Maria Nakova, the lawyer retained to defend the rights and interests of Ayr Property Development AD ("APD"), and separately by APD's Creditors Committee, requesting that I confirm for APD's bankruptcy proceedings the rights held by Ayr's bankruptcy estate and the powers vested in me as the trustee representing the property of Ayr's bankruptcy estate. Therefore, as I did earlier with my notices sent to Torier Partners Limited, British Virgin Islands dated June 5, 2015, October 2, 2015, I hereby kindly ask that you consider and take notice of the following:

1. **Acting as Ayr's trustee I represent the property belonging to Ayr's bankruptcy estate, which includes the creditor rights claimed against APD's bankruptcy estate by: (i) Claim # 2 filed by All Seas Property 2 OOD ("ASP2") in the amount of BGN 66,025,846.38; (ii) Claim # 1 filed by Asset Management EAD ("Asset") in the amount of BGN 25,664.247.66; and (iii) Claim # 7 filed by All Seas Bulgaria EOOD (also known as All Seas Bulgaria OOD, "ASB") in the amount of BGN 50,700,012.36.**

---

[1] A certified copy of the notice of Ayr's bankruptcy filing is enclosed as Exhibit A.

Ganka Kolyovska (Mrs), Trustee
Re:  In re Ayr Logistics Limited Inc.
January 7, 2016
Page 2

Based on investigation to date, Ayr's bankruptcy estate, under my supervision as the appointed chapter 7 trustee, is the owner of the claims filed against APD by ASP2, Asset and ASB.

On March 28, 2012, Ayr entered into that certain *Agreement* with ASP2 and Asset (the "March 28 Agreement").[2]  Pursuant to Section 3 of the March 28 Agreement, Ayr "acquire[d] and assume[d] and enter[ed] into the rights of ASP2 and Asset as defined in the Reorganization Plan for APD...."  Moreover, pursuant to Section 4 of the March 28 Agreement, the March 28 Agreement:

> [S]uperced[d] all preceding agreements on the method and manner of payment of ASP2's and Asset's rights, including all primary agreements made by and between Ayr and ASP2 on the acquisition of the lands and the Silver Beach investment enterprise of 10th December 2009 and by and between Ayr and Asset of 8th August 2009 on the application for a bank loan in support and in favor of Ayr's agreements with [First Investment Bank AD ("FIB")] for rescheduling and buyout of the mortgage rights over the Silver Beach Project.

Finally, Section 5 of the March 28 Agreement provided that ASP2 was required to "render their agreement with ASB for the transfer of the accounts receivable ("AR") from the sale price of the transaction for the sale of the Silver Beach investment enterprise dated December 10, 2009, null and void by reason of ASB's default on making the payment of such price as agreed."[3]

On March 29, 2012, in furtherance of the March 28 Agreement, Asset executed that certain *Endorsement of Share Transfer* (the "Asset Endorsement"), pursuant to which Asset "transfer[ed] over to Ayr Logistics Limited, Inc. and place[d] at the disposal of Ayr Logistics Limited, Inc. all our rights enforceable against Ayr Property Development AD, being an investment enterprise of Ayr Logistics Limited, Inc....."[4]  As a result, claim # 1 filed against APD by Asset was transferred to Ayr.

Also on March 29, 2012, and in furtherance of the March 28 Agreement, ASP2 executed that certain *Endorsement of Share Transfer* (the "ASP2 Endorsement"), pursuant to which ASP2 "transfer[ed] over to Ayr Logistics Limited, Inc. and place[d] at the disposal of Ayr Logistics Limited, Inc. all our rights enforceable against Ayr Property Development AD, being an investment enterprise of Ayr Logistics Limited, Inc....."[5]  Subsequently, pursuant to the *Notice of Cancellation of Agreement*, dated November 19, 2012 (the "Notice of Cancellation"), and in

---

[2] A copy of the March 28 Agreement and an English translation is enclosed as Exhibit B.  Subsequently, Rudersdal EOOD joined in the March 28 Agreement.  The Trustee is still analysing the effect of the joinder, but notes that Rudersdal EOOD filed a claim against the Ayr bankruptcy estate.

[3] Any disputes arising from March 28 Agreement, including interpreting the will of the parties thereto, the validity of the March 28 Agreement and the fulfillment of the parties' obligations under the March 28 Agreement, are, pursuant to Section 6(b) of the March 28 Agreement, to be determined by "the competent court having jurisdiction over the principal place of business of Ayr."  The Bankruptcy Court is the competent court having jurisdiction over the principal place of business of Ayr.

[4] A copy of the Asset Endorsement and an English translation is enclosed as Exhibit C.

[5] A copy of the ASP2 Endorsement and an English translation is enclosed as Exhibit D.

Ganka Kolyovska (Mrs), Trustee
Re:  In re Ayr Logistics Limited Inc.
January 7, 2016
Page 3

furtherance of the March 28 Agreement, ASP2 gave notice to ASB that the agreement between
ASP2 and ASB for the transfer of the AR from the sale price of the transaction for the sale of the
Silver Beach investment enterprise, dated December 10, 2009, was null and void by reason of
ASB's default on making the payment of such price as agreed.[6]  Pursuant to that certain
*Statement of Confirmation*, also dated November 19, 2012 (the "Statement of Confirmation"),
ASP2 gave notice to Ayr that it had nullified and voided the agreement with ASB for the transfer
of the AR from the sale price of the transaction for the sale of the Silver Beach investment
enterprise dated December 10, 2009, and that it unconditionally and irrevocably:

> Concede[d] to Ayr Logistics Limited our rights as creditors of APD and all the
> rights we hold in accounts receivable owed to us arising from the price payable in
> sale and purchase transaction for the lands and the business of the Silver Beach
> enterprise under the agreements signed among us, as said rights were agreed in
> the four-partite agreement of 9th December 2009 parties to which are Ayr
> Logistics Limited, Inc., Ayr Property Development AD, All Seas Bulgaria EOOD
> and All Seas Property 2 OOD.[7]

On November 18, 2013, ASB executed that certain *Endorsement No. 2 of Interim Registered
Share Certificate On Allonge* (the "Endorsement"), pursuant to which ASB "[e]ndorse[d] and
transfer[red] 20 (*twenty*) ordinary registered voting shares as held by ASB and representing 40%
(*forty per cent*) of the capital of APD … over to Ayr along with the property rights to dividend
and to liquidation quota as arising from such act of share transfer.…"[8]  By transferring to Ayr its
rights as a shareholder in APD, ASB also transferred to Ayr all claims and property rights that
ASB held against APD that arose from ASB's participation as a shareholder.  As a result of the
foregoing transactions regarding ASP2 and ASB, claim # 2 filed against APD by ASP2 and
claim # 7 filed against APD by ASB (which includes the underlying debt that reverted back to
ASP2 upon cancelation as set forth above) were transferred to Ayr.

Section 541 of the Bankruptcy Code defines "property of the estate" to include "all legal
or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §
541(a)(1).  "[E]very conceivable interest of the debtor, future, nonpossessory, contingent,
speculative, and derivative, is within the reach of § 541."  *Chartschlaa v. Nationwide Mut. Ins.
Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (internal citations and quotations omitted).  Pursuant to the
March 28 Agreement, Asset Endorsement, APS2 Endorsement, Notice of Cancelation, Statement
of Confirmation and Endorsement, Ayr's bankruptcy estate is the owner of the claims filed
against APD by ASP2, Asset and ASB, and which claims belong to and are property of Ayr's
bankruptcy estate.

---

[6] A copy of the Notice of Cancellation and an English translation is enclosed as Exhibit E.

[7] A copy of the Statement of Confirmation and an English translation is enclosed as Exhibit F.

[8] A copy of the Endorsement and an English translation is enclosed as Exhibit G.  As in the March 28 Agreement, the Endorsement provides that
disputes under the Endorsement "shall be resolved according to the laws and the rules effective at the principal place of business of Ayr."  The
Bankruptcy Court is the competent court having jurisdiction over the principal place of business of Ayr.

Ganka Kolyovska (Mrs), Trustee
Re:  In re Ayr Logistics Limited Inc.
January 7, 2016
Page 4

## 2. Ayr is the full owner of APD and holds all 50 shares of APD's stock.

As set forth above, on November 18, 2013, ASB executed that certain Endorsement, pursuant to which ASB "[e]ndorse[d] and transfer[red] 20 (*twenty*) ordinary registered voting shares as held by ASB and representing 40% (*forty per cent*) of the capital of APD ... over to Ayr along with the property rights to dividend and to liquidation quota as arising from such act of share transfer...."  As a result of the transfer of the 20 shares, Ayr is the 100% owner of APD.[9]

As the owner of 100% of the shares in APD, Ayr's bankruptcy estate is entitled to demand and obtain full and detailed information about the existing liabilities of the APD bankruptcy estate in order for it to be determined what portion of APD's bankruptcy estate Ayr may claim as its 100% shareholder. Please advise as to the current value of the property of APD's bankruptcy estate and of all changes (and the reasons for any changes) in value that have occurred since October 10, 2014.

## 3. Request for return of funds transferred to or for the benefit of FIB and Investbank

I have been informed that, after Ayr's bankruptcy filing on October 10, 2014, BGN 102,946,442 was transferred from APD to or for the benefit of FIB and that 10,854,912 was transferred to or for the benefit of Investbank AD. These transfers, made in violation of not only Bulgarian law, but possibly other applicable international and US laws, have a direct effect on Ayr's bankruptcy estate by virtue of its status as a creditor, and 100% shareholder, of APD. Accordingly, I request that you investigate these transfers and institute appropriate proceedings to have these funds returned to APD's bankruptcy estate. Please note that I am investigating whether Ayr's bankruptcy estate has claims and causes of actions relating to these same transfers.

## 4. I hereby give notice of the following:

(A) The rights Ayr's bankruptcy estate holds as a creditor and 100% equity holder in APD's bankruptcy estate, as indicated in Sections 1 and 2 above, are hereby asserted and claimed against APD's bankruptcy estate as Ayr's bankruptcy estate is entitled to said APD's assets, which must be delivered to and handed over to Ayr's Trustee in Ayr's bankruptcy proceeding in <u>Case No. 14-34940-BJH-7 (Bankr. N.D. Tex.)</u> for the purpose of satisfying the claims asserted in the latter;

(B) I request that you investigate the funds transferred to or for the benefit of FIB and Investbank, as indicated in Section 3 above, and institute appropriate proceedings to have these funds returned to APD's bankruptcy estate; and

(C) The powers vested in me while acting as Ayr's Trustee should be honored in APD's bankruptcy proceeding and I should enjoy status equal to or more favorable than that provided for under applicable Bulgarian and European Union law.

---

[9] A copy of the Schedule B filed in Ayr's bankruptcy case indicating Ayr's 100% ownership of APD is enclosed as <u>Exhibit H</u>.

Ganka Kolyovska (Mrs), Trustee
Re:  In re Ayr Logistics Limited Inc.
January 7, 2016
Page 5

Best regards,

Jeffrey H. Mims, Chapter 7 Trustee;
Bankruptcy Estate of Ayr Logistics Limited
Inc.

Enclosures

# Фрея Fleya
## Транслейшънс Translations

**Преводи от и на чужди езици**

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Превод от английски език*

*Правоъгълен печат:* "Комитет на кредиторите
на Еър Пропърти Девелопмънт
Вх.№ 20 от 08.01.2016 г."

Джефри Х. Мимс, Синдик
Фаундърс скуеър
900 Джаксън стрийт, офис 560
Далас,  Тексас 75202
(214) 210-2913
jeffm@chfirm.com

Дата: 07.01.2016 г.

*Изпратено по електронна поща и куриерска служба "Федерал Експрес"*

Синдик Ганка Кольовска
Гр. София, кв. Мусагеница
Бул. Кл.Охридски 1а, офис 2
Тел: 02 870 05 02, 0888391174
Е-мейл: syndic@abv.bg

Назначена за синдик на Еър Пропърти Девелопмънт АД
С Определение № 566 от 15.12.2015 г. на Окръжен съд Шумен,
Търговско отделение по дело № 730/2013

*Отн.:* *Във връзка с Еър Лоджистикс Лимитид, Инк., дело № 14-34940-BJH-7*
(Федерален съд по несъстоятелност за Северен окръг на щата Тексас)

Уважаема Синдик Кольовска,

Аз съм Джефри Х. Мимс, синдик на масата на несъстоятелността ("Синдикът") на "Еър Лоджистикс Лимитид, Инк." ("Еър"), назначен съгласно Глава 7 в горецитираното дело за несъстоятелност. Както знаете, на 10.10.2014 г. Еър внесоха молба за доброволна несъстоятелност и правна защита по Глава 7 от Част 11 на Кодекса на САЩ ("Закон за несъстоятелността") в съда по несъстоятелността за Северен окръг на щата Тексас, САЩ ("Щатският съд по несъстоятелността")[1].

---

[1] Заверено копие от уведомлението за подадената от Еър молба за несъстоятелност е приложено към настоящото като "Доказателство А" (Exhibit A)



Синдик Ганка Кольовка                                                        2
Относно: Във връзка с Еър Лоджистикс Лимитид Инк.
07.01.2016 г.

При мен постъпиха искания от адв. Мария Накова – процесуалният представител на "Еър Пропърти Девелопмънт" АД ("ЕПД"), ангажиран да представлява и защитава правата на дружеството, и от Комитета на кредиторите на ЕПД, с молба за потвърждение от моя страна пред производството по несъстоятелност на ЕПД както на правата, притежавани от масата на несъстоятелността на Еър, така и на правомощията ми като синдик, представляващ имуществото от масата на несъстоятелността на Еър. Поради тази причина и както по-рано сторих това с уведомленията си до "Ториър Партнър Лимитид", Британски Вирджински острови, с настоящото най-учтиво моля да вземете под внимание и да съобразите следното:

1. **Като синдик на Еър представлявам имуществото от масата на несъстоятелността иа Еър, включваща следните права на кредитор спрямо имуществото в масата на несъстоятелността на ЕПД, предявени с: (а) Иск № 2 от "Ол Сийз Пропърти 2" ООД ("ОСП2") в размер на 66 025 846.38 лв, (б) Иск № 1 от "Асет Мениджмънт" ЕАД ("Асет") в размер на 25 664 247.66 лв, и (в) Иск № 7 от "Ол Сийз България" ООД (известно и под наименованието "Ол Сийз България" ЕООД, "ОСБ") в размер на 50 700 012.36 лв.**

Въз основа на проучените до този момент факти се установява, че масата на несъстоятелността на Еър, която е под мое управление в качеството ми на синдик, назначен по Глава 7, е притежател на предявените към ЕПД права от страна на ОСП2, Асет и ОСБ.

На 28.03.2012 г. Еър сключва нарочен *Договор* с ОСП2 и Аест ("Договорът от 28-и март").[2] Съгласно Чл. 3 от Договора от 28-и март, Еър *"придобива и встъпва в правата на ОСП2 и Асет, така както са посочени в оздравителния план за ЕПД....."*. Освен това, съгласно Чл.4 от Договора от 28 март, същият:

*"[П]реурежда всички предходни договорености относно реда и начина на изплащане правата на ОСП2 и Асет, включително и изначалните договорености с ОСП2 по придобиване на земята и инвестиционното предприятие "Силвър бийч" от дата 10.12.2009 г., както и договореността с Асет от 08.08.2009 г. за ползване на банков кредит в подкрепа и в полза на договаряншята на Еър с [Първа инвестиционна банка АД ("ПИБ")] за преструктуриране и изкупуване на ипотечните права в проекта "Силвър бийч""*.

---

[2] Копие от договора от 28-и март с превод на английски език е приложено като "Доказателство Б" (Exhibit B). Впоследствие, "Рудерсдал" ЕООД се присъединява към договора от 28-и март. Синдикът все още извършва анализ на последиците от това присъединяване, но отбелязва, че "Рудерсдал" ЕООД е внесло иск срещу масата на несъстоятелността на Еър.

Синдик Ганка Кольовка                                                                    3
Относно: Във връзка с Еър Лоджистикс Лимитид Инк.
07.01.2016 г.

Също така в чл. 5 от Договора от 28-и март се предвижда, че от ОСП2 се изисква да *"анулира договореността с ОСБ за прехвърляне на вземането за продажната цена по сключената на 10.12.2009 г. сделка за покупко-продажба на инвестиционното предприятие "Силвър бийч", поради неизпълнение на договореното заплащане на тази цена от страна на ОСБ."*[3]

На 29.03.2012 г. в изпълнение на Договора от 28-и март, Асет издава *Джиро на акционерна квота* ("Джирото на Асет"), по силата на което Асет *"разпорежда(ме) и прехвърля(ме) на Еър Лоджистик Лимитид Инк., изцяло всички наши права спрямо Еър Пропърти Дивеломпънт АД, инвестиционно предприятие на Еър Лоджистикс Лимитид, Инк....."*[4] Така правата по Иск №1, предявен от Асет срещу ЕПД са прехвърлени в полза на Еър.

Също така на 29.03.2012 г. и в изпълнение на Договора от 28 март, ОСП2 изготвя *Джиро на акционерна квота* ("Джирото на ОСП2"), по силата на което ОСП2 *"разпорежда(ме) и прехвърля(ме) на Еър Лоджистик Лимитид Инк., изцяло всички наши права спрямо Еър Пропърти Дивеломпънт АД, инвестиционно предприятие на Еър Лоджистикс Лимитид, Инк....."*[5] Впоследствие съгласно *Уведомлението за разтрогване на договор от 19.11.2012 г.* ("Известие за разтрогване") и в изпълнение на Договора от 28-и март, ОСП2 уведомява ОСБ, че договорът между ОСП2 и ОСБ за цесия на вземанията от продажната цена по сделката за продажбата на инвестиционното предприятие "Силвър Бийч" от 10.12.2009 е анулиран и е недействителен поради неизпълнението на ОСБ да извърши плащане на договорената цена.[6] Съгласно посоченото *Потвърдително изявление*, също от 19.11.2012 г., ("Потвърдителното изявление"), ОСП2 уведомява Еър, че е анулирало и обезсилило договора с ОСБ за цедиране на вземанията от продажната цена по сделката за продажбата на инвестиционното предприятие "Силвър Бийч" от 10.12.2009, и безусловно и неотменяемо ОСП 2:

*"Отстъпва(ме) на Еър Лоджистикс Лимитид, Инк., всички наши права като кредитори на ЕПД по парично вземане, имащи за предмет дължимата цена по покупко-продажбата на земята и предприятието Силвър Бийч, съгласно сключените между нас договори, така както тези права са номинирани в четиристранното споразумение от 09.12.2009 г. при участието на Еър Лоджистикс Лимитид Инк., Еър Пропърти Дивелопмънт АД, Ол Сийз*

[3] Всички спорове, произтичащи от договора от 28-и март, в това число тълкуванието на волята на страните по него, валидността на договора от 28-и март и изпълнението на задълженията на страните по същия, следва - съгласно разпоредбите на Чл. 6 (б) от същия - да се уреждат от "компетентния съд в мястото на седалището/управление на Еър". Щатският съд по несъстоятелността е компетентния съд, под чиято юрисдикция се намира седалището/мястото на управление на Еър.

[4] Копие от Джирото на Асет с превод на английски език е приложено като <u>Доказателство В (Exhibit B)</u>.

[5] Копие от Джирото на ОСП2 с превод на английски език е приложено като <u>Доказателство Г (Exhibit D)</u>.

[6] Копие от Известието за разтрогване с превод на английски език е е приложено като <u>Доказателство Д</u> <u>(Exhibit E)</u>.



Синдик Ганка Кольовка

4

Относно: Във връзка с Еър Лоджистикс Лимитид Инк.

07.01.2016 г.

*България ЕООД и Ол Сийз Пропърти 2 ООД.*"[7]

На 18.11.2013 г. ОСБ издава документ, наречен "Алонжно джиро № 2 на Временно удостоверение за акции" ("Алонжно джиро"), съгласно което ОСБ *"Джиросва(м) и прехвъря(м) на Еър ... 20 (двадесет) броя обикновени поименни акции с право на глас, представляващи 40 % (четиридесет процента) от капитала на "Еър Пропърти Девелопмънт" АД, ... ведно с всички произтичащи от това прехвърляне имуществени права на дивидент и ликвидационен дял... ."[8]* Като прехвъря на Еър акционерните си права в ЕПД, ОСБ прехвъря в полза на Еър и всички свои имуществени права и претенции спрямо ЕПД, възникнали по силата на акционерното участие на ОСБ в ЕПД. В резултат на описаните сделки между ОСП 2 и ОСБ, както предявеният от ОСП2 Иск № 2 към ЕПД, така и предявеният от ОСБ Иск №7 към ЕПД (който включва възстановяване на задължението към ОСП2 след развалянето на договора, описано по-горе) са прехвърлени в полза на Еър.

Съгласно дефиницията в чл.541 от Закона за несъстоятелността на САЩ (ЗН - САЩ) "имуществото на масата на несъстоятелността" включва "всички законни интереси в собственост или такива по правото на справедливостта на длъжника, съществуващи към момента на образуването на делото" (*Кодекс на САЩ, част 11, чл. 541 ал.(а) т.1*). "В обхвата на чл. 541 попадат всички права, били те разумно предполагаеми права, бъдещи права, права на ползване, права под условие, абстрактни/вероятни права, както и производни права". (*Виж (Chartsclaa v. Nationwide Mut. Ins.Co., 538 F.3d 116, 122 (2d Cir. 2008) - делото «Чартилаа срещу Национална взаимозастрахователна компания», Сборник съдебна практика, т.538, трето издание, стр.116, 122 (Апелативен съд за втори апелативен окръг, 2008 г.) – без цитираните там текстове)*). Съгласно договора от 28-и март, джирото от Асет, джирото от ОСП2, уведомлението за прекратяване, както и уведомлението за потвърждение и джиросване, масата на несъстоятелността на Еър е собственик на и притежава правата върху вземанията на ОСП2, Асет и ОСБ, предявени към ЕПД, които така предявени права принадлежат на и са имущество от масата на несъстоятелността на Еър.

**2. Еър е пълноправен собственик на ЕПД и притежава всичките 50**

---

[7] Копие от Потвърдителното изявление с превод на английски език е е приложено като Доказателство Е (Exhibit F).

[8] Копие от това джиро с превод на английски език е приложено като Доказателство Ж (Exhibit G). Както договорено от 28-и март, така и въпросното джиро предвижда всякакви спорове по или във връзка с последното "се уреждат съгласно законодателството и действащите разпоредби по седалището/в мястото на управление на Еър". Компетентният съд по седалището/мястото на управление на Еър е Щатския съд по несъстоятелност.

Синдик Ганка Кольовка                                                                5
Относно: Във връзка с Еър Лоджистикс Лимитид Инк.
07.01.2016 г.

**броя акции на ЕПД.**

Както е посочено по-горе на 18.11.2013 г. ОСБ издава алонжното джиро, с което ОСБ *"джиросва и прехвърля 20 (двадесет) броя обикновени поименни акции с право на глас, собственост на ОСБ, представляващи 40 (четиридесет процента) от капитала на ЕПД.... на Еър, ведно с всички произтичащи от това имуществени права на дивидент и ликвидационен дял ....."* В резултат на прехвърлянето на 20-те акции, Еър става 100% собственик на ЕПД.[9]

Като собственик на 100% от акциите от капитала на ЕПД, масата на несъстоятелността на Еър има право да изиска и получи пълна информация за задълженията при масата на несъстоятелността на ЕПД, с оглед определяне на това какъв дял може да претендира Еър от масата на несъстоятелността на ЕПД, в качеството си на кредитор и 100% собственик на капитала на ЕПД. Моля да ни информирате за текущото състояние на имуществото от масата на несъстоятелността на ЕПД и за всички настъпили промени в неговата стойност (с посочване на основанията за тези промени) в периода след 10.10.2014 г.

**3. Искане за възстановяване на средствата, прехвърлени на или в полза на ПИБ и Инвестбанк**

Бях уведомен, че след като Еър са внесли молбата си за откриване на производството по несъстоятелност на 10.10.2014 г., сумата от 102 946 442 лв от средствата на ЕПД е прехвърлена в полза на ПИБ, а в полза на Инвестбанк АД е прехвърлена сумата от 10 854 912 лв. Тези трансфери, извършени в нарушение не само на българското право, но и вероятно и на други приложими международни и щатски закони засягат пряко масата на несъстоятелността на Еър, поради статута на последното дружество на кредитор и собственик на 100% от акциите от капитала на ЕПД. По тази причина отправям към Вас искане да разследвате тези трансфери и да предприемете съответните процедурни действия за възстановяване на въпросните средства в масата на несъстоятелността на ЕПД. Моля, имайте предвид, че проучвам дали масата на несъстоятелността на Еър има право да предяви иск, както и на какво основание може да предяви претенции във връзка с горепосочените трансфери.

**4. С настоящото Ви уведомявам за следното:**

**(А)** С настоящото предявявам правата на масата на несъстоятелността на Еър, в качеството му на собственик на 100% от капитала на ЕПД н кредитор на масата на несъстоятелността на ЕПД, така както същите са посочени в параграф

---

[9] Копие от Приложение Б (Schedule B), внесено по делото за несъстоятелност на Еър, в което се посочва, че Еър притежава 100% от капитала на ЕПД, е приложено като <u>Доказателство 3 (Exhibit H).</u>

Синдик Ганка Кольовка                                                    6
Относно: Във връзка с Еър Лоджистикс Лимитид Инк.
07.01.2016 г.

1 и 2 по-горе, спрямо масата на несъстоятелността на ЕПД като права, които следва да бъдат задължени за изплащане от последната, тъй като масата на несъстоятелността на Еър има право да получи това имущество на ЕПД, което е подлежащо на предаване и изплащане в производството по несъстоятелност на Еър, водено пред Федералния съд по несъстоятелност за Северен окръг на щата Тексас, дело №14-34940-BJH-7, за удовлетворяване на предявените в същото претенции;

**(Б)** Моля да разследвате прехвърлените средства на или в полза на ПИБ и Инвестбанк, както е посочено в параграф 3 по-горе и да заведете съответните дела за възстановяване на въпросните средства в масата на несъстоятелността на ЕПД; и

**(В)** Правомощията ми на синдик на масата на несъстоятелността на Еър да бъдат да зачетени от производството по несъстоятелност на ЕПД със статут, който е равен или по-благоприятен от статута, определен по българското и Общностното право;

С уважение,

/п/ не се чете

Джефри Х. Мимс,
Синдик на масата на несъстоятелноста на
Еър Лоджистикс Лимитид, Инк., съгласно
Глава 7 от ЗН на САЩ

*Приложения съгласно текста*

*Подписаната, Илка Симеонова Дюлгерова, удостоверявам верността на извършения от мен превод от английски на български език на приложения документ – Писмо от Джефри Мимс - синдик на Еър Лоджистикс Лимитид, Инк. до Ганка Кольовска, синдик на Еър Пропърти Девелопмънт АД от 7-ми януари 2016 г, регистрирано под вх.№ 20 от 08.01.2016 г. от Комитета на кредиторите на Еър Пропърти Девелопмънт. Преводът се състои от 6 (шест) страници.*

*Преводач:* _____ Илка Симеонова Дюлгерова



# EXHIBIT 36

Jeffrey H. Mims, Trustee
Founders Square
900 Jackson Street, Suite 560
Dallas, Texas 75202
(214) 210-2913
jeffm@chfirm.com
March 3, 2016


Ganka Kolyovska
Trustee in Bankruptcy (Liquidator)
Sofia, Musagenitsa Residential Area
1a Kl. Ohridski Boulevard, Office 2
Tel: 02 870 05 02, 0888391174
E-mail: syndic@abv.bg

Re:   *Ayr Property Development AD*, Case No. 730/2013 (Shumen District Court)
      Investigation Into Claim of UniCredit Bulbank AD as Creditor

Dear Trustee Kolyovska:

As you are aware, I am Jeffrey H. Mims, the Chapter 7 Trustee (the "Trustee") of Ayr Logistics Limited Inc. ("Ayr") in Case No. 14-34940-BJH-7 in the United States Bankruptcy Court for the Northern District of Texas (the "Ayr Bankruptcy Case"). As you may also be aware, the laws of the United States vest me with the exclusive power and right over Ayr's bankruptcy estate, including but not limited to all assets and claims that may be asserted on behalf of Ayr wherever they may exist. Ayr is the one hundred percent (100%) shareholder of its subsidiary Ayr Property Development AD ("APD") and is a creditor of APD in its bankruptcy proceeding, Case No. 730/2013 (Shumen District Court, Commercial Division) (the "APD Bankruptcy Case") by virtue of your notice to the Shumen District Court on February 1, 2016, and your notice to APD and its creditors on February 10, 2016.

Please allow this letter to serve as formal request to conduct a full investigation into the claims of UniCredit Bulbank AD, having a seat and registered office address of 7 Sveta Nedelya Square, Sofia, Vazrajdane Area, Stolichna Municipality, City of Sofia, and EIK (company number) 831919536 ("UniCredit Bulbank"), in the APD Bankruptcy Case.

The Information Report of the APD Creditors Committee dated February 8, 2016 (the "Committee Report"), lists UniCredit Bulbank as a creditor of APD in the amount of 68,762,664 BGN on the basis of the following two credit contracts (the "Credit Contracts"):

(A) $10,000,000 (Ten Million US Dollars) loan issued by HVB BANK BIOHIM AD (part of the UniCredit Group) for financing coal transactions between the Bulgarian company All Seas Bulgaria EOOD and Toplofikatsia Ruse EAD in the amount of $2,000,000 USD; and between All Seas Bulgaria EOOD and TEC

Ganka Kolyovska
Re: Ayr Property Development AD
March 3, 2016
Page 2

> Varna EAD and Interbul Trading S.A. (Italcementi Group) in the amount of $8,000,000 USD;[1] and
>
> (B) €14,000,000 (Fourteen Million Euros) loan issued by UNICREDIT BULBANK AD for financing coal transactions between All Seas Bulgaria EOOD and TEC Varna EAD and Brukner Company LTD for €14,000,000 Euros.[2]

Since neither APD nor Ayr are parties to the bank loan agreements set forth above, the only grounds pursuant to which UniCredit Bulbank may claim that it is entitled to repayment from APD's bankruptcy estate is the November 1, 2010, agreement between APD and All Seas Bulgaria EOOD (the "November 1 Agreement"), whereby APD agreed to become a join debtor and assume the repayment obligations arising out of the loan relationship between UniCredit Bulbank and All Seas Bulgaria.[3] Pursuant to Section 1.1 of the November 1 Agreement, APD only obligated itself to pay valid payment claims asserted by UniCredit Bulbank pursuant to the Credit Contracts. Specifically, the November 1 Agreement provides as follows:

> 1.1    Ayr Property Development AD shall become a Joint Debtor along with All Seas Bulgaria EEOD to UniCredit Bulbank AD and shall assume the obligation to repay to such Bank each and every valid payment claim asserted with regards to the above loan relationship....

The Committee Report indicates that no valid proof of payment has been provided by UniCredit Bulbank showing that the debts arising under the Credit Contracts are valid and legitimate, despite repeated requests to do so by numerous parties.[4] Moreover, even if UniCredit Bulbank had a valid claim, Section 1.2(b) of the November 1 Agreement appears to cap UniCredit Bulbank's claim at 58,000,000 BGN, which is less than the 68,762,664 BGN listed in the Committee Report. This is very troubling to me as the Trustee of Ayr, as I am charged with investigating and collecting all assets and rights belonging to Ayr, which includes its rights as a creditor of APD. Ayr's rights as a creditor of APD are damaged if creditors with invalid claims are granted allowed claims against APD's bankruptcy estate. Against this backdrop, I have recently learned that UniCredit Bulbank is seeking to negate Ayr's rights as a creditor of APD's bankruptcy estate. As such, in fulfilling my duties as the Trustee of Ayr's bankruptcy in its bankruptcy proceedings in the United States, I respectfully request that you conduct a full investigation into UniCredit Bulbank's claim with all due and deliberate speed and comprehensiveness.

As part of your investigation please include in your response definitive answers to the following questions, after having addressed these questions and concerns directly to UniCredit Bulbank as necessary:

---

[1] A copy of the September 25, 2006, Bank Loan Agreement No. 002 is enclosed as "Exhibit A".

[2] A copy of the September 2, 2008, Bank Loan Agreement No.: 274/05205/0111288 is enclosed as "Exhibit B".

[3] A copy of the November 1, 2010, Agreement to Assume Debt is enclosed as "Exhibit C".

[4] A copy of the Committee Report and applicable exhibits is enclosed as "Exhibit D".

Ganka Kolyovska
Re: Ayr Property Development AD
March 3, 2016
Page 3

1.  Whether the purported obligations under the Credit Contracts referenced above are still in full force and effect and validly exist on the books and records of UniCredit Bulbank;

2.  Whether UniCredit Bulbank has any information regarding the pledged collateral (the accounts receivable due All Seas Bulgaria pursuant to the underlying coal transactions) or the coal transactions and monetary flows pursuant to them. Please collect and provide all supporting documentary evidence showing use of the borrowed funds and how APD benefitted, if at all, from the Credit Contracts or the November 1 Agreement;

3.  Provide all documents showing any payments made to UniCredit Bulbank on account of the Credit Contracts or the November 1 Agreement and the source of financing of any such repayments made; and

4.  Generally whether any valid and substantiated claims against APD pursuant to the Credit Contracts or the November 1 Agreement still exist, and specifically whether UniCredit Bulbank maintains its position as a creditor of APD despite its failure to substantiate or document any of its purported claims against APD in its bankruptcy case. If so, provide any and all relevant documents and information regarding UniCredit Bulbank's claims.

Please reply to this request by e-mail at your earliest possible convenience. I reserve the right to take any and all action under applicable law.

Best regards,

Jeffrey H. Mims
Chapter 7 Trustee for the bankruptcy estate of
Ayr Logistics Limited Inc.

cc:     Mr. Andrea Casini (*via* Federal Express)
        Unicredit Bulbank AD
        7 Sveta Nedelya Sq.
        1000 Sofia
        Bulgaria

        Mr. Gianpaolo Alessandro (*via* Federal Express)
        Head of Group Legal – Secretary of the Board of Directors
        UniCredit S.p.a.
        Head Office in Milan
        Piazza Gae Aulenti 3 - Tower A
        20154 Milano

# EXHIBIT 37

Kristian W. Gluck (SBT 24038921)
Shivani P. Shah (SBT 24102710)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
kristian.gluck@nortonrosefulbright.com
shivani.shah@nortonrosefulbright.com

COUNSEL FOR THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: )<br><br>Ayr Logistics Limited Inc., )<br><br>                                Debtor. ) | Chapter 7<br><br>Case No. 14-34940-bjh-7 |

## STIPULATION BY AND BETWEEN
## TRUSTEE, ZAHARI TOMOV, ASSET MANAGEMENT EAD, ALL SEAS
## PROPERTY 2 OOD, AND RUDERSDAL EOOD CLARIFYING CAUSES OF
## ACTION SOLD PURSUANT TO PURCHASE AND ASSIGNMENT AGREEMENT
[Related to Dkt. No. 63 and 70]

Jeffrey H. Mims, Chapter 7 Trustee for the estate of Ayr Logistics Limited Inc. (the

"Trustee"), by and through his undersigned attorneys, files this *Stipulation By and Between*

*Trustee, Zahari Tomov, Asset Management EAD, All Seas Property 2 OOD, and Rudersdal*

*EOOD Clarifying Causes of Action Sold Pursuant to Purchase and Assignment Agreement* (the

"Stipulation"), and hereby shows the Court as follows:

## RECITALS

A.      WHEREAS, on October 10, 2014, Ayr Logistics Limited Inc. (the "Debtor") filed

a voluntary petition under chapter 7 of title 11 the U.S. Bankruptcy Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division

(the "Bankruptcy Court"). Jeffrey H. Mims was thereafter appointed chapter 7 Trustee in the

above-referenced chapter 7 bankruptcy case (the "Chapter 7 Case") of the Debtor's estate (the "Estate");

B.     WHEREAS, on October 22, 2017, the Trustee filed *Trustee's Motion, Pursuant to 11 U.S.C. §§ 105(a) and 363, For Approval to Sell Causes of Action* (the "Motion to Sell") [Dkt. No. 63] and *Motion for Expedited Hearing* (the "Motion to Expedite") [Dkt. No. 64];

C.     WHEREAS, on October 24, 2017, the Bankruptcy Court orally granted the Motion to Expedite. *See* Dkt. No. 64;

D.     WHEREAS, on November 8, 2017, the Bankruptcy Court held an expedited hearing on the Motion to Sell, at which time the Court granted the Motion to Sell;

E.     WHEREAS, on November 20, 2017, the Bankruptcy Court entered *Order Granting Trustee's Motion, Pursuant to 11 U.S.C. §§ 105(a) and 363, For Approval to Sell Causes of Action* (the "Sale Order") [Dkt. No. 70] and the Trustee, Zahari Tomov, solely in his individual capacity, All Seas Property 2 OOD, Asset Management EAD, and Rudersdal EOOD (the "Creditors" and, collectively with the Trustee, the "Parties") executed the Purchase and Assignment Agreement, dated as of November 20, 2017 (the "Agreement"), attached hereto as **Exhibit A**;

F.     WHEREAS, paragraph 2 of the Order approves the Agreement and all of the terms and conditions thereof, including paragraph 19 of the Agreement, which provides that the Trustee "shall execute  and deliver to the [Creditors] such conveyances, assignments, or other instruments and documents as the [Creditors] may reasonably request in order to effect the sale, conveyance, and transfer" of the causes of action. *See* Dkt. No. 63-1; and

G.     WHEREAS, the Parties enter into this Stipulation to clarify which causes of action were sold and assigned to the Creditors.

## **STIPULATION**

1.      The foregoing recitals are incorporated herein by reference as if set forth in full herein and are made an express part of this Stipulation.

2.      The Agreement provides that the Trustee assign all of the Estate's causes of action to the Creditors with the specific exclusion of claims and potential claims under international law, including without limitation, the *Treaty Between the United States of America and The Republic of Bulgaria Concerning the Encouragement and Reciprocal Protection of Investment* signed on September 23, 1992, entered into force on June 2, 1994, at U.S. Senate Treaty Doc. 103-3, as amended, restated, supplemented or otherwise modified from time to time thereafter (the "International Law/Treaty Claims").

3.      To the extent the Agreement is not clear, the Parties desire to clarify that the causes of action assigned to the Creditors include all of the Estate's causes of action regarding: cross-border tort, unjustified enrichment, fraudulent activities, money laundering, and corruption (collectively, the "RICO Claims").

4.      This Stipulation does not alter any of the terms of the Agreement or the Sale Order referenced above.  Each term of the Agreement and Sale Order remain in full force and effect.

5.      This Stipulation will be binding upon, and shall inure to the benefit of, each of the Parties, and their respective agents, employees, representatives, assigns, successors in interest, and attorneys. The Parties consent to the waiving of any stay of effectiveness provided by the Federal Rules of Bankruptcy Procedure.

6.      The provisions of this Stipulation shall be liberally construed to effectuate the treatment of the matters addressed herein. For purposes of determining the meaning of, or resolving any ambiguity with respect to any word, phrase, term or provision of this Stipulation,

73375767.4

the Parties shall be deemed to have had equal bargaining strength in the negotiation of this Stipulation and equal control over the preparation of this document, such that neither the Stipulation nor any uncertainty or ambiguity herein shall be arbitrarily construed or resolved against any party under any rule of construction. This Stipulation shall be construed under the laws of the state of Texas.

7.      This Stipulation may be signed in counterparts and by facsimile, image, or by affixing "/s/". When each party has signed and delivered at least one such counterpart, or otherwise indicated in writing that it has approved the Stipulation and authorized its "/s/", each counterpart shall be deemed an original, and when taken together with the other signed counterpart, shall constitute on Stipulation.

8.      The Parties agree that each of the Parties to the Stipulation shall bear its own attorneys' fees and costs in connection with the matters resolved by this Stipulation.

9.      This Stipulation constitutes the entire agreement between the Parties and may not be amended or modified in any manner except by a writing signed by each of the Parties or their counsel.

AGREED:

JEFFREY H. MIMS, TRUSTEE

By: _____

Name: Jeffrey H. Mims

Title: Chapter 7 Trustee, Assignor

ZAHARI TOMOV, solely in his individual capacity

By: _____

Name: Zahari Tomov, solely in his individual capacity

Title: Assignee

the Parties shall be deemed to have had equal bargaining strength in the negotiation of this Stipulation and equal control over the preparation of this document, such that neither the Stipulation nor any uncertainty or ambiguity herein shall be arbitrarily construed or resolved against any party under any rule of construction. This Stipulation shall be construed under the laws of the state of Texas.

7.  This Stipulation may be signed in counterparts and by facsimile, image, or by affixing "/s/". When each party has signed and delivered at least one such counterpart, or otherwise indicated in writing that it has approved the Stipulation and authorized its "/s/", each counterpart shall be deemed an original, and when taken together with the other signed counterpart, shall constitute on Stipulation.

8.  The Parties agree that each of the Parties to the Stipulation shall bear its own attorneys' fees and costs in connection with the matters resolved by this Stipulation.

9.  This Stipulation constitutes the entire agreement between the Parties and may not be amended or modified in any manner except by a writing signed by each of the Parties or their counsel.

AGREED:

JEFFREY H. MIMS, TRUSTEE

By: _____

Name: Jeffrey H. Mims

Title: Chapter 7 Trustee, Assignor

ZAHARI TOMOV, solely in his individual capacity

By: _____

Name: Zahari Tomov, solely in his individual capacity

Title: Assignee

73375767.4

ALL SEAS PROPERTY 2 OOD

By: _____

Name: Yordanka Zhekova Georgieva

Title: Assignee

RUDERSDAL EOOD

By: _____

Name: Erik Bresling

Title: Assignee

ASSET MANAGEMENT EAD

By: _____

Name: Svetlozar Krasenov Kasabov

Title: Assignee

RUDERSDAL EOOD

By: _____

Name: Michael Bertelson

Title: Assignee

73375767.4

# EXHIBIT A

Purchase and Assignment Agreement

## PURCHASE AND ASSIGNMENT AGREEMENT

November This Purchase and Assignment Agreement (the "**Agreement**"), dated as of 20th day of ~~October~~ 2017, by and between, Jeffrey H. Mims, in his capacity as the Chapter 7 Trustee for Ayr Logistics Limited Inc. (the "**Trustee**" or "**Assignor**"), and Zahari Tomov, solely in his individual capacity, All Seas Property 2 OOD, Asset Management EAD and Rudersdal EOOD (and together with their assignees, successors or designees, the "**Creditors**" or the "**Assignees**"). In consideration for the mutual covenants herein contained and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties state and agree as follows:

### WITNESSETH:

**WHEREAS**, on October 10, 2014, Ayr Logistics Limited Inc. (the "**Debtor**") filed a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Texas (the "**Bankruptcy Court**"). The Debtor's chapter 7 bankruptcy case is pending in the Bankruptcy Court as *In re Ayr Logistics Limited Inc.,* Case No.: 14-34940-bjh-7 (the "**Ayr Bankruptcy Case**");

**WHEREAS**, Jeffrey H. Mims was appointed Chapter 7 Trustee of the Debtor's bankruptcy estate (the "**Bankruptcy Estate**");

**WHEREAS**, the Debtor's Bankruptcy Estate holds potential claims, causes of action and rights of recovery against various parties pertaining to the taking of funds from Ayr Property Development's bank account at Corporate Commercial Bank (the "**Causes of Action**");

**WHEREAS**, included in the Bankruptcy Estate's Causes of Action are the Bankruptcy Estate's potential claims, causes of action and rights of recovery under international law, including without limitation the *Treaty Between The United States Of America And The Republic Of Bulgaria Concerning The Encouragement And Reciprocal Protection Of Investment*, which was signed on September 23, 1992, entered into force on June 2, 1994, at U.S. Senate Treaty Doc. 103-3, as amended, restated, supplemented, or otherwise modified from time to time thereafter (the "**International Law/Treaty Claims**");

**WHEREAS**, Assignor wishes to assign to the Assignees all of the Bankruptcy Estate's rights and obligations in the Causes of Action, but excluding the International Law/Treaty Claims, so that the Assignees may pursue such Causes of Action in any forum having jurisdiction over such Causes of Action;

**WHEREAS**, notwithstanding anything to the contrary in this Agreement, in no event shall the Assignor or the Bankruptcy Estate be deemed to sell, transfer, assign or convey, and the Assignor and the Bankruptcy Estate shall retain all right, title and interest to, in and under the International Law/Treaty Claims;

**WHEREAS**, the Creditors wish to have Zahari Tomov, on their behalf, respectively, and collectively, pursue any and all of the Causes of Action outside of the Ayr Bankruptcy Case, but

excluding the International Law/Treaty Claims which shall remain within the Bankruptcy Estate; and

**WHEREAS**, the assignment of the Causes of Action (excluding the International Law/Treaty Claims) shall be subject to the approval and entry of an order by the Bankruptcy Court, and to the terms and conditions set forth herein.

**NOW THEREFORE**, in consideration of the foregoing, the representations, warranties and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignees do hereby agree as follows:

1.  Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, Assignor shall unconditionally and irrevocably sell, convey, transfer and assign to the Assignees all of Assignor's and the Bankruptcy Estate's rights, title, interest in and to all of the Causes of Action; *provided, however*, Assignor is not selling, conveying, transferring or assigning the International Law/Treaty Claims to the Assignees, which shall remain with the Bankruptcy Estate and under the auspices of the Trustee to prosecute in his discretion;

2.  Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, Assignor assigns to Assignees all rights and benefits of the Assignor and the Bankruptcy Estate relating to the Causes of Action (excluding the International Law/Treaty Claims), including without limitation: (i) the Assignor's and the Bankruptcy Estate's right to receive interest, penalties and fees, if any, which may be paid with respect to the Causes of Action, (ii) any actions, claims, rights or lawsuits of any nature whatsoever against any party arising out of or in connection with the Causes of Action, and (iii) all cash, securities, instruments and other property which may be paid or issued in satisfaction of the Causes of Action (collectively, the "**Transferred Rights**");

3.  Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, the consideration provided by the Assignees for this Agreement is a contingency fee (the "**Fee**") from prosecuting and/or settling the Causes of Action as set forth in Paragraphs 9 & 10 below;

4.  Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, this assignment shall be deemed an absolute and unconditional assignment of the Causes of Action (excluding the International Law/Treaty Claims) for the purpose of collection and satisfaction, and shall not be deemed to create a security interest. This Agreement, assignment and sale does not create an attorney client relationship with the Ayr Bankruptcy Case or estate in any fashion;

5.  Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, Assignees hereby accept the assignment of the Causes of Action (excluding the International Law/Treaty Claims) to freely pursue the Causes of Action (excluding the International Law/Treaty Claims) and all of Assignor's and the Bankruptcy Estate's rights, title and interest in said Causes of Action (excluding the International Law/Treaty Claims). However,

Creditor/Assignees and their attorneys have no affirmative obligation or affirmative duty to the Ayr Bankruptcy Case or Bankruptcy Estate and shall have sole discretion to take or not take action in pursuit of the Causes of Action or any cause of action, exclusive of the International Law/Treaty Claims. The Creditor/Assignees and their attorneys shall have sole discretion as to venue, forum, jurisdiction, how and if to settle or how and if to proceed with trial, arbitration or mediation of the Causes of Action or any cause of action or party, exclusive of the International Law/Treaty Claims;

6.      Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, the Assignor hereby warrants and represents that the Assignor possesses full right and authority to enter into this Agreement and to transfer Assignor's and the Bankruptcy Estate's rights, title, and interest in the Causes of Action (excluding the International Law/Treaty Claims);

7.      Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, Assignees shall in their own name, at their own expense, and for their own benefit prosecute the Causes of Action (excluding the International Law/Treaty Claims) and collect, settle, compromise and grant release on said Causes of Action (excluding the International Law/Treaty Claims) as they in their sole discretion deem advisable;

8.      Subject to the approval and entry of an order by the Bankruptcy Court approving this Agreement, Assignees shall be entitled to all judgments, awards and payments therefrom, subject to payment of the Fee to the Bankruptcy Estate as set forth in this Agreement;

9.      In consideration for the Assignment and this Agreement, Assignor and Assignees agree that if any Causes of Action are settled prior to trial, Assignees shall pay to the Bankruptcy Estate seven percent (7%) of any net proceeds (after payment of fees and expenses of counsel) from any and all judgments, awards and payments resulting from any of the Causes of Action.  Assignees agree that they will pay such amount to the Bankruptcy Estate within twenty (20) business days of receipt of such net proceeds;

10.     In consideration for the Assignment and this Agreement, Assignor and Assignees agree that if any Causes of Action are not settled prior to trial, Assignees shall pay to the Bankruptcy Estate five percent (5%) of any net proceeds (after payment of fees and expenses of counsel) from any and all judgments, awards and payments resulting from any of the Causes of Action.  Assignees agree that they will pay such amount to the Bankruptcy Estate within twenty (20) business days of receipt of such net proceeds;

11.     The Assignees hereby acknowledge and agree that the Assignor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Causes of Action. Without in any way limiting the foregoing, the Assignor hereby disclaims any warranty (express or implied) as to any of the Causes of Action. The Assignees further acknowledge that they are proceeding with their acquisition of the Causes of Action based upon their independent inspection and investigation.  Accordingly, the Assignees will accept the Causes of Action "AS IS" and "WHERE IS".  Assignor disclaims any representation as to the merits or collectability of the Causes of Action and agrees to hold harmless Assignees, their assigns and counsel in whatever capacity for pursuing such claims and release any claims against Assignees, their assigns and counsel including, but not limited to, professional malpractice or negligence.  Assignor hereby

acknowledges that no attorney-client relationship is established between Assignor and the Assignees, their assigns or counsel as a consequence of this Agreement. Assignor shall have no causes of action against Assignees, their assigns, or counsel, including, but not limited to, professional malpractice, negligence, gross negligence or omissions;

12.     Assignees acknowledge that the assignment of the Causes of Action to the Assignees could negatively impact the International Law/Treaty Claims, even to the point that the International Law/Treaty Claims can no longer be prosecuted for the benefit of the Bankruptcy Estate and the Creditors, and therefore the Assignees agree to hold harmless Assignor and his counsel and release any claims against Assignor and his counsel, including, but not limited to, professional malpractice or negligence, should the assignment of the Causes of Action negatively impact the International Law/Treaty Claims, including affecting the International Law/Treaty Claims such that they can no longer be prosecuted for the benefit of the Bankruptcy Estate and the Creditors;

13.     This Agreement is governed by the laws of the State of Texas, without regards to Texas' conflict or choice of law provisions. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court;

14.     Assignor represents that he has not assigned or transferred the Causes of Action to any other party. From the date hereof until closing, Assignor shall not move, sell, lease, transfer or otherwise dispose of or agree to move, sell, transfer, lease or otherwise dispose of, any of the Causes of Action (excluding the International Law/Treaty Claims);

15.     The Assignees have the requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. The execution, delivery and performance of this Agreement by the Assignees has been duly and validly authorized and approved by all necessary action on the part of the Assignees, and subject to the entry of an order by the Bankruptcy Court approving this Agreement, this Agreement constitutes the legal and binding obligation of the Assignees, enforceable against the Assignees in accordance with its terms;

16.     Each signatory to this Agreement represents and warrants that such person is duly authorized to bind the Party for whom such person acts. The Parties expressly represent and warrant on behalf of themselves and their heirs, legal representatives, successors, and assigns, that they are legally competent to execute this Agreement and that they do so of their own free will and accord, without reliance on any representation of any kind or character not expressly set forth herein;

17. Except for the approval and entry of an order by the Bankruptcy Court approving this Agreement, no consent, approval or authorization of, filing or registration with, or notification to any governmental authority, person, partnership, corporation or other entity is required in connection with the execution and delivery of this Agreement or any ancillary documents by the Assignees or the consummation of the transactions contemplated hereby and thereby;

18. As part of Assignor's agreement to assign the Causes of Action (excluding the International Law/Treaty Claims) to the Assignees, Assignor hereby grants unto Assignees full authority to do all things necessary to enforce the Transferred Rights and Assignor's and the Bankruptcy Estate's rights thereunder. Assignor agrees that the powers granted in this paragraph are discretionary in nature and exercisable at the sole option of Assignees;

19. Assignor shall execute and deliver to the Assignees such conveyances, assignments, or other instruments and documents as the Assignees may reasonably request in order to effect the sale, conveyance, and transfer of the Causes of Action. Each party to this Agreement shall, from time to time, execute and deliver such additional documents, instruments, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by any other party to confirm and assure the rights and obligations provided for in this Agreement and render effective the consummation of the transactions contemplated hereby;

20. Assignees shall provide to the Assignor: (i) upon request, but no more frequent than annually, updates in writing on the public record status of the Causes of Action assigned to the Assignees, exclusive of any attorney work product or attorney client privilege information of Assignees; (ii) notice of any settlement of the Causes of Action assigned to the Assignees, within ten (10) business days of any such settlement; and (iii) notice of any payments received on account of any settlements of any Causes of Action, within five (5) business days of the receipt of such payments;

21. Assignor agrees to forward to Assignees all notices received from the Bankruptcy Court or any third party with respect to the Causes of Action;

22. Assignor further agrees that if Assignor receives any distributions on account of the Causes of Action (excluding the International Law/Treaty Claims and the Fee payable under this Agreement), whether in the form of cash, securities, instruments or any other property, the aforementioned shall constitute property of the Assignees to which the Assignees has an absolute right. Assignor shall hold such property in trust and will at its own expense deliver to Assignees any such property in the same form received, together with any endorsements or documents necessary to transfer such property to Assignees within ten (10) business days of receipt. Should all or any portion of the distributions on account of the Causes of Action not be assignable by Assignor to Assignee, then Assignor grants to Assignees a participation interest in the Causes of Action or such distributions, in accordance with applicable law;

23. This assignment shall be binding upon and inure to the benefit of the parties, their successors, assigns, and personal representatives as may be applicable;

24.    The Parties acknowledge that they have consulted with and received advice from such legal counsel and/or other advisors as deemed necessary relative to this matter, including the terms of this Agreement and the advisability of executing this Agreement.  Each Party represents and warrants that it/he/she understands the legal effect and content of this Agreement, and is executing same as its/his/her own knowing and voluntary act and deed;

25.    All representations, warranties, covenants and agreements contained herein shall survive the execution and delivery of this Agreement and any such reassignment, and shall inure to the benefit of Assignor, Assignees and their respective successors and assigns of any party hereto; provided, however, that the obligations of Assignor and Assignees contained herein shall continue and remain in full force and effect until fully paid, performed and satisfied;

26.    This Agreement, together with any exhibits hereto, constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings or representations pertaining to the subject matter hereof, whether oral or written. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically and expressly set forth herein. This Agreement may be signed in counterparts, each of which shall be an original and all of which taken together shall constitute one agreement. No amendment of any provision of this Assignment shall be effective unless it is in writing and signed by the parties and no waiver of any provision of this Assignment, nor consent to any departure by either party from it, shall be effective unless it is in writing and signed by the affected party, and then such waiver or consent shall effective only in the specific instance and for the specific purpose for which given;

27.    Except as otherwise expressly provided herein, each of the parties hereto will pay and discharge its own expenses and fees in connection with the negotiation of, and entry into, this Agreement and the consummation of the transactions contemplated hereby;

28.    All notices, requests, demands, consents and communications necessary or required under this Agreement shall be made in the manner specified, or, if not specified, shall be delivered by hand, delivered by a recognized overnight courier or sent by registered or certified mail, return receipt requested, to:

    if to the Assignees:

    Zahari Tomov
    1 Kiril and Metodi Street
    Region: Asparuhovo
    Varna, Bulgaria 9000

    with a copy (which shall not constitute notice) to:

    Rolinski Law Group, LLC
    14915 River Road
    Potomac, MD 20854
    Attention: Sylvia J. Rolinski, Esq.

if to the Assignor:

Jeffrey H. Mims, Chapter 7 Trustee
900 Jackson Street, Suite 560
Dallas, Texas 75202

with a copy (which shall not constitute notice) to:

Norton Rose Fulbright
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attention: Kristian Gluck

All such notices, requests, demands, consents and other communications shall be deemed to have been duly given upon receipt of delivery confirmation, or on the date on which delivered by hand (receipt confirmed), as the case may be, and addressed as aforesaid;

29.     In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason in any jurisdiction, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired or affected, it being intended that each of the parties' rights and privileges shall be enforceable to the fullest extent permitted by law, and any such invalidity, illegality and unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the fullest extent permitted by law, the parties hereby waive any provision of any law, statute, ordinance, rule or regulation which might render any provision hereof invalid, illegal or unenforceable.  This Agreement is complete, and all promises, representations, understandings, warranties and agreements with reference to the subject matter hereof, and all inducements to the making of this Agreement relied upon by any of the parties hereto, have been expressed herein. This Agreement may not be amended except by an instrument in writing signed on behalf of the Assignor and the Assignees;

30.     THE ASSIGNEES AND THE ASSIGNORS EACH HEREBY EXPRESSLY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER PURCHASE DOCUMENT, THE CAUSES OF ACTION OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.  THE ASSIGNOR AND THE ASSIGNEES ALSO WAIVE ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THE ASSIGNOR AND THE ASSIGNEES FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER

WITH ITS OR HIS LEGAL COUNSEL; AND THAT EACH VOLUNTARILY WAIVES ITS OR HIS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE AND MAY ONLY BE MODIFIED IN AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL (WITHOUT A JURY) BY THE COURT; and

31.     All recitals are incorporated herein by reference.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement by their duly authorized representatives as of this the _____ day of October, 2017.

**ASSIGNOR:**

By:

Name: Jeffrey H. Mims, solely in his capacity as Chapter 7 United States Bankruptcy Trustee for Ayr Logistics Limited Inc.
Title: Chapter 7 United States Bankruptcy Trustee for Ayr Logistics Limited Inc.


**ASSIGNEES:**
Zahari Tomov, solely in his individual capacity

By:

Name: Zahari Tomov, solely in his individual capacity
Title: Ayr Logistics Limited Inc. Creditor

AND

All Seas Property 2 OOD

By:

Name: Yordanka Zhekova Georgieva
Title: Manager and Ayr Logistics Limited Inc. Creditor

WITH ITS OR HIS LEGAL COUNSEL; AND THAT EACH VOLUNTARILY WAIVES ITS OR HIS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE AND MAY ONLY BE MODIFIED IN AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL (WITHOUT A JURY) BY THE COURT; and

31.    All recitals are incorporated herein by reference.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement by their duly authorized representatives as of this the **25** day of October, 2017.

**ASSIGNOR:**

By:

Name: Jeffery H. Mims, solely in his capacity as Chapter 7 United States Bankruptcy Trustee for Ayr Logistics Limited Inc.
Title: Chapter 7 United States Bankruptcy Trustee for Ayr Logistics Limited Inc.

**ASSIGNEES:**
Zahari Tomov, solely in his individual capacity

By:

Name: Zahari Tomov, solely in his individual capacity
Title: Ayr Logistics Limited Inc. Creditor

AND

All Seas Property 2 OOD

By:

Name: Yordanka Zhekova Georgieva
Title: Manager and Ayr Logistics Limited Inc. Creditor

AND

Asset Management EAD

By:

Name: Svetlozar Krasenov Kasabov
Title: Executive Director  and Ayr Logistics Limited Inc. Creditor

AND

Asset Management EAD

By:

Name: Nikolay Georgiev Hubenov
Title: Executive Director  and Ayr Logistics Limited Inc. Creditor

AND

Rudersdal EOOD

By:

Name: Erik Bresling
Title: Shareholder and Ayr Logistics Limited Inc. Creditor

AND

Rudersdal EOOD

By:

Name: Michael Bertelson
Title: Shareholder and Ayr Logistics Limited Inc. Creditor

REMAINDER OF THIS PAGE DELIBERATELY LEFT BLANK!!

# EXHIBIT 38



**EUROPEAN COMMISSION**

## Complaint – Infringement of EU law

Before filling in this form, please read *'How to submit a complaint to the European Commission'*:
https://ec.europa.eu/assets/sg/report-a-breach/complaints_en/
All fields with * are mandatory. Please be concise and if necessary continue on a separate page.

## 1. Identity & contact details

| | Complainant* | Your representative (*if applicable*) |
|---|---|---|
| Title* Mr/Ms/Mrs | Mr | Mr |
| First name* | Jeffrey | Zahari |
| Surname* | Mims | Tomov |
| Organisation: | Trustee in bankruptcy for Ayr Logistics Limited, Inc. | Attorney-at-law |
| Address* | 900 Jackson Street, Suite 560 | 30 Beli Lilii Str., fl. 3, ap. 13 |
| Town/City * | Dallas, Texas | Varna |
| Postcode* | 75202 | 9000 |
| Country* | United States of America | Bulgaria |
| Telephone | | 00359887200444 |
| E-mail | | zahari.tomov@gmail.com |
| Language* | English | Bulgarian/English |
| Should we send correspondence to you or your representative*: | | To the representative ☐ |

## 2. How has EU law been infringed?*

| | Authority or body you are complaining about: |
|---|---|
| Name* | Bulgarian State |
| Address | |
| Town/City | |
| Postcode | |
| EU Member State* | Bulgaria |
| Telephone | |
| Mobile | |
| E-mail | |

## 2.1 Which **national measure(s)** do you think are in breach of EU law and why?*

102 966 946 BGN equal to approximately 65 million USD acquired from the liquidation of US investment property owned in Bulgaria, were used for payment of obligations of third persons of Bulgarian towards Corporate Commercial Bank in favor of VTB's call options for Bulgartabac Holding AD and Vivacom (Bulgarian Telecommunication Company AD) in violation of Foreign Account Tax Compliance Act (FATCA), the Bankruptcy Law (BL) of USA and Foreign Corrupt Practices Act (FCPA) of USA, and the Racketeering Influenced and Corrupt Organizations Act (RICO) of USA. These were capitals acquired from the liquidation of investment property owned in Bulgaria by the Texas-based US company Ayr Logistics Limited, Inc. (Ayr) which has been undergoing a bankruptcy proceeding since 10 October 2014 in the Federal Bankruptcy Court for the Northern District of Texas (FBC), case No. 14-34940-bjh. The said liquidation of investment property was performed at commercial case No. 730/2013 held under the supervision of the District Court in Shumen, Bulgaria (the Bulgarian Court Forum or BCF). Dismissing the obligations which the Bulgarian liquidation proceeding had towards the bankruptcy in USA, which required restoration of 102 966 946 BGN disposed by and in favor of the said third persons, and their transfer to Ayr's Trustee in bankruptcy, the BCF terminated case 730/2013. Thus the BCF preferred the interests of the third persons to avoid

restoring the funds they had disposed, which were due to and owned by Ayr. These actions of the BCF demonstrate hostile attitude towards the rights of the international bankruptcy held against Ayr, including against his special consul for Bulgaria, EU and UAE. In this manner the fundamental principles of the international law for universal and uniform nature of international bankruptcy proceedings. As a result the bankruptcy proceeding held in USA against Ayr suffered damages in amount of tens of million USD.

## 2.2 Which is the **EU law** in question?

a) Treaty on European Union (TEU) – art. 4, par. 3;
b) Treaty on Functioning of the European Union (TFEU) – art. 63, art. 65, par. 3, art. 216, art. 267;
c) Council regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (the Regulation) – considerations 1 to 4, 12 and 13, 17 – 18 and 19, art. 2 "h", art. 3, art. 20;
d) Charter of Fundamental Rights of the European Union (CFR) – art. 17, art. 47, art. 54.

## 2.3 Describe the problem, providing facts and reasons for your complaint* (max. 2000 characters):

In December 2009 Ayr acquired the commercial activity of the Bulgarian company All Seas Property 2 OOD with the purpose of developing an urbanization project for 104.3 hectare expansion of the city of Balchik. For this purpose Ayr incorporated a fiduciary company – Ayr Property Development AD (APD) without the latter having organizational structure, uniting material and human resources allowing it to perform its own business activity separate by the mother company Ayr. The whole process of planning and arranging the benefits and risks, the rights and obligations, the management and control, and the financing of the Silver Beach Project (SBP) were entirely and solely performed by Ayr and its owner and President – in the USA. APD was a mere post box of Ayr and the centre of main activity of SBP was in the USA. Since 10 October 2014 Ayr's international property fell in the scope of action of the US Bankruptcy Law and the capitals acquired from the liquidation of its investment properties fell in the scope of application of FATCA. Ayr consolidated 100% of the monetary claims from the development of the SBP. The Bulgarian liquidator was unable to transfer to Ayr's Trustee the due amount of 102 966 946 BGN because the monetary funds from the SBP were used by third persons for payment of their obligations towards Corporate Commercial Bank AD (CCB). For this reason the BCF terminated the liquidation proceeding. BCF denied the opportunity for performance of the obligations of this proceeding to restore the monetary funds and their transfer to Ayr's bankruptcy estate. Neither of the third persons who used the monetary funds from APD's bankruptcy proceeding for payment of their obligations towards CCB had a valid monetary claim arising out of the development of the SBP. SBP had no obligations towards CCB. As a result of the expropriation of the capitals owned by Ayr in Bulgaria, which the terminated liquidation proceeding of APD was obliged to transfer to the bankruptcy estate of Ayr, damages for more than 65 million USD were caused in the USA.

## 2.4 Does the Member State concerned receive (or could it receive in future) EU funding relating to the subject of your complaint?

☑ Yes, please specify below        O No        O I don't know

The European Commission approved on 29 June 2014 a state aid for the liquidity of Bulgarian banks in amount of 3.3 billion BGN, used entirely in support of First Investment Bank AD, whose activity is among the basis grounds of the complaint filed pursuant to the RICO Act before the US District Court for the District of New York (Southern), case No. 1-18-cv-110072.

## 2.5 Does your complaint relate to a breach of the EU Charter of Fundamental Rights?

The Commission can only investigate such cases if the breach is due to national implementation of EU law.

☑ Yes, please specify below        O No        O I don't know

Art. 17, 47, 52, par. 1 and 54 of the CFR of EU were violated as a result of failure to perform the obligations set forth by the primary and secondary EU legislation, as described in items 2.2 and 2.3 above. Dismissal of the obligations of the liquidation proceeding towards the main proceeding regarding the monetary funds from Ayr's enterprise – SB, does not comply with the requirement for public interest and violates the requirements set forth in art. 17 of the CFR for "fair compensation being paid in good time".

## 3. Previous action taken to solve the problem*
Have you already taken any action in the Member State in question to solve the problem?*

**IF YES**, was it: ○ Administrative    ○ Legal ?

3.1 Please describe: (a) the body/authority/court that was involved and the type of decision that resulted; (b) any other action you are aware of.

(On 6 December 2017 Ayr's Trustee submitted a request for transfer to Ayr's bankruptcy estate of the monetary funds acquired in APD's liquidation proceeding from the sale of SBP's property in total amount of 102 966 946 BGN. In response, the BCF terminated this liquidation proceeding on 19 January 2018. Pursuant to the provisions of: Treaty on European Union (TEU) – art. 4, par. 3; Treaty on Functioning of the European Union (TFEU) – art. 63, art. 65, par. 3, art. 216, art. 267; Council regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (the Regulation) – considerations 1 to 4, 12 and 13, 17 – 18 and 19, art. 2 "h", art. 3, art. 20; Charter of Fundamental Rights of the European Union (CFR) – art. 17, art. 47, art. 54 Ayr's Trustee appealed Decision No. 5 which had terminated the bankruptcy proceeding before the Appellate Court in Varna, Bulgaria. Denying its obligation under art. 267 TFEU, the Appellate Court confirmed Decision No. 5 which had terminated the bankruptcy proceeding. On 16 July 2018 Ayr's Trustee appealed against the termination of APD's liquidation proceeding before the Supreme Court of Cassation.

3.2 Was your complaint settled by the body/authority/court or is it still pending? If pending, when can a decision be expected?*

Pursuant to the Bulgarian Civil Procedure Code, the examination of the cassation complaint filed by Ayr's Trustee in essence is under condition – if the Supreme Court of Cassation agrees to make a request for preliminary interpretation before the EU Court under art. 267 TFEU and on the basis of this interpretation would allow cassation proceeding. The Supreme Court of Cassation is expected to decide these matters by 27 March 2019.

---

**IF NOT** please specify below as appropriate

○ Another case on the same issue is pending before a national or EU Court
○ No remedy is available for the problem
○ A remedy exists, but is too costly
○ Time limit for action has expired
○ No legal standing (not legally entitled to bring an action before the Court) please indicate why:

○ No legal aid/no lawyer
○ I do not know which remedies are available for the problem
○ Other – specify

4. If you have already contacted any of the EU institutions dealing with problems of this type, please give the reference for your file/correspondence:

O Petition to the European Parliament – Ref:........................................

☑ European Commission – The special counsel for Ayr's Trustee in Bulgaria, EU and UAE filed a complaint regarding this case before the European Commission, registered under No. CHAP(2019)00337.

O European Ombudsman – Ref:.....................................................

O Other – name the institution or body you contacted and the reference for your complaint (e.g. SOLVIT, FIN-Net, European Consumer Centres)

5. List any supporting documents/evidence which you could – if requested – send to the Commission.

⚠ Don't enclose any documents at this stage.

Notice to liquidation procedure dated of APD on  22 October 2014 and 19 November 2014, about Automatic Stay on US Bankruptcy Law in case No.14-34940-bjh-7; Court Order Granting Trustee Motion to: Enforce the protections of the Automatic Stay and Confirm the Jurisdiction of the Bankruptcy Court to determine property of the estate, case No.14-34940-bjh-7, Doc.35, Filed of June 17, 2016; Letter of Trustee of Ayr on 7 January 2016; Judgement of 13 March 2017, Doc.13 as entered on 14 March 2017 in Case 16-03139-bjh; Final Judgment as entered in Case No.16-03140-bjh on 13th November 2017, Doc.37; Letter of Trustee of Ayr on 3 March, 2016;Payment Request of ref.396 dated 6th December 2017; The Bulgarian Trustee's letter in reply of 27th April 2016; The Bulgarian Trustee's letter in reply of 15th August 2016; Bank account statements of 10th and 13th November 2014; Court Order No 5 as entered by Shumen District Court and dismissing case 730/2013 Filed On 19th January 2018; Appeal on 25 January, 2018 against Court Order No 5 as entered by Shumen District Court, appeal case 187/2018; Motion under Art.267 TFEU filed under No.2462 on 25 April 2018, appeal case 187/2018; Supplemental Motion under Article 267 TFEU filed under No.2566 on 30 April 2018, appeal case 187/2018; Written Comments under Art.267 TFEU submitted at a court hearing held on 2 May 2018, appeal case 187/2018; Transcript of Court Hearing held on 2 May 2018, appeal case 187/2018; Motion in Defence filed under No.2735 on 9 May 2018, appeal case 187/2018; Judgment No.124 of Varna Appeal Court on 1 June, 2018, appeal case 187/2018; Statement on the grounds or admissibility the complaint to the Supreme Court of Cassation on 16 July, 2018, cassation case 2154/2018; Cassation Complaint on 16 July, 2018, cassation case 2154/2018; – AND OTHER EXHIBITS.

6. Personal data*

Do you authorise the Commission to disclose your identity in its contacts with the authorities you are lodging a complaint against?

O Yes          O No

⚠ *In some cases, disclosing your identity may make it easier for us to deal with your complaint.*

*28 February 2019*

*Signed by:*

Zahari Tomov, Esc.

# EXHIBIT 39

12/13/2019    Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL    Document 220-3    Filed 01/06/20    Page 208 of 299

| Author | Title | Averment | Source | Date | Exhibit |
|---|---|---|---|---|---|
| Roderick Moore | Deputy Chievr in Mission of the US Embassy (2000-2003), US Ambassador in Bulgaria (2015) | In 25 years Bulgaria marks no progress in curbing corruption. This is not his personal opinion but that of the people in this country. | Bulgarian National Radio August 26, 2015 | August 2015 | 1 |
| James Warlick | US Ambassador in Bulgaria (2010 – 2012) | Bulgarian justice system is corrupt. Bulgarian judicial system is dishonest, corrupt, and had two sets of standards: one set for the wealthy and powerful and another for the poor and ordinary. It is imperative that the Bulgarian government enforce the rule of law, that it ends the double standards in judicial proceedings. | SofiaEcho press release from an anti-crime conference organized by George Marshall Association in Bulgaria April 5,2011 | April 2011 | 2 |
| Nancy McEldowney | US Ambassador in Bulgaria (2008-2009) | Bulgaria lacks rule of law. Corruption and organized crime reign over the country and this is heard in ordinary people conversations. | Bulgaria News March 26, 2009 | March 2009 | 3 |
| Bruce Burton | Deputy Ambassador in Bulgaria | I am afraid that in Bulgaria corruption has reached a critical level which influences the life of each and every citizen. | Offnews press release from a meeting with Bulgarian judiciary magistrates December 11, 2014 | December 2014 | 4 |
| Eric Rubin | US Ambassador in Bulgaria (2015 – acting) | We are highly worried that Russia is trying to intervene in the progress of the Western Balakns and their integration in the EU. Recently due to problems with the supremacy of law and the corruption, a specialist on issues regarding justice, was sent to the Embassy in Sofia. Since I have been here we have strenghtened our cooperation regarding the supremacy of law. | Free Europe February 14,2015 | February 2015 | 5 |
| Friedrich Naumann Foundation | German Foundation of Freedom and Democracy | Corruption, freedom of media and the independance of the judicial system are Bulgaria's biggest problems. Although Bulgaria has been part of the EU for over 10 years, independance of the judicial system is in stagnation. Corruption in Bulgaria is among the biggest impediments to the country's accession to the Schengen Area and the rapid economic development. | Media release by Bulgarian National Radio quoting an Annual Report February 11,2019 | 11 Feb 2019 | 6 |
| Guardian | UK Media | Cloud of corruption hangs over Bulgaria as it takes up EU presidency. Bulgaria, the poorest and most corrupt country in the EU. "No one [in Bulgaria] is prosecuting political corruption, there are no ex-government officials in jail" says Ogian Shentov, chairman of the Centre for Study of Democracy in Sofia. "We have reached a stage of state corruption which we describe as state capture". A report by his organization paints a devastating picture of corruption from the top to bottom of society. More than one in five adults, 1.3 million, are thought to have taken part in a corrupt transaction, but only 72 court cases were completed in 2015. Another red flag includes the delay in investigating the murky tale behind the collapse of the Corporate Commercial Bank, which was the country's fourth largest lender until a 2014 bank run, which appears to have been set off by a feud between its wealthy owner and a politician. | theguardian.com Dec 28, 2017 | 28 Dec 2017 | 7 |
| Transparency International | International Agency | Stagnation in the fight against corruption continues. Bulgaria's corruption index for 2018 is 42 points, with the country score of 77th in the world ranking. In the regional ranking of Member States of the EU, Bulgaria continues to take last place (the average value of the EU index is 64.6). In this year's ranking, the country score is with six positions down in the world ranking (from 71 in 2017 to 77 this year) which is a retreat indicator compared with other countries. The result for the period 2012-2018 gives critical assesment – there is a stagnation in the fight against corruption. In comparison to positive developments in a significant part of the other EU Member States Bulgaria is seriously lagging behind. | transparency.org quoting an Annual Report for 2018 | 2018 | 8 |

12/13/2019    Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL   Document 220-3   Filed 01/06/20   Page 209 of 299

| | | | | | |
|---|---|---|---|---|---|
| US State Department | | US State Department Diana Bulgaria 220-3 Country Global Filed 01/06/20 Page 209 of 299 Annual Report for 2018 | | | 9 |
| | | corruption. The government did not implement the law effectively and officials in all branches of the government reportedly engaged in corrupt practices with impunity. "Corrupt practices included bribery, conflict of interest, elaborate embezzlement schemes, procurement violations, and influence trading". The European Commission's Cooperation and Verification Mechanism report concluded that "progress in tackling high-level corruption … has continued to be a challenge" and the country had "a very limited track record of concrete cases leading to final convictions in court". The Bulgarian constitution and law provide for an independent judiciary but corruption, inefficiency, and a lack of accountability continued to be pervasive problems, the report said. "Public trust in the judicial system remained extremely low because of the perception that magistrates were susceptible to political pressure and rendered unequal justice" the US State Department report said. | | | |
| European Commission | | The European Commission has repeated its now-traditional calls on Bulgaria and Romania to step up the fight against corruption. In monitoring reports due to be published today, the Commission lists major shortcomings in the judiciary in each country, Bulgaria has shown sustained political will to combat corruption and organized crime, the report says, but this has not led to credible results over the last year. | politico.eu quoting an Annual Report July 19,2011 | 19 July 2011 | 10 |
| US Embassy in Sofia, Bulgaria | | The ethnic Turkish MRF party continues to be a main source of corruption in the three-party government, which needs the MRF votes to maintain its stable majority in parliament. The MRF and its autocratic (but seldom publicly vocal or visible) leader Ahmed Dogan have influence in the government disproportionate to the party's size. MRF's outright disrespect for public morality was illustrated in the case of Deputy Minister of Natural Disaster Management Delyan Peevski, an MRF appointee dismissed in May for his involvement in a major corruption scandal but reinstated to the post in December following MRF pressure. | Confidential Report January 10,2008 | 10 Jan 2008 | 11 |
| US Embassy in Sofia, Bulgaria | | The strength and immunity from the law of organized crime (OC) groups is arguably the most serious problem in Bulgaria today. OC activities underlie corruption and the ineffectiveness of the legal system in Bulgaria, and inhibit the country,s economic development. Bulgarian OC is particularly involved in international money laundering, drug trafficking, and counterfeiting. To date, not a single major OC figure has been punished by the Bulgarian legal system, despite an on-going series of OC-related assassinations. Many groups use a host of legitimate businesses domestically and abroad to launder the proceeds of their illegal activities. Several well-known businessmen linked to organized crime have parlayed their wealth into ownership of sports teams, property developments, and financial institutions. | Confidential Report July 7, 2005 | 7 July 2005 | 12 |
| Lozan Panov | Chairman of the Supreme Court of Cassation | The Bulgarian judiciary is a quagmire of dependancies – and the signs are there for all to see: The President of the Supreme Court of Cassation (SCC) was nearly impeached for freely expressing his views on the enacted amendments to the Constitution, which effectively transformed the judiciary into a minefield. The member of the Supreme Judicial Council who relayed the proceedings of the Council directly to the Prime Minister via text messages continues to serve – tirelessly and with utter impunity – as a judicial officer. The Prosecutor-General persecutes those who criticise him while shielding his friends in power from prosecution, without anyone daring take the first step to putting in place a mechanism that would ensure he can be held to account for his actions. Magistrates and judges, including the | Press release by capital.bg from a conference organized by MEDEL (Magistrats Europens pour la Democratie et les Libertes) November 16, 2018 | 16 Nov 2018 | 13 |

12/13/2019     Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL Document 220-3 Filed 01/06/20 Page 210 of 299

for his actions. Magistrates and judges, including the subjected to gruesome media attacks and institutional terror, which turns their lives upside down. The President of the Court of Appeal, implicated by a fellow magistrate in an act of high misdemeanour commited with the express intent of doing the bidding of oligarchs and those in power, has not only evaded punishment but has even received commendations from all inspection bodies called upon to conduct a proper investigation. The judge who shone a torch on the offence is not a hero, but a defendant in a criminal case. The Minister of Justice publicly stated that the judiciary needed silence. In Bulgaria we are up against a system that has recruited enormous human and matterial resources to build a well-oiled machine that is all too adept at exploiting public institutions, the media, the economy, the political system and, naturally, the judiciary. Its actions are never discussed in public but remain hidden.

| | | | | | |
|---|---|---|---|---|---|
| Transparency International | International Agency | With 88 points Denmark returns as a global leader on the Corruption Perceptions Index. Finland, Sweden and Switzerland score 85. At the bottom of the region, Bulgaria score 42, dropping one point since last year. | transparency.org quoting an Annual Report for 2018 January 29,2019 | 29 Jan 2019 | 14 |
| The Greens / EFA | Political parties in the European Parliament | A hit to GDP of over 11 billion Euros is lost each year in Bulgaria due to corruption. That's 14% of GDP. This figure is three times bigger than the national healthcare budged and 2.4 times spending on the elderly. The amount of money annually lost to corruption in Bulgaria is enough to give around 2.5 million people in the country (more than a third of the population) the average Bulgarian wage. A 2017 Eurostat survey found that 48% of the respondents in Bulgaria believed that the level of corruption had worsened in the preceding 3 years, while 27% believed that the level had remained the same. Only 4% believed the level of corruption had decreased. Indeed, 83% believe corruption is widespread in the country; and 76% believe corruption is part of the business culture of the country. | Report on Corruption from 2018 , page 10 | 7 Dec 2018 | 15 |
| US Committee of Foreign Relations | US Senate | Russia would rather destroy the EU through corruption … than through the support of anti-EU forces. Russia's use of energy to influence politics in Europe is part of the Kremlin's "energy superpower" strategy. The placement of and control over energy pipelines provides the Russian government with a key source of leverage. Russia exerts influence in Bulgaria through its dominant role in the economy, primarily in the energy sector, as well as propaganda and relationships with political parties. Bulgaria has perhaps the most longstanding historical ties to Russia. The modern manifestation of Moscow's influence is more focussed on soft power, energy economics and political and cultural influence. Kremlin uses a complex and opaque network of colluding officials within the governing apparatus and business community to advance its interests. During debate on the South Stream pipeline in the Bulgarian parliament, MPs introduces amendments which would have circumvened EU energy law. | Report page 89, January 18, 2018 | 10 Jan 2018 | 16 |
| Freedom Barometer, Europe Team | Friedrich Naumann Foundation for Freedom | Organized crime, influential oligarchs and high-level corruption among politicians can undermine democratic procedures and decision-making process. Although formally independent, judiciary is often subject to extensive political pressure, or one by wealthy business. Corruptive practices are not rare in this branch of power. According to Transparency International, Bulgaria is the most corruptive country in the EU. Despite more than a decade of EU membership, Bulgaria has seen very little progress in independence of its judiciary. There was stagnation, or oscillations. Stalemate thereof considerably hinders improvement in other areas of rule of law, e.g. fighting corruption, or safeguarding human rights. As Freedom House noted in Nations in Transit in 2018 "Bulgarian justice system continued to face a high level of politicization, a statist approach with inefficiency an lack of administrative capacity". The rest of the recent judicial appointments were marked by political parties' trade-offs instead of merit-based selection. Bulgaria is the wors corrupted EU-member, behind the otherwise comparable Hungary, Romania, Greece or Croatia, so much | Annual Report for 2018, page 54 | 2018 | 17 |

12/13/2019    Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-G    Document    Filed 01/06/20    Page 211 of 299

one of Bulgaria's major obstacles to its accession. Scientists are the informal alliance of political and business oligarchy, organized crime, only partially reformed secred services, and biased media, has remained as the main catalyst of corruption. A specialized anti-corruption body was established to investigate high level corruption. With its president appointed by the national parliament, however, its true independence from established political elites is put into question. Atop all those, fighting the widespread petty corruption remains a giant task. Although legal framework is mostly in line with other EU countries, its adequate implementation is often lacking. Rule of law in Bulgaria rests on weak foundations due to the weak judiciary that is often considered to be under external influences, Judiciary is still one of the least trusted institutions in the society. It is also perceived as highly corrupt. Regulatory enforcement is also weak or arbitrary. Court proceedings are generally long, effectively limiting the right to a legal proceeding within a reasonable timeframe, since these last 1.5 years on average and incur very high costs. Resolving insolvency lasta longer than three years on average and results in a very low recovery rate of just a little over one third of the claim. Regulatory obstacles can be used to benefit important market players. The biggest obstacles remain in the area of favourable treatment of different business entities and partial application of rules. Corruption in public services and administration is present, corroborated by government policy instability arising from frequent regulatory changes and inconsistent application of laws.

| | | | | | |
|---|---|---|---|---|---|
| John R. Haines | Co-Director of FPRI (Foreign Policy Research Institute) | Russia's ambassador to the EU memorably claimed: "Bulgaria is in a good position to become our special partner, a sort of a Trojan horse in the EU". BT Invest GmbH, an Austrian shell corporation registerred in April 2011. In late June 2011 BT Invest disclosed it was owned by VTB Capital PE Investment Holding (Cyprus), whose parent corporation JSB VTB Bank is majority (60%) owned by the Russian government. A Liechtenstein corporation, Livero Establishment, agreed to acquire VTB's stake in BT Invest at some undetermined point in the future. At the time Livero's majority (55%) owner was the Panim Foundation, a Liechtenstein entity controlled by the aforementioned Mr. Peevski and his mother. The aforementioned Mr. Dogan reportedly received a minority (10%) stake in Livero, which he held through Inter Projects Group controlled by a second Dubai-registered company, Prest Trade Ltd. Prest's ownership cannot be ascertained from public records. In March 2014 Livero acquired BT Invest and in June 2014 it sold half its position (equating to about 40% stake) to a Liechtenstein-registered entity, Woodford Establishment, which according to one publisher report, is controlled by Mr. Peevski. Several days before the National Assembly authorized the parlieamentary investigation of Dogan and Peevski, the Turkish government banned both men from entering the country. Sabah (a Turkish newspaper) called Mr. Dogan "a soviet agent" and "an informer" for RUMNO. Der Spiegel (a German newspaper) called Mr. Dogan "the political mastermind behind Mr. Peevski". | frpi.org, August 5,2016 | 5 Aug 2016 | 18 |
| The Greens / EFA Combating Corruption: From Commitments To Action The messy fight against corruption in Bulgaria and the need for ambition in the EU institutions | Political parties in the European Parliament | Out of all EU Member States, Bulgaria has the worst standing in the Transparency International Corruption Perception Index, ranking 75th out of all countries in the world. It could even be argued that the fight against corruption has been overly politicized, at least in recent years. In Bulgaria there were only 8 indictments against corruption offences over the course of one year. In addition, Bulgarians have the lowest levels of trust in their courts and judges compared to all other EU Countries. The [anticorruption] law fails to comply with international standards in the fight against corruption and even raises further concerns in that area. Furthermore, it would appear that the fight against corruption is now being used as an excuse to limit criticism of the government and tame the opposition. This law attempted to introduce some improvements but actually also raised serious concerns about the protection of whistleblowers, even taking a step back in the current levels of protection and opening the doors for further legal prosecution of those reporting on corruption offences. An analysis of the existing [anticorruption] bodies shows that some of them have overlapping functions while others lack independence, thus raising questions about the efficiency of the system as a whole. In March 2016 it became public that 15 public prosecutors, 4 investigators, and 7 technical assistants work in the unit on 43 criminal cases and 144 other files. Within one year they introduced 8 indictments in the courts and won one (the case is still pending). There are cases in which the people who are the subject of a whistle-blowers' alert on corruption or other criminal offences or misconduct have actually initiated legal proceedings against the one who blew the whistle. Some criminal courts have applied criminal defamation laws to those reporting corruption and in several recent cases the European Court of Human | Annual Report January 2018 | January 2018 | 19 |

12/13/2019          Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL  Document 220-3  Filed 01/06/20   Page 212 of 299

freedom of expression for criminalising the reporting of corruption. The 2017 Anti-Corruption law creates a number of problems. The right balance between the power of the State to combat corruption and the protection of Human Rights is not well established. Furthermore, the bill does not provide any protection of whistleblowers, thus taking a step backwards in comparison with the existing legal regime. The public administration is not well protected against political influence and opression, and is arguably more politicized than it is in the other EU countries.

| | | | | |
|---|---|---|---|---|
| Bureau of Democracy, Human Rights and Labor | US Department of State | The constitution and law provide for an independent judiciary, but corruption, inefficiency, and a lack of accountability continued to be pervasive problems. Public trust in the judicial system remained low because of the perception that magistrates were susceptible to political pressure and rendered unequal justice. The European Commission noted that "targeted attacks on judges in some media" affected judicial independence and encouraged the Supreme Judicial Council, which is responsible for the administration of the judiciary, to take an active role against such attacks. According to human rights organizations, the law has low standards of fair trial, creating possibilities for violation of procedural rights of lawyers and defendants. Corporate and political pressure, combined with the growing and nontransparent concentration of media ownership and distribution netwrosk, as well as government regulations of resources and support for the media, gravely media pluralism. Government did not implement the law effectively, and officials in all branches of government reportedly engaged in corrupt practices with impunity. Corrupt practices included bribery, conflict of interest, elaborate embezzlement schemes, procurement violations, and influence trading. According to the Institute for Market Economics, the new law focuses on creating administration rather than introducing new anticorruption tools. NGOs criticized the legislators for providing an administrative body with wiretapping authority. In August the Bulgarian Industrial Association identified corruption as the main factor for the lowest level of foreign direct investments in the last 10 years. Transparency International Bulgaria stated there had been no significant progress in the country's anticorruption efforts. | Country Reports on Human Rights Practices for 2018 | 2018 | 20 |
| US Chamber of Commerce in Bulgaria | | It is our opinion that the accumulated and unresolved problems in the judiciary are systematic. The resulting feeling that the reform is not happening leads to uncertainty among investors and the economic entities operating in the country. This is a price the whole society pays and will continue to pay. Ultimately, one of its most valuable resources is being depleted – trust. | Open Letter January 25, 2016 | 25 Jan 2016 | 21 |
| Magistrats Europeens pour la Democratie et les Libertes | Magistrates Association | Conclusions expressed in these reports which, from the perspective of our organization and its members, seem far off from the realities in both countries. The CVM report failed to offer an objective analysis and to give valid recommedations. As far as Bulgaria is concerned, we find it surprising that the European Commission discerns "steady progress" and declared three benchmarks "provisionally closed": judicial independence, the legal framework, and the fight against organized crime. Despite the constitutional reform in 2015, the members of the Judicial Chamber of the Supreme Judicial Council in Bulgaria elected by judges do not prevail over the members appointed by the Parliament.Thus each recruitment, career progress or termination of office of a judge in Bulgaria remains politically dominated. The President of the Supreme Court of Cassation, Justice Lozan Panov, has been subjected to | Open Letter December 18, 2018 | 18 Dec 2018 | 22 |

12/13/2019          Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL   Document 220-3   Filed 01/06/20   Page 213 of 299

Court of Cassation, Justice Lozan Panov, has been subjected to several attacks, through his classification, the media and different institutions, even the ones from witin the judiciary. Things have degenerated so much that his life and physical integrity have been directly threatened: the bolts of the back tire of his official car were found to be loosened, and masked men "greeted" him at the door of the Supreme Judicial Council (SJC) with freshly cut-off lamb heads – a threat usually used by the Sicilian mafia during the 1970's. No serious investigation has been conduced by the police in these cases. The Prosecutor General remains an extremely important power factor and trader, but without any accountability, like it used to be under communism. None of these serious issued appear in the CBM report, raising serious questions not only about its objectivity, but also the actual knowledge of those who wrote it about what is actually happening in Bulgaria. The CVM reports now presented, however, don't go in this direction, giving contradictory signs that can be misinterpreted and could be read in a very dangerous way, with effect in undermining the independence of the Romaina and Bulgarian Judicial systems.

| | | | | |
|---|---|---|---|---|
| Judge Kalin Kalpakchiev | Member of the Supreme Judicial Council | The specific reason for Borisov (Bulgaria's Prime Minister) to enter the room was an SMS. The message was sent to the prime minister first by a member of the SJC, who is still unknown. With this message, the SJC member informed the Prime Minister that the Chairman of the Supreme Court of Cassation – Lozan Panow, pleaded Borissov to be auditioned for his role in the Yanevagate scandal (a scandal involving a district judge). To show that he knows very well what is happening in SJC, Borisov forwarded this SMS to Panov. This was interpreted as a waved finger by the Prime Minister to the highest judge. Lozan Panov decided to highlight the case and showed the media the premier's forwarded SMS. So Borisov decided to go personally to the SJC to deal with the situation. Oher problem is the oversized large political quota in the SJC. Of the 25 members of the council, the parlamentary parties elected 11. Another 3 are appointed by a decree of the President – the chairmen of both Supreme Courts and the Prosecutor General. This means that the policitally elected members have a majority of 14 to 11. By comparison, the judges elect only 6 of ther representatives in the SJC. Parties usually allocate these positions according to quotas and fill the SJC with people whose first task is certainly not independence of the judiciary. Thus, the system falls under political influence because the SJC appoints all judges and prosecutors. "The intolerable and poisonous atmosphere of work in the SJC, the attempts to bring illegitimate party-oligarchic influences into the council's human resources selection, the fierce, slanderous media campaigns directed against certain judges with critical and free opinion, the inability to engage in reasonable dialogue, the lack of competence and will to solve the pressing problems of justice – these are thc main features that marked the mandate of the SJC in the period 2012-2017" stated judge Kalin Kalpakchiev, elected representative of the judges after the end of his mandate in 2017. | Press release at bulgarianpresidency.eu January 3, 2018 | 3 Jan 2018 | 23 |
| Judge Rumyana Chenalova | Member of Sofia City Court | Discribe the technology on the work of the judical sistem in BIgaria and the role of the Peevski and oligarhs. | Statement May 11, 2015 | 11 May 2015 | 24 |
| Ttrustee Daniela Kuceva | Trustee of EFV and TC-IME | Discribe how Peevski use the court sistem and Cibole Bulgaria to take control over EFV and TC-IME which companies have a key role in the two call options -for Bulgartabak Holding and for Vivavacom. | Statement May 11, 2015 | 11 May 2015 | 25 |
| Attorney Todor Nenov | Represnted UniCredit Bulbank as a member of Committee of Creditors of APD | Discribe how FIB have a agreement with the judges in Soffia Appeal Court to acting in favour FIB's inteerest to legimate the theft the Ayr's money | Transcript of the video of the meeting with Attorney Tomov February 20,2016 | 20 May 2016 | 26 |
| Attorney Zahari Tomov | Special counsel of US Trustee for BG, EU and UAE | Discrimantion over his job with prpose to joint to FIB and UniCredit action to dismiss APD bankruptcy procedure and legimate the theft on Ayr's money | Complaint to protect against discrimation, Filed before BG Court against BG State March 9, 2018 | 9 March 2018 | 27 |

12/13/2019    Exhibit 39 Chart setting forth third party observations of the lack of independence in the Bulgarian judiciary and the lack of access to just…

Case 1:18-cv-11072-GHW-RWL Document 220-3 Filed 01/06/20 Page 214 of 299

| | | | | | |
|---|---|---|---|---|---|
| Attorney Zahari Tomov | Special counsel of US Trustee for BG, EU and UAE | Discrimantion and violation of EU and International law | Complaint to EU Commission to invsetigation BG State January 31,2019 | 2019 | 28 |
| Trustee Jeffrey Mims | Trustee of Ayr | Discrimantion and violation of EU and International law | Complaint to EU Commission to invetigate BG State Fbruary 28,2019 | 28 February 2019 | 29 |
| Trustee Ganka Kolyovska | Trustee of APD | Discribe the pressure on him in replay his refuse to pay FIB's payment claim | Motion in APD Bankruptcy procedue July 11, 2014 | 11 July 2014 | 30 |
| Freedomgouse Report | Bulgaria | DP, MFR, CCB, Russia,South Stream Pipeline, Corruption | May 31, 2015 | 2015 | 31 |
| Freedom | Bulgaria | DP, Bulgartabak, Corruption | page 20 , June 15,2017 | 2017 | 32 |
| Attornee of General Report to U.S.Congress | Bulgaia | GMA case of Tsveran Vassilev against BG State and DP/ Aviora Consult EAD, sole owned attorney Alexandur Angelov | page 26, December 31,2017 | 2017 | 33 |
| Lozan Panov | Chairman of the Supreme Court of Cassation | Warned of dark days of repressions looming in the judiciary in Bulgaria. The principles which are the pillars of democracy, have been perverted; rule of law and the division of powers are severely compromised; and the state institutions have been subdued by private interests. For the past seven years: spoils of oligarchic circles. | BTA news, April 17,2019 | 17 April 2019 | 34 |
| Chamber of Commerce in BG | Open Letter to Bulgarian Government | Support of Judicial Reform in BG | January 25, 2016 | | |
| Presidend of Sofia Region and Appeal Court | Speech on conference "Independent Judiciary Makes a Country Freedom" April 23, 2019 | Peevski has an uncanny say in key appointments in the judiciary, even when the nominations come from sitting high-ranking judges | Radio Free Europa, April 23, 2019 | | |
| US Embassy | Report BG Banking sistem December 11, 2006 | Fibank is "bad aple" | Bivol | | |
| US Embassy | Locus of Corruption January 10, 2008 | Peevski involvement in a major corruption scandal. This scandl is related to Bukgartabac and Salam Faraj in money launderin | Bivol | | |
| US Embassy | BG Organized Crime July 7, 2005 | MFR , the political party of Peevski support The BG Organize Crime | Bivol | | |
| The Judge Lalov, furmer Presidend of Sofia Region Court | Dependand Judiciary Sistmes of BG May 10, 2019 | The brutal political pressure on Bulgarian judiciary | EUelectionsBulgaria | | |
| Justice Commissioner Vera Jourava | TRUST IN COURTS DECLINING IN EASTERN EUROPE April 26, 2019 | The Cooperation and Verification Mechanism, CVM, would not be dropped for Bulgaria by the end of the current Commission's mandate.There are still too many EU citizens who don't see their justice systems as independent and who are waiting too long for justice to be served.If a justice system is broken in one country, the impact will be felt across the EU. | balkaninsight.com | | F352 |

# EXHIBIT 40

from:       Priyatel P <priyatel@hotmail.com>
to:         "zachari.tomov@gmail.com" <zachari.tomov@gmail.com>
date:       Sat, May 21, 2016 at 4:43 PM
subject:    Preduprejdenie
mailed-by:  hotmail.com
signed-by:  hotmail.com
security:   Standard encryption (TLS) Learn more
:           Important mainly because of the people in the conversation.

*Фрея*
*Транслейшънс*

**Freya**
*Translations*

**Преводи от и на чужди езици**
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

Dear Friend

Please think this over very carefully before it's too late

Whether or not and how you will proceed with the case of Ayr Property Development

The money and the opportunities are here at the tip of your fingers, while America is across the ocean

Mind your P's and Q's

Remember we're keeping an eye on your every step

You surely are smarter than that.

Don't miss the chance you are given

Make use of the situation/seize the occasion

Eventually everything will sink into oblivion

The right thing to do is to be in the right place at the right time *with* the right kind of people

The right kind of people will come to the rescue whether you call for them or not

What you need to do however is to play it smart

---

*The undersigned, Ilka Simeonova Dyulgeriva, hereby attest that this is a true and correct translation from Bulgarian into English of the attached text opening with "Dear Friend". This translation has 1 (one) page.*

*Translator:* _____   *Ilka Simeonova Dyulgerova*

Приятелю

Докато не станало прекалено късно добре обмисли следното

Дали как и какво ще правиш по случай Еър Пропърти Девелопмънт

Парите и възможностите са тук в Америка е от другата страна на океана

Опичай си акъла

Не забравяй че следим секи твой ход

Не си глупав човек

Не пропускай шанса който ти се дава

Възползвай се от ситуцията

Всичко подлежи на забрава

Важното е да си на правилното място и време ис правилните прилтели

Правилните приятели ще ти помогнат и без да ги търсиш

От теб се иска само да бъдеш умен

elivered-To: zachari.tomov@gmail.com Received: by 10.157.10.230 with
SMTP id 93csp280257otq;          Sat, 21 May 2016 06:44:21 -0700 (PDT)
X-Received: by 10.202.87.16 with SMTP id
l16mr4662185oib.62.1463838261651;          Sat, 21 May 2016 06:44:21 -
0700 (PDT) Return-Path: <priyatel@hotmail.com> Received: from BAY004-
OMC2S15.hotmail.com (bay004-omc2s15.hotmail.com. [65.54.190.90])
by mx.google.com with ESMTPS id
c22si592820oig.183.2016.05.21.06.44.21          for
<zachari.tomov@gmail.com>          (version=TLS1_2 cipher=ECDHE-RSA-
AES128-SHA bits=128/128);          Sat, 21 May 2016 06:44:21 -0700
(PDT) Received-SPF: pass (google.com: domain of priyatel@hotmail.com
designates 65.54.190.90 as permitted sender) client-ip=65.54.190.90;
Authentication-Results: mx.google.com;          dkim=pass
header.i=@hotmail.com;          spf=pass (google.com: domain of
priyatel@hotmail.com designates 65.54.190.90 as permitted sender)
smtp.mailfrom=priyatel@hotmail.com;          dmarc=pass (p=NONE
dis=NONE) header.from=hotmail.com Received: from EUR01-HE1-
obe.outbound.protection.outlook.com ([65.54.190.124]) by BAY004-
OMC2S15.hotmail.com over TLS secured channel with Microsoft
SMTPSVC(7.5.7601.23008);          Sat, 21 May 2016 06:43:32 -0700 DKIM-
Signature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=hotmail.com;
s=selector1; h=From:To:Date:Subject:Message-ID:Content-Type:MIME-
Version;   bh=riHHI54FP+j/qb2fuJk3U4sYaNw2EKDVDoBhhEdSuow=;
b=S5ebon5z4mjMDRzjV7Y+a4pK5OBRbovTPz75sg34B1SNw1hRhiqB/+sCoKxRUnpQ4jj
ikG9N3Q9vFVUqXaVreckHAC7rTHheSwgfLf9QyDCpxyt24obEgMZNr+bc70jAXHJbFd2Y
qROMO236wWev1RMuzqhjmlOzYPXUWCMyL80Sysxn5dQkChq5YqJETkmHBqnOcf8Ak22cT
RsX0gYfZqa+6dv7rhTMzQ2xXY1EuC7UABtKtG6QIVJzpPr3ixuRVHHAA5zW6d718VxxsX
JGy2VzpmswCeidi0uGUMQjpbUkYAIESDzP1Ub+25CEgUIZMp/coUyOFiBvZLpnOu/n0Q=
= Received: from HE1EUR01FT064.eop-EUR01.prod.protection.outlook.com
(10.152.0.54) by HE1EUR01HT174.eop-EUR01.prod.protection.outlook.com
(10.152.0.124) with Microsoft SMTP Server (TLS) id 15.1.497.8; Sat,
21 May  2016 13:43:29 +0000 Received: from
DB4PR07MB249.eurprd07.prod.outlook.com (10.152.0.53) by
HE1EUR01FT064.mail.protection.outlook.com (10.152.1.31) with
Microsoft SMTP  Server (TLS) id 15.1.497.8 via Frontend Transport;
Sat, 21 May 2016 13:43:29  +0000 Received: from
DB4PR07MB249.eurprd07.prod.outlook.com ([10.242.231.146]) by
DB4PR07MB249.eurprd07.prod.outlook.com ([10.242.231.146]) with mapi
id  15.01.0497.019; Sat, 21 May 2016 13:43:29 +0000 From: Priyatel P
<priyatel@hotmail.com> To: "zachari.tomov@gmail.com"
<zachari.tomov@gmail.com> Subject: Preduprejdenie Thread-Topic:
Preduprejdenie Thread-Index: AQHRs2aWDSQg7PxUEUi2wpPLYQqZdA== Date:
Sat, 21 May 2016 13:43:29 +0000 Message-ID:
<DB4PR07MB249EC15C4C264F027F1D709C14C0@DB4PR07MB249.eurprd07.prod.out
look.com> Accept-Language: en-AU, en-US Content-Language: en-AU X-MS-
Has-Attach: yes X-MS-TNEF-Correlator: authentication-results:
spf=softfail (sender IP is 25.152.0.53)  smtp.mailfrom=hotmail.com;
gmail.com; dkim=none (message not signed)  header.d=none;gmail.com;
dmarc=fail action=none header.from=hotmail.com; received-spf:
SoftFail (protection.outlook.com: domain of transitioning
hotmail.com discourages use of 25.152.0.53 as permitted sender) x-
tmn: [o66q9z4Bl2FbnO5V42C/mC7WJvIboleA] x-eopattributedmessage: 0 x-
forefront-antispam-report:
CIP:25.152.0.53;IPV:NLI;CTRY:GB;EFV:NLI;SFV:NSPM;SFS:(10019020)(98900
003);DIR:OUT;SFP:1102;SCL:1;SRVR:HE1EUR01HT174;H:DB4PR07MB249.eurprd0
7.prod.outlook.com;FPR:;SPF:SoftFail;MLV:ovrnspm;MX:1;A:1;LANG:et; x-
ms-office365-filtering-correlation-id: eac7bbab-10d7-4631-4ac4-
08d3817de4cb x-microsoft-antispam:
UriScan:;BCL:0;PCL:0;RULEID:(1601124038)(5061506196)(5061507196)(1603
103041)(1603101087)(1601125047);SRVR:HE1EUR01HT174; x-exchange-
antispam-report-cfa-test:
BCL:0;PCL:0;RULEID:(432015012)(102415293)(102615271)(82015046);SRVR:H
E1EUR01HT174;BCL:0;PCL:0;RULEID:;SRVR:HE1EUR01HT174; x-forefront-

```
prvs: 09497C15EB Content-Type: multipart/mixed;
       boundary="_004_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB
249eurprd_" MIME-Version: 1.0 X-OriginatorOrg: hotmail.com X-MS-
Exchange-CrossTenant-originalarrivaltime: 21 May 2016 13:43:29.6295
(UTC) X-MS-Exchange-CrossTenant-fromentityheader: Internet X-MS-
Exchange-CrossTenant-id: 84df9e7f-e9f6-40af-b435-aaaaaaaaaaaa X-MS-
Exchange-Transport-CrossTenantHeadersStamped: HE1EUR01HT174 Return-
Path: priyatel@hotmail.com X-OriginalArrivalTime: 21 May 2016
13:43:32.0389 (UTC) FILETIME=[C3D33550:01D1B366]  --
_004_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB249eurprd_
Content-Type: multipart/alternative;
       boundary="_000_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB
249eurprd_"  --
_000_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB249eurprd_
Content-Type: text/plain; charset="iso-8859-1" Content-Transfer-
Encoding: quoted-printable    --
_000_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB249eurprd_
Content-Type: text/html; charset="iso-8859-1" Content-Transfer-
Encoding: quoted-printable <html> <head> <meta http-
equiv=3D"Content-Type" content=3D"text/html; charset=3Diso-8859-= 1">
<style type=3D"text/css" style=3D"display:none;"><!-- P {margin-
top:0;margi= n-bottom:0;} --></style> </head> <body dir=3D"ltr"> <div
id=3D"divtagdefaultwrapper" style=3D"font-
size:12pt;color:#000000;back= ground-color:#FFFFFF;font-
family:Calibri,Arial,Helvetica,sans-serif;"> <p></p> <div
id=3D"divtagdefaultwrapper" style=3D"font-
size:12pt;color:#000000;back= ground-color:#FFFFFF;font-
family:Calibri,Arial,Helvetica,sans-serif;"> <p><br> </p> </div>
<p></p> </div> </body> </html>  --
_000_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB249eurprd_--  --
_004_DB4PR07MB249EC15C4C264F027F1D709C14C0DB4PR07MB249eurprd_
Content-Type: application/pdf; name="otpriqtel.pdf" Content-
Description: otpriqtel.pdf Content-Disposition: attachment;
filename="otpriqtel.pdf"; size=114841;        creation-date="Sat, 21
May 2016 13:42:16 GMT";       modification-date="Sat, 21 May 2016
13:42:16 GMT" Content-Transfer-Encoding: base64
```

# EXHIBIT 41

**Фрея** **Freya**
**Транслейшънс** **Translations**

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

Republic of Bulgaria, Varna, 3 Nikola Yonkov Vaptsarov St.,
Office Centre, 8th floor, office 22; tel.: +359 52 712 666; fax: +359 52 712 533;
Email: zachari.tomov@gmail.com

Our ref. 355 dated 21 June 2016
*Sent by courier!*

**TO:**      The Sofia City Court
           Commercial Division
           Panel VI-12
           In case 3242/2015

**Attn:**      Judge Plamen Kolev

**Parties to**      UniCredit Bulbank AD, Claimant
**the above**
**case:**      First Investment Bank AD, Respondent

*Re:*      *Disposal of a property right from the bankruptcy estate of Ayr*
           *Property Development AD (b) undergoing bankruptcy proceedings in*
           *case 730/2013 before the Shumen District Court*

## MOTION TO DISMISS

Dear Judge,

I, the undersigned Zahari Tomov, attorney at law, am acting as duly retained counsel for the Trustee in bankruptcy for Ayr Logistics Limited, Inc. Jeffrey H. Mims (Ayr Trustee) in the bankruptcy proceedings in case No.14-34940-bjh-7 before the US Bankruptcy Court for the Northern District of Texas, USA.

*Please see* the documentary proofs of the above: **Exhibit 1** (A Form of 10th October 2014 showing that case No.14-34940-bjh-7 has been opened); **Exhibit 2** (US Bankruptcy Court Order of 10th May 2016 as issued in case No.14-34940-bjh-7 granting Ayr Trustee's Motion to employ Zahari Tomov as Ayr Trustee's Special Counsel for Bulgaria);



2

Pursuant to Art.758 of the Bulgarian Commercial Law (a.k.a. "Commercial Act", hereinafter the "Bulgarian CA") I hereby respectfully submit Ayr Trustee's motion to show the Court as follows:

1.  Trustee Jeffrey H. Mims has full powers to handle Ayr's bankruptcy estate, the latter being inclusive of Ayr's rights in Ayr Property Development AD ("APD") as the main creditor and owner of APD.

    *Please see* **Exhibit 3** (List of APD Creditors as of 9th July 2014), **Exhibit 4** (List of APD Creditors as of 29th January 2016) and **Exhibit 5** (Register of Shareholders in APD);

2.  The property rights held in the bankruptcy estate of Ayr Logistics Limited, Inc. ("Ayr's estate") fall within the reach of the US Bankruptcy Code as confirmed by the US Bankruptcy Court for the Northern District of Texas, USA ("US Bankruptcy Court") in the latter's Court Order entered on 17th June 2016 in case No.14-34940-bjh-7 under No.35 in the docket of said court;

    *Please see* **Exhibit 6** (US Bankruptcy Court Order Granting *Trustee's Expedited Motion to (i) enforce the protections of the automatic stay and (ii) confirm the jurisdiction of the bankruptcy court to determine property of the estate* entered on 17th June 2016 in Case No.14-34940-bjh-7;

3.  In due exercise of his powers Ayr Trustee submitted formal requests on January 7th 2016 and March 3rd 2016, respectively, seeking to elucidate the following matters:

    •   The legitimacy, if any, of the disposal on the part of First Investment Bank AD ("FIB") in its own favour of the rights in the bank accounts with holder APD in the amount of BGN 102, 966,945.59; and

    •   The legitimacy, if any, of the debts claimed against the property of the bankruptcy estate of Ayr Property Development AD ("APD's estate") by Unicredit Bulbank AD ("Bulbank") proof of which is required as set forth in Art.1.1 and Art.1.3 of the *Agreement of 1st November 2010*, pursuant to which Bulbank has been allowed as a registered creditor of APD.

    *Please see* **Exhibit 7** (Ayr Trustee's letter of 7th January 2016) and **Exhibit 8** (Ayr Trustee's letter of March 3rd, 2016);

4.  None of the requests made in said Ayr Trustee's letters – the requests so made being essentially an exercise of the powers vested in the Trustee by the US Bankruptcy Code and by the acts of the US Bankruptcy Court – have been responded to, yet.

5.  As APD Creditors Committee's Report of 7th June 2016 (said Report being prepared in furtherance of the direction given in Ruling No.212 of 31st May



2016 issued by the Shumen District Court in case 730/2013) showed, FIB's acts of disposal of the rights held in APD's bank accounts in FIB's own favour has been severely detrimental to APD, its creditors and its owner alike.

*Please see* **Exhibit 9** (APD Creditors Committee's Report of 7th June 2016);

6. As the documentary proof attached to APD Creditors Committee Report (namely the APD Creditors Committee's Resolution passed on 5th May 2015 and duly approved by Bulbank itself at that) show FIB owes to APD's estate the amount of BGN 102, 966,945.59.

*Please see* **Exhibit 10** (APD Creditors Committee's Resolution of on 5th May 2015);

7. The declarations submitted along with APD Creditors Committee's Report of 7th June 2016 make a reference to the provisions of Art.681 and Art.683 of the Bulgarian CA, which prohibit the members of the creditors' committee to acquire in any way either directly or through another person, or throught any transactions and/or series of transaction, or though any other means a property or any right from APD bankruptcy estate.

8. Accordingly and pursuant to 11 U.S.C § 541 and §362 Ayr Trustee is only exercising his powers to protect the rights held by Ayr and duly claimed in APD's bankruptcy proceedings.

The action initiated by FIB and Bulbank aiming to dispose of the property rights from APD's estate by opening case No.3234/2015 in the Sofia City Court, now before Panel VI-12 of said court, is, without doubt, harmful and severely detrimental to the rights in question.

Pursuant to Art.758 of the Bulgarian CA Ayr Trustee's powers to protect the rights enforceable against and due and payable by APD's estate are definitely something to be reckoned and complied with in APD's bankruptcy proceedings, namely (quote): *"A receiver in bankruptcy appointed in a decision of a foreign court shall have the rights envisaged in the state where the bankruptcy proceedings are instituted, to the extent they do not contradict the public order rules of the Republic of Bulgaria."*

9. Relying on the US Bankruptcy Code and invoking the provisions of Chapter 52, Part Four of the Bulgarian CA, we request from the Court to order FIB and Bulbank to cease and desist their actions and the dismiss case No.3242/2015 in the docket of the Sofia City Court tried by Panel VI-12 for being harmful and detrimental to Ayr's rights held in APD as APD's owner and creditor.

In furtherance of the US Court Order of 17th June 2016 and by letters of 347 dated 20th June 20166 addressed to UniCredit Bulbank and No.354 of 21st

June 2016 addressed to First Investment Bank AD I have caused said US Court Order to be served by e-mail and by courier accordingly.

In view of the gravity of the warning given by the US Court Order I hereby attach copies of the above-mentioned letters to be served through the Sofia City Court, Panel VI-12, on the parties to Case 3242/2015 at the hearing set to 24th June 2016.

10. The claim Bulbank has asserted against FIB and the settlement agreement as negotiated by and between Bulbank and FIB which is subject to court approval, are equally harmful to APD creditors rights to claim payment and collect on the debts owed to them from the property of APD's estate.

11. The disposal by FIB in its own favour of the rights held in APD's bank accounts and the so initiated lawsuit intended to re-distribute the money in the amount of BGN 102, 966,945.59 otherwise owed to APD's estate and its creditors – what the above indicated settlement agreement negotiated by and between the two banks seeking the court's approval essentially is about – are still very much going and under way, despite the fact that APD's bankruptcy proceedings has been duly notified and warned of all consequences of Ayr's bankruptcy case No.14-34940-bjh-7 as opened on 10th October 2014 in the US Bankruptcy Court for the Northern District of Texas.

What it means is that these are wilfully initiated actions against Ayr's estate and its creditors for the purpose of depriving Ayr of its legitimate claim as APD's owner and creditor thus stripping Ayr's creditors of their lawful rights to have their claims satisfied, accordingly.

12. In their essence those actions constitute a wrongful disposal of somebody else's rights, hence harmful to both the owner of APD and APD's creditors (per Art.760 of the Bulgarian CA) alike. On that account only Ayr Trustee has the full power to demand from any such wrongdoing party to cease and desist any and all actions that might obstruct, restrict or deprive Ayr's estate of the right to obtain the payment owed to it by and from APD's estate.

13. Bulbank's conduct, its claim purportedly filed against FIB, but in reality seeking a redistribution of the money in the amount of BGN 102, 966,945.59, which FIB wrongfully caused to be disposed of in its own favour, and the settlement agreement being negotiated by and between the two banks in case 3242/2015 alike are all acts committed in gross violation of Art.683 of the Bulgarian CA.

RELIEF SOUGHT:

In view of the foregoing and for the reasons stated hereinabove we feel compelled to respectfully, but insistently seek from the Court the following relief:

The Sofia City Court, Panel VI-12, is respectfully asked to **DISMISS AS INADMISSIBLE** the lawsuit initiated by UniCredit Bulbank AD against First Investment Bank AD, i.e. the _UniCredit Bulbank AD v. First Investment Bank AD_ case No.3243/2015 - which court action has been brought to seek recovery of money in the amount of BGN 102, 966,945.59 which FIB misappropriated by having wrongfully disposed of such money in its own favour and which money FIB owes to APD's bankruptcy estate on account of the fact that said money are legitimately owed and payable to APD's owner and APD's creditors, instead.

The Sofia City Court, Panel VI-12, is respectfully asked to **DENY the Motion To Approve The Settlement Agreement** negotiated by and between UniCredit Bulbank AD and First Investment Bank AD in case 3243/2015 - which court action has been brought to seek recovery of the money in the amount of BGN 102, 966,945.59 which FIB misappropriated by having wrongfully disposed of such money in its own favour and which money FIB owes to APD's bankruptcy estate on account of the fact that said money are legitimately owed and payable to APD's owner and APD's creditors, instead.

_Proofs in support of this Motion:_

1. A printout from the Electronic Filing System of the US Bankruptcy Court for the Northern District of Texas showing that Ayr Logistics Limited filed for bankruptcy on 10th October 2014 and that case No.14-34940-bjh-7 has commenced accordingly;

2. US Bankruptcy Court Order of 10th May 2016 as issued in case No.14-34940-bjh-7 granting Ayr Trustee Motion to employ Zahari Tomov as Ayr Trustee's Special Counsel for Bulgaria;

3. List of APD Creditors as of 9th July 2014;

4. List of APD Creditors as of 29th January 2016;

5. Register of Shareholders in APD;

6. US Bankruptcy Court Order dated 17th June 2016 as entered in Case 14-34940-bjh-7;

7. Ayr Trustee's letter of 7th January 2016;

8. Ayr Trustee's letter of March 3rd, 2016;

9. APD Creditors Committee's Report of 7th June 2016 (Minutes of Work Meeting)

_Attached hereto are:_





6

A. A copy of this Motion completed with the proofs in support hereof to be served on First Investment Bank AD;

B. A copy of this Motion completed with the proofs in support hereof to be served on UniCredit Bulbank AD;

C. Letter of ref.347 dated 20th June 20166 addressed to UniCredit Bulbank and a copy thereof for court purposes;

D. Letter of ref.354 of 21st June 2016 addressed to First Investment Bank AD and a copy thereof for court purposes.


Respectfully,
*(Sgd.)*
Zahari Tomov, Attorney at Law
Ayr Logistics Limited, Inc. Trustee's Special Bulgarian Counsel

Cc:   Jeffrey H.Mims
Trustee for Ayr Logistics Limited Inc.
Chapter 7 US Bankruptcy Code
jeffm@chfirm.com

Cc:   Dr Kristian W.Gluck
kristian.gluck@nortonrosefulbright.com

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attests that this is a true and correct translation from Bulgarian into English of the attached document – Ayr's Motion to Dismiss of ref. 355 dated 21ª June 2016 to the Sofia City Court. This translation has six [6] pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*

**Република България, гр.Варна, улица Никола Йонков Вапцаров № 3,
офисен център, етаж 8, офис № 22, тел:+35952712666,
факс: +35952712533, Е-мейл : zachari.tomov@gmail.com**

Изх. № 355/ 21.06.2016 г.!
*Изпратено по куриер !*

До:      **Софийски градски съд**
           Търговско отделение, VI-12 състав
           **Търговско дело № 3242/2015 г.**

На вним. на:  Почитаемия съдия Пламен Колев

Страни:     УниКредит Булбанк АД – ищец
             Първа Инвестиционна Банка АД - ответник

**Относно:** Разпореждане с имуществено право от масата на несъстоятелността
          на Еър Пропърти Девелопмънт АД, несъстоятелност, т.д.№ 730/
          2013 г., водено пред Шуменски окръжен съд.

**Почитаеми г-н Съдия,**

    Долуподписаният адвокат Захари Томов, съм назначен в това ми качество да представлявам в България, г-н Джефри Х.Мимс, Синдик на Еър Лоджистикс Лимитед Инк. (Еър), в производство по несъстоятелност, водено пред Федералния съд по несъстоятелността за Северен окръг на щата Тексас, САЩ, Дело № 14-34940-bjh-7.

    **Виж доказателства: № 1** (Формуляр от 10.10.2014 г. за образуване на Дело 14-34940-bjh-7 ) - **№ 2** (Разпореждане от 10.05.2016 г. на Съда по Дело № 14-34940-bjh-7 за назначаване на адвокат Захари Томов за особен представител на Синдика на Еър, за България)

    Съответно с разпоредбата на чл.758 от ТЗ на България, представям следната молба на Синдика на Еър Лоджистикс Лимитед Инк. :

    **1.** В обхвата на масата на несъстоятелността и на правомощията на Синдик Джефри Х.Мимс, попадат и правата на Еър Лоджистикс Лимитед Инк. (Еър), като основен кредитор и собственик на Еър Пропърти Девелопмънт АД (ЕПД).

1

**Виж** доказателства: **№ 3** (Списък на кредиторите на ЕПД от 09.07.2014 г.) – **№ 4** (Списък на кредиторите от 29.01.2016 г. на ЕПД) – **№ 5** (Акционерна книга на ЕПД)

**2.** Имуществените права в масата на несъстоятелността на Еър са под юрисдикцията на Закона за несъстоятелността на САЩ, както това е потвърдено с издадената на дата 17.06.2016 г. от Федералния съд по несъстоятелността за Северен окръг на щата Тексас, САЩ, по Дело №14-34940-bjh-7, съдебна заповед, с пореден номер на вписване 35.

**Виж** доказателство **№ 6** (Заповед на Съда по Дело №14-34940-bjh-7 от дата 17.06.2016 г., с която се уважава спешната молба на Синдика на Еър Лоджистикс Лимитед Инк, за (I) прилагане на обезпечителната мярка служебно спиране на производството и (II) за утвърждаване юрисдикцията на съда по несъстоятелността за произнасяне по имуществото в масата на несъстоятелността )

**3.** Съответно с правомощията си, Синдикът на Еър Лоджистикс Лимитед Инк., на дата 07.01.2016 г. и на дата 03.03.2016 г. е направил официални постъпки за изясняване на следните положения :

- Легитимността на извършените към, от и в полза на Първа Инвестиционна Банка АД разпореждания с правата по банковите сметки на ЕПД, на стойност 102 966 945.59 лева;
- Легитимацията на задълженията на имуществото в масата на несъстоятелността на ЕПД към УниКредит Булбанк АД, дължима и изисквана с клаузите на параграфи 1.1. и .1.3 от Споразумението от 01.11.2010 г., въз основа на което споразумение УниКредит Булбанк АД е конституиран като кредитор на ЕПД;

**Виж** доказателства: **№ 7** ( Писмо на Синдика на Еър от 07.01.2016 г.) – **№ 8** ( Писмо на Синдика на Еър от 03.03.2016 г.)

**4.** Понастоящем тези искания на Синдика на Еър Лоджистикс Лимитед Инк., които по същество упражняват правомощия, предоставени му от Закона за несъстоятелността на САЩ и актовете на Федералния съд по несъстоятелността за Северен окръг на щата Тексас, продължават да стоят без отговор.

**5.** Както е посочено в доклада на Комитета на кредиторите на ЕПД, от 07.06.2016 г., изготвен в изпълнение на Определение № 212/31.05.2016 г., постановено по т.д.№ 730/2013 от Шуменски окръжен съд, разпоредителните действия по прехвърляне към, от и в полза на Първа Инвестиционна Банка АД, права по банковите сметки на ЕПД, са осъществени във вреда на ЕПД, неговите кредитори и собственик.

**Виж** доказателство **№ 9** (Доклад на Комитета на кредиторите на ЕПД от 07.06.2016 г.)

**6.** Съгласно приложените към доклада на Комитета на кредиторите на ЕПД доказателства (Решението на Комитета на кредиторите, от 05.05.2015 г.,

2

одобрено и от УниКредит Булбанк АД), Първа Инвестиционна Банка АД е задължена към масата на несъстоятелността на ЕПД със 102 966 945.59 лева.

**7.** Депозираните с доклада на Комитета на кредиторите от 07.06.2016 г. декларации, препращат към разпоредбите на чл.681 и чл.683 от ТЗ, като последната се отнася до забраната, членове на Комитета на кредиторите да участват лично, или чрез други лица, пряко, косвено, или по какъвто и да е друг начин, в сделки и/или комбинация от сделки и действия, насочени и имащи за предмет придобиване на имуществени права от масата на несъстоятелността на ЕПД.

**8.** Съответно с горното и съгласно чл.541 и чл.362 от Закона за несъстоятелността на САЩ, Синдикът на Еър упражнява възложените му правомощия в  защита правата в масата на несъстоятелността, с които Еър е представен в производството по несъстоятелност на ЕПД.
Предприетите от Първа Инвестиционна Банка АД и УниКредит Булбанк АД действия на разпореждане с имуществените права от масата на несъстоятелността на ЕПД, предмет на т.д.№ 3242/2015 г., водено пред Софийски градски съд, VI-12 състав, несъмнено имат увреждаща насоченост и ефект по отношение на тези права.
Правомощията на Синдика на Еър Лоджистикс Лимитед Инк, отнасящи се до защитата на правата, с чието изплащане е задължено имуществото в масата на несъстоятелността на ЕПД, са задължителни за производството по несъстоятелност на ЕПД, съгласно чл.758 от ТЗ (*Синдикът, назначен по чуждестранно съдебно решение, има дадените права от държавата, където е открито производството по несъстоятелност, доколкото те не противоречат на правилата на обществения ред в Република България*).


**9.** Позовавайки се на Закона на САЩ за банкрута;  за глава 52 в част четвърта от ТЗ, настояваме да бъдат преустановени предприетите от УниКредит Булбанк АД и Първа Инвестиционна Банка АД действия, предмет на т.д.№ 3242/2015 г., водено пред Софийски градски съд, VI-12 състав, тъй като същите се осъществяват във вреда на имуществените права на Еър като кредитор и собственик на ЕПД.
Съобразено със Заповедта, с писмо № 347/20.06.2016 г., адресирано до УниКредит Булбанк АД и писмо № 354/21.06.2016 г., адресирано до Първа Инвестиционна Банка АД, извърших нейното връчване по e-mail и по куриер.
**С оглед сигурността на предупредителния характер на разпорежданията, дадени със Заповедта, прилагам в препис тези уведомителни писма, за връчване чрез Софийски градски съд, VI-12 състав, на страните по т.д. № 3242/2015 г., на насроченото за 24.06.2016 г. съдебно заседание.**

**10.** Както предявеният иск от УниКредит Булбанк АД, така и подготвяната спогодба между УниКредит Булбанк АД и Първа Инвестиционна Банка АД, чието одобрение се иска от съда, имат увреждащ характер по отношение правата на кредиторите да изискат и получат плащане от имуществото в масата на несъстоятелността на ЕПД.

**11.** Действията на разпореждане към, от и в полза на Първа Инвестиционна Банка АД, с правата по банковите сметки на ЕПД, както и действията за преразпределяне на длъжимите към масата на несъстоятелността и нейните кредитори 102 966 945,59 лева, каквото в същността си представлява исканото одобрение на спогодбата между двете банки, са извършени и продължават да се осъществяват, след като производството по несъстоятелност на ЕПД е уведомено за последиците на образуваното на 10.10.2014 г., пред Федералния съд по несъстоятелността за Северен окръг на щата Тексас, производство по банкрут на Еър, Дело №14-34940-bjh-7.

Т.е. същите са преднамерено предприети срещу правото на масата на несъстоятелността на Еър и неговите кредитори, да получат плащане, съответно на правата на Еър като кредитор и собственик на ЕПД.

**12.** Тези действия в същността си представляват разпореждане с чужди имуществени права, с пряк ефект на увреждане на правата на кредиторите и собственика на ЕПД (чл.760 от ТЗ), като Синдикът на Еър има правомощията да иска преустановяване на всяко действие, което възпрепятства, ограничава, или лишава правото на масата на несъстоятелността на Еър да получи дължимото й от масата на несъстоятелността на ЕПД плащане.

**13.** Действията на УниКредит Булбанк АД, предявения иск за преразпределяне на разпоредените от и в полза на Първа Инвестиционна Банка АД, 102 966 945, 59 лева, както и подготвената за това спогодба между двете банки, предмет на т.д.№ 3242/2015 г., са в драстично нарушение на чл.683 от ТЗ.

Ето защо сме принудени да представим следната настоятелна молба,

## ПЕТИТУМ:

Молим **ПОЧИТАЕМИЯ СОФИЙСКИ ГРАДСКИ СЪД**, VI- 12 състав, да постанови **прекратяване като недопустимо, на воденото от УниКредит Булбанк АД срещу Първа Инвестиционна Банка АД, исково производство**, предмет на т.д.№ 3242/2015 г., имащо за предмет задължението на Първа Инвестиционна Банка АД да възстанови в масата на несъстоятелността на Еър Пропърти Девелопмънт АД, разпоредените от нея и в нейна полза 102 966 945,59 лева, които средства са задължени към кредиторите и собственика на Еър Пропърти Девелопмънт АД.

Молим **ПОЧИТАЕМИЯ СОФИЙСКИ ГРАДСКИ СЪД**, VI- 12 състав, да постанови **отказ по искането за одобряване на спогодбата между УниКредит Булбанк АД и Първа Инвестиционна Банка АД**, исково производство, предмет на т.д.№ 3242/2015 г., имаща за предмет задължението на Първа Инвестиционна Банка АД да възстанови в масата на несъстоятелността на Еър Пропърти Девелопмънт АД, разпоредените от нея и в нейна полза 102 966 945,59 лева, които средства са задължени към кредиторите и собственика на Еър Пропърти Девелопмънт АД.

4

**Доказателства:**

**№ 1** – Извлечение от електронния регистър на Федералния съд по несъстоятелност за Северен окръг на щата Тексас, САЩ, удостоверяващо, че от 10.10.2014 г., Еър Лоджистикс Лимитед Инк. е в производство по банкрут, Дело 14-34940-bjh-7 ;

**№ 2** - Разпореждане от 10.05.2016 г. на Съда по Дело № 14-34940-bjh-7 за назначаване на адвокат Захари Томов за особен представител на Синдика на Еър, за България;

**№ 3** - Списък на кредиторите на ЕПД от 09.07.2014 г.;

**№ 4** - Списък на кредиторит от 29.01.2016 г. на ЕПД;

**№ 5** - Акционерна книга на ЕПД;

**№ 6** - Заповед на Съда по Дело №14-34940-bjh-7 от дата 17.06.2016 г. ;

**№ 7** - Писмо на Синдика на Еър от 07.01.2016 г.;

**№ 8** - Писмо на Синдика на Еър от 03.03.2016 г.;

**№ 9** - Доклад на Комитета на кредиторите на ЕПД от 07.06.2016г.

**Приложения:**

(А) Препис от настоящата молба, ведно с доказателствата към нея за Първа Инвестиционна Банка АД.

(Б) Препис от настоящата молба, ведно с доказателствата към нея за УниКредит Булбанк АД.

(В) Писмо реф. № 347/20.06.2016 г., адресирано до УниКредит Булбанк АД, придружено с препис за съда.

(Г) Писмо реф. № 354/21.06.2016 г., адресирано до Първа Инвестиционна Банка АД, придружено с препис за съда

С почит:

Адв. Захари Томов

**Копие до**: г-н Джефри Х.Мимс
Синдик на масата на несъстоятелността на
Еър Лоджистикс Лимитед Инк., съгласно Глава 7 на ЗН на САЩ
jeffm@chifrm.com

Адв. Крисчън У. Глук
kristian.gluck@nortonrosefulbright.com

5

# EXHIBIT 42



*Фрея*
*Translations*
*Фрея*
*Транслейшънс*

**Преводи от и на чужди езици**
гр. Варна, бул. Св.Св. Кирил и Методий № 1
Email: freyatranslations@gmail.com

<div align="right"><u>*Translation from Bulgarian*</u></div>

| To: **UNICREDIT BULBANK AD** | Unique Reg. No.: --- |
|---|---|
| Branch: --- | Date: **26 November 2015** |
| Address: **Sofia** | Originator's seal and signature: /s/ (*ill.*) |

| Pay to: (*name of Payee*): **THE SHUMEN DISTRICT COURT** |
|---|

| Payee's IBAN: **BG38BUIN70143330202334** | Payee's bank BIC: **BUINBGSF** |
|---|---|

| At the bank of (*Payee's banker*): **ALLIANZ BANK BULGARIA AD** |
|---|

| **PAYMENT ORDER/DEPOSIT SLIP**<br>**For payment to/from the national budget** | Currency<br>**BGN** | Amount (in digits)<br>**22,520.00** |
|---|---|---|

| Amount (in words): **Twenty Two Thousand Five Hundred and Twenty** Bulgarian Levs |
|---|

| Details of payment: **Payment to resume Ayr Property Development AD bankruptcy proceedings in Case No.730/2013 with the Shumen District Court**<br>More details: ---- |
|---|

| Liable person/entity (natural or legal person's full names):<br>**UNICREDIT BULBANK AD**<br>Liable Person's BULSTAT: **831919536** |
|---|

| Originator (natural or legal person's full names):<br>**UNICREDIT BULBANK AD** |
|---|

| Originator's IBAN:<br>BG56UNCR70001621606941 | Originator's bank BIC: **UNCRBGSF** |
|---|---|
| Payment system: --- | Date of Payment: **26th November 2015** |
| Accountant: --- | Cashier: --- |

<div align="center">*Round seal (ill.)*</div>

*The undersigned Ilka Simeonova Dyulgerova hereby certify that the above is an exact and accurate English translation of the Bulgarian original - Payment Order/deposit slip dated 26th November 2015 showing payment made to resume APD bankruptcy proceedings with the ShDC in Case 730/2013 - and that I am competent in both English and Bulgarian language to render such translation. This translation has 1 (one) page.*

Translator: _____ *Ilka Simeonova Dyulgerova*



До **УниКредит Булбанк АД**
банка

Клон                                                      уникален регистрационен номер

**26.11.2015 г.**
дата на представяне

Адрес **София**

Платете на - име на получателя
**ШУМЕНСКИ ОКРЪЖЕН СЪД**                    Подпис на наредителя

IBAN на получателя                                          Чуждестранно лице
**BG38BUIN70143330202334**                         по смисъла на
                                                         Валутния закон
При банка - име на банката на получателя        BIC на банката на получателя
**АЛИАНЦ БАНК БЪЛГАРИЯ**                        **BUINBGSF**

                                                         Вид плащане

| **ПРЕВОДНО НАРЕЖДАНЕ/ВНОСНА БЕЛЕЖКА** за плащане от/към бюджета | Вид валута **BGN** | Сума **22520.00** |
|---|---|---|

Сума с думи
**двадесет и две хиляди и петстотин и двадесет лева**

Основание за плащане
**подновяване произв. По несъстоятелност срещу Еър Пропърти дивелъпмънт АД /н/,**
**т.д.№730/2013г на ШОС**

Още пояснения

Вид* и номер на документа, по който се плаща                     Дата на документа

Период за който се плаща
от дата (ддммгггг)                                         До дата (ддммгггг)

Задължено лице-наименование на юридическото лице или трите имена на физ. лице     Чуждестранно лице
**УниКредит Булбанк АД**                                     по смисъла на
                                                         Валутния закон
БУЛСТАТ на задълженото лице    ЕГН на задълженото лице    ЛНЧ на задълж. лице
**831919536**

Наредител-наименование на юридическото лице или трите имена на физ. лице
**УниКредит Булбанк АД**

IBAN на наредителя
**BG56UNCR70001621606941**                         BIC на банката на наредителя
                                                         **UNCRBGSF**

Платежна система

| | Такси** | Дата за изпълнение | Вид плащане |
|---|---|---|---|
| | | **26.11.2015 г.** | |

Счетоводител                          Касиер

# EXHIBIT 43



## Фрея f Freya
## Транслейшънс  Translations

**Преводи от и на чужди езици**
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com, freyatranslations@abv.bg

*Translation from Bulgarian*

## RULING No.545
### Town of Shumen, 2nd December 2015

The Shumen District Court, Commercial Divisions sitting in camera on second of December 2015 and panel composed of:

Presiding Judge: Konstantin Mollov

heard commercial case No.730 in the docket of the above court for 2013 as briefed by the reporting judge Konstantin Mollov and in order to deliver a judgment the instant court looked into the following:

By virtue of Decision No. 154 of 2nd December 2015 and pursuant to Art.632, Para 2 of the Commerce Act (CA) the court resumed the bankruptcy proceedings, subject matter of this case, as result of the fact that on 26th November 2015 the creditor UniCredit Bulbank AD deposited the amount of 22,520.00 Bulgarian levs as determined by the court in the instant court's Ruling of 27th October 2014 made under Art.629b CA, which funds were required to cover the bankruptcy proceeding costs.

After UniCredit Bulbank AD lodged their motion, the creditor Silver Beach EAD lodged another motion under Art.632Para 2 CA of filing No.5904 of 30th November 2015, where a property of the debtor was indicated, against which according to the movant actions for collection and liquidation could be taken.

In view of the foregoing Mr. Martin Milchev Apostolov, acting as the Trustee in Bankruptcy for Ayr Property Development AD (declared bankrupt), having EIK 200958720, Targovishte, should be directed to specify and indicate a special bank account to which UniCredit Bulbank AD shall remit the amount of BGN 22,500.00 upon entry into full force and effect of the court decision to resume the proceeding in the case.

Then, the trustee in bankruptcy having examined the data contained in the motion of Silver Beach EAD, shall submit to the Bankruptcy Court a report on the amount of money needed to cover the costs of the bankruptcy proceeding for a year ahead, the latter period commencing on the date when the Decision of the Court to resume the proceedings enters into full force and effect. Beside the costs for trustee's remuneration and accounting services, this report must show the amount of money needed for taking all appropriate actions to ensure collection and liquidation of pertinent property, as well as for all anticipated costs in filing lawsuits to collect the amounts due and replenish the bankruptcy estate. This report should be submitted to the Court within two week's period after the receipt of this Ruling.

In view of the foregoing and pursuant to Art.252 of the Civil Procedure Code (CPC) with reference to Art.621 CA, the Shumen District Court

### RULED as follows:

**Martin Milchev Apostolov, Trustee in Bankruptcy for Ayr Property Development AD** (declared bankrupt) of EIK (Company number): 200958720, the town of Targovishte, **IS DIRECTED** to specify and indicate a special bank account,

2

to which UniCredit Bulbank AD shall remit the amount of BGN 22,500.00 upon entry into full force and effect of the court decision to resume the proceeding in the case.

**Martin Milchev Apostolov, Trustee in Bankruptcy for Ayr Property Development AD** (declared bankrupt) of EIK (Company number): 200958720, the town of Targovishte, **IS DIRECTED** to submit within a two-week's period after the receipt of this ruling a report on the amount of money needed to cover the costs of the bankruptcy proceeding for a year ahead, the latter period commencing on the date when the Decision of the Court to resume the proceedings enters into full force and effect.

The Trustee's report must show the amount of money needed for taking all appropriate actions to ensure collection and liquidation of pertinent property, as well as for all anticipated costs in filing lawsuits to collect the amounts due and replenish the bankruptcy estate.

A copy of the Ruling and a copy of SEEK Foundation, LLC's Motion shall be sent to the permanent Trustee in Bankruptcy.

This Ruling shall be entered in the book kept under Art.634c, Para 1 CA.


**District Judge:** (signed ill.)

---

*The undersigned, Boryana Ilieva Stefanova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Ruling No.545 dated 2nd December 2015 issued by the Shumen District Court in case 730. This translation has 2 (two) pages.*

*Translator:*
   *Boryana Ilieva Stefanova*

*б715*

**О П Р Е Д Е Л Е Н И Е**
гр. Шумен 02.12.2015 г.

Шуменски окръжен съд, търговско отделение, в закрито заседание на втори декември две хиляди и петнадесета година в състав:

Окръжен съдия:  Константин Моллов

като разгледа докладваното от съдията Константин Моллов т. дело № 730 по описа за 2013 г. за да се произнесе, взе предвид:

С Решение № 154 от 02.12.2015 г. на основание чл.632, ал.2 от ТЗ е възобновил производството по несъстоятелност, предмет на настоящото дело, предвид обстоятелството, че кредиторът "Уникредит Булбанк" АД е внесъл определената от съда, с определението му от 27.10.2014 г. по чл. 6296 от ТЗ, сума за покриване на текущите разноски в размер на 22 520.00 лв. на 26.11.2015 г.

След молбата на "Уникредит Булбанк" АД е постъпила молба по чл.632, ал.2 от ТЗ и от кредитора „Силвър бийч" ЕАД с вх. № 5904/30.11.2015 г., в която е посочено имущество на длъжника, за което според молителя следва да се предприемат действия за събирането и осребряването му.

С оглед на гореизложеното ще следва да се укаже на синдика на "Еър пропъртти девелопмънт" АД (в несъстоятелност), ЕИК 200958720, град Търговище Мартин Милчев Апостолов да уточни и посочи особената банкова сметка, по която след влизане в сила на решението за възобновяване на производството ще бъде преведена внесената от "Уникредит Булбанк" АД сума в размер на 22 520.00 лв.

На следващо място синдика, след анализ на данните съдържащи се в молбата на „Силвър бийч" ЕАД да представи на съда по несъстоятелността доклад за необходимата парична сума, която да покрие разноските на производството по несъстоятелност в рамките на една година, считано от датата, на която влезе в сила решението на съда за възобновяване на производството, като се вземат предвид не само разходите за възнаграждение на синдика и за счетоводно обслужване, но и необходимите суми за предприемане на съответните действия за събиране и осребряване на съответното имущество, включително и разноските по делата, които ще следва да бъдат заведени във връзка със събиране на имуществото и попълване масата на несъстоятелността. Докладът следва да бъде депозиран в съда в двуседмичен срок, считано от датата на получаване на настоящото определение.

Водим от горното, иа основание чл.252 от ГПК във вр. с чл.621 от ТЗ, Шуменският окръжен съд

**О П Р Е Д Е Л И :**

Указва на синдика на "Еър пропъртти девелопмънт" АД (в несъстоятелност), ЕИК 200958720, град Търговище Мартин Милчев Апостолов да уточни и посочи особената банкова сметка, по която след влизане в сила на решението за възобновяване на производството ще бъде преведена внесената от "Уникредит Булбанк" АД сума в размер на 22 520.00 лв.

Указва на синдика на "Еър пропъртти девелопмънт" АД (в несъстоятелност), ЕИК 200958720, град Търговище Мартин Милчев Апостолов, в двуседмичен срок,

1

считано от датата на получаване на настоящото определение да представи на съда по несъстоятелността несъстоятелността доклад за необходимата парична сума, която да покрие разноските на производството по несъстоятелност в рамките на една година, считано от датата, на която влезе в сила решението на съда за възобновяване на производството.

В доклада да бъде включени сумите необходими за предприемане на съответните действия за събиране и осребряване на съответното имущество, включително и разноските по делата, които ще следва да бъдат заведени във връзка със събиране на имуществото и попълване масата на несъстоятелността.

Препис от определението и от молбата на „Силвър бийч" ЕАД да се изпрати на постояния синдик.

Определението да се впише в книгата по чл.634в, ал.1 от ТЗ.

Окръжен съдия:

2

# EXHIBIT 44



### Фрея ꞙ Freya
### Транслейшънс ꞙ Translations
#### Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

<div align="right"><u>Translation from Bulgarian</u></div>

**Republic of Bulgaria, Varna, 3 Nikola Yonkov Vaptsarov St.,**
**Office Centre, 8ᵗʰ floor, office 22; tel.: +359 52 712 666; fax: +359 52 712 533;**
**Email: zachari.tomov@gmail.com**

<div align="right"><b>Ref.359 dated 24ᵗʰ June 2016</b></div>

## DELIVERY AND ACCEPTANCE STATEMENT

The undersigned:

**Kota Energy AD** having EIK (Company number): 201469650, seat and registered office address at Varna, 1 Mir St. (Nov Hlebozavod) as represented by the Executive Director Krassen Kassabov and a member of the Creditors Committee for Ayr Property Development AD (**"the Committee"**) in the latter Company's bankruptcy proceedings in case 730/2013 in the Shumen District Court, *and*

**Attorney Zahari Tomov** (Varna Bar) acting as the Special Bulgarian Counsel for the Trustee for Ayr Logistics Limited, Inc. in the bankruptcy proceeding in case No. 14-34940-bjh-7 before the U.S. Bankruptcy Court for the Northern District of Texas, USA, (**"Special Counsel"**),

Drew up and executed this <u>Delivery and Acceptance Statement</u> on this 24ᵗʰ June 2016 at 5.25 p.m. at Attorney Zahari Tomov's law office, for the following:

1. On 17ᵗʰ June 2016 the Shumen District Court issued a ruling as entered under No.380 in the Book kept under Art.634c of the Commercial Law on case 730/2013 ordering the parties involved to prepay the amount of BGN 30,000 to cover the costs of the proceedings in case 730/2013 (Ayr Property Development AD bankruptcy case).

2. Prepayment of the above-mentioned court costs was set as a mandatory requirement and failure to meet it would lead to suspension of the proceedings in case 730/2013.

3. Accordingly, [Attorney Zahari Tomov] handed the amount of BGN 30,000 in cash over to the Committee at 5.00 p.m. [on the date shown above] and the Committee undertook to deposit the said amount in the Special Bank Account for Ayr Property Development with UNICREDIT BULBANK AD and **IBAN:** BG59 UNCR 7000 1520 1153 99, **BIC:** UNCR BGSF with payment details as follows: ***"Prepayment of court costs in case 730/2013 in furtherance of the Shumen District Court Order issued on 17ᵗʰ June 2016"***.

4. The Special Counsel hereby declared that the amount of BGN 30,000 so delivered was from his personal money he earned with his legal practice.



This D&A Statement was drawn up and executed in two identical counterparts and each of the parties hereto shall retain one.

For the Committee:                          For the Special Counsel:

/s/                                         /s/

Krassen Kassabov,                           Attorney Zahari Tomov
Executive Director

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attests that this is a true and correct translation from Bulgarian into English of the attached document – D&A Statement of Ref. No.359 dated 24th June 2016. This translation has two (2) pages.*

Translator: _____ Ilka Simeonova Dyulgerova



**Republic of Bulgaria, Varna, 3 Nikola Yonkov Vaptsarov St.,
Office Centre, 8th floor, office 22, tel.: +359 52 712 666; fax: +359 52 712 533;
Email: zahari.tomov@gmail.com**

Реф. № 359/ 24.06.2016 г.

## ПРИЕМО-ПРЕДАВАТЕЛЕН ПРОТОКОЛ

Долуподписаните:

Кота Енерджи АД, ЕИК 201469650, със седалище и адрес на управление: гр.Варна, улица Мир № 1 (нов хлебозавод), представлявано от изпълнителния директор Красен Касабов, член на Комитета на кредиторите на Еър Пропърти Девелопмънт АД, в производство по несъстоятелност, водено пред Шуменски окръжен съд, т.д.№730/2013, означавани по –долу за удобство (**КК**), и

Адвокат Захари Томов, адвокакатска колегия –Варна, назначен за особен представител на Синдика на Еър Лоджистикс Лимитед Инк, производството по несъстоятелност, водено пред Федералния съд по несъстоятелност за Северен окръг на щата Тексас, САЩ, Дело № 14-34940-bjh-7, означаван по –долу (**Представляващия адвокат**)

Днес 24.06.2016 г., 17.25 часа,
 в адвокатския офис на адвокат Захари Томов , съставиха настоящия протокол за следното :

1. С определение на Шуменски окръжен съд, произнесено на 17.06.2016 г., с пореден номер на вписване 380 в книгата по чл.634в ТЗ, водена по т.д.№730/2013, е поставено изискване за предплащане на разноски в производството по несъстоятелност на Еър Пропърти Девелопмънт АД, в размер на 30 000 лев.

2. Предплащането на разноските е изискване, постановено с указания за спиране на производството по т.д.№730/2013 , в случай, че не бъде изпълнено.

3. В съответствие с горното в 17.00 часа, в брой и със задължение за внасяне на по особената банкова сметка на Еър Пропърти Девелопмънт АД, открита в УниКредит Булбанк АД, **IBAN:** BG59 UNCR 7000 1520 1153 99, **BIC:** UNCR BGSF, предаде на КК сумата от 30 000 лева , със следното платежно основание

: **Предплащане на рааноски по т.д.№730/2013, съгласно Определение на Шуменски окръжен съд от 17.06.2016.**

4. Предоставените средства на стойност 30 000 лева, Представляващият адвокат декларира като негово притежание с произход упражняваната от него адвокатска професия.

Настоящият протокол се състави и подписа в два еднообразни екземпляра , по един за КК и за Представляващия адвокат.

За КК                                                    За Представляващия адвокат

Красен Касабов –Изп.Директор                  Адвокат Захари Томов

# EXHIBIT 45



## Фрея Freya
## Транслейшънс Translations

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

### CREDITORS COMMITTEE FOR
### AYR PROPERTY DEVELOPMENT AD
**Bankruptcy proceeding in case 730/2013 in the Shumen District Court**

**Our ref.42 (*outgoing*)**
**Date: 27ᵗʰ June 2016**
*Sent on 25ᵗʰ June 2016*
*Fax:   + 359 54 850 322;*

**To:    THE SHUMEN DISTRICT COURT**

**In Re: Case 730/2013**

**Attn: Honoroubable District Judge Konstantin Mollov**

Cc:    Trustee for Ayr Property Development AD
       Mrs Ganka Kolyovska
       Sofia, Bulgaria
       syndic@abv.bg

Cc:    Trustee for Ayr Logistics Limited, Inc
       Mr Jeffrey Mims
       Dallas, Texas, USA
       jeffm@chfirm.com

### NOTICE TO CONFIRM PAYMENT

By:    **Kota Energy AD** having EIK (Company number): 201469650, seat and
       registered office address at Varna, 1 Mir St. (Nov Hlebozavod) as
       represented by the Executive Director Krassen Kassabov and a member of
       the Creditor Committee for Ayr Property Development AD

*Re:*   *Prepayment of BGN 30,000 (thirty thousand Bulgarian levs) effected on*
       *24ᵗʰ June 2016 to cover the costs of the bankruptcy proceedings for Ayr*
       *Property Development AD in case 730/2013 entertained by the Shumen*
       *District Court and made in furtherance of Ruling dated 17ᵗʰ June 2016*
       *(entered under No.380 in the Book kept under Art.634c of the*
       *Commercial Law)*

Dear District Judge,

Dear Trustees,

This is to respectfully advise you **that** on this 26ᵗʰ June 2016 we have paid the
amount of BGN 30,000 to cover the costs costs of the bankruptcy proceedings

for Ayr Property Development AD in case 730/2013 entertained by the Shumen District Court and made in furtherance of Ruling dated 17th June 2016 (entered under No.380 in the Book kept under Art.634c of the Commercial Law).

For lack of explicit court instructions as to what bank account the above amount should be paid into, we Kota Energy AD has ordered payment thereof to be made to the special bank account opened by Trustee Ganka Kolyovska (Trustee for APD) and shown below:

- Special account of Ayr Property Development AD (bankruptcy proceedings) with UNICREDIT BULBANK AD and details:

  IBAN: BG59 UNCR 7000 1520 1153 99

  BIC: UNCR BGSF

Please find attached the Payment Order dated 27th June 2016.

Respectfully:
/s/
Krassen Kassabov,
Executive Director

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Kota Energy AD's Notice to Confirm Payment of ref.42 dated 27th June 2016. This translation has 2 pages.*

*Translator:* _____ *Ilka Simeonova Dyulgerova*

**Комитет на кредиторите на Еър Пропърти Девелопмънт АД, в производство по несъстоятелност, водено пред Шуменски окръжен съд, търговско дело № 730/2013**

Изх. № 42/27.06.2016 г.
Изпратено на 25.06.2016 г.
Факс: + 359 54 850 322;

До:
Шуменски Окръжен съд
Търговско дело №730/2013 г.

На вниманието на :
Окръжен съдия Константин Моллов

С копие До:
Синдика на Еър Пропърти Девелопмънт АД
Г-жа Ганка Кольовска,
Гр.София , България,
Е-майл: **syndic@abv.bg**

С копие До:
Синдика на Еър Лоджистикс Лимитед Инк.,
Далас, щат Тексас, САЩ
Г-н Джефри Х. Мимс
Е-майл: **jeffm@chfirm.com**

## УВЕДОМИТЕЛНО ПОТВЪРЖДЕНИЕ
от

Кота Енерджи АД, ЕИК 201469650, със седалище и адрес на управление: гр.Варна, улица Мир № 1 (нов хлебозавод), представлявано от изпълнителния директор Красен Касабов, член на Комитета на кредиторите на Еър Пропърти Девелопмънт АД.

**Относно:** Извършена на 24.06.2016 г. вноска от 30 000 (тридесет хиляди лева), предплатени разноски по т.д. №730/2013 г., водено пред Шуменски окръжен съд, производство по несъстоятелност на Еър Пропърти Девелопмънт АД, съгласно Определение от 17.06.2016 г., вписано под номер 380 в книгата по чл.634в от ТЗ .

**ПОЧИТАЕМИ ГОСПОДИН ОКРЪЖЕН СЪДИЯ,**
**УВАЖАЕМИ СИНДИЦИ,**

С настоящото Ви уведомяваме за това, че днес 26.06.2016 г., внесохме сумата от 30 000 лева като предплащане на разноски в производството по несъстоятелност на Еър Пропърти Девелопмънт АД, търговско дело №730/2013, водено пред Шуменски окръжен съд, в изпълнение на произнесеното на 17.06.2016 Определение,  с пореден номер на вписване 380 в книгата по чл.634в ТЗ.

По причина на това, че в посоченото определение липсва изрично посочване на банковата сметка, по която следва да бъде внесена сумата от 30 000 лева, Ви уведомяваме, че тази сума е преведена от Кота Енерджи АД по особената банкова сметка, открита от Синдик Ганка Кольовска, в качеството й на синдик на Еър Пропърти Девелопмънт АД, а именно :

Особена сметка на "ЕЪР ПРОПЪРТИ ДЕВЕЛОПМЪНТ" АД
(производство по несъстоятелност), УНИКРЕДИТ БУЛБАНК АД,
IBAN: BG59 UNCR 7000 1520 1153 99
BIC:   UNCR BGSF

Приложено представяме платежно нареждане от 27.06.2016 г.

С Уважение:

Красен Касабов
(Изпълнителен директор)



# *Фрея* **F** *Freya*
## *Транслейшънс* *Translations*

### Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

| | |
|---|---|
| To: **Central Cooperative Bank AD ("CCB")** | Unique Reg. No.: **80802П-АЙ-4650** |
| Branch: **CCB AD – Varna Branch** | Date, time and place of submission: **27ᵗʰ June 2016, 10:04:47 hrs, Varna, Office of CCB Leasing** |
| Address: **58A Saborni Blvd., Varna** | |
| Printed by: (illegible) 27ᵗʰ June 2016, 10:05:19 | Originator's seal and signature: (s. *illegible*) |

| | | |
|---|---|---|
| Pay to: (*name of Payee*): **AYR PROPERTY DEVELOPMENT AD** | | |
| Payee's IBAN: **BG59UNCR70001520115399** | | Payee's bank BIC: **UNCRBGSF** |
| At the bank of (*Payee's banker*): **UNICREDIT BULBANK AD – CENTRAL SYSTEM** | | |

| **PAYMENT ORDER** | Currency | Amount |
|---|---|---|
| for credit transfer | **BGN** | **30,000.00** |

| |
|---|
| Details of payment (Payee's data): **PREPAYMENT OF COURT COSTS IN CASE 730/2013 in furtherance of Ruling of the Shumen District Court dated 17ᵗʰ June 2016** |
| More details: |

| | | |
|---|---|---|
| Originator: **KOTA ENERGY AD** | | |
| Originator's IBAN: **BG95CECB979010C8274601** | | Originator's bank BIC: **CECBBGSF** |
| Payment system: **BISSERA** | Fees: 002 | Date of payment: **27ᵗʰ June 2016** |
| Bank Officer who accepted the document: **Darya R. Petrova** | | Bank Officer who checked the document: *Rectangular stamp reading:* "CCB AD, 27ᵗʰ June 2016, 11ᵗʰ Branch Varna" |

| |
|---|
| ***Additional information:*** *to be filled in for money transfers to another country and between resident and non resident persons in the country in an amount equal to or exceeding the amount specified in Art.2, Para 1 of Ordinance No.27 of the Bulgarian National Bank on the statistics of payment balance.* |

| | |
|---|---|
| Originator's Details: **resident entity/non-resident entity** | Payee's Details: **resident entity/non-resident entity** |
| Originator's Country: | Payee's Country: |
| Originator's Address: | Payee's Address: |

| |
|---|
| Description of the economic nature of the payment transfer |
| For transfers of money under financial loans extended by or to a non-resident entity      BNB's No. |
| *I'm aware of the penal liability under Art.313 of the Penal Code for declaring any untrue data.* |

*Rectangular stamped seal reading:* True to the original, (*s. illegible*)

The undersigned Boryana Ilieva Stefanova hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Payment Order for Credit Transfer dated 27ᵗʰ June 2016. This translation has 1 (one) page.

Translator: _____
Boryana Ilieva Stefanova

До: ЦЕНТРАЛНА КООПЕРАТИВНА БАНКА АД
Клон: ЦКБ АД - клон ВАРНА
Адрес: Варна, бул. Съборни 58А

уникален регистрационен номер  80802П-АЙ-4650
дата, час и място на представяне  27.06.2016, 10:04:41, Варна ИРМ ЦКБ - Лизинг

подпис и печат на нареждащия                подпис на наредителя

Платете сумата на получателя: ЕВР ПРОПЪРТИ ДЕВЕЛОПМЪНТ АД          В/С на банката на получателя: UNCRBGSF

IBAN на получателя BG95UNCR70001520115399

При банката на получателя: УНИКРЕДИТ БУЛБАНК АД - ЦЕНТРАЛИЗ.СИ

**ПЛАТЕЖНО НАРЕЖДАНЕ**
**за кредитен превод**                  Вид валута:  BGN          Сума:  30'000.00

Основание за превод-информация за получателя: ПРЕДПЛАЩ НА РАЗНОСКИ ПО ТДГ30 2013 ОПРЕД НА ШУМ ОКР СЪД ОТ 17.06.16.

Още пояснение:

Наредител - имe: КОТА ЕНЕРДЖИ АД          В/С на банката на наредителя: CECBBGSF

IBAN на наредителя  BG85CECB97910C8274601          Приемам/извърших  27.06.2016.

Платежна система: БИСЕРА          Такса:  002

Данни за наредителя - физическо лице/чуждестранно лице
Адрес на наредителя:
Държава на наредителя:

Данни за получателя - физическо лице/чуждестранно лице
Адрес на получателя:
Държава на получателя:

Банков служител, приел документа:
**Даря Р. Петрова**

Банков служител, проверил док.гр.

Допълнителна информация (Попълва се при преводи към чужбина и между местни и чуждестранни лица и между местни лица или използвани операции по чл.2, ал.1 от Наредба 27 на БНБ за статистиката на платежния баланс

Данни за наредителя -местно лице/чуждестранно лице

Приемам/извърших
Адрес на наредителя:
Държава на наредителя:

Основание на превода:
Описание на плащането в свободен текст:

При превод на средства към или от чуждестранно лице финансовия кредит      Номер на БНБ
Финансовия код, за да проследите на неверни данни носи отговорност по чл.313 от Наказателния кодекс

# EXHIBIT 46

**RULING No.586**
**Varna, September 15ᵗʰ 2016**

The Commercial Division of the VARNA COURT OF APPEALS ("VCA"), sitting in camera on September the fourteenth in two thousand and sixteen in a panel consisting of:

Presiding Judge: Viliyan Petrov

Panel Judges:  Georgi Yovchev

Nikolina Damyanova

Heard interlocutory commercial action No.539 in the docket of the VCA for 2016 as briefed by Judge N. Damyanova and in order to rule the court looked into the following:

The instant proceedings is conducted under Art.274 et seq. of the Civil Procedure Code ("CPC") and has been instituted upon filing an appeal by Silver Beach EAD (domiciled in Varna) from Court Order No.471 issued on August 4ᵗʰ 2016 by the Shumen District Court ("ShDC") in Case No.730/2013. By the said Court Order and pursuant to Art.129 Para 2 CPC the ShDC returned the Movant's motion (filing No.3591 of July 25ᵗʰ 2016) together with the said Movant's Motion to specify (filing No.3669 of July 29ᵗʰ 2016) and the attachments thereto.

**The Motion alleges that the Bankruptcy Court for Ayr Property Development AD ("APD") erred when it refused to address and deal with the matters referred to the said Court under Art.658 Para 2 of the Commercial Act ("CA") in the motion filed on 29ᵗʰ July 2016 by an Art.693 CA creditor. The Motion further alleges that it is seeking to have certain facts clarified and established pursuant to Art.621a Para 1 and Para 2 CA as prompted by the necessity to ascertain the authenticity and the validity of a certain document entitled "Payment Order No.9763 of 24ᵗʰ October 2014" and the consequences it has given rise to, i.e. the exercise on the part of First Investment Bank AD ("FIB") of the rights of a holder of APD's bank accounts. The relief sought with the Motion is dismissal of the Order issued by ShOS and mandatory instructions for the trial court to examine the demands refering to the validity of the said payment order and undertaking the respective actions and enforcement of measures for realization of the property rights of the bankruptcy estate.**

The interluctory motion was filed in the respective term set by Art. 275, par. 1 CPC by representatives of a legitimate party against an appealable act of the bankruptcy court as specified by Art. 274, par. 1, item 1 CPC as an act formally stopping the further development of the subject matters with an existing legal interest of the appeal therefore it is procedurally admissible.

The present panel of VAC, having examined the statements and arguments expressed in the motion regarding the complaints made, considers the motion to be ungrounded for the following reasons:

Motion filing No. 3591/25[th] July 2016, filed by Silver Beach at case No. 730/2013, consists of different, unspecified and unclear demands to APD's bankruptcy court to issue a court act regarding matters and recognizing facts and their legal consequences without an established legal possibility and procedural order in the bankruptcy procedure.

With Order No. 452 dated 27th July 2016 the claimant was given instructions to clarify their demand to the bankruptcy court in a period of one week.

**In their explanatory motion, filing No. 3669/29[th] July 2016, filed at case No. 730/2013 in the due term, the claimant stated that they demand and insist for investigation of the facts and evidence, refering to the creation, use and legitimacy of a document entitled "payment order ref. No. 9763/24[th] October 2014" and the right exercised by FIB on the basis of this document.**

Once again, this statement does not include a request to the bankruptcy court which can be legally classified and does not legitimately approach the court to examine and decide it during the bankruptcy procedure, as well as during a general claim case.

The above stated circumstances serve as ground for the present panel of VAC to reach to a conclusion that the appealed Order is correct for the following reasons:

Pursuant to Art. 621 CL, inasmuch as Part IV CL contains no special provisions, the respective provisions of CPC shall apply. This provision sets the subsidiary application of CPC and marks the correlation between the procedural rules from CL and those from CPC as a correlation between special towards general rules.

Pursuant to the subsidiary provision of Art. 129, par. 3 CPC, if the claimant fails to cure the non-conformities of their statement of claim, it is to be returned. The assesment about the legality of the Order for the return of a statement of claim is in functional dependance with the legality of the preliminary court act under Art. 129, par. 2 CPC issuing instructions for curing the existing non-conformities.

In the present case, by stopping the procedure under Motion filing No. 3591 of 25th July 2016 with specific instructions to the claimant to clarify their demands to the bankruptcy court, the trial court acted in accordance with Art. 127, par. 1, item 5 CPC in connection with Art. 628, par. 2 CL because the existance of a clear relief sought that allows an undoubted legal classification and assesment by the court for the admissibility of the motion, is recognized by the law as a requirement for the validity for approaching the court. **Although filed within the stipulated statutory term the motion to specify filed in furtherance of the court order still fails to comply with the court's instructions, because it contains, again, pleadings that may not be heard within the bankruptcy case for the law does not provide for any such procedure.**

For all the foregoing reasons the instant Court finds that the appealed court act is correct and that the interlocutory motion on appeal should be denied.

In view of the above the Court

**RULED:**

The motion filed by **SILVER BEACH EAD** under No.3792 on August 8th 2016 on appeal from Court Order No. 471 entered on August 4th 2016 by the Shumen District Court in Case 730/2013 **IS DENIED**;

Pursuant to Art.613 a CA this Ruling is not subject to appeal.

Presiding Judge: ---                    Panel Judges: 1--- 2---

# О П Р Е Д Е Л Е Н И Е  № 586

15.09.2016г., гр. Варна

**ВАРНЕНСКИЯТ АПЕЛАТИВЕН СЪД, ТЪРГОВСКО ОТДЕЛЕНИЕ,** в закрито съдебно заседание на четиринадесети септември през две хиляди и шестнадесета година, проведено в състав:

ПРЕДСЕДАТЕЛ: **ВИЛИЯН ПЕТРОВ**
ЧЛЕНОВЕ: **ГЕОРГИ ЙОВЧЕВ**
**НИКОЛИНА ДАМЯНОВА**

като разгледа докладваното от съдията Н. ДАМЯНОВА ч. т. д. № 539 по описа на ВАпС за 2016г., за да се произнесе взе предвид следното:

Производството е по реда на чл. 274 и сл. ГПК, образувано по въззивна частна жалба вх. № 3792/08.08.2016г. на „ СИЛВЪР БИЙЧ" ЕАД със седалище гр. Варна, срещу разпореждане № 471/04.08.2016г. по т. д. № 730/2013г. по описа на Шуменски окръжен съд, с което е върната на жалбоподателя молба вх. № 3591 от 25.07.2016г., заедно с пояснителна молба вх. № 3669/29.07.2016г. и приложенията към тях, на основание чл. 129, ал. 3 ГПК във вр. чл. 621 ТЗ.

В жалбата се твърди, че съдът по несъстоятелността на „ Еър Пропърти Девелопмънт" АД неоснователно е отказал са разгледа и се произнесе по отнесените пред неговите правомощия по чл. 658, ал. 2 ТЗ искания от 29.07.2016г., направени от кредитор по чл. 693 ТЗ. Излага се, че се касае до необходимост от изясняване, по реда на чл. 621 а, ал. 1 и ал. 2 ТЗ, на факти и положения, свързани с действителността на документа „ платежно нареждане вх. № 9763/24.10.2014г." и последиците от него за осъществяване, от страна на Първа инвестиционна банка АД, права на титуляр по банковите сметки на „Еър Пропърти Девелопмънт" АД. Петитумът на жалбата е за отмяна на разпореждането и връщане на делото на ШОС с указания за разглеждане на исканията, отнасящи се до валидността на посоченото платежно нареждане и за предприемане на съответните действия и налагане на мерки за реализиране на имуществените права на масата на несъстоятелността.

Частната жалба е подадена в срока по чл. 275, ал. 1 ГПК, от представители на легитимирано лице, срещу подлежащ на обжалване акт на съда по несъстоятелността по смисъла чл. 274, ал. 1, т. 1 ГПК като формално прегряждащ по – нататъшното развитие на повдигнатите въпроси по конкретната молба, при наличие на правен интерес от обжалването и е процесуално допустима.

Настоящият състав на АС - Варна, като обсъди твърденията и доводите в жалбата във връзка с направените оплаквания, намира частната жалба за неоснователна по следните съображения:

С подадената от „ СИЛВЪР БИЙЧ" ЕАД - гр. Варна молба вх. № 3591/25.07.2016г. по т. д. № 730/2013г. по описа на ШОС са направени различни, неуточнени и неясни искания до съда по несъстоятелността на „Еър Пропърти Девелопмънт" АД, за произнасяне, със съдебен акт, по въпроси, свързани с установяване на факти и правни последици от тях, за което не е предвидена правна възможност и процесуален ред в производство по несъстоятелност.

С разпореждане № 452 от 27.07.2016г. на молителите са дадени указания, че в едноседмичен срок от получаване на съобщението следва да уточнят в какво се състои искането към съда по несъстоятелността.

В подадената в срок пояснителна молба вх. № 3669/29.07.2016г. се сочи, че молителят изисква и настоява в производството по несъстоятелността да се изследват фактите и доказателствата, отнасящи се до съставянето, употребата и легитимността на документ, озаглавен „ нареждане за плащане вх. № 9763/24.10.2014г.", и упражнените права от „ Първа инвестиционна банка" АД въз основа на този документ.

Тези изявление отново не обективират искане към съда по несъстоятелността, което да подлежи на правна квалификация и да сезира валидно съда за разглеждането му, както в рамките

на производство по несъстоятелността, така и в общо исково производство.

Така установените обстоятелства обосновават извода на настоящия състав на ВнАпС за правилност на обжалваното определение по следните съображения:

Съгласно чл. 621 ТЗ, доколкото в част четвърта на ТЗ няма особени разпоредби, прилагат се съответните разпоредби на ГПК. Нормата регламентира субсидиарното приложение на ГПК и очертава съотношението между процесуалните правила по ТЗ и тези по ГПК, като съотношение на специални към общи правила.

По силата на субсидиарно приложимата разпоредба на чл. 129, ал. 3 ГПК, когато ищецът не отстрани в срока нередовностите на исковата молба, същата се връща. Преценката за законосъобразността на определението за връщане на нередовна искова молба е във функционална зависимост от законосъобразността на предхождащия съдебен акт по чл. 129, ал. 2 ГПК за даване на указания за отстраняване на допуснати нередовности.

В случая, оставяйки без движение производството по молба вх. № 3591 от 25.07.2016г., с изрични указания за уточняване на това в какво се състои искането към съда по несъстоятелността, съдът е действал в съответствие с чл. 127, ал. 1, т. 5 ГПК във вр. чл. 628 ал. 2 ТЗ, тъй като обективирането на ясен петитум, който да позволява еднозначна правна квалификация и преценка за допустимост, е предвидено от закона като изискване за редовността при сезиране на съда. С подадената в срока за изпълнение на указанията уточняваща молба указанията не са изпълнение, тъй като отново са обективирани искания, за разглеждането на които не е предвидена правна възможност и процесуален ред в производството по несъстоятелност

Въз основа на посоченото съставът на ВнАпС прави извода, че обжалваният съдебен акт е правилен, поради което частната жалба следва да бъде оставена без уважение.

Воден от горното, съдът

## О П Р Е Д Е Л И:

**ОСТАВЯ БЕЗ УВАЖЕНИЕ** частна жалба вх. № 3792/08.08.2016г. на „СИЛВЪР БИЙЧ" ЕАД със седалище гр. Варна, срещу разпореждане № 471/04.08.2016г. по т. д. № 730/2013г. по описа на Шуменски окръжен съд.

Определението не подлежи на обжалване, по аргумент от чл. 613 а ТЗ.

**ПРЕДСЕДАТЕЛ:**　　　　　**ЧЛЕНОВЕ: 1.**　　　　　**2.**

# EXHIBIT 47

*Фрея* *Freya*
*Транслейшънс* *Translations*

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

## RULING No.589
### Varna, September 16th 2016

The Commercial Division of the VARNA COURT OF APPEALS, sitting in camera on September ... in two thousand and sixteen in a panel consisting of:

CHAIRMAN: VANUHI ARAKELYAN
MEMBERS: DARINA MARKOVA
NIKOLINA DAMYANOVA

Heard interlocutory commercial action No.540 in the docket of the VCA for 2016 as briefed by Judge V. Arakelyan and in order to rule the court looked into the following:

The instant court has been referred to through **two** interlocutory motions on appeal from Court Order No.472 dated August 4th 2016 issued in Case 730/2016 ("**Court Order 472**") by the Shumen District Court ("**ShDC**" or "**the Bankruptcy Court**"). In the said Court Order and pursuant to Art.129 Para 3 of the Civil Procedure Code ("**CPC**") with reference to Art.621 of the Commercial Act ("**CA**") the trial court returned unprocessed a motion filed under No.3640 on July 27th 2016, a motion to specify filed under No.3749 on 4th August 2016 and a notification filed under No.3689 on July 29th 2016 complete with all attachments thereto to the movants.

The first appeal was filed under No.3791 on August 8th 2016 by one of the creditors sitting on the Creditors Committee for Ayr Property Development AD (declared bankrupt) ("**APD**"), namely **KOTA ENERGY AD** having EIK:*** and represented by its Executive Director Krassen Kassabov ("**Kota Energy**"). The Appellant contested that the Bankruptcy Court erred when it issued its Court Order No.742 dated August 4th 2016 and that the latter was unlawful. The appellant moved the instant Court to reverse it. The Appellant also sought to have their motion filed with the Bankruptcy Court to be heard by the instant Court requesting from the instant Court to direct the trial court to cause the requests Silver Beach EAD made to [APD] Trustee on July 15th, 22nd and 28th 2016, respectively, and the letter demanding payment sent by the Trustee for Ayr Logistics Limited, Inc. ("**Ayr**") dated July 20th 2016 to be served on [APD] Trustee with a set time limit.

Another motion on appeal from Court Order 472 was filed, this time by the Art.693 CA creditor **Silver Beach EAD** as represented by its Executive Director Kalina Kassabova ("**Silver Beach**").

The motion alleges that APD's Bankruptcy Court refused to consider and make a determination on an Art.693 CA creditor's requests submitted to the said court on July 29th 2016 and falling within the competence of the latter under Art.658 Para 2 CA. The motion alleges further that the requests so made fall within the powers of the Bankruptcy Court as





set forth in Art.621a Para 1 (2) CA with reference to Art.658 Para 1 (15) and Para 2 CA and seek fro the trial court to pronounce on the matters concerning the *de facto* dissipation and depletion of the monetary assets of APD's bankruptcy estate ("**APD's Estate**") resulting from the use of a certain document entitled "<u>Payment Order No.9763 dated 24<sup>th</sup></u> <u>October 2014</u>", and the ones addressing the actions that need to taken and measures to be imposed in order to pursue successfully the rights of APD's Estate enforceable against First Investment Bank AD ("FIB"). The instant court is further asked to deliver a judgement reversing Court Order 472 and remand the case to the trial court directing it to proceed with case as the provisions of Art.621a Para 1 (2) CA and Art.658 Para 1 (15) and Para 2 CA set forth while imperatively instructing the trial court to apply those.

The motion on appeal was filed within the statutory term set forth in Art.275 Para 1 CPC; it was filed by a legitimate person and from a court order of the Bankruptcy Court subject to appeal within the meaning of Art.274 Para 1 (1) CPC for formally barring progress in terms of proper consideration of the matters raised in the original motions; the instant Court is thus referred to in order to address and make a determination on such matters.

Having looked into the motion in question, the allegations made therein, the arguments adduced and the complaints contained therein, on the merits, the VCA found those ill founded for the following reasons:

Kota Energy filed a motion with the Bankruptcy Court as docketed under No.3640 of July 27<sup>th</sup> 2016 (page 14 in this case file). The motion contained certain vaguely worded and unspecified requests for applying a procedure, which the instant Court found to be non-existent in bankruptcy proceedings.

In its Court Order No.458 of July 28<sup>th</sup> 2016 the trial court intrusted the creditor and member of the Creditors Committee Kota Energy to specify its request, i.e. what it asked the court for, within a week's term.

**The motion to specify as filed under No.3749 on July 29<sup>th</sup> 2016 (page 22 of the instant case file) did contain certain explanations, but those failed to rectify the flawed original motion. In the motion to specify the Movant did point out that what it sought from the Bankruptcy Court was for the latter to order that the requests made by Silver Beach were to be served on the Trustee for the Debtor and on all other addressees, as well as order that the papers listed in the motion to specify and produced by Attorney Tomov acting as the Special Bulgarian Counsel for Ayr Trustee were to be served on Trustee Kolyovska.**

The instant Court agrees with the trial court's legal conclusion that the motion to specify failed to cure the flaws of the motion filed under No.3640 on July 27<sup>th</sup> 2016. The creditor's additional statement made to comply with Court Order No.458 of July 28<sup>th</sup> 2016 failed, once again, to make a proper request to the Bankruptcy Court, i.e. one subject to legal classification, or to validly refer it to the Court for consideration in neither the bankruptcy proceedings, nor in a general claim procedure, thus failing to convincingly and properly



cure the non-conformities of the original motion filed under No.3640 on July 27th 2016, as it was intended.

The Second Appellant and an Art.693 CA creditor Silver Beach submitted a notification filed under No.3698 on July 29th 2016 and **containing a pleading to the Bankruptcy Court asking for the court's institutional support for and pleading the court to ensure proper conditions for the exercise of her [APD Trustee's] powers with respect to the protection of the property rights in the bankruptcy estate and the successful pursuit of the rights held by the debtor's owner and creditors. The Second Appellant named specific steps that needed to be taken and that in its opinion would immensely help accomplish the intended results, among which was the pleading to the Bankruptcy Court to declare the document entitled <u>Payment Order No.9763 dated 24th October 2014</u> invalid and lacking legitimacy, and issue an injunction against FIB and the former APD Trustee Martin Apostolov. The instant Court however found that none of those might be proceeded with for lack of proper procedure to that effect within the bankruptcy proceedings.**

The relevant facts so ascertained support the instant VCA panel's conclusion that the trial court did right when it issued Court Order 472, the reasons being as follows:

Undoubtedly, in the light of the rule set forth in Art.621a CA and when Part Four of the CA does not contain any special provisions governing a case-specific matter, the relevant general provisions of the CPC apply.

By virtue of the so authorized alternative application of the CPC provisions it is only natural that Art. 129 Para 3 CPC applies, as well. Assessment as to whether the court erred or not when its returned the flawed motion is functionally dependent on whether the preceding act of court issued pursuant to Art.129 Para 2 CPC and instructing the movant to rectify its motion was proper and lawful. The Bankruptcy Court did its duty in a lawful and proper fashion when it gave specific instructions to the movant to cure the non-conformities of its motion. It goes without saying that formulating a clearly-worded relief that is sought and one that is easy to unambiguously classify and makes it not hard for the court to assess the admissibility of the motion containing such relief is among the main explicit requirements for conformity of a motion filed in a court of law that the law sets forth. Although filed within the stipulated statutory term the motion to specify filed in furtherance of the court order still fails to comply with the court's instructions, **because it contains, again, pleadings that may not be heard within the bankruptcy case for the law does not provide for any such procedure. Likewise, none of the pleadings contained in Silver Beach's notification may be heard for lack of a valid legal procedure.**

For all the foregoing reasons the instant Court finds that the trial court was right when it issued the appealed Court Order 742 and that the interlocutory motion on appeal should be denied.

In view of the above the Court



**RULED:**

The motion filed by **KOTA ENERGY AD** under No.3791 on August 8th 2016 on appeal from Court Order No.472 entered on August 4th 2016 by the Shumen District Court in Case 730/2013 **IS DENIED**;

The motion filed by **SILVER BEACH EAD** under No.4138 on August 30th 2016 on appeal from Court Order No.472 entered on August 4th 2016 by the Shumen District Court in Case 730/2013 **IS DENIED**;

Pursuant to Art.613 a CA this Ruling is not subject to appeal.

Presiding Judge: ---                    Panel Judges: ---

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attests that this is a true and correct translation from Bulgarian into English of the attached document – Ruling No.589 dated September 16th 2016 entered by the Varna Court of Appeals in appellate action 540/2016. This translation has four (4) pages.*

*Translator: _____ Ilka Simeonova Dyulgerova*



# О П Р Е Д Е Л Е Н И Е 589

## Гр. Варна, № 16.09./2016 година

**ВАРНЕНСКИЯТ АПЕЛАТИВЕН СЪД, ТЪРГОВСКО ОТДЕЛЕНИЕ**, в закрито съдебно заседание на ............... септември през две хиляди и шестнадесета година, в състав:

### ПРЕДСЕДАТЕЛ: ВАНУХИ АРАКЕЛЯН
### ЧЛЕНОВЕ: ДАРИНА МАРКОВА
### НИКОЛИНА ДАМЯНОВА

като разгледа докладваното от съдия В. Аракелян  в.ч. т. д. № **540** по описа на Апелативен съд- Варна за 2016г., за да се произнесе взе предвид следното:

Настоящата съдебна инстанция е сезирана с две частни жалби срещу постановено разпореждане № 472/4.08.2016г. по т.д. № 730/13г. по описа на ОС- Шумен, с което са върнати на жалбоподателите молби с вх. № 3640 от 27.07.2016г., уточняваща молба с вх. № 3749/4.08.2016г., и уведомление с вх. № 3689/29.07.2016г., ведно с приложенията към всички тях, на основание чл. 129, ал. 3 ГПК във вр. чл. 621 ТЗ.

Първата е подадена с вх. № 3791/ 8.08.2016г. от кредитора и член на Комитета на кредиторите на „ ЕЪР Пропърти Девелопмънт" АД / в несъстоятелност / **„КОТА ЕНЕРДЖИ" АД**, ЕИК *, представлявано от Изпълнителен директор  Красен Касабов. Излагат се съображения, че постановеното от съда по несъстоятелността разпореждане № 472/4.08.2016г. е неправилно и незаконосъобразно и като такова следва да се отмени от настоящата съдебна инстанция. В частната жалба се съдържа и петитум да се разгледа искането, с което е сезиран първоинстанционния съд, както и да се дадат задължителни указания и определи срок, в който ОС- Шумен да разпореди извършване по съдебен ред на връчване на синдика на отправените към неговите правомощия искания от Силвър Бийч ЕАД от дата 15-ти, 22-ри и 28-ми юли 2016г. и от синдика на Еър Лоджистикс Лимитед Инк. от 20.07.2016г.

Срещу постановения от съда по несъстоятелност съдебен акт – разпореждане № 472/4.08.2016г. по т.д. № 730/13г., ОС- Шумен, е подадена възивна частна жалба и от **„СИЛВЪР БИЙЧ" ЕАД**, *, представлявано от Изпълнителния директор Калина Касабова, като заявен кредитор по чл. 693 ТЗ.

В жалбата се твърди, че съдът по несъстоятелността на „ Еър Пропърти Девелопмънт" АД неоснователно е отказал са разгледа и се произнесе по отнесените пред неговите правомощия по чл. 658, ал. 2 ТЗ искания от 29.07.2016г., направени от кредитор по чл. 693 ТЗ. Излага се, че се касае до искания, сезиращи правомощията на съда по несъстоятелността, посочени в чл. 621а, ал.1, т. 2 ТЗ, във вр. с чл. 658, ал.1, т.15 и ал.2 ТЗ, отнасящи се до произнасяне на въпросите и последиците на фактическото изчерпване на паричната маса на несъстоятелността на ЕПД, в резултат на  „ платежно нареждане вх. № 9763/24.10.2014г." и до необходимостта от предприемане на действия, и налагане на мерки, за реализиране на имуществените права на масата на несъстоятелността на Еър Пропърти Девелопмънт" АД спрямо Първа инвестиционна банка АД. Моли да се постанови съдебен акт, по силата на който обжалваното разпореждане да се отмени и делото да се върне  ШОС с указания за продължаване на съдопроизводствените действия по чл. 621а, ал.1, т.2 ТЗ, чл. 658, ал.1, т.15 и ал.2 ТЗ, със задължителни указания по тяхното прилагане.

Частната жалба е подадена в срока по чл. 275, ал. 1 ГПК, от представители на легитимирано лице, срещу подлежащ на обжалване акт на съда по несъстоятелността по смисъла на чл. 274, ал. 1, т. 1 ГПК като формално преграждащ по – нататъшното развитие на повдигнатите

въпроси по конкретните молби, поради което ангажира настоящата съдебна инстанция с произнасяне по същите по същество.

Разгледани по същество, Апелативен съд - Варна, с оглед на всички правни твърдения и доводи и предвид инвокираните в частните жалби оплаквания, намира същите за неоснователни по следните съображения:

„КОТА ЕНЕРДЖИ" АД, ЕИК **, представлявано от Изпълнителен директор Красен Касабов е подал искане до съда по несъстоятелността с вх. № 3640/27.07.2016г. / стр.14 от настоящото дело/. В него са визуализирани неясно формулирани и неконкретни искания, за които настоящата инстанция не достига до позитивен правен извод за наличен съществуващ процесуален ред в производството по несъстоятелност.

С разпореждане № 458/ 28.07.2016г. на кредитора и член на Комитета на кредиторите „Кота Енерджи" АД са дадени указания в едноседмичен срок от получаване на съобщението да уточнят в какво се състои искането към съда по несъстоятелността.

В подадената в законоустановения срок уточняваща молба вх. № 3749/29.07.2016г. / стр. 22 от настоящото дело/ се дават пояснителни уточнения, които не отстраняват валидно правния дефект на депозираното искане. Сочи се, че молителят иска съдът по несъстоятелността да се разпореди да бъдат връчени на синдика на длъжника и на другите адресати, представени от кредитора „ Силвър бийч" ЕАД искания , както и да се връчи на синдик Кольовска представените от адв. Томов, действащ като особен представител за България на синдика на Ер Лоджикпле Лимитед инк., посочени в молбата документи.

Настоящата съдебна инстанция приема правните изводи на съда по несъстоятелността, че с подадената допълнителна молба не се отстраняват неизправностите по молбата – искане с вх. № 3640 / 27.07.2016г. Допълнителното изявление на кредитора, направено в изпълнение на разпореждане № 458/28.07.2016г. отново не обективира искане към съда по несъстоятелността, което да подлежи на правна квалификация, да сезира валидно съда за разглеждането му, както в рамките на производство по несъстоятелността, така и в общо исково производство и като такова – да отстранява валидно и надлежно процесуалните пороци на направеното искане с вх. № 3640/27.07.2016г.

Вторият частен жалбоподател в настоящото производство - „СИЛВЪР БИЙЧ" ЕАД, ЕИК **, представлявано от Изпълнителния директор Калина Касабова, като заявен кредитор по чл. 693 ТЗ, е подал уведомление с вх. № 3689/29.07.2016г., съдържащ искане до съда по несъстоятелността да се окаже институционална подкрепа и условия за ефективно упражняване на нейните правомощия, отнасящи се до защита на имуществените права в масата на несъстоятелността и реализация на правата на кредиторите и собственика на длъжника. Посочени са и конкретни действия, които според кредитора биха имали за своя резултат постигането на посоченото искане., между които искането съдът по несъстоятелността да постанови липсата на легитимност на документа, озаглавен „нареждане за плащане, вх. № 9764/24.10.2014г.", да издаде обезпечителна заповед спрямо ПИБ АД и бившия синдик Мартин Апостолов, за които настоящата съдебна инстанция счита, че не съществува предвиден процесуален ред в производството по несъстоятелност.

Така установените обстоятелства обосновават извода на настоящия състав на ВнАпС за правилност на обжалваното разпореждане по следните съображения:

Безспорно е, че с оглед нормата на чл. 621 ТЗ, при липсата на особени, специални разпоредби в част четвърта на ТЗ, се прилагат се относимите общи разпоредби на ГПК.

По силата на регламентираното субсидиарно приложение на ГПК, съответно приложение намира и разпоредбата на чл. 129, ал. 3 ГПК. Преценката за законосъобразността на разпореждането за връщане на нередовна искова молба е във функционална зависимост от законосъобразността на предхождащия съдебен акт по чл. 129, ал. 2 ГПК за даване на указания за отстраняване на допуснати нередовности. Съдът по несъстоятелност е изпълнил прецизно и законосъобразно своето задължение, давайки конкретни и коректни указания за отстраняване неизправностите на исканията, с които е сезиран. Безспорно е, че обективирането на ясен петитум, който да позволява еднозначна правна квалификация и преценка за допустимост на искането , с което е сезиран, е въздигнато от закона като изискване за редовността при сезиране на съда. С подадената в срока за изпълнение на указанията уточняваща молба указанията не са

изпълнение, тъй като отново са обективирани искания, за разглеждането на които не е предвидена правна възможност и процесуален ред в производството по несъстоятелност. Такава правновалидна процесуална възможност отсъства и при съдържащите се в уведомлението на частния жалбоподател „ Силвър бийч" ЕАД искания.

Предвид всичко гореизложено, настоящата съдебна инстанция достига до извод за правилност на обжалвания съдебен акт, поради което частните жалби следва да бъдат оставени без уважение.

Воден от горното, съдът

**О П Р Е Д Е Л И:**

**ОСТАВЯ БЕЗ УВАЖЕНИЕ** частна жалба вх. № 3791 / 08.08.2016г. на **„КОТА ЕНЕРДЖИ" АД,** ЕИК *, представлявано от Изпълнителен директор Красен Касабов , срещу разпореждане № 472 / 4.08.2016г. на ОС – Шумен, по т.д. № 730/ 2013г.

**ОСТАВЯ БЕЗ УВАЖЕНИЕ** частна жалба вх. № 4138 / 30.08.2016г. на **„СИЛВЪР БИЙЧ" ЕАД,** ЕИК *, представлявано от Изпълнителния директор Калина Касабова, срещу разпореждане № 472 / 4.08.2016г. на ОС – Шумен, по т.д. № 730/ 2013г.

Определението не подлежи на обжалване, по аргумент от чл. 613 а ТЗ.

**ПРЕДСЕДАТЕЛ:**          **ЧЛЕНОВЕ: 1.**          **2.**

# EXHIBIT 48

RULING No. 457

Town of Shumen, December 16<sup>th</sup> 2016

The Shumen District Court sat in camera this December the sixteenth two thousand and sixteen, composed of

District Judge: Konstantin Mollov

And in order to rule looked into the matter as reported by Judge Konstantin Mollov regarding Case 730/2013, as follows:

On December 12, 2016 the Trustee in Bankruptcy for Ayr Property Development AD G.Y.K filed a motion with this court (docketed under No.5959). The motion stated that upon payment of the November 2016 [bankruptcy] costs the money left in the special account amounted to BGN ***.26, which amount would cover the December 2016 costs only. Come January 2017 there would not be sufficient funds to cover the bankruptcy case proceedings any longer. In the Trustee's opinion a notice should be sent to the creditors calling on them to deposit BGN 26,000 at the minimum in order to ensure sufficient funds for the bankruptcy costs over the next six months.

In the light of the Trustee's statement the Court accepts that the situation provided for in Art.629b with reference to Art.632 Para 5 CA has occurred, namely: the money available is insufficient to cover the current bankruptcy costs and keep the bankruptcy case going, accordingly. Therefore, the Court needs to determine a minimum amount, which will ensure the progress of the bankruptcy case in 2017. To do so the Court must account for the trustee's monthly remuneration fee first as determined in Ruling No.566 of December 15, 2015 and equal to ten times the minimum salary in the country, as well as the provision of Art.59 of the Law on 2017 State Budget of the Republic of Bulgaria (promulgated in the State Gazette, issue 98 of December 9, 2016). According to the said provision the minimal salary in the country is BGN 460.00 effective January 1<sup>st</sup> 2017. So far there exists no case-related data leading to and supporting a conclusion for it being likely that in 2017 an asset of the debtor will be found, which might ensure the money to cover the bankruptcy costs. Hence, the creditors need to be called on to prepay the amount of BGN 60,000 thus providing for the bankruptcy costs to be incurred in 2017, namely: the trustee's fee for the period from January 2017 through December 2017, accounting fees, filing fees, and other contingency expenses.

The amount needs to be deposited within a week's term commencing on the date of entry of this Ruling in the Book kept under Art.634c Para 1 CA, which date shall also be deemed the date when the creditors are notified hereof.

This Court finds it expedient to explain the consequences ensuing from Art.632 Para 1 CA, and the consequences are: the proceedings in the case will be suspended.

For all the foregoing reasons and pursuant to Art.629b with reference to Art.632 Para 5 CA, the Court

ORDERED:

The creditors of Ayr Property Development AD (declared bankrupt), EIK: ***, Targovishte, that hold allowed claims in bankruptcy case 730/2013with the Shumen District Court ARE CALLED ON to prepay the amount of BGN 60,000 (sixty thousand Bulgarian levs) to cover future bankruptcy proceeding costs within a week's term after this Ruling is entered in the Book kept under Art.634c Para 1 CA, and produce proof of payment thereof to the Filing Department of the ShDC, accordingly.

The creditors ARE WARNED of the consequences to ensue from failure to prepay the amount of BGN 60,000 needed to keep the bankruptcy case for Ayr Property Development AD going, namely: pursuant to Art.632 Para 1 CA the case proceedings will be suspended.

This Ruling is not subject to appeal, nor is it subject to forced execution.

Prepayment of the amount so determined or expiration of the time limit to do so shall be immediately reported to the court for taking one or another procedural action, accordingly.

This Ruling is subject to entry in the Book kept under Art.634c Para 1 CA.

<div align="center">**District Judge:**</div>

**Online check 780738 made on December 16, 2016 at 15:09:25 hours by Trustee Ganka Yaneva Kolyovska**

О П Р Е Д Е Л Е Н И Е   № 457

гр. Шумен 16.12.2016 г.

Шуменски окръжен съд, търговско отделение в закрито заседание на шестнадесети декември две хиляди и шестнадесета година в състав:

Окръжен съдия:  Константин Моллов

като разгледа докладваното от съдия Константин Моллов т. дело № 730 по описа за 2013 г. за да се произнесе, взе предвид следното:

Постъпила е молба с вх. № 5959 от 12.12.2016 г. от синдика на "Еър про- пърти девелопмънт" АД (в несъстоятелност), ЕИК ...., град Търговище Ган- ка Я.К.. В молбата се посочва, че след заплащане на разноските за м. ноември 2016 г. в особената банкова сметка ***.26 лв., с която може да се покрият разноските за м. декември 2016 г. От месец януари 2017 г. по делото няма да има средства за издръжка на производството по несъстоятелност. С оглед на това счита , че кредиторите следва да бъдат поканени да предплатят разноски в размер минимум на 26 000.00 лв., които да покрият раз- носките в производството по несъстоятелност за още шест месеца.

С оглед изложеното в молбата на синдика, съдът по несъстоятелността прие- ма, че налице е хипотезата иа чл.629б, във вр. с чл.632, ал.5 от ТЗ – наличните суми са недостатъчни за покриване текущите разноски по несъстоятелностт, съответно за продължаване на производството. С оглед на това съдът по иесътоятелността следва да определи минималната сума, която е необходима за издръжса на произ- водството по несъстоятелност през 2017 г. При определяне на необходимата сума трябва да се съобрази месечното възнаграждение на синдика, определено с Опреде- ление № 566 от 15.12.2015 г. в размер на десет минимални работни заплати за стра- ната и чл.59 от Закона за държавния бюджет на Република България за 2017 г. (обн. ДВ бр.98 от 09.12.2016 г.). Съгласно тази разпоредба минималната работна заплата за страната е 460.00 лв. от 01.01.2017 г. Към настоящият момент не са налице данни по делото, от котито да се направи обоснован извод за вероятна възможност през 2017 г. да се установи имущество на длъжника, от което да се финансират разходи- те в производството по несъстоятелност.Предвид на това следва да се поканят кре- диторите на несъстоятелността да внесат сумата от 60 000.00 лв., необходима за те- кущите разноски на производството през 2017 г., а именно заплащане възнагражде- нието на синдика за периода от м. януари до м. декември 2017 г., разходи за счето- водно обслужване, заплащане на държавни такси и други непредвидени разходи.

Сумата следва да бъде внесена в едноседмичен срок от вписването на опре- делението в книгата по чл.634в, ал.1 от ТЗ, от който момент се счита съобщено на кредиторите.

Следва да бъде разяснена и последицата по чл.632, ал.1 от ТЗ, която е спира- не на производството.

Водим от горното, на основание чл. 629б във вр. с чл.632, ал.5  от ТЗ съдът

## О П Р Е Д Е Л И:

Поканва кредиторите на "Еър пропърти девелопмънт" АД (в несъстоятел- ност), ЕИК ...., град Търговище, с приети вземания, в производството по несъстоятелност по т. д. № 730/2013 г. по описа на Шуменския окръжен съд в едно- седмичен срок от вписване на настоящото определение в книгата по чл.634в, ал.1 от ТЗ да предплатят сумата от 60 000.00 (шестдесет хиляди) лева, необходима за по- криване на бъдещите текущи разноски в производството по несъстоятелност, като следва в деловодството на ШОС да се представят доказателства за нейното запла- щане.

Указва, че последиците, ако посочената по-горе сума от 60 000.00 лева, не- обходима за покриване на разноските по несъстоятелността на "Еър пропърти деве- лопмънт" АД (в несъстоятелност), ЕИК ...., град Търговище, не бъде пред- платена, е спиране на производството на основание чл.632, ал.1 от ТЗ.

Определението не подлежи на обжалване и принудително изпълнение.

Делото да се докладва при внасяне на определената за разноски сума или след изтичане на срока за внасяне, за предприемане на съответните процесуални действия.

Определението да се впише в книгата по чл.634в, ал.1 от ТЗ.

**Окръжен съдия:**

справка 780738 извършена на 16.12.2016 г. 15:09:25 от потребител ГАНКА ЯНЕВА КОЛЬОВСКА - СИНДИК

# EXHIBIT 49

*Фрея*
*Транслейшънс*

**Freya**
**Translations**

Преводи от и на чужди езици

гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
e-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

### JUDGMENT

### No.5

### Town of Shumen, 19th January 2018

The Shumen District Court sitting in camera on nineteenth of January two thousand and eighteen in a panel composed of:

Reporting Judge: Konstantin Mollov

heard commercial case No.730 in the docket of the above court for 2013 as reported by the reporting judge and in order to deliver a judgment the instant court looked into the following:

The proceedings in this case are under Art.632 Para 4 of the Commerce Act (CA).

By Judgment No.16 of 3rd May 2011 in case 14/2011 in the docket of the District Court of Targovishte (TDC) delivered under Art.630, Para 1 CA Ayr Property Development AD (APD) having EIK (company number): 200958720 was declared insolvent and bankruptcy proceedings against APD were opened.

On December 12th 2016 the Trustee for APD Ganka Kolyovska filed a motion docketed under No.5959 warning that upon payment of the December 2016 costs there would not be funds left to cover the costs further proceedings in the bankruptcy case. In her opinion the creditors should be called upon to prepay estimated costs of the proceedings for the next 6 months.

Based on the Trustee's motion and request, on December 16, 2016 the instant court delivered Ruling No.457, whereby and pursuant to Art.632 Para 5 CA with reference to Art.629b CA, the instant court notified the creditors of the need to prepay the amount of BGN 60,000 in a week's term in order to keep the bankruptcy action going and cover its costs from January 2017 through December 2017; the court also warned the creditors that failure to prepay would result in suspension of the case proceedings pursuant to the provision of Art.632 CA. The Ruling was entered and recorded in the Book under Art.634c CA Para 1 CA and the date of such recording was deemed the date when the creditors were notified accordingly. Despite the notice thus given to the creditors however, no payment of the amount indicated in the said Ruling to cover the 2017 bankruptcy expenses was made. Therefore, by Court Order No.5 of January 16, 2017 in this case delivered under Art.632, Para 5 with reference to Para 1 CA the TDC suspended the bankruptcy proceedings. The said Court Order was entered in the Commercial Register on January 16, 2017.

Having examined the documents contained in the case file and the report of Trustee Ganka Yaneva Kolyovska (filing No.306) of January 19, 2018, the instant court found that no monies were deposited for the purpose of prepaying the costs of the bankruptcy action and no motion seeking to resume the case was been filed within the term set in Art.632, Para 2



2

CA, which term expired on January 16, 2018. The provision of Art.632 Para 4 CA was thus triggered requiring a dismissal of the bankruptcy case and deregistration of the company from the Commercial Register. The enforcement of this Judgment shall give rise to the consequences as set forth in Art.738 and Art.739 CA.

In view of the foregoing and pursuant to Art.632, Para 4 of the Commerce Act, the instant court

## ORDERED:

The bankruptcy case in re: **Ayr Property Development AD** (declared bankrupt) having EIK: 200958720 and registered office address at Targovishte, Liliya St., bl.4, section B, 1st floor, app.2, as represented by Phillip Robert Harris (whose powers have been suspended), **IS DISMISSED.**

The company **Ayr Property Development AD** (declared bankrupt) having details as shown above shall be **DEREGISTERED.**

This Judgment is subject to enforcement and recording in the Commercial Register kept at the Registry Agency; a copy of the Judgment shall be transmitted to the latter immediately.

This Judgment is subject to appeal before the Varna Court of Appeals within 7 days upon recordation hereof in the Commercial Register.

This Judgement shall be recorded in the Book kept under Art.634c (1) Commerce Act.

District Judge: (*Signed ill.*)

---

*The undersigned, Ilka Simeonova Dyulgerova, hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Judgment No.5 of the Shumen District Court issued on 19th January 2018. This translation has 2 (two) pages.*

Translator: _____ *Ilka Dyulgerova*

Р Е Ш Е Н И Е

град Шумен, 19.01.2018 г.

Шуменският окръжен съд, търговско отделение в закрито заседание на де-
ветнадесети януари две хиляди и осемнадесета година в състав:

Окръжен съдия: Константин Моллов

като разгледа докладваното от докладчика т. д. № 730 по описа на Шуменския ок-
ръжен съд за 2013 г., за да се произнесе взе в предвид следното:

Производство по реда на чл. 632, ал.4 от ТЗ.

С Решение № 16 от 03.05.2011 г. по т. д. № 14/2011 г. по описа на Окръжен
съд гр. Търговище по чл.630, ал.1 от ТЗ е обявена неплатежоспособността и откри-
то производство по несъстоятелност на "Еър пропърти девелопмънт" АД, ЕИК 200
958720, град Търговище.

В депозираната на 12.12.2016 г. молба с вх. № 5959 синдикът на "Еър про-
пърти девелопмънт" АД (в несъстоятелност) Ганка Янева Кольовска посочва, че
след ендолжение за разноските за м. декември 2016 г. по делото няма да има средст-
ва за издръжка на производството по несъстоятелност. С оглед на това счита, че
кредиторите е следва да бъдат поканени да предплатят разноските в производството
по несъстоятелност за още шест месеца.

Въз основа на молбата на синдика и направеното с нея искане съдът с пос-
тановил Определение № 457 от 16.12.2016 г., с което на основание чл.632, ал.5 от ТЗ
във вр. с чл.629б от ТЗ е поканил кредиторите в едноседмичен срок да предплатят
по делото сумата от 60 000,00 лв., необходима за покриване на бъдещите текущи
разноски в производството по несъстоятелност в периода м. януари – м. декември
2017 г., като е указано, че в противен случай производството по делото ще бъде
спряно, съгласно разпоредбата на чл.632 от ТЗ. Определението на съда е вписано в
канала по чл.634в, ал.1 от ТЗ от когато се счита съобщено на кредиторите. Незави-
симо от извършеното уведомяване, кредиторите не предплатиха указаната с гореце-
тосоченото определение гаранична сума за разноски по несъстоятелността през 2017
г. С оглед на това обстоятелство, с Решение № 5 от 16.01.2017 г. на Шуменския ок-
ръжен съд по настоящото дело, на основание чл.632, ал.5 във вр. с ал.1 от ТЗ е
спряно производството по несъстоятелност. Решението на съда е вписано в Търгов-
ския регистър на 16.01.2017 г.

От съдържащите се в делото книжа, а и от депозирания на 19.01.2018 г. (вх.
№306) доклад на синдика Ганка Янева Кольовска, съдът констатира, че в срока, по-
сочен в чл. 632, ал.2 от ТЗ, който е изтекъл на 16.01.2018 г. няма постъпили суми с
основание предплащане на разноските по несъстоятелността и не е поискано въз-
обновяване на производството. С оглед на това налице са предпоставките визирани
в чл.632, ал.4 от ТЗ за постановяване на решение за прекратяване на производст-
вото по несъстоятелност и заличаване на търговското дружество от Търговския ре-
гистър. С влизане в сила на настоящото решение ще настъпят последиците визира-
ни в разпоредбите на чл. 738 и чл.739 от ТЗ.

Водим от горното и на основание чл.632, ал.4 от ТЗ съдът

Р Е Ш И :

Прекратява производството по несъстоятелност на "Еър пропърти девелоп-
мънт" АД (в несъстоятелност), ЕИК 200958720, със седалище и адрес на управле-

ще град Търговище, ул. „Лилия", бл.4, тяло Б, ет.1, ап.2, представлявано от Филип Робърт Харис с прекратени правомощия.

**Постановява заличаване** на търговеца – "Тър пропърти девелопмънт" АД /в несъстоятелност/ с горепосочените седалище, адрес на управление и представител.

Решението подлежи на изпълнение и вписване в Търговския регистър при Агенцията по вписванията, като за целта следва да й се изпрати неблавно препис от него.

Решението подлежи на обжалване в 7-дневен срок от датата на вписване в Търговския регистър пред Апелативен съд гр. Варна.

Решението да се впише в книгата по чл.634в, ал.1 от ТЗ.

                                 **Окръжен съдия:**

2

# EXHIBIT 50

*Фрея*
*Транслейшънс*

**Freya**
**Translations**

Преводи от и на чужди езици
гр. Варна, ул. Н. Вапцаров № 3, вх. Г, ет. 8, офис 21, тел. +359 52 712 522, факс +359 52 712 533
E-mail: freyatranslations@gmail.com

*Translation from Bulgarian*

*Delivered by courier*

*Rectangular stamp:*

| The Shumen District Court |
| --- |
| Filed under No.441 at 9.25 a.m. |
| On January 25, 2018 |
| *(Signed ill.)* |

**C/o**        **The District Court of Shumen**
Commercial Division
Commercial case No.730/2013
*In re*: Ayr Property Development AD bankruptcy

**To:**        **THE VARNA COURT OF APPEALS**

## APPEAL

**Against**        **Court Order No.5** as entered by the Shumen District Court and dismissing Case No.730/2013 – Ayr Property Development AD bankruptcy proceeding

**Filed by:**        **Attorney Zahari Tomov** (Varna Bar) acting as the Special Bulgarian Counsel for the Trustee for Ayr Logistics Limited, Inc. and appointed by virtue of Court Order (doc.24 in Case No.14-34940-bjh) entered by the U.S. Bankruptcy Court for the Northern District of Texas, the U.S.A.

**Service Address:**        30 Beli Lilii St., 3rd floor, apt.13, Varna

**Legal grounds:**        Article 274 Para 1 (1) of the Civil Procedure Code (CPC)
Article 735 Para 1 of the Commercial Act (CA)

**Dear Appellate Judges,**

The instant Appellant respectfully requests the Honourable Court of Appeal to admit this Appeal from **Court Order No.5** as entered on January 19th, 2018 by the Shumen District Court (ShDC) and dismissing bankruptcy case No.730/2013.

The facts underlying our allegation - that the court order of dismissal is ill-founded, unjustified and, what is more, it gives undue advantage to the parties that have misappropriated an amount of money exceeding 113 Million Bulgarian levs, which money is duly owed to the creditors of the bankruptcy estate of **Ayr Logistics Limited, Inc.** (Ayr's Estate) – are not only indisputable, but those have been verified and confirmed in the course of the proceedings in **Ayr Property Development AD's** bankruptcy case (APD's bankruptcy).

What we have here is a deeply flawed act of the trial court; the gravest flaw of the trial court's order is that it is lacking in valid legal grounds, which were they to exist might have justified the trial court's decision to disregard and let go unpunished those certain harmful activities that have caused damages to the creditors of the bankruptcy estate and that have given undue advantage to certain third parties within the meaning of the provisions of Article 13 of *Council Regulation (EC) No.1346 of 29 May 2000 on insolvency proceedings.*

For the sake of precision and as a form of introduction into the causes of action for reversal of the said court order, let me first show the Court the following crucial and case-pertinent facts and documents:

- APD is under the obligation to hand over to Ayr Trustee the money in the amounts shown on the payment demands sent on several subsequent occasions to the Trustee for APD, namely: on 20th July 2016 (**Attachment A**); on 24th August 2016 (**Attachment B**) and on 6th December 2017 (**Attachment C**);

- The reports of APD Creditors Committee dated 7th June 2016 (**Attachment D**) and 2nd September 2016 (**Attachment E**) clearly and accurately indicate the precise amounts of money from APD's Estate unduly used and disposed of for the benefit of certain entities being third parties to APD bankruptcy case. The reports also prescribed what further actions APD Trustee should take to cause the said money to be returned to APD's Estate;

- On 14th September 2016 APD Trustee simply transmitted the matters concerning her prescribed actions under Art.685 Para 1 (8) CA - *"collect the cash receivables of the debtor and deposit them in a special bank account"* – to APD Bankruptcy court (**Attachment F**);

- In Ruling No.545 entered on December 2, 2015 (**Attachment G**) the APD Bankruptcy court directed APD Trustee to submit a report on all steps the latter

had taken to collect the dues and replenish APD's Estate. No such report has been submitted in Case 730/2013 till this very day;

The above outlined facts and circumstances are of utmost importance and are directly related to the causes of action as stated below for reversal of the court order dismissing APD's case and ordering deregistration of the insolvent debtor. We plead the causes of action set forth in Art.735 Para 1 (1) and (2) CA.

## A. The rule of Art.735 Para 1 (1) CA

1. The rule laid down in Art.735 Para 1 (1) CA provides that a bankruptcy proceeding may only be dismissed after all debts of the bankruptcy estate have been discharged. As the above-mentioned facts and documents testify nothing of the sort ever took place in the course of APD bankruptcy.

2. APD Trustee's explanations – whether reasonable or not (which is the case here) – were as simple as "lack of directions from the Bankruptcy court as to what actions needed to be taken to collect the receivables of the bankruptcy estate". The fact speaks for itself – nothing, even the basic necessities, had ever been taken care of that, if done, would have paved the way to the accomplishment of the ultimate purpose of APD's bankruptcy proceedings, namely: have the creditors claims equitably satisfied. The Bankruptcy court, in turn, and despite APD Trustee's request for directions, chose to disregard it and to dismiss the case altogether. By so doing both APD Trustee and APD Bankruptcy Court have given undue advantage to those third parties that have already wrongfully taken away the moneys belonging to APD's Estate and that should have been used to repay its debts to the creditors, instead.

3. In fact the court order for dismissal creates a bar to proceeding with APD in order to hold those certain third parties liable for the harm inflicted and the infringement upon APD creditors' rights and claims.

4. APD Bankruptcy court erred in entering the courts order at issue for it was entered in violation of the rule set forth in Art.735 Para 1 (1) CA and to the detriment of the my Client's legitimate rights.

## B. The rule of Art.735 Para 1 (2) CA

5. By virtue of the above rule one of the conditions that must be met before the bankruptcy proceedings could be closed occurs when the bankruptcy estate has been depleted – which is definitely not the case here.

6. Considering that all of the following - APD Bankruptcy court (in its Ruling No.245 entered on December 2nd, 2015) along with APD Trustee and APD Creditors Committee (APD Creditors Committed letter in reply to Ayr Bankruptcy court of December 3rd, 2014, please see Attachment H), the Resolution of May 5th, 2015 (Attachment I) and the Resolutions passed by the Meeting of ADP Creditors on August 12, 2013 (Attachment J) − acknowledge the fact that the preconditions, which must be met before the situation provided for in Art.658 Para 1 (8) CA may be deemed to exist, have occurred as a result of the taking away of the money belonging to APD's Estate by those certain third parties for their own benefit. When such a situation arises, as it did in this case, APD Trustee should have proceeded to collect all receivables of the debtor. Regardless of the generally accepted findings in Case 730/2013, i.e. that a similar situation did arise, nothing happened. None of the APD Bankruptcy court's directions in that regard and contained in its Ruling No.245 of December 2nd, 2015, nor any of the resolutions of the Meeting of APD Creditors, nor those of APD Creditors Committee have been followed through.

7. If in APD Bankruptcy court's opinion it was deemed necessary for APD Trustee to initiate steps to collect the receivables of APD's Estate, the said court should have known that there existed no legal grounds to dismiss APD's bankruptcy case pursuant to Art.735 Para 1 (2) CA.

(1) In the light of the above the court order for dismissal (Court Order No.5 of January 19, 2018) bot only fails to comply with the law, but is harmful to my Client's legitimate rights and interests. That being so, the court order for dismissal should be reversed and the trail court directed to strictly apply the law while observing the international rules of bankruptcy and complying with the requirements for "most favoured nation" and "non-discriminatory treatment" as set in Article I (f) and (h) of the *Treaty between the United States of America and the Republic of Bulgaria Concerning thee Encouragement and Reciprocal Protection of Investment* as promulgated in the State Gazette, Issue 47 of February 26, 2004 (The Bilateral Investment Treaty or The BIT).

8. In addition to Art.735 Para I (2) CA and for the sake of completeness of the solutions this Appeal offers to the matters concerning the preconditions that need to be met for a bankruptcy case to be dismissed, closed and the insolvent debt deregistered, and which matters APD Bankruptcy court has dealt with, I find it

necessary to bring *Council Regulation (EC) No.1346 of 29 May 2000 on insolvency proceedings* and the rule of Art.632 Para 4 CA to this Court's notice.

(1) Council Regulation (EC) No.1346 of 29 May 2000 on insolvency proceedings contains adequate provisions for meeting the criterion of "most favoured nation", while Art.632 Para 4 CA meets the criterion for "national treatment" as defined in Article I (g) of the BIT, which criteria when met ensure that my Client's rights *will not be subjected to discriminatory treatment.*

## C. Council Regulation (EC) No.1346/2000 of 29 May 2000 on insolvency proceedings (Insolvency Regulation 1346/2000):

9.  According to the established case law of the European Court of Justice (**ECJ**) when the national law of a member state governs certain relationships having subject matter and grounds regulated by acts passed by EU institutions, the respective national courts must obey the rule of Art.267 Para 3 TFEU and ensure the rule of law and the efficiency of the EU laws. *See,* inter alia, Judgment of the Court in Case C-32/11 of March 14, 2013 *(Allianz Hungária Biztosító Zrt. and Others v Gazdasági Versenyhivatal);* Judgment of the Court of December 5, 2000 in Guimont case (C-488/98, ECR, page I-10663); Overview of ECJ case law in the opinion of Mr. Advocate General N.Wahl delivered on September 5, 2013 in joined cases C-159/12, C-160/12 and C-161/12 *(Alessandra Venturini v ASL Varese and Others (C-159/12), Maria Rosa Gramegna v ASL Lodi and Others (C-160/12) and Anna Muzzio v ASL Pavia and Others (C-161/12)).*

10. It needs to be noted at this point that Bulgaria has exercised its right to keep the BIT in full force and effect in accordance with the EU law and the provisions of Regulation (EU) No 1219/2012 of the European Parliament and of the Council of 12 December 2012 establishing transitional arrangements for bilateral investment agreements between Member States and third countries. Since Bulgaria and the EU have decided that the Bilateral Investment Treaty with the USA is consistent with and in line with the EU laws, then there is not a single reason, which the Bulgarian court can use to exclude or circumvent the application of the Regulation in this case, especially if such exclusion might result in discriminatory treatment of my Client's rights.

11. We allege that Court Order No.5 as delivered on August 19, 2018 (probably a clerical error it should read January instead – *Translator's note*), which ordered APD's bankruptcy case to be dismissed and the company deregistered is in

violation of the Insolvency Regulation, Article 13 "Detrimental Acts" in particular.

The Bankruptcy Court and APD Trustee have not replied to the main question, namely: *"Are there any grounds and, if yes, what are they exactly, which could have justified the decision to the release the persons/entities, which gained control over and disposed of the funds from APD's bankruptcy estate for their own benefit from liability for their actions?"* This is an important preliminary question, which the court needs to answer first before giving its reasons for dismissing case No.730/2013!

12. APD Trustee's refusal to proceed with collecting the accounts receivables of APD's Estate unless the court instructed the APD Trustee to do so, on the one hand, and APD bankruptcy court keeping silent on the matter, on the other, is nothing less than tacitly giving undue advantage to the very entities that took away money exceeding BGN 113 million from APD's Estate.

13. In the light of Art.13 of the Insolvency Regulation it needs to be acknowledged that there exist not a single valid reason that might have justified a decision to let the persons who committed such detrimental acts to APD's creditors go unpunished!

14. APD Bankruptcy court in this case apparently gave preference to the interests of the persons whose detrimental acts have harmed APD creditors' rights over the latter when it ordered the dismissal of the bankruptcy case and APD's deregistration in breach of Art.735, Para 1(1) and (2) CA.

**D. The provision of Art.632 (1) and (4) CA:**

15. According to the provisions of Art.632 (1) and (4) CA in order to dismiss the case for failure to deposit the funds required to keep the bankruptcy action going, the following preconditions need to be met first:

- The property in APD's Estate must be insufficient to cover the costs of the bankruptcy proceedings;

- All costs must be accounted for by showing every single item of expenses incurred by APD Trustee in the course of management, preservation and/or replenishing of the bankruptcy estate.





(1) All the above preconditions need to be met cumulatively and should be reasonable and predictable.

16. Although it was APD Trustee's duty to submit an action plan showing the appropriate steps that needed to be taken for collection of the amounts due and replenishment of the bankruptcy estate – as the APD Bankruptcy court directed in its Ruling No.545 of December 2, 2015 – no such plan was ever prepared, nor submitted in case 730/2013. What APD Trustee did instead, was to forward the matter to APD Bankruptcy court, which, in turn, chose to dismiss the bankruptcy case rather than apply the measures which, if applied, could have caused the BGN 113 million, which were taken away by third parties, to be returned to APD's Estate.

17. Accordingly, the lack of such well-substantiated plan providing for reasonably anticipated consequences explains the failure to prepay costs. No one of sound mind would ever pour water in a broken pot, because it would be wasted.

18. The provisions of Art.632 (1) and (4) may not be applied as a sanction against the reasonable expectation that prepayment of costs for the bankruptcy action should be determined on the basis of an action plan, announced in advance, at that, detailing the steps that needed to be taken to collect the amounts due replenish APD's Estate.

19. In fact, that is exactly what the court did – it imposed a sanction on the creditors' rights for the creditors' reasonable unwillingness to funnel funds for the purpose of certain unannounced steps, which the Trustee might take only if instructed to do so by APD's bankruptcy court, which, in turn, dismissed the case, instead.

(1) As shown in APD Trustee's Report of February 26, 2016 (**Attachment K**), the only costs ever incurred in the bankruptcy proceeding at that time were the Trustee's remunerations. Yet, it has not been made clear why should the costs of a certain activity needed to be paid, when that activity would never be carried out since the court never gave any instructions to that effect.

20. Any assessment as to whether or not it is necessary to prepay the costs to be incurred in the collection of the amounts owed to APD's Estate and its replenishment – what the Trustee has the powers to do under Art.658, Para 1 (8) CA – should account for the provision of Art.620, Para 5 CA, pursuant to which



a filing fee shall not be collected in advance with respect to actions aimed at replenishing the bankruptcy estate.

21. The requirement for prepayment of costs in the bankruptcy proceedings for the purpose of providing for necessary expenses to be made while taking certain steps to collect the amounts due to the bankruptcy estate, when no pre-justification of those certain expenses or those certain steps was ever given in a transparent or predictable manner, may not serve as grounds to dismiss APD's bankruptcy case.

## E. Conclusion

22. The above-outlined facts clearly and indisputably show that the dismissal of APD's bankruptcy case has a discriminatory effect on and is detrimental to my Client's rights. Let me once again highlight what is wrong with the dismissal of APD's bankruptcy case – that a bankruptcy case is dismissed without however resolving the matter of liability, i.e. for no good or legitimate reasons and in breach of Art.13 of the Insolvency Regulations, to boot, certain third parties - the activities of which have caused harm to APD creditors' interests and as result of which activities money exceeding BGN 113 million from APD's estate have been taken away and transferred over to and used for the benefit of certain other third parties - have been released from liability.

23. As APD Trustee explained in her replies of April 27, 2016 (**Attachment L**) and August 15, 2016 (**Attachment M**), it was the unlawful disposal and transfer of APD's funds over to and for the benefit of certain third parties that made it impossible for APD Trustee to meet Ayr Trustee's payment demands. Therefore, it can be concluded that APD's Bankruptcy court has obviously dismissed case No.730/2013 knowing and understanding well that the BGN 113 million (the property of APD's Estate) are owed to APD's creditors and that certain actions and measures need to be taken in order to rerun the money to APD's Estate.

(1) So it is beyond doubt that there exist no legal grounds under Art.13 of the Insolvency Regulation to release those certain third parties from their liability for their detrimental actions, thus making Court Order No.5 of January 19, 2018 dismissing APD's Bankruptcy case not only ill-founded, but being in itself a form of discriminatory treatment of my client's rights. So it should be reversed!

## 24. PRAYER

(1) IT IS HEREBY KINDLY REQUESTED FROM THE HONOURABLE COURT OF APPEALS to admit this Motion on Appeal to hearing and having found it well-substantiated, to reverse Court Order No.5 of January 10, 2018 dismissing

case No.730/2013 as wrong and violating Art.735, Para 1 (1) and (2) and Art.632, Para 1 and 4 CA, and Art.13 Council Regulation *(EC)* No. 1346/2000 of 29 May 2000 on insolvency proceedings, for such Court Order not only infringes upon the rights held by the Trustee for Ayr Logistics Limited Inc., Texas, USA, but violates the prohibition for discriminatory treatment, as well, as laid down in Art.1(f) of the US-Bulgaria Bilateral Investment Treaty (promulgated in State Gazette, issue 47 of February 26, 2003.

(2) IT IS HEREBY KINDLY REQUESTED FROM THE HONOURABLE COURT OF APPEALS to provide - by applying the provision of Art.267 TFEU and referring the matter to the ECJ, as well - an answer to this question: "What legal grounds, if any, when applied in strict observance of Art.13 of the Insolvency Regulation as well, may justify the release of certain third parties from their liability for those certain harmful actions of theirs as a result of which those third parties managed to take control over the BGN 113 million in APD's Estate and then disposed of the money at their own liking and in their own favour – all that to the detriment of APD's creditors".

(3) IT IS HEREBY KINDLY REQUESTED FROM THE HONOURABLE COURT OF APPEALS having reversed Court Order No.5 of January 19, 2018, to remand case 730/2013 to the Shumen District Court and order it to resume the proceedings, as well as directing it to apply the law for the purpose of proceeding with the case and taking further actions to cause collection of the amounts due to APD's Estate and its effective replenishment.

(4) IT IS HEREBY KINDLY REQUESTED FROM THE HONOURABLE COURT OF APPEALS to schedule an open hearing of this Appellate Motion as soon as possible and summon APD and APD's Trustee in attendance.

### 25. Attachments

For the sake of simplicity and in support of the grounds for reversal, certified true copies of the evidence cited in this Motion are attached hereto, as follows:

Attachment (A):   Ayr Trustee's demand for payment dated July 20, 2016;

Attachment (B):   Ayr Trustee's demand for payment dated August 24, 2016;

Attachment (C):   Ayr Trustee's demand for payment dated December 6, 2017;

Attachment (D):   APD Creditors Committee Report dated June 7, 2016

Attachment (E):   APD Creditors Committee Report dated September 2, 2016;

Attachment (F):   APD Trustee's Report dated September 14, 2016;

Attachment (G):   Ruling No.545 of December 2, 2015 issued in case 730/2013;




Attachment (H):  APD Creditors Committee Letter in reply to Ayr's Bankruptcy Court dated December 3, 2014;

Attachment (I):  Creditors Committee Resolution dated May 5, 2015;

Attachment (J):  Creditors Meeting Resolution of August 12, 2013;

Attachment (K):  [APD] Trustee's Report of February 26, 2016;

Attachment (L):  APD Trustee's letter in reply to Ayr Trustee of April 27, 2016;

Attachment (M):  APD Trustee's letter in reply to Ayr Trustee of August 15, 2016;

**Discovery request:**

It is hereby kindly requested from the Appellate Court to demand that the Shumen District Court supply it with the entire case file in case No.730/2013 for the purposes of the appellate action in re Court Order No.5 of January 19, 2018.

Respectfully submitted:

/s/ *Zahari Tomov*
Zahari Tomov,
Special Bulgarian Counsel for Ayr Trustee per Court Order entered on May 11, 2016 by the US Bankruptcy Court for the Northern District of Texas in case No.14-34490-bjh

---

*The undersigned Ilka Simeonova Dyulgerova hereby attest that this is a true and correct translation from Bulgarian into English of the attached document – Appeal against Court Order No.5 of January 19, 2018 of the Shumen District Court and filed under No.441 on 25th January 2018. This translation has 10 (ten) pages.*

Translator: _____ *Ilka Simeonova Dyulgerova*



**Чрез:**

**Окръжен съд –Шумен**

Търговско отделение

търговско дело № 730/2013 г.

производство по несъстоятелност на

Еър Пропърти Девелопмънт АД

**До:**

**ВАРНЕНСКИ АПЕЛАТИВЕН СЪД**

# АПЕЛАТИВНА ЖАЛБА

От: Адвокат Захари Томов, Адвокатска колегия –гр.Варна, с адрес на кантора: гр.Варна, улица "Бели Лилии" № 30, ет.3, ап.13, е-мейл: zahari.tomov@gmail.com, действащ в качеството на особен представител на Синдика на Еър Лоджистикс Лимитед Инк., назначен за такъв с одобрението на Федералния съд по несъстоятелност за Северен окръг на щата Тексас, САЩ, съгласно Разпореждане от 10.05.2016, Документ 24, внесен по Дело № 14-34940-bjh.

**Срещу**: Решение № 5 от 19.01.2018 г., с което Шуменския окръжен съд (съд по несъстоятелността) прекратява производството по несъстоятелност, водено спрямо Еър Пропърти Девелопмънт АД , т.д. № 730/2013 г.

**Правно основание:**

Чл.274, ал.1, т.1 от ГПК;

Чл. 735, ал.1  от ТЗ;

1

**МОЛЯ ПОЧИТАЕМИЯ АПЕЛАТИВЕН СЪД,**

Да допусне до разглеждане по същество настоящото обжалване на прекратителното Решение № 5, постановено на 19.01.2018 от съда по несъстоятелността по т.д. № 730/2013 г.

Фактите, на които се основава твърдението ни, че постановеното прекратително определение е лишено от основание, а в същността си предоставя незаслужено предимство на лицата, които неправомерно са се облагодетелствали с дължимите към кредиторите на масата на несъстоятелността на Еър Лоджистикс Лимитед Инк (Еър) - 113 и повече милиона лева, са безапелационни - проверени и потвърдени в производството по несъстоятелност на Еър Пропърти Девелопмънт АД (ЕПД).

В този случай сме изправени пред съдебен акт, чиято неправомерност произтича пряко от липсата на основание за освобождаване от отговорност на увреждащите кредиторите на масата на несъстоятелността действия, осъществени от и в полза на трети лица, както това е разгледано по –долу с оглед разпоредбата на чл.13 от Регламент № 1364/2000 на Съвета на Европа от 29.05.2000 относно производството по несъстоятелност.

С цел прецизност и като въведение в отменителните основания, намирам за необходимо да посоча следните фундаментални за случая документи и обстоятелства:

• ЕПД е задължено да предаде на Синдика на Еър паричните средства посочени в платежните искания връчени на Синдика на ЕПД последователно на 20.07.2016 (**приложение А**) ; 24.08.2016 (**приложение Б**) и на 06.12.2017 (**приложение В**);

• В докладите на Комитета на кредиторите на ЕПД от 07.06.2016 (**приложение Г**) и от 02.09.2016 (**приложение Д**), ясно и точно са означени паричните фондове от масата на несъстоятелността на ЕПД,

2

чието разпореждане е осъществено от и в полза на трети на производството по несъстоятелност лица. В тези доклад са посочени и действията, които Синдикът на ЕПД трябва да предприеме за връщането на тези парични средства в масата на несъстоятелността.

• На 14.09.2016, Синдика на ЕПД пренасочва въпросите, отнасящи се до дължимите от него действия по чл.658, ал.1, т.8 от ТЗ – " действия за събиране на парични вземания на длъжника", към съда по несъстоятелността – (**приложение Е**).

• Със свое Определение № 545 от 02.12.2015 (**приложение Ж**), съдът по несъстоятелността е изискал от Синдика на ЕПД да представи доклад относно необходимите действия за събиране на имуществото и попълването на масата на несъстоятелността, което и до днес не е направено по т.д. № 730/2013.

Всички тези факти и положения, имат съществено значение и пряк ефект по отношение на основанията за прекратяването на производството по несъстоятелност и за заличаването на несъстоятелния длъжник, установени в чл. 735, ал.1, т.1 и т.2 от ТЗ, предмет на следващото изложение.

## (А) Правилото на чл. 735, ал.1, т.1 от ТЗ:

1. Правилото на чл.735, ал.1, т.1, въздига като предпоставка за прекратяване на производството по несъстоятелност, изискването да са изплатени задълженията на масата на несъстоятелността. Посочените по –горе факти и документи, не оставят място за съмнение, че в производството по несъстоятелност на ЕПД не е процедирано плащане на задълженията.

2. Обясненията на Синдика, независимо от това дали изобщо същите са състоятелни (за което едва ли може да бъде намерено разумно основание и обосновани аргументи), се свеждат до -"липсата на указания от страна на съда по несъстоятелността относно действията, които следва да бъдат предприети, за да се съберат паричните вземания от масата на несъстоятелността". Този факт ясно посочва, че дори не е направено необходимото, за да бъде подготвено дължимото в производството по несъстоятелност на ЕПД, за да се извърши

3

плащане на задълженията към кредиторите. Съдът по несъстоятелността от своя страна, въпреки исканите от Синдика на ЕПД указания, не се отзовал на тези искания, а е предпочел да прекрати производството по несъстоятелност. По този начин съдът по несъстоятелността и Синдикът на ЕПД, действат в подкрепа на лицата, които са се облагодетелствали с паричните фондове, принадлежащи на масата на несъстоятелността и предназначени за изплащане задълженията към кредиторите.

3. На напрактика прекратителното решение поставя преграда в производството по несъстоятелност на ЕПД да бъде реализирана отговорността на тези трети лица, произтичаща от техните увреждащи действия спрямо законните права на кредиторите .

4. В случая, съдът по несъстоятелността е постановил прекратителното решение в нарушение правилото на чл.735, ал.1, т.1 от ТЗ и във вреда на законните права на моя доверител.

### (Б) Правилото на чл.735, ал.1, т.2 от ТЗ:

5. По силата на това правило, прекратяването на производството по несъстоятелност предпоставя и изисква като абсолютно и задължително условие, масата на несъстоятелността да е изчерпана, което в случая не е така.

6. В случая, както съда по несъстоятелността (Определение № 245 от 02.12.2015), така и Синдика, и Комитета на кредиторите - писмото-отговор на Комитета на кредиторите до съда по несъстоятелност на Еър от 03.12.2014 (приложение З) и Решението от 05.05.2015 год. (приложение И), решенията на събранието на кредиторите от 12.08.2013 (приложение Й), признават факта, че в резултат на извършените от и в полза на трети лица на масата на несъстоятелността разпореждания с паричните фондове на ЕПД е налице хипотезата уредена в чл.658, ал.1, т.8 от ТЗ. В тази хипотеза Синдикът на ЕПД следва да предприеме дължимите действия за събиране на паричните вземания. Това обаче, въпреки всеобщото признание по т.д. № 730/2013, остава неизпълнено. Неизпълнени са както дадените за това указания от съда по

4

несъстоятелността с Определение № 245 от 02.12.2015, така и решенията на Комитета на кредиторите и на събранието на кредиторите.

7. След като съдът по несъстоятелността е бил наясно с необходимостта от това Синдика да предприеме действията за събиране на паричните вземания на масата на несъстоятелността, то очевидно същият е бил наясно с отсъствието на основание за прекратяване на производството по несъстоятелност по чл.735, ал.1, т.2 от ТЗ.

(1) В този ред прекратителното Решение № 5 от 19.01.2018 е незаконосъобразно и увреждащо правата и законните интереси на доверителя ми , и като такова трябва да бъде отменено, със задължителни указания относно приложението на закона, при зачитане и спазване на международните правила, отнасящи се до производството по несъстоятелност, съобразено с правилата за "най-облагодетелствена нация" и за "недискриминационно третиране", възведенн в чл. I , букви "е" и "з", от Договора за насърчаване и взаимна закрила на инвестициите между България и САЩ, обнародван в Държавен вестник бр. 47 от 26.02.2004 год.

8. В допълнение към чл.735, ал.1, т.2 от ТЗ и с оглед завършеността на отговора, който настоящото обжалване дава на разгледаните и решени от съда по несъстоятелността въпроси, отнасящи се до предпоставките, при които е допустимо прекратяване на производството по несъстоятелност и заличаването на несъстоятелния търговец,  намирам за необходимо да обърна внимание и върху Регламент № 1364/2000 на Съвета иа Европа от 29.05.2000 относно производството по несъстоятелност, както и върху правилото на чл.632, ал.4 от ТЗ.

(1) Регламент № 1364/2000 на Съвета на Европа от 29.05.2000 относно производството по несъстоятелност, отговаря най-адекватно и издържа теста по критерия за "най-облагодетелствена нация" , а правилото на чл. чл.632, ал.4 от ТЗ съответства на изнскването за "национално третиране" установено в чл. I , буква "ж", от Договора за насърчаване и взаимна закрила на инвестициите между България и САЩ, които критерии са определящи за избягването на

положения, идентифициращи се като дискриминационно третиране по отношение правата на моя доверител.

## (В) Регламент № 1364/2000 на Съвета на Европа от 29.05.2000 относно производството по несъстоятелност (Регламента) :

9. Съгласно трайната практика на Съда на ЕС, когато националните закони на държавите членки уреждат отношения с предмет и основания, уредени с приетите от институциите на ЕС актове, то в тези случай националните съдилища на тези държави членки на общността са длъжни да спазят правилото на чл.267, ал.3 от ДФЕС и да осигурят ефективността и върховенството на правото на ЕС . В този смисъла са – Решение на Съда от 14.03.2013 по дело С-32/11 (*Allianz Hungaria Biztosito Zrt и др. срещу Gazdasagi Versenyhivatal*) – Решение от 05.12.2000 по дело Guimont (*С-448/98 , Recueil, стр. I-10663*) – Обзорния преглед на практиката на Съда на ЕС, представен със заключението на Генералния адвокат г-н N.Wahl, от 05.09.2013 , по съединени дела С-159/12, С- 160/12 и С-161/12 (*Alessandra Venturini срещу A.S.L. Varese и др., Maria Rosa Gramegna срещу A.S.L. Lodi и др., Anna Muzzio срещу A.S.L. Pavia и др.*)

10. Трябва също така да обърна внимание, че по отношение на Договора за насърчаване и взаимна закрила на инвестициите между България и САЩ, обнародван в Държавен вестник бр. 47 от 26.02.2004 год., българската държава е упражнила правото за запазване на неговото действие след присъединяването й към ЕС, с потвърдено съответствие с правото на ЕС, съгласно правилата на Регламент (ЕС) № 1219/2012 за установяване на преходни разпоредби за двустранните инвестиционни споразумения между държавите членки и трети на Съюза държави. След като България и ЕС са преценили, че инвестиционната спогодба със САЩ съответства и е в синхрон с правото на Съюза, то очевидно липсва основание за това българският съд да изключи приложението на Регламента в случая, особено ако такова изключване може да доведе до дискриминационно третиране на правата на доверителя ми.

6

11. Твърдя, че прекратителното Решение № 5 от 19.08.2018, с което съдът по несъстоятелността постановява прекратяване на несъстоятелността и заличаване на ЕПД, нарушава Регламента:

*Чл.13 "Уреждащи действия" – Съдът по несъстоятелността и Синдикът на ЕПД, не са дали отговор на основния въпрос, отнасящ се до това, съществуват ли и кои са основанията за освобождаване от отговорност на лицата, установили контрол и извършили разпореждане в своя и в полза на трети лица, с паричните фондове от масата на несъстоятелността на ЕПД. Този въпрос е от преюдициално значение и на него съдът дължи отговор при произнасяне на прекратителните основания спрямо т.д. № 730/2013 !*

12. Поставянето от Синдика на предварително условие за предприемането на действия за събиране на паричните вземания на масата на несъстоятелността, като изисква съдът по несъстоятелността да му даде указания за такива действия , от една страна и от друга - мълчанието на съда по несъстоятелността по този въпрос, в същността си не е нищо повече от предоставяне на незаслужено предимство в полза на лицата, чийто действия са отнели от масата на несъстоятелността на ЕПД 113 и повече милиона лева.

13. В духа на чл.13 от Регламента, трябва да се признае, че липсва основание за освобождаване на увреждащите действия спрямо кредиторите на ЕПД от отговорност !

14. В случая, съдът по несъстоятелността очевидно е предпочел интересите на лицата, чийто действия имат увреждащ ефект за правата на кредиторите в производството по несъстоятелност, пред правата на последните, постановявайки в нарушение правилата на чл.735, ал.1,т.1 и т.2 от ТЗ, прекратяване на производството по несъстоятелност и заличаването на ЕПД.

**(Г) Правилото на чл.632, ал.1 и ал. 4 от ТЗ:**

15. Прекратяването, поради невнасяне на средства за издръжка на производството по несъстоятелност според правилата на чл.632, ал.1 и ал.4 от ТЗ, предпоставят следните обективно установени предпоставки:

- Имуществото в масата на несъстоятелността на ЕПД да не е достатъчно за покриване на разноските в производството по несъстоятелност ;
- Тези разноски да имат за адресат ясни действия, които следва да бъдат предприети от страна на Синдика на ЕПД и да се отнасят до управлението, запазването и попълването на масата на несъстоятелността ;

(1) Тези предпоставки трябва да са кумулативно дадени, като едновременно с това да отговарят на критериите за разумност и предвидимост.

16. Въпреки изисквания и дължим от Синдика план за действията, които са необходими за събиране на паричните вземания на масата на несъстоятелността и за нейното попълване, както това е посочено в постановеното от съда по несъстоятелността Определение № 545 от 02.12.2015, такъв план не е изготвен и не е представен по т.д.№ 730/2013. Вместо това Синдикът е препратил този въпрос към съда по несъстоятелността, който пък от своя страна предпочита да прекрати производството по несъстоятелност, вместо предприемането на действията и прилагането на мерките, чрез които разпоредените от и в полза на трети лица 113 и повече милиона лева, да бъдат възстановени в масата на несъстоятелността на ЕПД.

17. Липсата на обоснован план за действия с предвидими в разумните рамки последици, напълно обяснява и липсата на предплатени разноски. Никой разумен човек няма да налива вода в спукан съд, тъй като същата логично само ще се разпилее .

18. Правилата на чл.632, ал.1 и ал.4, не могат да служат като санкция спрямо разумното очакване, че предплащането на разноски в производството по

8

несъстоятелност ще бъде обвързано с предварително обявения план за действията, чрез които ще бъдат събрани паричните вземания и попълнена масата на несъстоятелността.

19. В случая, съдът по несъстоятелността е направил точно това - наложил е санкция спрямо правата на кредиторите, за това, че последните са били разумни и на практика не са се съгласили да наливат пари за дейност, която е напълно анонимна и за която, Синдика очаква да получи от съда по несъстоятелността указания, които обаче са заместени от съда по несъстоятелността с прекратяването на производството по несъстоятелност.

(1) Както е посочено в доклада на Синдика от 26.02.2016 (приложение К), единствените разноски в производството по несъстоятелност се отнасят до неговите възнаграждения. В случая обаче не е изяснено, защо са необходими разноски за дейност, която няма да бъде извършена, тъй като за нея липсват указания от страна на съда по несъстоятелността.

20. Преценката за необходимостта от предплащане на разноски за действията, ангажирани със събиране на паричните вземания и попълването на масата на несъстоятелността, каквито са правомощията на Синдика по чл.658, ал.1, т.8 от ТЗ, включва несъмнено и правилото на чл.620, ал.5 от ТЗ, където действията за попълване на масата на несъстоятелността са освободени от задължение за предварително внасяне на държавна такса.

21. Изискването за предплащане на разноски в производството по несъстоятелност, отнасящи се до издръжката на действията за събиране на паричните вземания на несъстоятелността, които разноски и действия не са предварително обосновани и по тях липсва прозрачност и предвидимост, не може да бъде използвано за основание за прекратяване на произвдството по несъстоятелност на ЕПД.

**(Д) Заключение:**

22. Посочените по-горе факти и положения, ясно и безусловно посочват, че по отношение правата на моя клиент, прекратяването на производството по

9

несъстоятелност на ЕПД има увреждащи дискриминационен характер и ефект. Отново ще подчертая факта, че в случая става въпрос за прекратяване на производство по несъстоятелност, в което без основание и в нарушение на чл.13 от Регламента е освободена от отговорност, увреждащата кредиторите на ЕПД деятелност на третите лица, в резултат на която деятелност притежаваните в масата на несъстоятелността 113 и повече милиона лева, са били разпоредени в тяхна полза и/или в полза на други трети лица.

23. Невъзможността да бъдат изпълнени платежните искания на Синдика на Евър, Синдикът на ЕПД идентифицира в дадения от него отговор от 27.04.2016 (приложение Л) и от 15.08.2016 (приложение М) с извършените от и в полза на трети лица разпореждания с паричните средства на ЕПД. Следователно прекратяването на т.д. № 730/2013 очевидно е осъществено в условията на ясното разбиране, че по отношение иа 113 и повече милиона лева, формиращи паричната маса на несъстоятелността, следва да бъдат предприети действия и мерки за тяхното възстановяване на ЕПД, тъй като същите се дължат на кредиторите.

(1) Без съмнение, липсата на основание по чл.13 от Регламента за освобождаване от отговорност на увреждащите действия на трети лица, посочва и определя постановеното от съда по несъстоятелността прекратително решение № 5 от 19.01.2018, като лишено от основание и имащо за пряк ефект - дискриминационното третиране на правата на моя клиент, и същото трябва да бъде отменено !

## 24. ПЕТИТУМ:

(1) МОЛЯ ПОЧИТАЕМИЯТ АПЕЛАТИВЕН СЪД, да допусне до разглеждане настоящата въззивна жалба и след като се убеди в нейната основателност да постанови отмяната на произнесеното от Шуменски окръжен съд по т.д. № 730/2013 прекратително Решение № 5 от 19.01.2018, като постановено в нарушение на чл.735, ал.1, т.1 и т.2, на чл.632, ал.1 и ал.4 от ТЗ, и на чл.13 от Регламент № 1364/2000 на Съвета на Европа от 29.05.2000 относно производството по несъстоятелност, които нарушения по отношение на правата

10

на Синдика на Еър Лоджистикс Лимитед Инк., щат Тексас, САЩ, са със съставомерност на нарушаване забраната за дискриминационно третиране, установена в чл.1, б. "е" от Договора за насърчаване и взаимна закрила на инвестициите между България и САЩ, обнародван в Държавен вестник бр. 47 от 26.02.2004 год.



(2) **МОЛЯ ПОЧИТАЕМИЯТ АПЕЛАТИВЕН СЪД**, да даде отговор на въпроса, включително и като приложи разпоредбата на чл.267 от Договора за функциониране на Европейския съюз и изиска от Съда на ЕС, отнасящ се до конкретните основания и тяхното съществуване, с приложението иа които, без да се нарушава разпоредбата на чл.13 от Регламента, следва да бъдат освободени от отговорност увреждащите действия, в резултат на които 113 и повече милиона лева, притежавани от масата на несъстоятелността ЕПД, са поставени под конктрол и разпоредени от и в полза на трети лица и във вреда на кредиторите на ЕПД.

(3) **МОЛЯ ПОЧИТАЕМИЯТ АПЕЛАТИВЕН СЪД**, въз основа отмяната на Решение № 5 от 19.01.2018, да върне производството по т.д. № 730/2013 на Шуменски окръжен съд, като даде задължителни указания по приложението на закона, с оглед продължаване на съдопроизводствените действия за събиране на паричните вземания на масата на несъстоятелността на ЕПД и нейното ефективно попълване.

(4) **МОЛЯ ПОЧИТАЕМИЯТ АПЕЛАТИВЕН СЪД**, да насрочи разглеждане на настоящата жалба в най-кратък срок и в открито съдебно заседание с призоваване на Еър Пропърти Девелопмънт АД и Синдика на несъстоятелното дружество.

### 25. Приложения:

С цел прегледност на отменителните основания и за удобство на Апелативния съд, представям в заверен препис за вярност цитираните в настоящата жалба доказателства :

Приложение (А)  - Платежно искане на Синдика на Еър от 20.07.2016;

11

Приложение (Б) – Платежно искане иа Синдика на Еър от 24.08.2016 ;

Приложение (В) – Платежно искане на Синдика на Еър от 06.12.2017 ;

Приложение (Г) - Доклад на Комитета на кредиторите на ЕПД от 07.06.2016;

Приложение (Д)  - Доклад на Комитета на кредиторите на ЕПД от  02.09.2016 ;

Приложение (Е) -   Доклад на Синдика на ЕПД от 14.09.2016 ;

Приложение (Ж) - Определение № 545 от 02.12.2015, постановено по т.д. № 730/2013;

Приложенне (З) – Писмо-отговор на Комитета на кредиторите до съда по несъстоятелиост на Еър от 03.12.2014;

Приложение (И) -  Решението на Комитета на кредиторите от 05.05.2015 ;

Приложение (Й) - Решенията на събранието на кредиторите от 12.08.2013

Приложение (К) - Доклад на Синдика от 26.02.2016 ;

Приложение (Л) – Писмо-отговор на Синдика на ЕПД до Синдика на Еър, от 27.04.2016;

Приложение (М) – Писмо-отговор на Синдика на ЕПД до Синдика на Еър, от 15.08.2016 ;

### Искане по доказателствата:

Моля дело № 730/2013 да бъде изискано в цялост от Шумеиски окръжен съд, за послужване в производството по обжалване на Решение № 5 от 19.01.2018 г.

С Почит:

Адвокат Захари Томов

(особен представител иа Синдика на Еър,

съгласно Разпореждане от 11.05.2016,

Дело № 14-34490-bjh,

Федерален сът по несъстоятелност

за Северен окръг иа щата Тексас, САЩ)

12