# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>Ayr Logistics Limited Inc.,<br><br>                  Debtor,<br><br>Jeffrey H. Mims, Chapter 7 Trustee for<br>Ayr Logistics Limited, Inc. | Chapter 7<br><br>Case No. 14-34940-bjh-7 |

## DECLARATION OF CHAVDAR ANGELOV ANGELOV

I, Chavdar Angelov, declare, pursuant to 28 U.S.C. § 1746(1), under penalty of perjury under the laws of the United States of America that:

1. I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are, in all things, true and correct.

2. I am a Bulgarian citizen, permanently residing in Varna, Bulgaria at a tourist lodge in the Aladzha Manastir locality, Primorski Region; e-mail: allseas.chavdar@gmail.com. I am fluent in both written and spoken English.

3. Acting as a person who enjoyed the rights granted by the laws of the USA and more specifically the right to live and own property, and work in the USA, I agreed to make this statement on the truthfulness of the facts detailed below.

1

4. I hereby issue this declaration being fully aware and knowing that the facts I confirmed below are directly related to the Order issued by the United States Bankruptcy Court for the Northern District of Texas, Doc.68 Filed November 13, 2017, case No. 14-34940-bjh-7, of which Order I have a copy.

5. The facts and supporting evidence presented here outline a fuller picture and a better explanation of the events described in my earlier declaration of May 18, 2017 and how those came to occur and the consequences therefrom. I hereby confirm that the facts and evidence in support thereof contained therein are true and correct to the best of my knowledge. My earlier declaration of May 18, 2017 is attached hereto as **Attachment [A]**.

6. The Mexican bonds deal and the Silver Beach Project were entirely different projects initially, the only link being the human factor interested in both. Eventually, in a series of uncontrollable events, they ended quite intertwined.

7. The bank loans of 2007 and 2008 were borrowed by Port Investment and Development, Inc. (PID Inc.), State of Delaware, 12 Timber Creek Lane, City of Newark, DE 19711. *See* **Exhibit [1]**. The money so borrowed was invested in the purchase of Mexican bonds as I stated earlier in my Declaration of May 18, 2017. PID, Inc. is the company that created and controlled Port Investment Development – Bulgaria 2, EAD (PIDB2) back in 2007 for the purpose of engaging in and financing the Mexican bonds purchase. *See* **Exhibit [2]**.

8. The *Preliminary Sale and Purchase Agreement for the Silver Beach Project* dated November 2, 2007 as signed by and between PIDB2 and All Seas Property 2 was used in the applications for the two bank loans of 2007 and 2008, respectively. *See* **Exhibit [3]**. When the money borrowed under Bank Loan No.39KP-AA-2510 of 22 November 2007 was successfully transferred to the bank account of All Seas Management Ltd (ASM) with the Bank of Valetta, Malta, PID Inc. and PIDB2 withdrew from and left the SB project purchase deal. *See* **Exhibit [4]**.

9. In October 2008 further financing in the amount of 2.5 million Euros was needed. It was then that under the pretext of additional funding of the SB project purported purchase deal, which PID Inc. and PIDB 2 had in the meantime left altogether, Fibank extended a new loan to PIDB2, this time in the amount of 2,5 million euros

2

under Bank Loan No 014LD-L-000002, and the money so lent was again wired to ASM account with the Bank of Valetta, Malta. *See* **Exhibit [5]**.

10. Fibank expected to have the money it lent under said bank loans, namely: Bank Loan No.39KP-AA-2510 and Bank Loan No.014LD-L-000002, respectively, safely recovered out of the profit from the Mexican bonds sale no later than December 15, 2009.

11. It became clear at the time that despite the efforts put and the series of trips to the USA in 2009 and business meetings in New York in that regard the Mexican Bonds sale would not going to be closed before 2010. Meanwhile Harris had shown interest in both the Mexican bonds deal and the SB project, so in April 2009 Fibank and Harris entered in negotiations trying to find a way out and deal with the matter of recovering the money originating from the two loans borrowed by PID, Inc. *See* **Exhibits [6] and [7]**.

12. Harris undertook to acquire PID, Inc. and PIDB2, so he sought out to do it via Target Financial Services, Inc. (Target), State of Oregon, 171 S.W. "C" Street, Suite No.303, Madras, Oregon 97741, USA. *See* **Exhibit [8]**. Target and I were the shareholders in PID, Inc.

13. It was Commerce Commodities, Ltd., Oregon, 171 S.W. "C" Street, Suite No.303, Madras, Oregon 97741 USA, a company associated to Target, that undertook to represent Harris' interests in the acquisition of the SB project. *See* **Exhibit [9]**.

14. The SB project was entirely Ayr's project. Harris was the one to make all the arrangements with HSBC, NY, and opened the bank account of Oriana Capital Partners, LLC there. *See* **Exhibit [10]**. Oriana Capital Partners, LLC was engaged as escrow-agent for HSBC, NY in the Ayr's SB project.

15. Although the Mexican bonds deal and the SP project came into being independently as two separate business projects, the link between the holders of economic interests in those two projects was strong, albeit invisible on the outside. The link was that the financing of the purchase of the Mexican bonds originated from the two bank loans Fibank extended to PID, Inc. in 2007 and 2008.

16. The delay in Mexican bonds selling, which in turn delayed the return of the money

3

ensured by way of said two bank loans, was becoming a matter of great concern for Fibank, because outstanding payments under the two loans kept accumulating and the debts grew. The matter needed to be dealt with by the end of 2009 at the latest when the two bank loans of 2007 and 2008 would mature.

17. On October 2, 2009 the negotiations between Fibank and Harris that started earlier in April 2009 were reopened, *see* **Exhibits [11] and [12]**. On December 21, 2009 their outcome proved successful when Harris issued his first letter of commitment on behalf of Ayr undertaking to buy the debts under the bank loans of 2007 and 2008. The interesting thing, though, was that there was not a single mention of the fact that the debts in question were actually owed by PID, Inc., as a result of the Mexican bonds purchase; the debts instead were represented as debts owed by the SB project. *See* **Exhibit [13]**. That is how the Agreement of June 4, 2010 was reached eventually. Under said Agreement Ayr undertook repay to Fibank the debts arising from said bank loans no later than June 30, 2010 – the same bank loans the money from which was elsewhere invested, i.e. in the Mexican bonds purchase. *See* **Exhibit [14]**. The payment itself was intended to be made via the Oriana Capital Partners bank account with HSBC, NY. *See* **Exhibit [15]**.

18. The terms of payment under the June 4, 2010 deal provided, *inter alia*, as follows: 1) a 20-million-Euro security deposit in support of the Silver Beach Project had to be made; and 2) the said security deposit had to be confirmed by a MT 799 SWIFT to HSBC, NY in favour of the Oriana Capital Partners bank account.

19. Bank of America's refusal to deliver to HSBC NY and Oriana Capital Partners LLC the MT 799 SWIFT that Investbank, Bulgaria, issued on October 27, 2010 in confirmation of the 20-million-Euro security deposit made in support of the Silver Beach Project, *see* **Exhibits [16] and [17]**, on one hand, and Investbank AD's inability to deliver directly the said SWIFT to HSBC, NY, in the beginning of 2011, *see* **Exhibit [18]**, on the other, caused certain changes to be made in the terms of payment agreed with Fibank under the June 4, 2010 Agreement.

20. On January 27, 2011 Harris agreed that performance under the June 4, 2010 Agreement would no longer the require a SWIFT confirmation of the security deposit in place in support of the SB Project to Oriana Capital Partners bank

4

account with HSBC, NY. *See* **Exhibit [19]**. Said requirement was replaced by a swap of economic interests between Haris and Fibank in the Mexican bonds deal, instead. The swap so negotiated provided for the following: (1) Fibank's claims arising from the bank loans extended to PID Inc. and for which claims in 2010 Fibank succeeded in obtaining writs of execution against PID Inc.'s Bulgarian subsidiary PIDB2 would become property of Ayr and Oriana Capital Partners, LLC, while (2) Harris would in return acquire a direct interest in both the Mexican bonds deal and a share of profit to be gained from the Mexican bonds sale.

21. As of February 2011 Harris had already taken charge of the Mexican bonds sale, see **Exhibit [20]**. On February 21, 2012 West Low Group, P.C. (Virginia, USA, 8000 Towers Crescent Drive, Suite 600, Viena, VA 22182), the erstwhile escrow agent hired back in November 2010 to sell the Mexican bonds, was disengaged, *see* **Exhibit [21]**, and replaced by Andrew A. Layman, P.C., State of Texas, 8588 Katy Freeway, Suite 230, Huston 77024, the new escrow agent hired to see through the sale, *see* **Exhibit [22]**.

22. Replacement of escrow-agents and the changed method of sale of the Mexican bonds however did not affect in any way the role New York played in being a renowned international financial centre and being the centre of economic interests of the participants in (1) the swap negotiated on the basis of the Mexican bonds deal; (2) the financing of the SB project, and (3) Ayr's consolidation of all payment claims in the SB project.

23. The laws of the State of New York and the international renown of the New York Courts as being competent and having jurisdiction over international disputes having a cross-border element was what tilted the scales in favour of choosing both HSBC, NY, as the servicing bank for the economic interests in the Mexican bonds swap deal and Deutsche Bank, NY, as the servicing bank for Ayr's Reorganization Plan for Ayr Property Development AD (APD) and for consolidating the payment claims under Ayr's Silver Beach Project.

24. Setting in motion the swap deal under the June 4, 2010 Agreement not only failed to solve the issues thereunder existing since the end of 2012, but failed to slow their aggravation, which was getting out of hand.

25. In late 2012 the Danish and UK investors in the Silver Beach Project, namely the Rudersdal Group, hired a Danish law firm named Holck-Andersen & Tyge Sørensen, Copenhagen, to investigate Fibank's payment claims against APD purportedly arising from the June 4, 2010 Agreement. **See Exhibit [23].**

26. On February 8, 2013 the Bulgarian Court denied Fibank's request to be registered as allowed creditor in the bankruptcy proceedings for APD under the three bank loans. **See Exhibit [24].**

27. Attorney Zahari Tomov – representing Ayr's interest in APD's bankruptcy case – notified Harris on December 31, 2013 that Ayr's payment of Fibank's claims (under which Fibank had already obtained writs of execution against PIDB2) would breach the U.S. Foreign Corrupt Practices Act, the UN Convention against corruption (UNCAC), and the UN Convention against Transnational Organized Crime. **See Exhibit [25].** Fibank's claims for payment against APD bankruptcy were void of any grounds that might have qualified the Mexican bonds investment as investments in the SB Project.

28. On June 20, 2014 by invoking the provisions of UNCAC and the international laws dealing with money laundering, corruption and terrorism financing APD Trustee denied Fibank's payment claims. **See Exhibit [26].**

29. During the first half of June 2014 the Bulgarian banking system was hit by a crisis that affected Corporate Commercial Bank AD (Corpbank) and Fibank the strongest.

30. Under those circumstances Harris could no longer postpone finding a solution to the payment issues arising from the June 4, 2010 Agreement.

31. On October 9, 2014 Harris and I were notified by the Bulgarian counsel for APD Trustee Attorney Maria Nakova that Ayr should take immediate action in court pursuant to the U.S. laws to protect Ayr's money amounting to $65,000,000 kept on deposit in bank accounts at Corpbank. *See* **Exhibit [27]**.

32. During the first half of October 2014 it was already impossible to even think of a U.S. Court order to make Fibank cease and desist from taking away Ayr's money in the SB Project. It would have been in breach of the swap agreed under the June 4, 2010 Agreement.

33. It was impossible for Harris and Fibank to produce to HSBC, NY and Oriana Capital Partners LLC any proof showing that payment of the claims under the June 4, 2010 Agreement were investments in the SB Project rather than in the Mexican bonds deal, the reason being that the Bulgarian Court had already adjudicated that the debts arising from the bank loans specified in the June 4, 2010 Agreement were owed by PIDB2 and had denied Fibank's request to be allowed as a creditor of APD bankruptcy proceeding.

34. Neither PID, Inc. nor PIDB2 had any capital that might have made it possible for them to repay the debts arising from the two bank loans of 2007 and 2008, especially when the money lent thereunder however was invested in the Mexican bonds purchase.

35. Eventually, Harris who as early as the beginning of 2011 acquired the rights in the Mexican bonds based on the swap deal chose to relinquish the rights Ayr held in SB Project assets of $65,000,000 by filing for a No Assets bankruptcy on behalf of Ayr on October 10, 2014.

36. In the period following October 10, 2014 till December 1, 2014 Fibank succeeded in making itself entered in the records as the holder of the rights in and disposed of Ayr's money in the SB Project, which was deposited with Corpbank for safe-keeping in early 2013 at the instructions of APD Bankruptcy Court.

37. That final act of Fibank's handling and disposing of Ayr's money in the Silver Beach Project was what brought to closure the Harris-and-Fibank-agreed-under-the-June-4-2010-Agreement swap deal governed by New York laws and subject to New York jurisdiction.

*[The remainder of the this page is left blank intentionally]*

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date: October 3, 2018

Varna, Republic of Bulgaria

Respectfully submitted,

By: _____

## LIST OF CITED DOCUMENTS

## IN THE DECLARATION OF CHAVDAR ANGELOV ANGELOV

## DATED OCTOBER 3, 2018

| Exhibit No. | Document |
|---|---|
| Attachment A | Declaration of Chavdar Angelov Angelov dated May 18, 2017 |
| Exhibit 1 | Statement of Incorporator of Port Investment And Development Inc. |
| Exhibit 2 | PIDB2 Sole Owner's Decision of November 18, 2011 |
| Exhibit 3 | Preliminary Agreement for Sale And Purchase of Real Estate by and between PIDB2 and ASP2 of November 2, 2007 |
| Exhibit 4 | Title Deed for Purchase and Sale of Real Estate by and between PIDB2 and ASP2 of December 12, 2007 |
| Exhibit 5 | Annex to Bank Loan Agreement No.014LD-L-000002 of October 2, 2008 |
| Exhibit 6 | Philip Harris' Letter to Fibank of April 16, 2009 |
| Exhibit 7 | Fibank's Letter to PH of April 22, 2009 |
| Exhibit 8 | Certificate of Incorporation of Target Financial Services, Inc. |
| Exhibit 9 | Commerce Commodities, Ltd.'s Letter to Fibank of August 27, 2009 |
| Exhibit 10 | PH's Letter to Investbank, Fibank and Bulbank |
| Exhibit 11 | Fibank's email to Philip Harris of October 2, 2009 |
| Exhibit 12 | Fibank's Letter to Philip Harris of October 2, 2009 |
| Exhibit 13 | Philip Harris' Letter of Commitment to Fibank of December 21, 2009 |
| Exhibit 14 | Mortgage Receivables Sale and Purchase Agreement of June 4, 2010 |
| Exhibit 15 | Philip Harris' Letter to Fibank of January 24, 2011 |
| Exhibit 16 | Letter from Philip Harris to Investbank and HSBC, NY, of November 1, 2010 |
| Exhibit 17 | Bank of America Report on Delivery of Swift MT 799 to HSBC, NY |
| Exhibit 18 | Oriana Capital Partners, HSBC, NY message to Investbank dated January 20, 2011 |
| Exhibit 19 | Philip Harris' Letter to M.Mattev of 27 January 2011 |
| Exhibit 20 | Exhibit 20 Philip Harris email for deal of Mexican Bonds dated February 23, 2011 |
| Exhibit 21 | Escrow Agreement West Law Group dated November 19.2010 |
| Exhibit 22 | Escrow Agreement Black Diamonds, Andrew A.Layment P.C. Texas, dated February 21, 2012 |
| Exhibit 23 | Danish Lawyer Request dated December 17,2012 |

| | |
|---|---|
| **Exhibit 24** | Judgment No.3 dated 8 February 2013, case No.82-2011 |
| **Exhibit 25** | Attorney Tomov Notice to Philip Harris about FCPA dated December 31, 2013 |
| **Exhibit 26** | BG Trustee Report dated June 20.2014 |
| **Exhibit 27** | Notice of Attorney Nakova to Philip Harris and Chavdar Angelov dated October 9, 2014 |