**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW YORK**
**(SOUTHERN DIVISION)**

|  |  |  |
|---|---|---|
| RUDERSDAL, EOOD, et al. | ) | Case No. 18-cv-11072 (GHW-)-(RWL) |
|  | ) |  |
|  | ) | [rel. 19-cv-01762] |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | Declaration |
| PHILIP ROBERT HARRIS, et al. | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**DECLARATION OF DANIEL KIRILOV BOZHILOV**
**IN SUPPORT OF PLAINTIFFS CLAIMS**

I, Daniel Kirilov Bozhilov, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that:

1. I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are true and correct to the best of my knowledge and belief.

2. From 2007 till 2015 I was Manager of Telecom Advisers, OOD having address at 27 Petar Parchevich St, Sofia, Bulgaria. My contact details are: email: danibozhilov@abv.bg, cell: +359 887 885 166.

3. Since 2015 I have been one of the Co-presidents of the *We, the Citizens*, an NGO having address at 119, Tsar Samouil str. Sofia 1202, Bulgaria, E-mail: niegrajdanite@gmail.com; phone number: +359 888 416 770 and created by

7,800 depositors, of whom 98 U.S. nationals[1] who have suffered damages as a result of Corpbank's winding-up.

4. I graduated from the Neofit Rilski South-West University of Blagoevgrad, Bulgaria, earning a Master of Law Degree in 2000.

5. I have also completed additional qualification courses at the Bulgarian Institute for European Integration in Sofia, Bulgaria and awarded qualifications in: *Assignment, Management and Control of Public Tenders Activities* in 2001; *Legislative Activities and Legislative Process* in 2003; and *Electronic Document, E-trade and Electronic Security* in 2003.

6. During 2002-2003 I headed the Department of Secondary Legislation Making, Telecommunications Market Regulation and Legal Representation at the Legal Division of the Bulgarian Communications Regulation Commission.

7. During 2003-2006 I was employed as legal advisor for *Financial Management and Control*; *Procurement Management*, and *Military Medical Academy* to the Bulgarian Minister of Defence.

8. While working with the Bulgarian Communications Regulation Commission and the Ministry of Defense I gained knowledge and now have expertise in: expert-level involvement in research and drafting statutory rules for commercial assets management and management control activities; financial management and control; tender and competitive selection procedures.

9. As co-chair of *We the Citizens* organization I have accumulated further professional experience and broadened my expertise bank management of banks placed under the special supervision of the Bulgarian National Bank (BNB); management of commercial and financial assets of Corporate Commercial Bank AD (Corpbank or CCB); management of deposits with Corpbank and more specifically in the management practices introduced by BNB and the Conservators in Corpbank's case.

---

[1] See Attachment A – Sofia City Court Decision No.851 dated January 12, 2015, Registration of *We the Citizens*.

10. Being well-versed in law and working as co-chair of *We the Citizens* NGO I have gained vast knowledge of BNB's responsibilities, duties and the powers it exercises BNB in managing banks placed under its special supervision, such as: what BNB's powers are and how it execises these, sovereign immunity issues as well as BNB managerial decisions during he time when it took Corpbank into conservatorship.[2]

11. I have reviewed and am familiar with the averments in the Amended Complaint filed in the *Rudersdal, et. al. v. Harris, et. al.* litigation.

12. I have reviewed and am familiar with the declaration of Lazar Tomov dated November 1, 2019, filed on behalf of BNB in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

13. Lazar Tomov's conclusion that BNB enjoys or is protected by sovereign immunity from suit for the damages caused to Corpbank's depositors is wrong for the following reasons: 1) the use of Corpbank's deposits for repayment of others debts to Corpbank is in fact a commercial activity of managing and collecting debts, to which activity liability is attached and outside of any sovereign immunity protection; 2) breaches of international laws against money laundering, corruption and terrorism financing are not protected by immunity of any kind from lawsuit; and 3) BNB is not above the law for its bad acts.

14. Similarly wrong is Lazar Tomov's conclusion put forth in general terms by him that anything which happened in Bulgaria can be addressed in Bulgarian courts. This is a superficial and incorrect conclusion both factually and legally as it relates to this case and these defendants in particular.

15. Recall that the theft of Ayr's asset, $65,000,000 (BGN 102,966,946) (The Funds) were used in the performance of the June 4, 2010 Swap Agreement, which permanently deprived Ayr Creditors' of their rights and interests in the Supplemental Agreement executed by Harris and Ayr on November 27, 2013 (consolidating the payment claims under the Silver Beach Project). Both the

---

[2] See Attachment (B) to this Declaration – my CV.

Swap deal and the consolidation of the payment claims are governed by the laws and the jurisdiction of New York.  The New York court's jurisdiction over the claims brought against the Defendants is further supported by Bulgarian and EU law as follows: 1) provisions of Art.93(1)[3] and Art.105[4] of the Bulgarian Private International Law Code (PILC); and 2) Recital (13), Article 2(h) and Article 3 of EU Regulation (EC) No.1346/2000 of 29 May 2000, international jurisdiction over cross-border bankruptcy proceedings (EU Regulation)[5], **Exhibit 29.**

16. Lazar Tomov's conclusion that Ayr is not a creditor in the bankruptcy proceeding for Ayr Property Development AD (APD) is neither factually nor legally supported. On the contrary, on July 9, 2014, APD Trustee listed Ayr as

---

[3] PILC, Article 93. (1) Contracts shall be governed by the law chosen by the parties. Any such choice must be expressed or clearly demonstrated by the terms of the contract or by the circumstances where under the contractual relationship evolves.

[4] PILC, Article105: (1) The obligations arising out of a tort or delict shall be governed by the law of the State within whose territory the direct damage arises or is likely to arise (*lex loci delicti commissi*).  (2) Where the author of the tort or delict and the person sustaining damage both have their habitual residence or a place of business in the same State at the time when the damage occurs, the law of that State shall apply. (3) Notwithstanding the provisions of Paragraphs (1) and (2), if it appears from the circumstances as a whole that the tort or delict is manifestly more closely connected with another State, the law of that other State shall apply. A manifestly closer connection may be based on a pre-existing relationship between the parties, such as a contract that is closely connected with the tort or delict in question.

[5] EU Regulation is determined by 3 elements: 1) the "*center of main interests*" factor; 2) in the case of *a letter-box* or *a shell company*, the EU Regulation disregards the place-of-registration-factor of the insolvent corporate *letter box* debtor; and 3) the EU Regulation disregards the location of an insolvent debtor's assets if such assets fail to meet the criteria of the definition for "*establishment*". namely, as set forth in Article 2(h), an entity "with a minimum level of organization and a degree of stability for the purpose of pursuing an economic activity". Ayr Property Development,AD, (APD) is *a letter-box* or *a shell company of Ayr and Ny York, New York is a center of main interests of AYR in Ayr Silver Beach Project.*

a creditor in APD bankruptcy case (Ayr is the biggest creditor of APD) on the basis of the March 28, 2012 Agreement and the November 27, 2013 Supplemental Agreements. See **Exhibit 30** and **Exhibit 31.**

17. Lazar Tomov's conclusion that Fibank's payment claims filed in APD bankruptcy recognized Fibank as a creditor and were authorized by a court to be paid is false. The factual and legal evidence completely contradicts this wrong conclusion.

18. First, Fibank's singular payment claim, **Exhibit 32,** timely filed in APD's bankruptcy was for $63,694 (BGN100,000) and was based on three bank loans Fibank had extended of Nos.39-KP-AA-2510 of 22.11.2007, 14-LD-L-000002 of October 02, 2008 and 14-LD-L-000006 of December 12, 29, 2009, respectively, the Agreement of June 4, 2010 and the contractual mortgages created as security for said three bank loans. By virtue of Ruling No.728 of July 30, 2012, **Exhibit 33,** entered by the Supreme Cassation Court the matter of said Fibank's claim was remanded to the trial court (the APD Bankruptcy Court, Targovishte District Court) for further proceedings in Case No.82/2011. On February 8, 2013 the Targovishte District Court entered Judgment No.3, **Exhibit 34,** by which it denied Fibank's claim in its entirety and dismissed Case 82/2011. Fibank failed to appeal the trial court's judgment (Judgment No.3 of February 8, 2013). Hence, pursuant to Art. 296 (2) of the Bulgarian Civil Procedure Code[6] Judgment No.3 of February 8, 2011, entered into full force and effect making the dismissed interlocutory action *res judicata* of the case. Therefore, pursuant to Art.694 (8) of the Bulgarian Commerce Act[7] Judgment No.3 became mandatorily enforceable with respect to APD Bankruptcy case.

---

[6] **Bulgarian Civil Procedure Code, Art.296** "The following decisions shall enter in force - (2) against which no appellate or cassation complaint has been filed within the term, specified by the law"

[7] **Bulgarian Commerce Act, Art.694 (8)**: "A declaratory judgement in full effect under (1) above shall be legally binding to all relations between the parties to the bankruptcy proceedings, including the debtor, the trustee in bankruptcy and all the creditors".

19. *Second*, Fibank's claims of May 21, 2013, **Exhibit 35,** were filed after the expiration of the deadlines set forth in Art.685 (1)[8] and Art.688 (1)[9] of the Bulgarian Commerce Act. That crucial two-month limitation period for filing any additional claims in APD bankruptcy, apart from claims already filed and subsequently denied in case No. 82/2011, started to run on the date when Judgment No.16 of May 3, 2011, **Exhibit 36** – the judgment by which the Targovishte District Court opened the bankruptcy proceeding for APD – was published on the Bulgarian Commercial Register. **Exhibit 37**. Said Judgment was thus published under ref.#: 20110510150602 on May 10, 2011. Fibank's May 21, 2013 claims, were irreversibly precluded (effect of time barrier) with the expiration of the two-month limitation period set forth in Art.688 (1) of the Bulgarian Commerce Act, which expired as early as July 11, 2011; hence payment in satisfaction of such claims out of APD bankruptcy estate is unlawful. APD Bankruptcy Court was well aware of the above and never authorized any payment under Fibank's May 21, 2013 claims.

20. *Third*, it is impossible to authorize payment in satisfaction of Fibank's claims of May 21, 2013. In addition to the *res judicata* effect of Judgment No.3 entered on February 8, 2013 and because Fibank;s claims were *time-barred*, on June 20, 2014 APD's Trustee Ganka Kolyovska refused to make payment on Fibank's payment claims of May 21, 2013, because any such payment vioklated the UN Convention against corruption, the EU Civil Law Convention on Corruption and Directive 2005/60/EC on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing.

---

[8] **The Bulgarian Commerce Act Art.685 (1):** "Creditors shall submit their claims in writing to the bankruptcy court within one month upon entry into the Commercial Registry of the court decision opening bankruptcy proceedings."

[9] **The Bulgarian Commerce Act Art.688 (2):** "Claims submitted after the term under Art. 685 (1) has expired and no later than two months of its expiration shall be entered into the list of submitted claims and shall be proceeded as set forth in the law. Claims that have arisen prior to the date of opening of the bankruptcy proceedings may no longer be submitted after the latter time limit has expired."

21. Fibank never appealed and APD Bankruptcy Court never reversed APD Trustee's June 20, 2014 refusal.

22. ***Fourth***, APD's bank accounts with Corpbank and the money deposited under court supervision and for safe-keeping (the money paid by Fibank for the purchase of Ayr's SB Project lands) were to be managed pursuant to the rulings/orders of APD Bankruptcy Court: (1) Ruling No.38 of February 14, 2013, authorizing APD's Trustee to make electronic payments limited solely to bankruptcy expenses, **Exhibit 8**, and (2) Ruling No. 304 dated July 11, 2014, authorizing the transfer of the money from Corpbank into the Bulgarian Development Bank, **Exhibit 9**. APD Bankruptcy Court had not issued any other acts in that regard concerning how the money deposited at Corpbank should be managed and used, moreover any acts authorizing the Defendants to carry out the actions, which lead to reducing the balance of APD bank accounts with Corpbank to zero and their consequent closing.

23. I have reviewed and am familiar with the declaration of Emil Emanuilov dated August 21, 2019, filed on behalf of Fibank. His conclusions and assertions are wrong. My critique of Lazar Tomov's declaration above in **Para 13-22** is equally applicable to my expert criticism of Emil Emanuilov's declaration conclusions, and reassert them herein. A further critique of Emil Emanuilov's declaration is presented below.

24. The following conclusion of Emil Emanuilov's is wrong for multiple reasons[10]: "*The Bulgarian Courts properly exercised jurisdiction over the insolvency proceedings of APD and the parties to that proceeding. The jurisdiction of Bulgarian courts over corporations seated in Bulgaria is exclusive, which is in full compliance with EU law and practice (see COUNCIL REGULATION (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings). Issues surrounding the allowance of claims asserted against a Bulgarian debtor in its Bulgarian bankruptcy proceedings are within the exclusive jurisdiction of the Bulgarian courts*".

---

[10] Para.12 of Emil Emanuilov's Declaration dated August 29,2019.

25. ***First,*** as stated above in Para 15 (foot note 5) as per Recital (13), Article 2(h) and Article 3 of EU Regulation, the centre of main interests of Ayr regarding the Silver Beach Project is New York, as is the centre of main interests per the agreement of June 4, 2010 with Philip Harris and Ayr (The Swap), **Exhibit 38 and Exhibit 39**; the centre of main interests under the Ayr's agreement with Ayr's creditors for consolidation of the payment claims of March 28, 2012, and November 27, 2013, (The Consolidation deal), is again New York. The Bulgarian court entertaining APD bankruptcy case does not have jurisdiction over the above matters nor is it an adequate alternative to New York jurisdiction.

26. ***Second,*** pursuant to Art.93 (1) and Art.105(3) of PILC (see Para 15 above and footnotes 3 and 4) the claims filed against the Defendants and arising from the theft of The Ayr's Funds (deposited at Corpbank) - whereby Fibank got back its money under The Swap – do fall under the exclusive jurisdiction of the State of New York.

27. ***Third,*** the Bulgarian Court entertaining APD bankruptcy case found no domestic damage to have been done by the theft of The Funds. By dismissing APD's bankruptcy case on January 19, 2018 for lack of assets (Funds) in the bankruptcy estate the Shumen District Court shut the door to all actions that needed to be taken against the Defendants to make them return the money they had stolen. The resulting lack of assets in APD's bankruptcy estate is caused by APD Bankruptcy Court own inaction, because it did nothing to enforce its own Ruling No.545 of December 12, 2015 in the three years that followed. **Exhibit 40**. Despite that APD creditors paid twice the costs for the bankruptcy case in advance, the Shumen District Court judges entertaining said case did nothing to cause the Funds $ 65,000,000 (BGN 102,966,946) stolen by the Defendants from the bank accounts with Corpbank to be returned (to its rightful owner).

28. Equally wrong is Emil Emanuilov's conclusion[11] that: *"Bulgarian law is fully developed and comprehensively addresses civil criminal, and commercial*

---

[11] Para 10 of Emil Emanuilov's Declaration dated August 29,2019.

*matters. Bulgarian law implements a large number of EU regulations and adopts adequate procedural safeguards of due process. Although some of the Plaintiffs' claims might not have an exact Bulgarian analogue, Bulgarian law provides for substantially similar claims and remedies, including causes of action for negligence and breach of contract"*.

29. **First,** the Shumen District Court failed to follow the directions of the European Court of Justice in Luxemburg as given in the Order of the Court of September 9, 2014 in case No.C-488/13. **Exhibit 41**. The EU Court of Justice in Luxemburg issued said Order at the request of the Targovishte District Court of September 2, 2013, **Exhibit 42,** made to EU Court and seeking guidance in resolving the issues created by Fibank's payment claims filed once again on May 21, 2013 in APD bankruptcy case. In Para (34) of the Order delivered by the European Court of Justice in case No. C-488/13 the Court held that: *"Rather, it appears that those provisions of Bulgarian law merely authorize the court before which the application has been brought to fall back on general principles, national legislation and EU law to fill the lacuna found, by means of the decision it is to adopt and in accordance with its own evaluation of the guidance offered by those rules and principles."*

30. **Second**, Bulgaria being an EU Member State and a signatory to the UN Convention against corruption (UNCAC) failed to meet the requirements of Art.34 and Art.35 of this Convention[12], which obligate Bulgaria to adopt domestic laws to ensure that entities or persons who have suffered damage as a result of an act of corruption have the right to initiate legal proceedings

---

[12] **Art.216** Treaty on the Functioning of the European Union (TFEU) – **International Agreements:** "1. The Union may conclude an agreement with one or more third countries or international organisations where the Treaties so provide or where the conclusion of an agreement is necessary in order to achieve, within the framework of the Union's policies, one of the objectives referred to in the Treaties, or is provided for in a legally binding Union act or is likely to affect common rules or alter their scope; 2. Agreements concluded by the Union are binding upon the institutions of the Union and on its Member States."

against those responsible for that damage in order to obtain compensation. Unlike Bulgaria, the United States of America is the only one among all the countries signatories to the UNCAC that stated upon signing the UNCAC that it had (and still has) all the legal means in place to effectively apply the UNCAC. In the light of the fact that the European Union is a signatory to the UNCAC a judgment entered by the Court in New York under the RICO and FSIA claims shall be internationally recognized and shall be subject to enforcement within the EU. Plaintiffs' claims, which have been filed in the court in New York based on the fact that (i) New York is the place focusing the interests held by the parties to the Swap agreement and (ii) New York is the place where the payment claims in the SB project were consolidated, seek a judgment from the court in New York, because such judgment shall be internationally recognized and enforced, including within the EU and within Bulgaria, hence New York *is* the proper *and* adequate forum to hear and adjudicate Plaintiffs' claims. The Choice of Jurisdiction and Governing Law Clause of the Supplemental Agreement of November 27, 2013 meets the mandatory standards set in Art.35 UNCAC.

31. ***Third,*** Pursuant to Art.26 (1) and (2) of the Bulgarian Civil Procedure Code[13] and pursuant to Art.758 of the Bulgarian Commerce Act[14] Plaintiffs may not file claims before the Bulgarian Court different from the ones filed under RICO, *see* **Exhibit 45**, because such claims are within the powers of Ayr Trustee.

32. ***Fourth,*** Bulgarian Courts refused to meet the standards or observe those EU laws that ensure depositors' rights to protect their deposits in the Bulgarian

---

[13] **Bulgarian Civil Procedure Code Art.26:** "1) Parties to civil lawsuits are the persons, on who's behalf and against whom the lawsuit is being handled. (2) Except the cases provided for by a law, nobody can claim on his own behalf someone's else rights before a court."

[14] **Bulgarian Commerce Act, Art. 758:** "A receiver in bankruptcy (trustee) appointed in a decision of a foreign court shall have the rights envisaged in the state where the bankruptcy proceedings are instituted, to the extent they do not contradict the public order rules of the Republic of Bulgaria".

banks from being trampled upon by the BNB. Till this very day and in breach of: Judgment of ECHR of 24 November 2005, in case *Capital Bank AD v. Bulgaria* (Application no. *49429/99*); and Judgment of ECHR of 02 June 2016 in case *International Bank for Commerce and Development AD and Others v. Bulgaria* (application no. 7031/05), none of the depositors in the Bulgarian banks who lost their deposits as result of BNB's compulsory administration of banks suffering liquidity problems, has ever succeeded in obtaining a judgment against BNB in Bulgaria or a relief or a court adjudication ordering BNB to pay damages for lost bank deposits.

33. As a result of BNB conservatorship over Corpbank, in the past 5 (five) years more than **1000 (a thousand)** petitions and/or complaints have been filed against BNB based on its malpractices, bad acts, and unauthorized acts during Corpbank's conservatorship. *We the Citizens* who were depositors with Corpbank have suffered damages and have no avenue for relief in any Bulgarian Court. In violation and contravention of Bulgarian and EU law, in none, not even a in a single case of all cases opened against BNB, has any Bulgarian court been willing to rule let alone rule against BNB.   The thousands of claimants who filed complaints have been left without any relief. In violation of the EU Strasbourg and Luxembourg court precedent, Bulgarian Courts failed to recognize Corpbank depositors' rights or damages resulting from BNB's conduct in the Coprbank take over on June 20, 2014.

34. As BNB is a co-conspirator with Peevski and other Defendants in the pending *Rudersdal, et. al.  v. Harris, et. al.* litigation, the prospect of any kind of fair hearing or trial before any single Bulgarian Judge is completely futile and a mere fantasy. The Notice of Damages by Harris and Ayr dated December 3, 2010, **Exhibit 43**, and the Ayr's Letter "Regarding TB Investbank AD of Republic of Bulgaria – Breach of contractual obligation, Breach of Society for Worldwide Interbank Financial Telecommunication (SWIFT) undertakings, by-lows, corporate rules and contractual terms, Breach of United States of America Federal Laws, Wrongful and Unlawful Conduct, Breach of International Banking Laws and Practices" dated December 20,2010, **Exhibit 44,** *clearly alert* the BNB, Fibank and any third party to the jurisdiction of The State New York on all claims based on - "unlawful and hostile interference

with Ayr's investment agreement, arrangements and commitments, which interference has a direct effect within the USA at the place where arrangements related  both to such payment transaction and to the entire financing process for the investment project are being made, maintained and take off ".   Agreeing to participate in civil conspiracy based on the Swap, BNB takes the risk of going to court in New York.

Fundamental principles regarding the function of a banking system

35. In Bulgaria as in any EU Member State banking is a business governed by regulations. Those regulations are intended to uphold and maintain the fundamental principle of banking and banking system stability, namely: the principle of trust. Depositors have been granted all the necessary legal and contractual reasons to believe that their deposits and bank accounts will be kept sufficiently safe and intact even in the event of BNB taking over the management of a troubled bank facing difficulties to meet its liabilities and in need of special stabilizing measures. The moment we take the trust component out of the equation banking as such will cease to exist.

36. In Corpbank's case BNB strived to observe the principle of trust:

• BNB's press release of June 17, 2014 reads as follows: "… the Bulgarian National Bank says that carefully and closely monitors the development of the banking sector, including the said Bank. BNB has current detailed data of the entire banking system. Based on such information BNB expressly confirms that *"the banking system, Corpbank including, has high liquidity and capital adequacy and is functioning properly"*. **Exhibit 1;**

• BNB's press release of June 22, 2014: *"…aiming to preserve the activities of the Corpbank bank group in its recovery, BNB [acting] within [te scope] of its legitimate powers will take joint actions with the Government to increase the group's capital using funds through the state-owned Bulgarian Bank for Development and the Deposit Guarantee Fund. The Government and BNB will secure the needed liquidity support for the Corporate Commercial Bank group to fully cover its obligations to its customers. All necessary actions will be taken by 20 July this year. Corporate Commercial Bank and its subsidiary will open for business on 21 July at 9.00 a.m."*. **Exhibit 2;**

- BNB's press release of July 11, 2014: *"... the goal remains unchanged! This goal remains that all citizens and companies to have at their disposal the full amount of their funds. [...] Restructuring and recovering of this credit institution is very important for key sectors of the economy and for sizable Bulgarian municipalities, hospitals, many companies and thousands of citizens alike. Any other decision would be irresponsible."* **Exhibit 3.**

37. The practices introduced during Corpbank's conservatorship however were not only in sharp conflict with the EU law and the U.S. laws, but with the United Nations conventions against corruption, against transnational organized crime and fight against money -laundering, as shown below:

- When someone else other than the depositor gains access to such depositor's bank account(s) – which is exactly the case with the bank accounts held by Ayr Property Development (APD) with Corpbank;

- When a portion of a depositor's money kept in that depositor's accounts – in this case APD's deposit in the amount of BGN 102,966,946, in APD's bank accounts with Corpbank – is used for repayment of someone else's debts to Corpbank;

- When a depositor's bank account is opened with a certain bank in furtherance of a court order in that regard – as is the case here: APD was the depositor and its accounts were opened in furtherance of APD's Bankruptcy court order – is reduced to zero balance and closed without the prior authorization by the court to that effect.

38. The facts in the case of APD's bank accounts with Corpbank clearly and unequivocally show that these bank accounts fall within the authority of the Bankruptcy Court and the money deposited there in the amount of BGN 102,966,946 (USD 65,584,038 per BNB's exchange rate as of December 1, 2014[15] ) enjoy the status of U.S. capital, hence fall within the reach of FATCA, and since October 10, 2014 were subject to automatic stay under the U.S. Bankruptcy Code.

---

m[15]  1 US dollar = 1.56855 Bulgarian levs

39. On December 15, 2012 the Targovishte District Court being APD's bankruptcy court granted permission to Fibank to buy the lands of Ayr Logistics Limited, Inc.'s Silver Beach Project (the SB Project) at the price of BGN 97,500,000. **Exhibit 4**. As early as December 20, 2010 Ayr Logistics Limited, Inc. (Ayr) notified BNB of its investment property in the SB Project. **Exhibit 5**.

40. Upon choosing the best bank offer and obtaining the court's permission (dated January 14, 2013) in that regard the proceeds from Ayr's SB Project lands sale amounting to BGN 97,500,000 (The Funds) paid by Fibank were placed on deposit in an interest bearing account with Corpbank, Account of IBAN: BG21 KORP 9220 2029 01.

41. The interest accrued was credited to several other accounts. As shown on the last issued statements of account as of November 13, 2014 the balances were as follows:
   - Bank account of IBAN:BG21 KORP 9220 2029 02 – BGN 2,064,914.15;
   - Bank account of IBAN:BG21 KORP 9220 2029 03 – BGN 1,018,298.30;
   - Bank account of IBAN:BG21 KORP 9220 2029 51 – BGN 2,464,449.50. **Exhibit 6.**

42. According to APD Trustee's Report of April 27, 2016 the money available in APD's bank accounts at Corpbank as of October 10, 2014 - when the protections of the automatic stay of the U.S. Bankruptcy Code was enforced regarding Ayr's property within the USA and overseas - amounted to USD 65,584,038 (BGN 102,966,946) in total. **Exhibit 7**.

43. APD Bankruptcy court entered all in all two orders addressing the matter of who had the right to instruct the use of the money in APD's accounts with Corpbnak. In its Ruling No.38 of February 14, 2013 APD Bankruptcy court authorized payments of APD-bankruptcy-case-related costs only, which payments were to be made electronically by APD Trustee's electronic signature only. **Exhibit 8.** In its second Ruling No.304 entered on July 11, 2014 APD Bankruptcy court authorized the transfer of APD's money from

Corpbank over to Bulgarian Development Bank, the latter being a state-owned bank. **Exhibit 9.** The Bankruptcy Court issued no further rulings in that regard or any rulings that might have authorised the actions as result of which the balances of APD's bank accounts with Corpbank were reduced to zero and the account closed at the beginning of December 2014.

44. The documents underlying APD's bank accounts balances reduction to zero and their subsequent closing reveal that BNB and the conservators were wrong when granted permission to certain entities to use the proceeds from the sale of SB Project lands to have certain other parties' debts to Corpbank discharged, given that from June 20, 2014 onwards BNB and Corpbank Conservators were the ones in charge of Ccorpbank's affairs. The chaos and inconsistency of decision-making and measure-taking during the period of conservatorship as outlined by the facts showing what happened during that time is totally unacceptable and fails to meet the standards and rules of good banking practices. In the absence of any court authorization for the actions that lead to the taking away of The Funds that were court-supervised and amounted to USD 65,584,038 (BGN 102,966,946), it was only natural that chaos reigned. Had the court authorized any of them those actions would have been properly dated, which is not the case here.

45. On November 7, 2014 Ccorpbank Conservators issued Order No.3-2785 containing instructions that each and every payment operation related to any customer account with Corpbank should be accounted for as if made no later than a fixed date. The date fixed was November 6, 2014 and all payment operations even the ones to be made at a later date were to be accounted for as made on November 6, 2014. **Exhibit 10**.

46. On December 1, 2014 Corpbank Conservators issued a letter of reference to Fibank where Fibank was named and shown as the rightful holder of the money deposited in APD's accounts with Corpbank (The Funds) as of November 6, 2014. **Exhibit 11**. The letter of reference was based on a certain document titled "Payment Order No.9764 of October 24, 2014" **(Exhibit 12)**, which document as APD Trustee commented on August 15, 2014 was "…a

trustee's letter, which definitely could not be deemed to be a payment order." **Exhibit 13.**

47. On November 17,2014 Corpbank Conservators issued another letter of reference based on certain Fibank's instructions for the use of The Funds. In that second letter, effective from November 6, 2014, several other companies were named as the new rightful signatories to a large portion of The Funds, such as: Cibole Services Incorporated Bulgaria EOOD – to the amount of BGN 17,000,000; Droslian Bulgaria EOOD – to the amount of BGN 16,811,896; Tabak Market AD – to the amount 34,400,000; Promishleno Stroitelstvo Holding EAD – to the amount of BGN 7,038,489; and Vili Vist EAD – to the amount of BGN 10,407,000. Those certain companies had outstanding debts to Corpbank under bank loans each of them had borrowed earlier. Those certain companies used The Funds to repay their own debts to Corpbank amounting to BGN 85,657,286 in total. **Exhibit 14**.

48. None of these payment operations was ever authorized by APD Bankruptcy court. It was BNB's and the Conservators' duty to show those payment operations with The Funds both in the statements of account they had issued and in the entries made in register kept under Art.62 (12)(3) of the Bulgarian Law on Credit Institutions (LCI) (**Exhibit 15**), and expressly indicate that The Funds and the bank accounts concerned qualified as court-supervised the U.S. bankruptcy and taxable property held by Ayr overseas. The entries made in those documents show that BNB and the Conservators acted in breach of their obligations.

49. On December 1, 2014 after the debts owed by Cibole Services Incorporated Bulgaria EOOD, Droslian Bulgaria EOOD, Tabak Market AD, Promishleno Stroitelstvo Holding EAD, and Vili Vist EAD to Corpbank had already been discharged, the positive residual balance in each of APD's accounts with Corpbank of USD 11,025,192 (BGN 17,309,551.59) in total was reduced to zero and the bank accounts were closed. **Exhibit 16**.

50. Maintaining bank accounts in which a shortage of USD 54,558,843 (BGN 85,657,385) could neither be justified nor reasonably explained was certainly

a risky thing to do in the light of the responsibilities the law imposed on BNB and the Conservators. BNB and the Conservators had to reduce the balance to zero and close the compromised bank accounts in order to keep up appearances and make their own actions look like managerial decisions taken for the purpose of collecting the debts owed to Corpbank.

51. BNB and Corpbank Conservators' conduct resulting in the depletion and eventual closing of APD's accounts is a breach of fiduciary duty arising for BNB and Corpbank Conservators under the Bank Deposit Agreement No.29428 of January 14, 2013 entered by and between APD Trustee acting in furtherance of the Bankruptcy Court's authorization and Corpbank, for the simple reason that their conduct with respect to APD's accounts was not court-authorized. **Exhibit 17**. In addition, BNB and Corpbank Conservators' conduct is also a breach of U.S. laws and of the UN conventions against corrupt activities, money-laundering and transnational organized crime, to which the EU is a signatory.

52. BNB and the Corpbank Conservators acted beyond their powers when they acknowledged Fibank and Cibole Services Incorporated Bulgaria EOOD, Droslian Bulgaria EOOD, Tabak Market AD, Promishleno Stroitelstvo Holding EAD, and Vili Vist EAD as authorized signatories to APD's accounts and permitted those entities to use The Funds. None of these acts have been authorized by the court.

53. BNB and the Corpbank Conservators did not have the powers to allow those entities to dispose of The Funds amounting to USD 54,558,843 (BGN 85,657,385) in order to repay the debts Cibole Services Incorporated Bulgaria EOOD, Droslian Bulgaria EOOD, Tabak Market AD, Promishleno Stroitelstvo Holding EAD, and Vili Vist EAD owed to Corpbank. None of these acts have been authorized by the court.

54. Neither had BNB and the Corpbank Conservators the power to reduce the APD's bank accounts balances to zero or close them, because even after the repayment of those other entities' debts to Corpbank, as shown above, still a

leftover of The Funds in the amount of USD 11,025,192 (BGN 17,309,551.59) should have been there. None of these acts have been authorized by the court.

55. What BNB and Corpbank Conservators did was both unauthorized and unlawful, and what is more, their conduct at the time fell outside the reach of sovereign immunity, which pursuant to Art.79 (9) of the Bulgarian LCI ensures protection against damages caused by negligence only. Sovereign immunity however does not and may not protect officials who wilfully and intentionally have caused damages to certain individuals or entities. BNB's invoking the sovereign immunity doctrine as a shield from tort liability merely because of its central national bank status clashes with the inherent nature of conservatorship as such, originally intended as a remedial and recovery mechanism. Invoking sovereign immunity as a tool to dodge liability and go unpunished for one's unlawful conduct is an excellent illustration of abuse of sovereign immunity, which, if tolerated, would inevitably destroy the very foundation of banking, namely: *trust and security*.

56. The facts in this case clearly reveal that both BNB and the Corpbank Conservators were as well aware that their actions were unauthorized, as they knew that it was necessary to obtain the prior permission of the court before anyone could proceed with the use of The Funds. Moreover, both BNB and the Corpbank Conservators were well aware of the only two existing APD Bankruptcy court orders addressing the matter, namely: Ruling No.38 of February 14, 2013 and Ruling No.304 of July 11, 2014. Neither BNB nor Corpbank Conservators had the power to instruct the handling of APD's bank accounts or The Funds, because the power to do so originally lay with APD Bankruptcy court only, while from October 10, 2014 onwards it lies with Ayr Bankruptcy court and Ayr Trustee.

57. Handling Corpbank assets and managing Corpbank customers' accounts and money fall beyond the reach of BNB sovereign power. Conservatorship as a mechanism of handling the affairs of Corpbank is a function of the supervisory measures BNB put in place purportedly for the purpose of bringing Corpbank back to stability and ensuring that Corpbank depositors would have effective access to their respective deposits.

58. What makes Corpbank case different is that when Corpbank was taken into conservatorship BNB and the Corpbank Conservators acted in breach of BNB's own managerial decisions publicly announced in BNB press releases, as follows: (i) BNB Press Release of July 11, 2014 where BNB expressly stated that all Corpbank depositors would have full access to their deposits; (ii) BNB Resolution No 104 of August 15, 2014 where it was resolved that Corpbank depositors' funds could only be used for repayment of such depositors' debts to Corpbank, if any (*see* **Exhibit 18**); Corpbank Conservators Order of October 27, 2014 instructing the use of depositor's money in cases where handling of certain depositor's assets were subject to court-authorization and could only be used as ordered by that court. *See* **Exhibit 19**. By virtue of Art.116 (3) LCI any restriction on depositors' access to their deposits with Corpbank may *not be longer than five business days*. BNB violated said provision not once, not twice but thrice – the first time when it restricted depositors' access to their deposits with Corpbank, the second time when The Funds were wrongly taken away and the bank accounts were subsequently closed in gross violation of Ruling No.38 of February 14, 2013, and the third time when it disregarded Court Order No.304 of July 11, 2014 whereby the court authorized APD's funds to be moved from APD's accounts with Corpbank over to the Bulgarian Development Bank, AD. Those breaches however were intentional for they paved the way to and made possible the BNB-and-Conservators-introduced malpractice of *inside deposit-holder rights trading* ultimately aimed at appropriating the funds there and using the money for someone else's benefit other than the actual deposit-holders by writing off someone else's debts to Corpbank and associated collaterals put up as security for such debts.

59. The case where the balances in APD's accounts were reduced to zero and the accounts eventually closed is only one among numerous others where a Corpbank depositor has suffered damages. As a result of BNB and Corpbank Conservators' decisions and actions over the period from June 20, 2014 till April 2015 Corpbank assets worth over 4 Billion Bulgarian levs were

plundered, Corpbank was pushed into bankruptcy and over 7800 depositors lost their money amounting to a total of 2,7 Billion Bulgarian levs.

60. In an interview given to the Bulgarian National Television on June 23, 2015 the then acting BNB Governor Ivan Iskrov admitted that BNB failed in its rescue mission to save Corpbank mainly because it did certain influential Bulgarian politicians' bidding instead of doing what it had to do, namely: "...bring Corpbank back to normal and make it fully functional so that all depositors have full access to their respective money." **Exhibit 20**.

61. On April 17, 2015 in an interview for the Banker Newspaper the BNB Vice-Governor and Head of Banking supervisions Department Tsvetan Gunev said that it was the conduct of BNB and the activities of Corpbank Conservators that brought about Corpbank's fall. **Exhibit 21**.

62. Despite the fact that neither EU regulations nor the Bulgarian laws grant immunity to BNB from liability for the damages it wilfully and intentionally caused to Corpbank depositors by its mismanagement of Corpbank's assets and Corpbank depositors' money, none of the actions for relief brought against BNB had the outcome they should have had pursuant to Art.79 (9) LCI. The Bulgarian court simply refused to address the claims asserted against BNB wrongly assuming that because BNB's acts were incontestable Corpbank depositors had no legitimate standing to sue BNB, hence BNB could not be held accountable for the damages inflicted to Corpbank depositors.

63. Litigation against BNB and the Corpbank Conservators seeking to hold them liable for the damages inflicted to Corpbank depositors is practically impossible in Bulgaria. It is equally made impossible for **victims of corruption in Bulgaria to file claims for relief under the UN Conventions against Corruption or defend against corrupt activities. Even if a claim under the UNCAC were filed, it would be practically impossible for a plaintiff to be given a fair trial against the defendant.**

64. BNB and Corpbank Conservators acted with impunity, despite that their actions caused a 2,7–Billion-Bulgarian-levs-worth loss of Corpbank

depositors assets and contributed to the looting of Corpbank's assets worth over 4 Billion Bulgarian levs. That kind of impunity however has nothing to do with the concept of immunity. That kind of impunity is in conflict with and defeats the purpose of banking as a regulated business founded on trust. The rule of Art.79 (9) LCI is crystal clear:   *"The Bulgarian National Bank, its bodies and the persons authorized by them shall not be liable for any damages caused in exercising their supervisory functions, unless they have acted with intent."*

65. In any country banking is a business founded on trust; any country's central bank may only function, if the public trusts it. In Bulgaria public trust in BNB relies on the doctrine of conservatorship, i.e. those certain special rules and regulations, which when enforced will prevent failures, ensure banking stability and protect depositor' interests. At the first sign of uncertainty, however small it might be, or of suspicion that depositors' money at the bank might be at risk of being used by someone else, with impunity at that and for that someone else's benefit or interests, without depositors' consent or despite their expressed disagreement, depositors will spring to action that will inevitably cause a bank run, which will inevitably disrupt the banking system as a whole.

66. Art.2 (6) of the Bulgarian Law on the Bulgarian National Bank stipulates that *"the Bulgarian National Bank shall regulate and supervise the operation of the banks within the country in order to maintain the stability of the banking system and protect the interests of depositors"*. Likewise, the provisions of the Bulgarian Law on Credit Institutions (LCI) are intended to serve that same purpose by the prescribed supervisory measures and the rules for managing a bank on which BNB has imposed the supervisory measure of *"dismissing the bank's chief executive officers and shareholders from the bank's management and BNB's taking over such management through the conservators appointed to that effect"*.

67. Not long after BNB's press release of June 17, 2014 where BNB accentuated that "the banking system, including Corpbank, has a high liquidity and [good] capital adequacy", Corpbank was taken into conservatorship, which however was short-lived and eventually proved fatal for the bank and its depositors. On

November 6, 2014 BNB resolved to revoke Corpbank's banking license and leads Corpbank to bankrupt.

68. The fact that on December 1, 2014 the balance in APD's bank accounts at Corpbank was reduced to zero - given that the amount there was USD 65,584,038.00 (or BGN 102,966,946) prior to that date - as a result of using The Funds for discharging someone else's debts to Corpbank without prior court-authorization to that effect, is a perfect illustration of BNB's mismanagement of Corpbank's affairs and assets, and of its failure to save the bank it took into conservatorship several months earlier on June 20, 2014. BNB's mismanagement of Corpbank that pushed the latter into bankruptcy has nothing to do with BNB's exercise of sovereign power. When BNB suspended the powers of Corpbank's management and shareholders it practically usurped the control of Corpbank, took over the bank and appointed its own conservators to handle the bank's affairs to BNB's bidding.

69. BNB's nefarious abuse of power for the purpose of looting Corpbank's assets in proportion unseen so far and not without the help of the Bulgarian court, which practically granted impunity to BNB, is not what sovereign immunity is about, especially when Art.79 (9) LCI clearly provides that the mechanism of conservatorship is ultimately intended to preserve and protect Corpbank depositors rights.

BNB's supervisory powers and sovereignty

70. BNB is a national authority, which by virtue of a special law has the powers to regulate the creation and supervise the operations of banks in the Republic of Bulgaria. These powers are generally limited to issuing banking licenses, imposing restrictions, placing a bank under a special supervision and revoking of banking licenses.

71. The primary objective of placing a bank under special supervision is to preserve the stability of the banking system. By virtue of BNB's supervisory powers any relationship existing between BNB and a bank is one of authority and subordination; it is of administrative nature and its function is preventive.

BNB is released from liability for any damages caused as result of the supervisory measures it has imposed, unless such damages are intentionally caused. If however BNB's intent in selecting and imposing certain supervisory measure is proven malicious, pursuant to Art.79 (9) LCI BNB will be stripped of its immunity and will become liable for the damages caused by supervisory measures it has imposed[16].

72. Within its supervisory powers BNB may impose certain supervisory measures as laid down in Art.103 LCI[17]. Generally speaking, supervisory measures are flexible mandatory restrictions imposed on a bank and its shareholders, and ranging from limiting the bank's operations and/or restricting the rights of its shareholders or limiting the powers of its management, to imposing a duty on the bank to increase and/or restructure its capital or dismissing its management, or revoking its banking license and declaring the bank bankrupt.

73. All these are administrative powers and acts that are intended to adequately address any bank's risky conduct posing a threat to such bank's own depositors, hence undermining the stability of the banking system as a whole, or to put it otherwise, such administrative powers and acts serve preventive purposes. All BNB's acts imposing supervisory measures are mandatory for all banks and are subject to provisional enforcement[18]. In Corpbank's case BNB exercised its supervisory powers acting in furtherance of Corpbank's Request of June 20, 2014 (*see* **Exhibit 22**) by dismissing the bank's chief executive officers, suspending its majority shareholders' rights and appointing two conservators in their place (*see* **Exhibit 23**), all on the same day.

---

[16] The Bulgarian Law on Credit Institutions, Art.79 (9): "The Bulgarian National Bank, its bodies and the persons authorized by them shall not be liable for any damages caused in exercising their supervisory functions, unless they have acted with intent."

[17] The Measures laid down in Art.103 (2) of the Law on Credit Institutions are shown in **Attachment (2) to this Declaration**.

[18] Article 103 (4) of the Bulgarian Law on Credit Institutions: "All acts on imposing the measures under paragraph 2 shall come immediately into effect."

74. Few of the supervisory measures imposed by BNB are contestable. The few exceptions cover only a handful of causes for appeal and only few parties may bring such an appeal[19]. Depositors in the bank, on which BNB has imposed supervisory measures, may not contest the latter, because those measures are imposed on the bank and not on its depositors.

Conservatorship or how a bank placed under BNB's special supervision is managed

75. When BNB decides to place a bank under its special supervision – what it did on June 20, 2014 to Corpbank - it dismisses the bank's chief executive officers takes over the management of the bank and appoints two conservators to handle the bank's affairs. The period of conservatorship may not exceed six months. Upon expiry of the six-month period the rights of the bank's executive officers and shareholders are reinstituted, unless the bank's license is revoked.

76. During the time when a bank is placed under conservatorship it is managed by BNB-appointed conservators duly authorized by BNB to that effect. Each and every actions taken or thing done without the prior authorization by the conservators is deemed null and void[20].

77. Suspension of the powers of the troubled bank shareholders and chief executive officers and their replacement with BNB-appointed conservators practically introduces the conservative method of handling such bank's commercial assets and its customer deposits. The primary objective of placing

---

[19] Article 103 (15) of the Bulgarian Law on Credit Institutions: The administrative acts under paragraph 2 may be challenged before a three-member panel of judges of the Supreme Administrative Court with regard to their legality. The Court shall deliver its ruling on the appeal within 40-days term as of opening the relevant trail or cassation proceedings."

[20] Article 107 (6) of the Bulgarian Law on Credit Institutions: "Any actions and transactions on behalf and for the account of the bank done without the prior authorization of the conservators shall be void"

a bank in conservatorship is to stabilize it and preserve its depositors' rights intact. In Corpbank's case the conservative method was applied to the following:

- Proper keeping of the bank's accounts, *see* Order No.3-1960 issued by the Conservators on August 28, 2014 (**Exhibit 24**); Order No.3-2785 of November 7, 2014;

- Proper keeping of all customers' accounts along with proper handling of the funds there and of all banking operations and changes related to and concerning such accounts, *see* BNB Resolution No.104 of August 15, 2014;

- Charging banking services fees; setting of interest rates, *see* BNB Press Release of June 30, 2014 announcing a reduction in Corpbank's deposit interest rates (**Exhibit 25**);

- Handling the repayment of the debts owed by and the ones owed to the bank, see BNB's Instruction to Corpbank Conservators of August 22, 2014 (**Exhibit 26**); BNB's Order ref.#: BNB-79276 dated 25 June, 2014, (**Exhibit 27**);

- Writing off of such debts and the collaterals put up as security for them; bank accounts conversion form one currency to another; bank accounts closing, etc.

78. From June 20, 2014 onwards, when BNB placed Corpbank in conservatorship, Corpbank was fully controlled and managed by BNB itself and through the BNB-appointed conservators.

79. Managerial activities carried out during the period of conservatorship are not administrative activities, unlike the supervision powers, which BNB exercises. Conservators' relations with the bank customers are of neither administrative nor hierarchical nature where side one is the authority and the other is the subordinate. In the **cases to which international rules for fighting money-laundering activities, corruption and transnational organized crime apply, where BNB and the Conservators act as administrators of those rules.** Therefore, each and any right, claim, obligation or liability arising from

the management of Corpbank by BNB is determined by: a signed agreement or contract and its terms and clauses; the laws against money-laundering corruption and transnational organized crime.

80. In essence, 'conservatorship' is easily discernible and quite different from BNB's role and functions as banking supervisory authority. The correlation between the two is one of cause and effect. Imposition of supervisory measures comes first and conservatorship is what follows.

81. In other words, BNB's managerial role during the period of Corpbank's conservatorship is beyond the reach of BNB's sovereign power to impose supervisory measures prescribed in Law on Credit Institutions. Moreover, in the event of intentional damages caused by any act of BNB or of BNB-appointed conservators both BNB and the so-appointed conservators are stripped of their sovereign immunity.

82. In cases like the one at issue here to cause APD's bank accounts with Corpbank to be reduced to zero and then close them is a type of conduct that categorically falls outside BNB's exercise of sovereign power, because that could only be done if expressly authorized by the Bankruptcy court within the exclusively jurisdiction of which the power to do so resides. **International rules for fighting money-laundering activities, corruption and transnational organized crime are mandatory for both the BNB and the Bulgarian court.** (*see* **Exhibit 28**).

*[The Remainder of the This Page Is Left Blank Intentionally.]*

      Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date: November 13, 2019        Respectfully submitted,

Sofia, Bulgaria

By: _____

27

## LIST OF CITED DOCUMENTS

## IN THE DECLARATION OF DANIEL BOZHILOV DATED NOVEMBER 13,2019

| EXHIBIT NO. | DOCUMENT |
|---|---|
| Attachment A | Declaration of DANIEL BOZHILOV dated November 13, 2019 |
| Attachment B | Sofia City Court Dec. No 851 dated January 12, 2015 |
| Exhibit 1 | June 17, 2014 BNB Press Release |
| Exhibit 2 | June 22, 2014 BNB Press Release |
| Exhibit 3 | July 11, 2014 BNB Press Release |
| Exhibit 4 | December 15, 2012 Court Order of Receivership re SB project lands |
| Exhibit 5 | December 20, 2010 Ayr Notice to BNB |
| Exhibit 6 | November 13, 2014 APD Bank Account Statement |
| Exhibit 7 | April 27, 2016 APD Trustee Report |
| Exhibit 8 | Ruling No.38 Authorizing APD Trustee to handle APD account at Corpbank, February 14, 2013 |
| Exhibit 9 | Ruling No.304 re APD funds to Bugarian Development bank, July 11, 2014 |
| Exhibit 10 | November 7, 2014 Corpbank Conservators  Order No.3-2785 |
| Exhibit 11 | December 1, 2014 Bank reference re APD's Bank Account to Fibank |
| Exhibit 12 | Payment Order No.9764 by APD Trustee of October 24 2014 |
| Exhibit 13 | August 15,2016 APD Trustee letter to Ayr Trustee |
| Exhibit 14 | November 17, 2014 Bank reference showing The Five Company as signatories to APD account |
| Exhibit 15 | Registry Entry pursuant to Art.62 (12)(3) Bulgarian Credit Institutions Law |
| Exhibit 16 | December 1, 2014 APD Exposure Bank Statement |
| Exhibit 17 | January 14, 2013 Bank Deposit Agreement No.29428 by and between APD and Corpbank |
| Exhibit 18 | August 15, 2014 BNB Resolution No.104 |

| Exhibit 19 | October 27, 2014 Corpbank Conservators Order No.3-2732 |
| --- | --- |
| Exhibit 19-1 | Appendix to Corpbank Conservators Order No. 3-2732 on 27 Oct 2014 |
| Exhibit 20 | June 23, 2015 Interview with BNB Governer |
| Exhibit 21 | April 17, 2015 Tsvetan Gunev's Interview "THE SMOKING GUN", the Banker media outlet |
| Exhibit 22 | June 20, 2014 Corpbank Notice Ref.4098 to BNB |
| Exhibit 23 | June 20, 2014 BNB Resolution No.73 |
| Exhibit 24 | August 28, 2014 Corpbank Conservators Order No.3-1960 |
| Exhibit 25 | June 30, 2014 BNB Press Release re interest |
| Exhibit 26 | August 22, 2014 BNB Instructions to Corpbank Conservators |
| Exhibit 27 | June 25, 2014 BNB Payment Instructions of Ref.BNB-79276 |
| Exhibit 28 | APD Trustee Report of June 20, 2014 |
| Exhibit 29 | Synopsis of Case-pertinent Preliminary Rulings of The Court of Justice of the European Union |
| Exhibit 30 | Motion of All Seas Property 2 OOD and Asset Management EAD to Trustee of APD dated July 3, 2014 |
| Exhibit 31 | List of creditors of APD dated July 9, 2014 |
| Exhibit 32 | Fibank's Statement of Claim in APD Bankruptcy procedure |
| Exhibit 33 | Ruling of Supreme Cassation Court  No.728 dated July 30, 2012 |
| Exhibit 34 | Judgment of District Court of Targovishte No.3 dated 8 February 2013 |
| Exhibit 35 | FIB's payment claim dated May 21, 2013 |
| Exhibit 36 | Judgment of District Court of Targovishte No.16 dated May 3, 2011 |
| Exhibit 37 | Certified copy of Certificate of APD Creditors Committee dated September 3, 2014 |
| Exhibit 38 | Harris, Ayr, Fibank's Agreement dated June 4,2010 |
| Exhibit 39 | Ayr's Letter to Matthew Mateev, Chairman of the Managing Board and Executive Director of First Investment Bank AD, dated January 27,2011 |
| Exhibit 40 | Ruling No.545 dated December 2, 2015 of Shumen District Court |
| Exhibit 41 | Order of EU Court (Fifth Chamber ) dated September 9. 2014, case C- |

| | |
|---|---|
| | 488/13 |
| Exhibit 42 | Ruling of District Court of Targovishte No. 179 dated September 2,2013 |
| Exhibit 43 | Notice of Damages by Harris and Ayr dated December 3, 2010 |
| Exhibit 44 | Ayr's Letter dated December 20,2010 |
| Exhibit 45 | Stipulation to clarifying causes of action, Doc.81 Filed 09/07/18 case No.14-34940-bjh-7 |