UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RUDERSDAL, EOOD, *et al.* | ) Case No. 18-cv-11072 (GHW-)-(RWL) | |
| | ) | |
| | ) [rel. 19-cv-01762] | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Declaration |
| PHILIP ROBERT HARRIS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# DECLARATION OF DIMITAR BLAGOVESTOV YANAKIEV IN SUPPORT OF PLAINTIFFS CLAIMS

I, Dimitar Blagovestov Yanakiev, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that:

1.        I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are, in all things, true and correct;

2.        I submit this Declaration in support of Plaintiffs claims in the above captioned matter having first-hand knowledge of facts related thereto;

3.        I graduated from the University of National and World Economics earning an L.L.M. degree in law. I passed my final examinations at the end of 2006, then passed the examination at the Ministry of Justice of the Republic of Bulgaria in November 2007, and

finally the Bar examination at the Supreme Bar Council of the Republic of Bulgaria in June 2008.

4.          I have been a fully licensed practitioner in law since July 2008 after my judicial clerkship. The address of my legal practice is at 12 Tsanko Dyustabanov St., 6th floor, suite 12, 9000 Varna, Bulgaria. I was admitted to the Varna Bar Association and my Varna Bar number is 1900123790. *See* **Attachment (A)** – CV of Attorney Dimitar Ynakiev.

5.          Within 2014-2018 I provided legal advices to the Creditors Committee in the Bulgarian bankruptcy proceeding for Ayr Property Development AD (APD) created by Ayr Logistics Limited Inc. (Ayr) for the purposes of Ayr's Silver Beach Project (SB Project).

6.          In my capacity as the lawyer of APD's Creditors Committee[1] I have became familiar with: 1) APD's corporate structure; 2) the property, rights and obligations in Ayr's SB Project; 3) Bank Loans No.39-KP-AA-2510 of November 22, 2007, No.14-LD-L-000002 of October 2, 2008 as supplemented on March 31, 2009, and No.14-LD-L-000006 of December 29, 2009, (the Three Bank Loans), the money from which loans has been transferred by First Investment Bank AD (Fibank) and Chavdar Angelov Angelov over to All Seas Management and Blue Finance Limited; 4) the June 4, 2010 Agreement between Ayr and Fibank; 5) the court orders, decisions and rulings of the Bulgarian Court rendered in the APD bankruptcy proceedings in case No.14/2011 (before by the Targovishte District Court, Bulgaria) and in case No.730/2013 (before the Shumen District Court, Bulgaria); 6) the process of managing APD's bank accounts with Corporate Commercial Bank AD (Corpbank) opened at the instruction of the Bulgarian Bankruptcy Court for APD for the purpose of safe-keeping the $65,209,976(BGN 97,500,000) paid by Fibank for the purchase of the SB Project lands; 7) the depletion and closing of APD's bank accounts held at Corpbank;  8) the orders of the U.S. Bankruptcy Court for the Northern District of Texas, Dallas, USA (U.S. Bankruptcy Court in Dallas) entered in Ayr's bankruptcy case No.14-34940-bjh-7 and in the adversary proceedings to the above main U.S. bankruptcy proceeding with case nos.: No.16-03138-bjh, No. 16-03139-bjh and No. 16-03140-bjh.

---

[1] **Bulgarian Commerce Act, Art. 681. (1)**The creditors' committee shall assist and supervise the activities of the receiver in bankruptcy with respect to the property administration, inspect the commercial accounts and cash availabilities and inform the court in the cases under Art. 657."

7.        Based on my knowledge of the facts and documents, *inter alia*, shown below, I hereby give my true and fair *opinion*.

<u>***Expert opinion***</u>

**A. APD's incorporation in Bulgaria and the location of the property of Ayr's Silver Beach Project in Bulgaria are not factors on the basis of which the Bulgarian Court may assert jurisdiction over the claims originating from the theft of Ayr's money in the amount of $65,584,038(BGN 102,946,966).**

8.        APD is a shell company (letter-box company) created, managed and controlled entirely by Ayr. APD was created for the sole purpose of making it possible for Ayr to acquire ownership of the land in the Bulgarian Silver Beach investment project. The Bulgarian Constitution bans foreign individuals (non-EU nationals) from owning or holding real property in Bulgaria, unless a bilateral treaty with a Non-EU Member State regulates otherwise[2]. There is no such treaty between USA and Bulgaria.

9.        Pursuant to European Union Regulation (EC) No.1346/2000 of the Council of Europe of 29 May 2000 on bankruptcy (the EU Bankruptcy Regulation), APD fails to meet the test of "*establishment*" under Art.2 (h) of the Insolvency Regulation[3]. APD was merely Ayr's letterbox company because it had no office, no business email, no web page or employees, nor stand-alone autonomy to be able to run any business on its own.

10.        Throughout APD's legal existence until the time it filed for bankruptcy on *February 4, 2011, APD did not engage in any business activity, nor did it have any organizational ability of an autonomous entity to run any business activities.* In its Judgment No.63 of March 16, 2012 the Varna Court of Appeals recognized that - "APD is an investment enterprise within the meaning of the US-Bulgaria Treaty Concerning the Encouragement and Reciprocal Protection of Investment and the bilateral Treaty on

---

[2] **Constitution of the Republic of Bulgaria, Art.22 (1)** – "Foreigners and foreign legal entities may acquire property over land under the conditions ensuing from Bulgaria's accession to the European Union, or by virtue of an international treaty that has been ratified, promulgated and entered into force for the Republic of Bulgaria, as well as through inheritance by operation of the law."

[3] **Art.2 (h) of the Regulation**: "*establishment*" shall mean any place of operations where the debtor carries out a non-transitory economic activity with human means and goods."

Avoidance of Double Taxation. APD was created for the purpose of implementing Ayr's investment policy concerning the Silver Beach investment project, town of Balchik; APD is not a VAT registered entity and it relies solely on financing from the parent company and not on earnings from their own business activities."- **See Exhibit [1]**.

11.      Harris' and Ayr's management and control over the SB Project and APD meet the definition of *"associated activities"*[4] laid down in Art.1(e) of the Bilateral Treaty concerning the encouragement and reciprocal protection of investments signed between the USA and Bulgaria on September 23, 1992 in Washington DC. Harris and Ayr did not allow APD to be organized and develop as a stand-alone autonomous company, capable of developing its own business.

12.      Ayr and its shareholder and ultimate owner Philip Harris made and effectuated decisions concerning the acquisition, financing and development of the SB Project, including the property and the rights and obligations in this project. The activities concerning the organization, management and control of Ayr's SB Project were run from New York and Texas by telecommunications, email and Fedex and the swift system of New York banks. Harris initiated and made New York the permanent and continuous main financial center of Ayr's SB Project, where he concentrated on the consolidation of Ayr's rights and obligations under the SB project.

13.      Pursuant the EU Bankruptcy Regulation, the claims originating from the civil conspiracy fall under the jurisdiction of the New York Courts. Pursuant to this EU regulation New York is the proper venue in this case because jurisdiction lies where Ayr's center of main interest is located in the SB Project since APD is nothing more but Ayr's letterbox company in the SB project[5]. The predicate acts, such as: 1) Ayr's fraudulent filing for No

---

[4]  **U.S. Bulgaria Bilateral Treaty concerning the encouragement and reciprocal protection of investment, Art.1(e):** "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual and industrial property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for

[5]  **§ 58** of **Opinion of Advocate General Kokott Case C-396/09 delivered on 10 March 2011 to the Court (First Chamber), in Case C-396/09** – "... the presumption laid down in

Assets Bankruptcy; 2) Fibank's registration as being entitled to handle and dispose of Ayr's money; 3) The Five Companies'[6] registration as being entitled to handle and dispose of Ayr's money; 4) the discharge of the Five Companies' debts to Corpbank; and 5) the depletion and closing of the bank accounts, where Ayr's money was kept; - all of them are based on and serve the swap of economic interests in the Mexican bonds[7] agreed by Harris and Fibank, which exchange is within the jurisdiction of New York. The swap agreed by Harris and Fibank has a direct and devastating effect on Ayr's creditors and their economic interest in the consolidated claims in SB Project, which interests also fall under the New York jurisdiction.

14.      Based on <u>EU Bankruptcy Regulation</u> the place of APD incorporation and the location of the property in this project are irrelevant for determining the jurisdiction over these claims. *The Regulation does not distinguish whether or not it is within Bulgaria or within another EU Member-State or the USA.*

15.      The Bulgarian forum has no jurisdiction in this case over the claims originating from the theft of Ayr's money in Ayr's bankruptcy, which claims Ayr Trustee transferred (sold) to Ayr's creditors as ordered by the U.S. Bankruptcy Court in Dallas in November 2017.

16.      Pursuant to EU Bankruptcy Regulation, the "location of the property" criterion in Ayr's SB Project in Bulgaria cannot serve as a factor for determining the jurisdiction. There

---

Article 3 in favor of the registered office can be rebutted only if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect. As a possible example of a rebuttal of the presumption, the Court of Justice cited the case of a letterbox company not carrying out any business in the territory of the Member State in which its registered office is situated."

[6] The companies debtors of Corpbank that discharged their debts with Ayr's money held in APD's bank accounts with Corpbank, and namely: (1) Tabak Market AD (now renamed Lafka Market AD), (2) Cibole Services Incorporated Bulgaria, EOOD, (3) Droslian Bulgaria EOOD (now renamed Asteria), (4) Vili Vist, EAD and (5) Promishleno Stroitelstvo Holding, EAD (**The Five Companies**).

[7] Define Mexican bonds here and see section F *infra*.

is no "establishment" in this case as required as well in the EU Bankruptcy Regulation Art.3 (2) of the EU Bankruptcy Regulation for determining even a partial jurisdiction based on the 'location of the property' criterion[8].

17.      The *center of main interests*[9] in the SB Project is in New York, the place where Ayr and Harris engaged in the financing and development of the project and where they consolidated the rights and obligations in this project. By Harris' own hand, this fact is permanently present and clearly pervasive in a number of key Harris executed agreements, such as: 1) for the exchange (swap) of economic interests in the June 4, 2010 Agreement and in the Mexican bonds deal with Oriana Capital Partners bank account opened with HSBC, NY, as agreed between Harris and Fibank – **See Exhibit [2]**; 2) for financing the SB project through HSBC, NY, organized by Harris, Ayr, HSBC and Oriana Capital Partners LLC – See **Exhibit [3]**;  and 3) for consolidating the claims against Ayr's SB Project in Deutsche Bank, NY – **See Exhibit [4], Exhibit [5], Exhibit [6], Exhibit [19]** and **Exhibit [20]**.

17-a.      All decisions Fibank, Angelov, and Harris and Ayr made were made in New York; every step on the way to negotiating [the deal], all arrangements that were made in that regard as well as its follow through occurred in New York. It all started in April 2009 when said defendants made first business contacts by phone, email and NY postal services. During 2005 – 2012 Chavdar Angelov who was a Green Card holder at the time was residing in Maryland and New York spending extended periods of time in both places, NY as the global financial centre was where he chose to pursue his own business interests. New York, NY, was the place where all business meetings to discuss, make arrangements, and act in furtherance of the agreed Swap took place. Angelov, Harris and Ayr enlisted the cooperation

---

[8] **Judgment of the EU Court (First Chamber) on 20 October 2011, In Case C-396/09 (Interedil Srl, in liquidation v Fallimento Interedil Srl, Intesa Gestione Crediti SpA)** – "The term 'establishment' within the meaning of Article 3(2) of Regulation No 1346/2000 must be interpreted as requiring the presence of a structure consisting of a minimum level of organization and a degree of stability necessary for the purpose of pursuing an economic activity. The presence alone of goods in isolation or bank accounts does not, in principle, meet that definition."

[9] **Recital (13) of the Regulation**: The "*center of main interests*" should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

of a few other U.S. individuals and entities to see the Swap through to its successful end, such as 1) Target Financial Services, Inc., Commerce Commodities, Karen Lin Du Val Preuit, Syndicated Holdings, James McGee, Oriana Capital Partners, HSBC, NY. **See Exhibits [98+113]**.

18.     The parties to the above listed executed agreements set the laws of the State of New York and the jurisdiction of New York as the chosen and agreed upon contracted for place of jurisdiction and venue.  The economic rights and interests of the parties to the agreements between Harris and Ayr on the one hand and Fibank and Ayr's creditors on the other, originating from and concerning the SB Project are bound with the laws and the jurisdiction of the State of New York.

19.     The Bulgarian laws respect the inviolability and mandatory nature and recognize the dominant role of the choice of jurisdiction and applicable law clause in determining the jurisdiction and in case of claims against parties to an agreement for default on such agreement[10], and in the cases against third parties for vacating third parties's agreement[11]. The choice of jurisdiction and applicable law clause as a factor for determining the jurisdiction over the claims arising out of the theft of the money of Ayr's bankruptcy estate is also applicable under the operation of the Insolvency Regulation, but within the reach of the newly introduced and further developed specific criterion for cross-border insolvency – the *"center of main interest"* – **See Exhibit [7]**.

---

[10] **Art.93 (1) of the Bulgarian Private International Law Code (PILC)** – "Contracts shall be governed by the law chosen by the parties. Any such choice must be expressed or clearly demonstrated by the terms of the contract or by the circumstances where under the contractual relationship evolves."

[11] **Art.105 of the Bulgarian Private International Law Code (PILC)** – "(1) The obligations arising out of a tort or delict shall be governed by the law of the State within whose territory the direct damage arises or is likely to arise (*lex loci delicti commissi*). (2) Where the author of the tort or delict and the person sustaining damage both have their habitual residence or a place of business in the same State at the time when the damage occurs, the law of that State shall apply. (3) Notwithstanding the provisions of Paragraphs (1) and (2), if it appears from the circumstances as a whole that the tort or delict is manifestly more closely connected with another State, the law of that other State shall apply. A manifestly closer connection may be based on a pre-existing relationship between the parties, such as a contract that is closely connected with the tort or delict in question."

20.       The singular role of APD bankruptcy proceeding was to fulfil Ayr Trustee's requests for restoring the money taken from Ayr and delivering such money to the Ayr Trustee and Ayr's creditors.

21.       Any allegations that the claims originating from Ayr's bankruptcy and the theft of Ayr's money fall under the jurisdiction of Bulgaria are neither factually nor legally supported.

**B. The Bulgarian Forum lacks jurisdiction to make a determination on the pertinence of Ayr Trustee's claims against the persons who took and/or enriched themselves at the expense of Ayr's money.**

22.       The Dallas Bankruptcy Court confirmed Ayr Trustee's powers to demand and obtain the money Fibank had paid for the purchase of the SB Project land by its orders in case No.16-03139-bjh and case No.16-03140-bjh.

23.       Pursuant to Art. 758 of the Bulgarian Commerce Act[12], the powers and jurisdiction of the U.S. Bankruptcy Court in Dallas and Ayr Trustee are mandatorily imposed on the APD Bulgarian Bankruptcy Court and APD bankruptcy case and such powers enjoy international comity and recognition in Bulgaria.

24.       The Orders of the U.S. Bankruptcy Court in case No.16-03139-bjh and case No.16-03140-bjh– **See Exhibit [8]** and **Exhibit [9]** – as produced by Ayr Trustee for enforcement in APD bankruptcy case could not be obeyed because:

> 1) the laws do not provide any rules and procedures to hold the persons who took the money from APD bank accounts with Corpbank liable– **See Exhibit [10] and Exhibit [11]**;
>
> *2)* APD bankruptcy suffered no domestic damage and the APD Bulgarian Bankruptcy Court considered the theft of the money solely as lack of property in the bankruptcy estate and therefore used this as grounds to dismiss the bankruptcy case – **See Exhibit [12] and Exhibit [13]**;

---

[12] **Art.758 of the Bulgarian Commerce Act**: A Trustee in bankruptcy appointed in a decision of a foreign court shall have the rights envisaged in the state where the bankruptcy proceedings are instituted to the extent they do not contradict the public order rules of the Republic of Bulgaria."

3) Ayr Trustee claims against the persons who took away/enriched themselves with Ayr's money contain no legal grounds that might determine factually and legally supported jurisdiction of the Bulgarian Court over the Defendants, their actions and the damages caused by their actions – **See Exhibit [2]** and **Exhibit [3], Exhibit [6], Exhibit [7], Exhibit [8], Exhibit [9], Exhibit [14], Exhibit [15], Exhibit [17], Exhibit [76], Exhibit [82]** and **Exhibit [87]**.

4) At the Court hearings held on May 3, 2018 in case No.187/2018 the Varna Court of Appeals (VCA) found no grounds to support [Ayr] Trustee's demands –**See Exhibit [14]**, and namely:

*See page 5:* "**Before taking any action under the U.S. law, the U.S. Bankruptcy Court acting through Ayr Trustee sought to investigate and examine the case law of the European Court in Luxembourg with regard to the matter of what is the scope of authority and powers of the Bulgarian Court entertaining APD's bankruptcy case, and whether or not it has international jurisdiction.**"

*See page 6:* "**If the Bulgarian Court insists on keeping the effect of its ruling, which is not subject to appeal [the Court Judgement dismissing APD bankruptcy case], then it means that the Bulgarian bankruptcy proceeding is thus denying international jurisdiction over the connected actions based on non contractual obligations. As a result the Bulgarian banks and the persons that are involved in the taking away of assets worth over 113 million Bulgarian levs will then have to submit to the international jurisdiction of the court order and judgements delivered by U.S. Courts.**"

*See page 8* "**... as Trustee Kolyovska's reports and the ones submitted by APD's Creditors Committee have made it clear, what did happen was that FIB [Fibank], having decided that it was time it took the reins and acting in collusion with Corpbank's Conservators and the five other entities, simply disposed of the money available in APD's bank account with Corpbank.**"

25.     In Ayr Trustee's Appeal from APD's bankruptcy case dismissal dated January 25, 2018, Ayr Trustee insisted that before dismissing APD's bankruptcy case and closing the doors of the Bulgarian forum for that matter it was incumbent upon the APD Bulgarian Bankruptcy Court to answer the main question, namely:

**"Are there any grounds and, if yes, what are they exactly, which could have justified the decision to release the persons/entities, which gained control over and disposed of the funds from APD's bankruptcy estate for their own benefit from liability for their actions?" – See Exhibit [15].**

26.    The lack of any grounds justifying the release of the Defendants from their liability to return the money they have taken from Ayr's estate is a peremptory fact, which the APD Bulgarian Bankruptcy Court bypassed by dismissing APD bankruptcy case. Thus, the APD Bulgarian Bankruptcy Court closed the door before Ayr Trustee's requests for taking any actions against the Defendants and making them return the money they have taken from Ayr's estate. **See Exhibit [16].**

27.    After the U.S. Bankruptcy Court had confirmed Ayr Trustee powers to take any and all actions for restoring Ayr's money, on November 20, 2017 the U.S. Bankruptcy Court in Dallas granted Ayr Trustee's motion to transfer (sell) the causes of action against the persons who disposed of/enriched themselves with Ayr's and Ayr creditors' money (in the amount of $65,584,038) over to Ayr's creditors – **See Exhibit [17]** and **Exhibit [18].**

28.    Pursuant to the U.S. Bankruptcy Court's 06/17/2016 Order imposing an Automatic Stay and confirming the Jurisdiction of U.S. Bankruptcy Court, Fibank and any other person/entity alleging that these are claims pertaining to APD's bankruptcy must bring the matter before the U.S. Bankruptcy Court in Dallas for determining the pertinence of their claims. Despite the lengthy and multiyear proceedings, no one has ever filed a dispute as to the Ayr assets claims before the U.S. Bankruptcy Court in Dallas.

29.    *Trampling Ayr creditors' economic interests in* Ayr-negotiated consolidation of all payment claims in the SB project breached the laws of the State of New York and caused domestic damage in the State of New York, where Ayr had to pay for such consolidation of the claims and Ayr's creditors must pay their due taxes and fees. APD Trustee had recognized the consolidated claims as valid agreement as early as on July 9, 2014 – **See Exhibit [19]** and **Exhibit [20].**

30.    The Defendants could have reasonably anticipated that trampling upon Ayr's agreements with Ayr Creditors, the economic interests in which agreements were tightly connected to the jurisdiction and laws of the State of New York, would hale them into the New York Court.

31.     The disposal of Ayr's money, which was completed with Harris' and Fibank's exchange (swap) of economic interests in the June 4, 2010 Agreement and in the Mexican bonds deal had a direct effect within the State of New York, which jurisdiction governed such exchange. Any and all taxes and fees resulting from and based on such exchanges are at Ayr's expense and owed and payable in New York. **See Exhibit [2]**.

32.     The Defendants as well as any third party could have reasonably expected that their use of Ayr's money for completing the swap would produce a direct effect within the State of New York and that the Defendants would be haled into the Court of New York and be held liable for violating the laws of the State of New York and for the damages caused by their fraudulent activity to Ayr's creditors in New York.

33.     Short-lived is Defendants' arrogant presumptuousness that their activities would remain beyond the reach of the jurisdiction and the laws of the State of New York– the established center of main interest in the SB Project, of the swap agreed with Fibank and of the consolidation of the claims agreed with Ayr's creditors in this project. *See* **Exhibit [3]** Notice of damages dated December 3, 2010, whereby Harris warned that wrongful interference in Ayr's Silver Beach project-related agreements and arrangements had to be ceased and that any harm inflicted as a result of such tortious conduct would have direct effect within New York adversely affecting Ayr's arrangements made with respect to bank account Oriana Capital Partners with HSBC, NY. The Notice was copied to Fibank.

### C. According to Fibank's causes of action Fibank has done everything it could to bring its claims before the Bulgarian Court and thus the jurisdiction of the Bulgarian Court as laid down in the Bulgarian laws has been exhausted.

34.     Fibank obtained Writs of Execution issued by the Bulgarian Court (Varna Region Court) under the three bank loans against the Borrowers: Port Investment Development – Bulgaria 2 EAD, Varna, Bulgaria (a company created, managed and controlled by its single owner – the US based Port Investment Development Inc., Delaware, USA) and Asset Management EAD, Varna, Bulgaria. **See Exhibit [21]** and **Exhibit [22]**.

35.     Fibank assigned some of its claims under the three bank loans to Torier Partners limited, BVI, (Torier) at some time in October 2010. **See Exhibit [23]**.

36.     Torier's actions as result of Fibank's transfer of the claims were in breach of the U.S. Bankruptcy Court's Order imposing an Automatic Stay and confirming the Jurisdiction of US Bankruptcy Code entered in case No. 14-34940-bjh-7, Doc.35 Filed 06/17/16 – **See**

Exhibit [24]. These were actions designed and intended to divest Ayr of its consolidated claims for Ayr's SB Project money. As response to Torier's actions, the U.S. Bankruptcy Court in Dallas entered a Default Judgment against Torier (Doc.27 Filed 07/19/17 in case 16-03140-bjh). **See Exhibit [25]** and **Exhibit [26]**.

37.      The APD Bulgarian Bankruptcy Court denied Fibank's request to get payment from APD's bankruptcy estate on the basis of Fibank's claims under the three bank loans, the contractual mortgages under the said bank loans and the June 4, 2010 Agreement.

38.      *Claim preclusion pursuant to the res judicata doctrine (RJ).* The only payment claim lodged by Fibank in ADP bankruptcy proceeding was for the amount of $63,694.26(BGN 100,000.00) and was filed as a partial claim under the three bank loans, under the contractual mortgages under the said loans, and under the June 4, 2010 Agreement – **See Exhibit [27]**. The Targovishte District Court admitted for hearing Fibank's claim in case No.82/2011 in furtherance of Ruling No.728 of July 30, 2012 of the Supreme Court of Cassation and its instructions to hear and adjudicate this claim on the basis of the three bank loans and treat the claim as a claim secured by a mortgage under Art.722 (1) (1) of the Bulgarian Commerce Act[13]. On page 4 *in fine* of its Ruling No.728 of July 30, 2012 the Supreme Court of Cassation held that *"***the lodging of an Action for Declaratory Judgment seeking the ascertainment of the accounts receivable due by the Respondent [APD], which stem from the assuming of the liabilities expressly secured by a mortgage; likewise is the privilege under Art.722 (1)(1) of the Commerce Act alleged by the creditor.***"* - **See Exhibit [28]**.

39.      By its Judgment No.3 of February 8, 2013 – **See Exhibit [29]** – the Targovisthe District Court denied the entire Fibank's claim on all the counts, under which as per the instructions of the Supreme Court of Cassation the bank's claim was admitted for hearing in case No.82/2011, and namely the counts for: 1) the three bank loans; 2) the June 4, 2010 Agreement; and 3) the mortgages under the three bank loans.

---

[13] **Art. 722 (1) of the Bulgarian Commerce Act**: "In the course of the distribution of the assets converted into cash the claims are paid up in the following order: (1) claims secured by a pledge or mortgage, or distraint or injunction registered under the procedure of the Special Pledges Act - from the received sum from the realization of the security"

40.      Fibank did not appeal the above Judgement of the Court. Pursuant to Art.694 (8) of the Bulgarian Commerce Act[14] Judgment No.3 of February 8, 2013 has irrevocable, res-judicata and declaratory effect in APD's bankruptcy proceeding.

41.      Pursuant to Judgment No.3 of February 8, 2013 that has entered in full force and effect, Fibank cannot participate in the distribution of the money generated from the sale of the SB Project land, neither as an ordinary creditor, nor as mortgage holding secured creditor under Art.722 (1)(1) of the Bulgarian Commerce Act.

42.      _Claim preclusion because of omitting the deadlines for filing of the claims._ Fibank never filed any other valid claim in APD's bankruptcy proceeding (except for the claim for **$63,694.26(BGN 100,000.00)** filed in case No.82/2011) and omitted all legally stipulated terms in which it could do so[15]. Pursuant to Art.688 (1) of the Bulgarian Commerce Act[16] claims, which have not been filed in APD's bankruptcy proceeding within two months as of publishing in the Commercial Register of Judgment No.16 of May 3, 2011 of the Targovishte District Court for opening APD's bankruptcy case – **See Exhibit [30]** – shall be precluded. Judgment No.16 of May 3, 2011 was registered in the Bulgarian Commercial Register on May 10, 2011. **See Exhibit [31]**. In its Judgment No.182 of September 4, 2013 the Targovishte District Court held that:

> **"The lists of asserted and allowed claims of APD's creditors attached ex officio to the instant case file show that the Claimant FIB AD, Sofia [Fibank]**

---

[14] **Art. 694(8) of the Bulgarian Commerce Act**: "The effective court decision on a request under Paragraphs 1 - 3 shall have declaratory effect in the relationships among the debtor, the Trustee in bankruptcy and all creditors within the bankruptcy proceedings."

[15] **Art. 685(1) of the Bulgarian Commerce Act**: "The creditors shall submit their claims in writing to the bankruptcy court within one month from the entry into the commercial register of the decision for institution of the bankruptcy proceedings. Each creditor shall indicate the grounds and the amount of his claims, any alleged preference and security, his judicial address and submit documentary evidence."

[16] **Art. 688 (1) of the Bulgarian Commerce Act**: "Claims submitted after the term under Art. 685, Para 1, but not later than two months of its expiration, shall be entered into the list of submitted claims and shall be admitted as set out in the law. After the expiration of the said term no claims which have emerged before the date of institution of the bankruptcy proceedings may be submitted."

has none allowed claim against the insolvent debtor"[17] ... "... the Claimant FIB AD, Sofia [Fibank] does not qualify as APD's creditor for failure to fit in any of the above listed legal options for gaining such capacity in a bankruptcy proceeding." – See Exhibit [32].

43.     Fibank irreversibly and permanently lost its opportunity to obtain payment under its claims that were denied by Judgment No.3 of February 8, 2013. Despite that preclusion, FIbank nonetheless on May 21, 2013 Fibank once again filed claims for payment under the three bank loans on the basis of the mortgages it held over the SB Project land. Same as before Fibank's claims failed to assert any reasonable grounds to hold Ayr's SB Project and the assets of this project liable for restoring the money, which Fibank and Chavdar Angelov transferred over to the bank accounts of All Seas Management and Blue Finance Limited with the Bank of Valletta, Malta – See Exhibit [33].

44.     By filing its claims on May 21, 2013 Fibank attempted to bypass the effect and consequences of: 1) the res judicata authority of Judgment No.3 of February 8, 2013 (delivered by the Targovishte District Court in case No.82/2011); 2) Fibank's failure to appeal from Judgment No.3 of February 8, 2013; and 3) Fibank's omitted deadlines for filing valid claims for payment in APD's bankruptcy case.

45.     Since the money under the three bank loans has been transferred over to All Seas Management and Blue Finance Limited and was never invested in the SB Project, and the claims filed on May 21, 2013 failed to assert any new grounds different from the ones on which the Court has made its determination by issuing Judgment No.3 of February 8, 2013, Fibank's request to obtain the money it [Fibank] had paid for the purchase of the land raised a number of issues to be solved in APD's bankruptcy case. Therefore, on September 2, 2013 APD Bulgarian Bankruptcy Court sought the assistance of the Court of Justice of the European Union for resolving the matter – See Exhibit [34].

46.     On September 9, 2014 the Court of Justice of the European Union entered an order and remanded the matter referred to it for preliminary ruling (by Ruling No.179 of September 2, 2013 issued by the Targovishte District Court) back to the referring APD's Bankruptcy

---

[17] **Art. 693 of the Bulgarian Commerce Act**: "All claims included in the list approved by the court of the admitted claims according to Art. 692, except the claims under Art. 694(1), shall be deemed admitted for the purposes of the bankruptcy proceedings."

Court – **See Exhibit [35]** – and directed the latter to resolve the controversial issues by applying the fundamental principles of the EU laws. The Bulgarian APD's Bankruptcy Court however never produced any answer to these questions referred and dismissed APD bankruptcy case instead, for the lack of funds in the estate – that being the result of the theft of APD's bank accounts with Corpbank.

### D. Bulgarian Court has never granted authorization to anyone to freely dispose of Ayr's Funds

47.       APD's bank accounts with Corpbank and the money deposited for safe-keeping therein (the money paid by Fibank for the purchase of Ayr's SB Project lands) were managed in furtherance and in observance of the rulings/orders of APD Bankruptcy Court, such as: (1) Ruling No.38 of February 14, 2013, authorizing APD's Trustee to make electronic payments limited solely to bankruptcy expenses – **See Exhibit [36]**; and (2) Ruling No. 304 dated July 11, 2014, authorizing the transfer of the money from Corpbank into the Bulgarian Development Bank – **See Exhibit [37]**.

48.       APD Bankruptcy Court had not issued any other acts in that regard concerning how the money deposited at Corpbank should be managed and used, moreover any acts authorizing the Defendants to carry out the actions, which lead to reducing the balance of APD bank accounts with Corpbank to zero and their consequent closing – **See Exhibit [38]** and **Exhibit [39]**.

49.       The Rulings delivered by APD Bankruptcy Court, namely Ruling No. 731 of November 13, 2013 – **See Exhibit [41]** – and Ruling No.735 of November 14, 2013 – **See Exhibit [42]** – did not authorize in any way Fibank or the other Defendants to steal the $65,584,038(102,966,946 BGN) from the bank as they did. By these two rulings the Varna Court of Appeals determined the procedure to be applied for hearing Fibank's payment claims asserted in May 2013, **See Exhibit [33]**. The focus of the above rulings was the start and development of the procedures under Fibank's claims of May 21, 2013 over APD Trustee's drafting a Distribution list for distributing the money generated from the sale of the SB Project land. Both the rulings instructed APD Trustee to prepare such list and submit it to the Shumen District Court for approval. Such procedure however, could neither be opened nor further developed, because the Shumen District Court issued Ruling No.318 of July 18, 2014 where it denied the draft of APD Trustee's Distribution List – **See Exhibit [43]**.

50.       No court can authorize any payment of claims asserted in bankruptcy case if such claims are not qualified as *incontestable* as prescribed by Art.691 of the Bulgarian Commerce Act. Judgment No.3 of February 8, 2013 of the Targovishte District Court has entered in full force and effect[18] and is hence mandatory for APD bankruptcy case. This decision of the court is irrevocable and after the expiration of the term stipulated for appeal, as is the case here, the Court cannot reconsider the matter[19] or alter its decision to deny Fibank's claims lodged in case 82/2011 based on: 1) the three bank loans; 2) the June 4, 2010 Agreement; and 3) the mortgage guarantees. Fibank's claims for payment as filed again on May 21, 2013 were not qualified as incontestable pursuant to Art.691 of the Commerce Act and cannot be granted for payment as claims secured by a mortgage pursuant to Art.722(1)(1) of the Bulgarian Commerce Act.

51.       Ruling No.731 of November 13, 2013 and Ruling No.735 of November 14, 2013 of the Varna Court of Appeals are procedural acts of the Court and pursuant to Art.252 of the Bulgarian Civil Procedure Code[20] such acts have no power to vacate Judgment No.3 of February 8, 2013, which has entered in full force and effect. The Varna Court of Appeal by delivering Ruling No.731 of November 13, 2013 and Ruling No.735 of November 14, 2013 and thus turning a blind eye to the res-judicata authority of Judgment No.3 of February 8, 2013 and that it's mandatory to APD, cannot change the fact that the three bank loans, the June 4, 2010 Agreement and the mortgage contracts under the three bank loans provide no valid grounds for Fibank to pursue its claim for payment in APD's bankruptcy proceeding.

52.       The Varna Court of Appeal being fully aware of the above fact refrained from authorizing such payment and in order to please Fibank it forwarded Fibank's May 21, 2013 requests to a certain procedure, which however the Shumen District Court barred by delivering its Ruling No.318 of July 18, 2014. When the Shumen District Court delivered Ruling No.318 on July 18, 2014 it was well aware that if Ruling No.731 (of November 13,

---

[18] **Art.296 (2) of the Bulgarian Civil Procedure Code:** "The following decisions shall enter into force: against which no appellate or cassation complaint has been filed."

[19] **Art.297 of the Bulgarian Civil Procedure Code:** "The effective decision shall be obligatory for the court which pronounced it, and for all other courts of law, institutions and municipalities in the Republic of Bulgaria."

[20] **Art.252 of the Bulgarian Civil Procedure Code:** "The court shall render a ruling where the court pronounces on any issues whereby the dispute is not resolved on the merits."

2013) and Ruling No.735 of November 14, 2013) were to be put into effect, it would mean that other certain provisions need also be applied, such as: 1) the provisions of the UN Convention against corruption (UNCAC), the UN Convention against transnational organized crime and the U.S. Foreign Corrupt Practices Act – **See Exhibit [48]** and **Exhibit [49]**; 2) the provisions of the bankruptcy Regulation – **See Exhibit [34]**; and 3) the *res judicata* doctrine and the consequences from Judgment No.3 of February 8, 2014 delivered in case No.82/2011 and entered in full force and effect. The Shumen District Court was well aware that if it had applied the above provisions it would have made it incumbent upon the Court to take certain actions in APD's bankruptcy proceeding against the Defendants intended to make them restore Ayr's money they had taken. As at July 18, 2014 – the date when Ruling No.318 was delivered – the Shumen District Court was aware that APD Trustee listed Ayr as the major creditor in APD Bankruptcy on July 9, 2014 as result of Ayr's consolidation of the claims under the SB Project. **See Exhibit [19]** and **Exhibit [20]**.

53.       *Satisfaction of claims in APD bankruptcy proceeding may not serve economic interests in activities prohibited by international law.* Fibank did not appeal APD Trustee's refusal of June 20, 2014 to comply with Fibank's claims for payment, which refusal – based on the provisions of the UNCAC, the U.S. and the international laws against money laundering, corruption and terrorism financing – has not been revoked and is still effective as of today. **See Exhibit [44, last page 14]**.

54.       *It is impossible to authorize the payment of Fibank's claims of May 21, 2013 without examining and resolving the issues these claims created in APD Bankruptcy case.* The September 9, 2014 Order of the Court of Justice of the European Union in Luxembourg entered in case C-488/13[21] remanded the matter of Fibank's claims in APD bankruptcy case as brought before the Court in May 2013 to the Bulgarian Court and directed the latter to apply the fundamental principles of EU law, but the Bulgarian Court failed to do so.

---

[21] **In Para (34) of the Order delivered by the European Court of Justice in case No. C-488/13 the Court held that**: "Rather, it appears that those provisions of Bulgarian law merely authorize the court before which the application has been brought to fall back on general principles, national legislation and EU law to fill the lacuna found, by means of the decision it is to adopt and in accordance with its own evaluation of the guidance offered by those rules and principles."

55.        After the Varna Court of Appeals transferred APD bankruptcy case from the Targovishte District Court to the Shumen District Court on December 12, 2013 – **See Exhibit [45]**, the new hearing court in Shumen failed to proceed with resolving the issues the Targovishte District Court referred (with its Ruling No.179 of September 2, 2013) for a preliminary ruling to the EU Court of Justice in case C-488/13. The reason for such failure was that in order to resolve the issues raised by Fibank's claims for payment the Bulgarian Court had to consider the matter in terms of the UNCAC and the Insolvency Regulation provisions, being the fundamental principles of the EU Law specified by the EU Court.

56.        As any reasonable person would, the Shumen District Court also was well aware of the situation that the facts and evidence for the three bank loans failed to support the validity of FIbank's claims of May 21, 2013 seeking from the Court to restore the money Fibank had paid for the purchase of the SB Project lands and that no payment could be made under Fibank's claims. The Shumen District Court was aware that Fibank's claims for payment of May 21, 2013 could not be obeyed. This situation became irreversible when Judgment No.3 of February 8, 2013 was enforced and became effective and when on June 20, 2014 APD Trustee refused to comply with Fibank's claims for payment.

57.        By failing to comply with the September 9, 2014 Order of the Court of Justice of the European Union the Shumen District Court swept the problems Fibank's claims had caused under the carpet and avoided giving any authorization for payment of such claims. The reason for that was the same as the one that made the Shumen District Court issue Ruling No.318 on July 18, 2014 and thus barred the procedure for hearing and making a determination on the issues raised with Fibank's claims of May 21, 2013 as directed by the Varna Court of Appeals in its Ruling No.731 of November 13, 2013 and Ruling No.735 of November 14, 2013. The actions that followed after Ruling No.318 was delivered on July 18, 2014 in APD Bankruptcy case show that the Bulgarian Court did all that in order to prevent the Defendants' economic interest from facing the justice and the laws. After Corpbank was placed under BNB's compulsory administration on June 20, 2014 the Defendants conspired and pursued their goal of taking away Ayr's $65,584,038 (BGN102,946,966).

58.        Neither Fibank's actions nor those of the other Defendants who took the money generated from Ayr's SB Project lands sale and deposited at the instructions of APD Bankruptcy Court for safe-keeping in Corpbank, have ever been authorized by the Bulgarian Court or the U.S. Bankruptcy Court in Dallas. Such authorization is neither factually nor

legally supported as evidenced by the court rulings/orders delivered by APD Bankruptcy Court, which refrained from giving any such authorization.

**E. The Agreement of June 4, 2010 is nothing more than a twofold scheme used by Fibank and Harris as a way out of the tight spot they found themselves in: first, it made the money transfers to All Seas Management and Blue Finance Limited look legitimate on the face by misrepresenting said money transfers as investment in the SB project, and second it helped Fibank save face by shifting the liability to repay the debts under The Three Bank loans to Ayr in New York.**

59.     The Agreement Fibank and Ayr entered into on June 4, 2010 (The June 4 Agreement) was based on and intended to cash in the payments claimed under The Three Bank Loans, for which Fibank had obtained a writ of execution against the borrowers thereunder, namely: Port Investment Development – Bulgaria 2, EAD (PIDB2), *see* **[Exhibit 21]**, and Asset Management, EAD, see **[Exhibit 22].**

60.     Not a single reason exists that might have justified Fibank's treatment of the debts arising from The Three Bank Loans as 'investment' in Ayr's development project Silver Beach (SB project); nor can Fibank give any legitimate proof in support of its claim that those debts were owed by Ayr. On February 8, 2013 the Bulgarian court entered Judgment No.3 denying Fibank's creditor claim based on The June 4 Agreement and by which Fibank sought to have its payment claims satisfied in APD's bankruptcy. Therefore, APD Trustee's decision of June 20, 2014 denying Fibank's claims under The Three Bank Loans automatically invalidates Fibank's further attempts to obtain payment on those same grounds (namely The Three Bank Loans) in APD bankruptcy procedure. The consequences of those two adjudications have never been voided or reversed since even when Bulgarian court dismissed APD bankruptcy on January 19, 2018, which means they still stand and are still effective.

61.     That explains why Fibank has never filed a claim with the U.S. Bankruptcy Court in Dallas, Texas, seeking to be approved as a creditor of Ayr *either* on the basis of Three Bank Loans *or* on the basis of The June 4 Agreement.

62.     APD Trustee's decision of June 20, 2014 as based and relying on the United Nations Convention against Corruption (UNCAC) and international laws to combat money laundering, corruption and terrorist financing, to deny Fibank's payment claims lodged on

May 21, 2013 still stands and has been fully effective since. Bulgarian court's demonstrative brushing it off as if it did not exist may not and have not affected the validity or effect of said APD Trustee's decision.

63.      The mere fact that Fibank entered into an agreement with Ayr, namely the Agreement of June 4, 2010, desiring thereunder to assign its payment claims based on The Three Bank Loans over to Ayr, is a form of acknowledgement on the part of Fibank that said payment claims were, and still are, based on someone else's debt, not Ayr's in any case. Fibank's payment claims in reality are rooted in its investment in the Mexican bonds deal. Fibank's desire to recover the money so invested elsewhere without the need to wait until the Mexican bonds deal would have been followed through is not and may not be a valid justification for the theft of The Funds placed on deposit with Corpbank.

64.      Moreover, Fibank could have brought action against All Seas Management and Blue Finance Limited to claim repayment of the money transferred to their bank accounts in the light of the fact that the money originated from the Three Bank Loans. Fibank never did so. Why was that, one may wonder. The straightforward answer is this: because Fibank was, and still is, well aware of the backdoor arrangements in place and their first and foremost goal, which was to divert the money lent under the Three Bank Loans to the bank accounts held by All Seas Management and Blue Finance Limited in order to ensure financing for the Mexican bonds purchase. Investing the money in the SB project was never the objective. *See* **Exhibit [46]** and **Exhibit [47]**.

65.      Philip Harris also knew and was well aware of the fact that the money lent under The Three Bank Loans had never been intended to be invested in the development of the SB project and that the funds so lent were designated to finance the purchase of the Mexican bonds, which were to be then sold within the USA and the bank chosen for the sale transaction payment was Bank of America, New York. Harris' desire to acquire Fibank's interest in te Mexican bonds deal is not and may not be a valid justification for the theft of The Funds.

66.      On December 4, 2013 in his declaration submitted to the Bulgarian tax authorities and copied to APD Trustee, *see* **Exhibit [50]**, Harris, relying on the letters Ayr sent to the Prosecutor General of the Republic of Bulgaria on November 19, 2013, **See Exhibit [48]** and to the Minister of Justice, **Exhibit [49]**, respectively, and based on the U.S. Foreign Corrupt

Practices Act (FCPA), UNCAC and the UN Convention against Transnational Organized Crime, to oppose to Fibank's payment claims under the three bank loans, stated as follows:

> **"First Investment Bank AD had wrongly and incorrectly accounted for their mortgage receivable as the facts disclosed in the course of the court proceeding in 2012 and 2013 (case No.14/2012 and case No.82 in the Targovishte District Court) have shown. Because of such new circumstances letters have been sent to the Minister and Justice and the Prosecutor General of the Republic of Bulgaria requesting an inspection to be made in that regard and information of the results thereof."**

67.     Nothing in the June 4 Agreement can give rise to any legal or factual grounds for holding Ayr or the assets of SB project liable for any of the following: 1) repayment of the funds (i.e the price) that Fibank paid to buy the SB project lands; 2) repayment of the debts arising from the three bank loans, which debts were the inevitable result of the money transfers to and in favour of All Seas Management and Blue Finance Limited; 3) repayment of debts for which Fibank obtained writs of execution against Port Investment Development – Bulgaria 2, EAD and against Asset Management, EAD, respectively; and 4) payment in satisfaction of claims, which APD Trustee denied as both illegitimate and invalid under the UNCAC, the international laws on combating money-laundering, corruption, financial fraud and terrorist financing and the relevant U.S. laws.

**F. The Swap agreed under the June 4 Agreement and under the Mexican bonds deal laid the foundation for and gave rise to the predicate acts that followed and eventually deprived Ayr Creditors of their legitimate rights agreed in the process of consolidation of the payment claims against the SB project**

68.     In the short time following October 10, 2014 till the beginning of December 2014 Harris and Fibank acting in complicity with the other Defendants succeeded in accomplishing the ultimate goal of The June 4 Agreement. The swap negotiated between Harris and Fibank in early 2011 was what breathed life into and activated the chain of predicate acts, which eventually resulted in and successfully accomplished the intended theft of The Funds. The swap of economic interests in the **Mexican bonds (The Swap)** was effectuated in December 2014 when Defendants caused the debts owed by the Five Companies to Corpbank to be discharged with The Funds they stole from APD bank accounts with Corpbank.

69.        Harris' filing for a No Assets bankruptcy on behalf of Ayr served two purposes: one - he thus relinquished Ayr's rights in The Funds in favor of Fibank, and two - refused to have anything to do with The Funds, let alone take any steps to protect them. *See* **Exhibit [51]** and **Exhibit [68]**. Fibank, with the payment claims it filed back on May 21, 2013 in APD bankruptcy case hitting a dead end, took its cue from Harris' fraudulent filing for bankruptcy and with no further delay forced itself to be included on the list of signatories to APD's bank accounts with Corpbank, *see* **Exhibit [52]**. Shortly thereafter Fibank disposed of the Funds in favor of and for the benefit of The Five Companies that at the time owed debts to Corpbank, *see* **[Exhibit 53]**.

70.        The beneficiaries that gained from the arrangement to swap economic interests as presented in The June 4 Agreement and in the Mexican bonds are, as follows:

> 1) Fibank - which successfully dealt with the matter of two of its bad loans as BNB qualified those in its 2012 Report on Fibank, namely: bank loan No.39-KP-AA-2510 of November 22, 2007 and bank loan No.14-LD-L-000002 of October 2, 2008, *see* **Exhibit [54 at page 6 and page 19]**, by naming itself the holder and signatory to the bank accounts where The Funds amounting to $65,584,038 (BGN102, 946, 966) were kept on deposit;

> 2) Harris - who joined the Mexican bonds deal for himself and as early as 2010 negotiated a sell price of his share at $2,093,859,000 (two billion ninety three million eight under fifty-nine thousand u.s. dollars) - **See Exhibit [55]**;

> 3) Oriana Capital Partners, LLC and Ayr – which by virtue of the arrangements between Harris and Fibank would obtain ownership in the payment claims for the money originating from the Three Bank Loans and invested in the purchase of the Mexican bonds **Exhibit [2]**;

71.        Completing The Swap by means of Fibank's self-inclusion on the list of signatories to APD bank accounts with Corpbank was what triggered the annihilation of Ayr creditors' legitimate interests in the consolidation of the payment claims against the SB project as agreed with Ayr. Both the The Swap and the consolidation of the payment claims against the SB project are governed by New York laws.

72.        Fibank's fraudulent self-inclusion as signatory to The Funds was the event that triggered the chain of events and caused a domino effect: it triggered the series of predicate

acts that followed and was the cue for the other Defendants to rush in and take advantage of The Funds to repay The Five Companies' debts to Corpbank.

73.      New York was the designated venue where The Swap was to take place and be effectuated by Harris and Fibank in collusion with the other Defendants. The Swap was governed by the laws of New York, hence subject to the jurisdiction of the New York courts, as expressly stated in Harris' letter of January 27, 2011 to Fibank's then acting Executive Director and Chair of the Managing Board Matthew Mateev. **See Exhibit [2]**.

74.      New York was the place where Ayr Creditors' interests in the consolidation of the payment claims in the SB project as agreed with Ayr were annihilated. Ayr Creditors' interests have fallen victim to Harris and Fibank's backdoor arrangements and the ensuing theft of The Funds by the Defendants, thus thwarting their reasonable expectation to have their claims satisfied from The Funds as agreed with Ayr, which undertook to make such payments to its creditors via Deutsche Bank, New York.

75.      It took Harris, Fibank and the remaining Defendants only several months following June 20, 2014, when BNB took Corpbank into conservatorship to come up with and follow through the predatory scheme to take away The Funds and use them to repay the debts the Five Companies owed to Corpbank. In early December 2014 tasked with covering the tracks of the co-conspirators before the committed bank robbery, namely the theft of The Funds, could be traced back to them, BNB and the Conservators did their part and caused APD bank accounts – where The Funds were placed on deposit upon authorization in that regard by the Bulgarian APD's Bankruptcy Court - to be reduced to zero and promptly closed. [Exhibit 38].

76.  The ones that gained and benefitted from the theft of The Funds were as follows:

> 1) Fibank, which substituted the three bad loans in its books (given that the money lent thereunder had been invested in the Mexican bonds purchase) with the debts of The Five Companies, now freshly owed to Fibank, thus whitewashing Fibank's books, in return for Fibank's part in the repayment of their debts to Corpbank with The Funds. **See Exhibit [56]**[22];

---

[22] This also holds true for the arrangements in place between Fibank and each of the Five Companies Defendants, namely:  Tabak Market, AD (now renamed to Lafka Market, AD);

2) The Five Companies – because the discharging of their debts to Corpbank helped them dodge the imminent foreclosure of their assets initiated by Corpbank's management shortly before June 20, 2014 when Bulgarian National Bank (BNB) placed Corpbank into compulsory administration, see **Exhibit [57]**, **Exhibit [58]**, and **Exhibit [59]**;

3) Delyan Peevski and NSN Investment, EOOD – when Droslian Bulgaria, EOOD's debt to Coprbank was thus discharged they succeeded in preventing the forced collection of Droslian Bulgaria, EOOD's debt initiated on May 29, 2014 by Corpbank and the then imminent foreclosure of 68% share in Yuri Gagarin, AD (<u>YG</u>) pledged as security for the repayment of the debt. **See [Exhibit 60 – *see* Article 31 of Bank Loan Agreement of February 27, 2013]**. Now that the debts Droslian Bulgaria, EOOD and Tabak Market, AD owed to Corpbank were repaid thus, Peevski and one of the shareholders in Corpbank, namely VTB were free to move ahead and orchestrated the exercise of the call option for Bulgartabac Holding, AD (<u>BTH</u>) as a result of which YG was to be acquired by TGI Middle East FZE, Dubai, UAE. *See* **Exhibit [61], Exhibit [62], Exhibit [63]** and **Exhibit [64]**. Peevski and NSN Investment, EOOD took advantage of said machinations and Peevski acting through NSN Investment, EOOD acquired Komso Tobacco, EOOD and more importantly the 18% interest held by the latter in Yuri Gagarin, AD. The said 18% interest in YG was the quickly sold to TGI Middle East FZE, Dubai, UAE;

4) VTB and Peevski – because by having Cibole Service Incorporate Bulgaria, EOOD's debt to Coprbank thus discharged they successfully protected their respective economic appetite for the two calls option: Peevski's aspirations for 79.83 % share in BTH and VTB's appetite for the 76 % share in Vivacom, AD – *see* **Exhibit [65]** and **Exhibit [66]**;

5) BNB – which facilitated Fibank in meeting the recommendations in BNB 2012 Report on Fibank, **see Exhibit [54, at page 6 and page 19]** by assisting it in getting rid of the non-performing (bad) loans extended to PIDB2 under bank loan

---

Cibole services Incorporated Bulgaria, EOOD; Droslian Bulgaria, EOOD (now renamed to Asteria, EOOD); and Promishleno Stroitelstvo Holding, EAD.

agreements of Nos.39-KP-AA-2510 dated November 22, 2007 and 14-LD-L-000002 dated October 2, 2008;

6) BNB and the Conservators, which having successfully written off the debts owed by The Five Companies to Corbank, were free to report a steady growth of collection of Corpbank's receivables. *See* **[Exhibit 39]** and **Exhibit [40]**;

77.     What Defendants choose to ignore though is that by virtue of the Agreement of 28th March, 2012 and the Supplemental Agreement of November 27, 2013 of July 9, 2014 Ayr was recognized as the owner of the claims on assets in APD's Estate, namely the proceeds from the sale of the SB project lands, i.e. The Funds, **see Exhibit [19]** and **Exhibit [20]**. Even the foreseeable risk of intentional interference in the above Agreements and treating those as inconsequential would be a serious breach of New York laws and would lead to bringing an action in a NY court to hold the parties committing that breach liable did not stop the Defendants from following through with their predatory scheme.

78.     Moreover, Defendants choose to ignore the Notices submitted in APD's bankruptcy case on October 22, 2014, *see* **Exhibit [67]**, and on November 19 2014, **see Exhibit [68]**, duly notifying the parties involved of the automatic stay imposed under the US Bankruptcy law of all actions against Ayr's overseas property and of the consequences of breach thereof (that is the contemplated and actually committed theft of The Funds in early December 2014).

79.     APD accounts statement of November 13, 2014 issued by Corpbank, *see* **Exhibit [69]**, and APD Trustee Report of November 17, 2014, *see* **Exhibit [70]**, show existing total balance of $65,584,038 (102,966,946 BGN) there. At the beginning of December 2014 however and as a result of Defendants' scheming said APD accounts balances were reduced to zero and the accounts closed, regardless.

80.     Defendants clearly relied on being untouchable and beyond the reach of the law in a Bulgarian court, where they have made themselves 'at home', so they presumptuously moved ahead with their audacious plan to steal the Funds. By so doing however Defendants breached a handful of established legal standards and laws, such as the UNCAC, the US Bankruptcy Law, FCPA, FATCA, RICO and FSIA. All these laws have unlimited scope of application in terms of location meaning that they are as applicable to the EU as are to Bulgaria and the Bulgarian Defendants, one among which is BNB that on June 20 2014 took

Corpbank into conservatorship and placed into compulsory administration, another is VTB and still other is Fibank. In their unscrupulous pursuit of their own business agenda, their own economic interests or the ones of their shareholders solely for their own or their shareholders' personal gain and benefit Defendants stole The Funds amounting to $65,584,038 that rightfully belong to Ayr's Estate breaching each and every of said laws along the way over and over again.

### G. Bulgarian court effectively shielded the defendants from being held liable for what they did.

81.        In a Bulgarian court the Bulgarian Defendants made themselves literally at home and felt free to do as they please in full disregard for the law because they are treated as being above the law.

82.        The Targovishte District Court proved to be quite inconvenient to Fibank when it denied Fibank's creditor claims based on The Three Bank Loans and the ones based on the mortgage contracts thereunder, as well as the ones based on the June 4 Agreement, because it denied them not once, but twice, so it had to be replaced. Eventually, on December 12, 2013 APD's bankruptcy case was transferred over to the Shumen District Court. **See Exhibit [45]**.

83.        APD Trustee Ganka Kolyovska, who also refused to do Fibank's bidding, had a similar fate – she was removed from office and her replacement was Trustee Martin Apostolov (Apostolov) who was close with Peevski. **See Exhibit [71]**.

84.        At the time Apostolov was on the Board of Directors of Izdatelsko Poligraficheski Complex Rodina, EAD (a.k.a.IPK-Rodina), a company owned by Peevki's family. **See Exhibit [72]** and **Exhibit [73]**. Furthermore, Apostolov was the Executive Director of Tehnologichen Centar – Institut po Microelectronika, EAD (TC-IME) and it was Apostolov who signed the instrument by virtue of which on October 23, 2015 Peevski deprived TC-IME of its interest in the call option for 76% share in Vivacom, AD and let VTB acquire it. Acting as Executive Director of TC_IME at the time Apostolov signed the letter by which TC-IME withdrew from the Vivacom call option thus letting VTB to step in. **See Exhibit [62], Exhibit [63], Exhibit [71]** and **Exhibit [74]**[23]

---

[23] See Para 76 above.

85.     Apostolov turned a blinds eye to Bulgarian defendants' scheming to steal The Funds and did nothing to stop them. Apostolov chose to look away and do nothing, instead of exercising its powers to take legal action to cause The Funds to be returned to its rightful owner; moreover, Apostolov failed to do as ordered by the Shumen District Court in Ruling No.545 of December 2, 2015 directing him to draw up and submit an action plan for steps that needed to be taken against the Bulgarian Defendants to make them return The Funds they stole from APD's accounts with Corpbank. **See Exhibit [75]**. Likewise, the Shumen District Court chose to overlook and disregard its own Ruling No.454 of December 2, 2015 and kept doing so for over two years thereafter until January 19, 2018 when it dismissed APD's bankruptcy case for lack of property of the estate.

86.     The substitution of APD's Trustee and the change of APD Bulgarian Bankruptcy court from Targovishte to Shumen District Court, as outlined above, had a devastating effect on The Funds and prevented Ayr Trustee's efforts to cause The Funds to be recovered in a legal action at any Bulgarian court. The newly-appointed APD Bulgarian Trustee Apostolov and the Shumen District Court, to which APD case was newly-assigned, chose to collaborate with Defendants to disguise the Theft of the Funds as plausible grounds for dismissing APD bankruptcy case and thereby shutting out Ayr Trustee.

87.     On September 9, 2014, the Court of Justice of the European Union ("ECJ") entered an order in Case C-488/13 and directed the APD Bankruptcy Court to resolve the controversial issues arising from Fibank's claims. The Shumen District Court however failed to do as directed. Instead, the APD Bankruptcy Court deliberately misinterpreted the ECJ directions in an effort to hold Bulgarian Defendants and their business interests harmless from liability to return The Funds they had stolen[24].

88.     The Shumen District Court disregarded its own earlier Ruling No.545 of December 2, 2015 (directing APD Trustee to draw up and submit an action plan and estimated budget for steps that needed to be taken against the Bulgarian Defendants to make them return The Funds they stole) and chose to dismiss APD's bankruptcy case instead, conveniently, for lack of property.

89.     The Shumen District Court likewise disregarded another earlier court order made in APD Bankruptcy case (Ruling No.731 of November 13, 2013) and prescribing a procedure to

---

[24] See Para 41 through Para 44 above.

be followed for hearing and adjudicating on Fibank's payment claims filed on May 21, 2013. In its Ruling No.318 of July 18, 2014 the Shumen District Court denied the then acting AD Trustee submitted draft List of Distribution (i.e. creditor claims to be satisfied)[25].

90.     The Bulgarian court chose to shield the Defendants and deny Ayr Trustee's request of January 7, 2016, seeking from the court to start and inquiry into Fibank's and the other Bulgarian Defendants' acts that eventually resulted in the theft of The Funds from APD's accounts with Corpbank. *See* **Exhibit [76]**.

91.     APD Creditors Committee's Report of December 3, 2014, *see* **Exhibit [77]** was submitted to the U.S.Bankruptcy Court in Dallas, Texas, and to the Shumen District Court. The latter was well aware of what needed to be done to make the Bulgarian Defendants return The Funds they had stolen because Ruling No.545 adjudicated on December 2, 2015 made that perfectly clear. Unlike the U.S.Bankruptcy Court in Dallas that authorized Ayr Trustee to take action for recovery of The Funds against the Defendants, the Bulgarian court chose to get rid of APD case and shut out Ayr Trustee in the process.

92.     Art.632 (2) (sentence two) of the Bulgarian Commerce Act[26] made it incumbent on the Shumen District Court to discontinue its efforts to force-drive APD bankruptcy case into dismissal for lack of property and order APD Trustee to do what it needed to be done, including legal action against the Defendants, for recovery of The Funds.

93.     The Shumen District Court primary aim being to protect the Defendants rather that administer justice it kept on pushing APD bankruptcy case into dismissal for lack of property, only slowed down by the twice prepaid court costs as required to keep the case going and cause the Defendants to return The Funds they have stolen.

94.     On December 10, 2014 the Shumen District Court entered Judgment No.6 and stayed case No.730/2013 until costs in the amount of **$14,343,94(BGN 22,520.00)** would be

---

[25] See Para 39 and Para 44 above.

[26] **Bulgarian Commerce Act, Article 632 (2)(second sentence):** "Resumption [of the bankruptcy proceeding] shall be allowed if the requester proves there are sufficient assets or if he deposits the necessary amount for prepaying the initial expenses referred to in Art. 629b."

prepaid, *see* **Exhibit [78]**. On November 26, 2015 UniCredit Bulbank AD, which was sitting on APD Creditors Committee, paid the required amount to cover the costs. *See* **Exhibit [79]**.

95.      On June 17, 2016 the Shumen District Court stayed APD Bankruptcy case once again and instructed the parties to prepay proceeding costs in the amount of BGN 30,000. On June 24, 2016 Zahari Tomov, attorney at law acting as the Special Bulgarian Counsel for Ayr Trustee ensured the amount of **$19,108.28(BGN 30,000.00)** to Kota Energy AD, also a member of APD Creditors Committee, in order for the latter to prepay the costs in case No.730/2013 as required. **See Exhibit [80]**. Kota Energy AD deposited the amount needed to cover the costs as required by the Shumen District Court on June 27, 2016. **See Exhibit [81]**.

96.      Although court costs were prepaid twice as directed by the Shumen District Court, it did nothing in furtherance of Ruling No.545 of December 2, 2015, **see Exhibit [75]**, or to cause the necessary steps to be taken for recovery of The Funds.

97.      APD bankruptcy case dismissal served one purpose only – to keep Ayr Trustee as far away as possible from APD Bulgarian Bankruptcy Court. Art.758 of the Bulgarian Commerce Act recognizes Ayr Trustee's power to demand from the Bulgarian court to cause the Defendants return The Funds they have stolen and upon recovery of the latter to APD's Estate to be handed to Ayr Trustee.

98.      By shutting Ayr Trustee out the APD Bulgarian Bankruptcy court cut off the one factor that linked it to the claims raised in Ayr Bankruptcy and based on the theft of The Funds (which rightfully belong to Ayr).

99.      The Shumen District Court was only too familiar with the legal requirements and its duties in APD bankruptcy case it entertained, such as:

      1) That the proceeds from the sale of SB lands belong to APD's Estate and no third parties have the right to use The Funds to satisfy certain contestable payment claims especially when such third parties lack valid grounds to do so or any legitimate permission to that effect;

      2) The fact that none of the contestable payment claims, which were never proved to be otherwise in the course of APD bankruptcy, were not subject to satisfaction

within APD bankruptcy – see Art.691 of the Bulgarian Commerce Act[27]. By virtue of Judgment No. 3 of February 8, 2013 none of Fibank's claims lodged in APD bankruptcy case have been proved uncontestable;

3) That Ayr Trustee's powers to demand: (i) an inquiry into the theft of The Funds; (i) return of The Funds and (iii) their handing over to Ayr Trustee – especially when Defendants stole The Funds and used them for their personal gain and to pursue their own economic interests without having proven their legitimate claims against APD's Estate to be – are universally recognized and both the APD Bulgarian Bankruptcy Court and the Bulgarian Trustee are bound by law to acknowledge them. See Art.758 of the Bulgarian Commerce Act.

4) APD Trustee's refusal of June 20, 2014, (Exhibit 44) as based and relying on the United Nations Convention against Corruption (UNCAC) and international laws to combat money laundering, corruption and terrorist financing, to satisfy Fibank's invalid claims *still stands* and cannot be refuted as ill-founded. Even Fibank never dared to challenge it.

5) APD Bulgarian Bankruptcy Court failed to act as directed by the ECJ in the latter's Court Order of September 9, 2014 in Case C-488/13 and left the matter of Fibank's controversial claims as lodged on May 21, 2013 unaddressed and unresolved. Moreover, the APD Bulgarian Bankruptcy Court dismissed APD bankruptcy case without even making any adjudication to authorize payment in satisfaction thereof. Hence, it is still incumbent on the Shumen District Court to follow up on its own Ruling No.545 of December 2, 2015 and see to it that APD Trustee does as ordered thereunder (i.e. to draw up and submit an action plan and an estimated budget for steps that needed to be taken against the Bulgarian Defendants to make them return The Funds they stole). Compliance with Ruling 545 is mandatory by virtue of Judgment No.3 of February 8, 2013 and by virtue of former APD Trustee's refusal of June 20, 2014 to satisfy Fibank's claims.

---

[27] **Bulgarian Commerce Act, Art.691:** "Claims established by a court adjudication which has entered into full force and effect and was issued after the date of the decision to start bankruptcy proceedings, where the trustee in bankruptcy was a party, cannot be challenged."

Failure to meet the above duty prevents dismissal of APD's bankruptcy case for lack of property of the estate.

100.    Choosing to do Defendants' bidding so that they could keep The Funds they had stolen the APD Bulgarian Bankruptcy Court dismissed APD's bankruptcy case, despite being well aware that Defendants were - and still are - liable for returning The Funds they stole.

### H. Bulgarian court is not adequate and does not have jurisdiction over Plaintiff's claims, unlike the New York Court.

101.    APD Bulgarian Bankruptcy Court willingly chose to see through Fibank's eyes and turn a blind eye to certain inconvenient facts or disturbing legal provisions, so it looked at the theft of The Funds as a stroke of luck enabling it to dismiss APD's bankruptcy case and keep Ayr Trustee safely away.

102.    As noted in Ayr Trustee's motion on appeal from the dismissal of APD's case (**Exhibit 15**) and then reiterated in Ayr Trustee's Cassation Complaint (**Exhibit 83**) in that regard, shortly after the U.S. Bankruptcy Court in Dallas Court Order on Automatic Stay and Jurisdiction of US Bankruptcy law (case No. 14-34940-bjh-7, Doc.35, filed 06/17/16) was submitted to APD bankruptcy, the Shumen District Court abruptly changed course and did its best to dismiss APD case.

103.    On December 16, 2016 in its Ruling No.457 (Exhibit 12) the Shumen District Court made the following observation: "...**So far there exists no case-related data leading to and supporting a conclusion for it being likely that in 2017 an asset of the debtor will be found, which might ensure the money to cover the bankruptcy costs**".

104.    The Shumen District Court chose to brush off the fact that the so called' lack of property' resulted from and was caused by the Defendants that had stolen The Funds in the amount of $65,584,038 (or 102,966,946 BGN).

105.    The Shumen District Court took no notice of APD Creditors Committee reports of December 3, 2014, **see Exhibit [77]**, and of September 2, 2016, **see Exhibit [84]**, respectively, exposing the truth about what happened to the $65,584, 038 (or 102,966,946 BGN) that used to be on deposit with Corpbank and suggesting a viable course of action to make the Defendants return The Funds they had stolen.

106.    The Shumen District Court paid no attention to the fact that the provision of Art.620 (5) of the Bulgarian Commerce Act[28] *did not* require a prepayment of a filing fee for any of the legal steps that needed to be taken to cause the Defendant to return The Funds, nor to the fact that because of it APD bankruptcy was exempted from prepayment of proceedings costs.

107.    The Shumen District Court disregarded the Varna Court of Appeals (VCA) Ruling No.735 of November 14, 2013, **see Exhibit [42]** where the VCA held that: **"...If the [payment] claim is denied the trustee in bankruptcy may file a request for obtaining a recourse writ of execution for the amount paid to the mortgage creditor."**

108.    Fibank failed to assert valid claims in APD's bankruptcy within the statutory term and seek repayment of the entire amount lent under The Three Bank Loans (which money was diverted to All Seas Management and Blue Finance Limited).

109.    Fibank did manage to assert only one valid claim for the amount of $63,694.26(BGN 100,000.00), but the Targovishte District Court denied it *with prejudice*. *See* Judgment No.3[29] of February 8, 2013 in Case No.82/2011. Sufficient grounds exist to file for obtaining a counter writ of execution (against the Defendants) and no filing fee prepayment is required in that case.

110.    It was among the duties of the Shumen District Court to issue such writ of execution against Fibank, but it did not, despite multiple requests in that regard (the last one made on September 2, 2016, **Exhibit [84]**, by either APD Creditors Committee, or the legal counsel for APD Trustee.

111.    The VCA joined the chorus of the Shumen District Court in its effort to shield the Defendants and was quick to uphold the lower court's adjudications thus twice (on 15th and then on 16th September 2016) preventing an inquiry into Defendants' activities and helping the latter avoid the liability to return The Funds contrary to its earlier Rulings made in November 2013, namely Ruling No.731 of November 13, 2013, **see Exhibit [41]**, and Ruling No.735 of November 14, 2013, **see Exhibit [42]**. Hence, in its later determinations,

---

[28] **Bulgarian Commerce Act, Art.620 (5)** – "In respect of cases instituted for constitution of the bankruptcy estate and for avoidance actions no state fees shall be collected in advance."

[29] See also Para 36 in that regard.

i.e. Ruling No.586 of September 15, 2016, **see Exhibit [10]**, and Ruling No.589 dated September 16, 2016, **see Exhibit [11]**, the VCA held that the law failed to provide an adequate legal procedure or legal remedy within APD bankruptcy procedure that, if existent, might have made it possible to cause the Defendants to return The Funds.

### I.   Bulgarian court is inadequate and unable to direct the full force of the law to the Defendants

112.   The facts pertaining to APD's bankruptcy case outline a picture quite different from the one described by the Defendants and expose a shockingly harsh reality of grand-scale predatory practices. The facts are:

(1) That relying on the UNCAC and on international law against money laundering, corrupt activities and terrorist financing APD Trustee denied Fibank's payment claims and that decision still stands till this very day, **see Exhibit [44]**;

(2) That APD bankruptcy case **did not** authorize the Defendants to do what they did to steal The Funds amounting to $65,584,038 (approx. 102,966,946BGN);

(3) That a certain letter Defendants aptly named 'Payment Order" and used for stealing The Funds was nothing more than a mere letter, which according APD Trustee [Kolyovska]'s Report of August 15, 2016 had no legal value and could not be considered anything close to a valid payment order, **see Exhibit [85]** and **Exhibit [86]**;

(4) That the following amounts were on deposit in APD accounts with Corbank: (i) *$62,101,910(BGN*97,500,000) in bank account BG21 KORP 9220 2029 01; (ii) $1,315,231(BGN2,064,914.15) in bank account BG21 KORP 9220 2029 02; (iii) $648,998(BGN1,018,298.30) in bank account BG21 KORP 9220 2029 03; and (iv) $1,569,712(BGN2,464,449.50) in bank account BG21 KORP 9220 2029 03;

(5) That upon the unlawful use of $54,558,843(BGN85,657,385) from the above accounts for the purpose of discharging the debts The Five Companies owe to Corpbank, said accounts still had a positive balance of $11,025,192(BGN 17,309,551.59) in total;

(6) That despite the positive balance of $11,025,192(BGN 17,309,551.59) and the Conservators caused it to be exhausted and the then closed APD's accounts for the

sole purpose to cover up for the theft of The Funds. **See Exhibit [38]** and **Exhibit [39]**.

113.     Not only did the APD Bulgarian Bankruptcy Court turn a blind eye and never tackled the matter of that blatant form of bank robbery, but it chose to favor Defendants' economic interests and patently misconstrue said theft of $65,584,038 (or BGN102,966,946) as grounds for dismissal of APD bankruptcy case. **See Exhibit [12]** and **Exhibit [13]**.

114.     There were sufficient legal grounds for the APD Bulgarian Bankruptcy Court to cause The Funds to be returned to their rightful owner, had it not chosen to look away from all case-pertinent facts, but it did. **See Exhibit [14], Exhibit [15], Exhibit [44], Exhibit [75], Exhibit [76], Exhibit [77], Exhibit [83], Exhibit [84], Exhibit [85]**. By dismissing APD bankruptcy case the Shumen District Court severed the only link between Ayr Trustee's claims filed against the Defendants and the Bulgarian court forum. Thus, the APD Bulgarian Bankruptcy Court dodged responsibility for bringing Defendants to justice, as it should have.

115.     Having been thus shut out and prevented from pursuing further the claims in Bulgarian courts against the Bulgarian court-shielded Defendants, Ayr Trustee had to resort to:

> 1) Filing a motion (on October 22, 2017) before the U.S. Bankruptcy Court in Dallas and ask permission to assign the causes of action against the Defendants (**Causes of Action**) to Ayr Creditors, **see Exhibit [17]**. Ayr Trustee's motion was granted on November 20, 2017, **see Exhibit [18]**;

> 2) Filing a complaint to the European Commission on February 28, 2019 and seeking from it to open an infringement procedure against Bulgaria for the latter failure to comply with UNCAC, the anti-money laundering and counter terrorist financing Directive of the European Union, the U.S. FSIA, FATCA and RICO, **see Exhibit [87]**;

> 3)Preserving however the right to pursue claims against Bulgaria under Convention on the Settlement of Investment Disputes between States and Nationals of Other States (The Treaty Claims). The Treaty Claims are different from the Causes of Action assigned to Ayr Creditors. *See* **Exhibit [88]**.

**J. The claims filed against the Defendants have been lodged in the only adequate and proper forum, namely the court in New York.**

116.     The Causes of Action fall within the reach of RICO and the reach of FSIA.

117.     RICO and FSIA meet the high standards set in UNCAC and ensure adequate remedies to victims of corruption, money laundering and financial fraud enabling such victims to seek redress.

118.     The United States of America is the only one among all the countries signatories to the UNCAC that has stated upon signing the UNCAC that it has all the legal means in place to effectively apply the UNCAC.

119.     In contrast and despite being a signatory to the UNCAC Bulgaria has failed to ensure that adequate legal remedies are available to victims of corruption, money laundering and financial fraud; moreover, it has deprived such victims from the right to seek redress in a Bulgarian court. *See* **Exhibit [89]**. As a signatory to the UNCAC however it is Bulgaria's duty to recognize and enforce any judgment against the Defendants entered by a court of another country-signatory to the UNCAC.

120.     In the light of the fact that the European Union is a signatory to the UNCAC a judgment entered by the Court in New York under the RICO and FSIA claims shall be internationally recognized and shall be subject to enforcement within the EU. By virtue of Art.216 of the Treaty on the Functioning of the European Union (TFEU)[30], the UNCAC is part and parcel of the EU law and UNCAC provisions are binding to all EU Member States.

121.     Plaintiffs' claims, which have been filed in the court in New York based on the fact that (i) New York is the place focusing the interests held by the parties to the Swap

---

[30] **Art.216 TFEU – International Agreements:** "1. The Union may conclude an agreement with one or more third countries or international organizations where the Treaties so provide or where the conclusion of an agreement is necessary in order to achieve, within the framework of the Union's policies, one of the objectives referred to in the Treaties, or is provided for in a legally binding Union act or is likely to affect common rules or alter their scope.

2. Agreements concluded by the Union are binding upon the institutions of the Union and on its Member States."

agreement and (ii) New York is the place where the payment claims in the SB project were consolidated, seek a judgment from the court in New York, because such judgment shall be internationally recognized and enforced, including within the EU and within Bulgaria, hence New York *is* the proper *and* adequate forum to hear and adjudicate Plaintiffs' claims. The Choice of Jurisdiction and Governing Law Clause of the Supplemental Agreement of November 27, 2013 meets the mandatory standards set in Art.35 UNCAC. Therefore, allegations of 'forum shopping' ring hollow, because such allegations are neither legally nor factually supported – **see Exhibit [3]**.

122.    New York is the place where Fibank and Harris agreed to make the Swap; furthermore, New York is the pace where all related taxes and fees were to be paid according to Harris' letter to Matthew Mateev of January 27, 2011 – **see Exhibit [2]**.

123.    New York is the place where Ayr agreed to make payments upon consolidating the claims held by Ayr creditors as expressly set forth both in the March 28 2012 Agreement, **see Exhibit [5]**, and the Supplemental Agreement of November 27, 2013, **see Exhibit [6]**; New York is the place where Ayr Creditors undertook to pay taxes related to the payments agreed with and reasonably expected to be made by Ayr via Deutsche Bank, NY.

124.    Defendants have breached and violated a number of laws and their unlawful activities along with the consequences ensuing from the theft of Ayr's Funds have had a direct effect within New York, hence they are subject to the jurisdiction of the court in New York. Not so with the Bulgarian court, however, because it held that no domestic damage was suffered within Bulgaria and viewed Defendants' activities and consequences thereof solely as sufficient grounds to dismiss APD bankruptcy case.

125.    Both the U.S. Court in Dallas and APD Bulgarian Bankruptcy Court declined to exercise jurisdiction over the Defendants, hence the jurisdiction of the New York court is unrivalled and without alternative. None of the adjudications made either by the U.S. Court in Dallas or the APD Bulgarian Bankruptcy Court have ever challenged the jurisdiction of the court of New York. The claims arising from the theft of Ayr's Funds are as closely connected to New York as are the economic interests in the Swap agreed between Ayr and Fibank, and Ayr-consolidated payment claims in furtherance of the agreements between Ayr and Ayr Creditors.

126.     Bulgarian court, which is strongly dependent on Defendants' economic interests and eager to do their bidding, did it best to shut Ayr Trustee out and prevent him from initiating a procedure for recovery of Funds stolen by the Defendants. The corruption-ridden Bulgarian courts and its unhealthy dependency on certain private interests, just one example of which is the wrong dismissal of APB bankruptcy case, is not a one-time occurrence, but rather 'the norm' in Bulgarian judiciary as clearly shown in the statements made by the few Bulgarian judges and justices of integrity, among which are: (1) Trustee Daniela Kuceva on May 11, 2015, **see Exhibit [65]**; (2) Judge Rumyana Chenalova, **see Exhibit [66]**; (3) Judge Metodi Lalov on May 6, 2019, **see Exhibit [90]**; (4) The President of the Supreme Cassation Court in Bulgaria Judge Lozan Panov on November 16, 2018, **see Exhibit [91]**.

127.     The Court in New York fits perfectly in the universally acknowledged standards for good administration of justice as the adequate and proper forum where Plaintiffs' claims need to be heard and adjudicated, for it is there that the parties to this case will be on an equal footing and will be able to exercise their rights to due process, fair trial and equitable judgment as enshrined in the constitutional requirements in that regard set by the U.S. Congress.

128.     As a part of the applicable law to the matter related to the economic interests in the Swap agreed between Ayr and Fibank, and to the one of Ayr-consolidated payment claims in furtherance of the agreements between Ayr and Ayr Creditors, strict adherence to the constitutional requirements for due process, fair trial and equitable judgment is upheld by the provisions of Art.93 (1) and Art.105 of the Bulgarian Private International Law Code as shown in Para 19 above.

129.     Plaintiffs will never enjoy those rights and standards in the Defendants-suppressed Bulgarian court.

**K. Criticism of Defendants' motions to dismiss the jurisdiction of the New York Court.**

130. Incorrect are the inferences drawn in Defendants Fibank, Tseko Minev and Ivailo Mutafchiev[31] Motion to Dismiss and as are the ones contained in Defendant BNB[32]

---

[31] *See* Memorandum of Defendants Fibank, Tseko Minev, Ivailo Mutafchiev, which in pertinent part says: "The Bulgarian courts conclusively decided that question over six years

Motion to Dismiss, and in the respective declarations[33] in support thereof, that Plaintiffs RICO Claims filed in Case No.18-cv-11072(GHW-)-(RWL) are purportedly subject to and fall within Bulgarian jurisdiction.

---

ago, when six years ago, when they authorized the Bulgarian bank, defendant First Investment Bank AD ("Fibank"), to receive and retain those proceeds; Bulgaria was the appropriate forum for the plaintiff's claims; The doctrine of collateral estoppel bars Plaintiffs from re-litigating the Fibank court's holdings that U.S. courts lack personal jurisdiction over the Fibank Defendants and that Bulgaria provides a more appropriate forum for adjudicating Plaintiffs' claims; The Complaint alleges no contacts between the Fibank Defendants and New York (or even the United States) that would give rise to personal jurisdiction here; This Court should dismiss the Complaint under the *forum non conveniens* doctrine because Bulgaria is a more appropriate forum for Plaintiffs' claims, all of which turn on Bulgarian sources of proof, Bulgarian real property, and Bulgarian law; The Complaint does not allege that this so-called "Mexican bond scheme" caused plaintiffs to suffer any harm. Nor do Plaintiffs allege that the Fibank Defendants undertook any effort to sell the bonds in the United States; The Bulgarian court decisions show on their face that the Varna Appellate Court affirmed the termination of APD's Bulgarian bankruptcy because APD's creditors failed to pay court costs, not because the court lacked jurisdiction; the Bulgarian Courts' rulings are entitled to preclusive effect; This case does not involve a "cross-border tort"—all of the allegedly tortious activity took place in Bulgaria, and the "place where the alleged damages occurred" is Bulgaria—where APD is incorporated—not the United States";

[32] *See* Defendant Memorandum, which in pertinent part says: "The Funds were transferred to a secured mortgage creditor of APD in Bulgaria; BNB may not be sued for fraud or analogous torts; Plaintiffs choice of forum therefore is entitled to little or no deference, and smacks of forum shopping; BNB's alleged acts in Bulgarian regarding CCB were quintessentially sovereign in nature, and not commercial;   The immediate effect of those acts was, at most, losses to APD's estate in Bulgaria; Eliminating any possible "direct effect" in the United States; Bulgarian courts are an available and Adequate forum; All relevant factors otherwise point to Bulgaria."

[33] Para 19, 20, 21, 22, 39, 45, 50, 58, 61 of Declaration of Lazar Tomov dated August 30, 2019; Para 10 of Declaration of Chavdar Zlatev and Svetlozar Popov dated August 16,2019; Para 10, 12 of Declaration of Emil Emanuilov dated August 21, 2019;

a. Defendant Bulgartabac Holding, AD[34] and Defendants Tabak Market, AD (a/k/a Lafka Market, AD), Cibole Services Incorporated Bulgaria, EOOD, Asteria BG, EOOD (a/k/a Droslian Bulgaria, EOOD), Vili Vist, AD, Promishleno Stroitelstvo, EAD, **adopt as applicable the legal analysis in** the Memorandum of Defendants Fibank, Tseko Minev, Ivailo Muatafchiev, and **the legal analysis in** the Memorandum of Defendant BNB;

131.   The arguments presented in the following paragraphs question the expertise underlying Defendants' conclusions on the matter of jurisdiction.

a. The claims filed in NY court are definitely beyond the reach of Bulgarian court jurisdiction by virtue of one simple fact, which is that New York is the center of business interests[35] of several parties to this case: 1) Ayr's Silver Beach Project, **see Exhibit [4]**; 2) the Swap as agreed by and between Fibank, Harris and Ayr on June 4, 2010, **see Exhibit [2]**; 3) the consolidation of payment claims in the Silver Beach project as agreed by and between Ayr and Ayr Creditors, **see Exhibit [5]**, **Exhibit [6]**, **Exhibit [19]**, **Exhibit [20]**.

b. By virtue of Art.93 (1) and Art.103 (4) PILC jurisdiction over the claims based on Defendants' intentional interference in Ayr's major agreements concerning the SB project lies elsewhere, not in Bulgaria. When said agreements were abolished in one fell swoop, it was inevitable for their actions to produce a direct effect within New York for two distinct reasons: 1) HSBC, NY was the bank where rights and obligations arising from the Swap deal were to be exercised and met, respectively; and 2) Deutsche Bank, NY, was the bank where rights and obligations arising from the agreements consolidating the SB project claims were to be exercised and met. Those two distinct sets of agreements were made subject to and setting NY jurisdiction and governed by the laws of New York.

c. Pertinent proofs showing how and when and for what purposes bank account Oriana Capital Partners was opened at HSBC, NY, are in and within New York;

---

[34]See: Memorandum of Bulgartabak Holding, AD dated August 30,2019; Memorandum of Tabak Market AD (a/k/a Lafka Market, AD), Cibole Services Incorporated Bulgaria, EOOD, Asteria BG, EOOD (a/k/a Droslian Bulgaria, EOOD), Vili Vist, AD, Promishleno Stroitelstvo, EAD dated August 30,2019.

[35] See paragraphs 8÷10, 12÷19, 24, 29÷33, 68, 70, 71, 73, 74, 121÷123

Oriana Capital Partners is the bank account designated by Fibank, Ayr and Harris as the servicing account for payments under the Swap deal, including payments of taxes that needed to be paid under the deal, **see Exhibit [2]**;

d. According to EU Bankruptcy Regulation[36] it is the center of main interests of Ayr as the ultimate owner of the SB project that matters and that should be taken into account when determining jurisdiction over Plaintiffs' claims (that arose from the theft of The Funds in the course of Ayr's bankruptcy procedure), **and not** the place of registration of APD, which is merely Ayr's letter-box for holding the deed in the SP project, **or** the location of the SB project property. **See [Exhibit 7]** and **[Exhibit 35]**.

e. The theft of the Funds that served both Fibank's and Harris' interests and goals has had a direct effect in New York, hence its result falls under New York jurisdiction, because (i) Fibank used The Funds to keep the Swap deal afloat and to eventually finalize it in pursuit of its own economic interests, *i.e.,* getting the money it invested in the Swap deal back, while (ii) Harris acquired Fibank's share in the Mexican bonds deal for his personal gain.

f. The Varna Court of Appeals found not even one legal ground to determine jurisdiction over Ayr Trustee's claims based on the theft of The Funds and lodged against the Bulgarian Defendants, **see Exhibit [7]**, **Exhibit [35]** and **[Exhibit 14]**. Bulgarian courts, such as the Shumen District Court (ShDC), the Varna Court of Appeals (VCA) and the Supreme Court of Cassation, Sofia, Bulgaria, one after the other declined jurisdiction as to The Funds and focused on the result instead, namely "lack of property/assets" of APD's Estate, and dismissed APD's bankruptcy case, **see Exhibit [12]**, **[Exhibit 13]**, **[Exhibit 15]** and **[Exhibit 83]**.

132.    Plaintiffs may not file claims different from the ones based on the cause of action Ayr Trustee upon approval of Ayr's bankruptcy court has transferred to them, **see Exhibit [88]**.

---

[36] See Paragraphs 12, 13, 15, 16, 17, 23 and 24 above.

a. Per Art.26 (2) of Bulgarian Civil Procedure Code (CPC)[37] and by virtue of Art.758 of Bulgarian Commerce Act (CA) the power to file the claims that arose in the course of Ayr's bankruptcy procedure as a result of the theft of The Funds *lies exclusively with Ayr Trustee*, see Exhibit [24]. Ayr Creditors (i.e. instant Plaintiffs) may only file claims based on the RICO causes of action Ayr Trustee transferred to them on November 20, 2017; Ayr Creditors have no standing to file any other claims based on any of the causes of action Ayr Trustee has specifically preserved for himself.

b. Bulgaria failed to meet its duties under Art.34 and Art.35 of the *United Nations Convention against Corruption* (UNCAC) and failed to ensure that adequate legal means and remedies are readily available to victims of corrupt activities, money laundering and financial fraud, which, if it had, might have enabled such victims to bring action in a civil court of law against the perpetrators of such activities. In a Bulgarian court Plaintiffs will be deprived of the right to defend in a fair and unbiased court of law, unlike the New York court where they have filed their claims against the Defendants **see Exhibit [89]**.

133.    Bulgarian courts cannot as to these defendants meet the fundamental standards of due process or fair trial and justice will not be served where Plaintiffs' claims are concerned. This will definitely not be case in a New York court. Here is why: Defendants have undue influence over Bulgarian courts where their economic interests dominate the facts, disregard existing evidence and are above the law. Even fundamental principles of law, such as, the doctrine of *res judicata*[38] and its effect, the effect of being time-barred[39] or money-laundering as a valid cause of action[40] are impossible and eroded in Bulgarian courts, which time and time again choose to do Defendants' bidding and serve the latter' economic interests ignoring justice and rule of law. **See Exhibit [16]**, **Exhibit [28]**, **Exhibit [29]**,

---

[37] **Bulgarian Civil Procedure Code Art.26**: (1) Parties to civil lawsuits are the persons, on whose behalf and against whom the lawsuit is being handled. (2) Except the cases provided for by a law, nobody can claim on his own behalf someone's else rights before a court.

[38] See paragraphs 38, 39, 40, 41 above.

[39] See paragraphs 42, 43, 44 above.

[40] See paragraphs 53, 62, 66, 67, 112, 115, 117, 121 above.

**Exhibit [31], Exhibit [32], Exhibit [44], Exhibit [45], Exhibit [51], Exhibit [65], Exhibit [66], Exhibit [71], Exhibit [87], Exhibit [90], Exhibit [91], Exhibit [92], Exhibit [93].**

134.    Dismissal of APD bankruptcy case, which was the sole existing link[41] between Bulgarian forum and Plaintiffs Claims based on and arising from the theft of The Funds committed while Ayr's bankruptcy case was still underway, was and still is the result of the Bulgarian court's untoward protectionist policy where Defendants' interests are concerned.

a.   The ShDC failed to complete a number of legal procedures or see it that those were properly followed through[42] and all this is because it chose to embark on a course of pushing APD's bankruptcy case to closure, at all cost. Never followed was the procedure prescribed by the VCA in its Ruling No.731 of November 13, 2013, **see Exhibit [41]**, or the one it prescribed in its Ruling No.735 of November 14, 2013, **see Exhibit [42]**. Never was completed another procedure, as well, the one initiated by the Targovishte District Court in its Ruling No.179 of September 9, 2014, **see Exhibit [34]**, making a request for preliminary ruling to the European Court of Justice in Luxemburg, **see Exhibit [35]**. The ShDC had ulterior motive for choosing to overlook its duty to see the procedures to completion and act in favor of Defendants' interests: (i) by so doing it would ensure that Defendants would be safely kept away from having to take the consequences ensuing from the rules governing the *res judicata* effect, the effects of being time-barred or the effects of engaging in money laundering; and (ii) by so doing it would give the decisive push that would help drive APD's bankruptcy to closure on purely procedural grounds.

b.   The road leading to APD's bankruptcy case dismissal was carefully and systematically paved by the acts of the Shumen District Court and the ones of the Varna Court of Appeals intended to make certain that Ayr Trustee's powers and his legitimate efforts to have The Funds returned to their rightful owner would be neutralized once and for all. **see Exhibit [8], Exhibit [9], Exhibit [24], Exhibit [51], Exhibit [76], Exhibit [87], Exhibit [92]**.

---

[41] See paragraphs 23, 24, 25, 26, 27 above.

[42] See paragraphs 49, 51, 52, 57, 87 above.

c. Skillful artifices and stratagems were employed by the ShDC and the VCA in their joint effort to bend the rules of Art.734 (1) and (2) CA[43], and the ones set forth in Art.735 (1)(1) and (1)(2) CA[44], to drive APD's bankruptcy case to closure. If the said courts were to apply the above-mentioned rules as they should have done, they would have been obligated to seek answers to the questions, such as why, on what grounds and how APD's accounts with Corpbank had been depleted and closed. The absence of court permission for or approval of Defendants' use and disposal of The Funds, **see Exhibit [36]** and **Exhibit [37]** was staring them in the face so Defendants had to act without delay if they wanted to retain The Funds they stole. The only way out was to cause APD's bankruptcy case to be closed. The ShDC and the VCA followed their cue and did what they had to do in order to shield the Defendants from their obligation to return The Funds.

d. Procedural artifices the ShDC and the VCA resorted to in order to push APD's bankruptcy to closure were:

1) One, the action plan to cause Defendants return The Funds they had stolen was put on the backburner, despite ShDC's own Ruling No.545 of December 2, 2015 directing the then acting APD Trustee Apostolov to submit such plan, **see Exhibit [77]**;

2) Two, the VCA Ruling No.586 of September 15, 2016, **see Exhibit [10]**, and its Ruling No.598 of September 16, 2016, **see Exhibit [11]** denied APD's bankruptcy procedure the chance of forcing Defendants return The Funds;

3) Three, the ShDC ordered prepayment of costs for said action plan in APD's bankruptcy procedure and then the VCA effectively blocked its

---

[43] Art. 734. (1) CA: The court shall convene a conclusive meeting of the creditors within 14 days after receiving the account of the receiver in bankruptcy. (2) (amend. - SG 38/06) The meeting shall hear the report of the distribution of the amounts collected upon the conversion into cash and of the remaining unpaid claims. The meeting shall pass a resolution also of the unsellable objects from the bankruptcy estate.

[44] Art. 735. (1) CA: The bankruptcy proceedings shall be closed by means of a judicial decision, when: 1. the debts have been paid; 2. the bankruptcy estate has been depleted.

setting in motion by Ruling No.586 of September 15, 2016, **see Exhibit [10]**, and Ruling No.598 of September 16, 2016, **see Exhibit [11]**;

4) Last, but not least, the court ordered prepayment of costs for legal steps to be taken in APD bankruptcy procedure that according to Art.620 (5) CA however enjoyed exemption from the prepayment requirement.

e. This subtly woven web of procedural tricks the ShDC and the VCA resorted to eventually reduced the Theft of the Funds to a mere 'lack of property' in APD's Estate and, in turn, into a convenient legal ground for dismissal of APD's bankruptcy case. **See Exhibit [10], Exhibit [11], Exhibit [12] and Exhibit [13]**.

135.    Ayr Trustee[45] is *not* among those responsible for APD's bankruptcy case closure. **See Exhibit [15], Exhibit [83], Exhibit [87] and Exhibit [92]**.

a. Pursuant to the rule of Art.758 CA Ayr Trustee is required to submit evidence in APD's bankruptcy procedure proving Ayr Trustee's powers and standing. Ayr Trustee did so and complied fully with said provision. **See Exhibit [92]**.

b. Pursuant to the provision of Art.620 (5) CA avoidance actions intended to cause Defendants return The Funds they have stolen are exempt from the costs prepayment requirement.

c. The mere use of The Funds for satisfying Fibank's fraudulent claims - which actually arose from the Swap deal and which were otherwise precluded because of the res judicata effect, because they were time-barred and for being a part of a money laundering scheme – gave rise to a duty of APD's bankruptcy court (the ShDC) to issue a writ of execution against Defendants to force tem return the money they had stolen. **See Exhibit [84]**. Nothing doing. The ShDC and the VCA did their best to hold Defendants harmless and shield the latters' economic interests by dismissing APD's bankruptcy case, instead.

**Deposit and Debt Administration Method applied to Ayr's Funds on Deposit with Corpbank**

---

[45] Ayr Trustee holds 99 % of the payment claims in APD's bankruptcy case. Silver Beach, EAD is the other legitimate creditor holding a payment claim in the amount of $137,457 (BGN 215,808.43).

136.    Defendants' participation in the civil conspiracy and their unauthorized use of The Funds for discharging the debts owed by The Five Companies to Corpbank so that Fibank could get its money invested in the Swap deal negotiated with Harris and Ayr does not and may not enjoy immunity from lawsuit.

137.    Nothing in the laws[46] governing 1) the Swap agreement, **see Exhibit [2]**; or 2) the agreement for consolidation of the payment claims in the SB project can be construed as granting any such immunity, **see Exhibit [8]**, **Exhibit [9]**, **Exhibit [19]** and **Exhibit [20]**.

138.    UNCAC rules and standards impose even higher requirements on BNB, which among its other duties has a duty to comply with the laws of the State of New York fighting corruption, financial fraud, money laundering and terrorist financing:

1)  That duty follows from BNB's function as the authority controlling and supervising banks and financial institutions, **see Exhibit [54]** and **Exhibit [47]**;

2)  That duty also follows from BNB's compulsory administration of Corpbank in the period after June 20, 2014 until April 22,2015, when Corpbank was declared bankruptcy;

3)  Last but not least, that duty follows from letters of protest and notices of warning that were subsequently given on December 3, 2010, **see Exhibit [3]**, on December 20, 2010, **see Exhibit [94]**, on December 1, 2013, **see Exhibit [19]** and **Exhibit [95]**.

139.    In the case of Ayr's Funds at Corpbank BNB's obligation to strictly observe the laws against corruption, money laundering, financial fraud and terrorism financing becomes ever more binding in the light of the provisions of the Foreign Account Tax Compliance Act (FATCA), which mandatorily assign to these funds U.S. taxable assets status. As long as The Swap deal and the SB project consolidation agreement have been made subject to the laws and jurisdiction of the New York State, it follows and it stands to reason that performance under either Swap or the consolidation agreement, as well as the process of handling of The Funds, must at every step of the way obey and observe each of

---

[46] The laws of the State of New York.

these laws: Foreign Sovereign Immunity Act (FISA), Foreign Corrupt Practices Act (FCPA) and The Racketeer Influenced and Corrupt Organizations Act (The RICO Act)[47].

140.    To rely on the presumption that BNB is immune from lawsuit for its conduct and activities during the period of its compulsory administration of Corpbank after June 20, 2014 and, more specifically, its management of deposits at Corpbank and of the Corpbank's debt collection processes, **see Exhibit [39]**, **Exhibit [40]** and **Exhibit [96]**, is in correct. BNB may not plead immunity from lawsuit when during its span of compulsory administration of Copbank and as a result of its egregious management of the above-mentioned processes Ayr's Funds were stolen. BNB violated fundamental bank rules and standards for keeping bank deposits for the sole purpose of making it possible for Fibank to get its money under the Swap and bring the June 4, 2010 Agreement with Harris and Ayr to fruition.

**141.**    The provision of Art.79, (9)[48] of the Bulgarian Law on Credit Institutions categorically rules out the possibility of BNB enjoying sovereign immunity from suit regarding the theft of Ayr's Funds held at Corpbank. But for BNB's action, no such theft could have ever been committed, therefore BNB is fully responsible and liable for the damages caused by the theft of Ayr's Funds.

142.    After June 20, 2014 the management of bank deposits and use of depositors' money for repayment of liabilities under Corpbank's bank loans was entirely under BNB's control (BNB's model of managing Corpbank's deposits and debts):

1)  According to BNB Resolution No.104 dated August 15, 2014, **see Exhibit [96]**, Corpbank's bank deposits could be used for repayment of debts owed to Corpbank but by depositors only and for repayment of each of those depositor's own debt to Corpbank.  None of Defendants Harris, Ayr or Fibank had any debts to Corpbank.

---

[47] None of these issues have been examined by the U.S. Court in determining its jurisdiction in case No.16-03138-bjh, because Harris, Ayr and Fibank doggedly concealed the facts about the swap and the connection between the economic interests in the Swap and Ayr's Funds at Corpbank and their theft by the Defendants as made in early December 2014.

[48] The Bulgarian Law on Credit Institutions, Art.79 (9): The Bulgarian National Bank, its bodies and the persons authorized by them shall not be liable for any damages caused in exercising their supervisory functions, unless they have acted with intent.

2) According to BNB's Instructions of August 22, 2014, **see Exhibit [41]**, the procedure for making a payment operation for repayment of a debt to Corpbank with money deposited with Corpbank is as follows: a) seven days before the repayment of the debt, where the payment exceeds USD 127,388 (BGN 200,000) the Conservators contact BNB to obtain permission for making such operation; b) within the next seven days BNB may either allow or refuse the requested repayment of a debt to Corpbank with money taken from a bank deposit with Corpbank;

3) In the cases where BNB has authorized a payment of over $ 127,388 (BGN 200,000) to be made for discharging depositor's debt to Corpbank and after the payment is made, BNB has to confirm the payment operation and reduce the amount of the debt by entering this operation in the Register of debts owed to Corpbank discharged with money out of Corpbank's deposit accounts. **See Exhibit [39]**.

143. By applying BNB's model of managing Corpbank's debts and deposits to Ayr's Funds (which have been used for discharging the Five Companies' debts to Corpbank) BNB purposefully supported the efforts of Harris, Ayr and Fibank to finalize the Swap Deal and make it possible for Fibank to get its money under the said deal. Fibank actually had a fail-safe mechanism in place ensuring that it would get the money by having agreed with the Five Companies that the latter would return to Fibank that portion of Ayr's Funds, which they used to discharge their debts to Corpbank.

144. Nothing in BNB's participation in the civil conspiracy for stealing Ayr's Funds could justify immunity from suit for its conduct nor can BNB enjoying such protection be legally or factually supported or supported by any economic reasoning or legal provisions. BNB has no authorized power nor could have had any such power to advance Fibank's, Harris and Ayr's economic interests in the Swap deal aimed at laundering the artificial and falsely contrived debts under Fibank's loans used for financing the Mexican bonds deal.

145. Unlike Ayr Creditors' legitimate rights, **see Exhibit [8]**, **Exhibit [9]**, **Exhibit [19]** and **Exhibit [20]**, the rights claimed by Fibank, Harris and Ayr that had kept their agreements under the Swap deal hidden, rang hollow when: 1) on July 11, 2011 they crashed into the effect of being time-barred; 2) on February 8, 2013 crashed into the *Res judicata effect*; and 3) they crashed into the *Money Laundering Effect*. It was incumbent upon BNB to

take the above facts into account and refuse to participate in the civil conspiracy serving the economic interests of Fibank, Harris and Ayr that stood untouchable by the law. These illegitimate and "toxic" payment claims, finalized the New York Swap deal.

146. After the U.S. Bankruptcy Court, with the facts before it at that time, determined it had no jurisdiction over the matter in case No.16-03138-bjh on May 15, 2017, one by one certain facts came to light and the civil conspiracy scheme began to take visible form revealing the participants and their roles in the pursuit of the economic interests of: 1) Harris, Ayr and Fibank in the Swap; 2) The Five Companies, Peevski and Bulgartabac Holding AD in discharging of the debts owed to Corpbank; 3) Peevski and VTB in the call options for Vivacom AD and Bulgartabac Holding AD. The glaring absence of these facts in the file of case No.16-03138-bjh – facts crucial for determining jurisdiction - was Fibank's doing for it concealed them and kept them hidden. At the court hearing in case No.16-03138-bjh, **see Exhibit [97]** held on May 4, 2017 Fibank withheld information about the Swap agreed with Harris and Ayr kept silent about the role of the jurisdiction and the laws of New York in this deal.

147. Fibank's own treacherous conduct in case No.16-03138-bjh discredits the arguments and exhibits, on which Defendants based their conclusion that by virtue of the U.S. Court Order determining the jurisdiction in case No.16-03138-bjh it was the Bulgarian court that had jurisdiction over the claims brought before the Court of New York.

148. The fact that none of the factors laid out in the EU Bankruptcy Regulation[49] have ever been examined or considered in case No.16-03138-bjh, **see Exhibit [87]** along with the unscrupulous concealment of the existing link between the economic interests in the Swap and the theft of Ayr's funds indicate that:

  a. The U.S. Court's determination of the jurisdiction in case No. 16-03138-bjh of May 5, 2017 does not compete with the jurisdiction of the New York Court;

  b. The U.S. Court's Order entered in case No. 16-03138-bjh does not restrict Plaintiffs' right to bring claims before the Court of New York especially in the light of the fact that the latter's jurisdiction was stipulated at all times in all commitments Harris and Ayr had agreed with Fibank and in all of Ayr's agreements concerning Ayr's SB Project.

---

[49] See paragraphs 8, 9, 11, 12, 14, 16, 17.

149.    Fibank succeeded in taking the upper hand in the jurisdictional dispute in case No.16-03138-bjh by intentionally hindering the resolution of the matter when it brushed off as inconsequential the following key factors:

1)  That the <u>center of main interests</u> factor is established by the EU Bankruptcy Regulation as a crucial factor for determining the jurisdiction over the claims arising from Ayr's bankruptcy and based on the theft of The Funds which theft helped accomplish the economic goals of the Swap agreed by Fibank, Harris and Ayr;

2)  That New York is the place of performance of the rights and obligations in the Swap;

3)  That the SB Project was wielded as a tool for laundering the artificial and falsely contrived debts of Chavdar Angelov arising from the loans granted by Fibank and the attempt to get rid of such debts by shipping them over to New York and the New York banking system;

4)  That the Swap deal was the corner stone of the civil conspiracy focusing the economic interests of its participants[50].

150.  Fibank's undeserved success in case No.16-03138-bjh was due solely to Fibank's concealment of the key and critically pertinent facts know to it at the time concerning the origin, maintenance and completion of the Swap agreed with Harris and Ayr. From the viewpoint of the law and from the viewpoint of all case-pertinent facts it would be unfair if Fibank repeats this success once again, now that the curtain concealing the civil conspiracy, its methods and actions has already dropped.

151.  Defendants failed to show a single valid reason for dismissing the claims against them filed in New York Court for lack of jurisdiction. New York is the place having jurisdiction over and its laws are the ones governing the Swap deal brought to fruition by means of the civil conspiracy. Defendants' motion seeking to present these claims as being precluded by the Court Order delivered in case No.16-03138-bjh is ill grounded.

152.  Neither the direct connection of the Swap with the laws and jurisdiction of the State of New York nor the inherent link of The Consolidation Agreements to the laws and jurisdiction of the State of New York can be made to disappear by Defendants' recurrent

---

[50] See paragraphs 68, 69, 70, 72, 75, 76, 84, 85, 112,

theme that 'what happened with Ayr's Fund at Corpbank in Sofia, Bulgaria, stayed in Bulgaria'. Here is why:

1) When Fibank, Harris and Ayr concluded the Swap deal subject to the laws and jurisdiction of the State of New York they practically took the matter of toxic bank loans (with the money from which they funded the Mexican bonds purchase) out of the reach, and beyond the jurisdiction of Bulgarian courts.

2) The moment Defendants made the Swap deal the corner stone of their civil conspiracy was the moment when they made themselves subject to New York jurisdiction, the moment when they threw caution to the wind and stepped on a path that sooner or later would lead them to a clash with the laws of New York.

3) When they took full advantage of BNB's model of managing Corpbank's debts and deposits and applied it to The Funds, what Defendants actually did was to pull the trigger of the gun loaded by the civil conspiracy.

4) The theft of The Funds from Corpbank was the proverbial stone that killed two birds, both of which were in New York, hence what happened was subject to the jurisdiction of New York. What happened is this: (i) Fibank made sure that it would get its money from the Swap deal and (ii) Ayr was no longer answerable for its prior commitment to protect The Funds against Fibank's toxic claims as made under the Claims Consolidation Agreements and was free from its obligation thereunder to make payments to its creditors via Deutsche Bank, NY.

*The Remainder of This Page Is Left Blank Intentionally.*

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date: October 15, 2019         Respectfully submitted,

Varna, Bulgaria

By: _____

Dimitar Blagovestov Yanakiev

**LIST OF CITED DOCUMENTS IN THE DECLARATION OF DIMITAR
YANAKIEV DATED OCTOBER 15, 2019**

| EXHIBIT NO. | DOCUMENT |
|---|---|
| Attachment (A) | CV of Attorney Dimitar Yanakiev |
| Attachment (B) | Bulgarian Commerce Act<br>Chapter Forty-three<br>SUBMISSION OF CLAIMS |
| Attachment (C) | Bulgarian Civil Procedure Code<br>Chapter twenty-three<br>EFFECT OF THE COURT DECISIONS |
| Exhibit 1 | Certified copy of Judgment No.63 of the Varna Court of Appeals dated March 16, 2012 |
| Exhibit 2 | Certified copy of Letter of Philip Harris to Matthew Matteev, Chairman of the Management Board and Executive Director of Fibank, dated January 27, 2011. |
| Exhibit 3 | Certified copy of the Letter for damages from PH to Investbank, Fibank, UniCredit Bulbank, dated December 3, 2010 |
| Exhibit 4 | Certified copy of Ayr's Reorganization Plan filed in APD's Bankruptcy case dated August 16, 2011 |
| Exhibit 5 | Certified copy of the March 28, 2012 Agreement |
| Exhibit 6 | Certified copy of the Supplemental Agreement dated November 27, 2013 |
| Exhibit 7 | Certified copy of the Synopsis of Case-pertinent Preliminary Rulings of The Court of Justice of the European Union. |
| Exhibit 8 | Certified copy of the Judgment against Ayr Property Development, AD, Doc.13 Filed 03/14/17, case 16-03139-bjh |
| Exhibit 9 | Certified copy of the Judgment against Ayr Property Development, AD, Doc.37 Filed 11/13/17, case 16-03140 –bjh |
| Exhibit 10 | Certified copy of Ruling No.586 of the Varna Court of Appeals dated September 15, 2016 |
| Exhibit 11 | Certified copy of Ruling No.589 of the Varna Court of Appeals dated September 16, 2016 |
| Exhibit 12 | Certified copy of Ruling No.457of the Varna Court of Appeals dated December 16, 2016 |
| Exhibit 13 | Certified copy of Judgment No.5 of the Shumen District Court dated January 19, 2018 |
| Exhibit 14 | Certified copy of Transcript of Court Hearing of the Varna Court of Appeals dated May 2,2018 |
| Exhibit 15 | Certified copy of Ayr Trustee Motion on Appeal dated January 25, 2018 from Judgment No.5 dated January 19, 2018 |
| Exhibit 16 | Certified copy of APD Creditors Committee Notice to Ayr Trustee, September 16, 2016 |
| Exhibit 17 | Ayr Trustee motion for approval to sell causes of action, Doc.63 Filed 10/22/17, case No.14-34940-bjh-7 |
| Exhibit 18 | Court Order Granting Trustee's Motion for approval to sell causes of action, Doc.70 Filed 11/20/17, case No.14-34940-bjh-7 |
| Exhibit 19 | Certified copy of the Motion of All Seas Property 2 OOD and Asset Management EAD |

| | to APD Trustee dated July 3, 2014 |
|---|---|
| Exhibit 20 | Certified copy of the List of APD Creditors dated July 9, 2014 |
| Exhibit 21 | Certified copy of the Writs of Execution against PIDB2 under bank loan 39KP-AA-2510 and bank loan 014LD-L-000002 |
| Exhibit 22 | Certified copy of the Writ of Execution against Asset Management under Bank loan 14LD-L-000006 |
| Exhibit 23 | Certified copy of FIB transferring to Torier Partner Limited the accounts receivables under the three Bank Loans Agreements № 39-KP-AA-2510 dated 22.11.2007, № 14-LD-L-000002 dated 02.10.2008 and № 14-LD-L-000006 dated 29.12.2009 |
| Exhibit 24 | Certified copy of the Court Order imposing Automatic Stay and confirming the Jurisdiction of US Bankruptcy law, case No. 14-34940-bjh-7, Doc.35 Filed 06/17/16 |
| Exhibit 25 | Certified copy of Ayr Trustee's claim against Torier Partner Limited, Doc.1 Filed 10/11/16, case 16-03140-blh |
| Exhibit 26 | Certified copy of the Judgment against Torier Partner Limited, Doc.27 Filed 07/19/17, case 16-03140-bjh |
| Exhibit 27 | Certified copy of Fibank's Statement of Claim in APD Bankruptcy proceeding |
| Exhibit 28 | Certified copy of Ruling No.728 of Supreme Court of Cassation dated July 30, 2012 |
| Exhibit 29 | Certified copy of Judgment No.3 of the Targovishte District Court dated February 8, 2013 |
| Exhibit 30 | Certified copy of the Judgment of the Targovishre District Court of No.16 dated May 3, 2011 |
| Exhibit 31 | Certified copy of the Certificate of APD Creditors Committee dated September 3, 2014 |
| Exhibit 32 | Certified copy of Judgment No. 182 of the Targovoshte District Court of September 4, 2013 |
| Exhibit 33 | Certified copy of the FIB's payment claim dated May 21, 2013 |
| Exhibit 34 | Certified copy of Ruling No. 179 of the Targovishte District Court dated September 2,2013 |
| Exhibit 35 | Certified copy of the Order of EU Court dated September 9. 2014, case C-488/13 |
| Exhibit 36 | Certified copy of Ruling No. 38 of the Targovishte District Court dated February 14, 2013 |
| Exhibit 37 | Certified copy of Ruling No. 304 of the Targovishte District Court dated July 11, 2014 |
| Exhibit 38 | Certified copy of Corpbank bank statement of APD's bank account dated December 1, 2014 |
| Exhibit 39 | Certified copy of the BNB's Register Entry pursuant to Art.62 (12)(3) Bulgarian Credit Institutions Law |
| Exhibit 40 | Certified copy of BNB Instructions dated August 24, 2014 |
| Exhibit 41 | Certified copy of Ruling No.731 of the Varna Court of Appeals dated November 13, 2013 |
| Exhibit 42 | Certified copy of Ruling No.735 of the Varna Court of Appeals dated November 14, 2013 |

| Exhibit 43 | Certified copy of Ruling No. 318 of the Shumen District Court dated July 18, 2014 |
|---|---|
| Exhibit 44 | Certified copy of the APD Trustee's Report dated June 20, 2014 |
| Exhibit 45 | Certified copy of Ruling of the Varna Court of Appeals dated December 12, 2013 |
| Exhibit 46 | Certified copy of the Declaration of Asset Management EAD dated November 25, 2014 |
| Exhibit 47 | Certified copy of the Declaration of Port Investment Development Bulgaria 2 EAD dated August 3, 2016 |
| Exhibit 48 | Minutes of Court Hearing dated 10 January 2013, in case No.82/2011, pages 17,18,19,20 |
| Exhibit 49 | Certified copy of Notice to the Minister of Justice of Bulgaria dated November 19, 2013 |
| Exhibit 50 | Certified copy of the Declaration of Philip Harris dated December 4, 2013 |
| Exhibit 51 | Certified copy of Notice of Attorney Nakova to Philip Harris dated October 9, 2014 |
| Exhibit 52 | Certified copy of the Bank reference in favour of Fibank as owner of APD's bank account dated December 1, 2014 |
| Exhibit 53 | Certified copy of the Bank reference in favour of the Five Companies as owners of APD's bank account dated November 17, 2014 |
| Exhibit 54 | Certified copy of the BNB's Supervision Report to FIB for 2012 |
| Exhibit 55 | Certified copy of the Escrow Agreement signed by Anthony Harriott and West Law Group on November 19,2010 |
| Exhibit 56 | Certified copy of the Supplementing the Sell of Receivable Agreement between FIB and Vili Vist EAD dated October 30, 2014 |
| Exhibit 57 | Certified copy of the Notary Notice of Corpbank re execution of Vili Vist EAD's bank loan debt dated May 30, 2014 |
| Exhibit 58 | Certified copy of Corpbank's Request to Cibole Services Incorporated Bulgaria EOOD for Voluntary Performance of Contract Obligations dated June 19, 2014 |
| Exhibit 59 | Certified copy of Notary Notice from Corpbank to Droslian Bulgaria EOOD demanding voluntarily payment, dated May 29, 2014 |
| Exhibit 60 | Certified copy of the Bank loan agreement of Droslian Bulgaria EOOD dated February 27, 2013 |
| Exhibit 61 | Certified copy of the List of shareholders of Yurii Gagarin AD, 2015 |
| Exhibit 62 | Certified copy of the Good Standing Certificate of Comso Tabako EOOD |
| Exhibit 63 | Certified copy of the Good Standing Certificate of NSN Investment EOOD |
| Exhibit 64 | Certified copy of the TGI Middle East Presentation, 2016 |
| Exhibit 65 | Certified copy of the Statement of Trustee Daniela Kuceva dated March 11,2015 |
| Exhibit 66 | Certified copy of the Statement of Judge Rumyana Chenalova dated March 11, 2015 |
| Exhibit 67 | Certified copy of Attorney Nakova's Notice to APD Creditors Committee dated October 22, 2014 |
| Exhibit 68 | Certified copy of Attorney Nakova's Notice to APD Bankruptcy Court dated November 19, 2014 |
| Exhibit 69 | Certified copy of the APD's Bank Account Statement dated November 13,2014 |
| Exhibit 70 | Certified copy of the APD Trustee Martin Apostolov's Report dated November 17, 2014 |

| Exhibit 71 | Certified copy of APD Trustee's Request to be released from post on July 11, 2014 |
|---|---|
| Exhibit 72 | Certified copy of the Good Standing Certificate of IPK Rodina AD |
| Exhibit 73 | Certified copy of the List of shareholders of IPK Rodina EAD |
| Exhibit 74 | Certified copy of the Letter from TC-IME AD dated October 23, 2015 |
| Exhibit 75 | Certified copy of Ruling No.545 of the Shumen District Court dated December 2, 2015 |
| Exhibit 76 | Certified copy of the Ayr Trustee's Letter dated January 7, 2016 |
| Exhibit 77 | Certified copy of the APD Creditors Committee Report dated December 3, 2014 |
| Exhibit 78 | Certified copy of Judgment No.6 of the Shumen District Court dated December 10, 2014 |
| Exhibit 79 | Certified copy of Bulbank's Payment order to resume case costs of November 26, 2015 |
| Exhibit 80 | Certified copy of the Delivery and Acceptance Statement dated June 24, 2016 |
| Exhibit 81 | Certified copy of Kota Energy EAD's Notice to confirm payment of costs for APD Bankruptcy proceedings dated June 27, 2016 |
| Exhibit 82 | Certified copy of Judgment No.122 of the Targovishte District Court dated June 15, 2012 |
| Exhibit 83 | Certified copy of the Ayr Trustee's Cassation Complaint Filed on July 16, 2018 |
| Exhibit 84 | Certified copy of Meeting Minutes of APD Creditors Committee dated September 2, 2016 |
| Exhibit 85 | Certified copy of APD Trustee's Letter dated August 15, 2016 |
| Exhibit 86 | Certified copy of the Letter named «Payment Order» Filed sent by Fibank to Corpbank, Ref.9764 dated October 24, 2014 |
| Exhibit 87 | Certified copy of the Ayr Trustee's Complaint to the European Commission against the Republic of Bulgaria dated February 28, 2019 |
| Exhibit 88 | Certified copy of the Stipulation to clarify causes of action, Doc.81 Filed 09/0718 case No.14-34940-bjh-7 |
| Exhibit 89 | Certified copy of PIDB2's Claim against Bulgaria, Filing No 20891 of July 1, 2015 |
| Exhibit 90 | Certified copy of the Judge Metodi Lalov's article describing the brutal political pressure exerted on the Bulgarian judiciary, dated May 6,2019 |
| Exhibit 91 | Certified copy of the Speech of Judge Lozan Panov, the President of the BG Supreme Court dated November 16, 2018 |
| Exhibit 92 | Report of Trustee of APD, Ganka Kolyovska dated January 19,2016 |
| Exhibit 93 | "Friendly Warning" email letter to Attorney Zahari Tomov dated May 21, 2016 |
| Exhibit 94 | Ayr's Letter to BNB dated December 20,2010 |
| Exhibit 95 | Letter of Philip Harris to the Trustee of APD Attorney, Attorney Maria Nakova dated December 1,2013 |
| Exhibit 96 | BNB' s Resolution № 104 dated August 15,2014 |
| Exhibit 97 | Transcript of court hearing in case 16-03138-bjh dated May 4,2017 |
| Exhibit 98 | Commerce Commodities Ltd Letter to FIB dated August 27, 2009 |
| Exhibit 99 | FIB letter to PH dated April 22, 2009 |

| Exhibit 100 | Email correspondence of Chavdar Angelov with FIB dated October 2, 2009 about start of negotiation with Philip Harris and Ayr |
|---|---|
| Exhibit 101 | Fibank email dated October 2, 2009 to invitation of Philip Harris to start negotiation |
| Exhibit 102 | Philip Harris and Chavdar Angelov email discussion about negotiation with Fibank dated December 17, 2009 |
| Exhibit 103 | Philip Harris and Matthew Mattev email correspondence dated August 5 and 6, 2010 |
| Exhibit 104 | Letter of Syndicated Holdings LLC to FIB dated October 4, 2010 |
| Exhibit 105 | Expert Opinion of Carl F. Waid SWIFT MT 799 in support bank account Oriana Capital Partners dated November 6, 2010 |
| Exhibit 106 | Expert Opinion Colvin Financial Group of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010 |
| Exhibit 107 | Expert Opinion Wallace Financial Group, Inc. Expert Opinion of SWIFT MT 799 in support bank account Oriana Capital Partners dated November 7, 2010 |
| Exhibit 108 | Philip Harris email dated December 1, 2010 about conversation with Bank of America about Swift to bank account Oriana Capital Partners |
| Exhibit 109 | Philip Harris email dated December 3, 2010 Message from Bank of America about Swift to bank account Oriana Capital Partners |
| Exhibit 110 | Shawn Delbridge Program Manager of Oriana Capital Partners LLI dated January 20,2011 about Swift to bank account Oriana Capital Partners |
| Exhibit 111 | Philip Harris email correspondence with Chavdar Angelov dated February 23, 2011 about Mexican bond |
| Exhibit 112 | Philip Harris email correspondence with Anthony Harriott dated Febryary 24, 2011 about Mexican bond |
| Exhibit 113 | Declaration by Syndicated Holding LLC dated February 2011 to support Ayr's Reorganisation Plan for APD |