UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RUDERSDAL, EOOD, *et al.* | ) | Case No. 18-cv-11072 (GHW-)-(RWL) |
| | ) | |
| | ) | [rel. 19-cv-01762] |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Declaration |
| PHILIP ROBERT HARRIS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# DECLARATION OF MARIA GAVRILOVA NAKOVA IN SUPPORT OF PLAINTIFFS CLAIMS

**1.** I, Maria Gavrilova Nakova, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that:

**2.** I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration. All of the facts and statements contained herein are within my personal knowledge and are, in all things, true and correct;

**3.** I am a solo practicing attorney. I am licensed and a member of the bar in good standing registered with the Sofia Bar Association, Bulgaria, under lawyer personal No. 1100259610, with law office address at: 4 Sevast Ognyan St., floor 2, office 6, 2140 Botevgrad, Bulgaria, E-mail: mg_nakova@yahoo.com. In 2016 I successfully passed the mediator examination at the Krastyo Tsonchev Lawyer Training Center in the Republic of

1

Bulgaria. Since April 19, 2017, I have been a qualified practicing lawyer and my professional qualification has been recognized by the Bulgarian Ministry of Justice.

**4.**   I submit this Declaration in support of Plaintiffs claims in the above captioned matter having first-hand knowledge of facts related thereto;

**5.**   From August 13, 2013, until the termination of the APD bankruptcy proceeding on January 19, 2018, I was appointed as attorney for APD's Trustee, Mrs. Ganka Kolyovska, by the APD Bankruptcy Court in Targovishte, Bulgaria.

**6.**   In my capacity as attorney for APD's Trustee, Mrs. Ganka Kolyovska, I had direct observations over the facts and documents regarding the stealing of the $65 million US dollars owned by Ayr Logistics Limited, Inc. ("Ayr") in the Ayr Silver Beach Project ("SB project").

**7.**   On December 15, 2012 APD's bankruptcy Court in Bulgaria approved the purchase of Ayr's land in the SB project by First Investment Bank ("Fibank"), which paid for it *$65,209,976* (97,500,000 BGN). **[Exhibit 1]**

**8.**   In the beginning of January 2013, following a court sanctioned bank selection procedure and pursuant to a corresponding court order, the money from the sale of the SB Project land was deposited at CCB. The bank deposit agreement No.29428 entered into was a one-month fixed term one (*see* Article 1 thereof) containing a further one-month extension option (see Article 4 (1) thereof) and expired automatically at midnight on March 14, 2013, after which date it was no longer effective. **[Exhibit 2]**.

**9.**   APD's Trustee was mandated with the responsibility to manage possession of the funds and dispose of the funds deposited at the Corpbank deposit accounts pursuant to the bankruptcy court's rulings. The rulings provided for narrow action as follows: (1) Ruling No. 38 dated February 14, 2013, authorizing APD's Trustee to make electronic payments limited solely to bankruptcy expenses. **[Exhibit 3];** and (2) Ruling No. 304 dated July 11, 2014, authorizing the transfer of the money from Corpbank to the Bulgarian Development Bank. **[Exhibit 4]**.

**10.**   The court rulings regarding the conditions and ways of disposal of the money from the Corpbank bank accounts were equally mandatory both for APD's Trustee and Corpbank, notwithstanding if Corpbank was managed by its Board of Directors or by the Conservators appointed by BNB on June 20, 2014. The power of APD's bankruptcy court to authorize one

action or another with the money from the Corpbank bank accounts is exclusive and sovereign.[Exhibit 5]

11. On July 11, 2014, APD's Trustee – Ganka Kolyovska, was forced to resign as stated in her resignation letter due to threats to her and her family because she refused to execute on Fibank's fake payment request of the $65 million. [Exhibit 6]

12. Only a few months after APD's bankruptcy court had already denied in two decisions, on February 8, 2013 and September 4, 2013, Fibank's requests to receive the money from the sale of the land from Ayr's SB project, the APD bankruptcy case was unexpectedly and without cause transferred from the District Court in Targovishte to the District Court in Shumen.

13. The refusal of Trustee Kolyovska to perform Fibank's request and the inconvenient Targovishte bankruptcy court orders denying Fibank's access to the funds based on fake payment claims, resulted in the Bulgarian authorities turning a blind eye, the case to be changed to a Fibank favorable court in Shumen, and thereby preventing the two Targovishte court rulings from being a road block to Fibank's access to the funds.

14. There was no basis in law or fact for Fibank to have the funds it paid for the APD SB Project land purchase returned to it through a fabricated payment claim in the APD bankruptcy proceedings.

15. The only claim filed by Fibank in the APD Bankruptcy proceedings was in 2011 for the amount of $63,694.26(100,000 BGN). [Exhibit 7] This claim was dismissed by the Bulgarian Bankruptcy Court on February 8, 2013. Fibank did not appeal the court's decision. There was no further relief available for Fibank for this claim. [Exhibit 8]

16. Fibank never filed another claim in the APD bankruptcy proceeding by the mandated end date of July 11, 2011. Therefore, any possible claim after that date real or fake is time barred. Even if Fibank had a valid claim it lost its opportunity to raise such claims by sitting on its hands and failing to timely act. In its ruling issued on September 4, 2013, regarding one of many Fibank's repetitive requests, the bankruptcy court stated clearly and strictly: *"Fibank, Sofia, has not filed an allowed claim against the insolvent company"*. [Exhibit 9]

17. Fibank was unable to explain why the 2007, 2008 and 2009 transfers of tens of millions of Euros offshore were supposed to be paid back by Ayr or APD or have a claim

arising in the funds from the sale of Ayr's SB project land when no funds of these 2007, 2008 and 2009 Fibank loans were used in any way for Ayr's SB project.

**18.** The December 2012 investigation by the Danish law firm "Holck-Andersen & Tyge Sorensen", hired by the Plaintiff Rudersdal EOOD, discovered that Fibank had transferred to Defendant All Seas Management bank account held in Bank of Valletta, Malta. This Fibank transfer was effectuated with fake and fraudulent bank documents arising from 2007 and 2008 Fibank loans. The investigation further revealed that an additional 2009 Fibank loan disbursement was effectuated with fictitious transactions of Defendant Blue Finance Limited and were transferred back to Fibank.

**19.** Performing in good faith her legal obligations, on June 20, 2014, APD's Trustee Ganka Kolyovska submitted a refusal to perform the payment requests made by Fibank on May 21, 2013. Any such payment would have been in violation of the UN Convention against corruption, the Civil Law Convention on Corruption and Directive 2005/60/EC on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing. **[Exhibit 10]**

**20.** APD's Trustee could not afford the risk one day to be hauled before the US Courts to be responsible for violating US laws. **See Exhibit [11].** Fibank had lost all of its opportunities, granted by the laws in Bulgaria to establish a valid claim to receive payment from the APD Bankruptcy proceedings.

**21.** Facing the power of facts, pointing to the obvious – that Fibank had not invested money in the SB project, not a single Judge dared to dismiss APD's Trustee's refusal and to authorize the payment requested by Fibank.

**22.** On the basis of Ayr's Agreements with ASP2, AM and Rudersdal dated March 28, 2012 and November 27, 2013, APD's Trustee recognized on July 9, 2014 Ayr's rights as the main creditor in APD's bankruptcy assets. **[Exhibit 12]**

**23.** Ayr's rights as the main creditor in APD's bankruptcy proceeding is above dispute. Since Fibank's efforts otherwise failed, it looked to its associated entity, Torier Partners Limited, a company incorporated in the British Virgin Islands in 2014 to capture the money claims of Ayr in the APD Bankruptcy Proceedings. **[Exhibit 13]**

**24.** I was informed on October 21, 2014 by Ayr's counsel in Bulgaria – Plaintiff Zahari Tomov, that on October 10, 2014, Mr. Harris fraudulently filed a no asset bankruptcy for Ayr and that Ayr was subject to the automatic stay of the US bankruptcy laws and under the

power of a Trustee appointed by the Federal Bankruptcy Court in Dallas Texas – Mr. Jeffrey H. Mims.

25.   On October 22, 2014, I contacted APD's Committee of Creditors, which was the only acting body of APD's bankruptcy following Mrs. Kolyovska's resignation, with executive duties for the management, disposal and preservation of the property from APD's bankruptcy and informed them about the obligations and consequences arising out of APD due to the direct effect of the bankruptcy laws. **[Exhibit 14]**

26.   In my capacity as counsel to the APD Trustee, on November 19, 2014, I submitted to the APD Bankruptcy Court in Shumen, Bulgaria, a report of the effect of the U.S. automatic stay on the APD Bankruptcy assets and proceedings. **[Exhibit 15]**

27.   On December 9, 2014, I submitted to Ayr's Trustee and bankruptcy court in Dallas, the APD's Committee of Creditors report dated December 3, 2014, in the Ayr's bankruptcy proceedings **[Exhibit 16]**. Therein the report stated that something unclear had happened with the APD money at the Corpbank bank accounts. This was based on a bank reference issued by CCB in favor of Fibank as to APD CCB bank accounts.

28.   On January 7, 2016, Ayr's U.S. Trustee requested that an investigation ensue as to how to effectuate the return of Ayr's assets, the funds. To that end, on January 20, 2016, APD's Committee of Creditors and APD's Trustee Mrs. Kolyovska (who had been restored as APD's Trustee at the end of 2015) appointed me to investigate and prepare the legal analysis as to the steps to be undertaken against Fibank for restoration of the money. **[Exhibit 17]**

29.   On February 1, 2016, I presented my legal analysis. The analysis was based on the fact that Fibank had disposed of Ayr's money deposited in Corpbank without being validly authorized to do so. My conclusion, which I reiterate today, was that the APD bankruptcy court in this case should have issued a court order against Fibank to restore the so taken money. **[Exhibit 18]**

30.   APD's Committee of Creditors and Trustee supported the measures I recommended against Fibank to have it return Ayr's money. The Bulgarian Bankruptcy court, however, concluded that APD's bankruptcy proceeding should be terminated for lack of assets, instead of dealing with the matter of the need to have the money returned and then handed over to Ayr's Trustee.

**31.** Dismissing APD's bankruptcy was the only way in which the Bulgarian Bankruptcy court could prevent further actions against the Defendants to make the latter return the they money had stolen and any subsequent court ordered handing over thereof to Ayr's Trustee.

**32.** No Bulgarian court, neither Shumen District Court, Varna Appeal Court nor Supreme Cassation Court in Sofia, Bulgaria, ever reached any conclusion in fact or law that Defendants had the right to Ayr-owned-through-APD 65 million US dollars (102,966,946 BGN) or the right to close the Corpbank accounts.

**33.** APD's Bankruptcy procedure had an obligation to obey Ayr's Trustee request of December 6, 2017, for restoration and transfer of the money, based on the Judgments issued by the Federal Bankruptcy Court in Dallas, Texas, against APD. **[Exhibit 19]**

**34.** The fact that the theft of The Funds inflicted domestic harm to Ayr's bankruptcy and Ayr Creditors, while not directly affecting APD bankruptcy, does not relieve APD bankruptcy of its liability for causing The Funds to be returned to APD's Estate and hand them over to Ayr Trustee. Both in legal terms and in terms of all case-pertinent facts there exists not a single valid reason that, if existent, which it is not, might have been construed as releasing Defendants from their responsibility to return the money they stole from Ayr merely because the Theft of The Funds did not cause domestic harm in APD bankruptcy.

**35.** APD Creditors Committee September 16, 2016 report to Ayr's Trustee noted that Defendants enjoyed undue protection in Bulgaria courts. Defendants feared Ayr's participation in the Bulgarian bankruptcy proceedings because of the effect of U.S. law which explains why nothing was done in Bulgaria in regard to the return of the funds. **[Exhibit 20]**

**36.** Beginning December 1, 2014 it was APD's bankruptcy court that placed Defendants' economic interests above the law and to the detriment of Ayr's bankruptcy estate. From all known facts and evidence in the case it is only reasonable to conclude that Ayr Trustee's claims will not be granted fair trial against Defendants nor will they enjoy equal treatment in Bulgaria.

**37.** As the Varna Court of Appeals, so the Supreme Court of Cassation in Sofia, Bulgaria, found not one single ground to establish jurisdiction over Defendants or the matter of Ayr's stolen funds.

**38.** A forum that cannot stand by the lawful actions of APD's Trustee, of Ayr's Trustee and his Special Bulgarian Counsel or that is unwilling or unequipped to haul the Defendants into court or hold them responsible for the theft of the 65 million US dollars owned by Ayr

overseas, is anything but independent from the economic interests of these Defendants. In such a court the constitutional standards for due process and fair trial will not be met.

**39.** Said Bulgarian courts' policy aiming at and eventually pushong APD's bankruptcy case to dismissal, which was instrumental in shutting Ayr Trustee out once and for all, leave no doubt that Defendants' economic interests in the theft of $65 million US dollars stand above and are untouchable by the law in Bulgaria.

**40.** The series of recent revelations by a number of Bulgarian judges exposing the puppeteers who control appointment of judges and decide the latters' career growth or lack thereof, who manipulate the case assignment system to ensure that certain cases will be assigned to certain judges willing to bend the rules and deliver judgments in favor of Defendants' interests, is a perfect illustration of Plaintiff's averment that Bulgarian judiciary is not independent and that in a Bulgarian court Plaintiffss rights to due process and fair trial against the Defendants will not be honoured. **[Exhibit 21].**

**41.** The present case exposes to what preposterous degree the Bulgarian forum is dependent on and controlled by Defendants' economic interests making it the epitome of injustice.

**42.** For example, Fibank's failed attempts to be recognized as a legitimate creditor in APD's bankruptcy case was the reason why APD's bankruptcy case docketed under No.14/2011 at the Targovishte District Court and the latter's apparently inconvenient to Fibank adjudications was transferred from there to the more easily controlled Shumen District Court and docketed there as case No.730/2013. **[Exhibit 22];**

**43.** The new APD's bankruptcy court i.e. the Shumen District Court did its best to draw case No.730/2013 to closure. Eventually, the theft of the money was used as grounds for the case dismissal. The court made a veiled attempt to dismiss the case for interested parties' failure to pay court costs, which is fabricated and contrived. For example, on December 10, 2014 by its Judgment No.6 the Shumen District Court stayed the matter until court costs in the amount of $14,343(BGN 22,520) were prepaid. **[Exhibit 23].** On November 26, 2015 UniCredit Bulbank AD – a member of APD Creditors Committee – paid such costs. **[Exhibit 24].** On June 17, 2016 the Shumen District Court stayed APD Bankruptcy case and instructed the parties to additionally prepay court costs in the amount of $19,108(BGN 30,000). On June 24, 2016, Zahari Tomov, Ayr Trustee's Special Bulgarian counsel, tendered to Kota Energy AD – a member of APD Creditors Committee –

$19,108(BGN 30,000) for prepayment of these court costs. **[Exhibit 25]**. Kota Energy AD deposited this amount as required by the Shumen District Court on June 27, 2016. **[Exhibit 26]**.

**44.** Since the stay of case No.730/2013 did not yield the desired effect of having APD's bankruptcy case dismissed thus avoiding the mandatory steps required to recover the money taken from APD's estate (being the proceeds from the sale of the Silver Beach Project property, The Funds), the Shumen District Court had to admit that a plan for the recovery of such money was needed. By Ruling No.545 of December 2, 2015 the Shumen District Court instructed APD Trustee to prepare and present such action plan along with an estimated budget of the costs for implementing such plan. **[Exhibit 27]**.

**45.** However the enforcement of Ruling No.545 of December 2, 2015 was thwarted by the Varna Court of Appeals. The latter denied the request submitted in case No.730/2013 for inquiry into the theft of The Funds holding held that the request contained *"pleadings that may not be heard within the bankruptcy case for the law does not provide for any such procedure"*. Please see Ruling No.586 of September 15, 2016, **[Exhibit 28]** and Ruling No.588 of September 16, 2016 **[Exhibit 29]** both delivered by the Varna Court of Appeals.

**46.** On December 16, 2016 the Shumen District Court, being fully aware of the void in Bulgarian laws and procedures already noted in the Varna Court of Appeals adjudication, and feeling certain that the theft of the money could neither be investigated nor the money recovered, issued Ruling No.457 where it held that *"so far there exists no case-related data leading to and supporting a conclusion for it being likely that in 2017 an asset of the debtor will be found, which might ensure the money to cover the bankruptcy costs"* and ordered case No.730/2013 to be suspended (stayed) until such time when costs in the amount of 38,216(BGN 60 000) would have been prepaid. **[Exhibit 30]**.

**47.** It was that kind of doctoring, by which the Shumen District Court managed to transform the theft of the money and the closing of APD's bank accounts with Corpbank into seemingly reasonable grounds for a 'lack of assets' dismissal of APD case and on January 19, 2018 delivered Judgment No.5 actually dismissing APD bankruptcy case. **[Exhibit 31]**.

**48.** The shield of protection keeping Defendants safe from being held responsible and liable for their taking away of The Funds and the eventual dismissal of APD bankruptcy case effectively deflected all facts, exhibits and arguments presented in Ayr Trustee's Motion on Appeal from the dismissive Judgment No.5 of January 19, 2018. See the Appellate Motion

filed in case No.187 /2018 before the Varna Court of Appeals. [**Exhibit 32**]. Please see the Appellate Motion brought before the Supreme Court of Cassation of the Republic of Bulgaria [**Exhibit 33**] and [**Exhibit 34**].

**49.** None of the facts and exhibits referring to the theft of Ayr's money in the Silver Beach Project, nor any of the EU Regulations and the mandatory case-law of the European Court of Justice in Luxemburg, or the provisions of the UN Convention Against Corruption or the U.S. laws against corruption, money laundering and financial fraud were deemed sufficient or adequate grounds  in Bulgaria for haulin Defendants into court and holding them liable for their actions, as  result of which APD's bank accounts with a balance of $65,000,000 (The Funds) to be depleted and eventually closed. It was, and still is, Bulgarian courts eroding dependence on Defendants' economic interests that have made Defendants untouchable by the law within Bulgaria.

**50.** Bulgarian courts chose to look away and brush off as inconsequential multiple crucial facts of fundamental legal significance, such as: (1) Judgment No.3 of February 8, 2013, which Fibank has never appealed from, hence pursuant to Art.694 (8) of the Bulgarian Commercial Act Fibank's payment claims are not subject to satisfaction; (2) APD Trustee's decision of June 20, 2014 to deny payment in satisfaction of Fibank's claims has never been voided or reversed, meaning that it still stands; therefore, pursuant to international laws against corruption, money laundering and transnational organized crime said APD Trustee's decision constitutes an absolute bar to obtaining a court permission for any payment in satisfaction thereof; (3) pursuant to Art.298 (1) of the Bulgarian Civil Procedure Code Fibank's claims filed on May 21, 2013 have been precluded since February 8, 2013 when Judgment No.3 denied such claims, hence Fibank may not raise those claims again; and (4) Fibank's claims were permanently time-barred by the expiration of the procedural deadlines set forth in Art.685 (1) of the Bulgarian Commerce Act – **Exhibit [35]** and **Exhibit [36].** All claims, which have not been filed in APD's bankruptcy proceeding within two months as of publishing in the Commercial Register of Judgment No.16 of May 3, 2011 of the Targovishte District Court for opening APD's bankruptcy case shall be precluded.

**Criticism of Defendants' motions to dismiss the jurisdiction of the New York Court**

51. I have reviewed and am familiar with Defendants' Motions to Dismiss challenging jurisdiction[1] over the claims filed in case No.1-18-cv-110072(GHW)-(RWL).

52. I have reviewed and am familiar with the declarations of the Defendants in support[2] of their Motions to Dismiss.

---

[1] *See:* Memornadum of Defendants Fibank, Tseko Minev, Ivailo Mutafchiev, where they assert: The Bulgarian courts conclusively decided that question over six yers ago, when six years ago, when they authorized the Bulgarian bank, defendant First Investment Bank AD ("Fibank"), to receive and retain those proceeds; Bulgaria was the appropriate forum for the plaintiff's claims; The doctrine of collateral estoppel bars Plaintiffs from relitigating the Fibank I court's holdings that U.S. courts lack personal jurisdiction over the Fibank Defendants and that Bulgaria provides a more appropriate forum for adjudicating Plaintiffs' claims; The Complaint alleges no contacts between the Fibank Defendants and New York (or even the United States) that would give rise to personal jurisdiction here; This Court should dismiss the Complaint under the forum non conveniens doctrine because Bulgaria is a more appropriate forum for Plaintiffs' claims, all of which turn on Bulgarian sources of proof, Bulgarian real property, and Bulgarian law; The Complaint does not allege that this so-called "Mexican bond scheme" caused plaintiffs to suffer any harm. Nor do Plaintiffs allege that the Fibank Defendants undertook any effort to sell the bonds in the United States; The Bulgarian court decisions show on their face that the Varna Appellate Court affirmed the termination of APD's Bulgarian bankruptcy because APD's creditors failed to pay court costs, not because the court lacked jurisdiction; the Bulgarian Courts' rulings are entitled to preclusive effect; This case does not involve a "cross border tort"—all of the allegedly tortious activity took place in Bulgaria, and the "place where the alleged damages occurred" is Bulgaria—where APD is incorporated—not the United States;

*See:* Memorandum of Defendant BNB, where says: The Funds were transferred to a secured mortgage creditor of APD in Bulgaria; BNB may not be sued for fraud or analogous torts; Plaintiffs choice of forum therefore is entitled to little or no deference, and smacks of forum shopping; BNB's alleged acts in Bulgarian regarding CCB were quintessentially sovereign in nature, and not commercial; The immediate effect of those acts was , at most, losses to APD's estate in Bulgaria; Eliminating any possible "direct effect" in the United States; Bulgarian courts are an available and Adequate forum; All relevant factors otherwise point to Bulgaria

53. Based on my knowledge of the facts and supporting evidence underlying Plaintiffs' Claims against the Defendants in case No.1-18-cv-110072(GHW)-(RWL), I herein distinguish and lay out the improper and incorrect conclusion of Defendants' that it is Bulgaria that has jurisdiction over the claims, rather than New York.

54. Defendants' conclusion that BNB's compulsory administration of Corpbank after June 20, 2014 BNB enjoys sovereign immunity from suit is incorrect for the following reasons:

54-a. An analysis of Resolution No.104 of August 15, 2014 **[Exhibit 37]** and BNB's Instructions to Corpbank Conservators of August 22, 2014 **[Exhibit 38]** shows that BNB plays a key role and has a casting vote in managing bank deposits and the use of such deposits for repayment of debts to Corpbank. This process of managing debts owed to Corpbank was the tool, by which Ayr's Funds became easy prey of the enormous economic interests of Fibank, Harris, Ayr and the Five Companies[3] debtors to Corpbank. It was BNB that made Fibank the legitimate and entitled holder of Ayr's funds and made legitimate the use of Ayr's Funds for discharging the debts of the Five Companies to Corpbank which companies had nothing at all to do with the Silver Beach Project in any way. BNB legitimized the bank operations with APD's bank accounts by listing them in the Special Register it kept of the debts owed to Corpbank and of deposit accounts at Corpbank **[Exhibit 39]**.

54-b. APD Bankruptcy Court's Ruling No.38 of January 14, 2013 **[Exhibit 3]** and Ruling No.304 of July 11, 2014 **[Exhibit 4]** show that this method of managing APD deposit accounts with Corpbank, which eventually resulted in depleting and closing said bank accounts was never authorized by the court.

54-c. When the remaining balance of USD $11,025,192 (BGN 17,309,551.59) in APD's bank accounts with Corpbank was reduced to zero after the Five Companies repaid their debts to Corpbank using the better portion of The Funds in the amount of USD

---

[2] *See:* Para 19, 20, 21, 22, 39, 45, 50, 58, 61 of Declaration of Lazar Tomov dated August 30, 2019; Para 10 of Declaration of Chavdar Zlatev and Svetlozar Popov dated August 16,2019; Para 10, 12 of Declaration of Emil Emanuilov dated August 21, 2019;

[3] The Five Companies: Tabak Market AD (a/k/a Lafka Market AD), Sibole Services Incorporated Bulgaria EOOD, Ateria BG EOOD (a/k/a Droslian Bulgaria EOOD), Vili Vist AD, Promishleno Storitelstvo EAD (The Five Companies)

$54,558,843 (BGN 85,657,385) and the subsequent closing of said bank accounts were operations carried out for the sole purpose of covering up the misuse of The Funds kept at Corpbank. None of these operations had ever been authorized. BNB's conduct was what caused directly the plundering of Ayr's Funds; therefore BNB is responsible for said plunder.

54-d. When BNB placed Corpbank in compulsory administration on June 20, 2014, it took over the duties of Corpbank's released management being duties of an administrator of international laws against corruption, money laundering and financial fraud. In the case of Ayr's Funds at Corpbank the operation of said international laws is further strengthened by:

1) The provisions of the Foreign Account Tax Compliance Act (FATCA) that mandatorily qualify the $65,000,000 (BGN 102,946,966) kept in APD's bank accounts as U.S. taxable assets. Ayr's money kept at Corpbank cannot be used for servicing corruption practices nor for laundering artificial and falsely contrived debtor for financial fraud. In cases like the instant one, where Ayr's funds kept at Corpbank (used to serve Defendants' economic interests and debts) were subject to the jurisdiction and the laws of New York as well as to the effect of a few other primary laws, such: FATCA, Foreign Sovereign Immunities Act (FSIA), Foreign Corrupt Practices Act (FCPA). The theft of The Funds was what pulled the trigger but the shot fired in New York – the place where Harris, Ayr, Fibank and Ayr's creditors, as well as Angelov and other Defendants, agreed to perform their counter rights and obligations. Harris, Ayr, Fibank and Ayr's creditors purposefully agreed to subject their respective rights and obligations to the jurisdiction of New York by deed and in writings.

2) Harris and Ayr's warnings to BNB and to the BNB-supervised banks – TB Investbank AD, Fibank, and UniCredit Bulbank AD - were given on December 3, 2010 [**Exhibit 40]** and December 20, 2010 [**Exhibit 41**], accordingly. There Ayr and Harris warned said banks that jurisdiction rested in New York and that the laws of New York controlled. For example, the Agreement with Fibank of June 4, 2010 (the Swap) is one that submits thereto, as referred to in Harris and Ayr's letter to Fibank of January 27, 2011 [**Exhibit 56]** and [**Exhibit 57**]. Ayr's claims under Ayr's Silver Beach Project were based on agreements to consolidate and were likewise made subject to NY laws and jurisdiction, see [**Exhibit 11**] and [**Exhibit 12**].

54-e. Not only did BNB have the opportunity to but it was incumbent upon it to protect The Funds and prevent their theft that favoured Defendants' economic interests[4] only. This case is not about BNB's exercise of its supervisory authority, for the simple reason that from June 20, 2014 onwards it was the one responsible for managing and running Corpbank. The theft of The Funds is a classic example of abuse of the rules of trust in banks and in bank deposits. To argue that BNB enjoys immunity from lawsuit when Ayr's Funds on deposit with Corpbank (USD $65,000,000 or BGN 102,946,966) were taken away during the period of BNB's compulsory administration of Corpbank *and* because of it, is not only laughable and ludicrous, but it does not stand to reason at all.

54–f. BNB alleges that it enjoys immunity from litigation in the matter of the theft of Ayr's Funds. Immunity from suit recognized by Art.79 (9)[5] of the Bulgarian Law on Credit Institutions applies only to the selection of measures and restrictions BNB applies to problematic Bulgarian banks. That immunity is intended to ensure that BNB's expertise in making such choice will stay independent from external economical and/or political influence or interference. However, in cases concerning management of bank deposits and property of problematic banks placed under BNB's compulsory administration – as the one at issue – BNB is financially liable for the damages caused by its administration and related acts.

54-g. It is ridiculous to plead immunity from suit for conduct that helped Defendants carry out their devious plan to use Ayr's Funds kept in Corpbank in pursuit of Harris', Ayr's and Fibank's economic interests in the Swap or in support of the economic interests held in the call options for Vivacom AD (telecommunication) and Bulgartabac Holding AD (tobacco giant). None of these economic interests have been recognized as legitimate in either APD's bankruptcy proceeding or in Ayr's bankruptcy proceeding. According to the terms of the Swap deal – as shown in Harris and Ayr's letter of January 27, 2011 – the Court of New York is the competent body to determine whether or not the Swap and the economic interests in it are legitimate or whether or not the fashion of effectuating said deal was legitimate.

---

[4] The economic interests in the swap and in the call options for Vivacom AD and Bulgartabac Holding AD were the foundations on which the civil conspiracy was built and for which Ayr's money had been stolen.

[5] **Art.79 (9) LCI:** "The Bulgarian National Bank, its bodies and the persons authorized by them shall not be liable for any damages caused in exercising their supervisory functions, unless they have acted with intent."

54-h. The very idea of vesting immunity from suit in BNB for its bank administration activities would render the operation of international laws against corruption, money laundering and financial fraud inconsequential[6].

54-i. The fact that Bulgarian law vests in BNB the power of supervision and control over Bulgarian banks and their operations is irrelevant where BNB's liability as a co-conspirator is concerned. To the contrary, the UN Convention against corruption (UNCAC) and the UN Convention against transnational organized crime, like other international laws against corruption, money laundering and financial fraud set higher standards and impose stricter requirements on government agencies and organizations engaged in supervision and control of banking and financial institutions in the countries signatories to said Conventions. USA, EU and Bulgaria are signatories to these Conventions. In the case of Ayr's stolen money while Corpbank was under BNB's administration the definitely responsibility lies with BNB. Moreover, because of BNB's specific expertise in operation of banks placed under its compulsory administration, its exposure to liability is even greater.

55. Defendants' asserted conclusion that the consolidation of the claims under the Silver Beach Project is a form of *forum shopping* is incorrect for the following reasons:

55-a. In 2010, 2011, 2012 and 2013 Harris and Ayr gradually and consistently established New York as the centre of main interests in Ayr's Silver Beach Project:

1) HSBC, NY was the bank Ayr appointed as the servicing bank funding of Ayr's agreements and funding commitments to the Silver Beach Project and, more particularly, the Oriana Capital Partners bank account opened to that effect with HSBC, NY **[Exhibit 40] and [Exhibit 41].**

2) As early as August 16, 2011, when Ayr submitted its Reorganization Plan for APD it named Deutsche Bank, New York, as the place where the consolidation of payment claims under the Silver Beach Project would be made **[Exhibit 42].**

---

[6] The tragic events of September 11, 2001 changed the worldwide rules against corruption, money laundering and financing of cross border organized crime by introducing certain specific and strict rules for parties involved in the international payment system.

3) The exchange of economic interests in the Mexican bonds deal (The Swap) also designated Oriana Capital Partners bank account at HSBC, NY, as the servicing account **[Exhibit 56] and [Exhibit 57].**

4) In its letter of December 1, 2013 **[Exhibit 11]** Ayr emphasized that Ayr's funds enjoyed the protection of and were governed by the laws of New York against corruption, money laundering and financial fraud, hence they were subject to New York jurisdiction. Ayr's letter of December 1, 2013 referred to the Supplemental Agreement of November 27, 2013 entered by and between Ayr and its creditors [**Exhibit 12**].

55-b. None of the facts set forth below were known as at November 27, 2013, when Ayr and Harris entered into the Supplemental Agreement with its creditors. No one could have foreseen the events that followed, so Defendants' allegation of purported 'forum shopping' is ridiculous. Here is the series of events that followed:

1) Ayr's fraudulent No Assets Bankruptcy filing on October 10, 2014 [**Exhibit 14**];

2) Defendants' activities within October 2014 – December 2014 as a result of which APD's bank accounts with Corpbank were depleted and subsequently closed **Exhibit [16], [Exhibit 18];** and

3) APD bankruptcy court's discrimination of Ayr Trustee's exercise of powers [**Exhibit 17**] against the Defendants to make them return Ayr's money they had taken [**Exhibit 43**].

55-c. No one could have foreseen what would happened with Ayr's funds at some point of time after Ayr's signed  the November 27, 2013 Supplemental Agreement with its creditors, nor could anyone at that time have even foreseen that the claims of Ayr's bankruptcy estate, which Ayr Trustee later transferred to Ayr's creditors in November 2017 [**Exhibit 48**], would arise.  Therefore, reason and logic alone discredit Defendants' insinuations that Plaintiffs purportedly engaged in *forum shopping.*

55-d. No one could have ever thought that Fibank's precluded claims in APD Bankruptcy case, those very claims, which on June 20, 2014 and pursuant to international laws against corruption money laundering and terrorism financing APD Trustee refused to satisfy as illegitimate, would be the tool Fibank would use to steal Ayr's money deposited with Corpbank.

55-e. Defendants fail to present facts in support of their frivolous theme of Plaintiffs' *forum shopping*. Defendants discredit themselves in making the *forum shopping* allegation, which is flimsy, groundless and contrary to the facts. The shocking and blatant abuse of the law in APD bankruptcy case, which resulted in using the theft of Ayr's funds as grounds for its dismissal could not be attributed to Ayr Trustee's causes of actions against the Defendants. The filing of Plaintiffs' claims was largely driven by Bulgarian courts' (the Shumen District Court, the Varna Court of Appeals and the Supreme Court of Cassation, Sofia, Bulgaria) conduct intended to neutralize Ayr Trustee's powers, namely: Ayr Trustee's powers to make APD bankruptcy case do what was necessary to cause Defendants return the funds they had stolen. APD bankruptcy court had all the reasons to grant Ayr Trustee's request, but it chose to pursue and protect Defendants' economic interests instead. From January 7, 2016 [**Exhibit 17**] the Shumen District Court not without the support of the Varna Court of Appeals embarked on course pushing APD bankruptcy case to dismissal.

56. Incorrect is Defendants' conclusion that Fibank's May 21, 2013 payment claims filing in APD Bankruptcy case was equal to and had the effect of a payment authorization granted by APD Bankruptcy Court[7]. Here is why:

56-a. The only acts of APD Bankruptcy Court with regard to The Funds are two Rulings – the first one dated January 14, 2013 [**Exhibit 3**] and the other dated July 11, 2013 [**Exhibit 4**]. APD Bankruptcy Court never issued any other orders or rulings with respect to the management or use of the money generated from the sale of the lands of Ayr's Silver Beach Project and deposited at Corpbank (i.e. The Funds).

56-b. Defendants' actions causing APD's bank accounts with Corpbank to be depleted and later closed can hardly qualify as payment received in APD bankruptcy, case [**Exhibit 18**]. Defendants' actions were fraudulent, unauthorized and served one purpose only – that of advancing Fibank's economic interests in The Swap and at the same time helping Fibank get rid of its problematic payment claims filed in APD bankruptcy case in 2011 and 2013. Fibank's payment claims were problematic because they were already:

1) precluded by virtue of Judgment No.3 of February 8, 2013 [**Exhibit 8**][8];

---

[7] See previously Para 15,16, 19, 20, 32, 49, 50.

[8] *Res judicata effect*. **Bulgarian Civil Procedure Code, Art.298 (1)** "The decision shall enter into effect only between the same parties, for the same claim and for the same grounds."; **Bulgarian Commerce Act, Art.694 (8)**: "A declaratory judgement in full effect

2) precluded by virtue of the two-months preclusive period for filing claims in APD bankruptcy case, which started to run on May 10, 2011 when the Court Decision for opening APD bankruptcy case was published on the Commercial Register **[Exhibit 35], Exhibit [36]**[9] and expired on July 11, 2011.

56-c. On June 20, 2014 APD's Trustee acting in compliance with the international laws against corruption, money laundering and financing of terrorism refused to satisfy or recognize Fibank's May 21, 2013 payment claims filed in APD bankruptcy case **[Exhibit 10]**[10]. Fibank never appealed from said APD Trustee refusal. APD Bankruptcy Court has never voided said APD Trustee refusal. The effect of APD Trustee's refusal was binding upon and mandatory for BNB, which misrepresented the depletion APD bank accounts with Corpbank and their subsequent closing as payment in satisfaction of Fibank's claims filed in APD bankruptcy case. These are the very payment claims based on those toxic bank loans[11] BNB specifically mentioned in its Supervision Report on FIB for 2012 and the money from which actually funded the Mexican bonds deal, , **[Exhibit 59]**.

57. APD bankruptcy court has never ordered any payment to be made in satisfaction of Fibank's May 21, 2013 payment claims filed in APD bankruptcy case, nor could have done so. Those claims fell short of being incontestable thus failing to meet the mandatory condition set in Art.691 of the Bulgarian Commerce Act[12]; a condition that needed to be met before any payment in satisfaction thereof could be ordered or made in APD bankruptcy case.

---

under (1) above shall be legally binding to all relations between the parties to the bankruptcy proceedings, including the debtor, the trustee in bankruptcy and all the creditors".

[9] *Time barrier/time barred effect.* **The Bulgarian Commerce Act Art.685 (1):** "Creditors shall submit their claims in writing to the bankruptcy court within one month upon entry into the Commercial Registry of the court decision opening bankruptcy proceedings."

[10] Money laundering effect.

[11] Port Investment Development –Bulgaria 2 EAD bank loans Nos.39-KP-AA-2510 of 22.11.2007, 14-LD-L-000002 of 02.10.2008.

[12] **Bulgarian Commerce Act, Article 691:** "Incontestable Claims - Claims ascertained in a declaratory judgment that has entered in full force and effect and has been delivered after the date of the court decision to open bankruptcy proceedings, to which the trustee/receiver in bankruptcy is a party, shall not be subject to appeal".

57-a. In two of its rulings, namely: Ruling No.731 of November 13, 2013 [Exhibit 44] and Ruling No.735 of November 14, 2013, **[Exhibit 45]** the Varna Court of Appeals held that the matter of Fibank's May 21, 2013 claims  was to be considered under the procedure for examining objections to the Draft Distribution List (drawn up by APD Trustee for distribution of the proceeds generated from the sale of the land of Ayr's Silver Beach Project (Draft Distribution List). The Shumen District Court however blocked said procedure. On July 18, 2014 **[Exhibit 46]** in its Ruling No.318 the Shumen District Court denied the Draft Distribution List APD Trustee had submitted in furtherance of the instructions of the Varna Court of Appeals. In so doing the Shumen District Court effectively dodged its duty to examine  Fibank's May 21, 2013 claims against the rules governing effects of *res judicata*, time bar and money laundering activities. In none of the following court rulings, namely: Ruling No.731, Ruling No.735 and Ruling No.318, did the court authorize any payment in satisfaction of said Fibank's claims, **[Exhibit 10]**[13], **[Exhibit 18]**.

57-b. In September 2013 APD Bankruptcy Court – the Targovishte District Court at that time – submitted a request for preliminary ruling to the EU Court of Justice in Luxemburg seeking guidance for resolving the issues caused in APD Bankruptcy case by Fibank's May 21, 2013 payment claims **[Exhibit 5]**. By an Order of the Court delivered on September 9, 2014 in case C-488/13 the EU Court of Justice in Luxemburg remanded the case to Bulgaria instructing APD Bankruptcy Court to apply the fundamental principles and provisions of national and EU laws to the case **[Exhibit 47]**. The Shumen District Court failed to comply with the September 9, 2014 Order of the EU Court of Justice. The reason being that in order to apply the fundamental principles and provisions of the national and EU laws to the case, the court should have considered and observed: (i) the *res judicata* effect; (ii) time bar effect; and (iii) the money laundering effect, which, if it had, would have rendered Fibank's May 21, 2013 illegitimate.

57-c. Defendants' conduct, as a result of which APD's bank accounts with Corpbank, where Ayr's money was kept, were depleted, is fraudulent. *See* **[Exhibit 3]**, **[Exhibit 4]**, **[Exhibit 8]**, **[Exhibit 9]**, **[Exhibit 10]**, **[Exhibit 16]**, **[Exhibit 18]** and **[Exhibit 36]**. It is that

---

[13] In her Report of June 20, 2014 APD Trustee Mrs. Ganka Kolyovska explicitly noted the absence of any court authorization for payment in satisfaction of Fibank's claims adding that said claims needed to be proven as incontestable in APD bankruptcy case before APD bankruptcy court could order any payment in that regard.

very Defendants' conduct that has given rise to the causes of action which Ayr Trustee transferred to Ayr's creditors on November 20, 2017 with the approval of Ayr's Bankruptcy Court **[Exhibit48]**.

58. Incorrect is Defendants' conclusion that Plaintiffs' claims as filed in the court in New York are allegedly subject to the jurisdiction of Bulgarian court. It is incorrect for a host of reasons. Here they are:

58-a. Plaintiff's claims filed against instant Defendants (Plaintiffs' Claims) have arisen in the course of Ayr's bankruptcy when Defendants' took The Funds away in pursuit of Fibank's economic interests in the Swap. By so doing Defendants acted in breach of New York laws governing the Swap. Defendants had full notice of the fact that all SB project-related agreements and the arrangement made in that regard were subject to the jurisdiction of New York, of which Harris and Ayr warned them more than once, as evident from: 1) Ayr's letter of December 3, 2010 **[Exhibit 40]**; 2) Ayr's letter of December 20, 2014 **[Exhibit 41]**; 3) Supplemental Agreement Ayr signed with Ayr Creditors on November 27, 2013 **[Exhibit 11]**, **[Exhibit 12]**.

58-b By virtue of Recital (13), Art.2 (h) and Art.3 of *Regulation (EC) No 1346/2000* of the Council of 29 May 2000 (EU Regulation)[14], the claims arising from Ayr's bankruptcy are subject to the jurisdiction of the court at the place where Ayr's centre of main interests with respect to the Silver Beach project (SB project) is located. Year in and year out Harris and Ayr kept choosing and indicating New York as the centre of main interests of Ayr, *see* **Exhibit 11, Exhibit 12, Exhibit 40, Exhibit 41, Exhibit 42**. According to said EU Regulation neither the location of the SB project property nor the place of registration of Ayr's subsidiary and letter-box company Ayr Property Development, AD (APD) is a factor or something to be taken into consideration when determining jurisdiction

---

[14] EU Regulation determines 3 elements: 1) the *"center of main interests"* factor; 2) in the case of *a letter-box* or *a shell company,* the EU Regulation disregards the place-of-registration-factor of the insolvent corporate *letter box* debtor; and 3) the EU Regulation disregards the location of an insolvent debtor's assets if such assets fail to meet the criteria of the definition for *"establishment"*. namely, as set forth in Article 2(h), an entity "with a minimum level of organization and a degree of stability for the purpose of pursuing an economic activity".

over claims in a cross-border insolvency proceeding which APD's bankruptcy case certainly is.**[Exhibit 49]**.

58-c. At the hearing of Case No 16-03138-bjh [Exhibit 58] where each counsel presented their respective case the matter of jurisdiction over the claims based on and arising from the theft of The Funds was never discussed in terms of the EU Regulation. What followed is this: on May 2, 2018 in response to Ayr Trustee's request based on EU Regulation the VCA held that Bulgarian court had no jurisdiction over the claims that had arisen against instant Defendants from the theft of The Funds in the course of Ayr's U.S. bankruptcy.

58-d. Pursuant to the provisions of Art.93 (1)[15] and Art.105 (3)[16] of the Bulgarian Private International Law Code (PILC) the claims filed against the Defendants are subject to the jurisdiction of the court in New York. This is the court at the place where performance under the agreements between Ayr, Harris and Fibank, on one hand, and those between Ayr and Ayr Creditors, on the other, was to take place. New York is the venue specified in and the laws of the State of New York are the ones that govern all major agreements entered in and commitments made by Ayr and Harris with respect to the SB project. Bank account Oriana Capital Partners at HSBC, NY, which Ayr opened and designated as the SP project funding account and the servicing account under its agreements with Ayr Creditors for consolidation of the SB project claims. That same account was the one chosen by Fibank,

---

[15] PILC, Article 93. (1) Contracts shall be governed by the law chosen by the parties. Any such choice must be expressed or clearly demonstrated by the terms of the contract or by the circumstances where under the contractual relationship evolves.

[16] PILC, Article105: (1) The obligations arising out of a tort or *delict* shall be governed by the law of the State within whose territory the direct damage arises or is likely to arise (*lex loci delicti commissi*). (2) Where the author of the tort or *delict* and the person sustaining damage both have their habitual residence or a place of business in the same State at the time when the damage occurs, the law of that State shall apply. (3) Notwithstanding the provisions of Paragraphs (1) and (2), if it appears from the circumstances as a whole that the tort or *delict* is manifestly more closely connected with another State, the law of that other State shall apply. A manifestly closer connection may be based on a pre-existing relationship between the parties, such as a contract that is closely connected with the tort or *delict* in question.

Harris and Ayr as the servicing account of payments under the Swap[17]. Deutsche Bank, NY, via which Ayr undertook to make payment to Ayr Creditors under SB claims consolidation agreements, also falls within the reach of jurisdiction of the court in New York. Regretfully, none of the above facts along with the supporting evidence thereof was ever considered in the court's examination of the matter of jurisdiction over Ayr Trustee's claims against Fibank in Case No 16-03138-bjh.

58-e. The Varna Court of Appeals (VCA) held that no grounds existed for Bulgarian court to determine that it had jurisdiction over Ayr Trustee's claims arising from and based on the consequences of the theft of Ayr's Funds on deposit at Corpbank. [**Exhibit 50**]. According to Bulgarian court the theft of Ayr's Funds did not cause any domestic damage to APD's bankruptcy whatsoever, although APD's bankruptcy procedure had a duty to: 1) cause the return of The Funds and 2) hand the money so recovered over to Ayr Trustee.

58-f. The facts exposing the link between the Swap (as agreed by and between Harris, Ayr and Fibank) and the theft of The Funds make it crystal clear that Plaintiffs' Claims (which Ayr Trustee transferred over to Ayr Creditors on November 20, 2017) fall beyond the jurisdiction and remit of both APD bankruptcy court and Ayr bankruptcy court, respectively. The jurisdiction of the court of New York is unrivalled and the court in New York *has no alternative*, because none of the acts of court whether delivered in APD bankruptcy case or in Ayr bankruptcy case has ever addressed or dealt with any of claims that arose in the course of Ayr bankruptcy from the unauthorized use of The Funds in pursuit of the private interests in the Swap. The court in New York has exclusive jurisdiction over and the authority to (i) assess the matters of whether or not NY laws have been breached and, if yes, how serious that breach is; (ii) what damages have been caused as a result of Defendants' participation in the Swap and their tortious interference with Ayr Creditors agreements consolidation the SB project Claims.

---

[17] The information about the Swap, which Harris, Ayr and Fibank kept hidden and failed to disclose to Ayr Trustee both in the course of Case No 14-34940-bjh and in Case No 16-03138-bjh, deprived Ayr Trustee of the opportunity to raise the matter of the Swap before Ayr Bankruptcy Court and examine its effect on Ayr Trustee's claims against Fibank. On November 20, 2017 however remedial action in that regard was taken when Ayr Bankruptcy Court granted permission to Ayr Trustee to sell the causes of action against the Defendants to Ayr Creditors.

59. Incorrect is Defendants' conclusion that Ayr Trustee as the main creditor in APD's bankruptcy case was responsible for its closing for failure to prepay costs. Their conclusion is incorrect for several reasons. Here they are:

59-a. The Shumen District Court (ShDC) failed to do its duty and cause its own Ruling No 545 of December 12, 2015 **[Exhibit 27]** (concerning the action plan of measures against Defendants to make them return Ayr's Funds they had stolen) to be properly obeyed, and it was its failure that effectively protected Defendants' interests making it possible for them to retain their personal gain from the theft of The Funds.

59-b. On January 7, 2016 Ayr Trustee submitted a letter demanding  that measures be taken against Defendants to cause the latter return the money they had stolen. In response thereof the ShDC did indeed take measures, but ones that pushed APD bankruptcy to closure. In September 2016 the Varna Court of Appeals (VCA) did not hesitate to fell in line with ShDC's chosen policy. On September 15, 2016 the VCA issued Ruling No 586 **[Exhibit28]** and on September 16, 2016 it delivered Ruling No 589 **[Exhibit 29],** thus efficiently snatching away and eliminating the then still available option within APD bankruptcy to take the steps necessary and cause The Funds so stolen to be returned. The ShDC availed of the opportunity and on December 16, 2016 issued Ruling No.457 **[Exhibit 30]** in which it intentionally overlooked the actual theft of The Funds and saw its result only, i.e. the depletion of APD's Estate, conveniently termed "lack of property/assets".

59-c.  Having thus qualified the theft of The Funds as "lack of property/assets" in its Ruling No.457 of December 16, 2016, the ShDC "prudently" gave directions for prepayment of APD bankruptcy procedure costs.

59-d. Said prepayment of costs was ordered in a bankruptcy procedure where:

(1) For over an year the court direction as given in Ruling 545 of December 2, 2015 **[Exhibit 27]** - to prepare and set in motion an action plan to causing the return of The Funds - was never followed through, despite the fact that prepayment of bankruptcy procedure costs was made not once, but twice already in that period **[Exhibit 24]**, **[Exhibit 25]**, **[Exhibit 26]**;

(2) By issuing its Ruling No.586 of September 15, 2016 followed by Ruling No 589 of September 16, 2016 the VCA effectively prevented any steps to cause the return of The Funds from being taken against the Defendants;

(3) By virtue of Art.620 (5) of the Bulgarian Commerce Act (CA)[18] no fee prepayment for the steps that needed to be taken to cause the return of The Funds is required.

59-e. Those procedural tricks and shenanigans the ShDC and the VCA engaged in eventually brought forth the easily predicable outcome Defendants desired, i.e. circumvention of the provisions of Art.734 (1) and (2)[19] and of the ones set forth in Art.735 (1)(1) and (1)(2)[20] CA. If the provisions of Art.734 (1) and (2) along with the ones of Art.735 (1)(1) and (1)(2) were applied – as they should have been – then the court applying them would have been obligated to address a matter Defendants feared most, this is: ***On what grounds and by whose permission Fibank, in pursuit of its payment claims, which should have been effectively prevented by the Res judicata effect; Time barrier effect and the money-laundering effect by that time, gained access to APD's bank accounts, depleted them and caused the latter to be closed?***

59-f. Both the ShDC and the VCA were aware that none of the payments made from APD's accounts with Corpbank were court-authorized, as were they aware that Ayr Trustee's demands that all necessary measures and steps need to be taken within APD bankruptcy procedure to cause the return of The Funds where they belong and cause The Funds so recovered to be handed over to Ayr Trustee were well substantiated and should be granted and actions taken accordingly.

59-g. As the ShDC was aware, so was the VCA that Ayr Trustee did meet the requirements set forth in Art.758 CA[21] to prove his powers in APD's bankruptcy and exercise

---

[18] Art.620 (5) CA: "(*Former paragraph 2, amended State Gazette, No 70/1998; amended, State Gazette No. 84 from 2000*) In respect of cases instituted for constitution of the bankruptcy estate and for avoidance actions no state fees shall be collected in advance."

[19] Art. 734. (1) The court shall convene a conclusive meeting of the creditors within 14 days after receiving the account of the receiver in bankruptcy. (2) (amend. - SG 38/06) The meeting shall hear the report of the distribution of the amounts collected upon the conversion into cash and of the remaining unpaid claims. The meeting shall pass a resolution also of the unsellable objects from the bankruptcy estate

[20] Art. 735. (1) "The bankruptcy proceedings shall be closed by means of a judicial decision, when: 1. the debts have been paid; 2. the bankruptcy estate has been depleted."

[21] **Bulgarian Commerce Act, Article 758** "A receiver in bankruptcy (trustee) appointed in a decision of a foreign court shall have the rights envisaged in the state where the bankruptcy

those in order that cause the return of The Funds and their handing over to him. See [**Exhibit 15**], [**Exhibit 17**], [**Exhibit 19**], [**Exhibit 54**], [**Exhibit 55**].

59-h. Obeying Defendants' economic interests and their desire to retain The Funds at all costs, on January 19, 2018, the ShDC dismissed APD bankruptcy case [**Exhibit 31**]. One after the other the Varna Court of Appeals and the Supreme Court of Cassation in Sofia muffled Ayr's Trustee's protests over the ShDC judgment to dismiss APD case, [**Exhibit 32**], [**Exhibit 33**] and [**Exhibit 34**], **when they** uphold ShDC's decision to use the theft of The Funds only as a pretext to close APD bankruptcy case.

59-i. Shutting Ayr Trustee out and effectively blocking thus the exercise of the powers in APD's bankruptcy case as vested in him under Art.758 CA was the ultimate goal and what drove the ShDC forward on the course it embarked on in the days following January 7, 2016 [**Exhibit 17**] to doggedly push APD bankruptcy case to closure.

59-k. APD bankruptcy case dismissal was viewed as efficient means to make the obligations of APD bankruptcy procedure itself as shown below [**Exhibit 15**], [**Exhibit 19**], [**Exhibit 55**] and owed to Ayr Trustee practically disappear. Those obligations were: 1) cause the Defendants return The Funds they had stolen and 2) hand over The Funds so recovered to Ayr Trustee. Said obligations were the only thing that linked Ayr Trustee's claims against the Defendants to Bulgaria.

60. Neither the ShDC nor the VCA or even the Supreme Court of Cassation in Sofia, Bulgaria, found a single cause of action or any private or public interest factor at play that, if existent, might have justified each of those court's decision to determine jurisdiction over any of the claims that arose in the course of Ayr's bankruptcy and are based on the theft of the Funds.

61. Considering the above it is only fair to conclude that in Bulgaria Plaintiffs will be deprived of equal treatment with the Defendants; Plaintiffs are certain to be denied fair trial and justice. *See* [**Exhibit 6**], [**Exhibit 20**], [**Exhibit 21**], [**Exhibit 51**], [**Exhibit 52**].

61-a. Having learned from bitter experience what injustice looks like, on February 28, 2019, Ayr Trustee submitted a notice to the European Commission seeking from it to open an inquiry as to whether or not Bulgaria has breached anti-corruption, anti-money laundering

proceedings are instituted, to the extent they do not contradict the public order rules of the Republic of Bulgaria."

and anti-financial fraud international laws, including the U.S. laws and ones of the State of New York **[Exhibit 43].**

61-b. The discriminatory treatment of Ayr Trustee's powers as dished out by the ShDC, the VCA and the Supreme Court of Cassation in the course of APD bankruptcy proceedings is a perfect illustration of Defendants' enormous, albeit alarming, influence on Bulgarian court and judiciary, of which Attorney Zahari Tomov was warned of by email in 'friendly' fashion as early as May 21, 2016 **[Exhibit 53]**.

62. Incorrect is Defendants' conclusion that Plaintiffs cane bring the claims in Bulgaria. Their conclusion is incorrect for several reasons. Here they are:

62-a. Plaintiffs may not file claims different from the ones based on the cause of action Ayr Trustee upon approval of Ayr's bankruptcy court has transferred to them, because pursuant to European Union Regulation (EC) No.1346/2000 of the Council of Europe of 29 May 2000 on bankruptcy and pursuant **Art.93 (1) and Art.105 (3)** Bulgaria have not jurisdictional over the Plaintiffs claims.

62-b. Per Art.26 (2) of Bulgarian Civil Procedure Code (CPC)[22] and by virtue of Art.758 of Bulgarian Commerce Act (CA) the power to file the claims that arose in the course of Ayr's bankruptcy procedure as a result of the theft of The Funds *lies exclusively with Ayr Trustee.*

62-c. Bulgaria failed to meet its duties under Art.34 and Art.35 of the *United Nations Convention against Corruption* (UNCAC).

[The Remainder Of This Page Is Left Intentionally Blank]

---

[22] **Bulgarian Civil Procedure Code Art.26**: (1) Parties to civil lawsuits are the persons, on whose behalf and against whom the lawsuit is being handled. (2) Except the cases provided for by a law, nobody can claim on his own behalf someone's else rights before a court.

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.

Date: October 24, 2019

Botevgrad, Bulgaria

Respectfully submitted,

By: _____
Maria Gavrilova Nakova

**LIST OF CITED DOCUMENTS IN THE DECLARATION OF MARIA NAKOVA**

| EXHIBIT NO. | DOCUMENT |
| --- | --- |
| Attach A | CV of Attorney Maria Nakova |
| Attachment B | Bulgarian Commerce Act<br>Chapter Forty-three<br>SUBMISSION OF CLAIMS |
| Attachment C | Bulgarian Civil Procedure Code<br>Chapter twenty-three EFFECT OF THE COURT DECISIONS |
| Exhibit 1 | Court Order of Receivership No.270 dated December 15, 2012 |
| Exhibit 2 | Bank Deposit Agreement No.29428 dated January 14, 2013 |
| Exhibit 3 | Ruling 38 dated February14,2013 |
| Exhibit 4 | Ruling No. 304 dated July 11, 2014 |
| Exhibit 5 | Ruling No. 179 dated September 2,2013 |
| Exhibit 6 | APD Trustee's Request dated July 11, 2014 |
| Exhibit 7 | FIB's Statement of Claim against APD, 2011 |
| Exhibit 8 | Judgment No.3 of February 8, 2013 |
| Exhibit 9 | Ruling No.140 of September 4, 2013 |
| Exhibit 10 | APD Trustee Report dated June 20, 2014 |
| Exhibit 11 | Letter of Philip Harris dated December 1, 2013 |
| Exhibit 12 | Ayr being listed as a main creditor of APD, dated July 9,2014 |
| Exhibit 13 | Ayr Trustee's Complaint against Torier Partners Limited, Case 16-03139 |
| Exhibit 14 | Notice to APD Creditors Committee dated October 22, 2014 |
| Exhibit 15 | Notice to APD bankruptcy court dated November 19, 2014 |
| Exhibit 16 | APD Creditors Committee letter to Ayr Trustee dated December 3, 2014 |
| Exhibit 17 | US Trustee Mims Letter dated January 7, 2016 |
| Exhibit 18 | APD Trustee reports dated April 24, 2016 and August 15, 2016 |
| Exhibit 19 | US Bankruptcy Court Judgment against APD, case 16-03139-bjh; case 16-03139-bjh; |
| Exhibit 20 | APD Creditors Committee report to Ayr Trustee dated September 16,2016 |
| Exhibit 21 | Judge Metodi Lalov re the brutal political pressure on Bulgarian judiciary dated May 6,2019 |
| Exhibit 22 | Varna App. Court Ruling re APD Bankruptcy Case Transfer to Shumen District Court dated December 12,2013 |
| Exhibit 23 | Judgment No.6 dated December 10,2014 |
| Exhibit 24 | UniCredit Bulbank, AD, Payment of costs to resume APD Bankruptcy case dated November 26,2016 |
| Exhibit 25 | Delivery and Acceptance Statement of June 24, 2016 |
| Exhibit 26 | Notice to confirm payment of costs to resume APD Bankruptcy case dated June 25,2016 |
| Exhibit 27 | Ruling No 545 dated December 2,2015 |

| Exhibit 28 | Ruling No. 586 dated September 15, 2016 |
|---|---|
| Exhibit 29 | Ruling No.589 dated September 16, 2016 |
| Exhibit 30 | Ruling No 457 dated December 16,2016 |
| Exhibit 31 | Court Order No.5 dated January 19, 2018 |
| Exhibit 32 | Ayr Trustee Appeal dated January 25,2018 |
| Exhibit 33 | Ayr Trustee Statement on the grounds for admissibility of the Cassation Complaint dated July 16, 2018 |
| Exhibit 34 | Ayr Trustee Cassation Complaint dated July 16,2018 |
| Exhibit 35 | Judgment of District Court of Targovishte No.16 dated May 3,2011 |
| Exhibit 36 | Certified copy of the Certificate of the Committee of Creditors of APD dated September 3, 2014 |
| Exhibit 37 | BNB' s Resolution № 104 dated August 15, 2014 |
| Exhibit 38 | BNB Instructions to Corpbank Conservators dated August 22, 2014 |
| Exhibit 39 | BNB's Register Entry pursuant to Art.62 (12)(3) Bulgarian Credit Institutions Law |
| Exhibit 40 | Ayr's Letter for damages to TB Investbank AD, Fibank, UniCredit Bulbank, dated December 3, 2010 |
| Exhibit 41 | Ayr Letter to BNB dated December 20,2010 |
| Exhibit 42 | Ayr Filed Reorganization Plan in APD's Bankruptcy case |
| Exhibit 43 | Trustee of Ayr Complaint to European Commission against Bulgaria State dated February 28, 2019 |
| Exhibit 44 | Ruling of Appeal Court of Varna No.731 dated November 13, 2013 |
| Exhibit 45 | Ruling of Appeal Court of Varna No.735 dated November 14, 2013 |
| Exhibit 46 | Ruling of District Court of Shumen No. 318 dated July 18, 2014 |
| Exhibit 47 | Ruling of EU Court (Fifth Chamber ) dated September 9. 2014, case C-488/13 |
| Exhibit 48 | Stipulation to clarifying causes of action , Doc.81 Filed 09_0718 case No.14-34940-bjh-7 |
| Exhibit 49 | Synopsis of Case-pertinent Preliminary Rulings of The Court of Justice of the European Union |
| Exhibit 50 | Transcript of Court Hearing of Varna Appeal court dated May 2,2018 |
| Exhibit 51 | Statement of Trustee Daniela Kuceva dated March 11,2015 |
| Exhibit 52 | Statement of Judge Rumyana Chenalova dated March 11,2015 |
| Exhibit 53 | "Friendly Warning" email dated May 21, 2016 |
| Exhibit 54 | Report Trustee Kolyovska dated January 19,2016 |
| Exhibit 55 | US Court Order Automatic Stay and Jurisdiction of US Bankruptcy Court dated June 17.2016 |
| Exhibit 56 | Mortgage Receivables Sale Purchase Agreement dated June 4,2010 |

| | |
|---|---|
| Exhibit 57 | Ayr's Letter to Fibank dated January 27,2011 |
| Exhibit 58 | Transcript of court hearing in case 16-03138-bjh dated May 4,2017 |
| Exhibit 59 | Exhibit 59 BNB's Supervision Report on FIB for 2012, page 6, 19 |