```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/18/2020_
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
RUDERSDAL, EOOD, et al.,                          :
                                                  :        18 Civ. 11072 (GHW) (RWL)
                                                  :
                                                  :
                        Plaintiffs,               :    **REPORT AND RECOMMENDATION**
                                                  :    **TO HON. GREGORY H. WOODS:**
                                                  :    <u>**MOTIONS TO DISMISS**</u>
                                                  :
            - against -                           :
                                                  :
PHILIP ROBERT HARRIS, et al.,                     :
                                                  :
                                                  :
                        Defendants.               :
----------------------------------------------------------X


## TABLE OF CONTENTS

FACTUAL BACKGROUND                                                          3
    A.  The Silver Beach Project                                      3
    B.  The FIB Loans                                               3
    C.  Investment in Ancient Mexican Bonds                         7
    D.  APD Files for Bankruptcy in Bulgaria & Sells the SBP        8
    E.  The March 28, 2012 & November 27, 2013 Agreements          8
    F.  BNB Takes Over CCB                                         10
    G.  Ayr Files for Bankruptcy in Texas & Sale Proceeds Are
       Transferred to FIB                                      10
    H.  APD's Bankruptcy Proceedings in Bulgaria                  12
PROCEDURAL HISTORY                                                         14
DISCUSSION                                                                 16
    A.  PERSONAL JURISDICTION                                     17
        1.  General Principles of Jurisdiction                    17
        2.  Defendant Harris                                      21
            a.  "Alter Ego" Jurisdiction                         22
            b.  CPLR § 301: General Jurisdiction                  26
            c.  CPLR § 302(a)(1)-(3): Specific Jurisdiction      27
        3.  FIB Defendants                                        31
            a.  CPLR § 302(a)(3)(ii)                              32
            b.  Rule 4(k)(2)                                      39
        4.  The Five Bulgarian Companies, the Peevski Defendants,
           and Defendant Bulgartabac                           42
            a.  CPLR § 302(a)(3)                                  42
            b.  Rule 4(k)(2)                                      44
        5.  The Eaton Vance Defendants                            45
            a.  CPLR § 301: General Jurisdiction                  46
            b.  18 U.S.C.A. § 1965: RICO Jurisdiction             51
            c.  Other Bases for Jurisdiction: CPLR § 302(a)(3) and

Rule 4(k)(2) 53

6. Bulgarian National Bank 54

7. Bank of New York Mellon 59

B. FORUM NON CONVENIENS 59

1. *Fibank I* 61

2. Deference to Plaintiffs' Choice of Forum 62

3. Availability & Adequacy 67

a. Amenability to Service of Process 68

b. Availability of Alternative Forum:  Jurisdiction 69

c. Availability of Alternative Forum:  Laws & Remedies 71

d. Availability of Alternative Forum:  Corruption of Bulgarian Judiciary 73

4. Public/Private Interest Factors 78

a. Private Interest Factors 80

b. Public Interest Factors 82

5. The Non-Moving Defendants 85

C. COMITY AND STANDING 87

D. ORDER ON JURISDICTIONAL DISCOVERY 88

CONCLUSION 95

PROCEDURES FOR FILING OBJECTIONS 95

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RUDERSDAL, EOOD, et al.,                    :

                                            :          18 Civ. 11072 (GHW) (RWL)

                                            :
           Plaintiffs,                      :     **REPORT AND RECOMMENDATION**
                                            :       **TO HON. GREGORY H. WOODS:**
                                            :        <u>**MOTIONS TO DISMISS**</u>

     - against -                            :

                                            :
PHILIP ROBERT HARRIS, et al.,               :

                                            :
           Defendants.                      :
------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiffs Rudersdal, EOOD ("Rudersdal"); All Seas Property 2, OOD ("All Seas 2");
Asset Management, EAD ("Asset Management"); and Zahari Tomov (both individually
and in his capacity as Special Counsel to the U.S. Trustee in an action involving defendant
Ayr Logistics Ltd. ("Ayr") filed in U.S. Bankruptcy Court) ("Tomov" and, together with
Rudersdal, All Seas 2, and Asset Management, "Plaintiffs") assert that the defendants
fraudulently transferred approximately $65 million out of Plaintiffs' reach, breaching
fiduciary and contractual duties and engaging in illegal, tortious conduct in doing so.
Presently before this Court are several motions to dismiss filed by many, but not all, of
the defendants pursuant to Rule 12(b)(2), each seeking dismissal of all claims based on
lack of personal jurisdiction, forum non coveniens, and/or other jurisdictional bases.  For
the reasons that follow, this Court recommends that the defendants' respective motions
be GRANTED due to lack of personal jurisdiction.  Alternatively, the case should be
dismissed without prejudice based on forum non conveniens, subject to certain
conditions.

**The Moving Defendants**

The moving parties, referred to herein collectively as "Defendants," include: Bulgarian National Bank; First Investment Bank, AD, Tseko Todorov Minev, and Ivailo Dimitrov Mutafchiev (collectively, the **"FIB Defendants"**); Tabak Market, AD (a/k/a Lafka Market AD), Cibole Services Incorporated, Bulgaria, EOOD, Asteria BG, EOOD (a/k/a Droslian Bulgaria, EOOD), Vili Vist, EAD, and Promishleno Stroitelstvo Holding, EAD (collectively, the **"Five Bulgarian Companies"**); Delyan Slavchev Peevski and Instrust PLC (f/k/a NSN Investment, EEOD) (collectively, the **"Peevski Defendants"**); Philip Robert Harris (**"Harris"**); The Bank of New York Mellon Corporation (**"BNYM"**); Eaton Vance Management, Parametric Portfolio Associates (d/b/a Parametric Emerging Markets Fund), and Eaton Vance Structured Emerging Markets Equity Fund, LLC (a/k/a Eaton Vance Structured Emerging Markets, Inc.) (collectively, the **"Eaton Vance Defendants"**); and Bulgartabac Holding, AD (**"Bulgartabac"**).

Anthony Dennis Harriott ("Harriott"); Grant Capital Investments, Ltd.; Chavdar Angelov Angelov ("Angelov"); All Seas Management, Ltd.; and Blue Finance Limited have been served but have neither answered nor moved to dismiss. As of May 21, 2019, Plaintiffs stated an intent to pursue default judgment against them, though no such motions have been filed. (Dkt. 118.) Ayr has also failed to appear in this matter as the U.S. Bankruptcy Court for the Northern District of Texas has modified its automatic stay "solely to the extent necessary to allow the Creditors [Plaintiffs] to pursue claims against the Debtor [Ayr] in the Creditor Lawsuits for the sole purpose of piercing the corporate veil to pursue claims against Defendant Harris based on an alter ego theory." (*Id.* (quoting *In re Ayr Logistics, Ltd.*, No. 14-34940 (Bankr. N.D. Tex. May 10, 2019)).) As of the date

of this Opinion, neither the Bank for Foreign Trade of the Russian Federation (a/k/a VTB Bank), nor BNB conservators Stanislav Georgiev Lyutov and Elena Zdravkova Kostadinchev, have been served with the operative Complaint.  On June 4, 2020, this Court granted Plaintiffs' request to serve VTB Bank by a number of alternative methods (Dkt. 319), but Plaintiffs have yet to file proof of such service.

## Factual Background

Plaintiffs all are Bulgarian entities or persons.  At the core of their 644-paragraph-long second amended complaint (Dkt. 230, hereinafter the "Complaint" or "Compl.") is the allegation that, acting in concert and over the course of several years, Defendants fraudulently took approximately $65,209,976 (the equivalent of 97,500,000 Bulgarian lev ("BGN")) to which Plaintiffs are entitled.  (Compl. ¶ 52.)  The arguments lodged in the motions at issue warrant a comprehensive review of the intricate web of facts underlying the Complaint.

## A.    The Silver Beach Project

The monies that are the focus of Plaintiffs' allegations were originally intended to be used for the Ayr Silver Beach construction development project (the "SBP"), a projected "$542,976,244 . . . expansion of the town of Balchik, Bulgaria on the Black Sea into a multi-use and multi-purpose 259-acre residential and business development." (Compl. ¶ 51.)

## B.    The FIB Loans

Sometime between 2007 and 2008, and following purchase of the property underlying the SBP, defendant First Investment Bank, AD ("FIB"), a Bulgarian institution, issued two loans, secured by the property, totaling $46,907,243.69 to fund the property's

development.  (Compl. ¶ 58-59.)  While the Complaint notes differing totals, it makes clear that a significant portion of these monies were ultimately transferred to Malta either through defendant All Seas Management or defendant Blue Finance.  (*Compare* Compl. ¶ 59 (stating that approximately $33,417,656 was transferred to Maltan accounts of defendant All Seas Management), *with* Compl. ¶¶ 73-74 (stating that $39,823,594 was transferred to Maltan accounts of defendant All Seas Management or defendant Blue Finance).)  As discussed further below, Plaintiffs contend that these funds were not used to develop the SBP as intended and were instead used to purchase ancient Mexican bonds to be sold in the United States.

Over a year after defendant FIB issued its initial loans for the SBP, on September 15, 2009, defendant Ayr and defendant Angelov's company All Seas Bulgaria, EOOD ("All Seas"), executed a contract requiring All Seas to provide "the licensing, in-country support, operational support, and marketing for the SBP" and requiring Ayr, defendant Harris' Texas-based company, to provide the financing, design, engineering, construction, and construction management for the SBP.  (Compl. ¶ 66.)  Under an article entitled "Law," the parties agreed "to abide by United States Law prohibiting the bribing, favor-giving, or any other financial inducement provided to a foreign government official or any other party for the purpose of obtaining business within the foreign nation," but further agreed that the contract would "be governed by the laws of the United Kingdom." (Dkt. 1, Ex. A.)

Weeks later, on October 2, 2009, defendant FIB sent a letter to defendant Harris confirming his intention to take over the development of the SBP.  (Compl. ¶ 61.) Seemingly in that letter – though the Complaint is ambiguous on this point – FIB informed

Harris of the two loans it had issued to fund the development of the SBP and its corresponding lien on the underlying property, and called for Harris to purchase FIB's debt positions if he sought to develop the SBP.  (Compl. ¶ 62.)  On December 17, 2009, Ayr sent an initial letter of commitment to FIB, which stated that Ayr "would provide the financial backbone for SBP through its Bulgarian subsidiary company," Ayr Property Development, AD ("APD"), and that Ayr would accordingly purchase FIB's two outstanding loans related to the SBP.  (Compl. ¶ 63.)  FIB agreed, with the caveat that Ayr pay interest on those loans.  (Compl. ¶ 64.)  To pay the interest, Ayr took out a separate $11,646,640 loan from FIB, which was ultimately issued to plaintiff Asset Management, the company that "Harris and Angelov designed to be the front organization" for the loan.  (Compl. ¶ 65, 68.)  And, to serve as the basis for this loan, Harris and Angelov purportedly created fake coal delivery invoices from defendant Blue Finance, Angelov's company organized under the laws of the Marshall Islands with its principal place of business in Malta.  (Compl. ¶ 69.)

In December 2009, plaintiff All Seas 2 sold the SBP, with all existing approvals and permits, as well as the underlying land, to defendant Ayr for approximately $123,941,834.  (Compl. ¶ 88.)  Plaintiffs acknowledge that this transfer made plaintiff All Seas 2 a creditor of Ayr in the amount of approximately $37,897,480.61.  (Compl. ¶ 89.)  From December 2009 to June 2010, defendant Blue Finance transferred approximately $7,916,241 to defendant FIB to pay the agreed-upon interest for FIB's two loans funding the SBP.  (Compl. ¶ 79.)  In that same time frame, defendant Angelov transferred around $2,905,587 from defendant FIB to accounts associated with Blue Finance.  (Compl. ¶ 79.)  Purportedly, Blue Finance then wired those funds to another FIB bank account, held by

Cypress Adorna Management Ltd., "as a commission to [defendant] FIB or [defendant] Harris." (*Id.*) But even as this money moved and moved and moved, it never once landed in New York.

In June 2010, defendant Harris offered to "buy out" FIB's loans related to the SBP by purportedly arranging "buyout funds" to originate in New York City through an HSBC bank account held by Oriana Capital Partners. (Compl. ¶ 83.) In arranging the "buyout funds," defendant Harris "communicated on multiple occasions" with a New York branch of HSBC via email and/or telephone. (Compl. ¶ 84.) On June 4, 2010, defendant Harris' companies, Texas-based Ayr and Bulgaria-based APD, entered into a Mortgage Receivables Sale and Purchase Agreement with FIB (the "Sale and Purchase Agreement" or the "Swap Agreement") by which Ayr assumed the two construction loans defendant Angelov had procured for the SBP. (Compl. ¶ 85; Dkt. 1, Ex. B.) While the Complaint suggests that the Swap Agreement was executed in the United States as it was notarized by a notary associated with Texas, the opening paragraph reads that it "is made on this Fourth, June, 2010 in Sofia, Republic of Bulgaria." (*Compare* Compl. ¶ 86, *with* Dkt. 1, Ex. B at 1.) The Complaint makes no effort to reconcile this discrepancy. Plaintiffs further allege that – through the Swap Agreement – Harris and FIB "agreed and designated the State of New York as the place of performance and closure" through "purposeful, deliberate" actions, and "eventually made New York the financial center of" the SBP. (Dkt. 290, Declaration of Zahari Zhelyazkov Tomov dated October 3, 2019 ("Tomov Decl.") ¶ 11.) But the Swap Agreement makes no mention of New York. (*See* Dkt. 1, Ex. B.)

Following execution of the Swap Agreement, defendant Harris sent emails and letters confirming his intention to repay FIB's loans related to SBP. (Compl. ¶¶ 90-91.) On November 1, 2010, Harris sent a letter to HSBC Bank and Investbank, AD, in Bulgaria "confirm[ing] that the first stage of financing through Ayr for SBP had been completed in New York." (Compl. ¶ 91.) That letter further stated that "HSBC New York would be responsible for getting Ayr's board of directors to release from New York the first payment of $27,852,097 . . . out of the total $123,941,834 . . . for SBP." (Compl. ¶ 94.) But, by Plaintiffs' own admission, these actions never occurred – in New York or elsewhere – as "Ayr failed to repay the loans secured on SBP." (Compl. ¶ 95.)

## C.    Investment in Ancient Mexican Bonds

All of the money movement described above permitted defendants Angelov, Harriott, and Harris to use SBP funds to purchase ancient Mexican bonds to be sold in the United States for their personal benefit. (*See* Compl. ¶¶ 73-78, 87 ("Harris, Angelov, and FIB used the September 15, 2009 and the June 4, 2010 agreements to divert funds for the purchase of Mexican bonds from the two pre-existing loans in the SBP, for which the SBP land was collateral, instead of investing those funds into the SBP").) Defendant FIB also "participated" in this alleged "scheme" by authorizing the release of the two original loans to Malta and issuing a number of payment orders completed between November 2007 and January 2010. (Compl. ¶ 74.)

Seemingly because the loan proceeds intended to develop the SBP had been diverted to purchase ancient Mexican bonds, defendant Harris (and his companies Ayr and APD) was left unable to repay FIB's loans for the SBP. (Compl. ¶ 95.) On December 20, 2010, Harris sent a letter to defendant Bulgarian National Bank ("BNB"), notifying BNB

that "Ayr had an agreement to repay the liabilities associated with APD and the SBP, that Ayr owned the SBP, and that the funds designed to support it [were] designated to come from the HSBC bank account in New York."  (Compl. ¶ 52 at 30.)  In that letter, Harris purportedly blamed difficulties in financing the SBP on "the failings of the Bulgarian bank system."  (*Id.*)  Days later, on December 29, 2010, defendants Harris and Angelov, along with the other general shareholders of APD, held a meeting where they voted to initiate bankruptcy proceedings and prepare a "recovery plan" for APD.  (Compl. ¶ 97.)

**D.    APD Files for Bankruptcy in Bulgaria and Sells the SBP**

In February 2011, APD filed for bankruptcy in Bulgaria.  (Compl. ¶ 98.)  On December 15, 2012, the land underlying the SBP was sold to FIB at auction for $65,209,976 pursuant to an order from the Bulgarian bankruptcy court calling for APD to sell its assets.  (Compl. ¶¶ 108-109.)  On January 14, 2013, the Bulgarian bankruptcy trustee placed the sale proceeds into APD's bank account at Corporate Commercial Bank AD ("CCB") in Bulgaria.  (Compl. ¶¶ 111-112.)

**E.    The March 28, 2012 and November 27, 2013 Agreements**

During APD's Bulgarian bankruptcy proceedings, Plaintiffs, the majority stakeholders of APD, approved its reorganization plan.  (Compl. ¶ 101.)  On March 28, 2012, plaintiffs All Seas 2 and Asset Management and defendant Ayr entered into a written agreement to formalize that plan (the "March 28, 2012 Agreement").  (Compl. ¶ 103; Dkt. 1, Ex. D.)  That agreement specifically stated that "[a]ll matters arising from this Agreement . . . shall be settled by the parties in an amicable matter in observance of the good commercial and investment practices recognized by the international and the US laws" and that, if parties failed to meet an "amicable resolution," the parties "shall refer

the dispute for resolution to the competent court having jurisdiction over the principal place of business of Ayr." (Dkt. 1, Ex. D at 7-8.)

On November 27, 2013, Ayr, All Seas 2, and Asset Management executed a supplemental agreement to the March 28, 2012 Agreement (the "Supplemental Agreement"). (Compl. ¶ 122; Dkt. 1, Ex. F.) In a broad choice of law provision, the parties to the Supplemental Agreement agreed that "any dispute or claim arising from any of the money transfers servicing the fictitious transactions made by All Seas Management or Blue Finance Limited, or any controversy over any property right stemming from the payment claims FIB lodged against the property of APD's Estate where such controversy or right or claim concerns any of the rights or liabilities of the parties hereto, or any of the rights or liabilities of the parties to the March 28th 2012 Agreement . . . shall have its effect in the State of New York and therefore shall be domiciled in the State of New York" and that "the U.S. Federal District Court in New York, State of New York shall have subject matter jurisdiction and personal jurisdiction over all the parties hereto. The choice of law shall be New York State Law." (Dkt. 1, Ex. F at 3.)

The Supplemental Agreement goes on to provide "that the U.S. Federal District Court in New York . . . shall have jurisdiction over any dispute or controversy and/or shall be the one to make a determination or a decision on any rights and/or a claim concerning the exercise of any rights or meeting any liability of any of the parties hereto." (*Id.* at 3-4.) The parties stated that they "purposefully" subjected themselves to New York's jurisdiction "because they question the effectiveness of the rule of law in Bulgaria, and because the principle performance of the Agreements and any supplements thereto is in the State of New York." (*Id.* at 3.) The Supplemental Agreement further states that

defendant Ayr "has chosen and designated Deutsche Bank, New York, the State of New York as the place of performance under the Agreements and any supplements thereto." (*Id.* at 4.)

On December 27, 2013, lead plaintiff Rudersdal adopted both the March 28, 2012 Agreement and the Supplemental Agreement, requiring defendant Ayr to make payments to Rudersdal – in addition to plaintiffs All Seas 2 and Asset Management – through Deutsche Bank, New York, and subjecting Rudersdal to the choice of law provisions detailed above.  (Compl. ¶ 125.)  Ayr, however, never made those agreed upon payments.

**F.     BNB Takes Over CCB**

On June 20, 2014, defendant BNB "assumed management" of CCB.  (Compl. ¶ 130, 133.)  Pursuant to a resolution issued that same day, following take over, BNB's management assumed "complete control of all payments and transfers."  (*Id.* ¶ 133.)  To do so, BNB appointed two conservators, Stanislav Georgiev Lyutov and Elena Zdravkova Kostadinchev (the "Conservators"), to fill the role of CCB's managing bodies.  (*Id.*)  On July 11, 2014, the Bulgarian bankruptcy court then overseeing APD's bankruptcy proceedings (discussed further below) issued an order calling for the transfer of the SBP sale proceeds from APD's bank account with CCB to the Bulgarian Development Bank.  (*Id.* ¶ 138.)  On September 25, 2014, APD's bankruptcy trustee informed the Court that "BNB and the [Conservators] refused to effectuate the court's July 11, 2014 order to transfer APD's CCB accounts to the Bulgarian Development Bank, AD."  (*Id.* ¶ 142.)

**G.     Ayr Files for Bankruptcy in Texas and Sale Proceeds Are Transferred to FIB**

On October 10, 2014, Ayr filed for bankruptcy in the United States District Court for the Northern District of Texas.  (Compl. ¶ 146.)  Ayr's bankruptcy filing purportedly

omitted any mention of its subsidiary, APD, or the $65 million received by APD after selling the land underlying the SBP following its bankruptcy.  (Compl. ¶¶ 147-148.)  That day, the U.S. bankruptcy court issued an automatic stay.  (Compl. ¶ 151.)  On October 22, 2014, and again on November 19, 2014, the Bulgarian bankruptcy court handling APD's bankruptcy proceedings was notified of this stay.  (Compl. ¶ 153.)

Simultaneously, FIB took action to use the $65 million it paid to APD to purchase the SBP land to extinguish other outstanding debts on its books.  (Compl. ¶¶ 171-177, 186-190.)  Specifically, on October 22, 2014, FIB sent APD's bankruptcy trustee a payment order to submit to CCB in order to obtain the $65 million sale proceeds from the account containing those funds.  (Compl. ¶ 155.)  Two days later, on October 24, 2014, FIB purportedly forged the signature of APD's bankruptcy trustee on that payment order and called for the release of the $65 million sale proceeds from APD's bank account with CCB.  (Compl. ¶¶ 188-189.)  FIB then used those funds to satisfy the debts of five Bulgarian companies:  (1) Tabak Market, AD; (2) Cibole Services Incorporated, Bulgaria, EOOD; (3) Asteria BG, EOOD; (4) Vili Vist, EAD; and (5) Promishleno Stroitelstvo Holding, EAD (collectively, the "Five Bulgarian Companies").  (Compl. ¶¶ 190, 200.)  Three of the Five Bulgarian Companies were "owned or controlled" by defendant Delyan Slavchev Peevski, and two were owned or controlled by the Movement for Rights and Freedoms (the "MRF"), a Bulgarian political party led by defendant Peevski.  (Compl. ¶¶ 32-36; 181.)

Years later, on October 10, 2016, the U.S. bankruptcy trustee commenced an adversary proceeding against FIB and APD, which lodged many of the same allegations raised here.  On May 15, 2017, Chief Judge Barbara J. Houser dismissed the adversary

proceeding, concluding that the Northern District of Texas lacked personal jurisdiction over FIB and that the Northern District of Texas was an inconvenient forum for the litigation, which should instead be litigated in Bulgaria.  *See generally Mims v. Fibank*, No. 16-3138 (Bankr. N.D. Tex. May 15, 2017) ("*Fibank I*").

## H.    APD's Bankruptcy Proceedings in Bulgaria

As noted above, APD filed for bankruptcy in Bulgaria in February 2011, nearly a decade ago.  Since then, the Bulgarian court has issued decisions relevant to assessing the instant motions.  (*See generally* Tomov. Decl. ¶¶ 52-66.)

On September 15, 2016, the Varna Court of Appeals affirmed decisions rendered by the Shumen District Court over challenges that the trial court had "refused to address and deal with" the matters before it.  (Dkt. 220-3 at 254-56.)  Specifically, the Varna Court of Appeals affirmed the district court's dismissal of requests for "investigation for the facts and evidence" regarding the October 24, 2014 payment order that prompted the release of the SBP sale proceeds.  (*Id.* at 255.)  In describing the procedural history underlying this ruling, the Varna Court of Appeals noted that the initial filings "consist[ed] of different, unspecified, and unclear demands to APD's bankruptcy court to issue a court act regarding matters and recognizing facts and their legal consequences without an established legal possibility and procedural order in the bankruptcy procedure."  (*Id.*)  Following an opportunity to clarify, the claimant "demand[ed] and insist[ed] for investigation of the facts and evidence, referring to the creation, use and legitimacy of" the October 24, 2014 payment order calling for the transfer of the sales proceeds from APD's bank account.  (*Id.*)  The Varna Court of Appeals concluded that the request "did

not include a request to the bankruptcy court which can be legally classified" and failed to "legitimately approach the court to examine and decide it." (*Id.*)

The following day, the Varna Court of Appeals issued another, similar decision in response to a separate but related motion, which affirmed the district court's refusal to issue both a declaration that the October 24, 2014 payment order was "invalid and lacking legitimacy" and an injunction against FIB and former APD trustee, Martin Apostolov. (Dkt. 220-3 at 260-63.) In doing so, the Varna Court of Appeals stated that such requests were not cognizable as "the law does not provide for any such procedure." (*Id.* at 262.)

On December 16, 2016, the Shumen District Court found that APD lacked assets to "cover the current bankruptcy costs and keep the bankruptcy case going" and, accordingly, ordered that the creditors of APD's bankruptcy "prepay the amount of BGN 60,000 (sixty thousand Bulgarian levs) to cover future bankruptcy costs" and submit proof of payment. (Dkt. 220-3 at 268-69.) But no such payment was made, and no further motions were filed. Accordingly, on January 19, 2018, the Shumen District Court dismissed APD's bankruptcy proceedings and deregistered APD from the Commercial Register. (Dkt. 220-3 at 273-74.) An appeal followed.

On May 2, 2018, the Varna Court of Appeals affirmed the Shumen District Court's dismissal of the APD bankruptcy proceedings for failure to comply with an order calling for payments necessary to continue litigating the case. (Dkt. 258-31 at 7-11.) In its decision, the Varna Court of Appeals acknowledged the appellant's arguments for reversing dismissal, specifically discussing the allegations that – had the Shumen District Court acted appropriately – various monies, including the Funds, would have been reinstated to APD's bankruptcy estate. (*Id.* at 9.) But, ultimately, the Varna Court of

13

Appeals affirmed dismissal and concluded that such considerations were "irrelevant to the present case" in light of APD's failure to comply with its legal obligations to either pay the requisite court costs or request "resumption of proceedings."  (*Id.* at 11.)

On February 27, 2019, the Supreme Court of Cassation, Bulgaria's highest court, denied leave to appeal further, and the decision terminating Ayr's bankruptcy proceedings became final.  (Dkt. 258-32 at 7-9.)

### Procedural History

Plaintiffs filed the initial complaint before this Court on November 27, 2018.  (Dkt. 1.)  On May 6, 2019, the Honorable Gregory H. Woods, U.S.D.J., referred the matter to the undersigned for both general pretrial management and for Reports and Recommendations on any dispositive motions.  (Dkt. 105.)

On June 13, 2019, Plaintiffs submitted a letter identifying jurisdictional discovery they sought to obtain in advance of the instant motion.  (Dkt. 132.)  Defendants opposed, arguing that jurisdictional discovery should be denied because Plaintiffs had failed to plead specific facts establishing a prima facie case for jurisdiction, and the requests proposed were vastly overbroad.  (Dkt. 136, 137.)  On July 1, 2019, this Court denied Plaintiffs' requests for jurisdictional discovery, concluding that "the Complaint fails to allege a prima facie case of personal jurisdiction in New York over the Defendants in question" (and noting that defendant New York Bank of Mellon does not contest personal jurisdiction in New York, and defendant Ayr is not addressed in the correspondence). (Dkt. 139.)  In reaching that conclusion, the Court noted that Plaintiffs' contentions relied "to a large extent on insufficient conclusory statements, speculation, and contractual jurisdictional provisions not applicable to Defendants other than" defendant Ayr and

instructed that Plaintiffs could use affidavits "to provide additional information to oppose Defendants' anticipated jurisdictional motions." (*Id.*)

Since then, Plaintiffs have twice amended their complaint.  On July 24, 2019, Plaintiffs filed their first amended complaint, which lodged claims substantially similar to those currently before the Court.  (Dkt. 149.)  A month later, on August 30, 2019, Defendants submitted motions to dismiss that complaint, arguing, among other things, that Plaintiffs lacked personal jurisdiction over nearly all of them.  (Dkt. 151, 157, 164, 167, 169, 171, 174, 177.)  On December 13, 2019, Plaintiffs opposed the motions to dismiss (Dkt. 189, 199), and also submitted a letter motion for leave to file a second amended complaint and a motion for jurisdictional discovery (Dkt. 186, 188).  Plaintiffs sought leave "for the limited purpose of adding jurisdictional allegations" that Plaintiffs purportedly included in their opposition papers.  (Dkt. 186.)  On December 17, 2019, this Court ordered Plaintiffs to provide Defendants with a copy of the proposed second amended complaint and directed the parties to meet and confer about whether Defendants would consent to such amendment.  (Dkt. 215.)  Defendants ultimately consented, and, on January 10, 2020, Plaintiffs filed their second amended complaint, which remains the operative Complaint.  (Dkt. 230.)

The operative Complaint contains over 100 paragraphs dedicated to showing how and why this Court purportedly has jurisdiction over Defendants.  (*See* Compl. ¶¶ 550-644 (entitled "Additional Phase I Jurisdictional Averment per December 18, 2019 Court Order").)  It bears noting that, in light of the procedural history detailed above, Plaintiffs had a preview of Defendants' arguments on the First Amended Complaint's alleged jurisdictional deficiencies in preparing the operative Complaint.

On January 13, 2020, Judge Woods denied Defendants' motions to dismiss the first amended complaint as moot and set a briefing schedule for the instant motions.  (Dkt. 231.)  On February 3, 2020, Defendants filed the instant motions to dismiss.  (Dkt. 238, 244, 251, 253, 256, 260, 263, 265.)  On February 22, 2020, Plaintiffs filed their respective oppositions (Dkt. 270, 271, 272, 273) and, three days later, renewed their motion for jurisdictional discovery.  (Dkt. 293.)  On March 9, 2020, Defendants filed their respective replies (Dkt. 295, 297, 298, 299, 301, 302, 304, 305) and opposed Plaintiffs' renewed request for jurisdictional discovery.  (Dkt. 296, 303, 307.)

Then, on March 27, 2020, Plaintiffs filed a letter motion for leave to submit supplemental evidence in further support of their oppositions to Defendants' bid for dismissal.  (Dkt. 311.)  On April 1, 2020, the FIB Defendants opposed, and defendant BNB joined in that opposition.  (Dkt. 312, 313.)  On April 10, 2020, Plaintiffs filed a reply letter in further support of their request for this Court to consider the supplemental evidence submitted on March 27, 2020.  (Dkt. 314.)

## Discussion

Across their separate motions to dismiss, Defendants each assert four bases for dismissal:  (1) Plaintiffs lack personal jurisdiction over each of Defendants; (2) the appropriate forum for Plaintiffs' claims is Bulgaria, not the Southern District of New York; (3) Plaintiffs lack standing to bring the claims asserted against Defendants; and (4) comity dictates this Court's adherence to decisions already issued by the Bulgarian courts, which

moot Plaintiffs' claims before this Court.[1]  The Court will address these arguments in turn, grouping Defendants where they assert identical bases for dismissal.

## A.    Personal Jurisdiction

All but one of Defendants – which largely consist of Bulgarian entities and persons – argue that the Court lacks personal jurisdiction over them.  Plaintiffs oppose, arguing that the dealings described above "made New York the financial center of" the SBP and the monies associated with it and that the Defendants should have expected to be haled here for related disputes.  The Court finds that it does not have personal jurisdiction over Defendants.

### 1.    General Principles of Personal Jurisdiction

When served with a Rule 12(b)(2) motion to dismiss, "[t]he plaintiff bears the burden of establishing that the court has jurisdiction over the [relevant] defendant[s]." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001); *see also Universal Trading & Investment Co. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 54 (2d Cir. 2014) (summary order) ("Plaintiffs bear the burden of establishing that a court

---

[1] Defendant BNYM is the only Defendant that does not assert arguments for lack of personal jurisdiction, resting instead on the arguments for dismissal pursuant to collateral estoppel, forum non conveniens, lack of standing, and comity.  (*See* Dkt. 254, Memorandum of Law in Support of the Bank of New York Mellon Corporation's Motion to Dismiss, ("BNYM Mem."), at 2 n.1.)  All other Defendants incorporate by reference the arguments proffered in motions made by the FIB Defendants and defendant BNB, each of which assert all four bases for dismissal outlined.  (*See* Dkt. 250, Memorandum of Law in Support of the Bulgarian Companies' Motion to Dismiss, ("Bulgarian Co. Mem."), at 1; Dkt. 252, Memorandum of Law in Support of Defendant Philip Robert Harris's Motion to Dismiss, ("Harris Mem."), at 1 n.1; BNYM Mem. at 2 n.1; Dkt. 262, Memorandum of Law in Support of Defendants Delyan Peevski and Intrust PLC's Motion to Dismiss, ("Peevski Mem."), at 1 n.2; Dkt. 264, Eaton Vance Management's Memorandum of Law in Support of its Motion to Dismiss, ("Eaton Vance Mem."), at 2 n.1; Dkt. 266, Defendant Bulgartabac Holding AD's Supplemental Memorandum of Law in Support of Its Motion to Dismiss, ("Bulgartabac Mem."), at 1.)

has jurisdiction over a defendant").  To carry that burden, "a plaintiff must make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)); *see also Whitaker*, 261 F.3d at 208 ("A plaintiff may carry this burden by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction") (internal quotation marks and citations omitted); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993) ("To survive the motion to dismiss, [plaintiff] was required to make only a prima facie showing that [defendant] is amenable to personal jurisdiction in New York").  "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 196-97 (S.D.N.Y. 2018) (quoting *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 81 (2d Cir. 2018)).

In evaluating whether a plaintiff has surpassed this bar, the Court may consider the allegations proffered in plaintiff's complaint, along with plaintiff's "own affidavits and supporting materials," construing such materials "in the light most favorable to plaintiffs" and "resolving all doubts in their favor." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *Whitaker*, 261 F.3d at 208 ("A plaintiff can make this showing through his own affidavits and supporting materials containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant.  Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.") (internal quotation marks and

citations omitted); *A.I. Trade Finance, Inc.*, 989 F.2d at 79-80 ("where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party").  But the Court "need not . . . accept a legally conclusory assertion or draw 'argumentative inferences.'"  *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d. 736, 757 (S.D.N.Y. 2004); *see also In re SSA Bonds Antitrust Litigation*, 420 F. Supp. 3d 219, 229 (S.D.N.Y. 2019) ("On a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Personal jurisdiction may be either general or specific.  "A court's general jurisdiction . . . is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts."  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).  To assess whether general jurisdiction can be exercised, "courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'"  *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) and collecting cases).  Following that inquiry, courts will next assess "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of the particular case." *Id.* (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

To sufficiently allege specific jurisdiction, "[a] plaintiff must have a state-law statutory basis for jurisdiction and demonstrate that the exercise of personal jurisdiction

comports with due process." *Charles Schwab Corp.*, 883 F.3d at 82; *Licci ex rel. Licci*, 732 F.3d at 168 (describing the "two-step inquiry" involved in assessing whether a district court has jurisdiction over a foreign defendant). Accordingly, the Court "must look first to the long-arm statute of the forum state, in this instance New York," to determine whether it has a basis to assert jurisdiction over a defendant. *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997).

If jurisdiction is not available under the relevant state long-arm statute, "th[e] Court will then engage in a Rule 4(k)(2) analysis and examine the extent of the . . . defendants' contacts with the United States as a whole to determine whether the exercise of personal jurisdiction comports with the requirements of the Due Process Clause." *Daventree Ltd.*, 349 F. Supp. 2d at 758 (referring to Fed. R. Civ. P. 4(k)(2)). Commonly known as the "federal long-arm statute," Rule 4(k)(2) "allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and laws." *Porina*, 521 F.3d at 127 (quoting Fed. R. Civ. P. 4(k)(2)); *see also Dardana Ltd. v. Yugoskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) (Rule 4(k)(2) confers personal jurisdiction over a defendant where "defendant is not subject to personal jurisdiction in any state . . . so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment"). Rule 4(k)(2) was "specifically designed to 'correct[ ] a gap' in the enforcement of federal law in international cases" by allowing federal courts to exercise jurisdiction over a defendant "with enough contacts with the United States to satisfy due process, but not enough contacts with any single state to

support jurisdiction under a state's long-arm" statute.  *Porina*, 521 F.3d at 126; *In re SSA Bonds Antitrust Litigation*, 420 F. Supp. 3d at 240.

Plaintiffs assert distinct bases for personal jurisdiction for each of Defendants, most of whom are foreign entities or individuals without obvious ties to the United States. (*See* Dkt. 139 ("These cases are centered on events, property, and persons in Bulgaria and to some degree Texas").)  For defendant Harris, Plaintiffs assert both general and specific jurisdiction under CPLR §§ 301 and 302(a)(1)–(3), New York's long-arm statute. For the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and defendant Bulgartabac, Plaintiffs assert jurisdiction under only CPLR § 302(a)(3).  For defendant BNB, Plaintiffs assert jurisdiction under 28 U.S.C. § 1605(a)(2), one of the stated exceptions to the Foreign Sovereign Immunities Act (the "FSIA").  For all but defendant Harris, Plaintiffs argue that, even if no state long-arm jurisdiction can be exercised, the Court has jurisdiction over each of Defendants pursuant to Rule 4(k)(2), the federal long-arm statute.  Defendants uniformly oppose, arguing that Plaintiffs have failed to make the requisite showing of prima facie jurisdiction under any of the statutes cited.  Defendants are correct.

To ensure that each of Plaintiffs' arguments – some specific to a particular defendant, some widely overlapping – are addressed, the Court assesses them defendant by defendant.

### 2.    Defendant Harris

Plaintiffs assert jurisdiction over defendant Harris, the President and General manager of defendant Ayr (a Texas-based company) and its subsidiary companies including but not limited to defendant APD, pursuant to CPLR §§ 301 and 302(a)(1)–(3).

(Compl. ¶ 3.)  Specifically, Plaintiffs allege that this Court should exert jurisdiction over defendant Harris, among others, because he "transact[s] substantial business in New York State, the causes of action asserted in this lawsuit arise directly out of Harris['] . . . tortious acts both within New York and outside New York partly on behalf of and directly through Ayr[,] which caused injury to persons and property within New York."  (Compl. ¶ 3.)  Plaintiffs also point to the Supplemental Agreement (to which Plaintiffs and defendant Ayr are parties) as a basis for jurisdiction over defendant Harris, arguing that "the agreements upon which this claim in part arises specifically provide for venue in the State of New York as well as subject matter and personal jurisdiction in the State of New York." (*Id.*)  Defendant Harris contends that he is not a party to the Supplemental Agreement and that Plaintiffs have otherwise failed to satisfy the pleading burden necessary for this Court to assert either general or specific jurisdiction over him.  The Court agrees; there is no basis to assert personal jurisdiction over defendant Harris.

### a.    "Alter Ego" Jurisdiction

As an initial matter, the Court must assess whether it can – and, if so, should – pierce the corporate veil between defendant Harris and defendant Ayr, a Texas-based company of which defendant Harris is President and General Manager for purposes of jurisdiction.

The Second Circuit has long-recognized that, under certain circumstances, due process permits courts to exercise personal jurisdiction over an individual or a corporation where such person or entity is "an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."  *In re Platinum and Paladium Antitrust Litigation*, No. 14 Civ. 9391, 2017 WL 1169626, at *46 (S.D.N.Y. March 28, 2017) (Woods,

J.) (quoting *Transfield ER Cape Ltd. v. Industrial Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009); *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196-97 (2d Cir. 2005) (summary order) (affirming district court's exercise of jurisdiction over foreign corporation where that corporation was a "mere department" of another corporation subject to jurisdiction in New York).

The parties both invoke New York law in assessing whether to pierce the corporate veil here. (*See* Harris Mem. at 3 ("Under New York law, the separate existence and status of a corporation is not lightly disregarded because it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners") (quoting *Music Mix Mobile LLC v. Newman*, 592 B.R. 292, 302 (Bankr. S.D.N.Y. 2018)); Dkt. 272, Plaintiff's Opposition to Defendant Philip Robert Harris' Motion to Dismiss ("Pl. Harris Opp."), at 4 n.9 ("Since the subject parties assume New York law controls this issue . . . implied consent is sufficient to establish choice of law") (quoting *Miramax Film Corp. v. Abraham*, No. 01 Civ. 5202, 2003 WL 22832384, at *6 (S.D.N.Y. 2003)).) "To pierce the corporate veil under New York law, a plaintiff must establish (1) 'that the owner exercised complete domination over the corporation with respect to the transaction at issue' and (2) 'that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 726 (S.D.N.Y. 2017) (quoting *Thrift Drug, Inc. v. Universal Prescription Administrators*, 131 F.3d 95, 97 (2d Cir. 1997)).

A number of courts in this District have concluded that the standard for veil piercing is "relaxed where the alter ego theory is used not to impose liability, but merely to establish jurisdiction." *In re Platinum and Paladium Antitrust Litigation*, 2017 WL 1169626, at *47

(quoting *International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) and collecting cases); *D. Klein & Son, Inc.*, 174 F. App'x at 196 ("the exercise of personal jurisdiction over an alleged alter ego . . . requires application of a 'less onerous standard' than that necessary to pierce the corporate veil for liability purposes under New York law") (citations omitted).   Indeed, in assessing whether the corporate veil should be pierced for jurisdictional purposes, a reviewing court should focus only on whether "the corporation is a mere shell for its owner" (not whether the shell was used to commit a fraud) as "[i]f the corporation is merely a shell, it is equitable, even if the shell may not have been used to perpetrate a fraud, to subject its owner personally to the court's jurisdiction to defend the acts he has done on behalf of his shell." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 903 (2d Cir. 1981); *see also In re Platinum-Beechwood Litigation*, 427 F. Supp. 3d 395, 469 (S.D.N.Y. 2019) ("Personal jurisdiction over an alter ego defendant can be exercised where the allegedly controlled entity was a shell for the allegedly controlling party; it is not necessary to show also that the shell was used to commit a fraud") (quoting *International Equity Investments*, 475 F. Supp. 2d at 459).

In assessing whether a corporation amounts to a "mere shell" of its owner, the Court should consider several factors:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm[']s length, (8) whether the corporations are treated as independent profit centers, (9) the payment or

> guarantee of debts of the dominated corporation by other corporations in
> the group, and (10) whether the corporation in question had property that
> was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139

(2d Cir. 1991); *see also Cardell Financial Corp. v. Suchodolski Associates*, No. 09 Civ.

6148, 2012 WL 12932049, at *20 (S.D.N.Y. July 17, 2012), *report & recommendation

adopted*, 896 F. Supp. 2d 320 (S.D.N.Y. 2012).  "These factors are not exhaustive, nor is

proof of any one factor or a combination of factors necessarily determinative.  Rather, a

finding that a corporation is an alter ego of another entity is warranted when doing so will

achieve an equitable result."  *Miramax Film Corp.*, 2003 WL 22832384, at *8.

Plaintiffs assert that the veil between defendant Harris and defendant Ayr should

be pierced – leaving defendant Harris "absolutely subject to personal jurisdiction in this

forum" – because "[i]mproper use of the corporate form in order to enable the company

to incur liabilities without recourse by the creditor to company assets is conduct which

can support piercing the corporate veil."  (Pl. Harris Opp. at 6.)  But, aside from conclusory

allegations peppered throughout the Complaint that defendant Harris "treated Ayr as an

alter ego at all times relevant herein" and "completely dominated" Ayr, Plaintiffs fail to

assert any facts to show that defendant Ayr did not observe corporate formalities,

intermingled corporate funds with defendant Harris' own personal funds, or otherwise

functioned as a "mere shell" for defendant Harris.  (*See* Compl. ¶¶ 17, 56, 266-273.).

Such "scant allegations" on the relationship between defendant Harris and defendant Ayr

do not amount to a prima facie showing that this Court may exercise personal jurisdiction

over defendant Harris as defendant Ayr's alter ego.  *See In re Platinum and Palladium

Antitrust Litigation*, No. 14 Civ. 9391, 2017 WL 1169626, at *48 (S.D.N.Y. March 28, 2017)

(declining to exercise jurisdiction on alter ego theory where complaint failed to address whether the alleged "shell" company observed corporate formalities, had intermingled funds with its owners, or shared office space or addresses with its owners); *J.L.B. Equities, Inc. v. Ocwen Financial Corp.*, 131 F. Supp. 2d 544, 549-50 (S.D.N.Y. 2001) (declining to exercise jurisdiction over "mere department" subsidiary company where plaintiff failed to demonstrate that subsidiary was dependent on parent for funds, that parent intruded on subsidiary's personnel decisions or corporate formalities, or that parent otherwise exerted "any significant level of control" over the subsidiary); *see also Miami Products & Chemical Co. v. Olin Corporation*, No. 19 Civ. 385, 2020 WL 1482139, at *30 (W.D.N.Y. March 27, 2020) (collecting cases).

Given that there is no personal jurisdiction over defendant Harris based on veil piercing, the Court will assess whether it may exercise general or specific jurisdiction over defendant Harris as an individual.

### b.    CPLR § 301:  General Jurisdiction

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011); *see also Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 512 (S.D.N.Y. 2016) (rejecting claims of general jurisdiction where individual defendant was not domiciled in New York).  Plaintiffs do not posit – in the Complaint or in the instant briefing – that defendant Harris, a Texas resident, is domiciled in New York.  Accordingly, there is no basis for this Court to exercise general jurisdiction over him.

### c.  CPLR § 302(a)(1)–(3):  Specific Jurisdiction

Although neither Plaintiffs nor defendant Harris take care to address each subsection of New York's long-arm jurisdiction statute, the Court will do so given Plaintiffs' assertions of jurisdiction under all subsections.

**CPLR § 302(a)(1).**  "To establish personal jurisdiction under section 302(a)(1), two requirements must be met:  (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (citation omitted).  "A defendant transacts business within the meaning of § 302(a)(1) when it purposefully 'avails itself of the privilege of conducting activities [in New York], thus invoking the benefits and protections of its laws.'"  *Minnie Rose LLC*, 169 F. Supp. 3d at 513-14 (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 849 N.Y.S.2d 501 (2007)).  And, to assess whether such is so, "courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).

As emphasized by Plaintiffs, "Section 302(a)(1) is a 'single act' statute," meaning that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *HDtracks.com, LLC v. 7digital Group PLC*, No. 18 Civ. 5823, 2019 WL 6170838, at *5 (S.D.N.Y. Nov. 19, 2019) (internal quotation marks and citation omitted).  For a claim to have a "substantial relationship" with the transaction(s) justifying long-arm jurisdiction, the connection between the two must be more than "merely coincidental."

27

*Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (quoting *Johnson v. Ward*, 4 N.Y.3d 516, 520, 797 N.Y.S.2d 33 (2005)); *see also DirecTV Latin America, LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 417-18 ("claim aris[es] from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon or when there is a substantial relationship between the transaction or the claim asserted") (citation omitted).

**CPLR § 302(a)(2).**   CPLR § 302(a)(2) permits a court to "exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act within the state."   CPLR § 302(a)(2).   As is apparent on its face, "physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)," making this subsection only applicable to "tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act."   *Backus v. U3 Advisors, Inc.*, No. 16 Civ. 8990, 2017 WL 3600430, at *12 (S.D.N.Y. Aug. 18, 2017) (quoting *Bank Brussels Lambert*, 171 F.3d at 790).

**CPLR § 302(a)(3).**   CPLR § 302(a)(3) permits New York courts to "exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . if [the tortfeasor] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."   CPLR § 302(a)(3); *see also Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 448 (S.D.N.Y. 2000) ("CPLR § 302(a)(3) requires

commission of a tortious act outside New York State which causes injury within the state. Additionally, under the prong of § 302(a)(3)(ii), the defendant must expect that the tort will have consequences in the State and the defendant must derive substantial revenue from interstate commerce"); *Levisohn, Lerner, Berger & Langsam v. Medical Taping Systems, Inc.*, 10 F. Supp.2d 334, 342 (S.D.N.Y. 1998) (describing pleading requirements to successfully assert personal jurisdiction under CPLR § 302(a)(3)(ii)).

Plaintiffs' allegations fail to make a prima facie showing of jurisdiction under any of the three prongs of New York's long-arm statute. Without specifically referencing CPLR § 302(a), Plaintiffs allege that defendant Harris subjected himself to jurisdiction under at least one (if not all) of its subsections by sending letters from Texas as President and General Manager of Ayr to representatives of Bulgarian entities, which describe future transactions to occur through various New York banks between November 2010 and January 2011. (Pl. Harris Opp. at 2; Dkt. 290-2 at 107-08 (November 14, 2010 letter), 117-120 (December 3, 2010 letter).) In a footnote, Plaintiffs make the additional assertion that "[t]he role of defendant Harris, individually and through his control of Ayr, is set out in hundreds of references in the [Second] Amended Complaint" and in several cited declarations without citing any particular paragraphs of that complaint. (Pl. Harris Opp. at 1 n.3.) But, as with the FIB Defendants discussed below, the Complaint does little to show that Harris' limited connections to New York justify exercising long-arm jurisdiction here.

Indeed, Plaintiffs fail to point to any actions taken by defendant Harris in his individual capacity that caused the injuries alleged in the Complaint, relying only on actions taken by him in his capacity as President and General Manager of Ayr, which, as

this Court has already held, cannot serve as a basis for finding that it may exercise jurisdiction over Harris here.  Without that, Plaintiffs have failed to make a prima facie case of jurisdiction under CPLR § 302(a)(1)–(3), all of which necessitate a showing that defendant Harris committed some sort of act – whether a business transaction or a tortious act – in his individual capacity.

The only remaining argument proffered by Plaintiffs is that the choice of law provision contained in the Supplemental Agreement subjects defendant Harris to jurisdiction here.  (Compl. ¶ 3; Pl. Harris Opp. at 2; Dkt. 301, Reply Memorandum of Law in Support of Defendant Philip Robert Harris's Motion to Dismiss, ("Harris Reply Mem."), at 1-2.)  As indicated above, the Supplemental Agreement included a broad choice of law provision in which the parties agreed that "the U.S. Federal District Court in New York . . . shall have jurisdiction over any dispute or controversy and/or shall be the one to make a determination or a decision on any rights and/or a claim concerning the exercise of any rights or meeting any liability of any of the parties hereto."  (Dkt. 1, Ex. F at 3-4.)  The signatories to the Supplemental Agreement were defendant Ayr (represented by plaintiff Tomov) and plaintiffs Asset Management and All Seas 2.  (Dkt. 1, Ex. F at 5.)  Defendant Harris did not sign the Supplemental Agreement.  (*Id.*)

Under New York law, "only parties in privity of contract may enforce terms of the contract such as a forum selection clause."  *Dean Street Capital Advisors, LLC v. Otoka Energy Corp.*, No. 15 Civ. 0824, 2016 WL 413124, at *3 (S.D.N.Y. Feb. 1, 2016) (citation omitted).  Courts will make an exception to this rule where "a party qualifies as an intended third-party beneficiary of the contract under which they seek to bring suit."  *Id.*  To qualify as an intended third-party beneficiary to a contract, that non-party "must be the intended

30

beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (citation omitted).

Plaintiffs expend few words on their argument that defendant Harris is subject to jurisdiction under the Supplemental Agreement, and rightly so. As defendant Harris is not a party to the contract, and as Plaintiffs have made no allegation that Harris was somehow a third-party beneficiary to that contract, the Court cannot subject defendant Harris to its terms, including its choice of law provision. Plaintiffs thus have not sufficiently alleged any basis for personal jurisdiction over defendant Harris.

### 3.   FIB Defendants[2]

Plaintiffs argue that the Court has jurisdiction over the FIB Defendants pursuant to New York's long-arm statute, CPLR § 302(a)(3), or, alternatively, pursuant to Rule 4(k)(2), in light of their participation in the convoluted "civil conspiracy" set forth in the background section above. (*See* Compl. ¶ 4 (pleading jurisdiction over the FIB Defendants under CPLR § 302(a)(3) "because FIB was a co-conspirator with, inter alia, Harris, Harriott, and Angelov" and knew or should have known that its actions would have a "direct effect in the United States"); Compl. ¶ 6 (pleading jurisdiction over "the foreign defendants" pursuant to Rule 4(k)(2)).). The FIB Defendants oppose, arguing that Plaintiffs summarily

---

[2] The Court acknowledges the FIB Defendants' argument that this Court should be collaterally estopped from considering questions of personal jurisdiction over the FIB Defendants and forum non conveniens in light of the Northern District of Texas' decision in *Fibank I*. (Dkt. 239, Memorandum of Law in Support of the Fibank Defendants' Motion to Dismiss, ("FIB Mem."), at 6-7.) While certainly similar, and while the *Fibank I* decision informs this Court's analysis of the issues at bar, the questions of whether the FIB Defendants have jurisdiction pursuant to New York's long-arm statute and whether New York serves as a convenient forum for this litigation are not identical to the issues litigated there, which appropriately focused on Texas. (*See generally Fibank I.*)

fail to meet their burden to make a prima facie case of jurisdiction under either of the cited statutes.  (*See* FIB Mem. at 7-10.)  The FIB Defendants are correct.

### a.     New York Long-Arm Jurisdiction:  CPLR § 302(a)(3)(ii)

As explained above, CPLR § 302(a)(3) requires commission of a tortious act outside New York State which causes injury within the state.  *Best Cellars Inc.*, 90 F. Supp. 2d at 448.  Whether or not personal jurisdiction may be exercised over the FIB Defendants under this provision of New York's long-arm statute turns on what qualifies as causing "injury within the state."

To determine whether out-of-state tortious activity caused "injury" in New York for purposes of CPLR § 302(a)(3), courts "apply a situs-of-injury test, which asks them to locate the original event which caused the injury." *Banker v. Esperanza Health Systems, Ltd.*, 201 F. App'x. 13, 16 (2d Cir. 2006) (summary order) (quoting *Whitaker*, 261 F.3d at 209); *see also Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990) (defining the "situs of injury" as "the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff") (citation omitted).

Courts have held the situs of a "nonphysical commercial injury" to be "the place where the critical events associated with the dispute took place and not where the resultant monetary loss occurred."  *Darby Trading Inc. v. Shell International Trading and Shipping Co.*, 568 F. Supp. 2d 329, 337 (S.D.N.Y. 2008) (internal quotation marks and citation omitted); *see, e.g.*, *Banker*, 201 F. App'x at 16 (affirming that district court lacked jurisdiction because "situs of injury" for the alleged fraudulent scheme was the location where defendants "devised and carried out their alleged plan" (there, Texas or California, not in New York where plaintiff felt the effects)); *AVRA Surgical Robotics, Inc. v. Gombert*,

41 F. Supp. 3d 350, 362 (S.D.N.Y. 2014) (concluding that "situs of injury" for alleged breaches of fiduciary duty was Germany, not New York, where defendants' alleged malfeasance was centered on conduct that occurred in Germany); *Bank of New York Mellon v. SACE S.p.A.*, No. 10 Civ. 2510, 2011 WL 102728, at *5 (S.D.N.Y. Jan. 6, 2011) (concluding that the "critical events" associated with a contract dispute included the "negotiation and execution" of such contracts).

When applying the "situs of injury" test, courts in this Circuit have repeatedly and emphatically held that "residence or domicile of the injured party within [New York] is not a sufficient predicate for jurisdiction" under CPLR § 302(a)(3). *Troma Entertainment, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013) (quoting *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 787 (1980)). "Honoring this principle, we have rejected as insufficient to support the exercise of jurisdiction over a defendant's allegations of 'remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here.'" *Id.* (quoting *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir. 1975)). Put differently, "the suffering of economic damages in New York is insufficient, alone, to establish a 'direct' injury in New York for CPLR § 302(a)(3) purposes." *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 38 (2d Cir. 2010); *see also United Bank of Kuwait, PLC v. James M. Bridges, Ltd.*, 766 F. Supp. 113, 116 (S.D.N.Y. 1991) ("The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York").

The "situs of injury" test – and the limitations it places on the exercise of personal jurisdiction under CPLR § 302(a)(3)(ii) – was "designed to prevent injuries directly or fortuitously connected to New York from providing the basis for personal jurisdiction." *Levisohn, Lerner, Berger & Langsam*, 10 F. Supp. 2d at 343.  While certain courts have acknowledged difficulties in applying the "situs of injury" test to cases involving "less obvious factual circumstances" (e.g., medical malpractice cases, copyright infringement, "improper discharge" from employment), those courts have largely found ways to apply it to the facts at bar.  *See Levans v. Delta Airlines, Inc.*, 988 F. Supp. 2d 330, 337-38 (E.D.N.Y. 2013) (discussing examples).

Here, the FIB Defendants contend that the "situs of injury" – the "original event" that caused Plaintiffs' alleged injury – was Bulgaria, where "the alleged diversion of funds" took place.  (FIB Mem. at 8-9.)  Plaintiffs respond with contradicting arguments.  At first, Plaintiffs argue that the "situs of injury" is clearly New York as the FIB Defendants "devised and developed a plan with Harrys and Ayr in New York, targeting New York, and designating New York as the theater of action."  (Dkt. 270, Plaintiff's Opposition to Defendants First Investment Bank, AD, Tseko Todorov Minev, and Ivailo Dimitrov Mutafchiev's Motion to Dismiss, ("Pl. FIB Opp."), at 25.)  But Plaintiffs immediately proceed to argue that, in light of the "complex series of events" underlying the instant case, "there is no one single 'determinable' situs of injury but many, because there were many critical events that led to Plaintiffs' injuries," some of which happened in New York or specifically contemplated actions to be taken in New York.  (Pl. FIB Opp. at 26.)  As a result, Plaintiffs argue that even though "some of the 'original events' occurred outside of New York," the fact that "critical events" occurred in New York should mean that it served

as one of the "situses" of Plaintiffs' injuries and that New York accordingly has long-arm jurisdiction over the FIB Defendants.  (*Id.*)

Purportedly in support of this alternative application of the "situs of injury" test, Plaintiffs refer the Court to *Study Logic, LLC*, a decision issued by the Eastern District of New York.  *Study Logic, LLC v. Farmer Bros. Co.*, No. 18 CV 1645, 2019 WL 3412114 (E.D.N.Y. July 29, 2019).   While informative, *Study Logic, LLC* in no way supports Plaintiffs' arguments.   There, the Eastern District specifically rejected the plaintiff's argument that "different rules apply" in cases where the "situs of injury" was "more challenging to identify."  2019 WL 3412114 at *3-4.  In doing so, the Court distinguished the plaintiff's claims – involving improper access and use of an Excel spreadsheet containing the plaintiff's proprietary data – from the cited line of cases where courts had taken an alternative approach to assessing the "situs of injury."   *Id.*  Those cases, the court noted, involved online copyright infringement where the subject materials were posted to the internet, making the material available "for anyone, in New York or elsewhere, with an internet connection to read and download" for free and leaving the courts unable to identify a single situs of injury.   *Id.* at *3.  While also involving "digital matter," the court noted that the plaintiff's claims involved data that was "never uploaded to the internet" and could only be accessed by certain persons, making "the locus of the event causing the injury . . . determinable."   *Id.* at *4.  The court then concluded that, as the case "mirror[ed] a traditional commercial tort, the Court must use the injury-situs test." *Id.*  The Court proceeded to apply that test, swiftly concluding that because the defendant "committed all crimes that led to the injury in Texas," the situs of injury was Texas, not New York, and the Court did not have long-arm jurisdiction over the defendant.   *Id.*

Despite Plaintiffs' arguments to the contrary, the application of the situs of injury test here is indeed "as simple as [the FIB Defendants] make it seem."  (Pl. FIB Opp. at 25.)  As indicated in its very first paragraph, Plaintiffs allege that Defendants, acting in concert, "unlawfully misappropriated" the $65 million proceeds from the December 15, 2012 sale of the land underlying the SBP by "fraudulently and illegally diverting the funds to themselves through a series of corrupt business and regulatory actions, to their personal enrichment."  (Compl. ¶ 1.)  The purportedly fraudulent and illegal diversion occurred in October 2014, when the FIB Defendants generated a fraudulent payment order calling for CCB – the Bulgarian bank holding the monies at issue – to release those funds to the FIB Defendants.  (Compl. ¶¶ 188-194.)  That alleged fraud, perpetrated by Bulgarian-based Defendants over Bulgarian funds held in Bulgarian banks, is what moved the $65 million at issue from Plaintiffs' grasp.  Without question, the situs of Plaintiffs' injuries resulting from the alleged fraud is Bulgaria.

Plaintiffs' remaining arguments are without merit.  As stated in their opposition briefing, Plaintiffs' arguments that this Court has jurisdiction over the FIB Defendants are largely premised on the fact that "Plaintiffs suffered damages in New York, specifically, the payments that Ayr had promised to make through banks in New York pursuant to the Supplemental Agreement . . . were never made and the Ayr-developed Reorganization Plan [for APD] never took off, to Plaintiff's detriment as Ayr's creditors."  (Pl. FIB Opp. at 25.)  But, as indicated above, the "situs of injury" test was intended to prevent "injuries indirectly or fortuitously connected to New York from providing the basis for personal jurisdiction." *Levisohn, Lerner, Berger & Langsam*, 10 F. Supp. 2d at 343.

Indeed, the Second Circuit has repeatedly cautioned that "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York."  *Whitaker*, 261 F.3d at 209 (quoting *United Bank of Kuwait, PLC*, 766 F. Supp. at 116); *see also Timothy Coffey Nursery Landscape Inc. v. Soave*, 760 F. App'x 58, 61 (2d Cir. 2019) (summary order) (affirming refusal to exercise long-arm jurisdiction under CPLR § 302(a)(3) where alleged fraud and conversion took place in Canada, and the only injury suffered in New York was financial loss).  Although Plaintiffs assure this Court that their case "is not one of mere fortuitous financial consequences felt in New York" (Pl. FIB Opp. at 26), Plaintiffs make no effort to substantiate that claim with respect to the FIB Defendants, nor could they.  Plaintiffs do allege that they suffered financial losses in New York.  But that loss, standing alone, does not permit this Court to hear their claims against the FIB Defendants.

Plaintiffs' arguments that the FIB Defendants' role as alleged "co-conspirators" serves as an avenue for long-arm jurisdiction under CPLR § 302(a)(3) are similarly unavailing.  While Plaintiffs correctly note that CPLR § 302(a)(3)(ii) contemplates that a party could be subject to jurisdiction in New York due to the actions of an "agent," that term does not somehow negate the statute's other requirements, namely that those actions "caus[ed] injury to person or property within the state" and that the party "expects or should reasonably expect the act to have consequences in the state" and "derives substantial revenue from interstate or international commerce."  CPLR § 302(a)(3)(ii).  As discussed in detail above, Plaintiffs have failed to show that the FIB Defendants' actions

caused injury in New York that could warrant exercising jurisdiction over them pursuant to CPLR § 302(a)(3).  That is fatal to their argument.

Finally, Plaintiffs' arguments regarding "co-conspirator" jurisdiction are misplaced. While Plaintiffs are correct that courts have recognized "co-conspirator" jurisdiction, they have only done so when jurisdiction is asserted under CPLR § 302(a)(2).  *See In re SSA Bonds Antitrust Litigation*, 420 F. Supp. 3d at 234 ("Pursuant to § 302(a)(2), New York courts have recognized that jurisdiction may extend to out-of-state individuals if they have an agent or co-conspirator physically present in New York who committed a tort in furtherance of a conspiracy"); *Daventree Ltd.*, 349 F. Supp. 2d at 759 (holding that courts may exercise jurisdiction over defendants "based on the acts of their putative co-conspirators if plaintiffs have alleged facts sufficient" to show, among other things, "that a putative co-conspirator committed a tort or transacted business within New York within the meaning of CPLR § 302(a)(1) or (a)(2)"); *Heinfling v. Colapinto*, 946 F. Supp. 260, 265 (S.D.N.Y. 1996) (assessing jurisdiction under "agency theory based on an alleged conspiracy" between defendants pursuant to CPLR § 302(a)(2)).  Plaintiffs recognize as much in recounting the standards for exercising long-arm jurisdiction over a co-conspirator in New York.  (*See* Pl. FIB Opp. at 24-25 (repeatedly referencing the need for "New York co-conspirators" in pleading long-arm jurisdiction over co-conspirators) (quoting *Heinfling*, 946 F. Supp. at 265).)  But Plaintiffs only assert long-arm jurisdiction over the FIB Defendants under CPLR § 302(a)(3), not § 302(a)(2).

Accordingly, the Court does not have jurisdiction over the FIB Defendants under New York's long-arm statute.

### b.    Rule 4(k)(2)

Plaintiffs alternatively assert that the FIB Defendants are subject to jurisdiction in this Court under Rule 4(k)(2) – the "federal long-arm statute" – based on their connections with the United States as a whole.  Again, Rule 4(k)(2) establishes personal jurisdiction where (1) the claim arises under federal law; (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (3) exercising jurisdiction is consistent with the United States Constitution and laws.  *Havlish v. Royal Dutch Shell PLC*, No. 13 Civ. 7074, 2014 WL 4828654, at *4 (S.D.N.Y. Sept. 24, 2014) (internal quotations omitted).

It is undisputed that the first two elements of Rule 4(k)(2) have been met here – Plaintiffs raise claims under civil RICO, and the FIB Defendants are not subject to personal jurisdiction in any other state.  The question remains, then, whether this Court's exercise of jurisdiction pursuant to Rule 4(k)(2) would be "consistent with the United States Constitution and law" (i.e., would be consistent with constitutional due process). To answer it, the Court must address:  (1) "whether the defendant has sufficient minimum contacts with the United States" and (2) "whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case."  *Freeplay Music, LLC v. Nian Infosolutions Private Limited*, No. 16 Civ. 5883, 2018 WL 3639929, at *13 (S.D.N.Y. July 10, 2018) (quoting *Porina*, 521 F.3d at 127).  As part of its minimum contacts analysis, the Court typically considers two types of jurisdiction:  general and specific, as discussed in detail above (albeit in the context of New York's long-arm statute).  *Id.*  To recap, "[s]pecific jurisdiction exists where a forum exercises personal jurisdiction over a defendant 'in a suit arising out of or related to the defendant's contacts with the forum.'"

*Porina*, 521 F.3d at 128 (quoting *Helicopteros*, 466 U.S. at 414 n.8).  General jurisdiction "is based on a defendant's general business contacts with the forum, and 'permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.'"  *Id.* (quoting *Metropolitan Life*, 84 F.3d at 568).

Plaintiffs only assert that the FIB Defendants are subject to specific jurisdiction under Rule 4(k)(2), specifically noting that they "do not argue that traditional general jurisdiction exists over these three Defendants."  (Pl. FIB Opp. at 23 n.48; *see also* Pl. FIB Opp. at 27.)   But Plaintiffs simultaneously argue that, pursuant to Rule 4(k)(2), "specific jurisdiction can be established by looking at all of Defendants' contacts with the U.S., not just those directly related to the activities at the heart of Plaintiffs' claims."  (Pl. FIB Opp. at 27 n.49.)   That is not so.  As clearly stated by the Supreme Court, "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." *Bristol-Meyers Squibb Co. v. Superior Court of California*, __ U.S. __, __, 137 S. Ct. 1773, 1780 (2017); *see also In re del Valle Ruiz*, 939 F.3d 520, 530 (2d Cir. 2019) ("unrelated contacts cannot diminish the required showing of an affiliation between the forum and the underlying controversy").  Plaintiffs' citation to *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 89 (S.D.N.Y. 1995) does not move the needle.  There, the court acknowledged the foreign defendant's general business contacts with the United States as an "additional factor" supporting personal jurisdiction where plaintiffs had already alleged business contacts specific to their underlying claims.  872 F. Supp. at 88-89. Indeed, concluding that a plaintiff could base specific jurisdiction under Rule 4(k)(2) on contacts with the United States that were unrelated to their claims would eviscerate the

distinction between "general jurisdiction" and "specific jurisdiction," which this Court cannot and will not do.

With that distinction in mind, Plaintiffs' allegations regarding the FIB Defendants' contacts with the United States do not justify the exercise of jurisdiction pursuant to Rule 4(k)(2).  Plaintiffs point to the following contacts between the FIB Defendants and the United States:  negotiations between the FIB Defendants and Angelov "in the U.S. and in particular New York, Maryland, and Texas"; their procurement and retention of an "FAA license to charter flights in New York and Chicago on their airline venture, BH Air"; and their participation in Ayr's bankruptcy case before the Northern District of Texas (from which they were dismissed for lack of personal jurisdiction).  (Pl. FIB Opp. at 27-28.)  But, as the FIB Defendants aptly observe, Plaintiffs do not, as required for specific jurisdiction, connect the FIB Defendants' alleged "negotiations" with Angelov or the flights they chartered in New York and Chicago to Plaintiffs' claims.  (*See* FIB Mem. at 13.)  And, even if they had, the "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

As for appearance in Ayr's bankruptcy case, "it is well established that a defendant does not waive its right to contest jurisdiction simply by moving to dismiss for lack thereof" as permitting such would "create an untenable 'Catch-22' in which no defendant could contest personal jurisdiction, because the act of contesting jurisdiction would itself establish jurisdiction."  *Swindell v. Florida East Coast Railway Co.*, 42 F. Supp. 2d 320, 324 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 432 (2d Cir. 1999).  Accordingly, the FIB Defendants' appearance before the Northern District of Texas for the sole purpose of successfully

contesting personal jurisdiction cannot serve as a basis for establishing minimum contacts for purposes of Rule 4(k)(2).

In short, Plaintiffs cannot establish this Court's personal jurisdiction over the FIB Defendants under either New York's long-arm statute or Rule 4(k)(2).

### 4. The Five Bulgarian Companies, the Peevski Defendants, and Defendant Bulgartabac

Plaintiffs assert jurisdiction over the Five Bulgarian Companies, the Peevski Defendants, and defendant Bulgartabac under a virtually identical theory as that asserted against the FIB Defendants, claiming that their collective contacts with alleged co-conspirators' "U.S. and New York based activities" subject them to personal jurisdiction under "the agency theory" of New York's long-arm statute or, alternatively, under Rule 4(k)(2).  (Dkt. 273, Plaintiffs' Memorandum of Points and Authorities in Support of Their Opposition to Defendants Bulgartabac Holding AD; the Five Companies; Delyan Peevski and NSN Investment, EEOD['s] . . . Motions to Dismiss, ("Pl. Consolidated Opp."), at 6-7.)  In opposition, these defendants argue that the Court lacks personal jurisdiction over them "for the same reasons that the Court lacks personal jurisdiction over" the FIB Defendants, namely that Plaintiffs fail to fulfill any of the elements necessary to make out a prima facie case of jurisdiction under either CPLR § 302(a)(3) or Rule 4(k)(2). (Bulgarian Co. Mem. at 3; Peevski Mem. at 2-6; Bulgartabac Mem. at 2-5.)  For the reasons stated above, and expanded on below, the Court agrees with these defendants.

### a. CPLR § 302(a)(3)

Plaintiffs do not specifically mention the Five Bulgarian Companies, the Peevski Defendants, or defendant Bulgartabac when identifying jurisdictional bases for each defendant in the Complaint.  Instead, these defendants appear to fall under the

Complaint's catch-all jurisdictional allegations, which assert that this Court has jurisdiction of "all other defendants" pursuant to CPLR § 302(a)(3) and "foreign defendants" pursuant to Rule 4(k)(2).  (Compl. ¶¶ 5-6.)  In their opposition papers, Plaintiffs expand on this theory, asserting that these defendants – like the FIB Defendants – are subject to long-arm jurisdiction in New York as co-conspirators that were aware of others' tortious activities in New York and benefited from them.  (Pl. Consolidated Opp. at 6-8.)  But Plaintiffs do not cite to a single specific paragraph of the Complaint in support of that contention, stating only that "the Second Amended Complaint . . . clearly demonstrates that all these Defendants were aware of Defendants Angelov and Harris' activities in New York and elsewhere in the U.S. to bring about the SBP and the theft of [t]he Funds; that they benefited from them; and that Harris, Harriott, and Ayr as co-conspirators were working at the behest of and on behalf of Fibank to assist Fibank in defrauding the SBP for the clear benefit of these named Defendants."  (*Id.* at 6-7.)

Plaintiffs apparently seek to rely on the arguments and record citations contained in their opposition to the FIB Defendants' motion to dismiss.  (*See id.* at 6 ("To save space and for the sake of brevity, Plaintiffs incorporate by reference . . . the legal framework for New York Long-Arm Statute jurisdiction set forth in its Oppositions to Defendants First Investment Bank, AD . . . and BNB's Motions to Dismiss the Second Amended Complaint").)  But this Court has already reviewed and rejected those arguments – including Plaintiffs' misguided attempts to assert "co-conspirator" jurisdiction under CPLR § 302(a)(3) – with respect to FIB, and Plaintiffs fail to provide a reason to rule differently here.

### b. Rule 4(k)(2)

Plaintiffs do not contest that the Five Bulgarian Companies, the Peevski Defendants, and defendant Bulgartabac are entities and persons based outside the United States.  The Five Bulgarian Companies consist of five entities – Tabak Market, AD; Cibole Services Incorporated, Bulgaria, EOOD; Asteria BG, EOOD; Vili Vist, EAD; and Promishleno Stroitelstvo Holding, EAD – all of which are incorporated in Bulgaria. (Compl. ¶¶ 32-36.)  Indeed, each of the Five Bulgarian Companies maintains its principal places of business in Bulgaria; none is licensed to conduct business in the United States; none "have any branches, offices, affiliates or employees in the United States;" none "travel, advertise, or solicit business in the United States;" and "no U.S. court has ever exercised jurisdiction over any of the [Five] Bulgarian Companies."  (Bulgarian Co. Mem. at 1-2.)  The Peevski Defendants are similarly Bulgarian-based.  (Compl. ¶¶ 26-27.) Defendant Bulgartabac too is a Bulgarian corporation, but purportedly "holds 22 subsidiaries in a worldwide tobacco manufacturing and distribution business" and "routinely transacts business in the United States."[3]  (Compl. ¶ 28.)  Plaintiffs assert that the Five Bulgarian Companies, the Peevski Defendants, and defendant Bulgartabac's collective "contacts with the United States and their business activities here are numerous and substantial," pointing largely to a series of actions entitled the "Peevski Plan," which involved the coordination of company and stock shares that purportedly "benefit[ed] U.S.

---

[3] As with the FIB Defendants, Plaintiffs' allegations in support of exercising personal jurisdiction pursuant to Rule 4(k)(2) are suggestive of general, as opposed to specific, jurisdiction.  But Plaintiffs do not argue that this Court should – or could – exercise general jurisdiction over the Five Bulgarian Companies, the Peevski Defendants, or defendant Bulgartabac.  (*See* Pl. Consolidated Opp. at 7-8 (section arguing Rule 4(k)(2) jurisdiction entitled "Specific Jurisdiction").)

owners" and "enable[d] the N.Y. Swap Agreement to be materialized."  (Pl. Consolidated Opp. at 7-8; *see* Tomov Decl. ¶¶ 19, 62, 99-102, 108.)

Even taking these allegations as true, Plaintiffs again fail to connect the alleged contacts with their claims and thus preclude this Court from exercising specific jurisdiction over defendants pursuant to Rule 4(k)(2).  *See Porina*, 521 F.3d at 127 (no specific jurisdiction where plaintiffs "ma[de] no serious attempt to show that their suit either arises out of, or is related to, [defendant's] contacts with the United States").  Accordingly, this Court cannot exercise jurisdiction over the Five Bulgarian Companies, the Peevski Defendants, or defendant Bulgartabac under New York's long-arm statute or Rule 4(k)(2). The claims asserted against them should be dismissed.

### 5.    The Eaton Vance Defendants

Plaintiffs assert several theories of jurisdiction over the Eaton Vance Defendants, albeit at different stages of this litigation.  Initially, Plaintiffs alleged jurisdiction over the Eaton Vance Defendants – along with all defendants not otherwise specified – under CPLR § 302(a)(3) and, in the alternative, Rule 4(k)(2).  (Compl. ¶ 5-6.)  But, in opposing the Eaton Vance Defendants' motion to dismiss, Plaintiffs appear to abandon certain of those arguments, now asserting that the Court in fact has general jurisdiction over these entities pursuant to CPLR § 301 and, in the alternative, under either the Racketeer Influenced and Corrupt Organizations Act ("RICO"), codified as 18 U.S.C.A. § 1965, or Rule 4(k)(2), the federal long-arm statute.  (Pl. Consolidated Opp. at 3-6.)  The Eaton Vance Defendants disagree, arguing that Plaintiffs have failed to present a prima facie case of general jurisdiction under New York's long-arm statute and that Plaintiffs cannot assert jurisdiction over the Eaton Vance Defendants under the RICO statute as the

Complaint fails to allege a RICO claim against them.  (Dkt. 299, Defendant Eaton Vance Management Reply Memorandum of Law in Further Support of Its Motion to Dismiss, ("Eaton Vance Reply"), at 1-3.)  The Court agrees with the Eaton Vance Defendants.

### a.   CPLR § 301:  General Jurisdiction

As the Eaton Vance Defendants are all foreign corporations, the standard for asserting general jurisdiction over them is controlled by the Supreme Court's decisions in *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and *Goodyear Dunlop Tires Operations, S.A., et al. v. Brown*, 564 U.S. 915 (2011), which permit jurisdiction over a foreign corporation "when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 122 (quoting *Goodyear*, 564 U.S. at 919); *see also International Shoe*, 326 U.S. at 316 ("due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice") (internal quotation marks and citations omitted).  The Second Circuit has held that, "except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business – the 'paradigm' cases." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).

It is undisputed that none of the Eaton Vance Defendants is incorporated in New York or maintains its principal place of business here.   Defendant Eaton Vance Management is incorporated in Massachusetts and maintains its principal place of business there.  (Compl. ¶ 39; Eaton Vance Mem. at 2, n.2.)  Defendant Parametric

Portfolio Associates (d/b/a Parametric Emerging Fund) is incorporated as a Delaware limited liability company and similarly maintains its principal place of business there. (Compl. ¶ 38; Eaton Vance Memo at 2, n.2.)   And defendant Eaton Vance Structured Emerging Markets, Inc., was incorporated in Delaware and maintained its principal place of business in Massachusetts, but was "cancelled in March 2009."   (Eaton Vance Mem. at 2, n.3.)   Plaintiffs' opposition does not dispute that Eaton Vance Structured Emerging Markets is no longer in operation, nor do they appear to allege otherwise in the Complaint. (Compl. ¶ 40; Eaton Vance Mem. at 2, n.2-3.)

Instead, Plaintiffs' entire argument rests on the notion that the Eaton Vance Defendants' "continuous and systematic business contacts with New York" present one of the "truly exceptional cases" where general jurisdiction should be found over a foreign corporation without such a direct tie to New York.   As the Supreme Court acknowledged in *Daimler*, such a "truly exceptional case" presents itself where a corporation's operations in another state are "so substantial and of such a nature as to render the corporation at home in that State."   *Daimler*, 571 U.S. at 139 n.19.   But in that same breath, the Supreme Court cautioned that "[i]t is one thing to hold a corporation answerable for operations in the forum State, quite another to expose it to suit on claims having no connection whatever to the forum State" and that a corporation "that operates in many places can scarcely be deemed at home in all of them."   *Id.* at 139 n.19, 20.   Indeed, the Second Circuit has cautioned that "when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case.'"   *Brown*, 814 F.3d at 629.

47

In light of this high bar, the "systematic and continuous" contacts the Eaton Vance Defendants are alleged to have with New York are insufficient to provide a basis for general jurisdiction.  As an initial matter, Plaintiffs arguments largely center on the actions taken by non-party Eaton Vance Corporation, the Eaton Vance Defendants' parent company, but Plaintiffs provide no explanation for why this Court should use Eaton Vance Corporation's contacts to determine whether its subsidiaries are subject to general jurisdiction in New York.  In fact, in the only case that Plaintiffs cite in support of its arguments for general jurisdiction – *In re Aluminum Warehousing Antitrust Litigation*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) – calls this precise theory of jurisdiction into doubt in light of *Daimler*.  *See also Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 344-45 (S.D.N.Y. 2018) (discussing potential effects of *Daimler* on "agency" theory of jurisdiction); *see also NYKCool A.B. v. Pacific International Services, Inc.*, 66 F. Supp. 3d 385, 393 (S.D.N.Y. 2014) (stating that *Daimler* "expressed some doubt about the constitutionality of subjecting a company to general jurisdiction under the mere department or agency theory, which provides jurisdiction over the principal" based on activities of the subsidiary).

But even projecting the actions of Eaton Vance Corporation on the Eaton Vance Defendants, the facts cited as a basis for asserting general jurisdiction do not amount to the "truly exceptional case" contemplated by *Daimler*.  Plaintiffs assert that the Eaton Vance Defendants are subject to general jurisdiction because of their business operations in New York as evidenced by: (1) defendant Eaton Vance Management's "registered corporate presence in New York"; (2) Eaton Vance Corporation's registration on the New York Stock Exchange; (3) Eaton Vance Corporation's maintenance of an office in New

York where it conducts "principal operations"; and (4) the reasonable expectation that Eaton Vance Corporation's business flowing from its New York presence is "high-value, voluminous, and constant." (Pl. Consolidated Opp. at 4.) Plaintiffs fail, however, to point to a single case – let alone a case post-*Daimler* – where this Court has found such allegations sufficient to impose general jurisdiction on foreign corporations, perhaps because courts in this Circuit have consistently refused to do so when evaluating similarly situated corporations.

Courts in this District have repeatedly concluded that a registered corporate presence in New York does not justify the exercise of general jurisdiction over a foreign company post-*Daimler*. *See In re Aso*, No. 19 Misc. 0190, 2019 WL 3244151, at *4-5 (S.D.N.Y. July 19, 2019) ("With '*Daimler*'s strong admonition against the expansive exercise of general jurisdiction' for guidance, the Court declines to bridge the crucial gap between New York's business registration statute and . . . consent to general jurisdiction of state courts"); *Sae Han Sheet Co. v. Eastman Chemical Corp.*, No. 17 Civ. 2734, 2017 WL 4769394, at *4-5 (S.D.N.Y. Oct. 19, 2017) ("[I]n light of *Daimler* . . . , the more recent authority in this district has held that corporations do not consent to general jurisdiction when they register under the various New York registration statutes") (collecting cases); *Famular v. Whirlpool Corporation*, No. 16 Civ. 944, 2017 WL 2470844, at *4 (S.D.N.Y. June 7, 2017) ("[A] foreign defendant is not subject to the general personal jurisdiction of the forum state merely by registering to do business within the state, whether that be through a theory of consent by registration or otherwise").

Registration on the New York Stock Exchange is similarly insufficient to confer general jurisdiction in New York, and was considered so even before *Daimler* tightened

the requirements for general jurisdiction. *See Yih v. Taiwan Semiconductor Manufacturing Company*, No. 19-2218-cv, 2020 WL 2530183, at *2 (2d Cir. 2020) (summary order) (affirming rejection of "solicitation plus" theory of general jurisdiction where company's business activities were primarily related to its listing on the New York Stock Exchange, and it did not engage in "other activities of substance" in New York); *Minholz v. Lockheed Martin Corporation*, 227 F. Supp. 3d 249, 262 (N.D.N.Y. 2016) (refusing to exercise general jurisdiction over corporation that traded on the New York Stock Exchange because such "d[id] not change the calculus of its overall business operations because the determination of what stocks are traded in New York is based on the acts of third parties over whom [defendant] would have no control"); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000) ("Other cases in this line imply a similar result when they suggest that jurisdiction is not available over a corporation whose only contacts with the forum are listings on the New York stock exchanges and ancillary arrangements involving the distribution of their shares").

Finally, the Second Circuit has refused to exercise general jurisdiction over corporations that conduct some business in New York (e.g., sell products, negotiate transactions) and maintain an office here. *See Hood v. Ascent Medical Corporation*, 691 F. App'x 8 at 10-11 (2d Cir. 2017) (summary order) (rejecting contention that general personal jurisdiction could be exercised over a corporation that sold products in New York and maintained an office in New York). The circumstances alleged by Plaintiffs here are no different. It is undisputed that the Eaton Vance Corporation maintains an office in New York City. But it is one of many offices across the United States where the Eaton Vance Corporation conducts its "principal operations," and does not evidence that the Eaton

Vance Corporation is "at home" here.  (*See* Dkt. 199-2 (Eaton Vance Corporation Form 10-K stating that Eaton Vance Corporation conducts its "principal operations through leased offices located in Boston, Massachusetts; Atlanta, Georgia; Minneapolis, Minnesota; New York, New York; Seattle, Washington; Washington, District of Columbia; [and] Westport, Connecticut," among others); *see also Taormina v. Thrifty Car Rental*, No. 16 Civ. 3255, 2016 WL 7392214, at *5 (S.D.N.Y. Dec. 21, 2016) ("[A] corporation 'that operates in many places can scarcely be deemed at home in all of them.'") (quoting *Daimler*, 571 U.S. at 762 n.20).  And, while Plaintiffs assert that Eaton Vance Corporation conducts "high-value, voluminous, and constant" business in New York, the only example provided is a single portfolio of business for an investment manager based here acquired during the 2009 fiscal year.  (Pl. Consolidated Opp. at 4; Dkt. 199-2 at 105.)  This, without more, cannot be deemed sufficient to satisfy the exacting standards for general jurisdiction set by *Daimler* and its Second Circuit progeny.  *See Sonera Holding B.V. v. Cukorova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014) (explaining that "substantial, continuous, and systematic course of business" that included negotiations, multiple transactions, and an office in New York remained insufficient to warrant exercise of general jurisdiction over corporate defendant).

### b.    18 U.S.C.A. § 1965:  RICO Jurisdiction

Plaintiffs assert that the Court should exercise personal jurisdiction over the Eaton Vance Defendants under 18 U.S.C.A. § 1965(a) and (d).  The Eaton Vance Defendants oppose, noting simply that Plaintiffs have not alleged that the Eaton Vance Defendants – labeled "nominal defendants" in the Complaint – have committed a RICO violation and,

accordingly, cannot use it as a basis for jurisdiction.  Again, the Court agrees with the Eaton Vance Defendants.

The Complaint repeatedly refers to the Eaton Vance Defendants as "nominal defendants."  (*See* Compl. ¶¶ 38 ("Parametric is named as a Nominal Defendant"), 39 ("[Eaton Vance Management] is named as a Nominal Defendant"), 40 ("[Eaton Vance Structured Emerging Markets] is named as a Nominal Defendant"), 41 (collectively defining the Eaton Vance Defendants, along with defendant Bank of New York Mellon as the "Nominal Defendants").)  A nominal defendant is one "joined solely because it is a party which can facilitate the relief sought."  *Glynn v. Gonda*, No. 06 Civ. 5447, 2006 WL 2109457, at *1 (S.D.N.Y. July 26, 2006); *accord Banco Central De Paraguay v. Paraguay Humanitarian Foundation, Inc.*, No. 01 Civ. 9649, 2006 WL 3456521, at *11 (S.D.N.Y. Nov. 30, 2006).  In other words, a "nominal" (or "formal") party is one who "has little or no interest in the outcome of the litigation" and against whom "no cause of action or claim for relief is or could be stated."  *Novovic v. Greyhound Lines*, No. 08 CV 3190, 2008 WL 5000228, at *3 (E.D.N.Y. Nov. 19, 2008) (quoting *Still v. DeBuono*, 927 F. Supp. 125, 129 (S.D.N.Y. 1996)) (internal quotation marks omitted).  And, within the RICO context, "it is common practice . . . to add as nominal defendants entities that are not themselves charged with RICO violations but that would be directly affected by the equitable relief sought."  *U.S. v. Local 359, United Seafood Workers, Smoked Fish & Cannery Union*, No. 87 Civ. 7351, 1991 WL 230613, at *2 (S.D.N.Y. Oct. 24, 1991).

With that understanding of Eaton Vance Defendants' "nominal" status in mind, Plaintiffs' apparent attempt to use RICO as a basis for exercising jurisdiction over the Eaton Vance Defendants rings hollow.  Although the Complaint purports to plead a RICO

claim against "all Defendants," that group does not and cannot include the nominal Eaton Vance Defendants in view of their minimal relationship with the substance of those claims. Perhaps in recognition of this, the Complaint noticeably fails to reference the Eaton Vance Defendants in its extensive discussion of the bases for Plaintiffs' RICO claim or allege that the Eaton Vance Defendants committed any predicate RICO acts.  (*See* Compl. ¶¶ 473-524; *see also* Eaton Vance Reply at 3.)  Without lodging a RICO claim against the nominal Eaton Vance Defendants, there is no basis for the Court to use the RICO statute to exercise jurisdiction over them.  Indeed, doing so would lead to an untenable result: that a defendant could be hailed into this Court – or any other federal court – under a federal statute that they have not even allegedly violated.

### c.      Other Bases for Jurisdiction:  CPLR § 302(a)(3) and Rule 4(k)(2)

As noted, the two jurisdictional bases actually alleged in the Complaint with respect to the Eaton Vance Defendants are CPLR § 302(a)(3), the New York long-arm statute, and Rule 4(k)(2), the federal long-arm statute.  (*See* Compl. ¶¶ 5, 6.)  In their motion, the Eaton Vance Defendants argue that neither of these stated bases for jurisdiction exists here.  (*See* Eaton Vance Mem. at 5, n.4.)  Plaintiffs do not address these arguments in opposition, resting instead on notions of general jurisdiction and RICO jurisdiction as addressed above.   Because Plaintiffs do not dispute the Eaton Vance Defendants' arguments against long-arm jurisdiction pursuant to CPLR § 302(a)(3) or Rule 4(k)(2), the Court deems their claims on these points to be abandoned.  *See LBF Travel, Inc. v. Fareportal, Inc.*, No. 13 Civ. 9143, 2014 WL 5671853, at *16 (S.D.N.Y. Nov. 5, 2014) (dismissing claims where plaintiff failed to dispute defendants' arguments in favor of dismissal); *McNeil-PPC, Inc. v. Perrigo Co.*, No. 05 Civ. 1321, 2007 WL 81918, at *12 n.4

(S.D.N.Y. Jan. 12, 2007) ("[Defendant] ignores Plaintiffs' contention and, therefore, the argument is deemed conceded").

Accordingly, this Court concludes that Plaintiffs have failed to plead a prima facie case of jurisdiction over the Eaton Vance Defendants.

### 6.     Bulgarian National Bank

BNB presents a jurisdictional issue not implicated by the other Defendants: sovereign immunity.  It is undisputed that – as the "central bank of Bulgaria[]" – defendant BNB operates as a "foreign state" subject to the jurisdictional parameters set by the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.*  (*See* Compl. ¶ 7; *see generally* Dkt. 257, Memorandum of Law of the Bulgarian National Bank in Support of Its Motion to Dismiss, ("BNB Mem."), at 4; Dkt. 271, Plaintiff's Opposition to Defendant Bulgarian National Bank's Motion to Dismiss, ("Pl. BNB Opp."), at 5.)  Pursuant to the FSIA, a "foreign state is "presumptively immune" to jurisdiction and suit in the United States unless one of the statute's specified exceptions to that immunity applies.  *See* 28 U.S.C. § 1604 ("A foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" by the stated exceptions); *see also Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 199 (2d Cir. 2016) (once a defendant deemed to be a "foreign sovereign or related instrumentality," the reviewing court "must determine whether an FSIA-recognized exception to immunity applies").  In determining whether an exception applies, "the district court can and should consider matters outside the pleadings relevant to the issue of jurisdiction."  *Id.* (quoting *Kensington International Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007)).  And, where, as here, a sovereign defendant "challenges the factual basis of the plaintiff's claim [that the

sovereign defendants are not immune], the plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted." *Robinson v. Government of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001) (internal quotation marks and citation omitted).

In this instance, Plaintiffs invoke FSIA's "commercial activity" exception. (*See* Pl. BNB Opp. at 6.)  That exception provides that foreign states shall not be immune in actions based (1) upon a commercial activity carried on in the United States by the foreign state; or (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.  28 U.S.C. § 1605(a)(2).  Plaintiffs rest exclusively on the third ground for the "commercial activity" exception, referred to as the "direct effect" clause.  (*See* Pl. BNB Opp. at 6-12.). The requisite showing for the "direct effect" clause of the "commercial activity" exception can be broken into three requirements: "(1) that the operative act occur outside the United States, (2) that the act occur in connection with a commercial activity of the foreign state elsewhere, and (3) that the act cause a direct effect in the United States." *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 57 (2d Cir. 2016).

"The 'threshold step' in assessing the applicability of the commercial activity exception is always to 'identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims.'" *Chettri*, 834 F.3d at 56 (quoting *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006)).  Here, it is undisputed that the transfer of the sale proceeds out of defendant APD's bank account held at CCB comprises the gravamen of

Plaintiffs' claims.  But the parties disagree over whether BNB can be held responsible for those actions in light of its supervision of CCB.  Plaintiffs appear to argue, albeit cursorily, that the conservators appointed for CCB were acting as "BNB's agents," leaving BNB "liable for their intentional wrongdoing both under U.S. and Bulgarian law."  (Pl. BNB Opp. at 10-11.)  In response, Defendants maintain that Plaintiffs incorrectly "lump[] BNB and the conservators together," that Plaintiffs fail to show that an agency relationship existed between BNB and CCB, and that Plaintiffs "cannot overcome the inherently sovereign nature of BNB's supervisory activity" over CCB.  (Dkt. 305, Reply Memorandum of the Bulgarian National Bank in Support of Its Motion to Dismiss, ("BNB Reply"), at 5-6.) Accordingly, the first question that the Court must address is whether the "commercial activity" underlying Plaintiffs' invocation of the "commercial activity" exception – which was, by Plaintiffs' own admission, performed by CCB – should be attributed to defendant BNB in light of its supervisory role.

The Supreme Court has held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("Bancec"), 462 U.S. 611, 626-27 (1983); *see also Rubin v. Islamic Republic of Iran*, __ U.S. __, __, 138 S. Ct. 816, 822 (2018) (restating this rule when recognizing *Bancec*'s abrogation after Congress incorporated the *Bancec* factors into the FSIA, 28 U.S.C. § 1610(g) through a 2008 amendment).  Since then, the Second Circuit has concluded that the *Bancec* presumption applies equally to cases "concern[ing] the relationships between a foreign state's instrumentalities and other distinct legal entities that may not themselves be entitled to sovereign immunity."  *Arch Trading Corp.*, 839 F.3d at 201-02.  As the

Second Circuit has noted, "[s]ound justifications support" the presumption, specifically quoting the Supreme Court's observation that "'[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty' for sovereigns and creditors alike." *Arch Trading Corp.*, 839 F.3d at 201 (quoting *Bancec*, 462 U.S. at 626). Indeed, "both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness." *EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78, 90 (2d Cir. 2015) (citation omitted).

In light of those concerns, the Second Circuit has concluded that the *Bancec* presumption can be overcome only with evidence that:  "(1) the [entity] is so extensively controlled by its owner that a relationship of principal and agent is created, or (2) the recognition of an [entity's] separate legal status would work a fraud or injustice." *Arch Trading Corp.*, 839 F.3d at 201 (quoting *Kirschenbaum v. 650 Fifth Ave. and Related Properties*, 830 F.3d 107, 128 (2d Cir. 2016)); *EM Ltd.*, 800 F.3d at 90 (the "presumption of separateness may be rebutted by evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it"); *see also Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 294-95 (S.D.N.Y. 1987) (collecting cases).  The second prong is not raised here.

As to the first prong, the "touchstone inquiry" in determining whether Plaintiffs have shown "extensive control" required to overcome the *Bancec* presumption is "whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Arch Trading Corp.*, 839 F.3d at 202 (quoting *EM Ltd.*, 800 F.3d at 91).  That inquiry looks at several factors; specifically whether the sovereign entity:

> (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3)

> deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.

*Id.*

Nothing before the Court indicates that defendant BNB participated in the decision to authorize transferring money out of APD's bank account at CCB; to the contrary, defendant BNB's evidence clearly shows that the hired conservators – not defendant BNB itself – managed CCB's "day-to-day operations."  (*See* BNB Mem. at 13-14; BNB Reply 5-6.)  Instead, Plaintiffs repeatedly rest on the contradictory and conclusory statements that either (1) defendant BNB did, in fact, approve the transfer of the sales proceeds out of APD's bank account at CCB (*see, e.g.*, Pl. BNB Opp. at 7 ("BNB did not obey [set] court-ordered procedures when it authorized Fibank to become account holder and assign The Funds to the Five [Bulgarian] Companies"), 10-11 ("BNB's internal approval and transfer of The Funds are the acts that serve as the basis of Plaintiffs' claims")); or (2) the conservators appointed to manage CCB were operating as "BNB's agents" (*see* Pl. BNB Opp. at 11).  Plaintiffs' declarants offer nothing to support these contentions or contradict those made by Defendant.  (*See, e.g.*, Dkt. 217, Declaration of Kolio Petkov Paramov ("Paramov Decl.") ¶¶ 14-17 (listing the activities over which defendant BNB does not enjoy sovereign immunity).)  Similarly, nothing before this Court suggests that defendant BNB "so closely supervised" CCB (or even the conservators hired to supervise it) that such supervision would provide a basis to impute the decision to authorize the transfer at issue to defendant BNB.

Accordingly, defendant BNB has demonstrated that FSIA's "commercial activity" exception does not apply to its supervision of CCB and, more specifically, CCB's authorization of the transfer of the monies at issue out of APD's bank account.  Defendant BNB's motion to dismiss thus should be granted as BNB is an immune "foreign state" pursuant to FSIA.

### 7.    Bank of New York Mellon

As mentioned earlier, BNYM is the only Defendant who does not move for dismissal based on lack of personal jurisdiction.  But, as also mentioned earlier, BNYM is only a nominal defendant, named not because of any alleged wrongdoing on its part but rather to facilitate the relief sought.   (*See* Compl. ¶ 37 ("Mellon Bank is named as a Nominal Defendant").)   Given that all non-nominal Defendants should be dismissed for lack of personal jurisdiction, there is no basis on which a nominal defendant such as BNYM should remain in the case.   *See Gulf Insurance Company v. Caldor Corporation*, No. 03 Civ. 2894, 2006 WL 1586571, at *7 (S.D.N.Y. June 9, 2006) (dismissing case after finding lack of personal jurisdiction over defendants because remaining defendant was "purely a nominal party"), *aff'd*, 273 F. App'x 90 (2d Cir. 2008).  Accordingly, BNYM should be dismissed as well.

### B.    Forum Non Conveniens

Even if the Court had jurisdiction over the Defendants, dismissal would still be warranted under the doctrine of forum non conveniens.  Pursuant to that doctrine, "a federal district court may dismiss an action on the ground that a [forum] abroad is the more appropriate and convenient forum for adjudicating the controversy."  *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 425 (2007).

When faced with a motion to dismiss for forum non conveniens that is decided without a factual hearing, "the Court must accept as true the facts alleged in the complaint, but may also consider evidence outside the pleadings, including affidavits." *Little v. XL Insurance Company SE*, No. 18 Civ. 11919, 2019 WL 6119118, at *2 (S.D.N.Y. Nov. 18, 2019) (citing *Aguas Lenders Recovery Group LLC v. Suez, S.A.*, 585 F.3d 696, 697, n.1 (2d Cir. 2009)); *see also Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147, 149 (2d Cir. 1980) ("The district court took the motion to dismiss on submission, based on the pleadings, affidavits and briefs of the parties – a practice long recognized as acceptable and followed from time immemorial in the busy Southern District of New York in determining forum non conveniens motions").

To evaluate a motion to dismiss for forum non conveniens, the Court must apply the "three-step analysis set forth in *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-75 (2d Cir. 2001) (en banc)." *Abdullahi v. Pfizer Inc.*, 562 F.3d 163, 189 (2d Cir. 2009). First, the Court must determine "whether the plaintiff's choice [of forum] is entitled to more or less deference." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003) (citation omitted). Second, regardless of the level of deference owed, the Court must determine "whether the alternative forum proposed . . . is adequate to adjudicate the parties' dispute." *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 153 (2d Cir. 2005). And, third, the Court must balance the "private and public interests implicated in the choice of forum." *Id.*

While all defendants lodge arguments for dismissal for forum non conveniens, the supporting legal arguments are primarily proffered by two of them – FIB and BNB – and

incorporated by the rest.[4]  (*See* FIB Mem. at 15-21; BNB Mem. at 16-20.)  As expected, FIB and BNB argue that Plaintiffs' choice of the Southern District of New York as the forum for this action warrants little deference; that Bulgaria is both an adequate and available forum to adjudicate this action; and that both private and public interests merit dismissal based on forum non conveniens.  Plaintiffs oppose, arguing that its forum choice deserves significant deference; that Bulgarian courts are not an available forum to adjudicate this dispute both in light of prior decisions issued by those courts, and because alleged corruption will prevent Plaintiffs from receiving a fair adjudication of their claims; and that private and public interests weigh in favor of adjudicating the dispute here.  For the reasons stated below, the Court agrees with defendants FIB and BNB that this action should be dismissed based on forum non conveniens.

### 1.   *Fibank I*

As an initial matter, the Court notes that it is not the first federal court to consider whether forum non conveniens dismissal of claims rooted in the SBP sales proceeds is appropriate.  In *Fibank I*, the Northern District of Texas concluded that an adversary

---

[4] Defendant Harris separates from the other Defendants on this point, instead maintaining that this action should be dismissed for forum non conveniens in favor of Texas, not Bulgaria.  (Harris Mem. at 5-6.)  But, Harris does not even attempt to go through the factor-by-factor analysis required to assess forum non conveniens dismissal, and overlooks that forum non conveniens dismissal, unlike personal jurisdiction, is not assessed on a defendant-by-defendant basis.  *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) ("in order to grant a motion to dismiss for forum non conveniens, a court must satisfy itself that the litigation may be conducted elsewhere against all defendants").  Moreover, the Northern District of Texas has already held that Bulgaria poses a more convenient forum than Texas to litigate Plaintiffs' claims.  *See Fibank I* at 13-21.  Accordingly, this Court focuses its assessment on the other Defendants' more fulsome arguments that Bulgaria serves as an adequate, alternative forum, but conditions forum non conveniens dismissal on all Defendants' – including defendant Harris' – consent to jurisdiction there to ensure that the litigation may be conducted in Bulgaria against all Defendants.

proceeding brought against the FIB Defendants by Tomov, acting as Ayr's trustee, should be dismissed on these precise grounds. *Fibank I* at 13-21. While subject to the standards developed by the Fifth Circuit – not the Second – the three-step inquiry is nearly identical: "(i) determining if an adequate alternative forum exists; (ii) considering the relevant private interest factors, weighing in the balance the deference given the particular plaintiff's initial choice of forum; and (iii) weighing the relevant public interest factors if the private interests are either nearly in balance or do not favor dismissal." *Fibank I* at 14 (citing *Marnavi Splendor GMBH & Co. v. Alstom Power Conversion, Inc.*, 706 F. Supp. 2d 749, 754 (S.D. Tex. 2010)). Following a thorough and thoughtful analysis, at all three steps, the *Fibank I* court concluded that Bulgaria – not the Northern District of Texas – was the proper forum for these claims. And, as discussed in detail below, this Court sees no reason to find otherwise here.

### 2.     Deference to Plaintiffs' Choice of Forum

Plaintiffs generally enjoy "a strong presumption in favor of [their] choice of forum," so much so that "unless the balance in strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Norex*, 416 F.3d at 154 (first quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981); and then quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). This presumption is premised on the notion that "the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." *Wiwa*, 226 F.3d at 102; *see also Piper Aircraft Co.*, 454 U.S. at 256 ("the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient").

A court thus determines the amount of deference to afford a plaintiff's choice of forum using a sliding scale, which affords "the greatest deference" to "a plaintiff's choice of its home forum" and "less deference" to "a foreign plaintiff's choice of a United States forum."  *Norex*, 416 F.3d at 154; *see also BMR & Associates, LLP v. SFW Capital Partners, LLC*, 92 F. Supp. 3d 128, 139 (S.D.N.Y. 2015) (explaining the "sliding scale" used to assess level of deference to be afforded to plaintiff's choice of forum).  Less deference is afforded to a foreign plaintiff's choice of a United States forum because it is "less reasonable" to conclude that trying a case outside of the plaintiff's home forum is convenient.  *Piper Aircraft Co.*, 454 U.S. at 256; *Norex*, 416 F.3d at 154 ("when a foreign plaintiff chooses a U.S. forum, it is much less reasonable to presume that the choice was made for convenience") (internal quotation marks and citation omitted); *Iragorri*, 247 F.3d at 71 ("Even if the U.S. district was not chosen for . . . forum-shopping reasons, there is nonetheless little reason to assume that it is convenient for a foreign plaintiff").

The Second Circuit has emphasized that these rules are neither "abrupt [n]or arbitrary," and "may not apply, either at all or with full force to forum choices in particular cases."  *Norex*, 416 F.3d at 154 (citation omitted).  Courts assessing forum non conveniens claims thus are to "consider the totality of the circumstances supporting a plaintiff's choice of forum" by assessing the strength of a plaintiff's or lawsuit's "bona fide connection to the United States and to the forum of choice" when determining how much deference is warranted.  *Id.* (quoting *Iragorri*, 274 F.3d at 71-72).  Accordingly, "factors that argue against forum non conveniens dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the

availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Iragorri*, 274 F.3d at 72.

In contrast, "the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons – such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum – the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non coveniens motion by showing that convenience would be better served by litigating in another country's courts." *Id.* In other words, "where the circumstances indicate that the parties and events bear no bona fide connection to the United States, or that in relation to the core operative facts in dispute they at best may have only marginal links to the plaintiff's choice of forum, that choice of forum is not entitled to special deference, in particular where the claimants are all foreign residents." *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 522 (S.D.N.Y. 2006), *aff'd*, 343 F. App'x 623 (2d Cir. 2009); *see also Herald v. Kohn*, 540 F. App'x 19, 26-27 (2d Cir. 2013) (summary order) (affirming dismissal for forum non conveniens, in part, because lack of connection between the litigation and the United States was suggestive of forum shopping by foreign plaintiffs).

It is undisputed that Plaintiffs are Bulgarian: all corporate plaintiffs are companies incorporated in Bulgaria that maintain their principal places of businesses there, and individual plaintiff Tomov is a citizen of Bulgaria. (*See* Compl. ¶¶ 11-15.) Plaintiffs acknowledge that they are "not American," and instead maintain that they have

"significant, bona fide connections with the U.S. in connection with the claims they bring." (Pl. FIB Opp. at 16.)  But the facts before the Court compel the opposite conclusion and warrant according Plaintiffs' choice of forum little deference.

The claims before this Court center on the alleged theft of $65 million in proceeds generated from the sale of land owned by defendant APD – a Bulgarian subsidiary of defendant Ayr – following its bankruptcy.  When allegedly stolen, those funds were owned by a Bulgarian entity (defendant APD), held in a Bulgarian bank (CCB, then under the supervision of defendant BNB), and were generated from the sale of Bulgarian land to another Bulgarian entity (defendant FIB).  And, based on Plaintiffs' allegations, the theft of those funds was the result of a longstanding conspiracy involving various Bulgarian persons and entities premised on a fake project that purported to improve Bulgarian land.

It is clear, then, that the vast majority of witnesses, documents, and other sources of proof necessary to conduct trial in this matter are located in Bulgaria, making it unnecessarily difficult and costly to conduct trial here.  And, as noted by the *Fibank I* court, witnesses associated with BNB and the FIB Defendants – including, but not limited to the APD trustee and representatives of both FIB and CCB (the banks involved in the very transfer at issue) – are Bulgarian citizens not subject to the compulsory process of this Court.  (*See* Dkt. 243, Declaration of Emil Emanuilov, ("Emanuilov Decl."), ¶ 9; *Fibank I* at 18 (noting "third party witnesses and documents located in Bulgaria are outside the compulsory subpoena power of" the Northern District of Texas).)  The absence or near absence of witnesses, documents, and other evidence tied to New York gives rise to a strong inference that forum-shopping considerations served as a substantial motivation in Plaintiffs' choice to bring this action here.  *See Herald*, 540 F. App'x at 26 (affirming

grant of "very limited deference" where "Plaintiffs have not identified a single potential witness in New York or within 100 miles of this courthouse, the core operative facts of these cases involve the operations of foreign entities outside of the United States, and Plaintiffs, who are themselves foreign, each purport to represent a class of foreign investors . . . , and appear to have little or no connection to the United States.") (internal quotation marks omitted).

Indeed, Plaintiffs' arguments suggest that their choice to bring an action in the United States was motivated at least in part by a desire to bring claims under RICO, which "bespeak[s] forum shopping rather than genuine convenience for these foreign plaintiffs, defendants, and witnesses." *Herald*, 540 F. App'x at 27.  In opposition to forum non conveniens dismissal, Plaintiffs assert that deference is warranted because "their specific claims under the RICO and New York creditor and debtor laws promote and enforce . . . the elimination and prevention of racketeering under American auspices, and a U.S. state's interest in the just and efficient adjudication of bankruptcy proceedings in its purview." (Pl. FIB Opp. at 16-17.)  Put differently, Plaintiffs argue that the sheer assertion of claims under United States law should prompt this Court to afford significant deference to their forum choice.  But Plaintiffs cite not a single case in support of this argument, perhaps because the claims asserted fail to inform whether it would be more or less convenient to hold trial here.  All this argument demonstrates is that Plaintiffs brought the case in New York to take advantage of the federal RICO statute and New York's favorable debtor and creditor laws rather than because this forum is particularly convenient. Plaintiffs' choice of forum in this instance thus should be afforded little deference.  *Cf. Herald*, 540 F. App'x at 26-27 (affirming district court's decision to afford little deference

to plaintiffs' choice of forum where "[plaintiffs] themselves acknowledged that their choice of forum was motivated at least in part by a desire to take advantage of U.S. class action procedures and rules governing attorney's fees" as it evidenced forum shopping); *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479, 481 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83 (2d Cir. 2007) (affording plaintiffs' choice of forum "less deference," in part, because "some indicia of forum-shopping was present" where "little or nothing" was provided to justify suit in New York "[b]eyond the availability of contingent fees and class actions").

### 3.    Availability and Adequacy of Alternative Forum

Next, the Court must determine whether there is an available and adequate alternative forum where the dispute could be adjudicated.  *See Norex*, 416 F.3d at 157; *Pollux*, 329 F.3d at 70 ("the next level of inquiry requires a court . . . to determine whether an adequate alternative forum exists").   "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Pollux*, 329 F.3d at 75; *see also BMR & Associates, LLP*, 92 F. Supp. 3d at 140 ("If the forum permits such litigation and the defendants are amenable to service of process in the proposed alternative forum, courts are generally reluctant to judge a foreign forum as inadequate").   To determine whether a court "permits" litigation of a dispute, the dispositive question is "whether the foreign court would be capable of litigating" it, not whether it would offer the same remedy as an American court.  *In re Alcon Shareholder Litigation*, 719 F. Supp. 2d 263, 273-74 (S.D.N.Y. 2010).

Defendants argue that Bulgaria is an available and adequate alternative forum for the instant action, maintaining that they are amenable to suit in Bulgaria and that Bulgarian law provides suitable – albeit different – remedies for Plaintiffs' claims.  (FIB

Mem. at 17-18; BNB Mem. at 18-19.)  Plaintiffs oppose, arguing that (1) the "many" non-Bulgarian defendants are not "subject to compulsory process in Bulgaria" (but "have ties to or have contractually consented to personal jurisdiction in the United States"); and (2) that Plaintiffs cannot assert their claims in Bulgarian courts because they have "exhausted all avenues to bring their claims in a Bulgarian or EU court" and because "procedural hurdles and socio-political corruption and roadblocks" prevent litigation there.  (Pl. FIB Opp. at 17-18.)  The Court agrees with Defendants.

### a.  Amenability to Service of Process

Plaintiffs first argue that some non-Bulgarian Defendants are not subject to compulsory process in Bulgaria.  But that addresses only part of the relevant question, which is not only whether Defendants can be compelled to appear in Bulgaria, but also whether, in the event they cannot be compelled, Defendants are amenable to suit there. Both FIB and BNB explicitly state that they are amenable to suit in Bulgaria.  (FIB Mem. at 17; BNB Mem. at 18.)  Although the remaining Defendants have not explicitly stated as much, they have joined in defendants FIB and BNB's respective arguments, which necessarily include agreement to consent to jurisdiction in Bulgaria, for dismissal on grounds of forum non conveniens.  (*See* Bulgarian Co. Mem. at 1; Harris Mem. at 1 n.1; BNYM Mem. at 2 n.1; Peevski Mem. at 1 n.2; Eaton Vance Mem. at 2 n.1; Bulgartabac Mem. at 1.)  And, in any event, where defendants have not clearly expressed amenability to suit in the alternative forum, courts have made dismissal grounded in forum non conveniens conditional on defendants' appearance in the alternative forum to ensure that this requirement is satisfied.  *See, e.g.*, *BMR & Associates, LLP*, 92 F. Supp. 3d at 143 (conditioning dismissal on defendant's consent to the jurisdiction of the foreign court

(there, India), defendant's agreement to waive statute of limitations defenses, and willingness of appropriate Indian courts to hear the case).  The same condition can and should be imposed here.

### b.   Availability of Bulgarian Forum:  Jurisdiction

Plaintiffs next argue that Bulgaria is not an available forum because Plaintiffs have "exhausted all avenues to bring their claims in a Bulgarian or EU court which was found to lack jurisdiction."  (Pl. FIB Opp. at 18.)  Plaintiffs' declarants assert that, by dismissing defendant APD's bankruptcy proceedings, Bulgarian courts concluded that they lacked "legal or factual grounds for jurisdiction over the instant claims," leaving New York as the "only [court] having exclusive jurisdiction over the instant case."  (Tomov Decl. ¶ 46; *see also* Tomov Decl. ¶ 61 ("The Varna Appeals Courts found that it did not have jurisdiction . . . and upheld the trial court's decision to close APD bankruptcy proceedings for lack of estate assets"); Dkt. 216, Declaration of Daniel Kirilov Bozilhov in Support of Plaintiffs['] Claims, ("Bozhilov Decl."), ¶ 27 ("By dismissing APD's bankruptcy case on January 19, 2018 for lack of assets (Funds) in the bankruptcy estate the Shumen District Court shut the door to all actions that needed to be taken against the Defendants to make them return the money they had stolen").)

Defendants' declarants – other practicing attorneys in Bulgaria – disagree, asserting that the Bulgarian courts dismissed APD's bankruptcy proceeding on other, more limited grounds having nothing to do with jurisdiction (or lack thereof).  (*See* Dkt. 258, Declaration of Lazar Tomov, ("L. Tomov Decl."), ¶ 53 (Varna Court of Appeals' decision terminating APD's bankruptcy proceedings "was based on APD's creditors' failure, after notice, to pay the required costs necessary to continue the proceeds, despite

receiving express notice of the consequences for failing to do so" and "the Bulgarian court did not rule that it lacked jurisdiction over the issues raised by the appeal, nor did it rule that any assets 'were Ayr's assets in the United States' or subject to jurisdiction in the United States.  None of these points appear in the ruling."); Emanuilov Decl. ¶ 13 (Varna Court of Appeals' May 2, 2018 decision makes "clear that it was affirming the termination of APD's Bulgarian bankruptcy proceeding because APD's creditors failed to pay court costs, not because the court lacked jurisdiction").)

Although the certified translations of the Bulgarian court decisions appear to support Defendants,[5] this Court is not in the position to decide on which of the two interpretations of the Varna Court of Appeals' May 2, 2018 decision is accurate.[6]  But to ensure that the Bulgarian courts do, in fact, have jurisdiction over Defendants' claims (and therefore serve as an alternative forum for them), the Court should – as many others have – condition forum non conveniens dismissal on Bulgaria's willingness to hear the case. *See, e.g.*, *Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 984 (2d Cir. 1993) ("forum non conveniens dismissals are often appropriately conditioned to protect the party opposing dismissal") (collecting cases); *Spahic v. International Center for Transitional Justice, Inc.*, No. 18 Civ. 0057, 2019 WL 7605895, at *16 (S.D.N.Y. April 25, 2019) (conditioning dismissal on defendant's consent to jurisdiction, waiver of statute of limitations defenses, and Belgian court's willingness to exercise jurisdiction over

---

[5] *See* Dkt. 258-30 (January 19, 2018 decision); Dkt. 220-3 at 142-50 (May 2, 2018 oral argument); and Dkt. 258-31 (May 2, 2018 decision).

[6] The *Fibank I* decision does not confront this issue as it predates the Varna Court of Appeals' May 2, 2018 decision.

defendant), *report & recommendation adopted in relevant part sub nom. Ziga v. International Center for Transitional Justice, Inc.*, No. 18 Civ. 00057, 2019 WL 4784675 (S.D.N.Y. Sept. 27, 2019); *BMR & Associates, LLP*, 92 F. Supp. 3d at 143 (conditioning dismissal on defendant's consent to jurisdiction, defendant's waiver of post-filing statute of limitations defense, and Indian courts' willingness to hear the case).

### c.   Availability of Alternative Forum:  Laws and Remedies

As discussed above it is readily apparent that Plaintiffs elected to bring the instant action here at least in part because Bulgarian law lacks an equivalent for civil RICO.  (*See* Pl. FIB Opp. at 16-17 (claiming deference was warranted as Plaintiffs' "specific claims under the RICO and New York creditor and debtor laws promote and enforce important public policy goals and American interests:  the elimination and prevention of racketeering under American auspices"), 19 (Bulgarian proceedings "did not and could not adjudicate Plaintiffs' U.S.-specific claims under RICO and New York debtor and creditor laws"), 20 ("Plaintiffs claims are all brought under U.S. law, in particular RICO and New York debtor/creditor laws that have no and cannot have a corollary in Bulgaria that affords the same remedies for similar wrongs"); Tomov Decl. ¶ 49 ("The Bulgarian forum does not recognize the rights of victims of corruption, money laundering and financial frauds to bring actions in court seeking protection and compensation for the damages.  Bulgaria has no laws to address any of these issues.").)  But it is a "well-established principle" that "[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, []or on identical remedies."  *Norex*, 416 F.3d at 158 (quoting *PT United Can Co.*, 138 F.3d at 74).  Similarly, "the fact that a plaintiff might recover less in an alternative forum does not render that forum inadequate."

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011).

This principle "pertains with particular force to civil RICO actions because few foreign jurisdictions provide such an expansive civil vehicle for parties injured by ongoing criminal schemes; even more rare are foreign provisions for the recovery of treble damages." *Norex*, 416 F.3d at 158; *see also PT United Can Co.*, 138 F.3d at 74 ("Contrary to [plaintiff's] assertion, the nonexistence of a RICO statute there does not, by itself, preclude the use of another forum") (collecting cases). At the same time, the Second Circuit has observed that "most foreign jurisdictions provide alternative legal actions to address the wrongdoing encompassed by civil RICO." *Norex*, 416 F.3d at 158; *Turedi*, 460 F. Supp. 2d at 525-26 (rejecting argument that Turkish forum was an inadequate forum because it "may not contain provisions allowing causes of actions or remedies precisely equivalent to those Plaintiffs assert in the instant action"); *Moscovits v. Magyar Cukor Rt.*, No. 00 Civ. 0031, 2001 WL 767004, at *3 (S.D.N.Y. July 9, 2001) (rejecting argument that Hungary was an inadequate alternative forum because it did not recognize cause of action for conversion and fraud as it recognized "a general cause of action for damages . . . under which [plaintiff] likely could have brought suit asserting a right to recover damages for the type of injury" alleged), *aff'd*, 34 F. App'x 24 (2d Cir. 2002).

Bulgaria appears to provide similar alternatives. Indeed, the FIB Defendants and BNB point to a number of causes of action that Plaintiffs could bring in Bulgarian courts to redress their alleged harm, including, but not limited to, tort claims, criminal claims, and breach of contract claims. (*See* L. Tomov Decl. ¶ 67; Emanuilov Decl. ¶ 10.) While

Plaintiffs proffer that they have "consistently argued" that they could not bring a new action seeking relief in Bulgarian courts, the materials cited in support simply state that the Bulgarian bankruptcy proceedings have been closed; they do not state that Bulgarian courts are unable to hear claims sounding in tort, breach of contract, or otherwise.  (*See* Dkt. 118 at 3 (noting that the Bulgarian bankruptcy proceeding had closed); Dkt. 146 ¶ 48 ("APD's bankruptcy proceedings are closed for lack of an injury within Bulgaria and because there were no estate assets due to the stealing of The Funds.").)

### d.   Availability of Alternative Forum:   Corruption of Bulgarian Judiciary

Defendants posit that Bulgaria provides an adequate, alternative forum, pointing to decisions from three federal courts that have concluded that "the Bulgarian system provides an 'adequate' forum" when examining it under the same lens and that, contrary to Plaintiff's contentions, "Bulgaria's judiciary is independent, well-established, and respected."  (FIB Mem. at 17-18.)  Plaintiffs oppose, asserting that Bulgaria is an inadequate forum in light of the "rampant lack of due process and substantial justice in Bulgarian courts towards [them]," particularly in light of the recent "wave of oligarchical takeover and corruption" that has swept the country.  (Pl. FIB Opp. at 18.)  Again, the Court agrees with Defendants.

The Second Circuit "ha[s] been reluctant to find courts 'corrupt' or 'biased.'"  *In re Arbitration between Monegasque De Rassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002); *see also Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation"); *Zeevi Holdings Ltd. v. Republic of Bulgaria*, No. 09 Civ. 8856, 2011 WL 1345155, at *7 (S.D.N.Y.

April 5, 2011), *aff'd*, 494 F. App'x 110 (2d Cir. 2012) ("principles of comity strongly caution against declaring the entire court system of another country to be inadequate"), *aff'd*, 494 F. App'x 110 (2d Cir. 2012); *Moscovits*, 2001 WL 767004, at *4 (discussing the "legal difficulties and political perils" involved in rendering value judgments about the sufficiency of foreign justice systems).

Multiple federal district courts have confirmed the "adequacy" of the Bulgarian judicial system including, most recently, the Northern District of Texas in its oversight of defendant Ayr's bankruptcy proceedings.  *See Fibank I* at 15-16 (concluding Bulgaria was an adequate forum, despite Plaintiffs' allegations that it "has been under monitoring from the European Commission since 2007"); *see also Stroitelstvo Bulgaria Ltd. v. Bulgarian-American Enterprise Fund*, 589 F.3d 417, 421-22 (7th Cir. 2009) (confirming Bulgaria serves as an adequate alternative forum for petitioner's tort, contract, and RICO claims over expert testimony "lament[ing] a public perception of corruption in the Bulgarian courts" as they "made no attempt to quantify this purported corruption or document particular plaintiffs or claims that were treated unfairly"); *Zeevi*, 2011 WL 1345155 at *7 (concluding Bulgaria an adequate forum despite claims of purported "specific bias" against petitioner by the Bulgarian government evidenced by allegations of harassment and intimidation by state authorities and "pervasive corruption in the Bulgarian judiciary"). Plaintiffs attempt to argue that the latter two decisions – rendered in 2011 and 2009 – were "behind the wave of oligarchical takeover and corruption" that has recently swept Bulgaria.  (Pl. FIB Opp. at 18, 18 n.44.)  But their own declarant, Rumiana Metodieva Chenalova, a former district judge in Sofia, Bulgaria, suggests that the alleged corruption has been present within the Bulgarian judiciary since at least 2006 (i.e., long before either

of those decisions were rendered).  (*See* Dkt. 286, Declaration of Rumiana Metodieva Chenalova in Support of Plaintiffs['] Claims, ("Chenalova Decl."), ¶ 13.)

Without question, Plaintiffs paint the Bulgarian judicial system as unseemly, corrupt, and lacking independence.  Among other material, Plaintiffs draw upon seven different declarations, articles written by Bulgarian judges, and news items referring to certain Bulgarian judges as "corrupt."[7]  (*See generally* Pl. FIB Opp. at 11-12, 17-18.)  But Plaintiffs do not present evidence that Bulgarian judicial corruption – described by them as "rampant" throughout the Bulgarian judiciary – is specifically targeted at Plaintiffs.  This omission is fatal to their claims.  *See Mosha v. Yandex Inc.*, No. 18 Civ. 5444, 2019 WL 5595037, at *4 (S.D.N.Y. Oct. 30, 2019) (explaining that "[t]o establish that a foreign forum

---

[7]  *See, e.g.*, Dkt. 221, Declaration of Dimitar Blagovestov Yanakiev in Support of Plaintniffs['] Claims, ("Yanakiev Decl."), ¶ 126 ("The corruption-ridden Bulgarian courts and its [sic] unhealthy dependency on certain private interests, just one example of which is the wrong dismissal of the AP[D] bankruptcy case is not a one-time occurrence, but rather 'the norm' in Bulgarian judiciary as clearly shown in the statements made by the few Bulgarian judges and justices of integrity . . . ."); Tomov Decl. ¶ 64 ("Holding the Defendants liable is impossible in Bulgarian courts because: (1) the practice of clandestine backdoor arrangements; (2) payments to judges; (3) instructions to judges in Defendants['] favor; (4) allocation of cases to prearranged judges; (5) manipulating the discovery process and admission of evidence in court proceedings in their favor; and (6) judgments entered in their favor.  Defendants dictate and orchestrate the judicial process in Bulgaria to fit their economic interests."); Chenalova Decl. ¶¶ 19 (describing an unrelated lawsuit in which declarant was "ordered to rule" in favor of a particular party to give defendant Peevski control over two companies), 25 (referencing letter to the European Commission describing "the wide-spread corrupted practices in Bulgaria, Peevski's and the current Bulgarian Cabinet's double standards and ulterior motives, the corruption-ridden business schemes and their devastating effect and obliteration on the Bulgarian judiciaries [sic] independence, how principles of the rule of law was [sic] being trampled on and that justice or fair trial in a Bulgarian court was nowhere to be found any longer."); Dkt. 292-5 at 31-66 (submissions to the Supreme Judicial Council of the Republic of Bulgaria describing purportedly inappropriate conduct by judges in matters involving defendant FIB, which allegedly systematically advanced defendant FIB's "interest in the commercial division of the Varna District Court").)

is fundamentally inadequate, Petitioner must put forward evidence of corruption 'specifically targeted at a party' rather than broad claims about the judicial system as a whole"; and rejecting argument that Russia was an inadequate forum where plaintiff failed to proffer any evidence that he was a target of corruption) (quoting *Zeevi Holdings Ltd.*, 2011 WL 1345155, at *8)); *du Quenoy v. American University of Beirut*, No. 18 Civ. 6962, 2019 WL 4735371, at *7 (S.D.N.Y. Sept. 27, 2019) (rejecting argument that Lebanon was an inadequate forum in light of alleged corruption where plaintiff contended "that corruption is epidemic in the Lebanese judiciary" but presented only allegations that defendant "enjoys significant prominence and political clout in Lebanon" in support).

Perhaps recognizing that omission, Plaintiffs filed a letter with the Court on March 27, 2020 – after briefing had concluded – requesting to supplement its submission with evidence that two of Plaintiffs' declarants – Boyko Atanassov and Tsvetan Vassilev – were "targeted . . . with the intention of silencing, indisposing, intimidating, or otherwise making such witness' testimony and support unavailable in this matter."  (Dkt. 311.) Specifically, Plaintiffs argue that the Bulgarian Prosecutor's Office has threatened Atanassov with indictment and has issued a summons against him about "honest statements he made about the corruption and inaccessibility of the Bulgarian courts in his declaration in support of Plaintiffs' opposition" and that Vassilev was "yanked off the street in Bulgaria." (*Id.*)  As sordid and disturbing as these events may be, they are not relevant to the issue.  The indictment of Mr. Atanassov makes clear that any potential criminal prosecution is rooted in statements unrelated to this litigation, and Plaintiffs do not connect Mr. Vassilev's apparent disappearance with his statements made in connection with this case.  (*See* Dkt. 311, Ex. A.)

The closest that Plaintiffs come to asserting that they were "specifically targeted" are allegations about defendant FIB's harassment of the APD trustee, ultimately prompting her to step down from that post, and a "friendly warning" email from someone named "Priyatel P" (whom Plaintiffs do not identify) to plaintiff Tomov sent in May 2016 cautioning him to "think over very carefully . . . whether or not and how you will proceed with the case of Ayr Property Development." (Dkt. 284, Declaration of Maria Gavrilova Nakova in Support of Plaintiffs['] Claims, ("Nakova Decl."), ¶ 11 (stating that APD's trustee "was forced to resign as stated in her resignation letter due to threats to her and her family because she refused to execute on Fibank's fake payment request of the $65 million); Dkt. 284-2 at 63-68 (request from APD trustee to be removed from her post); Dkt. 290-3 at 216-17 (May 2016 email from Priyatel P to Tomov).)  But allegations of harassment, without more, are not enough to overcome the serious comity concerns identified by the Second Circuit.  *See Zeevi Holdings Ltd.*, 2011 WL 1345155, at *7 (finding Bulgaria an adequate forum despite allegations that representatives of plaintiff had been "harassed and intimidated" by Bulgarian authorities and that "a former attorney for the company was detained by Bulgarian authorities for approximately nine hours, questioned regarding alleged anti-state activities on behalf of [plaintiff], and had all of his legal files examined and copied") (internal quotation marks and alterations omitted).

This conclusion is only underscored by cases where courts have found foreign fora "inadequate" in light of alleged corruption or bias, all of which involved threats of persecution, torture, or death directed at plaintiffs.  *See e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 335 (S.D.N.Y. 2003) (concluding that Sudan was an inadequate forum in part because "plaintiffs, who are non-Muslims,

77

enjoy greatly reduced rights in Sudan under the system of Islamic law (Shari'a)" and the government "conducted a war of 'ethnic cleansing' against plaintiffs"); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) (denying motion to dismiss for forum non covneniens where Ghanaian citizen with political asylum established that he would face persecution if he brought a case in Ghana alleging that he had been tortured by a Ghanaian official); *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) (finding Iran to be an inadequate alternative forum because plaintiffs would not "obtain justice at the hands of the courts administered by Iranian mullahs" and "would probably be shot" if they returned to Iran), *aff'd*, 767 F.2d 908 (2d Cir. 1985).

As aptly observed, "our legal system could and should not be expected to assume the costs and burdens entailed as serving as court to the world, no more than in foreign affairs it would be generally tolerable to encourage the impression that our military should perform at all times and all places as policemen to the world." *Moscovits*, 2001 WL 767004, at *4. While the concerns raised by Plaintiffs are not to be trivialized, as presented they are insufficient to render Bulgaria an "inadequate" forum. Accordingly, Bulgaria stands as an adequate, available forum for Plaintiffs' claims.

### 4.    Public/Private Interest Factors

After concluding that Plaintiffs' choice of forum warrants no special deference, and that an adequate alternative forum exists, the Court must "balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake" using the factors outlined by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947). *Wiwa*, 226 F.3d at 100. Put differently, the Court must balance the "private interests of the litigants with the public

interests concerns of the Court" to assess "whether adjudication of the action in Plaintiff's chosen forum would be inconvenient and unjust." *Turedi*, 460 F. Supp. 2d at 526 (citing *Gulf Oil Corp.*, 330 U.S. at 508-09); *BMR & Associates, LLP*, 92 F. Supp. 3d at 141 ("Step three of the forum non conveniens analysis requires the Court to balance the public and private interest factors to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action") (internal quotation marks and citation omitted).

Defendants maintain that both the private and public interest factors weigh in favor of litigating in Bulgaria as much of the relevant evidence (documents, witnesses, and the underlying land itself) is based in Bulgaria, making trial "far easier, faster, and less expensive" if held there, and because Bulgaria has a significant interest in litigating the challenged transactions as they "occurred in Bulgaria among Bulgarian entities, relate to real property located in Bulgaria, and present issues of compliance with Bulgarian law." (FIB Mem. at 21.)  Plaintiffs oppose, arguing that the private interests support adjudication in New York as New York was the "site of negotiations, relationships, and course of dealings" at issue, New York courts will facilitate a shorter trial, and New York would permit Plaintiffs to pursue its claims under RICO and New York debtor and creditor laws. (Pl. FIB Opp. at 19-20.)  Plaintiffs further argue that the "public interest factors do not outweigh Plaintiffs' private interest factors."  (*Id.* at 21.)  For the reasons that follow, which largely echo the conclusions drawn by the Northern District of Texas in *Fibank I*, the Court agrees with Defendants.

### a.   Private Interest Factors

The private interest factors that the Court must consider include:  (1) the relative access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive.  *Iragorri*, 274 F.3d at 73-74 (quoting *Gulf Oil*, 330 U.S. at 508.)  In considering these private interest factors, the Court "necessarily engages in a 'comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal.'"  *BMR & Associates, LLP*, 92 F. Supp. 3d at 142 (quoting *Iragorri*, 274 F.3d at 74.)

The private interest factors clearly weigh in Defendants' favor here.  First, as noted throughout, it is uncontested that this matter is centered on Bulgarian transactions between largely Bulgarian entities involving proceeds from the sale of Bulgarian land. (FIB Mem. at 19; *Fibank I* at 17.)  All of Plaintiffs and the vast majority of Defendants are Bulgarian persons or entities.  (*Id.*)  And, as suggested by the exhibits attached in support of Plaintiffs' motions, many of the documents relevant to litigating these claims are written in Bulgarian.  (*See, e.g.*, Dkt 1, Ex. A, B, D, E, F.)  Notwithstanding the conveniences of electronic discovery, it is only logical to glean that document discovery would be more easily based in Bulgaria; Plaintiffs do not argue otherwise.   Plaintiffs point to no documents, witnesses, or other information relevant to this matter that are more easily accessible in New York, simply stating that "New York was the site of negotiations, relationships, and course of dealings" between Plaintiffs (admittedly Bulgarian entities)

and Defendants (largely Bulgarian entities).  (Pl. FIB Opp. at 19; *see also Fibank I* at 17 ("Indeed, the cost and burden of bringing evidence and witnesses from Bulgaria to Texas for a matter having no material connection with Texas or the United States weighs heavily in favor of dismissal").)

Second, and relatedly, the witnesses for a potential trial – including the APD trustee, the Ayr trustee, and representatives from the Bulgarian entities involved – are Bulgarian citizens who are not subject to the compulsory process of this Court, but are subject to process of Bulgarian courts.  (FIB Mem. at 20; Emanuilov Decl. ¶ 9; *Fibank I* at 18.)  Plaintiff's only response is that "all litigation avenues have been exhausted in Bulgaria resulting in preclusion of claims or lack of jurisdiction," a position that already has been debunked above.  (Pl. FIB Opp. at 19.)  Plaintiffs also rely on their recurring mantra that Bulgarian courts would be unable to adjudicate Plaintiffs' claims under RICO and the New York debtor and creditor laws – a fact that cuts against Plaintiffs because it suggests forum shopping and which is rendered of little to no relevance by virtue of the principles previously set forth regarding available, even if not identical, claims and remedies in Bulgaria.  Third and finally, to the extent that any "view" of the property underlying the SBP would be relevant to Plaintiffs' claims, that factor would similarly favor conducting trial in Bulgaria, where the property is located.  (*See Fibank I* at 18 ("to the extent that the opportunity to view the premises is relevant, it also favors the Bulgarian forum because the Property is located in Bulgaria").)

The private interest factors strongly indicate that holding trial in Bulgaria would be significantly less burdensome – financially and practically – than trial in New York.

### b.    Public Interest Factors

The public interest factors enumerated in *Gulf Oil Corp.* and subsequently summarized in *Piper Aircraft Co.* include:  (1) the administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having the trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of forum law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Murray v. British Broadcasting Corp.*, 81 F.3d 287, 293 (2d Cir. 1996).  These factors "pertain[] to the burden imposed on this forum by retention of these disputes."  *BMR & Associates, LLP*, 92 F. Supp. 3d at 142 (quoting *Doe v. Hyland Therapeutics Division*, 807 F. Supp. 1117, 1128 (S.D.N.Y. 1992)).

Again, as also determined in *Fibank I,* the public interest factors weigh in favor of dismissal for forum non conveniens.  *See Fibank I* at 19-21.  First, the Court certainly "has an interest in preventing unnecessary congestion of the court's docket" as it sits in "one of the busiest districts in the country."  *BMR & Associates, LLP*, 92 F. Supp. 3d at 142 (citation omitted).  Neither party makes any such claim about the congestion of Bulgarian courts.  *See Turedi*, 460 F. Supp. 2d. at 527 ("there is no indication that courts in . . . Turkey are any more congested than the busy courts in this District").  Second, as Plaintiffs and a significant number of Defendants are residents of Bulgaria, and the core events in dispute (i.e., the theft of the SBP sale proceeds) took place in Bulgaria, Bulgaria has a significant interest in resolving this dispute.  *See Herald*, 540 F. App'x at 29 (countries "have an undeniably significant interest in policing conduct within their borders," particularly where defendants were "investment funds and financial institutions

organized and regulated under their laws"); *see also Monegasque* 311 F.3d at 500-01 ("there is no reason why localized matters should not be determined by the courts of the locale bearing the most significant contacts with them"); *Fibank I* at 19 (concluding that the "interest in resolving local controversies locally" weighed in favor of dismissal because "none of the injuries alleged . . . arose from or are in any way related to Fibank's contacts with the United States").

The third and fourth public interest factors – the interest in trying a case in a forum familiar with the law that governs it, and the interest in avoiding unnecessary conflict of law problems or issues in the application of foreign law – also support dismissal. While the parties have not thoroughly briefed the conflict of law issues presented, they agree that, if this action remains in New York, the court will apply New York's choice of law principles to determine what law would apply to Plaintiffs' tort claims.[8]  (FIB Motion at 21; Pl. FIB Opp. at 21.)  *See 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assurance Company*, 96 F. Supp. 3d 182, 216-17 (S.D.N.Y. 2015) (New York law calls for an "independent analysis under New York choice-of-law rules to identify which state's law should apply" to tort claims). The parties disagree, however, on the result of that analysis: Defendants maintain that, pursuant to New York's conflicts law, New York courts would be required to apply Bulgarian law to "resolve nearly all of

---

[8] Plaintiffs' tort claims include tortious interference (Count IX), unjust enrichment (Count XIV), fraudulent concealment (Counts XV-XVI), and fraud (Count XVII).  Plaintiffs thus miss the mark when they posit that "as all of Plaintiffs' claims arise under U.S. law such a conflict is remote."  (Pl. FIB Opp. at 21, n.46).  Under New York law, tort disputes are governed by "[t]he law of the jurisdiction having the greatest interest in the litigation." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384-85 (2d Cir. 2006) (quoting *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 183, 197, 491 N.Y.S.2d 90 (1985) and describing the choice of law analysis for tort claims under New York law).

Plaintiffs' claims" as Bulgaria is the jurisdiction with the "greatest interest in the litigation";
Plaintiffs posit that New York would apply because this dispute "can hardly be deemed
'local' to any other place than New York."  (FIB Mem. at 21; Pl. FIB Opp. at 21.)

A matter such as this one, which centers on Bulgarian individuals and entities over
the sales proceeds of Bulgarian property governed by contracts entered into in Bulgaria
among Bulgarian corporations and citizens, is anything but local to New York.  *See Fibank
I* at 20.  To be sure, Plaintiffs allege discrete connections between New York and the
instant dispute – negotiations related to the SBP contracts and dealings, designations of
New York-based bank accounts to hold funds related to the SBP (Compl. ¶ 467) – but
they come nowhere close to making New York the jurisdiction with the greatest interest
in this litigation.  As discussed in detail above, most of Defendants are Bulgarian entities
or citizens, the transactions forming the crux of Plaintiffs' claims (i.e., the transfer of $65
million sale proceeds from APD's bank account with CCB to defendant FIB) took place in
Bulgaria and involved Bulgarian entities and citizens, and the sale proceeds arose from
the sale of Bulgarian land from one Bulgarian entity (defendant APD) to another Bulgarian
entity (defendant FIB).  Accordingly, Bulgaria has a demonstrably stronger interest in this
matter than New York, and a New York court overseeing this matter would therefore be
required to apply Bulgarian law to certain of Plaintiffs' claims.  It goes without saying that
Bulgarian courts are more equipped to handle matters of Bulgarian law and that allowing
Plaintiffs' claims to be litigated in Bulgaria would avoid the complicated, contested choice
of law issues raised in the parties' briefing.  *See Osuna v. Citigroup*, No. 17 Civ. 1434,
2018 WL 6547205, at *12 (S.D.N.Y. Sept. 28, 2018) (concluding that public interest
factors weighed in favor of dismissal where Mexico had a "demonstrably-stronger

interest" in the underlying lawsuit and the court would accordingly be called on to apply Mexican law if the case remained in New York); *Cavlam Business Ltd. v. Certain Underwriters at Lloyd's, London*, No. 08 Civ. 2225, 2009 WL 667272, at *8 (S.D.N.Y. March 16, 2009) (finding that public interest factors weighed in favor of dismissal where English law was "more likely to be applied in this case than New York law" because "[t]he mere likelihood that foreign law will apply weighs in favor of dismissing the case for forum non conveniens"); *Ioannides v. Marika Maritime Corp.*, 928 F. Supp. 374, 379 (S.D.N.Y. 1996) ("While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of this action"); *see also Fibank I* at 20 (concluding that the third and fourth public interest factors weighed in favor of dismissal because "Bulgarian law will likely apply in this case or, at a minimum, be critical to its outcome").

Fifth and finally, the Supreme Court has admonished that "jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp.*, 330 U.S. at 508-09. As this dispute is one that is clearly local to Bulgaria, a country "far removed from [New York jurors'] own communities," dismissal in favor of trying this case in that forum is all the more appropriate. *BMR & Associates, LLP*, 92 F. Supp. 3d at 142.

In sum, both the private and public factors weigh in favor of dismissing the case due to forum non conveniens.

### 5.     The Non-Moving Defendants

While all of Defendants move for dismissal under the doctrine of forum non conveniens, there are several defendants who have been served, but have neither

answered nor moved to dismiss the Complaint:  All Seas Management, Ltd., Grant Capital Investments, Ltd., Blue Finance Limited, Chavdar Angelov Angelov, Anthony Dennis Harriott, and Ayr (the "Non-Moving Defendants").  Defendant Angelov is a Bulgarian citizen subject to process in Bulgaria, and would be subject to courts of Bulgarian jurisdiction.  (Compl. ¶ 23.)  The other Non-Moving Defendants, however, are based in various countries across the world including the Marshall Islands (defendant Blue Finance Limited), Malta (defendants Grant Capital Investments, Ltd. and All Seas Management, Ltd.), Canada (defendant Harriott), and the United States (by way of Texas) (defendant Ayr).  (Compl. ¶¶ 17, 18, 19, 24, 25.)  Arguably, this dispersion cuts against Bulgaria serving as an alternative forum for Plaintiffs' claims as these Non-Moving Defendants are not necessarily amenable to process there.  *See PT United Can Co.*, 138 F.3d at 73 (to grant a motion to dismiss for forum non conveniens, the review court must find "that the litigation may be conducted elsewhere against all defendants").

The court faced a similar issue in *McCrann v. RIU Hotels S.A.*, No. 09 Civ. 9188, 2010 WL 5094396 (S.D.N.Y. Dec. 6, 2010).  There, plaintiffs brought an action against numerous foreign defendants alleging liability for injuries sustained while horseback riding during a vacation in Aruba.  *McCrann*, 2010 WL 5094396, at *1.  All but one of the defendants submitted motions to dismiss requesting – among other things – dismissal for forum non conveniens.  *Id.*  The remaining defendant – a foreign corporation – was served with process, but failed to answer or otherwise appear in the action.  *Id.* at *8.  Following extensive discussion, the court granted forum non conveniens dismissal in favor of Aruba on the condition that defendants "consent to the jurisdiction of Aruban courts" within ten days of the decision.  *Id.*

The court had "grave doubt" that it had personal jurisdiction over for the non-appearing foreign defendant for the same reasons it did not find jurisdiction over the other defendants.  The court also found that Aruba "undoubtedly" presented a more convenient forum for the non-moving defendant than New York.  Accordingly, the court ordered plaintiffs to "show cause why the court should not dismiss the complaint as against" the non-moving defendant "for either or both of the reasons raised by the moving defendants" within ten days of the decision.  If plaintiffs failed to "discharge their burden or fail[ed] to respond," the court would then dismiss the action against the non-moving defendant.  *Id.* at *8.

This Court has similarly grave concerns over whether it would have personal jurisdiction over the remaining, Non-Moving Defendants, all of which are foreign corporations with no obvious ties to New York.  And, for the reasons stated above, Bulgaria is "undoubtedly" a more convenient forum to litigate this action.  Accordingly, before dismissing the case based on forum non conveniens, the Court should order Plaintiffs to show cause why the Court should not dismiss the complaint as against the Non-Moving Defendants on grounds of forum non conveniens.

## C.   Comity and Standing

Defendants additionally argue that the case should be dismissed based on principles of comity and lack of standing.  Because the Court finds that dismissal is warranted based on both lack of personal jurisdiction and, alternatively, the doctrine of forum non conveniens, the Court does not address these remaining arguments.   *See Havlish*, 2014 WL 4828654, at *5, n.10 ("Because Petitioners did not make a prima facie

case for personal jurisdiction, this Court need not address Respondent's additional arguments for dismissal," which included comity and lack of subject matter jurisdiction).

### D.   Order on Jurisdictional Discovery

In a separate motion to this Court, Plaintiffs argue that – at a minimum – they are entitled to certain jurisdictional discovery from the FIB Defendants, defendant BNYM, the Eaton Vance Defendants, defendant Peevski, defendant BNB, defendant Ayr, and defendant Angelov.[9]  (Dkt. 294, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Leave, ("Pl. Disc. Mem.").)  Across three separate briefs, the FIB Defendants, defendant BNYM, the Eaton Vance Defendants, defendant Peevski, and defendant BNB oppose, asserting that Plaintiffs should not be afforded jurisdictional discovery where they have not pled a prima facie basis to exercise personal jurisdiction and, alternatively, where Plaintiffs fail to explain how the discovery requests they seek – contained in "impermissibly broad requests" – will assist in demonstrating that personal jurisdiction exists over one or more of these defendants.  (Dkt. 296, 303, 307.)

This is not Plaintiffs' first attempt to obtain such discovery.  On June 13, 2019, Plaintiffs submitted a letter request seeking jurisdictional discovery to support their oppositions to Defendants' anticipated motions for dismissal on the bases of forum non conveniens and lack of personal jurisdiction.  (Dkt. 132.)  There, Plaintiffs presented a similar overview of the discovery they intended to seek, which included materials from those defendants subject to the instant motion.  On June 20, 2019, Defendants filed

---

[9] As earlier noted, neither defendant Ayr nor defendant Angelov has appeared in this action, let alone responded to Plaintiffs' motion for jurisdictional discovery.  Accordingly, the above discussion centers on the propriety of jurisdictional discovery from the remaining Defendants, namely the FIB Defendants, defendant BNB, defendant BNYM, the Eaton Vance Defendants, and defendant Peevski.

separate letters in opposition, all of which argued that Plaintiffs failed to establish a prima facie case of jurisdiction over them and, even if prima facie jurisdiction had been established, the requests were "vastly overbroad . . . masquerade[s] for extensive merits discovery."  (Dkt. 136, 137.)

On July 1, 2019, this Court denied Plaintiffs' requests for jurisdictional discovery, finding the operative complaint – which largely contained "insufficient conclusory statements, speculation, and contractual jurisdictional provisions not applicable to Defendants other than [defendant Ayr]" – "fail[ed] to allege a prima facie case of personal jurisdiction in New York over the Defendants in question."  (Dkt. 139.)  Months later, Plaintiffs requested and were afforded a second opportunity to amend their Complaint and a second opportunity to request jurisdictional discovery based on their supplemented allegations.  (Dkt. 215, 225, 237.)  As discussed in detail above, Plaintiffs' second amended complaint suffers from similar deficiencies as its first and fails to plead a prima facie case of personal jurisdiction over the FIB Defendants, the Eaton Vance Defendants, the Five Bulgarian Companies, the Peevski Defendants, defendant Bulgartabac, or Bulgarian National Bank.  With that in mind, the Court must consider whether it should exercise its discretion to afford Plaintiffs' jurisdictional discovery anyway.  For the reasons stated below, the Court declines to do so.

"District courts have broad discretion to decide whether to allow jurisdictional discovery and, if so, to what extent."  *In re MS Angeln GmbH & Co. KG*, No. 10 Civ. 4820, 2012 WL 1080300, at *7 (S.D.N.Y. March 29, 2012).  In light of that discretion, the Second Circuit has repeatedly affirmed denials of jurisdictional discovery where the plaintiffs failed to demonstrate a prima facie case for personal jurisdiction over the subject defendants.

*See Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 402 (2d Cir. 2009) (affirming district court's "discretionary decision" to deny jurisdictional discovery where plaintiff failed to point to anything in the record to suggest that district court's personal jurisdiction analysis required reversal); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) (concluding that district court was "well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction"); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 186 (2d Cir. 1998) ("Since the Jazinis did not establish a prima facie case that the district court had jurisdiction over Nissan Japan, the district court did not err in denying discovery on that issue"); *see also In re MS Angeln GmbH & Co. KG*, 2012 WL 1080300, at *7 (denying jurisdictional discovery because plaintiffs had failed to establish a prima facie case of jurisdiction and because the requested discovery "will not alter the jurisdictional analysis").

At the same time, "[i]t is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *In re Platinum and Palladium Antitrust Litigation*, 2017 WL 1169626, at *50 (quoting *Ikeda v. J. Sisters 57, Inc.*, No. 14 Civ. 3570, 2015 WL 4096255, at *8 (S.D.N.Y. July 6, 2015)); *see also Havlish*, 2014 WL 4828654, at *5 ("It is within this Court's discretion to determine if jurisdictional discovery is appropriate where Petitioners have failed to make a prima facie case for personal jurisdiction") (citing *Frontera Resources Azerbaijan Corp.*, 582 F.3d at 401); *Daventree Ltd.*, 349 F. Supp. 2d at 761 ("If a plaintiff has identified a genuine issue of

jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction").    Indeed, the Second Circuit has instructed that "a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction."  *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks and citation omitted).

When considering whether to permit jurisdictional discovery, courts often consider the scope of the proposed requests and whether the particular facts they seek to adduce could aid in its jurisdictional inquiry.  *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 425 (S.D.N.Y. 2009).  This is because a "plaintiff cannot put [a] defendant through the costly process of discovery, even discovery limited to jurisdictional matters, simply because it thinks that it can probably show significant contact with the state of New York if discovery were to proceed."  *Bellepointe, Inc. v. Kohl's Department Stores, Inc.*, 975 F. Supp. 562, 565 (S.D.N.Y. 1997); *Daval Steel Products v. M.V. Juraj Dalmatinac*, 718 F. Supp. 159, 162 (S.D.N.Y. 1989) ("The mere commencement of a lawsuit without the support of a threshold showing of jurisdictional prerequisites, should not entitle the party to use the court processes to attempt to find support for having commenced the litigation") (citation omitted).

Courts thus have repeatedly refused to permit jurisdictional discovery where the requests amounted to "a fishing expedition unlikely to uncover any material facts" that would alter its conclusions regarding personal jurisdiction.  *Duff & Phelps Securities, LLC v. Wisniewski*, No. 16 Civ. 7226, 2017 WL 2880849, at *5 (S.D.N.Y. July 5, 2017); *see also SPV Osus Ltd. v. UniCredit Bank Australia*, No. 18 Civ. 3497, 2019 WL 1438163, at *12 (S.D.N.Y. March 30, 2019) (denying jurisdictional discovery where "Plaintiff does not

point to any particular facts that it would hope to discover that would permit this Court to exercise jurisdiction"); *In re Herald, Primeo and Thema Funds Securities Litigation*, No. 09 Civ. 289, 2011 WL 4056819, at *3 (S.D.N.Y. Sept. 8, 2011) (denying jurisdictional discovery where the discovery sought was "plainly more aimed at the merits of the case than the issue of in personam jurisdiction," particularly as the requests were "not limited to communications in which one of the parties was located in New York"); *M. Shanken Communications, Inc. v. Variant Events, LLC*, No. 10 Civ. 4747, 2010 WL 4159476, at *9 (S.D.N.Y. Oct. 7, 2010) (denying jurisdictional discovery where "[n]othing in the pleadings suggest[ed] that the facts needed to satisfy" long-arm jurisdiction in New York "would likely be uncovered through limited discovery").

Plaintiffs offer this Court little guidance on what particular facts they hope to adduce from their proposed jurisdictional discovery, largely resting on the assumption that responsive documents "would further strengthen Plaintiffs' basis for personal jurisdiction" over the respective defendants by highlighting additional contacts with the United States. (Dkt. 308, Plaintiffs' Reply to the Fibank Defendants' Opposition to Plaintiffs' Motion for Jurisdictional Discovery, at 6; Dkt. 309, Plaintiffs' Reply to . . . Delyan Peevski . . . and the Eaton Vance Defendants' Opposition to Plaintiffs' Motion for Jurisdictional Discovery, at 8.) To the contrary, what little guidance Plaintiffs do offer highlights that the facts they seek would not impact the jurisdictional analysis set forth above. For example, Plaintiffs assert that documents responsive to the proposed requests directed to defendant Peevski – banking activities, communications with U.S. defendants, stock ownership in U.S. based defendants, and lobbying activity in the U.S. – "would inform the Rule 4(k)(2) aggregate U.S. contacts theory for personal jurisdiction by further demonstrating Peevski's business

activities and contacts in the U.S." (Dkt. 309 at 8.) But Plaintiffs make no effort to connect these alleged "U.S. contacts" to the instant action, which is required where alleging specific – not general – jurisdiction under Rule 4(k)(2) as Plaintiffs do here. (Pl. FIB Opp. at 7-8 (arguing that Peevski, among others, is subject to "specific jurisdiction" pursuant to Rule 4(k)(2)); Dkt. 309 at 6 (acknowledging that Plaintiffs "only plead general jurisdiction as to Eaton Vance companies"), 10 (Plaintiffs stating that the "more stringent general jurisdiction standard" under Rule 4(k)(2) is not applicable to defendant Peevski).) *See In re Platinum and Palladium Antitrust Litigation*, 2020 WL 1503538, at *41 (specific jurisdiction is "[w]here the claim arises out of, or relates to, the defendant's contacts with the forum") (quoting *Licci ex rel. Licci*, 732 F.3d at 170); *In re MS Angeln GmbH & Co. KG*, 2012 WL 1080300, at *5 ("Under the specific theory, the cause of action is related to or arises out of the defendant's forum related activities").

Plaintiffs' requests from the remaining Defendants are no better. Without setting any time limits for such requests, Plaintiffs seek all "communications with" and records of payments made "to and from" the FIB Defendants and defendant BNYM and/or the Eaton Vance Defendants (or their affiliates). (Pl. Disc. Mem. at 6.) Plaintiffs seek similarly broad swaths of information from nominal parties defendant BNYM and the Eaton Vance Defendants, along with defendant BNB. (*See* Pl. Disc. Mem. at 6-7.) But records of "payments" or "communications" between foreign defendants and New York entities are insufficient to establish personal jurisdiction under New York's long-arm statute. *See Hau Yin To v. HSBC Holdings PLC*, No. 15 Civ. 3590, 2017 WL 816136, at *5 (S.D.N.Y. March 1, 2017) ("a foreign defendant's communications with a party in New York or sending of monies into New York are not sufficient to establish personal jurisdiction without the

defendant having 'projected' itself into New York for the purposes of conducting business there"), *aff'd*, 700 F. App'x 66 (2d Cir. 2017); *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) ("New York courts have consistently refused to sustain . . . jurisdiction solely on the basis of defendant's communication from another locale with a party in New York.") (citation omitted).  Similarly, Plaintiffs seek all "documents and communications" related to "lobbying or other activities in the United States" from defendant Peevski and the FIB Defendants.  (Pl. Disc. Mem. at 6-7.)  But evidence of "lobbying activities" in the United States, without more, is insufficient to establish personal jurisdiction.  *See Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 342 (2d Cir. 2016) (concluding that specific personal jurisdiction could not be based on lobbying activities that were "not connected to the wrongs for which the plaintiffs here seek redress").

Plaintiffs spill considerable ink to convince the Court otherwise by distinguishing their requests from the ones rejected in other cases cited in support of Defendants' oppositions.  (Dkt. 308 at 4-7; Dkt. 309 at 7-11.)  But Plaintiffs are simply distinguishing "overly broad" from "overly broader."  Neither is permissible.  This is readily apparent when comparing Plaintiffs' various requests from those that have been permitted to proceed, which were limited to particular transactions or time periods.  *See, e.g.*, *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 207-08 (2d Cir. 2003) (reversing denial of jurisdictional discovery where district court's denial did not acknowledge an allegation in plaintiffs' complaint that specifically cited the minutes of a meeting where relevant matters were discussed, which plaintiffs should have been allowed to further explore through discovery); *Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201, 2006 WL 587342, at *8-9 (S.D.N.Y. March 9, 2006) (permitting "limited" jurisdictional discovery on

four U.S. transactions identified in the complaint, on the defendant's "business contacts" in the United States "at the time of the alleged conspiracy," and on the activity in certain of his bank accounts "at the time of the conspiracy").  It is impossible to deduce how the materials requested will serve any function other than to "allow Plaintiffs to embark on a jurisdictional mining expedition," which should not be permitted.  *In re Platinum and Palladium Antitrust Litigation*, 2017 WL 1169626, at *50.  Accordingly, Plaintiffs' application for the jurisdictional discovery described in their request is denied.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for jurisdictional discovery is DENIED, and I recommend that Defendants' motions to dismiss be GRANTED based on lack of personal jurisdiction and the claims asserted against them DISMISSED without prejudice. Alternatively, the case should be dismissed without prejudice based on forum non conveniens, subject to the following conditions: (1) Defendants consent to personal jurisdiction in Bulgarian courts, (2) the Bulgarian courts accept jurisdiction over the matter, and (3) Plaintiffs be ordered to show cause why the action should not be dismissed against the Non-Moving Defendants for similar reasons.

## Procedures for Filing Objections

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Gregory H. Woods, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **FAILURE TO FILE TIMELY**

**OBJECTIONS WILL RESULT IN WAIVER OF OBJECTIONS AND PRECLUDE APPELLATE REVIEW.**

Respectfully Submitted,

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:          August 18, 2020
                New York, New York

Copies transmitted to all counsel of record.