```
                                                    USDC SDNY
                                                    DOCUMENT
UNITED STATES DISTRICT COURT                        ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK                       DOC #:_____
------------------------------------------------------------ X   DATE FILED: 1/28/22
                                                  :
RUDERSDAL, EOOD, et al.,                          :
                                                  :
                                Plaintiffs,       :              1:18-cv-11072-GHW
                                                  :
                     -against-                    :              MEMORANDUM
                                                  :              OPINION AND ORDER
PHILIP ROBERT HARRIS, et al.,                     :
                                                  :
                                Defendants.       :
                                                  :
------------------------------------------------------------ X
```

GREGORY H. WOODS, United States District Judge:

Plaintiffs in this action allege that the many defendants, most of whom are located in Bulgaria, engaged in a complex conspiracy to fraudulently divert loan proceeds away from a Bulgarian company, causing it to become bankrupt and sell certain land in Bulgaria through the resulting Bulgarian bankruptcy proceeding. The proceeds from this sale were allegedly then fraudulently transferred from a Bulgarian bank account to five Bulgarian companies instead of Plaintiffs. Several defendants moved to dismiss for lack of personal jurisdiction and for *forum non conveniens*. On September 30, 2020, this Court issued a Memorandum Opinion and Order (the "Order") adopting in large part the August 18, 2020 Report and Recommendation of Magistrate Judge Robert Lehrburger (the "First R&R") granting the moving defendants' motions to dismiss for lack of personal jurisdiction, and in the alternative for *forum non conveniens*. The Court ordered additional briefing on two topics. First, the Court directed the parties to file supplemental briefing on whether the conspiracy theory of jurisdiction endorsed by the Second Circuit in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) could support a finding of jurisdiction over the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac under Federal Rule of Civil Procedure 4(k)(2) ("Rule 4(k)(2)"). Second, Plaintiffs were directed to file a

motion for leave to amend their complaint with respect to piercing the corporate veil of Ayr, for the limited purpose of asserting personal jurisdiction over Harris, and to show cause why the Second Amended Complaint should not be dismissed for *forum non conveniens* as to certain defendants who had not yet moved to dismiss.  On February 27, 2021, Judge Lehrburger issued a second Report and Recommendation (the "Second R&R")—granting Plaintiffs' motion to amend and recommending that the Court grant the motions to dismiss for lack of personal jurisdiction and otherwise sever the claims against certain defendants to facilitate dismissal for *forum non conveniens*.

Now before the Court are several objections to the Second R&R.  In essence, Plaintiffs argue that they have pleaded a single, wide-ranging conspiracy involving all of the defendants; that a conspiracy theory of jurisdiction is available under Rule 4(k)(2); that they have adequately pleaded personal jurisdiction under such a theory; and that, otherwise, severance to facilitate a dismissal of certain defendants for *forum non conveniens* in this case would be inappropriate.  Having reviewed the objections and the Second R&R, the Court adopts in full the finding that severance is appropriate to facilitate dismissal of the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, Bulgarabac, VTB,[1] and the BNB Conservators[2] for *forum non conveniens*.[3]  While the Court need not address whether Rule 4(k)(2) allows Plaintiffs to plead a conspiracy theory of personal jurisdiction, however, as dicta, the Court concludes that a plaintiff may plead personal jurisdiction under Rule 4(k)(2) using a theory of conspiracy jurisdiction because the Second Circuit has expressly held that conspiracy jurisdiction is consistent with Constitutional Due Process and its exercise in this case

---

[1] While VTB had not yet appeared in this action at the time of the Order, it has subsequently appeared and requested permission to move to dismiss for *forum non conveniens*.  Dkt. No. 334.  Judge Lehrburger denied VTB permission to do so pending resolution of the Second R&R.  The Court now dismisses, *sua sponte*, the claims against VTB for *forum non conveniens*.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (discussing a court's inherent authority to dismiss an action on grounds of *forum non conveniens*); *In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 279 (S.D.N.Y. 2010) (dismissing claims *sua sponte* for *forum non conveniens*).

[2] Like VTB, the Court exercises its inherent authority to dismiss the BNB Conservators, *sua sponte*, for *forum non conveniens*.

[3] The Second R&R included BNB and the Eaton Vance Defendants in its *forum non conveniens* analysis.  But those parties were previously dismissed from this case.  *See* Order at *8–9.  As a result, the Second R&R's well-reasoned conclusion that those parties should be also dismissed for *forum non conveniens* serves only as an alternative basis for dismissal.

does not conflict with any other law identified by the parties or the Court. Regardless, Plaintiffs have failed to plead the minimum contacts necessary to establish personal jurisdiction over the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, or Bulgarabac, even when considering a conspiracy theory of jurisdiction. Accordingly, Plaintiffs' claims against those defendants would be subject to dismissal on that basis as well.

## I.   BACKGROUND

While the First R&R, the Order, and the Second R&R each contain a comprehensive description of the facts and procedural history of the case, the nature of the claims and objections here calls for the Court to recount some of the allegations that are most pertinent to the Court's resolutions of these objections.

### A.   Facts[4]

As Judge Lehrburger aptly described in the Second R&R, Plaintiffs broadly allege two separate courses of conduct. Second R&R at 4. First, Plaintiffs allege that they lost money when three loans issued by FIB (the "FIB Loans") were diverted from their originally intended purpose—the purchase and/or development of the Silver Beach Project ("SBP"), a $500 million development project on the Black Sea in Bulgaria—and instead were used for the personal benefit of Harris, Harriot, and Angelov—who used the diverted funds to purchase certain Mexican bonds. As a result of this diversion, the SBP's owner, APD—a Bulgarian subsidiary of Ayr, Harris's alleged shell company, and a company in which many of the Plaintiffs held interests—became bankrupt. The

---

[4] The following facts are taken from Plaintiffs Third Amended Complaint ("TAC"), filed following the Second R&R. *See* Third Am. Compl., Dkt. No. 411. "[W]hen a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303–04 (2d Cir. 2020). Here, Plaintiffs were granted permission to amend their complaint for the sole purpose of adding allegations supporting the exercise of personal jurisdiction over Harris by piercing the corporate veil of Ayr. (And the Court declines to consider any allegations beyond this limitation. *See, e.g.*, TAC ¶¶ 3A, 5A.) As the additional allegations are largely irrelevant to the other aspects of the Second R&R, the Court opts to consider the Second R&R using the Third Amended Complaint rather than to moot the pending motions.

defendants allegedly involved in the first course of action were Harris, Harriott, Angelov, their shell companies, and FIB (as the originator of the loans).

The second course of conduct involved the alleged theft of the proceeds from the sale of the SBP in Bulgarian bankruptcy court. After APD became bankrupt—as a result of the alleged diversion of the proceeds of the FIB Loans—the SBP was sold for approximately $65 million (the "Funds"). The Funds were placed in APD bank accounts with CCB, a Bulgarian bank. Plaintiffs claim that, while they were the sole creditors entitled to those funds, FIB forged a signature to effectively steal the Funds—at the direction of Peevski, a Bulgarian politician—to pay off debts owed to FIB by the Five Bulgarian Companies, in which Peevksi and Bulgartabac hold interests.

That the first and second sets of events are distinct is critical to the severance analysis below. While Plaintiffs argue that these actions were a single course of conduct or conspiracy, the pleadings fail to bridge the gap. Instead, Plaintiffs have pleaded two separate courses of conduct linked only by conclusory allegations.

a. First Course of Conduct: The Loan Diversion

On November 22, 2007, FIB issued the first FIB Loan to Port Investment Bulgaria for the purchase of the SBP land from All Seas 2 and to facilitate changing the designation of the land. Oct. 3, 2018 Angelov Decl. ¶ 8; May 18, 2017 Angelov Decl., Ex. 1; TAC ¶¶ 557. The SBP land served as collateral for the first FIB Loan. TAC ¶ 59. FIB issued the second FIB Loan, also collateralized by the SBP land, on October 2, 2008, when it issued a loan to All Seas 2 and Port Investment Bulgaria to deal with unexpected additional expenses in developing the SBP. TAC ¶ 557; May 18, 2017 Angelov Decl., Ex. 4 at 1–2. These two FIB Loans totaled approximately $46.9 million. TAC ¶ 59.

Plaintiffs allege that the funds from the first two FIB Loans were never used to develop the SBP. Instead, a significant portion of these loans were transferred—via intercorporate loan—from

Port Investment Bulgaria to All Seas 2, then transferred to a Bank of Valletta account in Malta belonging to defendant All Seas Management.  May 18, 2017 Angelov Decl., Ex. 9.2; TAC ¶ 59. From there, a portion of the funds were transferred to Grant Capital—Harriot's alleged Maltese shell corporation—and used to purchase Mexican bonds for the personal benefit of Angelov, Harriott, and Harris.  TAC ¶¶ 76–77, 106.

Because the funds from the FIB Loans were diverted, the SBP was never developed, and a contract for sale to Rudersdal was breached.  TAC ¶ 106.  Additionally, the FIB Loans became non-performing.  TAC ¶ 75.

In September 2009, Angelov and Harris created APD—a subsidiary of Ayr—and signed a contract memorializing a plan pursuant to which 1) Ayr would finance the SBP; 2) APD would purchase the SBP land from All Seas 2; and 3) Ayr would hold the mortgage on the SBP.  TAC ¶ 66; Dkt. 1, Ex. A ("APD Contract") at 1–4.  In December 2009, Ayr informed FIB of its plan and offered to purchase FIB's debt positions in the SBP (the first two FIB Loans).  FIB accepted this offer contingent on Ayr paying interest on the two FIB Loans.  TAC ¶¶ 63–64.  Critically, successful completion of this transaction would have divested FIB of any potential interest in the SBP.

On December 20, 2009, APD purchased the SBP land from All Seas 2—in accordance with the plan—for approximately $124 million (although APD allegedly shorted All Seas 2 approximately $37.9 million).  TAC ¶¶ 88–89.  On December 29, 2009, FIB issued the third FIB Loan related to the SBP for approximately $11.6 million.  TAC ¶¶ 68, 557.  The loan was an "interest payment loan" and was issued to Plaintiff Asset Management, a company Harris and Angelov used as a front organization for the loan.  TAC ¶¶ 68, 75.  A portion of the funds from this loan was also used to purchase Mexican bonds.  TAC ¶¶ 73–78.  Like the first two FIB loans, the SBP land served as collateral.  Swap Agreement at 3–4, 6.  Plaintiffs also allege that a fraudulent invoice for the delivery of coal served as a basis for the loan.  TAC ¶¶ 69–72.

On June 4, 2010, APD took steps to complete the third part of the alleged plan by acquiring FIB's debt interest in the SBP.  APD entered into a "swap agreement" with FIB, through which APD would purchase FIB's debt positions in the three FIB Loans.  TAC ¶ 85; Swap Agreement. Ayr attempted to make a payment on that agreement, but the transaction was never completed, in part due to the "failings of the Bulgarian bank system" and BNB's choice not to intervene to help the transfer go through.  TAC ¶¶ 90, 92, 94–95(c).  Because Ayr failed to make this payment, FIB threatened to foreclose on the SBP.  TAC ¶ 95.  Thereafter, on February 4, 2011, APD filed for bankruptcy in Bulgaria. *Mims v. Fibank*, No. 16-CV-3138 (Bankr. N.D. Tex. May 15, 2017), slip op. at 4.  Prior to a meeting of APD's creditors, Plaintiffs Asset Management and All Seas 2 signed an agreement with Ayr creating a "Reorganization Plan" that contemplated APD retaining possession of the SBP in exchange for stock in another Ayr subsidiary.  Agreement dated March 28, 2012 (the "Agreement"), Dkt. No. 1, Ex. D at 1–6; *Mims*, No. 16-CV-3138, slip op. at 4.  This stock transfer would serve as satisfaction for all debts owed to Asset Management and All Seas 2 related to the SBP (Rudersdal also had the option to join the Agreement).  Agreement at 1–6.

Ultimately, the Reorganization Plan failed to materialize because it was never funded.  TAC ¶¶ 107–12; Sept. 24, 2019 McClanahan Decl. ¶ 11; Sept. 6, 2018 McClanahan Decl. ¶ 8.  The SBP land was sold in the Bulgarian bankruptcy proceeding for approximately $65 million.  Asset Management and All Seas 2 later conducted an "investigation" into FIB's claims during the Bulgarian bankruptcy proceedings and determined that all three FIB loans related to the SBP were based on fictitious transactions and did not give FIB any rights to the SBP land or bind APD in any way.  TAC ¶¶ 123; Supplemental Agreement at 2–3.

On October 10, 2014, Ayr filed for bankruptcy in Texas.  Plaintiffs assert that APD and the Funds were Ayr assets, that FIB had no claim to the Funds, and that Plaintiffs were the sole creditors of Ayr, entitling them to the Funds.  TAC ¶¶ 1, 11–15, 43, 102, 329, 523.  Ayr, however,

failed to list APD or the Funds as Ayr assets in the Texas bankruptcy proceedings.  TAC ¶¶ 146–48.

Ultimately, the failure to list APD as an Ayr asset had no effect.  On the same day that Ayr filed for

bankruptcy, the Texas bankruptcy court issued an automatic stay on all potential Ayr assets—

including APD.  TAC ¶ 151.  On October 22, 2014, the Bulgarian bankruptcy court and APD

trustee were notified of the automatic stay.  TAC ¶¶ 153–154.

> b. <u>Second Course of Conduct:  Theft of the Bankruptcy Funds</u>

On October 24, 2014, FIB allegedly forged the signature of one of APD's Bulgarian

bankruptcy trustees, permitting CCB to release the Funds to FIB.  TAC ¶¶ 189–190.  According to

Plaintiffs, FIB took that action at the direction of Defendant Peevski and applied the Funds to debts

owed to FIB by the Five Bulgarian Companies, in which Peevski and Balgartabac had interests.

TAC ¶¶ 189–190.  Plaintiffs further allege that BNB and the BNB Conservators failed to safeguard

the funds.  TAC ¶ 154.  VTB also was allegedly involved because it had call options in some of the

Five Bulgarian Companies and exercised them shortly after their debts were extinguished using the

Funds.  TAC ¶¶ 233, 254.

## B.  Procedural History

Plaintiffs filed this action on November 27, 2018.  Dkt. No. 1.  In February 2020, many

defendants moved to dismiss based on lack of personal jurisdiction and *forum non conveniens*.  Those

Defendants were Harris, the FIB Defendants, the Peevski Defendants, the Five Bulgarian

Companies, Bulgartabac, BNB, BNYM, and the Eaton Vance Defendants (the "Moving

Defendants").  All but BNYM moved for dismissal based on personal jurisdiction.  First R&R at 17

& n.1, 59.  All of the Moving Defendants moved for dismissal based on *forum non conveniens* in favor

of Bulgaria, except for Harris, who moved for dismissal based on *forum non conveniens* in favor of

Texas.  *Id.* at 61 & n.4.

On September 30, 2020, the Court issued the Order, granting the motions to dismiss for lack

of personal jurisdiction filed by Harris, the Eaton Vance Defendants, and BNB.  *Rudersdal, EEOD v. Harris*, 2020 WL 5836517, at *6, 14 (S.D.N.Y. Sept. 30, 2020).  Regarding the motions to dismiss for lack of personal jurisdiction filed by the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac, the Court "held [the motions] in abeyance pending targeted briefing on conspiracy jurisdiction in light of [*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018)]."  *Id.* at *14.

The Court further granted the Moving Defendants' motions to dismiss based on *forum non conveniens*, subject to certain conditions.  *Id.*  It then ordered Plaintiffs to show cause "why the Second Amended Complaint should not be dismissed for *forum non conveniens* as against the Non-Moving Defendants."  *Id.*

## II.    STANDARD OF REVIEW

With respect to dispositive motions, the Court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  A district court must "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  "To the extent, however, that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error."  *IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citation omitted).  Objections like this "are frivolous . . . and would reduce the magistrate's work to something akin to a meaningless dress rehearsal.  The purpose of the Federal Magistrates Act was to promote efficiency of the judiciary, not undermine it by allowing parties to relitigate every argument which it presented to the Magistrate Judge."  *Vega v. Artuz*, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002) (citations and internal quotation marks omitted).

The Court may set aside a magistrate judge's order on a non-dispositive matter only if it is

clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).  A magistrate judge's order is clearly erroneous where "'on the entire evidence,' the [district court] is 'left with the definite and firm conviction that a mistake has been committed.'"  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Under this highly deferential standard of review, "magistrate judges are afforded broad discretion in resolving non-dispositive disputes and reversal is appropriate only if their discretion is abused."  *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283 (S.D.N.Y. 2005) (quoting *Derthick v. Bassett-Walker Inc.*, 1992 WL 249951, at *8 (S.D.N.Y. Sept. 23, 1992)) (internal quotation marks and alterations omitted).

Many of Plaintiffs' objections to the Second R&R simply repackage arguments already presented to Magistrate Judge Lehrburger and to this Court in Plaintiffs' objections to the First R&R.  Additionally, and somewhat inexplicably, Plaintiffs have filed objections on behalf of defendants Angelov, All Seas Management, Blue Finance, Harriott, and Grant Capital Investments.  *See* Dkt. Nos. 390, 391.  The Court will not consider these as proper objections as none of these defendants have formally appeared in this case and because the so-called objections were not filed by those parties.  If these defendants wish to file papers in this case, they should retain counsel and do so.  Plaintiffs' counsel may not represent parties on both sides of this action and should refrain from making any further filings on any defendant's behalf.  Nonetheless, the Court has reviewed the Second R&R *de novo*.

## III.   ORDER TO SHOW CAUSE WHY NON-MOVING DEFENDANTS SHOULD NOT BE DISMISSED FOR *FORUM NON CONVENIENS*

In the Order, the Court conditioned dismissal for *forum non conveniens* on 1) defendants' consent to personal jurisdiction in Bulgarian courts; 2) the Bulgarian courts' acceptance of jurisdiction over the matter; and 3) waiver of any statute of limitations defenses that would have arisen since the commencement of this action.  *Rudersdal*, 2020 WL 5836517, at *13.  The Court further ordered Plaintiffs to "show cause why the action should not be dismissed against the Non-

Moving Defendants for [*forum non conveniens*]." *Rudersdal*, 2020 WL 5836517, at \*13.  The Non-Moving Defendants are All Seas Management, Grant Capital Investments, Blue Finance, Angelov, Harriott, and Ayr (though Ayr has since appeared in this case and requested permission to move to dismiss).  As noted in the Second R&R, all of the Non-Moving Defendants with the exception of Ayr do not consent to jurisdiction in the Bulgarian courts.  Accordingly, the Court adopts the Second R&R's finding on the order to show cause and will not dismiss All Seas Management, Grant Capital Investments, Blue Finance, Angelov, or Harriott for *forum non conveniens*.

## IV.  SEVERANCE TO FACILITATE DISMISSAL FOR *FORUM NON CONVENIENS*

Because not all the Defendants are being dismissed from this action, the Second R&R analyzed "whether it is appropriate to sever those defendants that are not amenable to suit in Bulgaria in order to facilitate a dismissal for *forum non conveniens*." *Rudersdal*, 2020 WL 5836517, at \*13.  The Second R&R concluded that severance would be appropriate to facilitate dismissal of FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, Bulgartabac, the BNB Conservators, the Eaton Vance Defendants, and VTB (the "Group Two Defendants").  Because, as correctly determined in the Second R&R, the first and second courses of actions arise out of different transactions, the claims present different questions of law and fact requiring different witnesses and documentary proof, severance of the claims would facilitate judicial economy and possibly focus the issues for settlement and trial, and prejudice would be avoided if severance were granted, severance is appropriate in this case.  Accordingly, the claims against the Group Two Defendants are severed and dismissed for *forum non conveniens*.

### A.    Legal Standard

A court may sever claims to facilitate dismissal for *forum non conveniens*.  *See, e.g.*, *Wave Studio, LLC v. Gen. Hotel Mgmt.*, 2017 WL 972117, at \*10 (S.D.N.Y. Mar. 10, 2017) (severing claims against one defendant to facilitate dismissal for *forum non conveniens*), *aff'd*, 712 F. App'x 88 (2d Cir. 2018);

*Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 723 (S.D.N.Y. 2011) (same); *Zanghi v. Ritella*, 2021 WL 4392756, at *9 (S.D.N.Y. Sept. 24, 2021) (same).[5]

Rule 21 of the Federal Rules of Civil Procedure provides that a court may "sever any claim against a party." In resolving a motion for severance, courts consider "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.*" N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 114 (S.D.N.Y. 2015) (quoting *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 502–03 (S.D.N.Y. 2013)). Severance is appropriate where it "will serve the ends of justice and further the prompt and efficient disposition of the litigation." *Erausquin v. Notz, Stucki Management (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011) (internal quotation marks omitted). Deciding whether to sever is "committed to the sound discretion of the trial court." *State of New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988).

### B.    Discussion

As the Second R&R concluded, and as discussed below, the claims against the Group One Defendants should be severed from the claims against the Group Two Defendants and the claims against the Group Two Defendants should be dismissed for *forum non conveniens*.

---

[5] The Court recognizes that another court in this district has suggested the opposite conclusion. *Fasano v. Guoqing Li*, 2020 WL 5096001, at *11 (S.D.N.Y. Aug. 28, 2020) ("While it is clear that the Court could sever claims or parties if this were a motion to transfer pursuant to § 1404(a), the Court is skeptical that severance is permitted in the *forum non conveniens* context . . . "). But, as recognized in *Zanghi*, "in [*Phillips v. Audio Active Ltd.*, 494 F.3d 378, 393 (2d Cir. 2007)], the Second Circuit determined that it would be appropriate to dismiss a plaintiff's contract claim and to retain jurisdiction over his remaining claims when a forum selection clause required a contract claim to be litigated in England and the *forum non conveniens* analysis for the other claims weighed in favor of deferring to plaintiff's decision to sue in the United States." 2021 WL 4392756, at *9. Thus, it is certainly possible to dismiss certain claims for *forum non conveniens* while retaining jurisdiction over others. And the most appropriate procedural mechanism by which a court may effect such a dismissal is severance.

### 1. Same Transaction or Occurrence

Claims arise out of the "same 'transaction or occurrence'" only if there is a "logical relationship" between them. *Computer Assoc. Int'l v. Altai*, 893 F.2d 26, 29 (2d Cir. 1990). Here, there is no logical connection between the first course of conduct—the alleged diversion of the FIB Loan proceeds from a private commercial transaction—and the second course of conduct—the alleged theft of proceeds from the sale of an asset in a bankruptcy proceeding. As pleaded, the two transactions were not logically related. The first course of conduct alleges that the Group One Defendants took out loans from FIB for the SBP, but then diverted the funds from those loans for their personal use. TAC ¶¶ 57–109. The Group Two Defendants are not alleged to have planned the alleged conduct or participated in the alleged conduct (with the exception of the FIB Defendants, as discussed below). Indeed, the Third Amended Complaint fails to allege that the Group Two Defendants even knew of the first course of conduct. So too with the Group One Defendants and the second course of conduct (with the exception of Harris, as discussed below). Plaintiffs' attempts to bridge these two otherwise separate courses of conduct fall flat.[6] Accordingly, this factor weighs in favor of severance. *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 214 F.R.D. 152, 156 (S.D.N.Y. 2003) (severing claims where there were "two sets of defendants and two sets of claims" and "[t]he connection between the claims [was] tenuous").

The only notable exceptions to this otherwise clean division of conduct are allegations that the FIB Defendants were involved in the first course of conduct and that Harris—and Ayr, his alleged alter ego—were involved in the second course of conduct. But where, as here, the allegations connecting these defendants to the otherwise separate courses of conduct are particularly

---

[6] Here, the Court does not undertake an assessment of the merits of Plaintiffs' claims. *See Manu Int'l, S.A. v. Avon Prod., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981) ("The doctrine of *forum non conveniens* is intended to avoid trial in inappropriate forums, not to avoid meritless suits."). Rather, the Court assesses Plaintiffs' allegations in this context principally to discern any possible logical connection between the two alleged courses of conduct.

thin, their presence will not preclude severance or dismissal for *forum non conveniens*. *See Erausquin*, 806 F. Supp. at 721 (severing claims of one defendant to facilitate dismissal of claims against other defendants for *forum non conveniens* where allegations connecting the defendants were "particularly hollow"); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 214 F.R.D. at 156 (severing claims where allegations of conspiracy between the two groups were thin).

First, as to the FIB Defendants, the Second R&R correctly concluded that the allegations linking the FIB Defendants to the first course of conduct merely describe arms-length transactions—issuing loans and selling debt positions in those loans. *See* Second R&R at 53. The allegations related to the actual diversion of the funds to purchase Mexican bonds, however, make no mention of the FIB Defendants. At most, Plaintiffs allege that the FIB Defendants approved a transfer from All Seas 2 to All Seas Management via intercorporate loan. May 18, 2017 Angelov Decl., Ex. 9.2; TAC ¶¶ 59, 74. But this transfer was at least one step removed from the transfer that actually facilitated the purchase of the Mexican Bonds. TAC ¶¶ 76–78. And Plaintiffs fail to make any non-conclusory allegations that the FIB Defendants approved the initial transfer in order to facilitate purchases with the diverted funds. Accordingly, the insubstantial allegations linking the FIB Defendants to any wrongdoing associated with the first course of conduct does not justify forcing them to litigate in this forum.

Second, as to Harris and Ayr, the Second R&R correctly concluded that the allegations attempting to demonstrate that Harris aided the FIB Defendants in stealing the bankruptcy funds are contradicted by irreconcilable allegations that Harris took actions that would have precluded the FIB Defendants from absconding with the Funds. *See* Second R&R at 56–57. Specifically, Plaintiffs allege that Harris signed the June 4, 2010 swap agreement, which allegedly laid the groundwork for FIB to steal the bankruptcy funds. TAC ¶ 127. But Plaintiffs also allege that Harris attempted to follow through with the agreement, which would have extinguished the FIB Defendants' debt

positions collateralized by the SBP, and was foiled by an external event—the failing Bulgarian banking system.  TAC ¶ 95.

Next, Plaintiffs allege that Harris attempted to have the FIB Loans deemed APD debt in the Bulgarian bankruptcy.  TAC ¶ 128.  But not only did this attempt fail, it did not assist the FIB Defendants in the theft.  Rather, FIB allegedly stole the funds using a forged signature. TAC ¶¶ 180–90.  Thus, Harris' actions are not sufficiently connected to the alleged theft in the second course of conduct.

Finally, Plaintiffs allege that Harris filed a no asset bankruptcy in Texas in order to keep the Funds outside of the Texas bankruptcy court's automatic stay—thus facilitating FIB's theft.  TAC ¶ 225.  But the automatic stay included the Funds when it was issued.  TAC ¶151.  And the Bulgarian bankruptcy court was notified of the stay two days before FIB's alleged theft.  TAC ¶¶151, 153–54.  Plaintiffs plead no logical connection between Harris' actions and FIB's theft.  And absent such a connection, there is no reason for the Court to treat the two separate courses of conduct as related.  Again, the Court is not assessing the merits of Plaintiffs' claims.  But where, as here, there exists only an insignificant link between two separate but parallel courses of conduct, the Court will not treat the separate courses of conduct as a single transaction or occurrence.

### 2.     Common Questions of Law or Fact

Next, the two courses of conduct present separate questions of law and fact, weighing in favor of severance.  The factual allegations describing the alleged diversion of the FIB Loans are separate from the factual allegations that FIB forged a signature to steal the funds from the Bulgarian bankruptcy and then used those funds for the benefit of the Group Two Defendants. While the first course of conduct may have given rise to the bankruptcy proceedings in which FIB allegedly stole the Funds, those facts are little more than background for the second course of conduct.  And, as discussed above, Plaintiffs provide no allegations linking the two courses of

conduct, other than the conclusory allegation that the courses of conduct comprised a single scheme.  There are some overlapping facts between the two courses of conduct—one provides background and context for the other.  But this limited overlap in the facts does not weigh significantly against severance.  The two courses of conduct present largely separate questions of fact.

The two courses of conduct also present entirely separate questions of law.  The first course of conduct will involve legal questions regarding the use of loan proceeds for a purpose other than what was originally intended.  The second course of conduct will involve legal questions regarding whether FIB forged a signature and stole the Funds from the sale of the SBP.  As the Second R&R rightly concluded, these are distinct questions despite the fact that both involve the application of Bulgarian law.  Second R&R at 59.  Accordingly, the two courses of conduct present separate questions of law.  This factor weighs in favor of severance.

### 3. Common Witnesses and Documentary Evidence

Next, the two courses of conduct will likely require substantially separate witnesses and documentary evidence.  The first course of conduct will require documentary evidence of the FIB loans, records of transfers of the funds, and testimony from witnesses who dispersed the FIB Loan funds, transferred the funds, and ultimately used the funds to purchase the Mexican Bonds.  The second course of conduct will require evidence showing how the Funds were transferred, who approved the transfer, and where the Funds were transferred.  This evidence, due to the temporal and topical distinctions between the two courses of action, will be distinct.  The most significant potential overlap appears to be that the FIB Defendants will likely be witnesses and document custodians with respect to both courses of conduct.  But even there, Plaintiffs have not shown that the witnesses describing FIB's actions in both courses of conduct would be the same.  And the documentary evidence that FIB would need to produce would be distinct.  Accordingly, the two

courses of conduct do not involve common witnesses and evidence. This factor weighs in favor of severance.

### 4. Facilitation of Judicial Economy

Next, considerations of judicial economy strongly favor severance. The First R&R concluded, and the Court agrees, that the claims in this case would be more appropriately litigated in Bulgaria. *See Rudersdal*, 2020 WL 5836517, at *10. While the Group One Defendants do not consent to jurisdiction in Bulgaria—requiring litigation of the claims against them in this forum— dismissal of the claims against the Group Two Defendants will streamline the litigation in this forum and potentially better facilitate settlement or trial. Accordingly, this factor weighs in favor of severance.

### 5. Avoidance of Prejudice

Finally, severing the claims in this action would not result in significant prejudice to any party. Plaintiffs argue that they would be prejudiced by being required to litigate in separate fora and that Angleov, Harriot, and their alleged shell companies (All Seas Management, Blue Finance, and Grant Capital) would be prejudiced by being precluded from bringing certain cross claims against the Group Two Defendants. Second R&R at 61.

As to Plaintiffs, any prejudice they may suffer from litigating in two fora pails in comparison to the prejudice and burden to the Group Two Defendants of litigating the claims against them in this forum—hence the dismissal for *forum non conveniens*. And since the vast majority of witnesses and evidence relevant to this case are located in Bulgaria, Plaintiffs' choice to litigate some of the claims in New York, not the Court's ruling on severance, is the cause of any prejudice to them.

As for Angleov and Harriot, neither they, nor their alleged shell companies, have formally appeared in this litigation. Instead, bizarrely, both have submitted declarations, filed by Plaintiffs' counsel, objecting to severance, and vaguely alluding to counter claims each wishes to bring against

16

the Group Two Defendants.  *See* Dkt. Nos. 390, 391.  But the Court will not credit these vague assertions of potential counter claims—especially here, where the parties have declined to so much as appear in this forum.  Accordingly, this factor weighs in favor of severance.

Because each of the above factors weighs in favor of severance, the Court adopts the Second R&R's severance analysis and recommendation in full.  The claims against the Group One Defendants—Harris, Ayr, Angelov, All Seas Management, Blue Finance, Harriot, Grant Capital, and BNYM—are severed from the claims against the Group Two Defendants—the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, Bulgartabac, BNB, the BNB Conservators, the Eaton Vance Defendants, and VTB.  The claims against the Group Two Defendants are dismissed for *forum non conveniens* subject to the same conditions described in the Order.

## V.  CONSPIRACY THEORY OF JURISIDCTION UNDER RULE 4(K)(2)

As an alternative basis for dismissal, Plaintiffs have failed to plead personal jurisdiction over the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, and Bulgartabac— including by means of a conspiracy theory of jurisdiction.  In the Order, the Court directed the parties to address whether a plaintiff pleading personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2) may do so using a so-called conspiracy theory of jurisdiction, whereby the acts of an alleged co-conspirator are imputed to the other members of the conspiracy for jurisdictional purposes.  *See Rudersdal*, 2020 WL 5836517, at *14.  While it need not address this issue given its dismissal for *forum non conveniens*, as dicta, the Court concludes that a plaintiff may use a conspiracy theory of jurisdiction to plead personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2).

This case raises the issue of whether a party may plead a conspiracy theory of jurisdiction consistent with Rule 4(k)(2).  To exercise jurisdiction under Rule 4(k)(2), a plaintiff must show that (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.  Fed. R. Civ. P.

4(k)(2).  Plaintiffs have met the requirements of (A), meaning the only question here is whether exercising jurisdiction is consistent with the Constitution and other U.S. laws.  In two recent cases, the Second Circuit has confirmed that a conspiracy theory of jurisdiction is consistent with the Constitution under certain circumstances.  *See Schwab*, 833 F.3d at 86–87; *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 2021 WL 6143556, at *12 (2d Cir. Dec. 30, 2021)).  Therefore, the only question is whether the exercise of jurisdiction is consistent with other federal statutes.  As neither party has identified a law that would be confounded by the exercise of conspiracy jurisdiction here, and because the Court does not otherwise understand it to violate any applicable federal law, the use of a conspiracy theory of jurisdiction in this case comports with the textual requirements of Rule 4(k)(2).  Accordingly, the Court does not adopt the portion of the Second R&R recommending the opposite conclusion.

Even with a conspiracy theory of jurisdiction, however, Plaintiffs have failed to plead personal jurisdiction over the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, and Bulgartabac.  While Plaintiffs do plead a federal cause of action—namely, a RICO claim—they have not adequately pleaded membership in a conspiracy, or that any of the substantial acts in furtherance of the conspiracy occurred in the relevant jurisdiction—the United States.  The result of this deficient jurisdictional pleading is that Plaintiffs claims against the FIB Defendants, the Peevski Defendants, the Five Bulgarian Companies, and Bulgartabac are subject to dismissal for lack of personal jurisdiction.

### A.    Plaintiffs May Plead a Conspiracy Theory of Jurisdiction Under Rule 4(k)(2)

For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:  (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.  Fed. R. Civ. P. 4(k)(2).  The First R&R concluded, and this

Court agreed, that the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac were not subject to jurisdiction in any state, meaning that the only remaining question for the application of Rule 4(k)(2) is whether "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

Plaintiffs failed to establish general or specific personal jurisdiction over the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac using those defendants' direct contacts. *Rudersdal*, 2020 WL 5836517, at *7. However, under a conspiracy theory of jurisdiction—in which an alleged co-conspirators contacts with a forum are imputed to the other conspirators for jurisdictional purposes—it is possible that the contacts of some of the other defendants could be imputed to the defendants listed above sufficient to create jurisdiction.

In *Schwab*, the Second Circuit adopted the Fourth Circuit's test in *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) for alleging a conspiracy theory of jurisdiction in a way that does not offend due process. *Schwab*, 833 F.3d at 86–87. It held that conspiracy jurisdiction was available and to establish it, a "plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* at 87. But in *Schwab*, the court was applying New York's long-arm statute and did not explicitly address Rule 4(k)(2) or the concerns raised by courts in this district regarding applying the conspiracy theory of jurisdiction to Rule 4(k)(2). In that regard, Judge Lehrburger took an understandable approach in the Second R&R when he concluded that *Schwab* did not hold that a conspiracy theory of jurisdiction is available under Rule 4(k)(2) and that Congress did not intend for such a theory to apply under this rule. *See* Second R&R at 34–35.

Still, *Schwab* answered an important question—the circumstances under which the conspiracy theory of jurisdiction may be pleaded such that it is consistent with the purposeful availment

requirement of due process.  *See Schwab*, 833 F.3d at 86–87.  That is to say, *Schwab* establishes a test under which a plaintiff may plead a conspiracy theory of jurisdiction that is consistent with the Due Process Clause.  Thus, while some district courts (including this one) and scholars may have qualms about the ability of a conspiracy theory of jurisdiction to satisfy due process, the Second Circuit has adopted a test—binding on this court—which, if met, satisfies the necessary constitutional requirements.  *Schwab* found that conspiracy jurisdiction was consistent with Constitutional Due Process.  Thus, applying this test to a conspiracy theory of jurisdiction pleaded under Rule 4(k)(2) would be "consistent with the United States Constitution."  Fed. R. Civ. P. 4(k)(2).

The remaining issue, then, is whether Congress intended Rule 4(k)(2) to include a conspiracy theory of jurisdiction.  Here, the Court need look no further than the text.  Under Rule 4(k)(2), there is no limitation that would exclude an application of a conspiracy theory of jurisdiction.  The language of Rule 4(k)(2) requires (1) a federal claim; (2) an absence of jurisdiction under the long-arm statutes of any state; and (3) compliance with the Constitution and laws of the United States.  Fed. R. Civ. P. 4(k)(2).  Assuming the first two requirements are met, pleading a conspiracy theory of jurisdiction must be compliant with the Constitution and laws of the United States.  Under the test in *Schwab*, a conspiracy theory of jurisdiction would not offend due process.  And absent a statute-specific law that would preclude it, there is no other basis to exclude a conspiracy theory of jurisdiction from cases asserting personal jurisdiction under Rule 4(k)(2).

Courts in this district have been reluctant to extend the conspiracy theory of jurisdiction beyond its use in New York's long-arm statute.  *In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *49 (S.D.N.Y. Mar. 28, 2017) (citing cases).  These courts have raised concerns that using the conspiracy theory of jurisdiction in the Rule 4(k)(2) context would "in effect require the court to rule on the merits" of whether the conspiracy existed.  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 892255, at *5 (S.D.N.Y. Mar 3, 2015); *see also Laydon v. Mizuho Bank, Ltd.*, 2015 WL

151535, at *3 (S.D.N.Y. Mar. 31, 2015) (citing *In re Aluminum Warehousing Antitrust Litig.* 2015 WL 892255, at *5); *Tymoshenko v. Firtash*, 2013 WL 1234943, at *4 (S.D.N.Y. Mar. 27, 2013) (concluding that "although '[w]hether a plaintiff can establish personal jurisdiction over a defendant pursuant to Rule 4(k)(2) through the imputation of contacts of that defendant's putative co-conspirators with the United States has not been [decisively] addressed,' the use of this conspiracy theory has been widely criticized by courts and scholars." (citation omitted)). This Court shares those concerns, but finds it impossible to conclude that conspiracy jurisdiction is inconsistent with the Constitution given the Second Circuit's holding in *Schwab*.

The Second R&R raised a number of valid concerns with applying the conspiracy theory of jurisdiction in Rule 4(k)(2) cases. But none of these concerns provide a basis to divert from the text of Rule 4(k)(2) or the Second Circuit's holding in *Schwab*. First, the Second R&R raised the concern that a conspiracy theory of jurisdiction could be used with federal statutes that do not include a conspiracy element—and relatedly do not define what constitutes a conspiracy under that statute. *See* Second R&R at 38–39. Conversely, the Second R&R raised a concern that the definition of conspiracy for Rule 4(k)(2) purposes could be broader than a statute's specific definition of conspiracy.

The first concern, that the conspiracy theory of jurisdiction will be used in cases arising under federal laws with no conspiracy element is a valid concern, but one that the Court need not address in this case, where Plaintiffs bring a civil RICO claim, which contains a conspiracy element.

The second concern, that the conspiracy theory of jurisdiction would "render irrelevant the specified jurisdictional provisions of individual federal statutes prohibiting conspiracies" reads out the requirement in Rule 4(k)(2) that the exercise of jurisdiction must be consistent with U.S. law. *See* Fed. R. Civ. P. 4(k)(2). If a federal statute contains a specific limitation on the exercise of jurisdiction that would preclude the use of a conspiracy theory of jurisdiction, Rule 4(k)(2) defers to

that law by its own terms.

Finally, the Second R&R raised some concerns regarding forum shopping.  However, since Rule 4(k)(2) allows courts to consider contacts for jurisdictional purposes on a nation-wide basis even without a conspiracy theory of jurisdiction, this concern is more related to Rule 4(k)(2) as a whole, rather than the conspiracy theory of jurisdiction itself.

### B.    Application

Here, while a conspiracy theory of jurisdiction is available to Plaintiffs, they have not presented sufficient facts to support its application here.  The federal cause of action Plaintiffs assert is a civil RICO claim.[7]  To plead a conspiracy theory of jurisdiction under Rule 4(k)(2), they must show that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state[8] to subject that co-conspirator to jurisdiction in that state."  *Schwab*, 833 F.3d at 87.

First, Plaintiffs have failed to plead that the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac were members of a conspiracy that involved U.S.-based acts.  Plaintiffs' argument in favor of jurisdiction relies on pleading a single conspiracy in which the contacts for the first course of action may be imputed for jurisdictional purposes to the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac—who participated in the second course of action.  But as discussed previously, Plaintiffs have pleaded two separate courses of action.  And, even assuming either course of action constituted a conspiracy under RICO, the conspiracies, as pleaded, are separate.  As the second course of action occurred

---

[7] The Second R&R raised a concern that allowing a conspiracy theory of jurisdiction would interfere with RICO statutory jurisdiction provision—18 U.S.C. § 1965. However, "[A] district court relying on § 1965 may only exert this jurisdictional pull over defendants 'residing in any other district,' not foreign defendants. Instead, '[p]laintiffs asserting RICO claims against foreign defendants must rely on the long-arm statute of the state in which they filed suit.'" *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 342–43 (S.D.N.Y. 2015) (citations omitted). Because asserting jurisdiction over foreign defendants in RICO actions involves applying state long-arm statutes, it stands to reason that Rule 4(k)(2) would apply where gaps in those statutes arise.

[8] Applying Rule 4(k)(2), the "state" here refers to the United States as a whole.

only outside of the United States, none of the overt acts in furtherance of that course of action could give rise to personal jurisdiction.

Second, even when analyzing the Defendants' U.S.-based acts, Plaintiffs have not adequately pleaded personal jurisdiction over the FIB Defendants, the Five Bulgarian Companies, the Peevski Defendants, and Bulgartabac.

Plaintiffs' allegations regarding the conspiracy involve U.S. contacts in New York and Texas. TAC ¶¶ 473–524. The New York allegations merely involve bank transactions routed through New York and vague references to travel to New York to discuss matters related to the SBP (though, notably, not specifically the alleged fraud). TAC ¶¶ 487, 490. Neither of these contacts are overt acts in furtherance of any conspiracy.

As to the Texas contacts, these include notarizing the June 4 Swap Agreement between Ayr and FIB for the SBP, TAC ¶ 103; vague allegations of travel to discuss the alleged fraud, TAC ¶ 492; and Harris "fraudulently fil[ing] for [a] "No Asset" bankruptcy on behalf of Ayr under chapter 11 of the United States Code when, in fact, Ayr held the following: (1) APD, and (2) the Funds in CCB in Bulgaria[]," TAC ¶ 494. But none of these actions pleads "overt acts in furtherance of the conspiracy."

The allegations that the June 4 Swap Agreement was made in furtherance of the conspiracy, as the Second R&R correctly concluded, is not reconcilable to the purpose of the overall alleged conspiracy:

> Plaintiffs allege that by signing the June 4, 2010 swap agreement (two-and-a-half years before the SBP was sold) and allegedly knowing that FIB had no valid mortgages on the SBP, Harris laid the groundwork for FIB to seize the $65 million in the Bulgarian bankruptcy proceedings. (Compl. ¶ 127.) Plaintiffs also allege, however, that Harris attempted to consummate the swap deal, which would have extinguished FIB's claims against the SBP and APD, and was foiled because of the failing Bulgarian banking system. (See Compl. ¶¶ 95(a) and (b).)
>
> Those allegations are irreconcilable: if Harris's goal in signing the swap agreement was to give FIB claims against the SBP or APD, he would not have attempted to

consummate the swap agreement, which would have extinguished FIB's claims against the SBP or APD.

Second R&R at 57.

Second, vague allegations of meetings do not plead an overt act, as they do not allege how the "discussions" advanced the conspiracy.

Third, the Third Amended Complaint does not specify how the Texas bankruptcy proceeding was used to further the conspiracy. There is a vague allegation of delay. But the alleged theft occurred as a result of a forged signature. And there is nothing in the complaint that connects the two. *See* Second R&R at 58. At bottom, Plaintiffs' allegations do not explain why filing a no asset bankruptcy in Texas furthered the conspiracy to steal the Funds in the Bulgarian bankruptcy. If Harris had been successful in keeping the Funds out of the Texas bankruptcy stay, then it would have no effect on the Funds in the Bulgarian proceeding. And, even though the Texas bankruptcy court issued a stay, FIB was able to carry out the theft unencumbered. Finally, if Harris had meant to delay the effect of a stay issued from the Texas bankruptcy proceedings, it is unclear why he would have filed the no asset bankruptcy in the first place. These contradictions are unexplained. And without a logical basis, they are insufficient to serve as minimum contacts for jurisdictional purposes.

## VI.   CONCLUSION

For the reasons described above, the Second R&R is adopted in part and modified in part. The claims against the remaining Group Two Defendants are severed and dismissed for *forum non conveniens*.

SO ORDERED.

Dated: January 28, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge